**23-1697, 23-1703**

IN THE

# United States Court of Appeals

## FOR THE FIRST CIRCUIT

◆━◆

ERIC MOORE,

*Plaintiff-Appellee/Cross-Appellant,*

—v.—

INDUSTRIAL DEMOLITION LLC,

*Defendant-Appellant/Cross-Appellee,*

MICHAEL J. ROBERTS,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

## JOINT APPENDIX

THOMAS M. METZGER, No. 1209129
LITTLER MENDELSON, P.C.
41 South High Street, Suite 3250
Columbus, Ohio 43215
(614) 463-4216

ALEXA M. ESPOSITO, No. 1209131
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, Massachusetts 02110
(617) 378-6039

*Attorneys for Defendant-Appellant/*
*Cross-Appellee*

SAMUEL A. KENNEDY-SMITH,
    No. 1165298
MICHAEL J. TURIELLO
JAMIE GOODWIN
DUDDY GOODWIN & POLLARD
446 Main Street, 16th Floor
Worcester, Massachusetts 01608
(508) 523-2632

*Attorneys for Plaintiff-Appellee/*
*Cross-Appellant*

# TABLE OF CONTENTS

PAGE

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA1

Complaint, dated March 17, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA13

Plaintiff's Proposed Voir Dire Jury Instructions, Proposed Verdict
    Form and Other Pretrial Filings, dated April 7, 2023 . . . . . . . . . . . . . . .  JA22

Defendant's Proposed Jury Instructions, dated April 7, 2023 . . . . . . . . . . .  JA45

Defendant's Proposed Jury Verdict Form, dated April 7, 2023 . . . . . . . . . .  JA77

Plaintiff's Supplemental Jury Instructions Regarding Qualified
    Handicap, dated April 13, 2023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA92

Trial Transcript, Day 1, dated April 11, 2023 . . . . . . . . . . . . . . . . . . . . . . . .  JA94

Trial Transcript, Day 2, dated April 12, 2023 . . . . . . . . . . . . . . . . . . . . . . . .  JA236

Trial Transcript, Day 3, dated April 13, 2023 . . . . . . . . . . . . . . . . . . . . . . . .  JA388

Trial Transcript, Day 4, dated April 14, 2023 . . . . . . . . . . . . . . . . . . . . . . . .  JA492

Trial Exhibit and Witness List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA602

**Defense Exhibits:**

    Exhibit 3—
    Saint Anne's Hospital – Medical Records of Eric Moore . . . . . . . . . .  JA603

    Exhibit 4—
    Saint Anne's Hospital – Discharge Instructions . . . . . . . . . . . . . . . . . .  JA609

    Exhibit 17—
    NLRB – Confirmation of signed Settlement Agreement . . . . . . . . . . .  JA611

ii

PAGE

Exhibit 19—
NLRB – Certificate of Compliance – Payments...................  JA618

Exhibit 23—
Eric Moore – 2019 Payroll Records..............................  JA621

Exhibit 27—
2019 W-2 – Eric Moore from Industrial Demolition ..............  JA645

Exhibit 30—
2021 W-2 – Eric Moore from Petro Towery ......................  JA646

Exhibit 34—
Brayton Point Timesheet Tracker
(Eric Moore Deposition Exhibit 2)..............................  JA647

Exhibit 36—
Brayton Closing Letter.........................................  JA649

Exhibit 37—
Medical Records from St. Anne's (full) .........................  JA650

**Plaintiff's Exhibits:**

Exhibit A—
PEX36 2017-11-12 RO Tax Form...............................  JA693

Exhibit B—
PEX37 2019-11-25 E-mail R. Lydon and M. Roberts (Marked for
ID only)......................................................  JA694

Exhibit C—
PEX38 2019-11-25 E-mail R. Lydon and R. Becker...............  JA695

Exhibit K—
PEX46 2020-04-23 E-mail R. Lydon and M. Roberts .............  JA697

Jury Verdict Slip, dated April 14, 2023..............................  JA698

Declaration of Alexandra M. Buckingham, dated May 15, 2023........  JA701

iii

PAGE

Exhibit A to Buckingham Declaration—
2023-04-14 E-mail from A. Buckingham to L. Urso and others . . . . JA705

Exhibit B to Buckingham Declaration—
Call Log . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JA707

Exhibit C to Buckingham Declaration—
Excerpts of Trial Transcript, Day 2, dated April 12, 2023 . . . . . . . . . JA709

Exhibit D to Buckingham Declaration—
Excerpts of Trial Transcript, Day 3, dated April 13, 2023 . . . . . . . . . JA721

Exhibit E to Buckingham Declaration—
Excerpts of Trial Transcript, Day 4, dated April 14, 2023 . . . . . . . . . JA728

Defendant's Notice of Appeal, dated August 21, 2023 . . . . . . . . . . . . . . . JA742

Plaintiff's Notice of Appeal, dated August 22, 2023 . . . . . . . . . . . . . . . . . JA744

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:22-cv-10414-RWZ

| | |
|---|---|
| Moore v. Industrial Demolition LLC et al | Date Filed: 03/17/2022 |
| Assigned to: Judge Rya W. Zobel | Date Terminated: 04/27/2023 |
| Demand: $75,000 | Jury Demand: Plaintiff |
| Case in other court: Bristol Superior Court, 2173CV00859 | Nature of Suit: 442 Civil Rights: Jobs |
|     First Circuit Court of Appeals, 23-01697 | Jurisdiction: Diversity |
|     First Circuit Court of Appeals, 23-01703 | |
| Cause: 28:1446 Notice of Removal | |

**Plaintiff**

**Eric Moore**                      represented by    **Jamie Goodwin**
Duddy, Goodwin & Pollard
446 Main Street
Ste 16th Floor
Worcester, MA 01608
508-523-2632
Email: jg@dgpfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

    **Michael Joseph Turiello**
Duddy, Goodwin & Pollard
446 Main Street
Ste 16th Floor
Worcester, MA 01608
860-999-9394
Email: mt@dgpfirm.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

    **Paul M. Facklam , Jr.**
Sandulli Grace, PC
44 School Street
Suite 1100
Boston, MA 02108
617-763-0500
Fax: 617-523-2527
Email: pfacklam@sandulligrace.com

## JA1

*ATTORNEY TO BE NOTICED*

**Samuel A. Kennedy-Smith**
Lewis Brisbois Bisgaard & Smith
1 Citizens Plaza, Suite 1120
Providence, RI 02903
401-406-3310
Email: sks@dgpfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Industrial Demolition LLC**          represented by    **Thomas M.L. Metzger**
Littler Mendelson, P.C.
41 South High Street
Suite 3250
Columbus, OH 43215
614-463-4216
Fax: 614-573-9795
Email: tmetzger@littler.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alexa Marie Esposito**
Littler Mendelson P.C.
One International Place
Suite 2700
Boston, MA 02110
617-378-6000
Email: aesposito@littler.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael J. Roberts**          represented by    **Thomas M.L. Metzger**
*TERMINATED: 07/26/2022*                            (See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alexa Marie Esposito**
(See above for address)
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

**JA2**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/17/2022 | 1 | NOTICE OF REMOVAL by Industrial Demolition LLC, Michael J. Roberts ( Filing fee: $ 402, receipt number AMADC-9230597 Fee Status: Filing Fee paid) (Attachments: # 1 Exhibit A - State Court Documents, # 2 Exhibit B - Notice of Filing Notice of Removal, # 3 Civil Cover Sheet, # 4 Civil Category Form)(Esposito, Alexa) (Entered: 03/17/2022) |
| 03/17/2022 | 2 | NOTICE of Appearance by Alexa Marie Esposito on behalf of Industrial Demolition LLC, Michael J. Roberts (Esposito, Alexa) (Entered: 03/17/2022) |
| 03/17/2022 | 3 | ELECTRONIC NOTICE of Case Assignment. Judge Rya W. Zobel assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (Finn, Mary) (Entered: 03/17/2022) |
| 03/17/2022 | 4 | Certified Copy of Notice of Removal Provided to Defense Counsel by Email (McManus, Caetlin) (Entered: 03/17/2022) |
| 03/23/2022 | 5 | Assented to MOTION for Extension of Time to File Answer *or Otherwise Respond to Plaintiff's Complaint* by Industrial Demolition LLC, Michael J. Roberts.(Esposito, Alexa) (Entered: 03/23/2022) |
| 03/23/2022 | 6 | Judge Rya W. Zobel: ELECTRONIC ORDER entered granting 5 Motion for Extension of Time to Answer re 5 Assented to MOTION for Extension of Time to File Answer *or Otherwise Respond to Plaintiff's Complaint* All Defendants. (Urso, Lisa) (Entered: 03/23/2022) |
| 03/30/2022 | 7 | STATE COURT Record. (Attachments: # 1 Certificate of Service)(Esposito, Alexa) (Entered: 03/30/2022) |
| 04/14/2022 | 8 | MOTION to Dismiss by Industrial Demolition LLC.(Esposito, Alexa) (Entered: 04/14/2022) |
| 04/14/2022 | 9 | MEMORANDUM in Support re 8 MOTION to Dismiss filed by Industrial Demolition LLC. (Attachments: # 1 Exhibit A - NLRB Case, # 2 Exhibit B - Settlement)(Esposito, Alexa) (Entered: 04/14/2022) |
| 04/14/2022 | 10 | MOTION to Dismiss by Michael J. Roberts.(Esposito, Alexa) (Entered: 04/14/2022) |
| 04/14/2022 | 11 | MEMORANDUM in Support re 10 MOTION to Dismiss filed by Michael J. Roberts. (Attachments: # 1 Declaration of Michael J. Roberts)(Esposito, Alexa) (Entered: 04/14/2022) |
| 04/19/2022 | 12 | NOTICE of Appearance by Samuel A. Kennedy-Smith on behalf of Eric Moore (Kennedy-Smith, Samuel) (Entered: 04/19/2022) |
| 04/25/2022 | 13 | First MOTION for Extension of Time to May 12, 2022 to Oppose Pending MTDs by Eric Moore.(Kennedy-Smith, Samuel) (Entered: 04/25/2022) |
| 04/29/2022 | 14 | Judge Rya W. Zobel: ELECTRONIC ORDER entered granting 13 Motion for Extension of Time to 5/12/22. (Urso, Lisa) (Entered: 04/29/2022) |
| 05/04/2022 | 15 | |

| | | |
|---|---|---|
| | | First Opposition re 8 MOTION to Dismiss *of Industrial Demolition* filed by Eric Moore. (Attachments: # 1 Memorandum in support, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C)(Kennedy-Smith, Samuel) (Entered: 05/04/2022) |
| 05/04/2022 | 16 | First MEMORANDUM in Opposition re 10 MOTION to Dismiss *of Roberts* filed by Eric Moore. (Attachments: # 1 Memorandum in support, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C)(Kennedy-Smith, Samuel) (Entered: 05/04/2022) |
| 05/17/2022 | 17 | Assented to MOTION for Leave to File *Leave to File Reply in Support of Individual Defendant Michael J. Roberts' Motion to Dismiss* by Michael J. Roberts.(Esposito, Alexa) (Entered: 05/17/2022) |
| 05/24/2022 | 18 | Judge Rya W. Zobel: ELECTRONIC ORDER entered granting 17 Assented to MOTION for Leave to File Leave to File Reply in Support of Individual Defendant Michael J. Roberts' Motion to Dismiss; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Pezzarossi, Lisa) (Entered: 05/24/2022) |
| 05/26/2022 | 19 | REPLY to Response to 10 MOTION to Dismiss filed by Michael J. Roberts. (Esposito, Alexa) (Entered: 05/26/2022) |
| 06/15/2022 | 20 | ELECTRONIC NOTICE Setting Hearing on Motion 10 MOTION to Dismiss , 8 MOTION to Dismiss : Motion Hearing set for 6/29/2022 02:30 PM in Courtroom 12 (In person only) before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 06/15/2022) |
| 06/15/2022 | 21 | ELECTRONIC NOTICE Resetting Hearing on Motion 10 MOTION to Dismiss , 8 MOTION to Dismiss : Motion Hearing REset for 7/14/2022 02:30 PM in Courtroom 12 (In person only) before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 06/15/2022) |
| 06/28/2022 | 22 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Thomas M. L. Metzger Filing fee: $ 100, receipt number AMADC-9388463 by Industrial Demolition LLC, Michael J. Roberts. (Attachments: # 1 Exhibit A - Affidavit)(Esposito, Alexa) (Entered: 06/28/2022) |
| 06/28/2022 | 23 | Judge Rya W. Zobel: ELECTRONIC ORDER entered **ALLOWING** 22 Motion for Leave to Appear Pro Hac Vice Added Thomas M.L. Metzger. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (Warnock, Douglas) (Entered: 06/28/2022) |
| | | |

| | | |
|---|---|---|
| 07/14/2022 | 24 | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel: Motion Hearing held on 7/14/2022 re 10 MOTION to Dismiss filed by Michael J. Roberts, 8 MOTION to Dismiss filed by Industrial Demolition LLC. Judge hears parties and takes motions under advisement; (Court Reporter: Kathleen Silva at kathysilva@verizon.net.)(Attorneys present: Kennedy-Smith, Metger & Esposito) (Urso, Lisa) (Entered: 07/14/2022) |
| 07/26/2022 | 25 | Judge Rya W. Zobel: ENDORSED ORDER entered granting as to Count 7 and denying as to all other counts 8 Motion to Dismiss; granting 10 Motion to Dismiss without prejudice (Urso, Lisa) Modified on 7/26/2022 (Urso, Lisa). (Entered: 07/26/2022) |
| 07/29/2022 | 26 | Assented to MOTION for Extension of Time to August 22, 2022 to File Answer by Industrial Demolition LLC.(Esposito, Alexa) (Entered: 07/29/2022) |
| 08/22/2022 | 27 | *Defendant Industrial Demolition's* ANSWER to Complaint *of Plaintiff Eric Moore* by Industrial Demolition LLC.(Esposito, Alexa) (Entered: 08/22/2022) |
| 08/23/2022 | 28 | ELECTRONIC NOTICE of Scheduling ConferenceFurther Scheduling Conference set for 9/7/2022 02:00 PM before Judge Rya W. Zobel. (by phone) (Urso, Lisa) (Entered: 08/23/2022) |
| 08/31/2022 | 29 | JOINT STATEMENT re scheduling conference . (Esposito, Alexa) (Entered: 08/31/2022) |
| 09/07/2022 | 30 | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel: Further Scheduling Conference held on 9/7/2022, ( Final Pretrial Conference set for 3/22/2023 02:00 PM before Judge Rya W. Zobel., Jury Trial set for 4/11/2023 09:00 AM in Courtroom 12 (In person only) before Judge Rya W. Zobel.). 2 days (Court Reporter: No Court Reporter Used.)(Attorneys present: Kennedy-Smith & Esposito) (Urso, Lisa) (Entered: 09/08/2022) |
| 12/01/2022 | 31 | Judge Rya W. Zobel: ELECTRONIC ORDER entered granting 26 Motion for Extension of Time to Answer re 26 Assented to MOTION for Extension of Time to August 22, 2022 to File Answer Industrial Demolition LLC answer due 8/22/2022. (Urso, Lisa) (Entered: 12/01/2022) |
| 01/17/2023 | 32 | NOTICE of Appearance by Paul M. Facklam, Jr on behalf of Eric Moore (Facklam, Paul) (Entered: 01/17/2023) |
| 03/15/2023 | 33 | First MOTION to Amend *Complaint* by Eric Moore.(Goodwin, Jamie) (Entered: 03/15/2023) |
| 03/15/2023 | 34 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael Turiello Filing fee: $ 125, receipt number AMADC-9761558 by Eric Moore.(Goodwin, Jamie) (Entered: 03/15/2023) |
| 03/15/2023 | 35 | Joint MOTION for Extension of Time to 03/17/2023 to File Pretrial Memorandum by Eric Moore.(Goodwin, Jamie) (Entered: 03/15/2023) |
| 03/17/2023 | 36 | AFFIDAVIT of Michael Turiello in Support re 34 MOTION for Leave to Appear Pro Hac Vice for admission of Michael Turiello Filing fee: $ 125, receipt number AMADC-9761558 filed by Eric Moore. (Warnock, Douglas) (Entered: 03/17/2023) |

| 03/17/2023 | 37 | Judge Rya W. Zobel: ELECTRONIC ORDER entered **ALLOWING** 34 Motion for Leave to Appear Pro Hac Vice Added Michael Turiello.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(Warnock, Douglas) (Entered: 03/17/2023) |
| 03/17/2023 | 38 | PRETRIAL MEMORANDUM by Eric Moore. (Goodwin, Jamie) (Entered: 03/17/2023) |
| 03/22/2023 | 39 | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel: Final Pretrial Conference held on 3/22/2023, ( Jury Trial set for 4/10/2023 09:00 AM in Courtroom 12 (In person only) before Judge Rya W. Zobel.). 1 week; 10 jurors; question and requests by 4/7/23; (Court Reporter: None.) (Attorneys present: Goodwin, Metzger & Espisito) (Urso, Lisa) (Entered: 03/22/2023) |
| 03/22/2023 | 41 | Judge Rya W. Zobel: ELECTRONIC ORDER entered denying 33 Motion to Amend; granting 35 Motion for Extension of Time (Urso, Lisa) (Entered: 03/27/2023) |
| 03/24/2023 | 40 | MOTION in Limine *to Exclude Certain Evidence* by Eric Moore.(Goodwin, Jamie) Docket text modified for clarity on 3/27/2023 (McManus, Caetlin). (Entered: 03/24/2023) |
| 03/29/2023 | 42 | Set/Reset Hearings: Jury Trial set for 4/11/2023 09:00 AM in Courtroom 12 (In person only) before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 03/29/2023) |
| 03/31/2023 | 43 | MOTION in Limine *(Omnibus)* by Industrial Demolition LLC. (Attachments: # 1 Exhibit 1 - Roberts Transcript, # 2 Exhibit 2 - Moore Transcript, # 3 Exhibit 3 - Interrogatory Answers, # 4 Exhibit 4 - NLRB Settlement, # 5 Exhibit 5 - Payment)(Esposito, Alexa) (Entered: 03/31/2023) |
| 04/04/2023 | 44 | TRIAL BRIEF by Industrial Demolition LLC. (Attachments: # 1 Exhibit 1 - Deposition of Eric Moore, # 2 Moore Deposition Exhibit 2, # 3 Moore Deposition Exhibit 3, # 4 Moore Deposition Exhibit 4, # 5 Moore Deposition Exhibit 5, # 6 Moore Deposition Exhibit 6, # 7 Moore Deposition Exhibit 7, # 8 Moore Deposition Exhibit 8)(Esposito, Alexa) (Entered: 04/04/2023) |
| 04/05/2023 | 45 | MOTION to Bifurcate Trial on Issue of Punitive Damages by Industrial Demolition LLC.(Esposito, Alexa) (Entered: 04/05/2023) |
| 04/05/2023 | 46 | RESPONSE to Motion re 40 MOTION in Limine filed by Industrial Demolition LLC. (Attachments: # 1 Exhibit Eric Moore Deposition)(Esposito, Alexa) (Entered: 04/05/2023) |
| 04/05/2023 | 47 | Opposition re 45 MOTION to Bifurcate Trial on Issue of Punitive Damages filed by Eric Moore. (Goodwin, Jamie) (Entered: 04/05/2023) |

| 04/05/2023 | 48 | TRIAL BRIEF by Eric Moore. (Goodwin, Jamie) (Entered: 04/05/2023) |
|---|---|---|
| 04/06/2023 | 49 | Opposition re 43 MOTION in Limine *(Omnibus)* filed by Eric Moore. (Goodwin, Jamie) (Entered: 04/06/2023) |
| 04/07/2023 | 50 | Proposed Jury Instructions by Eric Moore. (Goodwin, Jamie) (Entered: 04/07/2023) |
| 04/07/2023 | 51 | Proposed Jury Instructions by Industrial Demolition LLC. (Esposito, Alexa) (Entered: 04/07/2023) |
| 04/07/2023 | 52 | Proposed Jury Verdict by Industrial Demolition LLC. (Metzger, Thomas) (Entered: 04/07/2023) |
| 04/09/2023 | 53 | MOTION for Leave to File *Response in Support of Defendant Industrial Demolition LLC's Omnibus Motion In Limine* by Industrial Demolition LLC. (Attachments: # 1 Exhibit A - Proposed Response)(Esposito, Alexa) (Entered: 04/09/2023) |
| 04/09/2023 | 54 | Proposed Voir Dire by Industrial Demolition LLC. (Esposito, Alexa) (Entered: 04/09/2023) |
| 04/10/2023 | 55 | Judge Rya W. Zobel: ENDORSED ORDER entered denying 45 Motion to bifurcate trial (Urso, Lisa) (Entered: 04/10/2023) |
| 04/10/2023 | 56 | Judge Rya W. Zobel: PRETRIAL ORDER entered. (Warnock, Douglas) (Entered: 04/10/2023) |
| 04/11/2023 | 57 | Set/Reset Hearings: Jury Trial Day 2 set for 4/12/2023 09:00 AM in Courtroom 12 (In person only) before Judge Rya W. Zobel. Jury Trial Day 3 set for 4/13/2023 09:00 AM in Courtroom 12 (In person only) before Judge Rya W. Zobel. Jury Trial Day 4 set for 4/14/2023 09:00 AM in Courtroom 12 (In person only) before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 04/11/2023) |
| 04/11/2023 | 58 | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel: Jury Trial Day 1 held on 4/11/2023. Jury of 10 selected and sworn; Plaitnif's opening; defendant's opening; plaintiff's witness #1 Heather Minton; direct; & cross; partial rulings on Docket #s 40 and 43. The Judge essentially denied Plaintiffs Motion in Limine (# 40) as to the complaint and insurance notice of denial as moot, and also denied it as to the NLRB investigation affidavit and NLRB settlement. Regarding Defendants Motion in Limine (# 43) the Judge allowed the motion to exclude Plaintiffs expert Craig Moore. (Court Reporter: James Gibbons at jamesgibbonsrpr@gmail.com.)(Attorneys present: various) (Urso, Lisa) (Entered: 04/12/2023) |
| 04/12/2023 | 60 | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel: Jury Trial Day 2 held on 4/12/2023. continued cross; redirect; witness #2 Eric Moore direct; cross; redirect; recross; plaintiff rests; defendant's witness #1 Rebecca Lydon; (Court Reporter: Kelly Mortellite at mortellite@gmail.com.) (Attorneys present: various) (Urso, Lisa) (Entered: 04/13/2023) |
| 04/13/2023 | 59 | Proposed Jury Instructions by Eric Moore. (Goodwin, Jamie) (Entered: 04/13/2023) |

| 04/13/2023 | 61 | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel: Jury Trial Day three held on 4/13/2023. continued direst of Rebecca Lydon; cross; redirect; witness #2 Michael Roberts; direct; cross; Defendant rests; (Court Reporter: Kristin Kelley at kmob929@gmail.com.)(Attorneys present: various) (Urso, Lisa) (Entered: 04/18/2023) |
| --- | --- | --- |
| 04/14/2023 | 62 | Electronic Clerk's Notes for proceedings held before Judge Rya W. Zobel: Jury Trial day 4 completed on 4/14/2023. defendant's closing; plaintiff's closing; both sides verbally ask for motion as directed verdict; Judge reserves; Jury verdict; 2:30 Jury Verdict; (Court Reporter: Kathleen Silva at kathysilva@verizon.net.)(Attorneys present: various) (Urso, Lisa) (Entered: 04/18/2023) |
| 04/14/2023 | 63 | Exhibit List by All Parties.. (Urso, Lisa) (Entered: 04/18/2023) |
| 04/14/2023 | 64 | JURY VERDICT in favor of plaintiff against Industrial Demo. (Urso, Lisa) (Entered: 04/18/2023) |
| 04/18/2023 | 65 | Judge Rya W. Zobel: ORDER entered. JUDGMENT entered. (Urso, Lisa) (Entered: 04/18/2023) |
| 04/24/2023 | 66 | Transcript of Jury Trial Day 4 held on April 14, 2023, before Judge Rya W. Zobel. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kathleen Silva at kathysilva@verizon.net. Redaction Request due 5/15/2023. Redacted Transcript Deadline set for 5/25/2023. Release of Transcript Restriction set for 7/24/2023. (McDonagh, Christina) (Entered: 04/24/2023) |
| 04/24/2023 | 67 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 04/24/2023) |
| 04/28/2023 | 68 | MOTION for Attorney Fees & Costs by Eric Moore. (Attachments: # 1 Appendix)(Goodwin, Jamie) (Entered: 04/28/2023) |
| 04/28/2023 | 69 | Transcript of Jury Trial Day Two held on April 12, 2023, before Judge Rya W. Zobel. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 5/19/2023. Redacted Transcript Deadline set for 5/30/2023. Release of Transcript Restriction set for 7/27/2023. (McDonagh, Christina) (Entered: 05/01/2023) |
| 05/01/2023 | 70 | Transcript of Jury Trial Day Three held on April 13, 2023, before Judge Rya W. Zobel. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kathleen Silva at kathysilva@verizon.net. Redaction Request due 5/22/2023. Redacted Transcript Deadline set for 6/1/2023. Release of Transcript Restriction set for 7/31/2023. (McDonagh, Christina) (Entered: 05/01/2023) |

JA8

| | | |
|---|---|---|
| 05/01/2023 | 71 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 05/01/2023) |
| 05/10/2023 | 72 | Assented to MOTION for Extension of Time to May 23, 2023 to File Response/Reply as to 68 MOTION for Attorney Fees & Costs by Industrial Demolition LLC.(Esposito, Alexa) (Entered: 05/10/2023) |
| 05/12/2023 | 73 | Judge Rya W. Zobel: ELECTRONIC ORDER entered granting 72 Motion for Extension of Time to File Response/Reply re 72 Assented to MOTION for Extension of Time to May 23, 2023 to File Response/Reply as to 68 MOTION for Attorney Fees & Costs , 68 MOTION for Attorney Fees & Costs Responses due by 5/23/2023 (Urso, Lisa) (Entered: 05/12/2023) |
| 05/12/2023 | 74 | MOTION for New Trial *on Punitiive Damages* by Eric Moore.(Goodwin, Jamie) (Entered: 05/12/2023) |
| 05/12/2023 | 75 | MOTION to Amend *Judgment* by Eric Moore.(Goodwin, Jamie) (Entered: 05/12/2023) |
| 05/15/2023 | 76 | MOTION for Judgment as a Matter of Law *or, in the Alternative, for a New Trial or, in the Alternative, for a Remittitur* by Industrial Demolition LLC. (Esposito, Alexa) (Entered: 05/15/2023) |
| 05/15/2023 | 77 | MEMORANDUM in Support re 76 MOTION for Judgment as a Matter of Law *or, in the Alternative, for a New Trial or, in the Alternative, for a Remittitur* filed by Industrial Demolition LLC. (Esposito, Alexa) (Entered: 05/15/2023) |
| 05/15/2023 | 78 | DECLARATION of *Alexandra M. Buckingham* by Industrial Demolition LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Esposito, Alexa) (Entered: 05/15/2023) |
| 05/17/2023 | 79 | Assented to MOTION for Extension of Time to June 14, 2023 to File Response/Reply as to 74 MOTION for New Trial *on Punitiive Damages* by Industrial Demolition LLC.(Esposito, Alexa) (Entered: 05/17/2023) |
| 05/17/2023 | 80 | Assented to MOTION for Extension of Time to June 14, 2023 to File Response/Reply as to 75 MOTION to Amend *Judgment* by Industrial Demolition LLC.(Esposito, Alexa) (Entered: 05/17/2023) |
| 05/19/2023 | 81 | MOTION for Extension of Time to 06/02/2023 to File Response/Reply *Oppose New JML/Trial/Remittur* by Eric Moore.(Goodwin, Jamie) (Entered: 05/19/2023) |
| 05/23/2023 | 82 | Opposition re 68 MOTION for Attorney Fees & Costs filed by Industrial Demolition LLC. (Attachments: # 1 Exhibit A - Trial Transcript, # 2 Exhibit B - Discovery, # 3 Exhibit C - Rate Report, # 4 Exhibit D - Response Letter) (Esposito, Alexa) (Entered: 05/23/2023) |
| 05/31/2023 | 83 | Judge Rya W. Zobel: ELECTRONIC ORDER entered granting 79 Motion for Extension of Time to File Response/Reply re 79 Assented to MOTION for Extension of Time to June 14, 2023 to File Response/Reply as to 74 MOTION |

## JA9

| | | |
|---|---|---|
| | | for New Trial *on Punitiive Damages* , 80 Assented to MOTION for Extension of Time to June 14, 2023 to File Response/Reply as to 75 MOTION to Amend *Judgment* , 74 MOTION for New Trial *on Punitiive Damages*, 75 MOTION to Amend *Judgment* ; granting 80 Motion for Extension of Time to File Response/Reply re 79 Assented to MOTION for Extension of Time to June 14, 2023 to File Response/Reply as to 74 MOTION for New Trial *on Punitive Damages* , 80 Assented to MOTION for Extension of Time to June 14, 2023 to File Response/Reply as to 75 MOTION to Amend *Judgment* , 74 MOTION for New Trial *on Punitiive Damages*, 75 MOTION to Amend *Judgment* Responses due by 6/14/2023 (Urso, Lisa) (Entered: 05/31/2023) |
| 06/02/2023 | 84 | REPLY to Response to 68 MOTION for Attorney Fees *& Costs by Defendant* filed by Eric Moore. (Goodwin, Jamie) (Entered: 06/02/2023) |
| 06/02/2023 | 85 | Opposition re 76 MOTION for Judgment as a Matter of Law *or, in the Alternative, for a New Trial or, in the Alternative, for a Remittitur* filed by Eric Moore. (Goodwin, Jamie) (Entered: 06/02/2023) |
| 06/14/2023 | 86 | Opposition re 74 MOTION for New Trial *on Punitiive Damages* filed by Industrial Demolition LLC. (Esposito, Alexa) (Entered: 06/14/2023) |
| 06/14/2023 | 87 | Opposition re 75 MOTION to Amend *Judgment* filed by Industrial Demolition LLC. (Esposito, Alexa) (Entered: 06/14/2023) |
| 07/05/2023 | 88 | ELECTRONIC NOTICE Setting Hearing on Motion 68 MOTION for Attorney Fees *& Costs* : Motion Hearing set for 7/31/2023 02:00 PM in Courtroom 12 before Judge Rya W. Zobel. (Warnock, Douglas) (Entered: 07/05/2023) |
| 07/11/2023 | 89 | ELECTRONIC NOTICE Resetting Hearing on Motion 68 MOTION for Attorney Fees *& Costs* : Motion Hearing REset for 8/3/2023 02:30 PM in Courtroom 12 (In person only) before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 07/11/2023) |
| 07/12/2023 | 90 | ELECTRONIC NOTICE Resetting Hearing on Motion 68 MOTION for Attorney Fees *& Costs* : Motion Hearing set for 8/31/2023 09:30 AM in Courtroom 12 (In person only) before Judge Rya W. Zobel. (time change only) (Urso, Lisa) (Entered: 07/12/2023) |
| 07/13/2023 | 91 | ELECTRONIC NOTICE Resetting Hearing on Motion 68 MOTION for Attorney Fees *& Costs* : Motion Hearing set for 8/3/2023 09:30 AM in Courtroom 12 (In person only) before Judge Rya W. Zobel. (Urso, Lisa) (Entered: 07/13/2023) |
| 07/25/2023 | 92 | Judge Rya W. Zobel: ENDORSED ORDER entered denying 74 Motion for New Trial; denying 75 Motion to Amend; denying 76 Motion for Judgment as a Matter of Law (Urso, Lisa) (Entered: 07/25/2023) |
| 08/21/2023 | 93 | NOTICE OF APPEAL re 65 Judgment, 92 Electronic Order denying 74 Motion for New Trial; denying 75 Motion to Amend; denying 76 Motion for Judgment as a Matter of Law by Industrial Demolition LLC. Filing fee: $ 505, receipt number AMADC-10001353 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov |

## JA10

| | | MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 9/11/2023. (Esposito, Alexa) Modified on 8/22/2023 to create links to orders being appealed (Pacho, Arnold). (Entered: 08/21/2023) |
|---|---|---|
| 08/22/2023 | 94 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 93 Notice of Appeal. (Pacho, Arnold) (Entered: 08/22/2023) |
| 08/22/2023 | 95 | NOTICE OF APPEAL of 65 Judgment, 92 Electronic Order denying 74 Motion for New Trial; denying 75 Motion to Amend; denying 76 Motion for Judgment as a Matter of Law by Eric Moore. Filing fee: $ 505, receipt number AMADC-10002426 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 9/11/2023. (Goodwin, Jamie) Modified on 8/23/2023 to create links to orders being appealed (Pacho, Arnold). (Entered: 08/22/2023) |
| 08/22/2023 | 96 | USCA Case Number 23-1697 for 93 Notice of Appeal, filed by Industrial Demolition LLC. (Pacho, Arnold) (Entered: 08/22/2023) |
| 08/23/2023 | 97 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 95 Notice of Appeal. (Pacho, Arnold) (Entered: 08/23/2023) |
| 08/24/2023 | 98 | USCA Case Number 23-1703 for 95 Notice of Appeal, filed by Eric Moore. (Pacho, Arnold) (Entered: 08/24/2023) |
| 08/25/2023 | 99 | Transcript of Jury Trial Day 1 held on April 11, 2023, before Judge Rya W. Zobel. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: James Gibbons at jamesgibbonsrpr@gmail.com. Redaction Request due 9/15/2023. Redacted Transcript Deadline set for 9/25/2023. Release of Transcript Restriction set for 11/24/2023. (McDonagh, Christina) (Entered: 08/25/2023) |
| 08/25/2023 | 100 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 08/25/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/29/2023 13:39:43 | | |
| **PACER Login:** | ambuckingham | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-10414-RWZ |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

**JA12**

## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss

SUPERIOR COURT

Docket No.:

Eric Moore,
      Plaintiff

vs.

Industrial Demolition LLC and
Michael J. Roberts,
      Defendants

### COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

This action is brought by the Plaintiff Eric Moore ("the Plaintiff") against the Defendants Industrial Demolition LLC ("Industrial Demolition") and Michael J. Roberts ("Roberts") (collectively "the Defendants") alleging: disability discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"); failure to accommodate, disability discrimination, and retaliation in violation of G.L. c. 151B; retaliation in violation of the Family and Medical Leave Act ("FMLA"); retaliation in violation of G.L. c. 152; retaliation in violation of G.L. c. 149; wrongful termination in violation of public policy; breach of contract; and quantum meruit.

### PARTIES

1.    The Plaintiff is an individual with a residence in the state of Kentucky.

2.    The Defendant Industrial Demolition is a company that performs demolition and redevelopment projects around the country.  It is incorporated in the state of Missouri and its principal office is located at 1650 Des Peres Road, Suite 303, St. Louis, MO.  The Defendant Roberts is the owner and a manager of Industrial Demolition, and he resides at 700 Lewis Road,

1

**JA13**

Eureka, MO.  Upon information and belief, the other manager of Industrial Demolition, Tom
Roberts, also resides in Missouri.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction of the dispute as the damages claimed will be of a value
greater than $50,000 and pursuant to its powers in equity.  See G.L. c. 212, § 1 et seq.

4.      Venue in this District is proper as the events giving rise to the Plaintiff's claims
occurred in Bristol County.

## FACTUAL ALLEGATIONS

5.      The Plaintiff was hired by Industrial Demolition on or around September 3, 2018.
He was assigned to work in the position of Driver/Laborer at a job site in Lawrenceberg, Indiana.

6.      After he was hired, the Plaintiff learned that his supervisor Roger Oberkramer
("Oberkramer") regularly used graphic slurs based on race (including the n word), gender, sexual
orientation and ethnicity.

7.      In March of 2019, the Lawrenceberg project ended. Around that time, Oberkramer
offered the Plaintiff continued employment at the Defendant's Brayton Point job site in Somerset,
Massachusetts. The Plaintiff initially declined that offer because he was not comfortable working
for Oberkramer and because his wife was pregnant.

8.      In June 2019, Oberkramer again offered the Plaintiff a position at the Brayton Point
job site, but this time offered an additional $1,000 per week in pay.  The Plaintiff accepted this
offer because he needed the additional income to support his new child.

9.      In early July 2019, the Plaintiff traveled to Massachusetts and began work at
Brayton Point.  Shortly after he arrived, his family joined him and they eventually leased a house
in Westport, Massachusetts.

2

**JA14**

10.     On December 7, 2019, the Plaintiff injured his right hip at work while moving furniture and large appliances.  His hip became increasingly sore throughout the workday.  When the Plaintiff awoke the next morning, December 8, 2019, he could not walk without limping.

11.     On December 9, 2019, the Plaintiff awoke early in the morning in excruciating pain.  Consequently, he went to the Emergency Room.  The Plaintiff called Oberkramer to inform him that he would not be at work due to his injury.  Oberkramer responded by stating, "let me know when you can work."

12.     The Plaintiff received a CT scan, which revealed that he had torn a muscle in his hip.  The Plaintiff's doctor informed the Plaintiff that he could not perform strenuous work, but that he could work modified duty (such as operating machinery).  The Plaintiff contacted Industrial Demolition's Chief Operating Officer, Rebecca Lydon ("Lydon"), who informed him that they could accommodate those restrictions if the Plaintiff supplied a doctor's note.

13.     The Plaintiff returned to work the next day, Tuesday, December 10, 2019, and conveyed the same restrictions to Oberkramer.  He proceeded to work from that Tuesday through Friday under those restrictions.

14.     On Friday, December 13, 2019, Oberkramer asked the Plaintiff and the group he was working with to exit their trucks and use their hands to clear debris.  Oberkramer said to the Plaintiff in particular, "I don't give a fuck what the office has to say, get out there and use your hands to get the job done.  We need production."  The Plaintiff followed Oberkramer's order despite his injury.

15.     Towards the end of the Plaintiff's shift that day, Oberkramer started yelling at the Plaintiff and a coworker while they were parking a machine.  Oberkramer proceeded to criticize the Plaintiff's work restrictions, stating that the Plaintiff was "jerking off in a machine all day" and

that Oberkramer could have done the job himself.  Oberkramer then said that he did not need the Plaintiff anymore.  He stated that the Plaintiff should not return to work and stated that he should call the office.

16.    On Monday, December 16, 2019, the Plaintiff called the office and told the owner of Industrial Demolition, Mike Roberts ("Roberts"), what happened with Oberkramer.  Roberts agreed that the incident should not have occurred and that he would talk to Lydon about it.

17.    The next day, December 17, 2019, Roberts called the Plaintiff back.  The Plaintiff explained that Oberkramer had fired him for following his work restriction.  He also stated that Oberkramer was creating a hostile work environment.  Specifically, the Plaintiff mentioned that Oberkramer bullies, belittles, and harasses employees, often using profanity and racial and derogatory slurs in the workplace.

18.    Roberts responded that Oberkramer may be "a little rough around the edges," but he was a good supervisor and gets the job done.  Roberts told the Plaintiff that the reason he had been sent home because he had discussed his wages with other employees.  He also stated that Oberkramer would be maintaining his supervisory role with Industrial Demolition.

19.    After the Plaintiff's termination, Oberkramer told multiple employees that they should not discuss their wages and that discussing wages is what led to the Plaintiff's termination.

20.    In or around March 2020, Oberkramer told multiple employees that they should stop talking to the Plaintiff and stop providing him with information.

21.    On March 13, 2020, the Plaintiff filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"), later docketed as MCAD #20BEM00971 and EEOC #16C-2020-01363.  On November 4, 2020, the MCAD granted the Plaintiff's request to withdraw the dispute in order to file a private right of action in civil court.

22.    On November 17, 2021, the Plaintiff received authorization from the Fair Labor

Division of the Office of Attorney General to file a private right to action.

## CAUSES OF ACTION

### COUNT I – FAILURE TO ACCOMMODATE IN VIOLATION OF G.L. c. 151B

23.    Based on the foregoing, the Defendant failed to accommodate the Plaintiff pursuant

to G.L. c. 151B, § 4(16) in that: (1) The Plaintiff was a qualified handicapped person; (2) He

needed a reasonable accommodation due to his handicap to transition back to work; (3) The

Defendants were aware of his handicap and that he needed a reasonable accommodation; (4) The

Defendants was also aware of a means to reasonably accommodate his handicap, and,

alternatively, failed to investigate a means to reasonably accommodate his handicap; and (5) The

Defendant failed to provide a reasonable accommodation.  Consequently, the Plaintiff suffered

damages.

### COUNT II – DISABILITY DISCRIMINATION IN VIOLATION OF G.L. c. 151B

24.    Plaintiff reasserts herein each allegation in paragraphs 1 through 22 as if set forth

fully in this count of the Complaint.

25.    Additionally, and/or alternatively, the Plaintiff asserts that pursuant to G.L. c. 151B,

§ 4(16): (1) He is a qualified handicapped person within the meaning of the law; (2) The

Defendants knew he was a handicapped person within the meaning of the law; (3) He was qualified

to perform the essential functions of the position with or without a reasonable accommodation;

and (4) The Defendants terminated him because of his disability.  Consequently, the Plaintiff

suffered damages.

**JA17**

### COUNT III – RETALIATION IN VIOLATION OF G.L. c. 151B

26.     Plaintiff reasserts herein each allegation in paragraphs 1 through 22 as if set forth fully in this count of the Complaint.

27.     Additionally, and/or alternatively, the Plaintiff asserts that pursuant to G.L. c. 151B, § 4(4): (1) He engaged in protected activity when he took a leave of absence and/or requested a workplace accommodation; (2) He thereafter suffered an adverse employment action; and (3) A causal connection exists between his protected activity and that adverse action.  Consequently, the Plaintiff suffered damages.

### COUNT IV – RETALIATION IN VIOLATION OF G.L. c. 152

28.     Plaintiff reasserts herein each allegation in paragraphs 1 through 22 as if set forth fully in this count of the Complaint.

29.     Additionally, and/or alternatively, the Plaintiff asserts that pursuant to G.L. c. 152, § 75B(2): (1) He engaged in protected activity when he notified the Defendants of a potential industrial accident; (2) The Defendants were aware of that protected activity; (3) The Defendants thereafter took an adverse employment action against him; and (3) A causal connection exists between his protected activity and that adverse action.  Consequently, the Plaintiff suffered damages.

### COUNT V – EARNED SICK TIME RETALIATION

30.     Plaintiff reasserts herein each allegation in paragraphs 1 through 22 as if set forth fully in this count of the Complaint.

31.     Additionally, and/or alternatively, the Plaintiff asserts that pursuant to G.L. c. 149, §§ 148C(i), 150: (1) He engaged in protected conduct when he requested to take sick time under Massachusetts earned sick time laws; (2) He was thereafter terminated; and (3) A causal

6

**JA18**

connection existed between that protected activity and his termination. Consequently, the Plaintiff
suffered damages.

### COUNT VI – RETALIATION IN VIOLATION OF G.L. c. 149

32.    Plaintiff reasserts herein each allegation in paragraphs 1 through 22 as if set forth
fully in this count of the Complaint.

33.    Additionally, and/or alternatively, the Plaintiff asserts that pursuant to G.L. c. 149,
§ 105A(c): (1) He engaged in protected activity when he inquired about, discussed, or disclosed
information about wages; (2) The Defendants thereafter took an adverse employment action
against him; and (3) A causal connection exists between his protected activity and that adverse
action. Consequently, the Plaintiff suffered damages.

### COUNT VII – WRONGFUL TERMINATION
### IN VIOLATION OF PUBLIC POLICY

34.    Plaintiff reasserts herein each allegation in paragraphs 1 through 22 as if set forth
fully in this count of the Complaint.

35.    Additionally, and/or alternatively, the Defendants wrongfully terminated the
Plaintiff in violation of public policy because: (1) It retaliated against the Plaintiff after he raised
complaints about the Defendant's failure to accommodate his disability; (2) Thereby, it terminated
the Plaintiff in violation of well-defined public policies. Consequently, the Plaintiff suffered
damages.

### COUNT VIII – BREACH OF CONTRACT

36.    Plaintiff reasserts herein each allegation in paragraphs 1 through 22 as if set forth
fully in this count of the Complaint.

**JA19**

37.     Additionally, and/or alternatively, the Plaintiff asserts that: (1) There was a valid, binding contract between the parties; and (2) The Defendants breached the terms of that contract by terminating the Plaintiff. Consequently, the Plaintiff suffered damages.

## COUNT IX – QUANTUM MERUIT

38.     Plaintiff reasserts herein each allegation in paragraphs 1 through 22 as if set forth fully in this count of the Complaint.

39.     Additionally, and/or alternatively, the Plaintiff asserts that: (1) He conferred a measurable benefit upon the Defendants; (2) He reasonably expected compensation from the Defendants; and (3) The Defendants accepted the benefit with the knowledge, actual or chargeable, of the Plaintiff's reasonable expectation. Consequently, the Plaintiff suffered damages.

## REQUEST FOR RELIEF

**WHEREFORE**, the Plaintiff prays that this Honorable Court grant the following relief:

I.   Judgment against the Defendants;

II.  Damages, including compensatory (including back and front pay trebled), double damages, emotional distress, punitive, and/or liquidated, to the Plaintiff, as authorized or mandated by applicable law, in an amount to be determined at trial;

III. Costs and any reasonable attorney's fees;

IV.  Pre-judgment and post-judgment interest;

V.   Appropriate injunctive, declaratory and other equitable relief; and

VI.  Such other relief as this Honorable Court may deem just and appropriate under the circumstances.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: November 24, 2021                          Respectfully submitted,
                                                  The Plaintiff,

8

**JA20**

By his attorney,

*/s/ Jamie Goodwin*
Jamie Goodwin, BBO No. 673207
KJC Law Firm
10 Tremont Street, 5th Floor
Boston, MA 02108
617-720-8447
jgoodwin@kjclawfirm.com

**JA21**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ERIC MOORE,

                 Plaintiff,

        v.

                                     Civil Action No.: 1:22-cv-10414-RWZ

INDUSTRIAL DEMOLITION, LLC
                 Defendant.

## PLAINTIFF'S PROPOSED VOIR DIRE JURY INSTRUCTIONS, PROPOSED VERDICT FORM AND OTHER PRETRIAL FILINGS

A.  Objections to Witnesses or Lines of Deposition Transcripts

      As there is has been no indication that the Defendant expects to rely upon deposition

transcripts but for impeachment, the Plaintiff has no objections at this time.  The Plaintiff

reserves the right to rely upon deposition at trial should a witness not be available to either party.

B.  Proposed Questions for Voir Dire

    **The Plaintiff proposes that the following statement be read at the outset of Voir Dire:**

      In this case the Plaintiff, Eric Moore, claims that the Defendant, Industrial Demolition,

LLC, ("Industrial Demolition"):

1.  failed to honor his reasonable accommodation;

2.  discriminated against him on the basis of his qualified handicapped status by not
    honoring his reasonable accommodation and by terminating his employment;

3.  terminated the Plaintiff in retaliation for his missing a day of work because of his
    injury and for requiring a reasonable accommodation;

4.  terminated the Plaintiff in retaliation for suffering an industrial injury and obtaining
    modified duty pursuant to the Massachusetts Worker's Compensation Act;

**JA22**

     5.   terminated the Plaintiff in retaliation for his taking sick time protected under the

Massachusetts Earned Sick Time Law;

Consequently, the Plaintiff suffered financial damages and is entitled to back pay, front

pay, emotional distress damages, treble damages, punitive damages, attorneys fees and costs.

    o   Have any of you heard of this case before today?

    o   Would your ability to serve impartially as a juror be affected by what you have

heard?

    o   Is there anything about the nature of this case that would affect your ability to be

fair to both sides?

C.  <u>Proposed Questions for Voir Dire</u>

**The Plaintiff proposes the following Voir Dire:**

1.   The trial of this case will begin today and is expected to concluded this Friday. Would any

of you be unable to serve as a juror during this time?

2.   Have Plaintiff, Eric Moore, introduce himself.  Have any of you, your relatives or close

friends ever met or had any interaction with Mr. Moore?  Do any of you have any opinions

about Mr. Moore that would affect your ability to be fair in a lawsuit alleging employment

discrimination and retaliation?

3.   Have Plaintiff's counsel explain the work of Duddy Goodwin & Pollard and where it

operates. Have any of you, your relatives or close friends ever worked for or had any

interaction with Duddy Goodwin & Pollard? Do any of you have any opinions about Duddy

Goodwin & Pollard or its work that would affect your ability to be fair in a lawsuit alleging

employment discrimination and retaliation?

**JA23**

4.  Have Defendant's counsel identify the nature of Industrial Demolition's business, its major subsidiaries or its parent corporation, and where it conducts business. Have any of you, your relatives or close friends ever worked for or with Industrial Demolition?  Do any of you have any opinions about Industrial Demolition in specific, or about demolition companies in general, that would affect your ability to be fair in a lawsuit alleging employment discrimination and retaliation?

5.  Have Defense counsel explain the work of Littler Mendelson and where it operates. Have any of you, your relatives or close friends ever worked for or had any interaction with Littler Mendelson? Do any of you have any opinions about Littler Mendelson or its work that would affect your ability to be fair in a lawsuit alleging employment discrimination and retaliation?

6.  The following people may be called as witnesses in this case or be referred to in testimony in this case. Please raise your hand if you know any of these people:

    a.  Eric Moore

    b.  Heather Minton

    c.  William Minton

    d.  Dr. Craig Moore

    e.  Rebecca Lydon

    f.  Roger Oberkramer

    g.  Russell Becker

    h.  Michael Roberts

    i.  Thomas Roberts

    j.  Ray Scully

**JA24**

    k.  Jason Howard

7.  Questions to each prospective juror:

    a.  What is your name, age, and city or town of residence?

    b.  What is your marital status and number of children, if any?

    c.  What is your current occupation (former if retired)?

    d.  What is the current (or former) occupation of your spouse or partner and any adult children?

    e.  Please describe any military service, including branch, rank and approximate date of discharge.

    f.  What is your highest level of education, and major areas of study?

    g.  Do you maintain memberships in any groups or organizations?

    h.  What are your hobbies and leisure-time activities?

    i.  What are your favorite types of reading material and what are you currently reading?

    j.  What are your favorite types of television shows?

    k.  Do you regularly listen to talk radio, and if so, to which programs?

    l.  Do you regularly use the internet to visit sites other than e-mail or personal business, and if so, what types of sites you visit most often?

    m.  Do you regularly watch cable news programming, and if so, what is your favorite cable news network?

    n.  Do you have any bumper stickers?  If so, what do they say?

    o.  Have you ever played team sports?  If so, what sports and positions?

    p.  Do you have any brothers or sisters?  If so, what is your place in the birth order?

**JA25**

8.  Do any of you know any of the other persons on the jury panel?

9.  Have any of you formed any opinion with regard to laws designed to protect against discrimination or retaliation in the workplace, such that you would be unable to fairly assess whether such unlawful conduct actually occurred?

10. Do any of you have opinions or feelings, whether positive or negative, about Christianity or Christian missions that would affect your ability to be fair to both sides in this lawsuit?

11. Have any of you ever had a negative encounter or experience with an employer, employee, or colleague that would impact your ability to be fair to both sides in this lawsuit?

12. Have any you ever experienced a hostile work environment, but been too afraid to speak up or complain for fear of losing your job?

13. Have you or any family member or close friend ever filed a lawsuit or grievance against your employer, supervisor, management, or another employee? If yes, please explain.

14. Do any of you have opinions or feelings, whether positive or negative, about safety protocols and procedures at work?

15. Other than what you have already told us, have you or any family member or close friend ever held a job in construction, demolition, or the trades?

16. Have you or any family member or close friend been employed in a human resources position or other position that involved administration or application of safety rules or antidiscrimination laws?

17. Have you ever held a supervisory position at work? If yes, did you supervise any employees who received light-duty accommodations based on a doctor's note?

18. Have you ever owned a business? If yes, have you ever had a complaint filed against you by an employee of the business in relation to employment?

**JA26**

19. Are you or have you ever been responsible for hiring, promotions or terminations of employees? If yes, please explain.

20. Have you or any family member or close friend ever been a defendant in a claim or lawsuit filed by an employee? If yes, please explain.

21. Do you believe that you or any of your close friends or family have been the victim of discrimination in the workplace because of your age, gender, race, religion or disability? If yes, please explain.

22. Prior experience with court proceedings:

        a. Have any of you ever been a party to a lawsuit? Describe circumstances.

        b. Have any of you ever been a witness in a lawsuit?

        c. How many of you have served previously on a jury?

Please tell us in what court, when, what type of case, the outcome, and whether you were foreperson.

23. At the end of the case I will give you instructions on the law that will govern your deliberations. As a juror, you are required to follow those instructions, even if you do not agree with them. Is there any one of you who would be unable or unwilling to follow the law given to you by the court?

24. Have you formed any opinions that would cause you to limit the amount of money an individual should receive, no matter what damages are proved?

25. Do any of you know of any reason whatsoever why you could not sit as a trial juror with absolute fairness and impartiality to all the parties in this case?

D.  Proposed Jury Instructions

I.  *Instruction No. 1 – Plaintiff's Burden of Proof*

Eric Moore accuses the Defendant of violating Massachusetts law by failing to accommodate his handicap; by discriminating against him on the basis of the same handicap; and for  retaliating against him for engaging in protected activities, namely

1. Requesting a reasonable accommodation;

2. Utilizing a reasonable accommodation;

3. Taking an unpaid sick day;

4. Suffering an industrial injury and obtaining modified duty pursuant to the Massachusetts Worker's Compensation Act;

The first term you must understand is "preponderance of the evidence."  This is not a criminal case and the Plaintiff does not need to prove his claim "beyond a reasonable doubt."  In a civil case, like this one, a Plaintiff must prove his case by a preponderance of evidence.  That simply means that if you believe that the Plaintiff's claims are, more likely than not, correct then he has satisfied his burden of proof under the law and you must find in his favor.  Another way to conceptualize a preponderance of the evidence is to image the scales of justice.  If, after you have heard all the evidence in this case, that the scales tip even slightly in Mr. Moore's favor then he has met his burden of proof and you must find in his favor.

To succeed on this claim for retaliation, Mr. Moore must prove by a preponderance of the evidence that:

First, the Defendant took an adverse action against Mr. Moore;

Second, were it not for his protected activity, The Defendant would not have taken an adverse employment action against him.

7

**JA28**

Mr. Moore is not required to prove that his protected activity claim had merit in order to prove the retaliation claim, but he must have a good faith, reasonable belief that it did.

An "adverse action" is one that would be materially adverse to a reasonable employee , an action that could well dissuade a reasonable worker from making or supporting a charge of discrimination.  This is an objective standard.  Material means significant, as opposed to trivial.  An adverse action by a supervisor is an action of the employer.

Mr. Moore is not required to show that retaliation was the only, or predominant, factor that motivated the Defendant.  In fact, you may decide that other factors were involved as well in the decision-making process of the Defendant. In that event, in order for you to find for Mr. Moore, you must find that he has proven that, although there were other factors, he would not have been terminated without undertaking protected activity.

An employer is free to terminate an employee for any nonretaliatory reason even if its business judgment seems objectively unwise.  But you may consider the believability of an explanation in determining whether it is a cover-up or pretext for retaliation. In order to succeed on the retaliation claim, Mr. Moore must persuade you, by a preponderance of the evidence, that were it not for his protected activity, he would not have been terminated.

To succeed on his claim for disability discrimination, Mr. Moore must prove by a preponderance of the evidence that:

First, that he was a qualified handicapped person;

Second, the Defendant knew that he was a qualified handicapped person;

Third, he was able to perform the essential functions of his job with or without a reasonable accommodation;

Fourth, the Defendant took an adverse employment action against Mr. Moore, and

Fifth, were it not for his status as a qualified handicapped person, the Defendant would not have taken an adverse employment action against him.

Massachusetts law defines a "handicap" as either, 1) a physical or mental impairment which substantially limits one or more major life activities; 2) a record of having such an impairment, or 3) being regarded as having such an impairment.

An "adverse action" is one that would be materially adverse to a reasonable employee , an action that could well dissuade a reasonable worker from making or supporting a charge of discrimination.  This is an objective standard.  Material means significant, as opposed to trivial. An adverse action by a supervisor is an action of the employer.

Mr. Moore is not required to show that his handicap was the only, or predominant, factor that motivated the Defendant.  In fact, you may decide that other factors were involved as well in the decision-making process of the Defendant. In that event, in order for you to find for Mr. Moore, you must find that he has proven that, although there were other factors, he would not have been terminated without undertaking protected activity.

An employer is free to terminate an employee for any nondiscriminatory reason even if its business judgment seems objectively unwise.  But you may consider the believability of an explanation in determining whether it is a cover-up or pretext for discrimination. In order to succeed on the discrimination claims, Mr. Moore must persuade you, by a preponderance of the evidence, that were it not for his qualified handicap, he would not have been terminated.

II.    *Instruction No. 2 – Motive, Intent, or State of Mind*

In this case, one critical issue is the question of whether the Defendant would have fired Mr. Moore even if Mr. Moore had not suffered a workplace injury, reported the accident, or requested an accommodation. To decide this case, you will have to inquire into and determine

**JA30**

the Defendant's motive, intent, or state of mind.

    a) <u>Direct Evidence</u>

Sometimes motive, intent, or state of mind can be proved directly. Direct evidence is evidence that, if believed, would result in a highly probable inference that a forbidden bias was present in the workplace.  Examples of direct evidence include: facially discriminatory employment policies, statements of a defendant that suggest a discriminatory attitude toward; testimony of a witness describing what [his/her] state of mind was; or testimony of a witness about what a defendant said  that would be reflective of [his/her] state of mind.  <u>See Sullivan v. Liberty Mut. Ins. Co.</u>, 444 Mass. 34 (2005); <u>Chief Justice for Admin. & Mgmt. of Trial Court v. MCAD</u>, 439 Mass. 729 (2003); <u>Wynn & Wynn v. MCAD</u>, 431 Mass. 665, 666–67 at n.20 (2000) (overruled on other grounds by <u>Stonehill Coll. v. MCAD</u>, 441 Mass. 549, 563 at n.17 (2004); <u>see also</u> <u>Northeast Metro. Reg'l Vocational Sch. Dist. Sch. Comm. v. MCAD</u>, 31 Mass.App.Ct. 84, 89–90 (1991).  However, Mr. Moore is not required to provide direct evidence of a discriminatory or retaliatory intent.  He can also prove his case with circumstantial evidence.

    b) <u>Circumstantial Evidence</u>

Motive, intent, or state of mind may be proved indirectly or circumstantially.  It has been noted that in modern times, "[d]irect evidence of . . . discriminatoryanimus and causation . . . rarely exists, [and a plaintiff] may [therefore establish one or both] by providing indirect or circumstantial evidence. . . ." <u>See</u>, e.g., <u>Bulwer v. Mt. Auburn Hosp.</u>, 473 Mass. 672, 680–81 (2016), citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802–05 (1973), and <u>Sullivan v. Liberty Mut. Ins. Co.</u>, 444 Mass. 34, 39 (2005) (internal quotation marks omitted); <u>see also</u> Verdrager <u>v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.</u>, 474 Mass. 382, 396 (2016). You may examine the Defendant's actions and words, and all of the surrounding circumstances,

10

**JA31**

to help you determine what the Defendant's motive, intent, or state of mind was when the Defendant fired Mr. Moore.

The law does not dictate any distinction between the amount of weight to be given to direct or circumstantial evidence; that is up to the jury. Circumstantial evidence permits you to draw reasonable inferences from facts in evidence. The inference proposed from the evidence need only be reasonable; and it need not be the *only* inference possible.  See Commonwealth v. Kilburn, 426 Mass. 31, 38 (1997); Commonwealth v. Dostie, 425 Mass. 372, 376 (1997); Brown v. Commonwealth, 407 Mass. 84, 89 (1990) (emphasis added).

    c) Pretext

Circumstantial evidence of discrimination can include proof that even one of the reasons given by the Defendant for firing Mr. Moore is not true.  In fact, the Defendant alleged that Mr. Moore was not even fired.  If you find that the circumstantial evidence proves that either of these assertions is false, then the law entitles you to draw an inference, or conclude, that Mr. Moore was terminated for one or all of reasons Mr. Moore alleged.

The "most probative" means of assessing discriminatory intent is by examining whether comparators—other employees who were similarly situated in terms of performance, qualifications, and conduct, but who did not file a lawsuit for discrimination—were treated differently. See Bulwer v. Mt. Auburn Hosp., 473 Mass. 672, 684–87 (2016). Other indications of pretext can support a conclusion that a proffered reason is pretextual, including an employer's "shifting explanation" for its adverse action. See, e.g., Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 450 (1stCir. 2009).  In other words, if you believe that the decision-maker made false or shifting statements or explanations for the reason(s) why Mr. Moore was fired, you may infer that the real reason he was fired was to retaliate and/or

11

**JA32**

discriminate against him.

This inference is allowable because experience indicates that people do not generally act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. In a situation where the legitimate reason or reasons advanced by the employer for taking an adverse action are rejected as not being the true reasons, one can reasonably conclude that the employer based its decision on impermissible consideration. When considering pretext, your focus must be on the Defendant's state of mind, not on whether the Defendant's reasoning was right or wrong or whether the Defendant's business judgment was sound or unsound.  See Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 97–99 (2009); Knight v. Avon Prods., Inc., 438 Mass. 413, 420–21 (2003); Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 114 (2000); Zaniboni v. Mass. Trial Court, 87 Mass.App.Ct. 1130, 2015 WL 3755916, at *1 (2015) (Rule 1:28 decision); Dragonas v. Sch. Comm. of Melrose, 64 Mass.App.Ct. 429, 442 (2005); North-east Metro. Reg'l Vocational Sch. Dist. Sch. Comm. v. MCAD, 31 Mass.App.Ct. 84, 88–89 (1991) (explaining that "[t]he employer need not persuade the trier of fact . . . that it was correct in its belief or was motivated solely by the proffered reason").

> d)   Attitude of Those in Authority

Unlawful motive on the part of a specific decision maker may be inferred from the attitudes of others in authority in the company, such as company officials and senior managers. See Northeast Metro. Reg'l Vocational Sch. Dist. Sch. Comm. v. MCAD, 31 Mass.App.Ct. 84, 89–90 (1991); Buckley Nursing Home, Inc. v. MCAD, 20 Mass.App.Ct. 172, 176 (1985); Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 85–86 (1st Cir. 2004); Tuli v. Brigham & Women's Hosp., Inc., 566 F. Supp. 2d 32, 49–51 (D. Mass. 2008).

The First Circuit found in <u>Conway v. Electro Switch Corp.,</u> 825 F.2d 593, 597–98 (1st Cir. 1987), that evidence of institutional state-of-mind may be presented for the consideration because an employer's  willingness to consider impermissible factors such as race, age, sex, national origin, or religion while engaging employment  decisions  may support an inference that such impermissible considerations may have entered into another area of ostensibly neutral employment decisions.  In <u>Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.</u>, 474 Mass. 382, 392 (2016), the court considered the "upward feedback" evaluation of the plaintiff's manager in demonstrating pretext for her gender-based firing. Anonymous comments from associates included incidents of harassing and inappropriate behavior towards women and holding different standards for men and women, among others. <u>Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.,</u> 474 Mass. at 401–02.

  e) <u>Employer's Failure to Follow Policy or Guidelines</u>

Unlawful motive may be inferred from an employer's failure to follow its own policies or guidelines in making the employment decision involved in this case.  <u>See</u> <u>Bulwer v. Mt. Auburn Hosp</u>. 473 Mass. 672, 687–88 (2016) (noting that failure to follow or irregularities in established procedures or criteria may support a reasonable inference of intentional discrimination) (citations omitted); <u>Dartt v. Browning-Ferris Indus., Inc.,</u> 427 Mass. 1, 17 (1998); <u>Wooster v. Abdow Corp.</u>, 46 Mass.App.Ct. 665, 672 (1999); <u>Martin v. Envelope Div. of Westvaco Corp.</u>, 850 F. Supp. 83, 92 (D. Mass. 1994).

III. *Instruction No. 3 – Damages*

If Mr. Moore has proven to you that the Defendant discriminated and/or retaliated against him then you must decide the amount of damages, if any, that will fairly compensate. The purpose of an award of compensatory damages is to make the Plaintiff whole for all the

**JA34**

  
losses that he suffered because of the Defendant's unlawful discrimination. Except where I instruct you otherwise, the Plaintiff bears the burden of proof on damages.

Although uncertainty in the amount of damages does not bar recovery and mathematical precision is not required, you must not speculate, conjecture, or guess in awarding damages. The award is acceptable as long as it is based on just and reasonable inferences from the evidence. If you find that the Defendant unlawfully discriminated and/or retaliated against the Plaintiff, then you may award damages in the following four areas: (1) back pay; (2) front pay; (3) emotional distress; (4) treble damages and (5) punitive damages. I will explain each to you. See G.L. c. 151B, § 9; Stonehill Coll. v. MCAD, 441 Mass. 549 (2004) (comparing judicial proceeding for damages to MCAD proceeding); Conway v. Electro Switch Corp., 402 Mass. 385, 388 (1988).

IV.     *Instruction No. 4 – Back Pay Damages*

The Plaintiff is entitled to back pay, which is the amount of the Plaintiff's lost earnings from the date of the adverse employment decision until today. This includes all lost salary, bonuses, the value of employment benefits, and health insurance benefits that would have accumulated but for the Defendant's illegal conduct. However, you should decrease this amount by any earnings and benefits received by the Plaintiff from another employer since the date of the adverse employment action. See DeRoche v. MCAD, 447 Mass. 1 (2006); Conway v. Electro Switch Corp., 402 Mass. 385, 388–89 (1988).

V.     *Instruction No. 5 – Front Pay Damages*

The Plaintiff is entitled to front pay, which is the amount of damages resulting from the loss of future earnings and benefits that is attributable to the employer's misconduct. You cannot speculate in awarding front pay; rather, the determination of the amount of the award must be

proven with reasonable certainty. You should make reasonable estimates based on the evidence concerning the amount of future earnings, including salary, bonuses, and the value of benefits that the Plaintiff would have received but for the Defendant's unlawful termination. In determining front pay, you should consider and weigh the following factors:

1. the amount of earnings, including salary and benefits, that the Plaintiff probably would have received between now and the Plaintiff's projected retirement date or date of future employment;

2. the Plaintiff's probable date of retirement or date of future employment;

3. the amount of earnings that the Plaintiff probably will receive from another employer until her retirement;

4. the availability of other employment opportunities; and

5. the possibility of inflation and wage increases in the future.

See Selmark Assocs. v. Ehrlich, 467 Mass. 525, 545 n.36 (2014); Haddad v. Wal- Mart Stores, Inc., 455 Mass. 91, 102–03 (2009); Conway v. Electro Switch Corp., 402 Mass. 385, 388–89 (1988); Ventresco v. Liberty Mut. Ins. Co., 55 Mass.App.Ct. 201, 210 (2002); Handrahan v. Red Roof Inns, Inc., 48 Mass.App.Ct. 901, 902 (1999).

a) Reducing Front Pay to Present Value

If you award damages to the Plaintiff for losses he will suffer in the future, keep in mind that a plaintiff cannot be awarded damages that overcompensate the losses that he suffered because of the Defendant's conduct. In order to avoid overpaying the Plaintiff, you must consider that the amount of money you give the Plaintiff today for future losses can be put in the bank, where it can earn interest. So, in making an award for future damages, you must determine the amount of money that, if invested today at a reasonable rate of interest, would in the future provide the Plaintiff with

15

**JA36**

the amount of money that you calculated he will lose in the future as a result of the Defendant's conduct. See Conway v. Electro Switch Corp., 402 Mass. 385, 388–89 & n.3 (1988); Trinity Church of Boston v. John Hancock Mut. Life Ins. Co., 399 Mass. 43, 52 (1987); Stephens v. Global NAPs, 70 Mass.App.Ct. 676, 684–86 (2007); Franchina v. City of Providence, 881 F.3d 32, 56–58 (1st Cir. 2018); McDonald v. Fed. Lab., Inc., 724 F.2d 243, 247 (1st Cir. 1984); Worden v. Consol. Rail Corp., 689 F. Supp. 35, 39 (D. Mass. 1988).

VI.    *Instruction No. 6 – Emotional Distress Damages*

If you find that the Plaintiff has been discriminated and/or retaliated against, you may also award him reasonable damages for his emotional distress. Emotional distress includes mental pain, discomfort, indignity, depression, fear, anxiety, or humiliation suffered as a result of the discrimination. Although uncertainty in the amount of damages does not bar recovery and mathematical precision is not required, you must not speculate, conjecture, or guess in awarding damages. See Robert & Ardis James Found. v. Meyers, 474 Mass. 181, 192 (2016); Stonehill Coll. v. MCAD, 441 Mass. 549, 575–76 (2004); Bournewood Hosp., Inc. v. MCAD, 371 Mass. 303, 315–17 (1976); Rombola v. Cosindas, 351 Mass. 382, 385 (1966); Agoos Leather Cos. v. Am. & Foreign Ins. Co., 342 Mass. 603, 608 (1962); Harvard Vanguard Med. Assocs. v. MCAD, 76 Mass.App.Ct. 1126 (2010) (Rule 1:28 decision); Franklin Publ'g Co. v. MCAD, 25 Mass.App.Ct. 974, 975 (1988); Buckley Nursing Home, Inc. v. MCAD, 20 Mass.App.Ct. 172, 182 (1985).

An award must rest on substantial evidence and its factual basis must be made clear on the record. Some factors that you should consider include, but are not limited to:

1.    the nature and character of the alleged harm;

2.    the severity of the harm;

**JA37**

3.  the length of time the complainant has suffered and reasonably expects to suffer;
    and

4.  whether the complainant has attempted to mitigate the harm (e.g., by counseling
    or by taking medication).

In addition, the Plaintiff must show a sufficient causal connection between the Defendant's unlawful act and the Plaintiff's emotional distress.  See Stonehill Coll. v. MCAD, 441 Mass. 549 (2004) (declaring these factors in con-text of MCAD award); Massasoit Indus. Corp. v. MCAD, 91 Mass.App.Ct. 208, 214–15 (2017); Smith v. Bell Atl., 63 Mass.App.Ct. 702, 710 (2005) (applying those factors to jury award, citing Stonehill as "instructive"); see also Restatement (Second) of Torts §§ 905, cmt. i, 912, 917 (1979).

VII.    *Instruction No. 7 – Punitive Damages*

If you find that the Defendant has intentionally retaliated against the Plaintiff, you may consider whether punitive damages are warranted. Punitive damages are different from compensatory damages. Unlike compensatory damages, which compensate the victim for the harm he has suffered, the purpose of punitive damages is to punish the Defendant for conduct that is outrageous, because of the Defendant's evil motive or reckless indifference to the rights of others.  See Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 110–11 (2009); Dartt v. Browning-Ferris Indus., Inc., 427 Mass. 1, 16–17 (1998); Bain v. City of Spring-field, 424 Mass. 758, 767–68 (1997); Labonte v. Hutchins & Wheeler, 424 Mass.813, 826–27 (1997) (warning that punitive damages must be reasonable,  and"not simply a criminal penalty"); Borne v. Haverhill Golf & Country Club, Inc., 58 Mass.App.Ct. 306, 321–23 (2003).

Punitive damages may be awarded only where the Defendant's conduct is outrageous or egregious.  See Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 304 (2016); Haddad v.

Wal–Mart Stores, Inc., 455 Mass. 91, 111 (2009); Dartt v. Browning–Ferris Indus., Inc., 427

Mass. 1 (1998); Figueiredo v. Armur, Inc., 91 Mass.App.Ct. 1121, 2017 WL 1959103, at *4

(2017) (Rule 1:28 decision); Sauer v. Belfor USA Group, Inc., 205 F. Supp. 3d 209, 220 (D.

Mass. 2016). In determining the amount of a punitive damage award, if any, you should

consider:

1. the egregious or outrageous character or nature of the defendant's conduct;

2. the defendant's wealth, in order to determine what amount of money is needed to punish the defendant's conduct and to deter any future acts of retaliation against others;

3. the actual harm suffered by the plaintiff; and

4. the magnitude of any potential harm to other victims if similar future behavior is not deterred;

5. whether there was a conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part (or the plaintiff because he or she is a member of the class);

6. whether the defendant was aware that the retaliatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise;

7. the defendant's conduct after learning that the initial conduct would likely cause harm; and

8. the duration of the wrongful conduct and any concealment of that conduct by the defendant.

If you do award punitive damages, you should fix the amount by using calm discretion and

sound reason.


**Space Left Intentionally Blank**


18


**JA39**

E.  Proposed Verdict Form


   *I.  Liability – Failure to Accommodate in Violation of G.L. c. 151B*

   Did the Plaintiff establish by a preponderance of the evidence that the Defendant failed to

   reasonably accommodate the Plaintiff's handicap?

                Yes: _____            No:_____

            Please answer the remaining questions.


   *II. Liability – Disability Discrimination in Violation of G.L. c. 151B*

   Did the Plaintiff establish by a preponderance of the evidence that he was discriminated

   against by the Employer, in the form of abuse and termination, on the basis of his handicap

   despite being able to work with a reasonable accommodation?

                Yes: _____            No:_____

            Please answer the remaining questions.


   *III. Liability – Retaliation in Violation of G.L. c. 151B*

   Did the Plaintiff establish by a preponderance of the evidence that his employment would

   not have been terminated but for undertaking protected activity (missing a day of work

   because of injury, requesting/advocating a reasonable accommodation, utilizing a

   reasonable accommodation, expressing inability to do certain tasks because of his

   handicap, and/or reporting an injury)?

                Yes: _____            No:_____

            Please answer the remaining questions.

**JA40**

*IV. Liability – Retaliation in Violation of G.L. c. 152*

Did the Plaintiff establish by a preponderance of the evidence that his employment would not have been terminated but for undertaking protected activity under the Workers Compensation Act (suffering an industrial injury, reporting an industrial injury, taking time off after an industrial injury, requesting modified duty/reasonable accommodation, utilizing a reasonable accommodation, and/or expressing inability to do certain tasks because of his handicap)?

Yes: _____          No:_____

Please answer the remaining questions.


*V. Liability – Retaliation in Violation of G.L. c. 149*

Did the Plaintiff establish by a preponderance of the evidence that his employment would not have been terminated but for the fact that he utilized unpaid sick leave?

Yes: _____          No:_____

If you have answered "Yes" to any of the questions above, please answer the remaining questions.  If you have "No" to all of the questions above, you are done.  Please sign and return the Verdict Slip.


*** Space Intentionally Left Blank***

20

**JA41**

*V. Damages*

      a)  <u>Back Pay</u>

Do you award compensation to Mr. Moore for back pay?

        Yes: _____        No:_____

        Amount in numbers: _____

        Amount in words: _____

      b)  <u>Front Pay</u>

Do you award compensation to Mr. Moore for front pay?

        Yes: _____        No:_____

        Amount in numbers: _____

        Amount in words: _____

      c)  <u>Emotional Distress</u>

Do you award compensation to Mr. Moore for emotional distress?

        Yes: _____        No:_____

        Amount in numbers: _____

        Amount in words: _____

**JA42**

d) <u>Punitive Damages</u>

Do you find that punitive damages are warranted to punish the Defendant and to prevent the Defendant from engaging in discrimination and/or retaliation in the future?

Yes: _____          No:_____

Amount in numbers: _____

Amount in words: _____

Signed: _____          Date:_____

(Jury Foreperson)

***Space Intentionally Left Blank***

**JA43**

E. <u>Proposed Special Verdict Questions</u>

The Plaintiff has no proposed special verdict questions.

Respectfully submitted,
EricMoore,
By his Attorney,

*/s/Jamie Goodwin*
Jamie Goodwin
BBO# 673207
Duddy Goodwin & Pollard
446 Main Street
16th Floor
Worcester, MA 01608


## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 7, 2023, the foregoing was filed with the Clerk of Court using the CM/ECF electronic filing system, and that notice was provided to the parties of record.

*/s/Jamie Goodwin*
Jamie Goodwin

23

**JA44**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ERIC MOORE,

               **Plaintiff,**

      **v.**                                **Civil Action No. 1:22-cv-10414-RWZ**

INDUSTRIAL DEMOLITION LLC,

               **Defendant.**

## DEFENDANT INDUSTRIAL DEMOLITION'S PROPOSED JURY INSTRUCTIONS

       Pursuant to Rule 51 of the Federal Rules of Civil Procedure, Defendant Industrial Demolition hereby submits the following proposed jury precharge and proposed jury instructions to be given to the jury at the close of evidence in this matter.  Defendants have included citations to the Massachusetts Superior Court Civil Practice Jury Instructions, applicable statutes, and caselaw for the convenience of the Court.

       Defendant is submitting a separate Memorandum that will include proposed Voir Dire and a proposed verdict form and interrogatories.

       Defendant also respectfully requests leave to submit revised or additional requests based upon testimony and evidence admitted at trial or to conform with any rulings of law the Court may render during the proceedings.

**JA45**

### DEFENDANT'S PROPOSED JURY PRECHARGE INSTRUCTION NO. 1
#### *Jury Precharge* – *Introductory Statement*

The Plaintiff, Eric Moore, has filed a lawsuit against the Defendant, Industrial Demolition relating to his employment. He claims that he was discriminated against based on an alleged handicap, and that Industrial Demolition did not accommodate his alleged handicap. He also claims that he was retaliated against for engaging in certain activity.

Defendant Industrial Demolition denies that it discriminated or retaliated against the Plaintiff. Defendant Industrial Demolition maintains that the Plaintiff cannot prove that he had a handicap as defined under the law, and that he cannot prove that his employment was terminated by Industrial Demolition.

The burden of proof rests with the Plaintiff, Eric Moore, at all times.

### DEFENDANT'S PROPOSED JURY PRECHARGE INSTRUCTION NO. 2

### *Jury Precharge – Burden of Proof*

When a person such as Plaintiff Eric Moore files a civil case, he has the burden of proof. That means that he must present enough evidence to prove his claims. What is enough evidence?

I will explain at the end of the trial each of the specific things that Plaintiff Eric Moore must prove. Eric Moore must show that each of these things is **more likely true than not true.** The lawyers or I may use the phrase "more probable than not," and that means the same thing as "more likely true than not true." The lawyers and I may also refer to proof by a "preponderance of the evidence," and that legal phrase simply means the same thing I have told you, namely proof that something is more likely true than not true.[1]

Now, from time to time during the trial, I may refer to proof or to proving something. By this, I mean showing that Plaintiff's version of the facts is more likely true than not true, based upon evidence and any reasonable conclusions from the evidence.

If you find that the evidence supporting Defendant's version of the facts is more persuasive, or that the evidence on the two sides is equally persuasive—50/50—then you must decide in favor of the Defendant, Industrial Demolition.[2]

---

[1]    See, e.g., *Sargent* v. *Mass. Accident Co.,* 307 Mass. 246, 250 (1940).
[2]    *Massachusetts Superior Court Model Jury Instructions, October 1, 2021 (Model Civil Jury Precharge)*

- 3 -

### DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 3

#### *Plaintiff's Burden of Proof – Preponderance of the Evidence*

As I explained at the beginning of this trial, the Plaintiff, Eric Moore, bears the burden of proving every essential element of his claim by a fair preponderance of the credible evidence.

Whether the Plaintiff has established the essential elements of his claims by a fair preponderance of the credible evidence is determined by the quality of the evidence: its credibility, believability, trustworthiness, and accuracy. To prove something by a preponderance of the evidence, the plaintiff must prove that thing to be more likely or more probably true than not true.

It is not enough that mathematically the chances somewhat favor a proposition to be proved. The weight of the preponderance of the evidence is its power to convince a jury of the actual truth of the proposition to be proved.[3]

If you find that the evidence supporting Defendant's version of the facts is more persuasive, or that the evidence on the two sides is equally persuasive—50/50—then you must decide in favor of the Defendant, Industrial Demolition.[4]

---

[3]    Brady et al., *Massachusetts Superior Court Civil Practice Jury Instructions* § 1.2.4 (MCLE 3rd ed., 2016 Supp.).

[4]    *Massachusetts Superior Court Model Jury Instructions, October 1, 2021 (Model Civil Jury Precharge)*

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 4

### *Evidence*

The evidence in this case is the sworn testimony of the witnesses, the exhibits received in evidence, stipulations, and judicially noticed facts.

By contrast, the questions of the lawyers are not to be considered by you as evidence.  It is the witnesses' answers that are evidence, not the questions.  At times, a lawyer may have incorporated into a question a statement which assumed certain facts to be true, and asked the witness if the statement was true.  If the witness denied the truth of a statement, and if there is no direct evidence in the record proving that assumed fact to be true, then you may not consider it to be true simply because it was contained in the lawyer's question.

Testimony that has been stricken or excluded is not evidence and may not be considered by you in rendering your verdict.  Also, if certain testimony was received for a limited purpose--such as for the purpose of assessing a witness's credibility--you must follow the limiting instructions I have given.

Arguments by lawyers are not evidence, because the lawyers are not witnesses.  What they have said to you in their opening statements and in their summations are intended to help you understand the evidence to reach your verdict.  However, if your recollection of the facts differs from the lawyers' statements, it is your recollection which controls.

To constitute evidence which may be considered by you, exhibits must be received in evidence.  Exhibits marked for identification but not admitted are not evidence, nor are materials brought forth only to refresh a witness' recollection.

Finally, statements which I may have made concerning the quality of the evidence do not constitute evidence.

- 5 -

**JA49**

It is for you alone to decide the weight, if any, to be given to the testimony you have heard and the exhibits you have seen.[5]

---

[5] *Modern Federal Jury Instructions* § 74.01.

**JA50**

**<u>DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 5</u>**

**(Direct and Circumstantial Evidence)**

There are two types of evidence that you may use in reaching your verdict. One type of evidence is called "direct evidence." An example of "direct evidence" is when a witness testifies about something that the witness knows through his own senses — something the witness has seen, felt, touched or heard or did. If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining. Another form of direct evidence is an exhibit where the fact to be proved is its existence or current condition.

The other type of evidence is circumstantial evidence. "Circumstantial evidence" is proof of one or more facts from which you could find another fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

You should consider both kinds of evidence that are presented to you. The law makes no distinction in the weight to be given to either direct or circumstantial evidence. You are to decide how much weight to give any evidence.[6]

---

[6] 3 Fed. Jury Prac. & Instr. § 101:42 (6th ed.).

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 6

### *Corporate Defendant*

In this case, the Defendant, Industrial Demolition, is a company and an employer.  The mere fact that one of the parties is a company and an employer does not mean it is entitled to any lesser consideration by you. All litigants are equal before the law, and corporations and employers, big or small, are entitled to the same fair consideration as you would give any other individual party.[7]

---

[7] *Modern Federal Jury Instructions* § 72.01.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 7

### *Sympathy*

Under your oath as jurors you are not to be swayed by sympathy.  You should be guided solely by the evidence presented during the trial, without regard to the consequences of your decision.

You have been chosen to try the issues of fact and reach a verdict on the basis of the evidence or lack of evidence.  If you let sympathy interfere with your clear thinking, there is a risk that you will not arrive at a just verdict.  All parties to a civil lawsuit are entitled to a fair trial.  You must make a fair and impartial decision so that you will arrive at the just verdict.[8]

---

[8] *Modern Federal Jury Instructions* § 71.10.

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 8**

***Handicap Discrimination – Plaintiff's Burden of Proof***

Plaintiff, Eric Moore, accuses Defendant, Industrial Demolition, of discrimination because of an alleged physical handicap. Specifically, he alleges that Defendant terminated his employment because of his alleged handicap. In order to recover, the Plaintiff must prove to you by a preponderance of the evidence each of the following elements:

1.    First, Plaintiff is a "handicapped person" due to a physical impairment that "substantially limits" one or more major life activities;[9]

2.    Second, Defendant knew Plaintiff was a handicapped person within the meaning of the law;

3.    Third, he was qualified to perform the essential functions of his position with or without a reasonable accommodation;[10] and

4.    Fourth, Industrial Demolition terminated his employment, and the termination was "because of" his handicap.[11]

The Plaintiff bears the burden of proving every essential element of his claim by a fair preponderance of the credible evidence.[12]

---

[9]    Mass. Gen. Laws Ann. ch. 151B, § 1:  "The term "handicap" means (a) a physical or mental impairment which substantially limits one or more major life activities of a person...."; *Courtois v. Legal Seafoods, Inc.*, No. CIV.A. 03-2752, 2004 WL 231311, at *10 (Mass. Super. Feb. 6, 2004), *aff'd*, 64 Mass. App. Ct. 1107, 833 N.E.2d 693 (2005); *Freire v. First Nat'l*, No. 964620, 1998 WL 1181751, at *8 (Mass. Super. July 22, 1998).

[10]    Mass. Gen. Laws Ann. ch. 151B, § 1:  " The term "qualified handicapped person" means a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap."

[11]    Mass. Gen. Laws Ann. ch. 151B, § 4 (16): "... because of his handicap..."; *Massachusetts Superior Court Civil Practice Jury Instructions* § 5.2.5; *Sullivan v. Liberty Mutual Insurance Co.,* 444 Mass. 34, 45 (2005); *Lipchitz v. Raytheon Company, 434 Mass. 493, 504 (2001)*(plaintiff must prove that the defendant's discriminatory animus was the determinative cause in bringing about the adverse employment action); *Carroll v. Xerox Corp.,* 294 F.3d 231, 237 (1st Cir. 2002).

[12]    *Massachusetts Superior Court Model Jury Instructions, October 1, 2021 (Model Civil Jury Precharge)*

**JA54**

### DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 9

#### (Failure to Accommodate – Plaintiff's Burden of Proof)

The Plaintiff also alleges that Industrial Demolition failed to accommodate his alleged handicap. In order to recover, the Plaintiff must prove to you by a preponderance of the evidence each of the following elements:

1. First, Plaintiff is a "handicapped person" due to a physical impairment that substantially limits one or more major life activities;[13]

2. Second, he needed a reasonable accommodation due to his alleged handicap;

3. Third, he requested an accommodation for his alleged handicap;

4. Fourth, Industrial Demolition knew he was a handicapped person, yet refused to provide an accommodation.[14]

The first element of Plaintiff's Failure to Accommodation claim is the same as the first element of Plaintiff's Handicap Discrimination claim. Therefore, you must decide whether Plaintiff is a "handicapped person" for both claims. If Plaintiff does not prove by a preponderance of the evidence that he is a "handicapped person" Plaintiff cannot succeed on either his Failure to Accommodate or Handicap Discrimination claims.

---

[13]    Mass. Gen. Laws Ann. ch. 151B, § 1: "The term "handicap" means (a) a physical or mental impairment which substantially limits one or more major life activities of a person...."
[14] Massachusetts Superior Court Civil Practice Jury Instructions § 5.2.5; *Lang v. Wal-Mart Stores E., L.P.,* 813 F.3d 447, 454 (1st Cir. 2016) ("...to survive an adverse summary judgment on a failure-to-accommodate claim, a plaintiff must point to sufficient evidence showing that (a) she is disabled within the ADA's definition; that (b) she could perform the job's essential functions either with or without a reasonable accommodation; and that (c) the employer knew of her disability, yet failed to reasonably accommodate it"); *Rocafort v. IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003); *Carroll v. Xerox Corp.,* 294 F.3d 231, 237 (1st Cir. 2002).

- 11 -

**JA55**

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 10

### *Definition of Handicap*

Plaintiff Eric Moore must prove that he is "handicapped" within the meaning of Massachusetts General Laws chapter 151B for both his claims for discrimination and his claim that he was not accommodated. Not all physical or mental impairments constitute a "handicap" under the law.

In this case, Plaintiff alleges he had a physical impairment, as opposed to a mental impairment. Therefore, in order to succeed on his claim of handicap discrimination Plaintiff must prove that he has: (a) an actual physical impairment which substantially limits one or more major life activities.[15]

---

[15] *Massachusetts* General Laws *c. 151B*, § 1 (17); *City of New Bedford v. Massachusetts Commission Against Discrimination, 440 Mass. 450, 462 (2003)* (subparts (b) and (*c*) by their terms, incorporate all of the requirements of subpart (a)); see also *Mekonnen v. OTG Mgmt., LLC,* 394 F. Supp. 3d 134, 151 (D. Mass. 2019), aff'd, No. 19-1846, 2021 WL 1110915 (1st Cir. Mar. 23, 2021); *Faiola v. APCO Graphics, Inc.,* 629 F.3d 43, 47 (1st Cir. 2010) (analysis under the ADA and Chapter 151B is identical) citing *Sensing v. Outback Steakhouse of Fla., L.L.C.,* 575 F.3d 145, 153–54 (1st Cir.2009) (noting that federal law construing the ADA should be followed in interpreting Massachusetts disability law). Although the ADA uses the term "disability," and Chapter 151B uses the term "handicap," the statutory definitions are essentially the same. *Id.*

- 12 -

JA56

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 11**

**Handicap Discrimination – Substantial Limitation of a Major Life Activity**

In order to establish that he is "handicapped," Plaintiff Eric Moore must also prove that the extent of the limitation caused by the impairment of a <u>major life activity</u> is <u>substantial</u>. It is insufficient to merely submit evidence of a medical diagnosis of an impairment.

The term "<u>major life activities</u>" include, but is not limited to, caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. An impairment "<u>substantially limits</u>" an individual's ability to work only if it prevents or significantly restricts the individual from performing a class of jobs or a broad range of jobs in various classes.[16] The determination of whether an individual is substantially limited in a major life activity depends on (i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of of resulting from the impairment.[17] To be substantially limiting, the impairment's impact must be permanent or long-term.[18]

---

[16]   *Marenco v. Broad Inst., Inc.,* No. 21-CV-11859-DJC, 2022 WL 2236354, at *7 (D. Mass. May 17, 2022), appeal dismissed, No. 22-1484, 2022 WL 17820290 (1st Cir. Aug. 2, 2022); *City of New Bedford v. Massachusetts Commission Against Discrimination*, 440 Mass. 450, 462(2003) citing *Carroll v. Xerox Corp.*, 294 F.3d 231, 238 (1st Cir. 2002) (it is insufficient to merely submit evidence of a medical diagnosis of an impairment); Massachusetts General Laws c. 151B, § 1 (20); MCAD Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B, II.A.6 (1998) (an impairment substantially limits an individual's ability to work if it prevents or significantly restricts the individual from performing a class of jobs or a broad range of jobs in various classes); *City of New Bedford*, 440 Mass. at 466, n. 31citing *Murphy v. United Parcel Service Inc.*, 527 U.S. 516, 523-525 (1999) (termination from a single, particular job is not sufficient to prove that an employer regards the employee as substantially limited in the major life activity of working).

[17]   *Obrien v. Mass Inst.* Tech, 82 Mass App. 905, 908 (2012); *Ocean Spray Cranberries, Inc. v. MCAD*, 441 Mass. 632,639 (2004); *Rivera-Garcia v. Sistema Universitario Ana G. Mendez*, 329 F. Supp. 2d 213, 220 (D.P.R. 2004) ("The EEOC recommends that the Court, in determining whether an individual is substantially limited in a major life activity, consider: '(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of of resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)'").

[18]   *Salomon v. Massachusetts Hous. Fin. Agency*, No. 22-CV-10181-ADB, 2023 WL 2588334, at *10 (D. Mass. Mar. 21, 2023) ("The Court notes that [while] work qualifies as a major life activity, that the limitation caused by the impairment must be permanent or long term, and that the impairment must limit plaintiff 'to a substantial extent'"), citing *Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011); *Freire v. First Nat'l*, No. 964620, 1998 WL 1181751, at *8 (Mass. Super. July 22, 1998) ("However, a temporary injury from which an individual quickly

- 13 -

**JA57**

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 12

### *Adverse Employment Action*

If Plaintiff proves that he is a handicapped person, he must also establish that Industrial Demolition took an adverse employment action against him.

Plaintiff Eric Moore alleges that Industrial Demolition terminated his employment, and Industrial Demolition denies that it terminated his employment. Therefore, in order for Plaintiff to establish that he suffered an adverse employment action, he must prove to you by a preponderance of the evidence that Industrial Demolition actually terminated his employment. Subjective feelings of disappointment or disillusionment concerning an employment action do not constitute an adverse employment action.[19]

---

and fully recovers, and from which she has no residual disability, is not a handicap for purposes of Chapter 151B"); see also *Faiola v. APCO Graphics, Inc.*, 629 F.3d 43, 47 (1st Cir. 2010); *Carroll v. Xerox Corp.*, 294 F.3d 231, 238 (1st Cir. 2002); *McDonough v. Donahoe,* 673 F.3d 41, 47 (1st Cir. 2012); *Miller v. Verizon Commc'ns, Inc.*, 474 F. Supp. 2d 187, 195 (D. Mass. 2007).

[19] Massachusetts Superior Court Civil Practice Jury Instructions § 5.2.9.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 13

### *(Handicap Discrimination – Motive, Intent or State of Mind)*

A question for you to decide in this case is whether Plaintiff has proven that Defendant Industrial Demolition terminated his employment, and if so, why. If you determine that Plaintiff Eric Moore has proven that he was terminated, then Plaintiff must also prove that Defendant Industrial Demolition acted with a discriminatory motive, intent, or state of mind. It is not unlawful for an employer to terminate a person's employment for legitimate, non-discriminatory or non-retaliatory reasons. Plaintiff Eric Moore was an employee at will of Industrial Demolition, meaning that Industrial Demolition could end his employment at any time for any reason or for no reason at all, as long as it was not because of Mr. Moore's alleged disability or because of retaliation.

To decide this case, you will first have to determine whether Plaintiff was terminated, and if you decide that he was, you will have to inquire into and determine the motive, intent, or state of mind of Industrial Demolition.[20]

---

[20] Massachusetts Superior Court Civil Practice Jury Instructions § 5.2.2.

- 15 -

**JA59**

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 14

### *(Handicap Discrimination – Causation)*

If you find that Plaintiff Eric Moore has proven that he was terminated, and that he has proven discriminatory intent, then the fourth element he must establish is causation. Plaintiff Eric Moore must show that his handicap (if he proves a handicap) was the determinative cause of a decision to terminate his employment. He need not show that his handicap was the only cause of the termination, but rather that it was the determinative factor in the alleged decision.

The discriminatory animus was "determinative" if it was a material and important reason that the employer took adverse action with respect to the plaintiff's employment. [21]

---

[21] Massachusetts Superior Court Civil Practice Jury Instructions § 5.2.1.

- 16 -

**JA60**

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 15

### Retaliation Claims – Plaintiff's Burden of Proof

Plaintiff Eric Moore alleges that Defendant terminated his employment in retaliation for engaging in certain activity that he alleges is protected under the law.

In order for Plaintiff to recover, he must prove to you by a preponderance of the evidence each of the following elements:

1. He engaged in protected activity protected under the law;

2. Industrial Demolition knew he engaged in the protected activity;

3. Industrial Demolition then subjected Plaintiff to an adverse employment action by terminating his employment; and

4. If not for Plaintiff engaging in those actions Industrial Demolition would not have terminated Plaintiff's employment. Defendant's desire to retaliate against Plaintiff for engaging in protected activity must have been a determinative factor in its decision to terminate his employment.[22]

Plaintiff Eric Moore must show by preponderance of the evidence that Industrial Demolition acted with retaliatory intent, motive or state of mind.  For Plaintiff to prevail on his retaliation claims, you must find a causal link between the protected activity and the adverse action. The mere fact that one event followed another is not sufficient to make out a causal link.[23] It is not permissible to draw an inference of retaliation where adverse employment actions or other

---

[22] Massachusetts Superior Court Civil Practice Jury Instructions § 5.2.8; *Mole v. Univ. of Mass.*, 442 Mass. 582, 592 (2004).

[23] *Beliveau v. Town of Mansfield Min. Elec. Dept.*, 2007 Jury Instr. LEXIS 1739, *20.

problems with an employee predate any knowledge that the employee has engaged in protected

activity.[24]

---

[24] Massachusetts Superior Court Civil Practice Jury Instructions § 5.2.9(d); *see Mole v. Univ. of Mass.*, 442 Mass. 582, 594 (2004) (where "adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation.").

### DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 16

**Retaliation Claim – Exercising Rights – Workers' Compensation**

Plaintiff alleges that Defendant terminated his employment in retaliation for allegedly exercising rights protected by law relating to workers' compensation.

In order for Plaintiff to recover, he must prove to you by a preponderance of the evidence each of the following elements:

5. He engaged in protected activity protected activity by pursuing a claim for workers' compensation prior to his termination;

6. Industrial Demolition knew he engaged in the protected activity;

7. Industrial Demolition then subjected Plaintiff to an adverse employment action by terminating his employment; and

8. If not for Plaintiff engaging in those actions Industrial Demolition would not have terminated Plaintiff's employment. Defendant's desire to retaliate against Plaintiff for engaging in protected activity must have been a determinative factor in its decision to terminate his employment.[25]

Plaintiff Eric Moore must show by preponderance of the evidence that Industrial Demolition acted with retaliatory intent, motive or state of mind.  For Plaintiff to prevail on his retaliation claims, you must find a causal link between the protected activity and the adverse action. The mere fact that one event followed another is not sufficient to make out a causal link.[26] It is not permissible

---

[25] Massachusetts Superior Court Civil Practice Jury Instructions § 5.2.8; *Mole v. Univ. of Mass.*, 442 Mass. 582, 592 (2004).

[26] *Beliveau v. Town of Mansfield Min. Elec. Dept.*, 2007 Jury Instr. LEXIS 1739, *20.

to draw an inference of retaliation where adverse employment actions or other problems with an

employee predate any knowledge that the employee has engaged in protected activity.[27]

---

[27] Massachusetts Superior Court Civil Practice Jury Instructions § 5.2.9(d); *see Mole v. Univ. of Mass.*, 442 Mass. 582, 594 (2004) (where "adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation."); *Courtois v. Legal Seafoods, Inc.*, No. CIV.A. 03-2752, 2004 WL 231311, at *10 (Mass. Super. Feb. 6, 2004), *aff'd*, 64 Mass. App. Ct. 1107, 833 N.E.2d 693 (2005).

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 17**

***Damages- Introduction***

The fact that I charge you on the measurement of damages is not, and should not be considered by you, as any indication that I believe you should find against Defendant or that damages should be awarded in this case.  I give you these instructions on damages solely because I am required to charge you on all phases of the case that you might have to consider.  If Plaintiff has not proven to you by a preponderance of the credible evidence that he was subjected to discrimination or retaliation, then you will not render a verdict for Plaintiff and will not consider the issue of damages.

If, however, Plaintiff has proven to you that he was subjected to discrimination or retaliation, then you may award damages. The amount of damages, if any, should fairly compensate Plaintiff. The purpose of an award of compensatory damages is to make Plaintiff whole for all the losses that he has suffered because of the Defendant's alleged unlawful conduct. Plaintiff bears the burden of proving his damages, if any.  If you find that Plaintiff has not met his burden of proof, then you should not award him damages.

Although uncertainty in the amount of damages does not bar recovery and mathematical precision is not required, you must not speculate, conjecture, or guess in awarding damages.  The award must be based on just and reasonable inferences from the evidence.  If you find for Plaintiff, then you may award damages in the following three areas:

1.    back pay;

2.     front pay; and

3.      emotional distress.

- 21 -

**JA65**

I will explain each to you.[28]

---

[28] Massachusetts Superior Court Civil Practice Jury Instructions § 5.3.1.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 18

### *Back Pay*

If you find for the Plaintiff, then he may be entitled to back pay, which is the amount of the Plaintiff's lost earnings from the date of his separation of employment from Industrial Demolition until today.  Back pay includes all lost wages, and any additional earnings that Plaintiff proves he would have received, for example, bonuses and employee benefits that would have accumulated but for the Defendant's conduct.  However, you may not overcompensate the Plaintiff for losses that he suffered because of the Defendant's conduct. To avoid overpaying the Plaintiff, when calculating the amount of back pay damages, any actual wages and additional earnings received by the Plaintiff following his separation from Industrial Demolition must be deducted from what he could have earned had he remained employed by Industrial Demolition.[29]

The burden is on Plaintiff to prove, with reasonable certainty, the dollar amount of his alleged damages, that is, what he would have earned at Industrial Demolition had he not been terminated. You may not engage in speculation about what Plaintiff's damages might be. It is very important for you to remember that before you may even consider the issue of back pay, you must have found that the Defendant unlawfully discriminated or retaliated against Plaintiff.

---

[29] Massachusetts Superior Court Civil Practice Jury Instructions § 5.3.2; *Fitzpatrick v. Boston Police Dep't.*, 18 MDLR 29, 30 (1996); *Denton v. Boilermakers Local 29*, 673 F. Supp. 37, 40-41 (D. Mass. 1987).

- 23 -

**JA67**

### DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 19

#### *Back Pay – Duty to Mitigate*

The law does not permit someone, even if he has been discriminated against, to simply remain idle. The law requires that a Plaintiff in an employment discrimination case make every reasonable effort to minimize or reduce his damages for loss of compensation by seeking other employment. This is called mitigation of damages. Please remember that in calculating any back pay, you must deduct the amount he actually earned or received after leaving Industrial Demolition.[30]

---

[30] *Conway v. Electro Switch Corp.,* 402 Mass. 385, 389 (1988); *Wayland v. Middlesex County Retirement Bd.,* No. 96-2101, 2000 WL 33170806 at *2 (Mass. Super. Ct. Oct. 7, 2000).

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 20

### *Back Pay –Calculating Amount*

If you do determine that Plaintiff should be awarded back pay damages, you must calculate the amount of damages he is owed. Remember, in measuring damages, that the burden is on Plaintiff to prove, with reasonable certainty the dollar amount of his damages, that is, what he would have earned had she remained employed by the Company. If you determine that he is entitled to any back pay damages, you must reduce these damages by the amount he actually earned or received after leaving Industrial Demolition.[31]

---

[31] *Conway v. Electro Switch,* 402 Mass. 385, 387-388 (1988); *Denton v. Boilermakers Local 29,* 673 F. Supp. 37, 40-41 (D. Mass. 1987); *Buckley Nursing Home v. MCAD,* 20 Mass. App. Ct. 172,185 (1985).

- 25 -

**JA69**

### DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 21

#### *Front Pay*

If you find for the Plaintiff, then he may be entitled to front pay, which is the amount of damages resulting from the loss of future earnings and benefits that is attributable to Industrial Demolition's conduct. You cannot award front pay damages if you do not award back pay damages. You cannot speculate in awarding front pay; rather, the determination of the amount of the award must be proven with reasonable certainty. You should make reasonable estimates based on the credible evidence concerning the amount of future earnings, including salary, bonuses, and benefits, that the Plaintiff would have received but for the Defendant's conduct. Front pay may not be determined by speculation or guess, must be causally related to the defendant's wrongdoing, and the Plaintiff should not be made more than whole.[32]

If you award damages to Plaintiff for losses he will suffer in the future, keep in mind that Plaintiff cannot be awarded damages that overcompensate the losses that he suffered because of Defendant's conduct. To avoid overpaying Plaintiff, you also must consider that the amount of money you give Plaintiff today for future losses can be put in the bank, where it can earn interest. So, in making an award for future damages, if any, you must determine the amount of money that, if invested today at a reasonable rate of interest, would in the future provide Plaintiff with the amount of money that you calculated he will lose in the future as a result of Defendant's conduct.[33]

---

[32] *McKenna v. Begin,* 5 Mass.App.Ct. 304, 311, 362 N.E.2d 548 (1977); *Newton v. Rockwood & Co.,* 261 F.Supp. 485, 488 (D.Mass.1966), aff'd 378 F.2d 315 (1st Cir.1967); *Conway v. Electro Switch Corp.,* 402 Mass. 385, 388, 523 N.E.2d 255, 257 (1988)

[33] Massachusetts Superior Court Civil Practice Jury Instructions § 5.3.3.

## DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 22

### *Mitigation*

Plaintiff also has a duty to limit his alleged damages. Industrial Demolition contends that Plaintiff failed to make reasonable efforts to secure new employment after working with Industrial Demolition because for a period of time he did not seek to secure suitable employment. If you find that Plaintiff did not seek new employment for a period of time, then you should reduce any back award to Plaintiff accordingly.[34]

---

[34] *Quint v. AE Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999) (affirming reduction of back pay for period in which "the former employee made no effort to secure suitable employment"); *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 379 (1st Cir. 2004) ("[F]ailure to mitigate damages can take a variety of forms, including not looking for new employment").

- 27 -

**JA71**

**DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 23**

***Emotional Distress***

If you find for Plaintiff, you may also award him reasonable damages for his alleged emotional distress, if any. Emotional distress includes mental pain, discomfort, indignity, depression, fear, anxiety, or humiliation suffered as a result of unlawful discrimination or retaliation. Although uncertainty in the amount of damages does not bar recovery and mathematical precision is not required, you must not speculate, conjecture, or guess in awarding damages. An emotional distress award must rest on substantial evidence and its factual basis must be made clear on the record.

Some factors that you should consider include, but are not limited to:

1.     the nature and character of the alleged harm;

2.     the severity of the harm;

3.     the length of time Plaintiff suffered, or if ongoing, the length of time he reasonably expects to suffer; and

4.     whether Plaintiff has attempted to mitigate the harm (e.g., by receiving counseling or by taking medication).[35]

In addition, Plaintiff must show a sufficient causal connection between the Defendant's alleged unlawful act and Plaintiff's emotional distress. If Plaintiff was suffering from the conditions he claims were caused by Defendant's conduct before Defendant engaged in the conduct, you may not find causation absent evidence that Defendant's conduct, in fact, exacerbated Plaintiff's distress. Emotional distress damages must be fair and reasonable, and proportionate to the distress suffered by Plaintiff, and should not be awarded to punish Defendant.[36]  Because

---

[35] Massachusetts Superior Court Civil Practice Jury Instructions § 5.3.4.
[36] *Stonehill Coll. v. MCAD*, 441 Mass. 549, 575-76 (2004).

- 28 -

**JA72**

Plaintiff is not a medical doctor, you should disregard any testimony in which Plaintiff offered a lay opinion regarding a medical diagnosis or medical causation.[37]

---

[37] *Canavan's Case*, 432 Mass. 304, 316 (2000) (proof of medical causation must come from a physician).

**JA73**

### DEFENDANT'S PROPOSED JURY INSTRUCTION NO. 24

***Instruction on Punitive Damages – Only if Court Determines Plaintiff is Entitled to Instruction on Punitive Damages[38]***

Plaintiff seeks to impose an award of punitive damages against Defendants. To sustain an award of punitive damages under G.L. c. 151B, a finding of intentional discrimination alone is not sufficient. An award of punitive damages requires a heightened finding beyond mere liability and also beyond a knowing violation of the statute. Punitive damages may be awarded only where the defendant's conduct is outrageous or egregious. Punitive damages are warranted where the conduct is so offensive that it justifies punishment and not merely compensation. In making an award of punitive damages, you should determine that the award is needed to deter such behavior toward the class of which plaintiff is a member, or that the defendant's behavior is so egregious that it warrants public condemnation and punishment.

In determining whether the defendant's conduct was so outrageous or egregious that punitive damages under G.L. c. 151B are warranted, you should consider all of the factors surrounding the wrongful conduct. Such factors may include:

---

[38] *See Dartt v. Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. 1, 17, 691 N.E.2d 526, 537 (1998) citing *Karcher v. Emerson Elec. Co.,* 94 F.3d 502, 509 (8th Cir.1996), cert. denied, 520 U.S. 1210 and ——, 117 S.Ct. 1692 and 1693, 137 L.Ed.2d 820 (1997) (punitive damages claim should not have been submitted to jury in sex discrimination case because evidence did not support finding that employer's conduct was outrageous, as required under State law claim, or that employer acted with malice or reckless indifference, as required under Title VII); *Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596 (D.Me.1994) (although plaintiff had established case of prima facie discrimination under ADA and evidence of pretext sufficient to defeat employer's motion for summary judgment, plaintiff had not raised sufficient evidence that employer had discriminated against him with "malice" or "reckless indifference" to allow claim of punitive damages to go to jury.

- 30 -

1. whether there was a conscious or purposeful effort to demean or diminish the class of which Plaintiff is a part (or Plaintiff because he or she is a member of the class);

2. whether the defendant was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise;

3. the actual harm to Plaintiff;

4. the defendant's conduct after learning that the initial conduct would likely cause harm;

5. the duration of the wrongful conduct and any concealment of that conduct by the defendant.[39]

---

[39] *Haddad v. Wal-Mart Stores, Inc.*, 455 Mass. 91, 110-11 (2009).

Defendant Industrial Demolition will also submit proposed Voir Dire and proposed Jury Interrogatories in a separate Memorandum.

Respectfully submitted,

INDUSTRIAL DEMOLITION LLC

By Its Attorneys,

/s/ Alexa M. Esposito
Alexa M. Esposito, Bar No. 698378
aesposito@littler.com
Thomas M. L. Metzger, Ohio Bar No. 0059694
tmetzger@littler.com

LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA  02110
Dated: April 7, 2023                         Tel. 617.378.6000

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of April 2023, a true copy of the foregoing document was filed electronically through the Court's CM/ECF system, is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ Alexa M. Esposito
Alexa M. Esposito

- 32 -

**JA76**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ERIC MOORE,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:22-cv-10414-RWZ** |
| **INDUSTRIAL DEMOLITION LLC,** | |
| **Defendant.** | |

### DEFENDANT INDUSTRIAL DEMOLITION'S PROPOSED JURY VERDICT FORM

Defendant Industrial Demolition hereby submits the following proposed Jury Verdict Form.

Defendant also respectfully requests leave to submit revised or additional proposed language based upon testimony and evidence admitted at trial, or to conform with any rulings of law the Court may render during the proceedings.

4887-3977-0716.1 / 108647-1004

**JA77**

**DEFENDANT'S PROPOSED JURY INTERROGATORIES**

I.    **TERMINATION**

**JURY INTERROGATORY NO. 1**

Do you find that Plaintiff proved by a preponderance of the evidence that Industrial Demolition terminated Plaintiff's employment?

Yes: _____            No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 1 – <u>DO NOT ANSWER ANY MORE QUESTIONS</u> – AND SIMPLY SIGN THE VERDICT FORM IN FAVOR OF DEFENDANT. IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 2.**

II.    **HANDICAP DISCRIMINATION**

**JURY INTERROGATORY NO. 2**

Do you find that Plaintiff proved by a preponderance of the evidence that Plaintiff is a "handicapped person" due to a physical impairment that "substantially limits" one or more major life activities?

Yes: _____            No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 2 – <u>SKIP TO INTERROGATORY NO. 10 (and do NOT answer Interrogatories 3-9)</u>. IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 3.**

4887-3977-0716.1 / 108647-1004

**JURY INTERROGATORY NO. 3**

Do you find that Plaintiff proved by a preponderance of the evidence that Industrial Demolition knew Plaintiff was a handicapped person within the meaning of the law?

Yes: _____          No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 3 – <u>SKIP TO INTERROGATORY NO. 10 (and do NOT answer Interrogatories 4-9)</u>. IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 4**

**JURY INTERROGATORY NO. 4**

Do you find that Plaintiff proved by a preponderance of the evidence that he was qualified to perform the essential functions of his position at Industrial Demolition with or without a reasonable accommodation?

Yes: _____          No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 4 – <u>SKIP TO INTERROGATORY NO. 10 (and do NOT answer Interrogatories 5-9)</u>. IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 5**

4887-3977-0716.1 / 108647-1004

**JA79**

## JURY INTERROGATORY NO. 5

Do you find that Plaintiff proved by a preponderance of the evidence that Industrial Demolition terminated Plaintiff's employment "because of" his handicap?

Yes: _____          No: _____

**PROCEED TO INTERROGATORY NO. 6**

## III.    FAILURE TO ACCOMMODATE HANDICAP

## JURY INTERROGATORY NO. 6

If you have found in Interrogatory No. 2 that Plaintiff proved by a preponderance of the evidence that Plaintiff is a "handicapped person" due to a physical impairment that "substantially limits" one or more major life activities, do you find that Plaintiff proved by a preponderance of the evidence that he needed a reasonable accommodation due to his alleged handicap?

Yes: _____          No: _____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 6 – SKIP TO INTERROGATORY NO. 10 (and do not answer Interrogatories No. 6-8). IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 7.**

4887-3977-0716.1 / 108647-1004

**JA80**

## JURY INTERROGATORY NO. 7

Do you find that Plaintiff proved by a preponderance of the evidence

that he requested an accommodation for his alleged handicap?

Yes: _____            No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 7 – SKIP TO INTERROGATORY NO. 10 (and do not answer Interrogatories 8-9) IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 8**

## JURY INTERROGATORY NO. 8

Do you find that Plaintiff proved by a preponderance of the evidence

that Industrial Demolition knew he was a handicapped person, yet refused to

provide an accommodation?

Yes: _____            No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 8 – SKIP TO INTERROGATORY NO. 10 (and do not answer Interrogatory No. 9). IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 9.**

4887-3977-0716.1 / 108647-1004

**JA81**

<u>**JURY INTERROGATORY NO. 9**</u>

Do you find that Plaintiff proved by a preponderance of the evidence that he suffered harm because of Industrial Demolition's refusal to provide an accommodation?

Yes: _____          No:_____

**PROCEED TO INTERROGATORY NO. 10**

**IV.    <u>RETALIATION UNDER G.L. 151B, 4(4)</u>**

<u>**JURY INTERROGATORY NO. 10**</u>

Do you find that Plaintiff proved by a preponderance of the evidence that he exercised a right under G.L. 151B by filing of formal charge of discrimination or complaining to management about alleged discriminatory treatment before Industrial Demolition terminated his employment?

Yes: _____          No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 10 <u>SKIP TO INTERROGATORY NO. 12 (and do not answer Interrogatory No. 11).</u> IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 11**

4887-3977-0716.1 / 108647-1004

### JURY INTERROGATORY NO. 11

Do you find that Plaintiff proved by a preponderance of the evidence that a determinative factor in the decision to terminate his employment was because he exercised a right under G.L. 151B by filing of formal charge of discrimination or complaining to management about alleged discriminatory treatment before his termination?

Yes: _____              No:_____

**PROCEED TO INTERROGATORY NO. 12**


### V.    RETALIATION IN VIOLATION OF G.L. 152, 75B(2)


### JURY INTERROGATORY NO. 12

Do you find that Plaintiff proved by a preponderance of the evidence that he experienced a workplace injury?

Yes: _____              No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 12 – SKIP TO INTERROGATORY NO. 16 (and do not answer Interrogatories 13-15). IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 13.**

4887-3977-0716.1 / 108647-1004

<u>**JURY INTERROGATORY NO. 13**</u>

Do you find that Plaintiff proved by a preponderance of the evidence

that he pursued a claim for workers' compensation before he was terminated?

Yes: _____          No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 13 – <u>SKIP TO INTERROGATORY NO. 16 (and do not answer Interrogatories 14-15)</u>. IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 13.**

<u>**JURY INTERROGATORY NO. 14**</u>

Do you find that Plaintiff proved by a preponderance of the evidence

that Industrial Demolition knew he pursued a claim for workers'

compensation before he was terminated?

Yes: _____          No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 14 – <u>SKIP TO INTERROGATORY NO. 16 (and do not answer Interrogatory 15)</u>. IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 13.**

4887-3977-0716.1 / 108647-1004

**JA84**

## JURY INTERROGATORY NO. 15

Do you find that Plaintiff proved by a preponderance of the evidence that but for his pursuit of a claim for workers' compensation he would not have been terminated?

Yes: _____          No: _____

**PROCEED TO INTERROGATORY NO. 16**

## VI.    RETALIATION UNDER G.L. 149, SECTION 148C

## JURY INTERROGATORY NO. 16

Do you find that Plaintiff proved by a preponderance of the evidence that he made a request to use paid earned sick time?

Yes: _____          No: _____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 16 – SKIP TO INTERROGATORY NO. 19 if applicable (and do not answer Interrogatories 17-18). IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 17.**

4887-3977-0716.1 / 108647-1004

**JURY INTERROGATORY NO. 17**

Do you find that Plaintiff proved by a preponderance of the evidence that Industrial Demolition knew Plaintiff made a request to use paid earned sick time?

Yes: _____                No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 17 – SKIP TO INTERROGATORY NO. 19 if applicable (and do not answer Interrogatory 18). IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 18.**

**JURY INTERROGATORY NO. 18**

Do you find that Plaintiff proved by a preponderance of the evidence that Industrial Demolition terminated Plaintiff's employment because he made a request to use paid earned sick time?

Yes: _____                No:_____

**PROCEED TO INTERROGATORY NO. 19 if applicable.**

4887-3977-0716.1 / 108647-1004

**JA86**

**VII.    <u>DAMAGES</u>**

### <u>JURY INTERROGATORY NO. 19</u>

If you have found that Industrial Demolition discriminated or retaliated against Plaintiff in the Interrogatories above, has Plaintiff proven that he suffered damages as a result of the termination of his employment?

Yes: _____                    No:_____

**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 19 <u>DO NOT ANSWER ANY MORE QUESTIONS</u> – AND SIMPLY SIGN THE VERDICT FORM. IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 20.**

### <u>JURY INTERROGATORY NO. 20</u>

If you have found that Industrial Demolition discriminated or retaliated against Plaintiff in the Interrogatories above, has Plaintiff proven that he should be awarded damages in the form of back pay to compensate for a loss of wages and benefits to the date of your verdict (minus any actual wages and additional earnings received by the Plaintiff following his separation from Industrial Demolition)?

Answer Yes or No          _____

- 11 -

**JA87**

If your answer is "Yes,"
in what amount?                    $_____


**IF YOU ANSWERED "NO" TO INTERROGATORY NO. 20 <u>DO NOT ANSWER ANY</u> <u>MORE QUESTIONS</u> – AND SIMPLY SIGN THE VERDICT FORM. IF YOU ANSWERED "YES", PROCEED TO INTERROGATORY NO. 21.**


**<u>JURY INTERROGATORY NO. 21</u>**


If you have found that Industrial Demolition discriminated or retaliated against Plaintiff in the Interrogatories above, has Plaintiff proven that he should be awarded damages in the form of front pay to compensate for a loss of future wages and benefits, taking into account earnings he is expected to receive from other employers?

Answer Yes or No          _____

If your answer is "Yes,"
in what amount?          $_____


**PROCEED TO INTERROGATORY NO. 22.**

4887-3977-0716.1 / 108647-1004

**JA88**

**JURY INTERROGATORY NO. 22**

If you have found that Industrial Demolition discriminated or retaliated against Plaintiff in the Interrogatories above, has Plaintiff proven that he is entitled to any compensatory damages for emotional distress caused by Defendant.

Answer Yes or No          _____

If your answer is "Yes,"
in what amount?          $_____

**PROCEED TO INTERROGATORY NO. 23.**

- 13 -

4887-3977-0716.1 / 108647-1004

**JA89**

**JURY INTERROGATORY NO. 22**[1]

If you have found that Industrial Demolition discriminated or retaliated against Plaintiff in the Interrogatories above, do you also find by clear and convincing evidence that Defendant's conduct is so outrageous or egregious that punitive damages are warranted because the conduct is so offensive that it justifies punishment and not merely compensation.

Answer Yes or No          _____

If your answer is "Yes,"
in what amount?          $_____

---

[1] As noted in Defendant's Motion in Limine, Defendant has also preserved an objection to an instruction on punitive damages.

4887-3977-0716.1 / 108647-1004

**JA90**

Respectfully submitted,

INDUSTRIAL DEMOLITION LLC

By Its Attorneys,

/s/ Alexa M. Esposito
Alexa M. Esposito, Bar No. 698378
aesposito@littler.com
Thomas M. L. Metzger, Ohio Bar No. 0059694
tmetzger@littler.com

LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA  02110
Dated: April 7, 2023                                Tel. 617.378.6000

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of April 2023, a true copy of the foregoing document was filed electronically through the Court's CM/ECF system, is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ Alexa M. Esposito
Alexa M. Esposito

4887-3977-0716.1 / 108647-1004

**JA91**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

ERIC MOORE,

                    Plaintiff,
          v.

INDUSTRIAL DEMOLITION, LLC
                    Defendant.

Civil Action No.: 1:22-cv-10414-RWZ

PLAINTIFF'S SUPPLEMENTAL  JURY INSTRUCTION REGARDING

QUALIFIED HANDICAP

   1.  Individuals with temporary disabilities can be qualified handicapped individuals.

   A temporary disability that effects a major life activity – i.e. physical labor, walking, lifting, renders an individual a qualified handicapped individual within the meaning of Chapter 151B. See, e.g., Gauthier v. Sunhealth Specialty Servs., Inc., 555 F. Supp. 2d 227, 240 (D. Mass. 2008)(temporary disabilities related to pregnancy and accommodations sought related to the same found sufficient to support a 151B retaliation claim related to a request for accommodation); Dartt v. Browning-Ferris Indus., Inc., 427 Mass. 1, 17, 691 N.E.2d 526, 536 (1998) ("[Defendant] urges us to hold that a temporary disability does not constitute a handicap within the meaning of the statute. We decline to do so.").

A reasonable jury could find that plaintiff's temporary inability to do heavy lifting rendered him "handicapped" within the meaning of ch. 151B, § 4. An inability to lift is a substantial limitation of a "major life activity." The Massachusetts Commission Against Discrimination includes "lifting" in its list of major life activities. *MCAD Guidelines,* § II.A.5. The First Circuit has also

1

**JA92**

held that lifting, under certain circumstances, can be a major life activity. *Gillen,* 283 F.3d at 22–23.

Gauthier v. Sunhealth Specialty Servs., Inc., 555 F. Supp. 2d 227, 240 (D. Mass. 2008)

    2. Individuals that suffer industrial accidents are per se qualified handicap individuals.

Under Massachusetts Workers Compensation Law "Any employee who has sustained a work-related injury and is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of such job with reasonable accommodations, shall be deemed to be a qualified handicapped person under [G.L. c. 151B]." If the jury concludes by the preponderance of the evidence that Mr. Moore suffered an injury at work on Saturday, December 7, 2019, then they must consider Mr. Moore a qualified handicapped individual.

Respectfully submitted,
Eric Moore,
By his Attorney,

 /s/Jamie Goodwin
Jamie Goodwin
BBO# 673207
Duddy Goodwin & Pollard
446 Main Street, 16th Floor
Worcester, MA 01608

**JA93**

1

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2

 3   * * * * * * * * * * * * *
     ERIC MOORE                 *
 4         Plaintiff            *     CIVIL ACTION
               vs.              *     No. 22-10414-RWZ
 5                              *
     INDUSTRIAL DEMOLITION,     *
 6   LLC AND MICHAEL J. ROBERTS *
           Defendant            *
 7   * * * * * * * * * * * * *

 8

 9

10            BEFORE THE HONORABLE RYA W. ZOBEL
          UNITED STATES DISTRICT JUDGE AND A JURY
11                   JURY TRIAL DAY 1
                     April 11, 2023
12

13   APPEARANCES:

14        DUDDY GOODWIN & POLLARD, (By James Goodwin, Esq.
     and Michael Turiello, Esq.) 2 Liberty Square, 10th
15   Floor, Boston, Massachusetts, 02109, on behalf of
     Plaintiff
16
          LITTLER MENDELSON, P.C., (By Thomas M.L. Metzger,
17   Esq. and Alexa Marie Esposito, Esq.) One International
     Place, Boston, Massachusetts, 02110, on behalf of
18   Defendant

19

20                            Courtroom No. 12
21                            1 Courthouse Way
                              Boston, Massachusetts 02210
22

23            JAMES P. GIBBONS, RPR/RMR
                Official Court Reporter
24           1 Courthouse Way, Suite 7205
              Boston, Massachusetts  02210
25              jamesgibbonsrpr@gmail.com
```

**JA94**

```
1                    P R O C E E D I N G S

2                        (8:50 a.m.)

3           THE COURT:  I should mention for the record that

4    plaintiff's counsel are Mr. Eric Moore, Jamie Goodwin, and

5    Mr. Michael Turiello is plaintiff, I think.

6           No.  Mr. Moore is the plaintiff.  Okay.  And Jamie

7    Goodwin and Michael Turiello are the counsel for him.

8           The defendant is represented by Thomas Metzger, Alex

9    Esposito, and Michael -- Michael Roberts is the defendant,

10   the named defendant.  So those are the persons sitting at

11   counsel table.

12          We thought that we would start early with some motions

13   that would allow us to continue in due course, but since the

14   judge who is currently impaneling hasn't finished yet, we

15   can't really start until he does and we get the jurors who

16   have not been previously assigned anywhere.

17          So the motions -- there are a bunch of them.  And I

18   think the best way to do this is to ask the plaintiff,

19   first, what motion they want to present initially, and we'll

20   deal with that.  And then we go -- once we finish with the

21   plaintiff's motion, we go to defendant's motion and do the

22   same thing.

23          But tell me what the motion is because I have them all

24   collected on -- you know, in bunches.

25          MR. GOODWIN:  So our initial motion in limine is
```

**JA95**

3

```
1    Document No. 40, and it essentially --
2            THE COURT:  Document 40, I have.
3            MR. GOODWIN:  Yes.
4        So basically, if you put it into three buckets, your
5    Honor, there's the evidence that honestly is probably going
6    to be discussed -- and this isn't everything, but this is
7    the macro points.  It's the -- some of it might be
8    appropriate to come in for probative purpose, such as, you
9    know, the answer to interrogatories or things like that, but
10   not for the truth that's in those documents.
11           THE COURT:  We're still talking about items one
12   through five, correct?
13           MR. GOODWIN:  So we are -- yes, correct.
14       We are talking about -- yes.
15       So the five things that we listed, and I believe the
16   complaint has been withdrawn, so I don't think item one is
17   an issue any longer.
18           THE COURT:  So everybody agrees that the complaint
19   should not be part of the evidence, or that it should be?
20           MR. METZGER:  We have withdrawn that as an exhibit.
21           THE COURT:  Well, I made a note to myself, okay.
22   So it is no longer part of the evidence.
23           MR. METZGER:  Correct.
24           THE COURT:  It's just simply one of the records in
25   the case.
```

**JA96**

4

```
 1              MR. METZGER:  Yes.
 2              THE COURT:  And does that mean that counsel objects
 3    to its going to the jury as an exhibit?
 4              MR. METZGER:  I'm sorry, your Honor?
 5              THE COURT:  Do counsel object to the inclusion of
 6    the complaint, number one, as an exhibit; and, number two,
 7    to go to the jury room when they deliberate?
 8              MR. METZGER:  Right now we've withdrawn submission
 9    of both those items one and two.
10              THE COURT:  So the complaint is not part of the
11    evidence?
12              MR. METZGER:  That's correct.
13              THE COURT:  Okay.
14              MR. GOODWIN:  Yes, your Honor.
15         So the parties conferred, and I do not think items one
16    and two are -- the defendant is seeking to submit any
17    further.
18         So that really leaves items three, four, and five,
19    which are -- the first two really are the NLRB documents.
20              THE COURT:  So items two, three, four, and five are
21    still to be determined.
22              MR. GOODWIN:  No.  Three, four, and five.
23         One and two --
24              THE COURT:  Three, four, and five are to be
25    determined.
```

**JA97**

5

```
1          One and two have been agreed?
2               MR. GOODWIN:  Withdrawn.
3               THE COURT:  Withdrawn.
4      Now, three is documents relating to the NLRB
5  investigation.
6               MR. GOODWIN:  Yes, certainly, your Honor.
7      So these are legal documents that a jury -- that would
8  frankly just confuse a jury.  The NLRB is a fairly archaic
9  system, and honestly they're just inadmissible hearsay
10 without an exception.
11     I think that there could be -- the affidavit of
12 Mr. Moore that was submitted could be used for impeachment
13 purposes.  But otherwise they're of no probative value.
14              THE COURT:  How did the NLRB case start?
15              MR. GOODWIN:  The NLRB --
16              THE COURT:  Was that at the instance of the NLRB or
17 at the instance of counsel?
18              MR. GOODWIN:  Well, Mr. Moore filed a charge after
19 his -- so after -- we contend Mr. Oberkramer terminated
20 Mr. Moore.  After that there was a conversation between
21 Mr. Moore and Mr. Roberts.  In the conversation, Mr. Roberts
22 said, Well, my understanding is that you were sent home
23 because Mr. Oberkramer said that you were having
24 conversation with other employees about their earnings, and
25 we don't like that in workplace scuttlebutt.
```

**JA98**

1      So that is a per se illegal violation of the National

2    Labor Relations Act.  And the NLRB became involved

3    thereafter and found some other things that aren't really

4    related to this proceeding.

5           THE COURT:  How was that lawsuit instituted?

6           MR. GOODWIN:  It was a charge by Mr. Moore at the

7    Board.

8           THE COURT:  To the agency?

9           MR. GOODWIN:  To the agency, yes.

10           THE COURT:  And then the agency went forward into

11    court?

12           MR. GOODWIN:  Yes.

13      And then the agency issues a complaint.  Then they do

14    whatever they want.  Mr. Moore no longer has control because

15    they're a quasi, you know, law enforcement agency.

16      So the engagement of that -- so, one, it's hearsay.

17    Two, it involves legal conclusions.

18      I think any representation made actually by Mr. Moore,

19    such as an affidavit, could come in for impeachment, but the

20    introduction of the documents are going to result in us

21    litigating the case that was resolved at the NLRB.

22           THE COURT:  But are not those documents relevant to

23    the issues in this case in this trial?

24           MR. GOODWIN:  They are relevant, but they're

25    hearsay.  Because we would have to call somebody from the

**JA99**

```
1    Board to explain why they did what they did.  They're not

2    self-authenticating.  And it's not the entire Board report

3    file, which is about 500 pages.

4         THE COURT:  So the basis for the objection to

5    documents relating to both the NLRB investigation and

6    settlement is that we don't know really what they are?

7         MR. GOODWIN:  We don't know why the decisions made

8    were made.  We'd have to get into what occurred when.  And

9    that would really detract away from what the initial

10   conversation was prior to when Mr. Moore was terminated when

11   Roger Oberkramer told him to, Get offsite.  You're not

12   working here anymore, because of his job accommodations.

13        So it is not as if you can't have two violations, and

14   that this -- the violation of the National Labor Relations

15   Act somehow eliminates the violation of the 151B point.

16        So that's sort of the investigatory documents part of

17   it.

18        I think the settlement goes a step further because

19   that's plainly a collateral source, just like unemployment

20   reports, Department of Industrial Accident records, that

21   doesn't come -- that should not come in in evidence to the

22   jury because it's unduly prejudicial as a collateral source.

23   And if there's any sort of offset that needs to be

24   discussed, it should really be dealt with through the Rule

25   60 process subsequent to -- if the plaintiff is to succeed
```

**JA100**

8

```
 1    in their case.

 2              THE COURT:  Okay.

 3              MR. METZGER:  Thank you, your Honor.

 4         First, with respect to the --

 5              THE COURT:  I'm sorry?

 6              MR. METZGER:  With respect to the NLRB documents,

 7    first, there is an affidavit that plaintiffs submitted to

 8    the NLRB, certainly not only for impeachment --

 9              THE COURT:  An affidavit by whom?

10              MR. METZGER:  By Mr. Moore, by the plaintiff, in

11    connection with his claims.

12         Certainly we believe that that should come in.  It's a

13    sworn statement.

14              THE COURT:  And did that affidavit include exhibits

15    which are at issue now?

16              MR. METZGER:  The affidavit is -- it stands alone.

17    That affidavit we can parse out from just the charged

18    documents, your Honor.  So I believe part of what

19    plaintiff's counsel is arguing is that there are charges

20    that were, for example, signed by counsel or that were just

21    submitted, similar to the complaint in this lawsuit,

22    submitted by counsel.

23         But there's an affidavit signed by the plaintiff that

24    we certainly believe should come in.

25              So that's the first issue.
```

**JA101**

9

```
1              THE COURT:  An affidavit signed by the plaintiff.

2              MR. METZGER:  By the plaintiff, initialed on each

3    page, dated by the plaintiff as a part of his claims against

4    this same employer for the exact same duration time of

5    employment.

6              THE COURT:  An this was after the commencement of

7    the lawsuit, the initial lawsuit?

8              MR. METZGER:  This was after the end of his

9    employment with Industrial Demolition.  I don't know, your

10   Honor, in terms of the exact timing of the lawsuit versus --

11   I believe --

12             THE COURT:  But it was relevant to the initial

13   proceedings?

14             MR. METZGER:  Correct.

15             MR. GOODWIN:  Your Honor, if I may on the

16   affidavit?

17             THE COURT:  Yes.

18             MR. GOODWIN:  We don't have an issue with the

19   affidavit coming in.

20             THE COURT:  I'm sorry?

21             MR. GOODWIN:  I said if the affidavit is all that's

22   coming in from the NLRB, the plaintiff does not object, and

23   we --

24             THE COURT:  You're not offering it?

25             MR. GOODWIN:  No, no.
```

**JA102**

```
 1          If the defendant's point is that the affidavit should
 2   come in to that particular part of the NLRB record, the
 3   plaintiff is fine with that coming in.
 4          THE COURT:  So we have no disagreement.
 5          MR. GOODWIN:  Just on the affidavit.
 6      There are other documents that --
 7          THE COURT:  So the affidavit comes in not by
 8   agreement but without disagreement.
 9          MR. GOODWIN:  Well, effectively -- technically
10   speaking, it should come in for impeachment.  But what's the
11   difference, honestly, your Honor?
12          THE COURT:  So the affidavit is no longer an issue.
13          MR. GOODWIN:  Correct.
14          MR. METZGER:  Correct.
15          THE COURT:  What is an issue?
16          MR. METZGER:  So the remaining issue, your Honor,
17   at the NLRB then is this settlement.  There was a settlement
18   that the defendant reached with the plaintiff, and it was a
19   direct payment from Industrial Demolition to the plaintiff
20   for back pay and for front pay.  It was not a collateral
21   source, and we submitted case law on this.
22      "Collateral," of course, by definition means some third
23   party.  If there is an insurance company that paid it.  It's
24   through unemployment compensation, a fund, that paid it.
25   That's a collateral source.
```

**JA103**

```
1              THE COURT:  How much money is involved
2    approximately?
3              MR. METZGER:  Approximately $75,000.
4              THE COURT:  How much?
5              MR. METZGER:  75,000.
6              THE COURT:  35,000.
7              MR. METZGER:  75,000.
8              THE COURT:  75,000.
9              MR. METZGER:  Correct.
10             THE COURT:  Why should that come in?  Why should
11   that -- I mean, can't the parties agree that to the extent
12   that the plaintiff has been paid damages for certain items,
13   that he's not entitled to get paid again for those same
14   items?
15             MR. GOODWIN:  Your Honor, I think that's correct.
16   I think it's --
17             THE COURT:  So how is the money paid as a result of
18   trial number one not -- shouldn't just go away and not be
19   mentioned in this case?
20             MR. GOODWIN:  Yes.  So the damages --
21             THE COURT:  Or not used in this case to get more
22   money.
23             MR. GOODWIN:  I think the plaintiff's point is that
24   it shouldn't being submitted to the jury.  It isn't that, if
25   we succeed at trial, that they wouldn't be dealt with in the
```

**JA104**

12

1    post-hearing process for Rule 60 purposes.  You know, the

2    Rule 60 process.

3        But it isn't -- because effectively what the

4    defendant's arguing, and the position of the defendant in

5    their motion in limine, is that the plaintiff is prevented

6    from collecting any back or future wages as a consequence of

7    entering into a settlement administered by the federal

8    government.

9            THE COURT:  Why is he wrong about that?

10           MR. GOODWIN:  Because under 151B is an individual

11   right to action provided by the Commonwealth of

12   Massachusetts for a -- for violation of the rights to

13   discrimination.

14       The National Labor Relations Act, once the federal

15   government gets involved, is just like the Department of

16   Unemployment Assistance or the Department of Industrial

17   Accidents, which all is money that comes from the employer.

18       If the defendant's argument is correct, worker's

19   compensation settlements come in, unemployment assistance

20   settlements come in, and that's not how "collateral source"

21   is defined in the First Circuit or in the Commonwealth of

22   Massachusetts.

23           THE COURT:  What was the payment of that first

24   trial about?  I mean, what was it designed to --

25           MR. GOODWIN:  Effectively, the National Labor

**JA105**

1    Relations Board found they should pay a fine through -- you

2    know, there are two types of settlements.  They have more

3    formal settlements and an informal settlement.

4        This was an informal settlement that only resolved that

5    specific matter.  It includes language stating that only

6    that specific matter is resolved about violations of the

7    Act.

8        Now, Mr. Moore received compensation for violations of

9    the Act, but it wasn't -- but that effectively is a fine;

10   that is, the government, the National Labor Relations Board

11   executing a fine against the Board [sic] and directing

12   payment to Mr. Moore.

13           THE COURT:  Who paid the fine, the defendant?

14           MR. GOODWIN:  The defendant did as administered by

15   federal government.  And the involvement of the

16   administrative government in Massachusetts renders it a

17   collateral source.

18       And further, it will just confuse the jury about a

19   dispute that happened the week after he was terminated.  I

20   mean, Mr. Moore -- this happened after the plaintiff

21   contends that he was terminated.  He was terminated on a

22   Friday.  This conversation happened on a Tuesday.  The

23   defendant held out illegal actions as the justification.

24   Almost a legitimate non-discriminatory reason was just

25   inherently non-legitimate, if you were to look at it that

1    way.  And it's post his employment.

2        So it's -- I don't necessarily have an issue as to

3    mitigation post hearing.  I'm not trying to double dip or

4    something like that.

5        But in terms of getting into the conversation with the

6    jury, it distracts about whether or not Mr. Moore was

7    terminated illegally under his own rights.  Because once a

8    charge is filed with the Board, the Board can issue a

9    settlement without Mr. Moore.  And that was part of the

10    conversation with the Board agent for -- about whether or

11    not to resolve it.

12        So then once we get into that, we have to start

13    explaining, Why did you enter into this settlement?  Was it

14    truly an elective decision or not?  And it gets far more

15    complicated and still doesn't talk about what happened on

16    the Friday when Eric Moore was terminated.

17        THE COURT:  So is it the plaintiff's position that

18    if the jury comes back not knowing about this prior issue,

19    that he is entitled to retain what he got initially and the

20    amount of money that the jury may or may not give him now?

21        MR. GOODWIN:  Well, it's also -- it -- what I

22    expect my brother to do is even go a step further than that,

23    your Honor, which is to say that somehow all -- he is

24    entitled to no further compensatory damages because this

25    settlement happened, I believe, in August of 2020, and he is

1    entitled to no compensatory damages or front pay after

2    August 2020 because of that settlement, when he did not

3    waive any rights in connection to the 151B, 152, and Wage

4    Act counts that we also have here today.

5            THE COURT:  So you're suggesting that there are

6    other things that -- if they prevail on what they want to

7    leave out, that there are other things that should be left

8    out?

9            MR. GOODWIN:  No, I'm not just suggesting it, that

10   is an argument they make in their motion in limine.  In

11   their omnibus motion in limine, they specifically assert

12   that the plaintiff should be capped from getting any

13   compensatory damages as a consequence of the settlement with

14   the National Labor Relations Board.

15           THE COURT:  Do we have a -- is there a written

16   document that is entitled "settlement"?

17           MR. GOODWIN:  Yes.

18           MR. METZGER:  Yes, there is, your Honor, and --

19           THE COURT:  Is that part of the record in this case

20   now?

21           MR. METZGER:  It is.  It's Exhibit No. 17.

22           THE COURT:  Seventeen?

23           MR. METZGER:  Seventeen.

24       And there was a payment as a part of that, your Honor,

25   that -- the total payment was approximately $83,000.

**JA108**

```
 1        It was $85,000.  So it was off by 10,000.
 2        The settlement is between Industrial Demolition, my
 3  client --
 4             THE COURT:  How much was the settlement?
 5             MR. METZGER:  $85,000.
 6             THE COURT:  That's the 85,000 that he's gotten?
 7             MR. METZGER:  Yes.
 8        And it specifically states in the settlement agreement,
 9  your Honor, that it is for back pay and for front pay.
10             THE COURT:  And for what?
11             MR. METZGER:  For front pay.
12        They're trying to prevent us from even mentioning the
13  fact that he received the Back Bay.
14        And, just very briefly, we quoted in our motion in
15  limine, Document No. 43, page 11, the plaintiff states -- I
16  asked him, "You understand that this was full reimbursement
17  for your back pay in connection with your employment at
18  Industrial Demolition, correct?"
19        ANSWER:  "Yes."
20        And that at page 134, lines 11 to 18 in his deposition.
21        There is -- they're attempting to now exclude us from
22  even mentioning the fact that he reached a settlement, that
23  the company that's the defendant here paid him, is going far
24  too far here.  He received the money, was paid.  It's for
25  back pay, and it's for his allegation that he was
```

**JA109**

```
 1    discriminated for another reason.
 2          We certainly --
 3            THE COURT:  So your view is he's entitled to no
 4    back pay because he's already been paid that.
 5            MR. METZGER:  He's been paid that.
 6            THE COURT:  That's the issue.
 7            MR. METZGER:  That's the issue.
 8          And we should be able to introduce it.
 9          And they're arguing, for example, that there's some
10    other period.  The settlement, your Honor, was in October of
11    2019.  If they're arguing, for example, that he's entitled
12    for back pay post October 2019, we can have that fight on
13    the record.  We can discuss that.  But we certainly
14    shouldn't be prohibited, where he receives the money.
15    Defendant has paid him directly the money.  He accepted and
16    cashed the check.  We shouldn't be prohibited from raising
17    that.
18          He's arguing now there's another reason why he
19    supposedly was terminated, but we shouldn't exclude the
20    reason that he said he was terminated for, that he accepted
21    money for.
22            MR. GOODWIN:  Your Honor, if I may?
23            THE COURT:  Okay.
24          Let me -- if you -- are you saying he is entitled to
25    recover again now what he recovered earlier?
```

**JA110**

```
1              MR. GOODWIN:  No.  I'm saying that the -- what the
2    -- that last argument that my brother made is the very
3    point, that the National Labor Relations Board writes
4    certain things on forms, and that Mr. Moore -- and the
5    legal -- at deposition, that is a legal conclusion of a
6    nonlawyer.  So that's not even admissible, and that argument
7    is a red herring in my opinion.
8         But if you're stepping back from it even further, the
9    events that led to the charge with the National Labor
10   Relations Board occurred subsequent to termination.
11        We are not arguing that the -- we are happy to have the
12   Court rule, if we are successful here today, subsequent to
13   hearing, that he already received compensatory payment up
14   until whenever he was paid by the National Labor -- pursuant
15   to that settlement.
16        But if we agree to that, there is no purpose to
17   introduce this settlement other than to confuse the jury
18   about a separate legal process that is archaic and not
19   related.
20        He was fired on Friday.  The reason that Michael
21   Roberts gave him for his termination was because he engaged
22   in activities under the National Labor Relations Act.  The
23   Board investigated that, and to fine them, as they always
24   do, they entered into a settlement that they are also a
25   party to, and the regional director --
```

**JA111**

```
1              THE COURT:  "They" being --

2              MR. GOODWIN:  The National Labor Relations Board.

3              THE COURT:  -- the NLRB.

4              MR. GOODWIN:  Exactly.

5          So just as Mr. Moore received unemployment compensation

6      in this case, just as he got medical benefits pursuant to a

7      Department of Industrial Accidents case, and just as he

8      received the settlement of the National Labor Relations

9      Board, he -- those should not come in because it's a

10     separate --

11             THE COURT:  He didn't get it from the Board.  He

12     got it from the defendant.

13             MR. GOODWIN:  But the worker's comp. he got it from

14     the defendant as well because within the worker's

15     compensation scheme, any insurance company is inherently a

16     stand-in for the employer.  They are a party to the case

17     just as with the National Labor Relations Board.  The

18     employer has to sign off on those determinations.

19         And it's the same with unemployment.

20             THE COURT:  But signing off on it doesn't mean that

21     they can't use it as a deduction of any further benefits

22     that he may -- or any further recoveries that he gets.

23             MR. GOODWIN:  No, I agree with that.

24         But the separate point is about -- but that's a Rule 60

25     process, not something that needs to go to the jury because
```

1   it is a collateral source under the law.

2         THE COURT:  He testified at this event, did he not?

3         MR. GOODWIN:  No.  He engaged -- I filed a charge

4   on his behalf, which I do not -- which is also -- they're

5   attempting to submit.  And then because on the website,

6   where you just check all the boxes on the form, and then

7   they interviewed him and he gave an affidavit.  We are

8   agreeing that the affidavit should come in, but --

9         THE COURT:  And the affidavit says what?

10        MR. GOODWIN:  It basically gives a recitation of

11  what happened.  It's a factual recitation that is relevant

12  to this proceeding and is the only true statement made by

13  Eric Moore about what happened.  Everything else --

14        THE COURT:  So you're offering it not for the fact

15  that he received payment already, but for what he said the

16  issue was?

17        MR. GOODWIN:  Correct.

18        MR. METZGER:  And then, your Honor --

19        THE COURT:  That's a different animal.

20        MR. GOODWIN:  They are, but there's -- the

21  defendant is gaining nothing by confusing the jury by

22  introducing this.  Because they're going to argue that

23  somehow magically that because you filed a charge and

24  entered into a settlement with the Board, that you -- the --

25  he somehow waives all his 151B rights.  And it is not

1    accurate.  And it will only confuse the jury, never mind

2    being a collateral source.

3           THE COURT:  Well, there has to be some explanation

4    to the jury that would prohibit them from compensating the

5    plaintiff again for what he has already been compensated.

6    So there has to be some understanding by the jury as to what

7    happened, doesn't there?

8           MR. GOODWIN:  I don't think so, no.

9        I think that if we -- we will agree on remittitur

10   subsequent.  I don't see why the jury needs to know.

11          THE COURT:  And what exactly would you agree to,

12   simply that he got money?

13          MR. GOODWIN:  Yeah.  If the jury issues X amount of

14   compensatory damages, and if it were --

15          THE COURT:  So it's post judgment.

16          MR. GOODWIN:  Yes.

17          THE COURT:  Post verdict you would deduct this

18   amount?

19          MR. GOODWIN:  Yeah.

20          THE COURT:  What does that say about the basis for

21   that amount in the trial now?  I mean, are you going to

22   retry the issue that --

23          MR. GOODWIN:  I mean, it's pretty straightforward,

24   your Honor.  It's just his back wages.  I mean, we've

25   eclipsed the period of time --

**JA114**

1    THE COURT:  But if it's only back wages, then it
2    doesn't in any way alleviate any issues of payment, for
3    instance.
4        MR. GOODWIN:  No, no.
5    Emotional distress -- I don't think we're talking about
6    emotional distress and punitive damages, which I think are
7    separate analyses, although, you know, punitive damages has
8    to be related to the compensatory reward in some --
9        THE COURT:  So your view is that they're entitled
10   to let the jury know that he's already been paid an amount
11   for back pay?
12       MR. GOODWIN:  No.  My position is that the amount
13   should not go to the jury because I believe that is a
14   collateral source and that if they want to probe Mr. Moore
15   about the charge that he filed and why he filed a charge, if
16   they believe it's inconsistent with the case we are
17   presenting here today, I think that they can have that
18   fight.  But -- and I think -- and we will -- we have already
19   agreed to submit the affidavit, so I think that they are
20   able to make those particular arguments.
21       But the introduction to the jury and the argument that
22   the defendant has already made about -- that he is capped
23   from further compensatory damages, again emotional distress
24   and punitives are separate, but he's capped from all such
25   compensatory damages and he got enough money already -- he

**JA115**

```
 1    got enough money already is the argument they are going to

 2    make, or at least I anticipate.  And that should not go to

 3    the jury.  It will confuse them.

 4         The National Labor Relations Board is not a party to

 5    this proceeding and that if that type of evidence is

 6    submitted, then we have to get -- have the Board come down

 7    here and explain why they authorized the settlement.

 8    Because this isn't just something that we agreed to

 9    together.  This is all administrative -- we didn't even

10    discuss it with the defendant.  It all goes through the

11    Board.

12         THE COURT:  What is the plaintiff planning to offer

13    in the way of the damages to him; that is, I guess you're

14    talking primarily about physical damages and not about loss

15    of earnings right now with respect to the first settlement.

16         MR. GOODWIN:  We are seeking compensatory damages

17    through a period, I believe, from a year from today because

18    that was the day that Mr. Moore would have --

19         THE COURT:  So his damages would begin today?

20         MR. GOODWIN:  No, no, no, from a year from today.

21    So we're seeking one year of front pay, and retroactive

22    damages to the date of termination.

23         And then I put -- what I'm suggesting is that -- just

24    as I can't tell the jury, Yes, you should be giving -- I

25    want nine times the amount of damages or that I can create
```

**JA116**

```
 1    these points of confusion around what a fair settlement is,

 2    they should look at neutrally, determine what a fair

 3    settlement is in the context of it.  And then in the

 4    post-hearing process, then the appropriate offsets are

 5    applied, just as it should be with his earnings.

 6          THE COURT:  What did the parties understand that

 7    settlement to be for?

 8          MR. GOODWIN:  We understood it was specifically

 9    about the National Labor Relations case only.  And there is

10    language that states in the settlement that this only

11    resolves this matter, and they have a nonadmission provision

12    in it.

13          THE COURT:  It will resolve this matter?

14          MR. GOODWIN:  Only -- it is only resolution of this

15    dispute, no other.

16          THE COURT:  It says that --

17          MR. GOODWIN:  It says that.

18          THE COURT:  Only this?

19          MR. GOODWIN:  Yes.

20          THE COURT:  And the "this" is what?

21          MR. GOODWIN:  What's that?

22          THE COURT:  What exactly did they agree at that

23    level or at that point?

24          MR. GOODWIN:  So we were going to a hearing before

25    an administrative law judge in, I want to say, October or
```

**JA117**

1    November, your Honor.

2            THE COURT:  But what were the issues that were --

3            MR. GOODWIN:  It was the speech issues.

4            THE COURT:  I'm sorry?

5            MR. GOODWIN:  The owner of the company, your Honor,

6    held out that the reason that Roger Oberkramer sent

7    Mr. Moore home, and I think this is pretty much undisputed

8    too, your Honor, the reason they sent Mr. Moore home was not

9    his disability, was not the injury he suffered at work, but

10   rather that he was talking about workplace scuttlebutt.

11           So on the advice of counsel, if that -- if discovery

12   bore that out, we filed a charge because we only have six

13   months to do so.

14           But what discovery demonstrated was that is not what

15   happened, and I think it was a reason -- a very poor

16   explanation or justification for an illegal action.

17           And then the National Labor Relations Board

18   investigated what was occurring and found that these types

19   of conversations were occurring at Industrial Demolition

20   regularly.

21           So they decided on an amount to resolve it and told --

22   and they -- and basically negotiated a settlement between

23   the parties because of their discovery that the employer was

24   limiting the protected activity of their employees to engage

25   in Industrial's -- protected Industrial speech around wages,

**JA118**

1  because obviously that is the first step you need to be able

2  to engage with to form a union.

3          THE COURT:  The alleged wrong that the agency

4  agreed with was not anything that he did other than talking

5  with other employees about --

6          MR. GOODWIN:  It is not.

7          THE COURT:  -- pay.

8          MR. GOODWIN:  It is -- the plaintiff's contention

9  is it was not why he was fired in this case.  And it was

10  borne out in discovery that that's not why he was fired.  It

11  was the explanation about why he was fired by Mr. Roberts,

12  here sitting in this room.  And it was an illegal

13  explanation, so the National Labor Relations Board engaged

14  an investigation, issued a complaint, and scheduled the case

15  for a hearing.

16          THE COURT:  So it had nothing to do with his

17  physical well-being.

18          MR. GOODWIN:  It had nothing to do with disability

19  discrimination, other than it's a conversation that

20  occurred -- that was prompted by Eric Moore.  He called on

21  Monday.  He called Mr. Roberts, and on Tuesday they spoke.

22  And that -- it did not have anything to do with whether or

23  not he was disabled, his accommodation was not -- now,

24  Mr. Moore reported it to him, and we'll contend that an

25  investigation should have occurred.  Mr. Roberts should have

**JA119**

```
 1    managed this, but he didn't.
 2         But that's just the facts of this case, and what
 3    happened happened.
 4         But the Board's investigation thereafter and other
 5    employees they talked to, the other decisions that they
 6    made, that is just -- it is a separate matter.
 7              THE COURT:  Were any other employees involved?
 8              MR. GOODWIN:  Yes.  I believe at least a handful.
 9    I know a gentleman named Kenny Webber.
10              THE COURT:  Who were fired or let go?
11              MR. GOODWIN:  I don't think that the Board ended up
12    concluding that anybody was fired or let go.
13              THE COURT:  So the Board was not engaged with any
14    other prospective plaintiff?
15              MR. GOODWIN:  I think they spoke to other people,
16    but I do not believe that anybody else filed a charge.  But
17    we have a copy of the Board record.  But it's all redacted,
18    so I can't really tell who they talked to.
19              THE COURT:  I gather your position is that since
20    he's not asking for damages for the conduct that was covered
21    by the agency, we can't talk about the agency?
22              MR. GOODWIN:  Not that we can't talk about the
23    agent, but we just can't talk -- the settlement is the
24    issue.
25         If you want to talk about, Did you file a charge with
```

**JA120**

```
 1    the National Labor Relations Board, did you write this
 2    affidavit, Mr. Moore, they want to impeach him, that's fair
 3    game.
 4         But to say that somehow he can't collect compensatory
 5    damages because Industrial Demolition violated the National
 6    Labor Relations Act and the NLRB ran an investigation, fined
 7    the defendant and then issued money to Mr. Moore, that's
 8    just like unemployment and workers compensation.
 9         THE COURT:  And there is no document with respect
10    to the settlement that describes what the settlement is for?
11         MR. METZGER:  Your Honor, the document itself,
12    Exhibit No. 17 describes that this is a payment of back pay
13    and front pay.
14         And I think, to cut to the chase on this, I think an
15    easy resolution to this is if the plaintiff wants to argue
16    additional back pay post-settlement agreement with the NLRB,
17    I think that's a fair compromise and resolution to this.  He
18    signed the settlement agreement as of October 9, 2020.
19         THE COURT:  The document that the plaintiff signed
20    says exactly what with respect to this issue?
21         MR. METZGER:  It says that there is a settlement
22    directly between Industrial Demolition and Eric Moore on the
23    charge that he had filed with the National Labor Relations
24    Board.
25         THE COURT:  And that what was what?
```

**JA121**

```
1              MR. METZGER:  That was the charge where he alleged
2       that he was terminated for talking about wages.
3              THE COURT:  Terminated...
4              MR. METZGER:  ...talking about wages, among others.
5              THE COURT:  So that document --
6              MR. METZGER:  This document is tied to the
7       affidavit that counsel's already agreed comes in.
8          But they want us to then be stuck with, have the
9       affidavit in, we can then impeach him on, but not get to the
10      fact that he not only came to a resolution but had been paid
11      directly by the company, not a collateral source, directly
12      by the company for that money.
13         And if they want to argue that he is entitled to
14      additional back pay up to today, that's -- we compromise on
15      that.  That's fine.  Let them do that.
16         But we shouldn't be silenced when he then says, I was
17      fired for a particular reason.  He files an affidavit saying
18      that.  He collects money in a settlement, and it was
19      Industrial Demolition that paid it.
20         We shouldn't be prohibited from raising that.
21             THE COURT:  So you don't object to all this coming
22      in, but you want to have your defense as well?
23             MR. METZGER:  We want to have our defense, your
24      Honor.  We want to be able to say that this comes in --
25             THE COURT:  The precise issue that I need to decide
```

**JA122**

```
 1    is what, your motion to --
 2              MR. METZGER:  The -- they want to exclude this
 3    settlement.  The plaintiff wants to exclude us from even
 4    raising the settlement that the plaintiff signed and on
 5    which he collected $85,000 for back pay and front pay.
 6          And we just want --
 7              THE COURT:  Why should this jury not know that?
 8              MR. GOODWIN:  Well, again, and I don't mean to
 9    belabor the point, it is clearly a collateral source in the
10    Commonwealth of Massachusetts.  The defendant has cited no
11    cases that supports the proposition that once the government
12    gets involved, that these type of resolutions don't become
13    collateral sources.  And every ruling that I can find on it
14    -- again it's not on National Labor Relations Board cases,
15    but every other similar case where the money has come -- the
16    employer is a party to a dispute that a third-party
17    government agency gets involved in, those are collateral
18    sources.  Unemployment, worker's compensation in
19    Massachusetts are collateral sources.  And there is no
20    distinction, your Honor, between that and a National Labor
21    Relations Board settlement.
22          And much the opposite, unlike the Department of
23    Unemployment or the Department of the Industrial Accidents,
24    the National Labor Relations Board can -- actually has more
25    power.  They can force settlements on people?
```

**JA123**

```
 1              THE COURT:  As I understand it, you're agreeing to
 2    deduct that amount from any verdict that the jury might
 3    render?
 4              MR. GOODWIN:  Correct.
 5              THE COURT:  Regardless of what the jury -- why the
 6    jury came up with a certain --
 7              MR. GOODWIN:  If they gave us less money, I will
 8    not agree to remit payment, but that would be the only
 9    issue.
10              THE COURT:  I mean, it's not clear to me why the
11    jury that has to determine an amount that is payable to the
12    plaintiff to make him whole should not know that he's
13    already been paid an amount by the defendant in an earlier
14    situation.
15              MR. METZGER:  And, your Honor, on that point,
16    exactly --
17              THE COURT:  Wait a minute.  I just want him to tell
18    me why I should not do that.
19              MR. GOODWIN:  Because a jury -- they're not a jury
20    of legal experts.  And when you get involved in something as
21    archaic on how resolution at the National Labor Relations
22    Board works, there is not -- it is not a straightforward
23    economic transaction where they pay him X for a vacation
24    payout or something like that, that's perhaps outside of a
25    settlement.
```

**JA124**

```
1          It is an archaic, structured position that we didn't
2     have that much say over whether or not to enter into.  We
3     were pushed to do it.
4          THE COURT:  So the --
5          MR. GOODWIN:  The amount is not an amount we came
6     up with, your Honor.  It isn't like we proposed $200,000,
7     and this is what we want.
8       The Board came in and said, this is what you're
9     getting.  Take it or leave it.
10         THE COURT:  But the proposal now is that the jury
11    not be told about this; that whatever verdict they come up
12    with will be reduced by the amount that he's already
13    received; is that what you're saying?
14         MR. GOODWIN:  Yeah, the actual settlement itself,
15    just as with our arguments about his subsequent paystubs, if
16    there is appropriate remittitur or reduction, if we're
17    fortunate enough to be successful, that makes sense, that it
18    would be fair that he not get additional compensatory
19    damages or --
20         THE COURT:  But the jury won't know anything about
21    that under your suggestion.  They would simply go ahead and
22    render a verdict in the normal course.
23         MR. GOODWIN:  But, your Honor, it's not my
24    suggestion --
25         THE COURT:  I'm asking.
```

**JA125**

```
 1              MR. GOODWIN:  It's not my suggestion.  I think it's
 2    case law in Massachusetts that this is a collateral source.
 3              THE COURT:  But that's what you want to do.  You
 4    want to go forward with the full amount, and then once the
 5    jury has decided, reduce -- if it comes up with anything for
 6    the plaintiff, reduce that amount by the amount that he's
 7    already gotten?
 8              MR. GOODWIN:  Precisely.
 9              THE COURT:  Why is that not a reasonable
10    proposition?
11              MR. METZGER:  Several reasons, your Honor.
12         First of all, I think the jury can fully understand
13    that Mr. Moore was given a check for $85,000.  He cashed the
14    check.  And Mike Roberts and his company, Industrial
15    Demolition paid him a check.  That's it.
16         It's not a collateral source.  It's not a confusing
17    issue.
18         There was a settlement that they reached directly.
19    It's not through a separate fund.  It's not a fund set up
20    through the National Labor Relations Board to pay insurance.
21    It's a direct payment --
22              THE COURT:  This was a settlement of precisely what
23    claim?
24              MR. METZGER:  Of his allegation that he was
25    terminated because he talked about wages among other
```

**JA126**

1    coworkers, your Honor.

2         THE COURT:  And is that -- so that issue, that

3    possible justification of termination, is not going to have

4    any evidence before this jury?

5         MR. METZGER:  Well, no, your Honor.

6         Really getting to the points of it, the settlement

7    related to the termination of the employment.  That's what

8    he was settling.

9         THE COURT:  The settlement what?

10        MR. METZGER:  The settlement related directly to

11   the termination of his employment.  He was alleging that he

12   was -- there was adverse action taken against him.

13        Because if there was no adverse action taken against

14   him in connection with talking about wages, there would be

15   no violation that they could then assert.

16        So what they're saying is, He says he was terminated

17   for certain reasons.  He collected money from the defendant

18   for that.  Now they want to silence us on it and say, Well,

19   we don't want to confuse the jury --

20        THE COURT:  What does the defendant want with

21   respect to this?

22        MR. METZGER:  Defendant wants to be able to have

23   the settlement agreement admitted into evidence, have the

24   opportunity to cross-examine the plaintiff as to that

25   settlement and his acceptance of back pay through, at

```
1    minimum, October of 2020.
2         Those are the facts.  It's not confusing.
3              THE COURT:  How many months of back pay does that
4    involve?
5              MR. METZGER:  It essentially, your Honor, got to
6    close to ten months.  He was --
7              THE COURT:  So it's about a year, not quite a year.
8              MR. METZGER:  It was about a year.
9              THE COURT:  So the object of defendant with respect
10   to this is to explain to the jury that the first year of his
11   departure, whatever that was, he received a certain amount
12   of money.  I mean, he claimed and received a certain amount
13   of money, which the jury should not repeatedly give him.
14             MR. METZGER:  Exactly.
15             THE COURT:  That's your issue.
16             MR. METZGER:  That's right, your Honor.  The
17   settlement agreement should come in.  They should hear that.
18   And, in fact, even their proposed jury instruction is saying
19   that they should deduct -- under the Massachusetts 151, the
20   jury should be deducting what else he was paid.
21        This is not a Title VII case where your Honor would be
22   deciding all this.  This is under Massachusetts law where
23   the jury is going to hear all that.  It is very
24   straightforward for the jury to hear in a straightforward
25   document that he signed, that he was paid back pay up to
```

**JA128**

```
 1    October 2020.  It's as simple as that.

 2              THE COURT:  And how is the jury going to be

 3    informed of this particular issue?

 4        I mean, it seems to me that if the parties can agree

 5    that the jury should be told that when they come to the

 6    issue of damages that he has already received a certain

 7    amount by agreement of the parties at some point in the

 8    distant past without getting into details about that,

 9    because if you get into details, it's going to affect the

10    whole case or the whole claim.

11              MR. GOODWIN:  But, your Honor, so it's even -- even

12    when my brother posited what this case is, he just says, You

13    told the federal government that the reason you got fired

14    was because you were engaging in protected speech.  And that

15    is not what occurred.

16        So that right there is -- that is -- if that is the

17    line of questioning that we're going down, that is extremely

18    problematic because, one, it's just not true.  And when you

19    read his affidavit, he never alleges that.

20        The Board might have alleged things like that in their

21    stock papers, but that is -- in fact, one, it's hearsay.

22    Two -- again, I won't keep harping on the collateral source

23    point, but it is a significant one in this one.

24        But it is a confusing -- basically what -- the intent

25    of the defense with this is going to be to confuse the jury
```

JA129

```
1    to make it say, Mr. Moore said that he got fired because of
2    protected speech; where, the reality is, is that the federal
3    government investigated Industrial Demolition because
4    Mr. Robert said, Nah, he sent you home -- he told me he sent
5    you home because of -- you were talking workplace
6    scuttlebutt.  You were talking with everybody.  Knock it
7    off.  Figure it out with him.
8         That's basically the conversation.
9         So to the extent that Mr. Moore himself has -- there's
10   written records of what he represented under attestation to
11   the federal government, that is fair game.
12        But it is not as simple as suggested.  The National
13   Labor Relations Board, I'm sure you know, it's a much more
14   complicated process than that.
15             THE COURT:  So precisely what do you want me to do?
16             MR. GOODWIN:  My hope would be that the exhibit be
17   struck, and that any amount of money be offset in a Rule 60
18   proceeding, if we are fortunate enough to --
19             THE COURT:  So this jury wouldn't know that any
20   money had already been paid, and it goes forward, and if it
21   finds the defendant had violated his rights, and then after
22   that, we deduct the amount that he's already been paid?
23             MR. GOODWIN:  Correct.
24             THE COURT:  And you want the jury to know that he's
25   already been paid?
```

**JA130**

```
 1              MR. METZGER:  I want them to know those facts, your
 2    Honor.
 3              THE COURT:  What do I tell the jury about how to
 4    calculate damages?
 5              MR. METZGER:  I think a good compromise, your
 6    Honor --
 7              THE COURT:  I'm sorry?
 8              MR. METZGER:  I think a good compromise, your
 9    Honor, on this issue, we have a dated settlement agreement,
10    and we have testimony from him that he accepted back pay in
11    connection with his employment at Industrial Demolition, and
12    I think the clear instruction is, He has received --
13    certainly our position is through the documents, he's
14    received back pay up through October 9, 2020.  Here's the
15    amount that he received.
16       If they're going to argue that he is entitled to more
17    back pay, let them argue that.  I think that's the right
18    compromise, in that there is no dispute he was paid the
19    money.  There's no dispute, as written in the document, it
20    was back pay.  He testified that it was back pay, and it's
21    dated October.  It's straightforward.
22              THE COURT:  Then there was a disagreement as to
23    whether he could continue to be paid?  Is that where we are?
24              MR. METZGER:  That's what they would argue to the
25    jury, and I think that's a good compromise.  They can say
```

**JA131**

```
1    he's entitled to more back pay.

2              THE COURT:  My guess is that the jury is ready,

3    right, Lisa?

4              THE CLERK:  They're lining up in order right now.

5              THE COURT:  I think --

6              MR. GOODWIN:  Your Honor, I might have a

7    compromise.

8              THE COURT:  I think we should switch now.

9              MR. GOODWIN:  I might have one compromise instead.

10         I would posit that if -- in the jury instructions, that

11   whatever the specific amount of money is, that we say to the

12   jury, If you reach a verdict of compensatory damages, it

13   should be reduced by a specific amount.

14         I don't think that the settlement --

15             THE COURT:  And the jury would be told that?

16             MR. GOODWIN:  Be told that, but in terms.

17             THE COURT:  If you tell them, then they've got the

18   ante, don't they?

19             MR. GOODWIN:  The problem with putting it in at

20   all, your Honor, is it's fluctuating the scales one side or

21   the other and we have to litigate over it.

22             MR. METZGER:  It's straightforward that he received

23   back pay for a defined period.

24             THE COURT:  I think we need to stop because the

25   jury is waiting, and I don't think it's appropriate to keep
```

**JA132**

1     them waiting.

2          So I think we had agreed to a certain number of jurors.

3               MR. GOODWIN:  I think we said ten, your Honor.

4               THE COURT:  Normally you would have six or so to

5     get to a verdict, but I think we should probably impanel ten

6     probably.

7               MR. GOODWIN:  Yes.

8               MR. METZGER:  Yes.

9               THE COURT:  I mean, not that they are -- there is

10    no reason why they can't all deliberate if the parties agree

11    that they can all deliberate, but at least we have a good

12    set of extras in case we need them, right?

13         So ten jurors, Lisa, we will impanel, and they will

14    include the -- well, is there any reason why we can't agree

15    that whoever is still available at the end of the trial who

16    hasn't left for some reason or another will be part of the

17    deliberating jury, which means up to ten?

18              MR. GOODWIN:  That works for plaintiff.

19              THE COURT:  Agreeable?

20              MR. METZGER:  That works for the defendant.

21              THE COURT:  So that's what we'll do.

22         We will impanel ten, and whoever of the ten are left,

23    provided it's not less than six, will deliberate on the

24    verdict to decide the case.

25         Now, Ms. Urso will bring the jurors in from downstairs.

**JA133**

```
1   You have a list that gives you certain information about
2   them, some of which you asked in motions, but you get it
3   here in the list prepared by the clerk downstairs.
4        We will seat them initially in the jury box, and then
5   any leftovers -- I don't know how many they sent up -- in
6   the back.  And I think what we will do once they're seated,
7   I will talk with counsel to ask you exactly what you want me
8   to ask them, and then we'll proceed that way.
9            (Jury venire enters courtroom.)
10           (Jury impanelment not ordered, not transcribed.)
11               THE COURT:  Now, members of the jury, let me
12  just --
13               A JUROR:  Can we turn the music off?
14               THE CLERK:  Yes, we can.
15               THE COURT:  It's about the time, a little earlier,
16  than we would normally take a recess, and Ms. Urso will do
17  that now.  Ms. Urso will show you to the jury room where you
18  will sit in between being in the courtroom and listening to
19  the case.
20       I guess we don't have time to get coffee.
21               THE CLERK:  No, I made coffee for them.
22               THE COURT:  Oh, so there's coffee waiting there for
23  you.
24               THE CLERK:  It's just for a couple of minutes.
25  I'll give you your badge and --
```

**JA134**

```
1              THE COURT:  We will take a recess now of about 10
2    or 15 minutes, whenever you're ready to go, and that's when
3    we will begin the trial in earnest.
4              THE CLERK:  All rise for the jury.
5         (Whereupon, the jury left the courtroom.)
6              THE COURT:  We will take a recess now.
7         You can be seated.  Both parties will make opening
8    statements?
9              MR. GOODWIN:  Yes, your Honor.
10             MR. METZGER:  Your Honor, in terms of the opening
11   statements -- I don't want to expand on what we're still
12   talking about in our motion in limine, but I would like to
13   make sure we are all on the same page as to what it is we
14   are going to be able to say and not say so we have --
15             THE COURT:  How much time do you need to do that?
16             MR. GOODWIN:  I think we need a ruling.
17             MR. METZGER:  I think we're going to need -- why
18   don't we take a break, if that's okay, your Honor.
19        I just wanted to raise before we start with openings, I
20   think both sides frankly may need a ruling on what we are
21   able to get into, particularly for the NLRB settlement,
22   whether that's going to be fair game to raise and, if so,
23   what the order is on that.  And there may be a few other
24   issues as well.
25             THE COURT:  So any reference to a settlement of
```

**JA135**

```
 1    that case is what you're objecting to?
 2          MR. METZGER:  I want that to come in because that's
 3    the document that he had signed and he was paid on.  So
 4    we're not objecting -- I just -- before we had brought the
 5    jury in, we were still discussing that point, and I wanted
 6    there to be clarity before --
 7          THE COURT:  Well, if you want me to explain it to
 8    the jury in some way, tell me exactly what you want me to
 9    tell them, and I'm likely to do that.  If there is no
10    problem with it, we'll just go ahead.
11          MR. GOODWIN:  I think he's --
12          MR. METZGER:  My question though, your Honor, is
13    during opening may I then raise it?  I would -- I don't want
14    to raise an issue and then have us get into a substantive
15    argument during the opening as to whether that's
16    something --
17          THE COURT:  You don't object?
18          MR. GOODWIN:  Well, I think we both agree that we
19    want to know what the guardrails are for our opening.  I
20    think we both maintain our positions.  So I think we do need
21    guidance though about how much we can get into it.  Is that
22    fair?
23          THE CLERK:  We have a juror issue, too, No. 10.
24          THE COURT:  We forgot to tell them about the timing
25    of the trial.
```

```
 1                THE CLERK:  But No. 10 has a problem.
 2                THE COURT:  Bring him down.
 3                MR. METZGER:  On the list now, No. 10.
 4                THE CLERK:  No. 17.
 5          Hold on.  He's not -- hold on.
 6                THE COURT:  I was so pleased we did it so quickly.
 7                THE CLERK:  It's actually No. 9 on the list, XXXXX
 8      XXXXXX.
 9          (Juror enters courtroom.)
10                THE CLERK:  Do you have to go over there?
11                THE COURT:  You can just tell us.
12                THE JUROR:  So child care for me is going to be a
13      little difficult.  I was just awarded custody of two
14      children.
15                THE CLERK:  Why don't counsel come up, and then we
16      can all hear.
17           (SIDEBAR CONFERENCE AS FOLLOWS:
18                THE JUROR:  I have children through DCF I just
19      adopted them.  It's a long period of time.  They were just
20      awarded to me this past Wednesday, they're my nephews.
21                THE COURT:  These are not your children?
22                THE JUROR:  They're not mine.
23                THE COURT:  They're children you take care of?
24                THE JUROR:  Yes.
25                THE COURT:  How many of them?
```

**JA137**

45

```
 1              THE JUROR:  A four year old and a nine year old.

 2              THE COURT:  So you take care of them?

 3              THE JUROR:  I have my girlfriend.  She works at

 4   Anna Jacques Hospital.  She is doing the job this morning.

 5   I'm usually there to meet the DCF workers that drop them at

 6   my house.

 7              THE COURT:  So you don't think you can sit as a

 8   juror?

 9              THE JUROR:  Depending how long it is, the case.

10              THE COURT:  You should have mentioned that.

11        We anticipate the case will finish Friday.

12              THE JUROR:  I have to be home to get them.  They

13   get out of school at three.

14              THE COURT:  We will go from nine to one every day

15   except on the last day when the jury will be deliberating

16   its verdict.  It will be here until it has a verdict or it

17   needs to go home.  Will that work for you?

18              THE JUROR:  Kind of.  It's hard to say.  I have to

19   be home to receive them.

20              THE COURT:  We anticipate finishing this week.

21              THE JUROR:  That last day, if we deliberate -- they

22   get dropped off at three.  My wife doesn't get home until

23   six.  They can't be alone.  You know, I have steps to deal

24   with, the DCF workers, and the laws and rules.

25              THE COURT:  Why don't we go ahead and see what we
```

**JA138**

```
1    can do until then.  If a problem arises --
2         THE JUROR:  That's pretty much why I didn't raise
3    my hand.  It was your discretion.
4         THE COURT:  That's fair.
5      Does that work fork you?
6         THE JUROR:  I have documentation.
7      (Document handed to the Court.)
8         THE COURT:  I understand that.  It is there.
9         THE JUROR:  I can reach out to the DCF office for
10   more help from them.  It's just where it's just starting,
11   and we're struggling.
12        THE COURT:  If you need any help from us getting to
13   them, let us know, and we will be happy to help.
14        THE JUROR:  No worries.
15        THE COURT:  Thank you very much.
16      (Juror leaves sidebar.)
17        THE COURT:  Is there anything counsel wish to
18   suggest?
19        MR. TURIELLO:  Not on that.  We have the extras,
20   your Honor.  See if we get to Friday.
21        THE COURT:  We'll use all of them.  I leave it to
22   you as to whether you want -- I mean, we can go as low as
23   six.  I prefer not to go below eight at most, and maybe you
24   want all ten of them, if they sit through it.  That's fine
25   with me, too.  Okay.
```

**JA139**

47

```
 1              MR. TURIELLO:  Thank you, your Honor.

 2              MR. METZGER:  Thank you, your Honor.

 3         END OF SIDEBAR CONFERENCE.)

 4              MR. METZGER:  So, your Honor, at this point we'll

 5    take a break then?

 6              THE COURT:  We'll take a break for about 10-15

 7    minutes for them to finish their coffee.  They started ten

 8    minutes ago.  Then we'll start with opening statements.

 9         Do you intend to start after he does?

10              MR. METZGER:  I do.

11         (Recess.)

12              THE CLERK:  All rise.

13              THE COURT:  Did the plaintiff wish to argue with

14    respect to any pending motions?

15              MR. GOODWIN:  I think it's just what we've been

16    going over, your Honor, just in terms of -- and I think this

17    is what --

18              THE COURT:  So the answer is no?

19              MR. GOODWIN:  What, do I want to make additional

20    argument?

21              THE COURT:  I just want to know whether anybody

22    wants to argue any of the motions that are pending?

23              MR. GOODWIN:  Yes.

24              THE COURT:  Briefly.

25              MR. GOODWIN:  I think I will reiterate.  I don't
```

**JA140**

```
 1    want to belabor it, your Honor.
 2             THE COURT:  Okay.  So we'll hear form the
 3    defendant.
 4        Please tell me what motion you're talking about at any
 5    moment in time.
 6             MR. METZGER:  Yes, your Honor.
 7        On the settlement agreement, we are seeking an order
 8    that we as the defendant can introduce the settlement
 9    agreement from the National Labor Relations Board that the
10    plaintiff entered into with the defendant in which he had
11    signed off that he was accepting back pay directly from
12    Industrial Demolition.
13             THE COURT:  What do you want me to tell the jury
14    about that?
15             MR. METZGER:  Well, first, I would like to be able
16    to mention that in my opening, to express that post
17    employment with Industrial Demolition, he had up through, at
18    a minimum, October of 2020 accepted back pay from Industrial
19    Demolition.
20             THE COURT:  I'm still not clear what you want me to
21    tell the jury.
22             MR. METZGER:  That in fact he had received back pay
23    directly from Industrial Demolition in connection with his
24    allegation that he was terminated.
25             THE COURT:  Why isn't that appropriate?
```

**JA141**

49

```
 1              MR. GOODWIN:  Well, your Honor, again, I don't want
 2      to belabor the points made.  It's the plaintiff's position
 3      that it's a collateral source and should not be relied upon
 4      in the opening or submitted in evidence.
 5              THE COURT:  I mean, it's money that he got for
 6      conduct by the defendant in the particular incident we're
 7      talking about today.  So I don't know why it shouldn't be
 8      admissible to tell the jury that he's gotten some money
 9      already.
10              MR. GOODWIN:  You know, your Honor, I think you've
11      heard from me pretty extensively on this subject, so if
12      you're going to rule in favor of the defendant, I'd just ask
13      for a ruling with --
14              THE COURT:  I'm inclined to tell the jury that at
15      some point, and you tell me when you want me to tell it, and
16      I'll try to accommodate that, or you can include it in your
17      opening statement.
18              MR. GOODWIN:  Okay.
19         And, your Honor, I do have to preserve for a mistrial
20      on -- in the event that this does confuse the jury.
21              THE COURT:  On what?
22              MR. GOODWIN:  So I think introduction of an
23      impermissible collateral source could be grounds for a
24      mistrial in the event that it creates confusion for the jury
25      on a separate legal proceeding.  So I would just ask that
```

**JA142**

50

```
 1    that be preserved and I not have to argue it each and every
 2    time.
 3              THE COURT:  So there is nothing to do now.
 4              MR. GOODWIN:  No.  I'm just preserving for the
 5    record, if that's acceptable.
 6              THE COURT:  And that's it for the plaintiff?
 7              MR. GOODWIN:  That's it for the plaintiff.
 8              MR. METZGER:  Next issue, your Honor, is also the
 9    additional payments he's received from subsequent employers.
10    For example, right now he is employed.  His testimony at
11    deposition earlier this year, he's employed full time.  He
12    has a certain base salary plus commissions.  He's working
13    full time.  And I want to be able to mention in the opening,
14    and certainly during cross as well, what his subsequent
15    employment is.  And there has been an objection to me
16    raising that, and I think it's even more directly
17    admissible, in that these are payments that he is receiving
18    through his work now.
19              THE COURT:  I mean, to the extent that I would have
20    to charge the jury in the end that he is entitled to recover
21    what he has lost...  But to the extent that he has another
22    job and gets money now, is being paid, I don't understand
23    why he should be entitled to recover from the defendant for
24    that period or that amount.
25              MR. GOODWIN:  Again, this is a collateral source.
```

**JA143**

```
 1    It is not admissible.  If the Court is going to rule on
 2    it --
 3              THE COURT:  Well, why is he entitled to recover
 4    twice?  I mean, the jury is entitled to know that he has a
 5    job now.
 6              MR. GOODWIN:  I mean, the case law on collateral
 7    source, your Honor, is pretty straightforward.  It is
 8    specifically prohibited from introduction, and there --
 9    there is no -- typically my experience, when you're bringing
10    in wages or subsequent employment, it's because the
11    defendant's arguing mitigation.  Here there is no argument
12    that the plaintiff failed to mitigate.  So I don't think it
13    should be submitted to the fact finders.  It is irrelevant
14    to their decision about whether or not he should be made
15    whole to the period.  Again, if it should come out in the
16    wash in the Rule 60 period, but if the Court's going to rule
17    in that direction, you know, I guess then rule.
18              THE COURT:  I don't understand how he can fairly
19    recover both the amount that the defendant hasn't paid in
20    part because he is employed.
21              MR. GOODWIN:  I think that's distinct from what the
22    jury decides though, your Honor.  Because the submission of
23    evidence from payment of a third party to -- versus what the
24    harm caused by --
25              THE COURT:  I'm not foreclosing the evidence of
```

**JA144**

1    that.  But it seems to me, that it is appropriate at the

2    time of the charge when I tell them how to calculate the

3    damages to say that he is entitled to recover the amount of

4    income that he has lost as a result of the defendant's

5    misconduct.

6         But to the extent that he is working and being paid

7    since the incident, that amount of payment will have to be

8    deducted from what he would otherwise -- from what he got

9    from the defendant.

10            MR. GOODWIN:  I don't disagree with that, but the

11   plaintiff's position, your Honor, is that occurs in the Rule

12   60 process, not with the jury, and that the jury -- that

13   evidence of collateral source should not be submitted.

14         Typically, such wage evidence is submitted for the

15   purpose of mitigation.  And if the Court is going to rule in

16   my brother's favor, I would again, just as what I did with

17   the NLRB agreement and those materials, preserve it and have

18   my objection noted.

19            THE COURT:  I mean, I guess there are two

20   questions.  One, whether you can mention it in the opening

21   statement.  And the second is, What about the evidence?

22         I mean, I think one sentence in the opening statement

23   is probably enough to simply alert the jury that he is

24   working and earning now and that he is entitled to recover

25   for what he has lost.

**JA145**

```
 1            I mean, that's -- you know, to the extent that he

 2    hasn't got a loss, he's not entitled to recover from you.

 3            MR. METZGER:  Understood.

 4            THE COURT:  That's, in essence, where I think we

 5    are.

 6            MR. METZGER:  Sure.

 7            THE COURT:  And I don't want to make a big deal of

 8    his working and getting paid now.

 9        On the other hand, the defendant is entitled to mention

10    that his -- he is entitled to whatever he lost, but to the

11    extent that he has a job, he hasn't lost.

12            MR. METZGER:  I understand, your Honor.

13        So just to step back and make sure I'm not creating any

14    problem in opening.  I understand I may briefly mention

15    essentially at a high level during opening that he is

16    gainfully employed, employed full time, and for now I can

17    leave it at that.

18            THE COURT:  Okay.

19        Anything else?

20            MR. METZGER:  I don't think right now we need to

21    decide this issue about the late and improperly disclosed

22    economic expert.  We may have to deal with that later, but I

23    don't know whether there would be anything mentioned at this

24    stage before we get to that.

25            THE COURT:  About what?
```

**JA146**

54

```
 1              MR. METZGER:  They had identified late their
 2      economic expert, and they also had not provided a report
 3      until very close to trial.
 4              THE COURT:  I have a couple of motions.  One has to
 5      do with expert, and specifically is that what you're talking
 6      about --
 7              MR. METZGER:  Correct, your Honor.
 8              THE COURT:  -- the defendant's motion to exclude?
 9        I think I have to allow that because that expert was
10      never really put into the case in time.
11              MR. METZGER:  Right.
12              MR. GOODWIN:  Your Honor, I disagree with that
13      assessment, but the ruling is the ruling.
14              THE COURT:  And I think I disallowed the deposition
15      of this witness -- I may have confused it with another
16      case -- but I think that expert came into the picture too
17      late.
18              MR. METZGER:  Correct, your Honor.
19              THE COURT:  So the motion to exclude him or her is
20      allowed.
21        And then there is the NLRB settlement.  I think that I
22      will hear you on that, but the real question is what do we
23      tell the jury about it, because I think I already heard
24      something about it.  We talked about it this morning.
25              MR. METZGER:  I believe, your Honor, in terms of
```

**JA147**

```
 1    being able to -- I believe we've landed, and just to restate
 2    back to again for me opening to make sure I'm not crossing
 3    any line that your Honor has drawn, that I may mention the
 4    fact that they brought the claim before the NLRB and that
 5    there was a settlement directly, a payment directly, by
 6    Industrial Demolition to him for what is labeled as back pay
 7    and that's through October of 2020.
 8              THE COURT:  You don't object to that?
 9              MR. GOODWIN:  I did object to that, but I think
10    that based upon the previous ruling --
11              THE COURT:  I mean, you were sort of in agreement
12    on this issue.
13              MR. GOODWIN:  No, I don't believe so, your Honor,
14    but based on your previous ruling, if the -- I mean, I guess
15    the question to me is whether or not -- and maybe Attorney
16    Metzger and I talk about this, whether or not the document
17    is coming in or if it's just a stipulation --
18              THE COURT:  That's fine.
19              MR. GOODWIN:  But basically --
20              THE COURT:  And if you can't get there, let me
21    know.
22              MR. METZGER:  But certainly in opening I may
23    mention it, to be clear, and I won't be ruling out the
24    document in opening.
25              THE COURT:  Okay.
```

**JA148**

```
 1            How long will you your opening be?
 2              MR. METZGER:  Mine, your Honor, I will seek to keep
 3      under 15 minutes.
 4              THE COURT:  One five?
 5              MR. METZGER:  One five.
 6              MR. GOODWIN:  I think it will be quite brief.
 7              THE COURT:  So we will start with that when the
 8      jury comes down.
 9          Are you ready for them to start the trial?
10              MR. GOODWIN:  Yes.
11          Is there water in those pitchers?
12              THE CLERK:  No, because we're not supposed to do
13      water anymore because no one wants us to touch anything.
14              THE COURT:  Do you want water?
15              MR. GOODWIN:  Yes, I just have to run out --
16              THE COURT:  You don't have to run, just go.
17          (Pause in proceedings.)
18              THE COURT:  Once we start the trial, if there is an
19      objection to any question or statement, or any question to
20      the jury, please rise and just say "objection," and then
21      I'll -- sometimes I know what you're going to talk about.
22      Most of the time, I don't, and I will ask you to explain it.
23              MR. METZGER:  Thank you.
24              THE CLERK:  All rise for the jury, please.
25              (Whereupon, the jury entered the courtroom.)
```

**JA149**

```
 1              THE CLERK:  I'd ask that you all remain standing
 2    for a brief moment, please, and raise your right hands.
 3         (Jury sworn.)
 4              THE COURT:  Members of the jury, I think we should
 5    start with what I totally neglected earlier, which is to
 6    introduce counsel for you.
 7         We have a case in which there are two parties who are
 8    against each other.  The plaintiff, the person who is
 9    complaining about something, is Eric Moore.  I don't know
10    where he lives.
11              THE CLERK:  We already did it.  Kentucky.
12              THE COURT:  Kentucky, right.  But he used to be
13    here at some point.
14         Please be seated.
15         And he is represented by Mr. Jamie Goodwin of the Law
16    firm Duddy Goodwin & Pollard in Boston, and Michael Turiello
17    of the same law firm.
18         Do any of you know any of these lawyers?
19         (No response.)
20              THE COURT:  Okay.
21         The defendant is represented by Mr. Thomas Metzger.
22              MR. METZGER:  Good morning.
23              THE COURT:  And Ms. Buckingham, right?
24              MS. ESPOSITO:  Alexa Esposito.
25              THE CLERK:  Ms. Buckingham is the paralegal.
```

**JA150**

58

```
1              THE COURT:  Alexa Esposito.

2         And in the middle is Mr. Michael Robert [ sic ], who I

3    think works for the defendant, right?

4              MR. METZGER:  Correct, your Honor.

5              THE COURT:  The defendant in this case is a company

6    named "Industrial Demolition, LLC," and it is located where?

7              MR. METZGER:  St. Louis, Missouri.

8              THE COURT:  Where?

9              MR. METZGER:  St. Louis, Missouri.

10             THE COURT:  That' s right.  I remember that from the

11   parties' stuff.

12        And the question -- counsel will now address you

13   starting with the plaintiff, and then the defendant will

14   address you to outline to you briefly what the evidence is

15   expected to be.  Be sure that when you listen to this, you

16   give them credence but ultimately your decision has to be

17   made not on what counsel promise you the evidence will be,

18   but what you decide the evidence in fact was.

19        We will start with the plaintiff' s summation -- not --

20   the opening statement.

21        And then are you planning to go now after him?

22             MR. METZGER:  Yes, your Honor.

23             THE COURT:  And then the defendant, who has a

24   choice to wait until the plaintiff has finished all their

25   evidence, but they are going to go now, which is a good
```

**JA151**

```
 1    thing, because you get a picture from both of them as to
 2    what the case is about.
 3         It will not be long, because we don't tolerate very
 4    long statements, which they have already figured that out.
 5         (Laughter.)
 6              THE COURT:  So you may proceed with the opening
 7    statement, and that I thank you.
 8              OPENING STATEMENT ON BEHALF OF THE PLAINTIFF
 9              MR. GOODWIN:  Thank you, your Honor.
10         Again, thank you all for your time today.  We thank you
11    all for doing your civil service.  We know you're all busy,
12    and we appreciate your time and the effort that it takes to
13    be here.
14         Eric Moore, he worked as a laborer for the defendant,
15    Industrial Demolition, and December of 2019 is when most of
16    the events that are germane to this particular dispute
17    occurred, just shortly before COVID 19, so the December
18    before COVID.
19         Industrial Demolition is a demolition company.  It was
20    demolishing the decommissioned coal-fire plant that sat
21    roughly on a 30-acre plot in Somerset, Massachusetts.  For
22    those of you not familiar with Somerset, it's down near Fall
23    River, near the Nantucket Sound, across from Providence.
24         So the project was to demolish the coal-fire plant, and
25    it's a big facility and it's a dirty facility.
```

**JA152**

```
1        So on December 7 of 2019, Eric was working on that
2   jobsite, and basically what he was doing at that time was
3   creating a clean room.
4        So when you work in dirty industries, and some of you
5   might have experience with this, some of you might not, but
6   what you usually have is donning and doffing rooms.  It's an
7   antiquated way of saying a place to change from dirty
8   clothes to clean clothes.
9        So when you're working at, as you can imagine,
10  decommissioning a power plant, a coal-fired power plant,
11  there is a lot of toxic, dirty things around, a lot of lead
12  exposure possible, and all sorts of other toxic exposures
13  that can potentially hurt you.
14       So this project had been going at least since the
15  spring of 2019, and they were just now creating a clean room
16  for their employees.  So on that day -- again, this is a
17  Saturday.  They typically work Monday to Saturday, with a
18  certain amount of built-in overtime, with Sundays off.
19       So on Saturdays, December 7 of 2019, Eric was working
20  on that job site.  He was moving furniture, appliances, with
21  a coworker, pulling stuff out, so again, they would have
22  clean place to change and a dirty place.  So you go into the
23  dirty room, take off your dirty clothes, clean yourself up,
24  go to the clean room.  It's likes an air lock on a
25  spaceship.
```

**JA153**

1    So on that day at some point in the shift, he began
2    experiencing right hip pain.  It wasn' t too bad that night.
3    So again, that' s Saturday night.  He goes home.  It' s tender,
4    but he' s doing okay.
5        The next day, Sunday, he' s off, and he begins to feel
6    sore.  It' s bothering him as he' s going about the day, sort
7    of limping.  He still has a relatively normal day, but he' s
8    hurting.  He has five kids.  He' s struggling to run around
9    with them, take care of them.  He' s feeling a little rough.
10       On Monday morning he wakes up early, and is in
11   excruciating pain.  And when he' s in that pain, what does he
12   do?  He goes to the emergency room, right.
13       So at the emergency room he -- so he drives to the
14   emergency room on that Monday.  Again we' re up to
15   December 9.
16       So on Monday, December 9, he goes to the emergency
17   room, and then he calls his supervisor, a man named Roger
18   Oberkramer, and let' s him know that he' s not going to be at
19   work that day.  He' s at the hospital.  He responds well to
20   treatment, and the doctor clears him to work with
21   restrictions.  Really the restrictions being no real heavy
22   lifting, which obviously laborers do a lot of heavy lifting,
23   and you can operate machinery.
24       So this site has enormous machinery.  We' re not talking
25   about a Ford F-150.  We' re talking about machines the size

**JA154**

```
 1    of this room, the biggest bulldozers you can imagine.  And
 2    he operates these various machines, sometimes as small as an
 3    ATV.  But he's cleared to return to work on that Monday,
 4    December 9, by his doctor.
 5         He goes to work that week on Tuesday, Wednesday,
 6    Thursday, and no issues; works within the restrictions,
 7    nothing happens.
 8         So then we get to Friday, December 13.
 9         So on Friday, December 13, Eric was working in a
10    front-end loader demolishing trailers.
11         Mr. Oberkramer told the group that Eric was working
12    with to get out of their vehicles and use their hands to
13    clear.  And Eric, noting his doctor's note to
14    Mr. Oberkramer, as he's been specifically told to not do
15    heavy lifting and has had what we would call a "reasonable
16    accommodation" granted by the employer for a temporary time
17    to have what we would say is restricted duty or modified
18    duty.
19         So when Eric brings up his doctor's note, Mr.
20    Oberkramer states, and excuse my language in advance, but "I
21    don't give a fuck what the office has to say.  Get out there
22    and use your hands and get the job done.  We need
23    production."
24         So Eric complies with that order.  He probably
25    shouldn't have, but he did.
```

**JA155**

1        So that's earlier in the day, midday.  And then the

2    shift progresses.

3        Eric goes -- toward the very end of the shift, Eric is

4    operating -- he's a passenger in an ATV and is going back to

5    the front of the site where he would leave the property

6    towards the gate.  And over the radio, Mr. Oberkramer starts

7    yelling about, "Who has the headlights on in the ATV?  Who

8    has headlights on in the ATV?"  Because, you know, that's a

9    huge issue, having headlights on in the ATV.

10        Again, erratic behavior.

11        So Mr. Oberkramer -- when Eric returns to the front of

12    the lot, Oberkramer approaches him and starts yelling at

13    Eric about his work restriction, saying things like Eric was

14    "jerking off in the machine all day."  And that Oberkramer

15    could have gotten that job done by himself.

16        And he said to Eric not to come in the next day.

17    "Don't come in the next day," and when Eric starts to voice

18    his opposition and probably shock for being spoken to that

19    way, Oberkramer says, "I don't need you anymore.  Don't come

20    back.  I don't need you anymore.  Don't come back."

21        And I don't know if any of you have ever had a

22    supervisor say that to you, but we know what it means.  It

23    means you're terminated.

24        So he terminated Mr. Ober -- Strike that.  He

25    terminated Mr. Moore for having an injury and having a

64

```
1    doctor's note to work light duty.
2         So Mr. Moore goes home, as you would when your
3    supervisor fires you.
4         And on Monday, as a normal employee would do, he calls
5    Mr. Roberts.
6         Mr. Roberts and his brother own Industrial Demolition,
7    and they own a variety of related companies.  And so Eric
8    calls him on Monday.  Mr. Roberts says he'll call him back.
9    Mr. Roberts calls him back the following day.
10        Eric -- so on Tuesday, December 17, Eric told Roberts
11   that -- just the story I told you, that he had been fired by
12   Mr. Oberkramer and what had occurred.
13        He also told Roberts that Oberkramer regularly uses
14   words like the N word.
15             MR. METZGER:  Objection, your Honor.  Objection.
16   This was part of the motion in limine.
17        I apologize for interrupting.
18             THE COURT:  Skip it.
19             MR. GOODWIN:  What's that?
20             THE COURT:  Go around it.
21             MR. GOODWIN:  It's not disputed, your Honor.  It's
22   the basis of the NLRB charge that we just argued about all
23   morning.  This is the exhibit that they want to put in.  It
24   has this specifically in it.
25             THE COURT:  Well, if it's in it, then you can talk
```

**JA157**

```
 1    about it.
 2             MR. METZGER:  We withdrew that exhibit.  It is not
 3    part of the exhibits, and this is not a part of the NLRB
 4    charge at all.
 5             MR. GOODWIN:  It is in the affidavit that we
 6    discussed this morning.
 7             THE COURT:  Why don't you go around it in some
 8    gentle way, still telling the jury what you need to tell
 9    them.
10             MR. GOODWIN:  A variety of racial slurs, and words
11    that you don't say in public and you don't say at work.
12         And he further said, "Oberkramer is dangerous."
13         And Roberts responds by saying, You know, he's rough
14    around the edges.  You know, everyone talks like that at
15    work, right.  You know, that's just shop talk.
16         And after -- the conversation goes forward.  The reason
17    that Mr. Roberts says that Oberkramer said he sent him home,
18    not terminated, just sent him home, was because he was
19    talking about his earnings with his coworkers and that they
20    didn't like that type of scuttlebutt.
21         Talking about your wages with your coworkers is
22    specifically protected activity under the National Labor
23    Relations Board Act.
24         Now, what is the National Labor Relations Board Act?
25    The National Labor Relations Board Act is the law that allow
```

**JA158**

```
 1    employees to form labor unions.  And it's a federal law.
 2    It's not a Massachusetts law.  It's a federal law.  Just
 3    like this is the federal court.  The United States passed
 4    this law in the '30s.
 5        And what that law provides for being able to speak
 6    about these issues is because you can't form a union without
 7    being able to talk about your wages.  It's concerted
 8    protected activity.
 9        So the good reason that they provided, the good cause
10    for sending him home, while he had a reasonable
11    accommodation from the employer, their good cause is, You
12    were talking with your coworkers about what you were making.
13    You were sharing information that we don't want you to share
14    with your employees because we don't want to have to pay
15    everybody the same.
16        "Rough around the edges."
17        Mr. Roberts did no investigation.  He did not
18    discipline Oberkramer.  He did nothing except told this
19    young man, who has five children, to just figure it out with
20    Mr. Oberkramer, a real rational actor, right.  Somebody you
21    really want to get in a room and have a negotiation with
22    over a problem.
23        He did nothing.  They did nothing.
24        And I expect, as you go forward in this hearing today,
25    you're going to hear about a charge that was filed with the
```

**JA159**

```
 1    federal government that resulted in Mr. Moore getting a
 2    certain amount of money that we will discuss within the
 3    larger context of the case.  And that the distraction is is
 4    that the defendant is saying that because the federal
 5    government concluded that there was probable cause that you
 6    violated law, that somehow Mr. Moore can't recover here
 7    today.
 8         And so again, I just want to get the timeline clear.
 9         Fired on December 7, the Friday.  And then -- I think I
10    got the day wrong.  On Friday, December 13, I apologize.
11    Fired on Friday December 13.  That conversation happens the
12    following Tuesday.
13         But why are you here today?  Why do you all have to put
14    your time into -- take the time out of your life to do your
15    civic service and help us resolve this dispute?  It's not
16    because of Roger Oberkramer.  He's a problem, but he's not
17    the problem.
18         It's because of Mike Roberts and Tom Roberts.  The
19    Roberts brothers have owned hundreds of companies that --
20    over the course of their career dating back, I think, to the
21    '80s.
22              MR. METZGER:  Objection, your Honor.  This was also
23    part of the motion in limine.
24              THE COURT:  Go on.
25              MR. GOODWIN:  And that --
```

**JA160**

68

```
 1              THE COURT:  We will not continue along these lines,
 2      but I will not strike it.
 3              MR. METZGER:  Thank you, your Honor.
 4              MR. GOODWIN:  I'm moving on.
 5          But their dirty, polluted property that you -- they're
 6      "brownfield sites," generally speaking.  I don't know if
 7      you're familiar with that term, but they're difficult to
 8      redevelop and they're dirty and they're polluted.  And when
 9      you operate in that space, it is essential that if you're
10      coming to work in the Commonwealth of Massachusetts, that
11      you do it safely.  This isn't like my law firm where, you
12      know, I have to make sure it's safe.  I have to make sure
13      there aren't trip hazards and I have to have my postings up.
14          But this is the type of industry where if you hire
15      people who are dangerous, if you hire people that are
16      erratic, people get hurt.  People can die.  Things get
17      polluted.
18          And in Massachusetts employers have obligations to
19      provide a place for people to work safely and to not be
20      discriminated against.
21          The Brayton Point project cost roughly $10 million to
22      purchase.  The Roberts brothers are sophisticated entities.
23              THE COURT:  I don't understand what that has to do
24      with the evidence.
25              MR. GOODWIN:  That it has to do with the evidence,
```

**JA161**

69

```
 1   your Honor, is that if you're -- well, one, it goes to
 2   punitive damages, because it gets to what --
 3           THE COURT:  I don't think we want to go into what
 4   the law is.
 5           MR. GOODWIN:  I will leave it at that.
 6           THE COURT:  Excuse me one moment.
 7       Members of the jury, the object of this opening
 8   statement by both counsel, whenever they choose to do it, is
 9   to give you an outline of what the case is about.  It is not
10   to instruct you on the law.
11       Thank you.
12           MR. METZGER:  Thank you, your Honor.
13           THE COURT:  And I don't mean to be harsh, but it
14   becomes very complicated when counsel tell you what law is
15   because sometimes I have to disagree with them.
16           MR. GOODWIN:  And that -- and the legal part of
17   that will bear out, but here is what I will leave you with,
18   is that they have to be held accountable.
19       Thank you.
20           THE COURT:  All right, Mr. Metzger.
21           MR. METZGER:  Thank you, your Honor.
22           THE COURT:  You have a bigger book, but I assume
23   you will not need that much.
24           MR. METZGER:  Exactly, your Honor.
25           THE COURT:  It's big printing.
```

```
 1              MR. METZGER:  Yes.
 2              OPENING STATEMENT ON BEHALF OF THE DEFENDANT
 3              MR. METZGER:  Thank you.
 4      Good morning, your Honor.
 5      Good morning, ladies and gentlemen.
 6      Again, my name is Tom Metzger, and I'm the attorney for
 7 Industrial Demolition.
 8      Let me just introduce everybody else at the table one
 9 more time.  Alexa Esposito, she is with our law firm.  She's
10 on the far side here.  She will be assisting us with the
11 trial.
12      And paralegal in the back here, Alex Buckingham.  She's
13 assisting us with all the paperwork that we see here.
14      And, Mike, if you could stand up just to introduce
15 yourself.  This is Mike Roberts.  You will be hearing from
16 Mike in the course of these proceedings as a witness in the
17 matter.
18      But just as brief overview from Mike, Mike had attended
19 high school back in St. Louis, and during high school he was
20 working in construction.  He was a self-employed guy during
21 high school.  And he finished up high school, no more
22 schooling after that, but he kept plugging away and working
23 in construction.
24      He had a lawn business and a pickup truck, and he
25 started to pick up more jobs.  And the first job that he got
```

**JA163**

```
1    that was really outside during the self-employed period was
2    to knock down someone's garage.  And, as you will hear from
3    him, it wasn't really in his bailiwick.  He was doing lawn
4    work, but he had a pickup truck and some equipment and
5    someone asked him to do that initial work.  He was right out
6    of high school and trying to earn some money for himself,
7    and he got that job and knocked down that garage.
8         He kept going, doing this type of work as a young man,
9    and he then had saw there was an old brewery called Heileman
10   [ph.] Brewery there in St. Louis.  The business had gone
11   bankrupt.  And Mike had nothing to do with this Heileman
12   Brewery.  It was someone else's operation.  But what Mike
13   started to inquire about was, I wonder if something could be
14   done with the site.
15        The building, the first building of Heileman Brewery
16   was, and Mike had inquired about, through bankruptcy,
17   whether he could perhaps demolish the building and see if
18   they could do something to improve that site.
19        Well, Mike's been doing that type of work basically
20   ever since.
21        As you hear, there wasn't some big scheme or some
22   design.  He was a high school kid with truck and some
23   equipment and just kind of kept moving through this, and
24   eventually he had developed Industrial Demolition.  He owns
25   the business, as you heard, with his brother Tom.  It's a
```

JA164

1    family business there in St. Louis.  Mike's been in

2    St. Louis throughout his career, but that's where this

3    business starred.

4          And what does Industrial Demolition itself now do?

5          Obviously what they do is a little -- it's not even a

6    problem.  It's directly in the name.  They demolish old

7    industrial sites.  So I think you'll hear a couple of

8    examples of these, but, for example, if a power company had

9    to shut down their operations or there's a manufacturing

10   facility that had been shuttered by its previous owners and

11   the land's just sitting vacant in the community, what

12   Industrial Demolition will do, and they built their

13   expertise starting back with that garage that Mike knocked

14   down working through Heileman Brewery and everything else,

15   and they built up their equipment to get to the point where

16   they can come in and demolish these sites and remove what's

17   there so the land for somebody else can be used in some

18   productive way.

19         But that work, in essence, is to address the -- what's

20   on the sites, take out what's there in the buildings, the

21   equipment, get it off the site so it can be, in fact,

22   cleaned up.

23         And they have typically, just so you've got a sense of

24   the scale, some smaller jobs where you have maybe 10, 15, 20

25   people.  Some larger jobs maybe have more than 50 on it.

```
 1        But it's going to vary.  And you will hear during the course
 2    of this that it's essentially job by job, just like a
 3    construction job would be, right.  You work on a particular
 4    job, and there may be an opportunity for workers to go to
 5    another one, but there may be a lag in there too depending
 6    upon what the business is doing.
 7        So in terms of the projects themselves, let's just talk
 8    a little bit about the timeline and the plaintiff's
 9    connection here to Industrial Demolition.  And we can be
10    brief because the time that the plaintiff, Mr. Moore, spent
11    with Industrial Demolition was rather short, and there are
12    really just two time periods that we need to talk about.
13        So back in 2018 there was a project that Industrial
14    Demolition was working on in a town called Lawrenceburg,
15    Indiana, southern Indiana, on the Ohio River, not too far
16    from Cincinnati, that region.  And that's important because
17    the plaintiff, Mr. Moore, was living in that area, and he
18    had heard about an opportunity to pick up some full-time
19    employment doing this work.  Industrial Demolition had
20    already been doing the work on this site, but there was an
21    opening there, and that's how Mr. Moore, the plaintiff here,
22    first started with Industrial Demolition.
23          And he spoke with the company there, and so then in
24    late 2018, just to give you a timeline, about October 2018,
25    that's when he started on this Lawrenceburg, Indiana, site.
```

**JA166**

```
1    You may hear it referred to, just so we're all on the same
2    page, when you're hearing it, the Tanners Creek Facility.
3    That was the name of the old facility that someone else had
4    owned.  But that's what was being taken down by Industrial
5    Demolition.
6            So the work continued in 2018.  And, as you will
7    hear, and as alluded to, just like a construction site, when
8    they're finishing up the work, they need to start thinking
9    about wrapping things up, right.  So they may be going to
10   another site.  They may have to lay off workers at that
11   point.
12           And we're getting to the time period of about
13   April 2019.  So this first period is a six-month window that
14   the plaintiff is working.
15           There was then this Brayton Point site.  You may have
16   heard of it.  It's in Somerset, Massachusetts.  That was
17   another facility that was an old cold-fired power plant that
18   had been shuttered by its previous owners.  And Industrial
19   Demolition was involved then in the same process of
20   demolishing what was there so that eventually the land could
21   be used by somebody else for some good purpose, to put the
22   land back to use itself.
23           The important thing about this time period is the
24   plaintiff, as the Lawrenceburg site, the Tanners Creek site
25   was being wrapped up, the plaintiff was offered the
```

**JA167**

```
 1    opportunity to continue with Industrial Demolition and to go
 2    to the Brayton Point site and continue his work.
 3         And at that point he had declined.  You may hear the
 4    reasons for that, but the important thing is he made the
 5    choice, and that's fine.  But that's an important thing I
 6    want you to remember, in that after this first period of
 7    employment he was given an offer to continue employment.  He
 8    wasn't fired.  Plaintiff's not saying he was fired after
 9    that first period of employment.
10         He was given the opportunity, and, in essence, he was
11    told, If you want to stay with the company, please stay.  If
12    you want to go, you want to move on, do something else, move
13    on and after all, entirely fair.  He was living in that
14    Indiana area, southern Indiana, has family there, has kids,
15    and he declined to move to the Brayton Point site initially.
16         Then there were discussions about him going to the
17    Brayton Point site and perhaps then trying to resolve the
18    issue of him living with family out here in Massachusetts.
19    What he was offered then, in addition to his wages, which by
20    the way were the same in Indiana and the same at Brayton
21    Point, which was $30 an hour plus overtime.
22         He was also offered what's called a "per diem."  It's
23    not really his wages.  A "per diem" is a fancy way of
24    saying, We'll pay your living expenses.  So he was paid a
25    thousand dollars a week by Industrial Demolition to continue
```

**JA168**

```
 1   his employment.

 2        But there was a gap.  There was a gap in his employment

 3   from when he stopped around April of 2019 until -- then we

 4   get to -- it's July of 2019 that he starts up again at the

 5   Brayton Point site itself.  So there was a two-month period

 6   there where he is not an employee of Industrial Demolition.

 7   But they were interested in continuing working with him, and

 8   that's how he ends up at this Brayton Point site.

 9        Again here at the Brayton Point site, that's a

10   full-time position.  The work that they did, just to give

11   you a little more context, the schedule typically was Monday

12   through Friday ten hours a day, and then they would also

13   work eight hours on a Saturday.  And it was rather steady

14   that way.  They had work to do.  They needed workers to get

15   this done, and that generally was the schedule.  And they

16   were paid overtime.  No dispute there.  Paid the $30 an

17   hour, paid the overtime each time, and he also received the

18   per diem, no dispute there.  He was paid what he was told he

19   was going be to paid.

20        From our timeline there, from July all the way to

21   December 2019, really nothing happened.  I don't think

22   you're going to hear much in this case about anything during

23   that period.

24        So the second period of employment, July through

25   December 2019, really no issues.  He continues on, continues
```

```
1    full time, no problems there.
2         Let's focus then in on this last period where he's an
3    active employee with the company.  Let me briefly go through
4    the timeline in the middle of December 2019.
5         December 7 is a Saturday.  He worked eight full hours
6    that day, consistent with his schedule.  He did not report
7    any issues that day.  He drove himself to work; drove
8    himself from work.  No report of a workplace injury.  No
9    call to the office of any type to say he was injured.
10        And let's remember that in our timeline.  That will
11   become important here in a moment.
12        December 8, Sunday, regular day off.  Always has been a
13   day off, spend time with the family, went to church.  Was
14   with friends.  No call to the office to say there was any
15   problem.  No visit to a doctor, nothing.
16        We get to Monday morning, December 9.  He does then
17   contact Industrial Demolition.  It's a regular day of work,
18   but he says he's going to get his hip checked out that
19   Monday morning, and he goes to a nearby hospital and gets
20   checked out.
21        What happened there?
22        He's evaluated for about two hours.  And we all know
23   there's waiting time, you go to the hospital without an
24   appointment.  But he's evaluated there.  And he had driven
25   himself there, by the way.  He's not on any medication that
```

**JA170**

```
 1    prevented him from driving there.  He's at the hospital, and
 2    they give him a release to leave.  He drives himself back
 3    home.  He's is given a release then to return to work the
 4    very next day.
 5         And the restrictions don't say he can't work.  The
 6    restrictions don't say, no lifting.  The restriction don't
 7    even give him a lifting restriction.  It just has a vague
 8    reference to "heavy lifting."  It doesn't say, for example,
 9    no standing.  It just says no "prolonged standing."
10         The plaintiff speaks to someone you're going to hear
11    from as well, Becky Lydon.  She's a human resources person.
12    That does finances, everything else.  A lot of -- another
13    jack of all trades for Industrial Demolition.
14         She spoke to the plaintiff about these restrictions
15    where he said that, Hey, I can get back to work the very
16    next day if you'll accommodate some limited restrictions.
17         What you're going to hear is she said, Fine,
18    immediately.  No problem.
19         And I believe, if my notes are right, during opening by
20    counseling for Mr. Moore, he also said that there were no
21    issues that week.  The restrictions were in fact honored.
22    The restrictions were honored by the company.
23         He was told that he could come back to work, and they
24    put him right back to work the very next day.  He was
25    operating equipment -- type of equipment that he was
```

**JA171**

1    experienced to operate, and that went along exactly as he

2    would hope and expect on Tuesday, all day Tuesday.  Ten

3    hours a day he worked.  No problem.

4         Wednesday, all day, ten hours a day, no problems.

5         Thursday, again no problem.

6         We get up to Friday, December 13, and he works again

7    all day, ten hours.

8         Accommodations were in fact honored, and on Friday what

9    the plaintiff is now saying, is that at the end of the day

10   they start this argument about a -- he is on one of these

11   large -- essentially like a really large golf cart, but much

12   more industrial, they call them "gator."  And it had

13   industrial planks on it.

14        And this Roger Oberkramer, who you're going to hear

15   about, apparently is yelling on the radio.  He doesn't even

16   know who's on this.  But we're at the end of the day, a long

17   week, words are spoken.

18        And what the plaintiff is saying is that this

19   ultimately gets to the point where, whatever the dispute is,

20   whatever they're arguing about, what he's trying to

21   emphasize in this case is that he was told words to the

22   effect of, Get out of here or, Go home.  And we don't know

23   exactly what was said, but essentially that.

24        But you know what he's not going to say?  You know what

25   he will agree with?  Is that, first, Roger Oberkramer never

1    told him, You're fired.  Never told him that.

2        There was no document given to him.  There was no

3    notice given to him, nothing, to say he was fired.

4        And what he did say, also you will hear, not in

5    dispute, Roger said, Call the office.

6        Now, if he's fired, what does he need to call the

7    office for?

8        But does he call the office that Friday?  No.  He had

9    Becky's number, remember, from when he spoke to her that

10   prior Monday.  He has it right in his cell phone, right.  He

11   called her when he said, I've got these restrictions.

12       He doesn't show up to work on Saturday.  You will see

13   that there was a note then where the company said, No call/

14   no show.  What's going on.

15       And there is no notice back to the office or back to

16   Becky, back to Mike, that he was fired.  He was told to call

17   the office.

18       What does the plaintiff do?

19       On Monday he calls Mike.  Mike says that what he will

20   do is check into it.

21       True to his word, Mike, who is not working on the site

22   there at Brayton Point, true to his word he follows up.  He

23   contacts, you will hear, Roger and essentially words to the

24   effect, What's going on?

25       Roger, we will hear, tells Mr. Roberts that he doesn't

**JA173**

```
1    believe he fired the plaintiff.  And Mike Robert has that
2    conversation with Roger Oberkramer, and what does Mike do?
3         Mike, consistent with his word to the plaintiff, calls
4    him back, calls the plaintiff back, and tells the plaintiff
5    repeatedly, My understanding is -- and this is the co-owner
6    of the business telling him, My understanding is you're not
7    fired.  And you're not fired.  You're welcome to stay.
8         He also says, If you want to go, you can go, but you're
9    welcome to continue with this business and to continue on.
10        And he understands that maybe there is some dispute
11   there between Roger and the plaintiff, okay.
12        But the plaintiff wasn't fired.  The owner of the
13   business is going to tell you straight out during this case
14   that he wasn't firing him.  He was telling him, If you want
15   to stay in the business, stay, and, If it's your choice to
16   go, that's your choice.
17        And remember I asked you to remember the important
18   point where the plaintiff, when that work was wrapping up in
19   Lawrenceburg, Indiana, he was given the offer to go to
20   Massachusetts.  And what did he do there?  It was the exact
21   same conversation.  It was, You can stay.  And at that point
22   he exercised his right, and he declined.  And then there
23   were more discussions, and he was -- he became an employee
24   again and continued on for just about six months or so at
25   the Brayton Point site.
```

**JA174**

1          Mike Roberts, the owner of the business, he is telling
2     him, not fired, and you can stay.  Absolutely your choice to
3     do what you want to do.
4          The plaintiff may throughout this case say his
5     perception is he's fired.  That's not a termination of his
6     employment.  The company did take -- we may use some loaded
7     terms like an "adverse action" against him or something else
8     like that where they're trying to establish their claim.
9     They didn't get rid of him.  They didn't fire him, and he
10    was told affirmatively that he was not fired.
11         Mike Roberts also told the plaintiff during that call
12    on that Tuesday, Contact Roger, your supervisor.  Let's get
13    there -- let's get everything back on track if there is some
14    misunderstanding.
15         Does the plaintiff call Roger?  No.
16         Does the plaintiff call Mike Roberts again?  No.
17         Does the plaintiff call Becky Lydon at HR?  No.
18         He doesn't do anything.  He stops showing up to work.
19         Eventually then he leaves Massachusetts and goes back
20    home.
21         And one thing you're not going to see in this case as
22    well, you're not going to see a termination notice.  You're
23    not going to see anything saying he was fired because he
24    wasn't.
25         And their assertion that he was fired -- the plaintiff,

```
 1    as who you will hear the Judge instruct you, has the burden
 2    of proof in this matter -- the plaintiff will not be able to
 3    prove that in fact he was fired.  Not only because he wasn't
 4    but because he was directly told that he was not fired.
 5         Plaintiff then goes back to the area where he had lived
 6    prior to working with Industrial Demolition.  He is in
 7    Indiana for a period of time.  Does not seek any work at
 8    that time for a period of time, several months --
 9         MR. GOODWIN:  Objection.  That's a
10    misrepresentation.
11         THE COURT:  Let us finish the opening.
12         MR. METZGER:  And you will also hear that he was
13    fully physically, mentally capable of working.  There will
14    be no testimony that he was unable to work.  He was fully
15    capable of working.
16         So why are we here?  What are these claims?
17         Now, remember when he said he went to the hospital
18    and had his hip evaluated and he returned to work the next
19    day?  He's claiming that under the law -- and the Judge will
20    instruct you on the law -- but what he's claiming is that he
21    was disabled.  He's claiming that he had a handicap under
22    the law.  And the Judge will give you what that means.  But
23    our contention is that the facts will not in any way line up
24    to what that law is and what the Judge will tell you the law
25    is.  It's not just any type of, "My hip hurts" or something
```

**JA176**

84

1    like that.  It's rises to a much higher level for it to be

2    an actual disability.

3        And he's claiming then as well that he was fired

4    because of this alleged disability.  That's one of his

5    primary claims, that he has a disability, he was able to

6    return to work the next day, and that he's claiming that he

7    was fired because of it even though the company immediately

8    brought him back to work, accommodated him all the way

9    through to the point where after then he is gone.

10        Now, the other part that you're going to hear where

11   he's now saying that he was injured at work, he is saying

12   that before he had gone to the hospital that he was injured

13   at work.

14        And I asked to remember that December 7 date, that

15   Saturday, as an important date as well, because what

16   happened and did not happen?

17        The day he's saying he was injured he didn't report an

18   injury.  There was no witness to this alleged injury.  He

19   will not testify that there was any fall or trip or that he

20   ran into anything.  But he will testify that he worked all

21   day, went home, drove himself home, and no issues.  No

22   Ibuprofen, no Baby Aspirin, nothing.

23        He went home the next day, too.  No issues.

24        And he's now also going to say, and what this claim is

25   about, is that he was fired by the company.

**JA177**

```
 1          Now, he wasn't fired.
 2          But that essentially is the core to what he's trying to
 3    say, is that this adverse action against him was not only
 4    taken against him, which those aren't the facts, but even
 5    if, even if for some reason, he's going to continue to say,
 6    I was fired, he cannot prove that he was fired for some
 7    illegal reason.
 8          He's saying that Mike Roberts, Industrial Demolition,
 9    violated the law in firing him and doing so for reasons that
10    are protected.  He wasn't disabled.  He wasn't fired.  He
11    wasn't fired for taking a day to go to the hospital to have
12    his hip evaluated.  Those facts simply aren't here, but
13    those are the claims that he is now trying to raise.
14          So, in essence, the case is about three things.  He
15    will not be able to demonstrate that he has a disability or
16    a handicap as defined in the law and based upon the facts
17    that you will hear.  He also was not fired.  There is no
18    adverse action taken against him for any reason.  And even
19    if for some reason he were to establish that he had been
20    fired, he does not have the proof that he was fired for some
21    illegal reason that he's now trying to assert.
22          Now, I work towards the conclusion here to get to some
23    of the issues that plaintiff has raised in their opening,
24    just to address those briefly.
25          And we certainly don't believe that there is any basis
```

**JA178**

1    in this case, when we get to the end of it, that there is a

2    reason for any damages, any dollars, to be paid to the

3    plaintiff.  But the plaintiff is going to argue that.

4        And the facts will be that the plaintiff has in many

5    ways continued to change the theories under which his

6    employment ended.

7        After his employment with Industrial Demolition ended

8    and he had gone back to Indiana, even though he could have

9    stayed, he had, as plaintiff's counsel mentioned during the

10   opening, filed a charge saying that there was some adverse

11   action taken against him, the termination because he was

12   talking about wages among fellow coworkers.  There was a

13   settlement agreement that was reached in which there was no

14   admission by the company, which is to resolve things, as

15   companies try to resolve things.  There was a claim that

16   they had in front of the National Labor Relations Board, and

17   the plaintiff was paid back pay up through October of 2020

18   by the company.  There was a check written by Industrial

19   Demolition to the plaintiff which the plaintiff accepted for

20   back pay.

21       So he stopped work in December of 2019.  This charge

22   went on.  There was no hearing, no order.  It's a

23   non-admission by the company just to resolve it.  But he was

24   paid by Industrial Demolition back pay through October '20

25   to try to resolve the matter, and to resolve his claim that

**JA179**

1  he was fired because he was saying then at that point he was

2  fired for talking about wages.

3       And also in terms of the damages too, and again I won't

4  spend too much time on this because we don't think he is

5  entitled to anything, any additional money.  He's already

6  been paid his back pay.  We don't think he's entitled to any

7  more.

8       But they're going to say there are additional damages.

9  He should recover because of these other claims.  Because

10  he's saying that he was terminated primarily because of this

11  disability he's asserting.

12       Well, what you will hear is that at no point after he

13  stopped working at Industrial Demolition was he physically

14  or mentally unable to work.

15       And now he has full-time employment, had full-time

16  employment for a significant period of time.  You will hear

17  during these proceedings that it's full-time employment

18  plus -- in addition to the salaries' paid, he is entitled to

19  commissions, and those wages he continues to receive.

20       And even if the plaintiff were to say that he's

21  entitled to some damages, we don't believe he's entitled to

22  any damages because, again, he was paid back pay by

23  Industrial Demolition and he's working in a position now

24  that's full time where he's earning good wages.

25       So in the end we don't believe the plaintiff will be

**JA180**

```
 1    able to demonstrate the claims that are before you here,

 2    which are whether he was terminated, those facts will not be

 3    here.  Whether he was terminated then for the disability, he

 4    did not have a disability.  And certainly he was not then

 5    terminated for disabilities or some other protected

 6    category.

 7         And based upon that, we contend that the plaintiff --

 8    his claims should fail and that the judgment should be here

 9    in favor of the defendant, and the defendant should not pay

10    plaintiff anything in this matter.

11         I thank you for your time.

12              THE COURT:  Members of the jury, let us stretch.

13         (Pause in proceedings.)

14              MR. TURIELLO:  Your Honor, may we approach briefly?

15              THE COURT:  You can sit.

16              THE CLERK:  We don't do sidebars.

17              MR. TURIELLO:  You don't do sidebars.  Okay.

18              THE COURT:  We don't like them.

19              MR. TURIELLO:  Can we have five minutes just to

20    organize our first witness?

21              THE COURT:  I'm sorry?

22              MR. TURIELLO:  May we have five minutes to organize

23    our first witness?  She is in the hallway.

24              THE COURT:  Can we wait about three minutes?

25              MR. TURIELLO:  I will make that three, a real
```

**JA181**

```
 1    three.
 2          THE COURT:  Members of the jury, I just wanted,
 3    before we have a recess and really start the evidence, to
 4    explain to you a little bit about the way we are going to do
 5    this for the rest of the week.
 6          I anticipate from what counsel have told me that you
 7    will get the case for deliberations on Friday.  Between now
 8    and then, we will start the trial at nine every day, and we
 9    tend to be very prompt.  We will probably take a recess at
10    about eleven or so, whenever it fits into the trial.  And
11    then at one o'clock we will stop until the next day, except
12    on Friday.
13          On Friday I hope the evidence will have been finished,
14    and the last thing for counsel to do then is to address you
15    again and not explain to you what the case is about but to
16    argue what the evidence has been in their favor and what
17    they would like your verdict to be.
18          After that, you will go up to your jury room.  You will
19    be totally alone.  If you need anything, there will be a
20    marshal who is sitting outside who can assist you in any
21    way, as will Ms. Urso.  When -- and you will be there in
22    general, except if things go wrong, until you have a
23    verdict.  And you will have selected a foreperson from among
24    those of you who will participate in the deliberations.  And
25    the foreperson is in charge of making sure that there is a
```

JA182

```
 1    proper verdict form, which I will help you with to begin
 2    with.  And when you're all done, you will let the marshal
 3    know that you are done and you have a verdict, and then we
 4    will assemble again to hear your verdict in open court.
 5         So that's sort of the way it works.
 6         We will try to start at nine promptly every day.  We
 7    will quit at one, unless there is some necessity to have 10
 8    minutes more to get somebody on a plane or whatever.  But we
 9    will try to be responsive, but I also want to be sure that
10    you understand what your obligations are and not infringe on
11    them.
12         I hope that you will listen carefully to the evidence.
13    You will have notebooks -- we will give you notebooks --
14    that you will leave here, but we won't read them, but they
15    are designed to help you remember the evidence because it's
16    not really -- we don't normally provide transcripts of
17    testimony, so listen carefully.
18         And if you cannot hear a witness, who will be sitting
19    over there, (indicating) then we will try to encourage the
20    witness to speak up.  But we need to know when you can't
21    hear, or tell Ms. Urso that he have a problem, or tell me if
22    you have a problem, and we'll try to do that.
23         So the basic work you have to do is to listen to the
24    witnesses, review any exhibits that the parties will give
25    you.  I don't know what they are at the moment, but there
```

**JA183**

1    will be exhibits and paperwork and other things to make the

2    case for the plaintiff by the plaintiff and then for the

3    defendant as well.

4        So during the trial, as I said, you need to hear the

5    witnesses.  If you don't hear what they have to say, just

6    raise your hand, and we will encourage them to speak up or

7    play with the sound system which sometimes has a problem.

8        During the trial I would prefer you not to talk about

9    the evidence when you take a recess.  Just -- it's important

10   that you all hear all of the evidence before you begin to

11   discuss it.  That's the fairest way as I understand you can

12   proceed.

13       You will elect a foreperson from among those of you who

14   will participate in the deliberations, and that foreperson

15   doesn't have any greater power to decide but is hopefully

16   going to make you do this in a reasonable way and not come

17   to blows over your decision.

18       If you have a problem of any kind, let Ms. Urso know,

19   or let me know, and we will try to resolve it.

20       I would ask you not to talk about the evidence outside

21   the jury room and in the jury room largely after the

22   evidence is concluded.  It changes.  You know, what your

23   impression of what happened very often changes as the

24   evidence comes into play.

25       I think that's about it.  We start at nine.  We try to

**JA184**

```
 1    be very prompt.  We quit at one, and we normally take a

 2    recess at about 11, try to fit it into the way the case is

 3    proceeding.

 4         Does anybody have any questions?

 5         (No response.)

 6            THE COURT:  If you do, let Ms. Urso know, and we'll

 7    try to respond to them, and if you have a problem, let us

 8    know that as well.

 9         So we are now ready to go to the first witness.

10         And have we stretched already?

11         (Jurors nod affirmatively.)

12            THE CLERK:  Yes.

13         So I'm just going to swear in the witness.

14         Can I ask you please to raise your right hand.

15                   HEATHER K. MINTON, sworn

16            THE CLERK:  You can be seated, and speak into the

17    microphone.

18         Can you state your name, spelling your last name for

19    the record, please.

20            THE WITNESS:  Heather K. Minton, M-I-N-T-O-N.

21            THE COURT:  Excuse me.

22         Did all the jurors hear her?

23         (Jurors nod affirmatively.)

24            THE CLERK:  I'm sorry.  What was your first name?

25            THE COURT:  Do we have a list of witnesses?
```

**JA185**

```
1              THE WITNESS:  Heather.
2              THE COURT:  I assume this is the plaintiff's
3    witness, right?
4              MR. TURIELLO:  Yes, your Honor.
5              MR. METZGER:  Yes, your Honor.
6              THE COURT:  Do we have a list of your witnesses you
7    intend to call?  If you don't have it now, can you get us
8    one tomorrow?
9              MR. TURIELLO:  Oh, yes, your Honor.
10             THE COURT:  And how long will this witness'
11   testimony be?
12             MR. TURIELLO:  I anticipate, given the hour, your
13   Honor, we will not finish her today.
14             THE COURT:  So she will not finish today?
15             MR. TURIELLO:  She will not finish today.
16             THE COURT:  Okay.
17             MR. TURIELLO:  Your Honor, may I stand during
18   questioning?
19             THE COURT:  I'm sorry?
20             MR. TURIELLO:  May I stand during questioning?
21             THE COURT:  Yeah.
22             MR. TURIELLO:  Okay.  Thank you.
23             THE COURT:  You can move that.
24             MR. TURIELLO:  I'm going to.
25
```

**JA186**

| | |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | **BY MR. TURIELLO** |
| 3 | Q   Good afternoon, Ms. Minton. |
| 4 | A   Hi. |
| 5 | Q   Ms. Minton, can you please do me a favor?  I need you to |
| 6 | speak into that microphone.  It's important for two reasons: |
| 7 | This is a very big courtroom.  We all need to hear you, and |
| 8 | also there's a record of this.  So it amplifies.  It |
| 9 | records.  It's very important. |
| 10 | Okay? |
| 11 | A   Yes. |
| 12 | THE COURT:  If any of the jurors cannot hear either |
| 13 | counsel or the witness please do raise your hand, and we |
| 14 | will try to encourage them. |
| 15 | Q   All right.  So let's give it a test. |
| 16 | Ms. Minton, can you please tell me what your birthday |
| 17 | is? |
| 18 | A   August 26 of 1979. |
| 19 | MR. TURIELLO:  Okay.  Wonderful.  I think we can |
| 20 | all hear you.  Thank you. |
| 21 | Q   Ms. Minton, tell me a little bit about yourself. |
| 22 | Are you married? |
| 23 | A   Yes, I am. |
| 24 | Q   What's your husband's name? |
| 25 | A   His name is Billy Minton. |

**JA187**

```
 1    Q    And do you have any children?

 2    A    I have one child.

 3    Q    What is his or her name?

 4    A    His name is Journey, and he's 11.

 5    Q    He's 11?

 6    A    Hm-hmm.

 7    Q    What did -- did you graduate from college, ma'am?

 8    A    No.

 9    Q    Did you graduate from high school?

10    A    Yes.

11    Q    What'd ya study?

12    A    General, general studies.

13    Q    So you didn't go to a trade school or anything?

14    A    Well, I did start classes for health and safety, to be a

15    CHSTP.

16    Q    What's a CHSTP?  What does that mean?

17    A    Certified Health and Safety Manager.

18    Q    When did you do that?

19    A    I guess I started in about January of '17 and up until I

20    quit the job -- well, up until I was terminated from

21    Industrial.

22    Q    Okay.

23          THE COURT:  Excuse me.  Can all the jurors hear

24    her?

25       (Jurors nod affirmatively.)
```

**JA188**

```
 1              THE COURT:  Okay.
 2    Q   Ms. Minton, prior to August of 2019, what did you do for
 3    work?
 4    A   I did another power plant -- well, actually it was a
 5    state building.  It was 13 stories, and we tore that down.
 6    Q   When you say you did it, what company -- what was the
 7    name of the company you worked for?
 8    A   That was MRD, Midwest Railway [ sic] and Dismantling.
 9    Q   And what was your specific role at Midwest Railway and
10    Dismantling?
11    A   Health and safety.
12    Q   So what did you do in your health and safety role?
13    A   Just made sure that everything was in compliance, up to
14    OSHA standards.
15    Q   And what does that entail?
16    A   Making sure holes are covered.  The guys that are
17    burning or torching have a facemask on, make sure the
18    facemasks -- mask sure the facemasks are clean.  Because it
19    gets dirty, and they put them on, and it can actually give
20    them lead poisoning.
21    Q   And were there any -- at your -- and what's the name of
22    that prior employer again?  I couldn't hear?
23    A   MRD.
24    Q   At MRD -- what type of safety program was in place at
25    MRD?
```

**JA189**

97

```
 1    A    It was a pretty good one.

 2    Q    Can you describe it for us.

 3    A    Well, we had a safety meeting every morning.  And we

 4    always knew where everybody was because we're tearing down a

 5    building, so it would matter to know where everybody's at

 6    because something could collapse.  Or you can go to swing a

 7    load and dump it, and it actually be a basement under there

 8    which could collapse down into the basement.

 9         So it's very important.  Safety is very important in

10    demolition.

11    Q    At MRD, was there a comprehensive onboarding when you

12    first started your job?

13    A    Yeah, it was pretty comprehensive.

14    Q    What was that onboarding process like?

15    A    Well, we sat in a room, and we discussed the practices

16    and like the harnesses, when you had to a wear harnesses,

17    when you had to wear facemasks.

18         What the red tape, the yellow tape meant.

19         And like how to cover holes and just stuff like that.

20    Q    What's the difference between red tape and yellow tape?

21    A    Red is absolutely, "Do Not Go In."

22    Q    When you say "tape," are we talking like crime scene

23    tape?

24    A    Yes.

25    Q    Could you please explain to us how that would be used?
```

**JA190**

1   A   Like if you needed to barricade off an area where there

2   was, say, torching, you would put the red tape around the

3   actual area that's being torched.  That way nobody could go

4   in.

5   Q   Okay.

6       And then yellow tape, I presume, is just a step down

7   from red?

8   A   Yes, just --

9   Q   Like a traffic light?

10  A   Yeah, "Proceed with Caution."

11  Q   You don't have green tape, do you?

12  A   No.

13  Q   I'm just checking.

14      So at MRD did you learn about different types of

15  personal protective equipment?

16  A   Yes.

17  Q   What's that also known as?

18  A   PPE.

19  Q   What's PPE?

20  A   Well, it's stay in your harnesses if you're four feet in

21  the air.  A lot of guards are in place on the machines.

22  Making sure that you're not in any kind of distance -- away

23  from it.  Make sure that you are in a safe distance away

24  from the machines.  Because there's a lot of blind spots

25  when you're turning that machine, and you got all that

```
1    steal, metal loaded.
2    Q    Are there any -- are hard hats a regular --
3    A    Oh, yeah.
4    Q    -- on a jobsite like that?
5    A    Yes.
6         Hard hats, safety vests, boots, steal-toe boots.
7    Q    What type of -- now, I'm asking these questions about
8    MRD, but what I'm really trying to ask, ma'am, is what was
9    your familiarity generally with demolition and the
10   demolition industry prior to your work at Industrial
11   Demolition?
12   A    Probably like a year and a half.
13   Q    Okay.
14   A    Yeah.
15   Q    So you said in 2017 you took some courses to get some
16   certifications, correct?
17   A    Yes.
18   Q    And at some point you decided that you wanted to get a
19   job at Industrial Demolition; is that right?
20   A    That's correct.
21   Q    Why?
22   A    Well, I needed field experience.  That's a major part of
23   what you have to have to be able to hold that certificate.
24   So that was the plan.
25   Q    Was there any other reason -- let me ask you this.  Why
```

**JA192**

1    didn't you apply to work anywhere else?  Why did it have to

2    be Industrial Demolition?

3    A    My husband went to work there, and he had worked there

4    in the past.

5    Q    What does your husband do?

6    A    He's a demolition engineer.

7    Q    And had he ever worked in demolition before?

8    A    Yes, he's a third generation.

9    Q    Third generation...

10   A    ...demolition engineer.

11   Q    Okay.

12        So fair to say it runs in the family?

13   A    Yes.

14   Q    So when your husband -- his name is Bill; is that

15   correct?

16   A    That's correct.

17   Q    When Bill got a job -- well, let me ask -- strike that.

18        When did you learn that Bill was going to get a job

19   with Industrial Demolition?

20   A    He actually got the job with Industrial Demolition right

21   after the job that was in Madison, Wisconsin, which was MRD.

22   They was right down the road in Janesville tearing down a GM

23   plant, so...

24   Q    Okay.

25        So through the grapevine, through the projects in the

**JA193**

```
1    neighborhood --
2    A    Yeah.
3    Q    -- there was a job opening?
4    A    That's correct.
5    Q    Okay.
6         Now, you guys were obviously living in Wisconsin at
7    that time; is that correct?
8    A    Yes, sir.
9    Q    Are you from Wisconsin?
10   A    No, we're not from Wisconsin.
11   Q    What's your -- what do you consider your home?
12   A    Indiana.
13   Q    Please explain to the jury how two folks from Indiana
14   working in Wisconsin ended up in Massachusetts.
15   A    Well, my husband was asked to go, and then we tried to
16   find out through one of the ladies that worked at Industrial
17   if they needed a health and safety director.  And they said
18   --
19   Q    Let me interrupt you there for a second.  I'm going to
20   get to that point.
21        I guess what I'm asking you, ma'am, is is it common in
22   this industry for folks to move around?
23   A    Oh, yeah.
24   Q    Why?
25   A    Well, you might have a power plant.  It might take 18
```

**JA194**

```
 1   months to three years to tear all that down.  And then you
 2   would go to the next project, and I mean it could be
 3   anywhere.
 4   Q   Do you consider the work that your husband did and the
 5   work that you did at Industrial Demolition to be specialized
 6   work?
 7   A   Yes.
 8   Q   So now I'm going to ask you, you figure out that there's
 9   this job down the street Industrial Demolition is doing in
10   Janesville and your husband applies; is that correct?
11   A   That's correct.
12   Q   And why did you decide then to apply there instead of
13   doing anything else?
14   A   Well, I was doing something else.  I was actually
15   building truck bodies at the time.
16   Q   What's that entail?
17   A   Like U-Haul trucks, just to make those trailers and all
18   that.  But I had been continuously going to school for
19   health and safety because I knew that's where I was going.
20   Because I wanted to do something that was in the same
21   vicinity of what my husband does that we would both have a
22   career.
23   Q   Now, in 2019, in August of 2019 when you decided to work
24   for Industrial Demolition, how long had you and your husband
25   been married at that point?
```

| | | |
|---|---|---|
| 1 | A | Since 2016. |
| 2 | Q | And did you always travel with him? |
| 3 | A | Yes. |
| 4 | Q | And so -- just correct me if I'm wrong.  You wanted to |
| 5 | | get a job at the same company that your husband did so that |
| 6 | | your family could be together; is that right? |
| 7 | A | Yes. |
| 8 | Q | So let's talk about that. |
| 9 | | When did you first learn of the opportunity for you at |
| 10 | | Industrial Demolition? |
| 11 | A | I guess it would have been like in July of -- it was the |
| 12 | | summer of 2019. |
| 13 | Q | What did you learn about that opportunity? |
| 14 | A | Well, my husband emailed one of the ladies that run |
| 15 | | Industrial and asked if they would have any position where |
| 16 | | they wanted a health and safety director. |
| 17 | Q | Did you interview with anybody at the company in order |
| 18 | | to obtain a position with Industrial Demolition? |
| 19 | A | Yes, I did. |
| 20 | Q | Who did you interview with? |
| 21 | A | His name is Becker. |
| 22 | Q | And do you recall what Russ Becker's title is? |
| 23 | A | He is an environmental analyst. |
| 24 | Q | And does he work for Industrial Demolition? |
| 25 | A | He -- well, he works for Industrial Demolition under an |

**JA196**

```
1    umbrella for CDC, which is the main company.

2    Q    What's "CDC"?

3    A    "Commercial Development Company."

4    Q    And what do they do?

5              MR. METZGER:  Your Honor, objection.

6              THE COURT:  What's the objection?

7              MR. METZGER:  Objection, your Honor.

8         This is going to the opening in terms of irrelevance,

9    getting into these other companies beyond the defendant.

10   The only defendant here is Industrial Demolition.  And the

11   witness was never employed by any other entity other than

12   Industrial Demolitions.  She has no knowledge of this.  She

13   has no personal knowledge.

14             MR. TURIELLO:  Your Honor, she has absolutely

15   personal knowledge, and I think --

16             THE COURT:  She has what?

17             MR. TURIELLO:  She absolutely has personal

18   knowledge, and I think the testimony will be that she was

19   directed by supervisors who were cross-designated amongst

20   all of the companies.  And so we're trying to lay the

21   foundation for exactly how this jobsite was run, what the

22   work environment --

23             THE COURT:  Try to do it in about five questions

24   not going on and on.

25             MR. TURIELLO:  Absolutely.  I just -- I will keep
```

**JA197**

```
1    it very brief.
2            THE COURT:  Your objection is noted.
3            MR. METZGER:  Thank you, your Honor.
4    Q    So because I only have five questions --
5    A    Okay.
6    Q    What is "CDCC"?
7    A    "Commercial Development Company Corp."
8    Q    Sure.
9        Do you know who owns CDCC?
10   A    Mike Roberts and his brother.
11   Q    And you said Russ Becker worked for enviroAnalytics?
12   A    Yes.
13   Q    Who owns EnviroAnalytics?
14   A    Mike Roberts and I think his brother.
15   Q    Okay.  Who did you specifically report to at Industrial
16   Demolition?
17   A    Russ Becker overseed a lot of it, but Becky Lydon was
18   kind of like the go-to.
19   Q    What is Becky Lydon's title?
20   A    She is the COO, chief operating officer.
21   Q    Of which company?
22   A    CDC.
23   Q    So I guess what I'm asking is your boss was Becky Lydon?
24   A    Yes.
25   Q    And Russ Becker; is that correct?
```

**JA198**

```
 1    A    That's correct.
 2    Q    So your employment starts -- well, you said you
 3    interviewed with Russ Becker.  Did you interview with
 4    anybody else?
 5    A    No.
 6    Q    What was your interview about?
 7    A    Just like how they wanted to set up a safety program,
 8    and they wanted to start applying the safety standards to
 9    the demolition work.
10    Q    Do did you accept that employment option?
11    A    Yes.
12    Q    Do you remember what you were paid?
13    A    I think $20 an hour plus per diem.
14    Q    Okay.  Plus per diem?
15    A    Yes.
16    Q    And your husband, I presume, also accepted employment
17    with Industrial Demolition; is that correct?
18    A    Yes, sir.
19    Q    And so when did the two of you move from Wisconsin --
20    well, first of all, where was the site located at Industrial
21    Demolition when you got your job?
22    A    Uhm --
23    Q    I guess, where were you going?
24    A    I was going to Massachusetts.
25    Q    Massachusetts.  And is that the Brayton Point project?
```

**JA199**

```
1    A    Yes, Somerset.
2    Q    That's the project that your husband was working on as
3    well?
4    A    Yes, sir.
5    Q    So it is summer of 2019, Augustish.
6    A    Yes.
7    Q    So you guys pack up the family and you move to
8    Massachusetts; is that correct?
9    A    That's correct.
10   Q    Have you ever been to Massachusetts before?
11   A    Never.
12   Q    Have you ever been to Somerset before?
13   A    No.  It's beautiful, but, no, never been there.
14   Q    How old was Journey at this point?
15   A    He would have been ten.
16   Q    He would have been ten?
17   A    Or, sorry, nine.
18   Q    Did you have to make any arrangements for a place to
19   live or schooling once you got here?
20   A    Yes, schooling.  I got him into a private school, the
21   Christian Academy East Gate.
22   Q    And so everybody came with you?
23   A    Yeah.
24   Q    Where did you live while you were here?
25   A    We lived on-site.
```

**JA200**

```
1    Q    What does that mean?

2    A    We had a fifth wheel.  It's a pretty large one.  It has

3    slide-outs, five slide-outs.  So that's what we lived in on

4    the site.

5    Q    "Fifth wheel," is that basically an RV without the

6    driving, without the seat in front?

7    A    Yes, sir.

8    Q    Towed with a big truck?

9    A    Yes.

10   Q    So you guys are basically -- you're living in a camper

11   on-site?

12   A    Correct.

13   Q    Big camper though?

14   A    Yeah.

15   Q    Is it normal for folks at Industrial Demolition to live

16   on-site?

17   A    I mean, some of the burners did live on-site, and one of

18   the management lived on-site.

19   Q    So there were people living on-site?

20   A    Yes, sir.

21   Q    And so I guess this wasn't a special arrangement for

22   you; is that correct?

23   A    That's correct.

24   Q    Okay.

25        So it's August 2019.  You're employed with Industrial
```

```
1     Demolition Demo.  You move out here.  Journey finds a
2     school.  You're living on-site.  And you were hired to be a
3     safety officer, correct?
4     A    That's correct.
5     Q    Okay.
6          What did you do when you got here?
7     A    I was placed in the scale house.
8     Q    What's the scale house?
9     A    The scale house is where they take scrap, weigh it, and
10    then write tickets and send them to St. Louis on the amount
11    of scrap they're getting out of there every day.
12    Q    I'm going to back up a little bit just so we understand
13    how this works.
14         So you're just tearing down a building here at Brayton
15    Point; is that correct?
16    A    Yes.
17    Q    So why would you need to measure the amount of material
18    that's coming off the site?  Why is that important?
19    A    It's worth a lot of money.
20    Q    Okay.  So is scrapping part of the job basically?
21    A    Oh, yeah, absolutely.
22    Q    So the material that is taken down is then bundled and
23    sold later?
24    A    Yes.
25    Q    So your job when you got there was to work at the scale
```

```
 1   house?
 2   A   Correct.
 3   Q   So take me through your normal day.  How did it start?
 4   What did you do?
 5   A   It would start right about 6 a.m.  We'd go -- I would go
 6   down to the scale, because the guys were there at 6 a.m. the
 7   trucks.  There was about six trucks that came every day,
 8   probably five times a day, so...
 9   Q   You said "trucks" --
10   A   Yes.
11   Q   "Trucks" means a lot of different things.
12   A   Semis.
13   Q   What kind of trucks are we talking about?
14   A   Semis.
15   Q   Semis?
16   A   Yeah.
17   Q   Big trucks.
18   A   Yes.
19   Q   Six semis lined up at 6a.m. a.m.?
20   A   Yes.
21   Q   And what did you do once you started?
22   A   Well, at first I got to come in and go straight to the
23   time scale house because what you got to do is you got to
24   get the tear, which means you got to get the weight of the
25   truck not loaded.
```

**JA203**

```
1    Q    Okay.
2    A    So you get that, and then they go down to the site, and
3    they get loaded, and then they come back to the scale house
4    and come in and get weighed.
5    Q    Okay.
6         And that's to determine how much stuff in pounds is
7    leaving the property, correct?
8    A    Yes, correct.
9    Q    And from that we estimate a value, and that's how that
10   works?
11   A    Yes.
12   Q    You said there were six trucks five times a day?
13   A    Yeah.
14   Q    Is that 30 trucks?
15   A    I mean, yeah.
16   Q    Every day?
17   A    Yes.
18   Q    For how many days?
19   A    Five days a week, because they didn't work on the
20   weekends --
21   Q    Okay.
22   A    -- so, yeah.
23   Q    And how long were you having trucks run back and forth?
24   You said you started in August.  How long did that go?
25   A    Oh, it never stopped.
```

112

```
1    Q   When was the last truck you saw leave the Brayton Point
2    site?
3    A   Probably the last day I was let go.
4    Q   When was that?
5    A   August of '20ish.
6    Q   Okay.  So a year later?
7    A   Yeah.
8    Q   So now I get an idea of this.
9         Brayton Point.  Can you describe for the jury what the
10   environment is there?  You've got six trucks coming in every
11   day five times a day.  You're moving a lot of material.  How
12   big is it?
13   A   How big is the site?
14   Q   Yeah, how big is the site.
15   A   Probably about 20, 25 acres.
16   Q   20, 25 acres?
17   A   Yeah.
18   Q   And I presume this is like a totally remote part of
19   Massachusetts.  There's no houses or anything around, right?
20   A   You would think so, but, no.
21   Q   So you had neighbors?
22   A   Oh, yeah.
23   Q   Who were your neighbors?
24   A   They sit right on the bay.  I mean, very nice houses.
25   And they sit right there.
```

**JA205**

113

```
 1        On the other side was where they were dumping scrap
 2   metal.  Another company was coming in with scrap while we
 3   were going out.  And they would dump it right on the bay,
 4   like four stories tall.
 5   Q   So I guess what I'm trying to understand, just cuz the
 6   jury -- I want the jury to understand.  Everybody needs to
 7   understand what this project -- what's involved in what
 8   you're doing.
 9   A   Yeah.
10   Q   You have a 25-acre site?
11   A   Um-hmm.
12   Q   And it's adjacent to residential neighbors?
13   A   Yes.
14   Q   And it's on the bay?
15   A   Yes.
16   Q   And what -- do you know what type of building was being
17   demolished at Brayton Point?
18   A   Yes.  It was a power plant.
19   Q   Okay.  How big was the power plant?
20   A   I believe it had -- I believe it had five turbines,
21   turbine halls.
22   Q   Enough to fill 30 trucks a day for a year?
23   A   Yeah, and some.
24   Q   A really big building?
25   A   Yup.
```

**JA206**

```
1    Q    So how many hours a day when you started would you say
2    you devoted to working at the scale house?
3    A    Probably 12.
4    Q    Twelve?
5    A    Yeah.
6    Q    What does that have to do with setting up a safety
7    program?
8    A    It has nothing to do with it.
9    Q    Okay, let me ask you this.  When you came on with
10   Industrial Demolition, did you receive any safety training?
11   A    Not one bit.
12   Q    Do you know whether or not there was a safety manual?
13   A    I never seen it, but, I mean, I think one existed maybe
14   somewhere.
15   Q    Okay.  Who was running morning safety meetings?
16   A    Oh, his name was Roger Oberkramer.
17   Q    Okay.  So there was someone that was running those
18   meetings?
19   A    Yes.
20   Q    We got that at least.
21       Can you please tell me, ma'am, at any point did your
22   responsibilities shift from the scale house to something
23   else?
24   A    Yeah, real fast.
25   Q    When did that happen?
```

```
 1    A    OSHA got involved with the site.

 2    Q    What does that mean?

 3    A    OSHA's like basically the police department for health

 4    and safety.

 5    Q    What do you mean they "got involved with the site"?

 6    What is your understanding of what happened?

 7    A    Well, there were still other companies there.  There was

 8    other people working on the site, so...

 9    Q    Hold on.  Let's stop there.

10         Who was working on the site?

11    A    Well, we had a salt truck company coming through.  I

12    don't really know the name.

13         And then we had -- its a -- it was the power plant's --

14    what was that?

15    Q    Who is National Grid?

16    A    National Grid, yeah.

17    Q    Who are they?

18         MR. METZGER:  Objection, your Honor.

19    A    The people that own the company.

20         MR. METZGER:  Objection, your Honor.

21    A    The power plant.

22         THE COURT:  Aren't you going rather far afield?

23         MR. TURIELLO:  Absolutely not, your Honor.  This is

24    all very germane to this case.  This is very germane to this

25    case.
```

**JA208**

```
 1              THE COURT:  It's very what?

 2              MR. TURIELLO:  Germane.  All very important to this

 3    case.

 4              THE COURT:  Well, I look forward to that.

 5          (Laughter.)

 6              MR. TURIELLO:  I promise you we'll get there.

 7          It's only day one.

 8    Q    National Grid.  Who was National Grid?

 9    A    They were the actual power plant that was originally the

10    operators of the power plant.

11    Q    Okay.

12          You said that OSHA got involved.  What does that mean?

13    A    Basically, they were going to open up an investigation

14    on Industrial Demolition.

15    Q    Do you know when that happened?

16    A    I want to say November of '19.

17    Q    And in November of '19, how, if at all, did that

18    investigation change your job duties?

19    A    Yeah.  Everything became very -- they wanted all the

20    health and safety done right away.  There was actually guys

21    that were dropping dirty for lead in their blood.  So that

22    all had to be changed.

23    Q    We'll go into -- we'll go into, you know, that portion.

24    I just want to know what you had to do.

25          So now you were running scales?
```

**JA209**

```
 1    A    Hm-hmm.

 2    Q    Now you're running safety.

 3    A    Yeah.

 4    Q    And that happens contemporaneous with OSHA coming in?

 5    A    Yes.

 6    Q    So at that point who would you say your supervisor was

 7    on a daily basis?  Who did you report to the most every day?

 8    A    Becky and Russ Becker.

 9    Q    Becky and Russ Becker?

10    A    Yes.

11    Q    And what was your assignment -- well, let me strike

12    that.

13         Did Becky and Russ Becker ever give you specific tasks

14    involved with the safety plan at Brayton Point?

15    A    Yes.

16    Q    What were those specific tasks?

17    A    We had to clean out a bunch of the trailers that had

18    furniture in them and convert one part of the area to a lead

19    room, a clean room.  And then the other part had to get all

20    the furniture out because we had to transfer the area, what

21    we were doing.

22    Q    So you had to establish that?

23    A    Yup.

24    Q    Did you ever have to design or implement any safety

25    protocols?
```

**JA210**

1    A    Yeah.  That's when they started to actually really look

2    into lead, and they got PSI out there, which was -- it's

3    another analytics place.  So they came out there.  They gave

4    us lead training.

5    Q    So you received -- you specifically received lead

6    training at that point?

7    A    Yeah.

8    Q    Did you administer any other -- when I say "administer,"

9    did you help with any other specific tasks as it related to

10   the safety program at that point?

11   A    Like -- OSHA came out to the site, and I had to help

12   with that investigation.

13   Q    Okay, good.

14        So you shifted completely.

15        Now, you testified a moment ago that you needed to

16   create a clean room.

17   A    Yes.

18   Q    Is it fair to say then, through my powers of deduction,

19   that one did not exist before that?

20   A    Yeah, it was nonexistent.

21   Q    Okay.

22        What was involved in creating a clean room?

23   A    Well, you had to have one room that had your dirty

24   overalls, your shoes, all the masks.  All that would be in

25   one room.

**JA211**

119

```
 1        Then they would have to walk through to the next room,
 2    and they were supposed to shower, put on clean clothes, and
 3    then they were free to go.
 4    Q   Okay.
 5        So, was this -- did -- you guy built this from scratch,
 6    I assume?
 7    A   Yes, correct.
 8    Q   So you built the building itself and like --
 9    A   Well, no, we didn't build the building.  We took the
10    trailers that was already available.  What they had, they
11    had trailers stacked up on each other that made all these
12    office spaces.  And we had to basically remove all the
13    furniture, remove the stove, remove refrigerators and clean
14    that area out.
15    Q   Okay.
16        So do you recall specifically what the conditioning of
17    those trailers was when you had to go clear them out?
18    A   Yeah, it was packed.
19    Q   How packed?
20    A   Well, you couldn't hardly even get around.
21    Q   How big's the trailer?
22    A   I don't know.  How big would a trailer be?
23    Q   I don't know.  We're in a courtroom.
24    A   Probably about as long as this, this jury box
25    (indicating).
```

**JA212**

```
1    Q   This here?
2    A   Yeah.
3    Q   Okay.
4           MR. TURIELLO:  Indicating for the record the jury
5    box.
6    Q   It's a big space.
7    A   It is a big space, yes.
8    Q   Are these the type of trailers -- maybe this is more
9    helpful.
10          Are these the type of trailers you can put on a flatbed
11   -- on a truck and can get trucked in?
12   A   Is what it is is it's kind of like a Conex trailer.
13   Q   Okay, all right.
14          So how many trailers had to be cleared up?
15          THE COURT:  What is the relevance of this?
16          MR. TURIELLO:  Your Honor, the relevance of this is
17   that these were the trailers that Eric Moore was assigned to
18   clear out, and all the furniture and all the things he had
19   to move when he alleges he had his injury.  And so we are
20   establishing exactly what happened and how Eric Moore got
21   into the position he was when the injury that the defendant
22   disputes occurred.
23          THE COURT:  I don't know, but go quickly.
24          MR. TURIELLO:  Quickly.
25   Q   Lots of furniture?
```

JA213

```
 1    A    Hm-hmm.

 2    Q    Lots of every stuff?

 3    A    Yeah.

 4    Q    Okay, great.

 5            So you had to clean them out.

 6            Do you recall who was assigned to clear out the space?

 7    A    Yes.

 8    Q    Who was assigned to clear out the space?

 9    A    Eric, and I want to say Romero, I believe was his name.

10    Q    Romero?

11    A    Yeah.

12    Q    Who oversaw the work of Eric, if you know, at the site?

13    A    You mean in general?

14    Q    Yeah.

15    A    Roger Oberkramer.

16    Q    Who is Roger Oberkramer?

17    A    He is the site superintendent at that time.

18    Q    What does that mean?

19    A    Basically he runs the show.

20    Q    Okay.  So does he run all the labor?

21    A    Yes.

22    Q    Okay.

23            So we've established -- a couple of more people -- I

24    want to make sure we've laid the function.

25            We've established Becky Lydon was your boss?
```

**JA214**

```
1    A    Yes.

2    Q    Russ Becker was kind of your boss?

3    A    Yes.

4    Q    Oberkramer ran the site?

5    A    Yes.

6    Q    Who was Roger Oberkramer's boss?

7    A    Mike.

8    Q    Mike Roberts?

9    A    Yes.

10   Q    He's the cheese, he runs everything?

11   A    Yes.

12   Q    Who's "Ms. Piggy"?

13   A    She was actually the environmental lady.

14   Q    How did she get that name?

15   A    Roger.

16   Q    Okay.

17        What was her responsibility?

18   A    Well, she was responsible for all the environmental,

19   taking the well samples, making sure the runoff didn't go

20   into the bay.  She was very important.

21   Q    Okay.

22        So in a project like the one that Mr. Moore was

23   assigned to do, he would report to Roger, or he would report

24   to -- I'm sure "Ms. Piggy" has another name.  What's

25   Ms. Piggy's real name?
```

**JA215**

```
1    A    What was...

2    Q    Does "Elaine" sound right?

3    A    Elaine, right.

4    Q    Or would he report to Elaine?

5    A    Roger.

6    Q    Okay.

7              MR. TURIELLO:  If I may have the Court's brief

8    indulgence.

9         (Pause in proceedings.)

10             MR. TURIELLO:  With the Court's indulgence, if I

11   may --

12             THE COURT:  I'm sorry?

13             MR. TURIELLO:  If I may have the Court's

14   indulgence, may I review one thing?

15        (Pause in proceedings.)

16   Q    Now, you said that Roger was the site superintendent and

17   he ran the work; is that correct?

18   A    Yes.

19   Q    Did he have any say as to your work?

20   A    He didn't really have a say to it, but he made my

21   work -- he made everybody's work where it was very hard to

22   do anything.

23             MR. TURIELLO:  Your Honor, if I may approach the

24   witness --

25             THE COURT:  Yes.
```

**JA216**

124

```
 1              MR. TURIELLO:  -- with what has been premarked as
 2    Exhibit B.
 3         Counsel, I have copies.
 4              THE CLERK:  Is this in?
 5              MR. TURIELLO:  No.
 6         Your Honor, do you need a copy?
 7              THE CLERK:  No, that's good.
 8              MR. METZGER:  Your Honor, I object.
 9         This -- going down this irrelevant line, and this has
10    nothing to do --
11              THE COURT:  Are you offering it?
12              MR. TURIELLO:  Yes.  Well, I'm going to attempt to
13    get it in.
14              THE COURT:  We don't know anything about it yet, so
15    I don't know exactly how to rule.
16              MR. TURIELLO:  If I may have the witness identify
17    it.
18    Q    Do you recognize Plaintiff's B?
19    A    Yes.
20    Q    How do you recognize Plaintiff's B?
21    A    Well, it's email from Becky, Mike, Becker, and myself.
22    Q    And did you write an email appearing in Plaintiff's B?
23    A    Yes.
24    Q    And do you remember the date that you wrote
25    Plaintiff's B?
```

**JA217**

```
1    A    11/25/2019.

2    Q    Does this appear -- or does it appear to be altered in

3    any way from what you remember in that email on November 25?

4    A    No, it looks right.

5          MR. TURIELLO:  Your Honor, the plaintiff would

6    offer Plaintiff's Exhibit B.

7          THE COURT:  I don't understand the relevance to

8    this lawsuit.

9          MR. TURIELLO:  May we have a sidebar, or should we

10   excuse the jury?  I'm happy to argue relevance, but I don't

11   want to poison the jury if it's --

12         THE COURT:  What's the objection?

13         MR. METZGER:  It's irrelevant, your Honor.  This

14   has nothing to do with the plaintiff, nothing to do with his

15   claims.  The plaintiff is not even mentioned in this

16   document.

17         THE COURT:  I feel we have to do it at the sidebar,

18   because I honestly don't know what this is about.

19         MR. TURIELLO:  Happy to explain, your Honor.

20         THE COURT:  So get to stretch.

21     (SIDEBAR CONFERENCE AS FOLLOWS:

22         THE COURT:  I don't understand what this has to do

23   with this lawsuit.

24         MR. TURIELLO:  I'll explain it, your Honor.

25      The defendants claims -- or the plaintiff claims,
```

**JA218**

```
 1    respectfully, two things.  The first is that Roger

 2    Oberkramer --

 3              THE CLERK:  We'll put the music on.

 4         (Laughter.)

 5              MR. TURIELLO:  The first is that Roger Oberkramer

 6    terminated --

 7              THE COURT:  The fellow sitting here?

 8              MR. TURIELLO:  The fellow we've never heard from.

 9         The first is that Roger Oberkramer terminated the

10    plaintiff on December 13 in the conversation -- that's the

11    thing my colleague stood up and talked about in the opening,

12    and that he had the authority to do this from Mike Roberts.

13         So Oberkramer here is directing the work of other

14    people on the site, and he had apparent authority to act as

15    an agent for Industrial Demolition.  So when he said on the

16    13th that "I don't need you anymore, hit the gate," that was

17    a termination.

18         So I'm establishing the role of Roger Oberkramer in the

19    organization.

20         She's going to say, I'm not sure how I'm supposed to do

21    safety, with more than 30 trucks on the scale, meeting with

22    National Grid --

23              THE COURT:  This is the witness.

24              MR. METZGER:  She is having a dispute with Roger

25    about what her job responsibilities are.
```

**JA219**

```
 1              THE COURT:  And what does this have to do with the
 2    plaintiff?
 3              MR. TURIELLO:  It has to do with the plaintiff --
 4    we are going to hear testimony later in the trial about the
 5    actions of Oberkramer, and whether or not  --
 6              THE COURT:  "He," Roger?
 7              MR. TURIELLO:  -- Roger has authority to terminate
 8    the plaintiff.
 9        His supplementary role as superintendent gives him that
10    power.  And Russ Becker, Becky Lydon, and Michael Roberts,
11    the gentleman sitting right there, endowed him with that
12    power.
13        So as to whether or not, as counsel said in his
14    opening, he was ever terminated, we have to rely on what
15    Roger Oberkramer says.  Because when he says, "You're
16    fired," it means you're actually fired.  So I'm establishing
17    Roger's role.
18              THE COURT:  Is that disputed?
19              MR. TURIELLO:  He made a dispute in the opening
20    about -- the opening statement was, He wasn't ever fired,
21    that I couldn't prove why he was fired.  They made job
22    abandonment an issue in the opening statement.
23              MR. METZGER:  This says just the opposite.  What
24    he's saying -- first of all, Roger is not part of this
25    email, this specifically.
```

**JA220**

```
 1              THE COURT:  This email here?
 2              MR. METZGER:  That one.
 3              MR. TURIELLO:  All the same, your Honor --
 4              MR. METZGER:  It says right here Roger does not
 5     have this authority.  This is just the opposite what they're
 6     trying to say.  It says --
 7              MR. TURIELLO:  That's the objection then.
 8              MR. METZGER:  This is absolutely irrelevant.  This
 9     has nothing to do with his claims.
10              MR. TURIELLO:  What Roger did and what Mike Roberts
11     allowed Roger to do is absolutely relevant in this.
12         In this email Roger Oberkramer is telling a person
13     assigned to do safety during an OSHA audit that she can
14     either be a safety officer or run the trucks, but she can't
15     do both.  He is making decisions on Industrial Demolition's
16     behalf about how this site is run.  And Mike Robert is aware
17     that his site supervisor is interfering with the safety
18     audit because the safety officer isn't allowed to do her
19     job.
20         So when we hear about --
21              THE COURT:  How is this relevant to this case?
22              MR. TURIELLO:  Because the termination happens on
23     the 13th, and this highlights --
24              THE COURT:  This relates to those events?
25              MR. TURIELLO:  What these relate to, these events,
```

1    Michael Roberts knew that Roger Oberkramer was a problem on

2    this site.  He was given specific information about what

3    Roger Oberkramer was doing.  He let it happen.

4         THE COURT:  This is the guy sitting here?

5         MR. TURIELLO:  He did no investigation of his

6    behavior.  He did no investigation.

7         THE COURT:  What does this have to do with this

8    lawsuit?

9         MR. TURIELLO:  Because they're going to argue that

10   Roger didn't have that authority.

11       And we're going to argue that, number one, he did; and,

12   number two, he was the irresponsible actor this guy put in

13   power.  He trusted him to make decisions.  And one of the

14   decisions that irresponsible, erratic, dangerous, actor made

15   was telling our client to get off his ass from the truck and

16   pick things up off the ground, which violated his reasonable

17   accommodation and flew in the face of logic and, frankly,

18   the policies --

19        THE COURT:  This is one incident.

20        MR. TURIELLO:  This incident -- there's going to be

21   a million incidents about Oberkramer acting exactly --

22        THE COURT:  This trial is going --

23        MR. TURIELLO:  I think it's interesting.  I think

24   what Mike Roberts knew about what Roger Oberkramer was doing

25   is absolutely relevant to whether or not Roger Oberkramer

**JA222**

1   terminated our client and whether or not Industrial

2   Demolition was in a position to --

3          THE COURT:  You're spending a lot of time about

4   building up somebody and to make judgments.  I mean, what

5   was his title at the time?

6          MR. TURIELLO:  He's the CEO.

7          THE COURT:  Well, then why does he not have the

8   power to fire people?

9          MR. TURIELLO:  He didn't.

10     What I am saying is that he, the CEO, empowered Roger

11   to fire someone, Roger Oberkramer.

12          THE COURT:  Why does he not have the power to do

13   that?

14          MR. TURIELLO:  He does have the power to do that.

15     I don't want him to be able to run and say, "I don't

16   know what was happening on my site."

17          THE COURT:  But this is a very roundabout way of

18   getting there.  I haven't been able to make any connection,

19   although I'm trying, between what you're trying to get in

20   and the ultimate -- that he had the power to do this, and

21   people knew he had the power to do it.

22     I think that's what you're saying.

23          MR. TURIELLO:  This email was on November 25.  Our

24   client's terminated three weeks later.  This is all

25   contemporaneous to the time.

**JA223**

```
 1              THE COURT:  What is the defendant's position, that

 2     this man didn't have authority to hire and fire?

 3              MR. METZGER:  With Roger?  He never fired him.

 4              THE COURT:  But that has nothing do with his

 5     ability to.

 6              MR. METZGER:  He could have the ability to fire

 7     certain people.  It didn't happen.  Roger had the power to

 8     terminate some people.

 9              THE COURT:  If that's agreed to, do we need to go

10     on with this?

11              MR. TURIELLO:  I think if that's agreed to, yes --

12     no.

13         If Roger had the power to fire people?  That's fine.

14     That's perfect.

15              MR. METZGER:  We are just not conceding in any way

16     that he was fired.

17              MR. TURIELLO:  Of course we don't have Roger

18     Oberkramer.

19              THE COURT:  He has the power to do it.  We don't

20     need to --

21              MR. TURIELLO:  No, we have -- that is correct.

22         We have to set the stage.

23              THE COURT:  I will explain to the jury there is no

24     dispute that he had the power to do it.  But the question is

25     what, in fact, did he do vis-a-vis the plaintiff?
```

**JA224**

```
 1              MR. TURIELLO:  Yes.  That's great.
 2         ...end of sidebar conference.)
 3              THE COURT:  Members of the jury, I asked to talk to
 4    counsel because it was becoming unclear where we were going,
 5    and as I understand it, one of the issues is what was the
 6    power of Mr. Rogers [sic], who is the gentleman sitting in
 7    the middle of defense counsel table, and there is no dispute
 8    that he is what?
 9              MR. METZGER:  Mr. Roberts, is co-owner of the
10    business itself.
11              THE COURT:  And he clearly had the power to hire
12    and fire employees.
13              MR. METZGER:  Mike Roberts does, yes.
14              THE COURT:  Yes.
15         Is there a dispute as to whether he in some way
16    exercised his power vis-a-vis the plaintiff?
17              MR. METZGER:  Yes, there's absolutely --
18              THE COURT:  There is a dispute about that?
19              MR. METZGER:  There is absolutely a dispute about
20    whether anyone at the company, Mike Roberts, Roger
21    Oberkramer, anybody, as to whether they had actually fired
22    him.
23              THE COURT:  So we can move to what the witness
24    knows about what Mr. Rogers in fact did vis-a-vis the
25    plaintiff, but we understand that he had the power to fire
```

**JA225**

```
 1   for sure, correct?

 2          MR. TURIELLO:  Yes.

 3          MR. METZGER:  Hypothetically he had the power in

 4   some cases to fire some individuals, yes.  Fair.

 5          THE COURT:  And what's your problem?

 6      No offense, counsel.

 7      (Laughter.)

 8          MR. TURIELLO:  Your Honor, as a point of

 9   clarification, and it's because they sound similar, we're

10   not talking about Mr. Roberts --

11          THE COURT:  Roberts.

12          MR. TURIELLO:  -- the CEO, who is at the table, who

13   unquestionably can do whatever he wants, he's the CEO, the

14   fact --

15          THE COURT:  Weren't the questions directed to him?

16          MR. TURIELLO:  No, it was Roger Oberkramer.  The

17   point that we're making is that Roger Oberkramer had the

18   authority to fire individuals on the site.

19          THE COURT:  Is there a dispute about that?

20          MR. METZGER:  No, there's not.  He, in general, had

21   authority to fire hourly workers on the site.

22      Our dispute, just to be clear, is whether that ever

23   occurred with respect to the plaintiff.

24          THE COURT:  Right.

25      So he had the -- Ober -- what's his name?
```

JA226

```
 1              MR. METZGER:  Oberkramer, Roger Oberkramer.

 2              THE COURT:  Roger Oberkramer, it is agreed, had the

 3    power to hire and fire.  It is not -- there is no -- the

 4    evidence is not clear at this point, if there is any

 5    evidence yet, as to whether he did that vis-a-vis the

 6    plaintiff.

 7              MR. METZGER:  Fair.  Yes.  Thank you, your Honor.

 8              THE COURT:  So we don't have to get into power.  We

 9    simply have to get into what, if anything, the witness knew

10    about what he did vis-a-vis the plaintiff.

11              MR. TURIELLO:  Correct, your Honor, with one

12    exception, but I'm sure we'll have --

13              THE COURT:  Okay.

14              MR. TURIELLO:  But yes.

15              THE COURT:  We have six minutes to finish with the

16    witness, hopefully, otherwise she has to come back tomorrow.

17              MR. TURIELLO:  She plans on coming back tomorrow,

18    your Honor.

19              THE COURT:  I'm sorry?

20              MR. TURIELLO:  She's planning on coming back

21    tomorrow.  We'll have her tomorrow.

22              THE COURT:  She may be.

23         (Laughter.)

24              THE COURT:  Let's use the next now five minutes

25    productively.
```

**JA227**

```
 1              MR. TURIELLO:  In order to maximize productivity,
 2    your Honor, if I may refer to my notes?
 3         (Counsel conferred.)
 4    BY MR. TURIELLO
 5    Q   Ms. Minton, how many employees worked at Industrial
 6    Demolition at the time you were there?
 7    A   Well, we went through -- there was about 25 on a regular
 8    basis.  We probably went through our whole time there
 9    probably 20-something people got fired.
10    Q   So a staff of 25 you said?
11    A   Yeah.
12    Q   But turnover during your time there.
13    A   Yes.
14    Q   Had you ever heard of an instance of Roger Oberkramer
15    terminating an employee at Industrial Demolition?
16    A   Oh, yeah.
17    Q   Who did you hear that he had fired?
18         Well, strike that.
19         When someone is fired at Industrial Demolition, are
20    they issued termination letters?
21    A   No.
22    Q   What is -- we talked about the onboarding process.
23         What's the offboarding process when you get fired at
24    Industrial Demolition?
25    A   You pack your stuff and you leave.
```

**JA228**

```
 1    Q   Who do you call?

 2    A   You would probably call Mike Roberts.

 3            MR. TURIELLO:  I have no more questions at this

 4    time.

 5            THE COURT:  Do you have any questions of this

 6    witness?

 7            MR. METZGER:  I do, your Honor.

 8            THE COURT:  Might as well start.

 9            MR. METZGER:  I'm happy to begin.  Thank you.

10            THE COURT:  Once he starts, then he gets the floor

11    tomorrow morning, so we don't go backwards.

12        (Laughter.)

13            MR. METZGER:  Thank you, your Honor.  I'll go three

14    minutes.

15        (Pause in proceedings.)

16            THE COURT:  And this time counts.

17        But you don't want to put yourself between the jurors

18    and the witness.

19            MR. METZGER:  I'll come over here.

20            THE COURT:  Can all the jurors see the witness?

21        (Jurors nod affirmatively.)

22                        CROSS-EXAMINATION

23    BY MR. METZGER

24    Q   Good afternoon, Ms. Minton.

25    A   Hello.
```

**JA229**

```
 1   Q   Tom Metzger on behalf of Industrial Demolition.  Can you
 2   hear me fine?
 3   A   Yes.
 4   Q   If at any point you can't, just raise your hand and let
 5   me know.
 6   A   Okay.
 7   Q   As we covered, you were previously employed for a period
 8   of time with Industrial Demolition, correct?
 9   A   That's correct.
10   Q   And your employment there began in approximately
11   September of 2019, correct?
12   A   My employment actually began in Janesville only for like
13   three weeks, basically doing an audit on the equipment that
14   was there.
15   Q   Okay.  And you're referring, ma'am, to the job that was
16   in Wisconsin?
17   A   Yes.
18   Q   And then after that, you, as you've already discussed,
19   went to the Brayton Point site in Massachusetts, correct?
20   A   That's correct.
21   Q   And you went there with your husband, right?
22   A   Yes, sir.
23   Q   And as has been covered, your husband Bill Minton was
24   already employed with Industrial Demolition when you
25   started, right?
```

**JA230**

138

```
 1     A   Yes, sir.
 2     Q   And how long had your husband been with the company by
 3     the point that you started?
 4     A   I'd say at least a year.
 5     Q   And after that year of experience with the company, your
 6     husband had spoken to you about joining Industrial
 7     Demolition, right?
 8     A   Yes.
 9     Q   And he encouraged you to apply for a position with the
10     company, right?
11     A   Well, I mean, he didn't really care if I went to work or
12     anything, but I was the one who was pursuing the career in
13     health and safety.
14     Q   Okay.  Fair enough.
15         Your husband, after a year of working with Industrial
16     Demolition on a demolition site, he did not discourage you
17     from working with Industrial Demolition, right?
18     A   That's right.
19     Q   I think in fact then you had spoken to individuals at
20     Industrial Demolition and you accepted a job, right?
21     A   Yes, sir.
22             THE COURT:  I think on that note, unless you have
23     more on this topic, we should quit until tomorrow.
24         So, members the of jury -- Lisa, do you give a list of
25     jurors to the people downstairs to identify them?
```

**JA231**

```
 1              THE CLERK:  Yes, they have their juror badge.
 2              THE COURT:  Okay.
 3         So wear your juror badges when you come in tomorrow so
 4    that the guards downstairs don't give you a tough time
 5    getting through their barriers.
 6         And we will start promptly at nine, if you're here at
 7    nine, otherwise we'll wait and start when the last one
 8    arrives.  And we will then probably go until around 11, and
 9    take a break at that point, and then again continue until
10    1:00 tomorrow.  And we try to be very prompt on both
11    starting and finishing so that you won't miss any public
12    transport and the like.
13         I thank you very much.  Do not think about the case.
14    Leave your notebooks on the chair.  We will collect them but
15    not read them, and we look forward to seeing you tomorrow at
16    nine o'clock.
17         Thank you very much.
18              THE CLERK:  All rise for the jury.
19         And you can come with me, please.
20         (Whereupon, the jury left the courtroom.)
21              THE COURT:  You are excused until nine o'clock
22    tomorrow morning, and counsel will tell you what you need to
23    do.
24              THE WITNESS:  Okay.  Thank you.
25              THE COURT:  I hope you have a nice evening.
```

**JA232**

```
 1        If you have issues that you want to talk about before
 2   we start the trial, we should start earlier than nine.  But
 3   I don't see any.  If you find something, let Ms. Urso know,
 4   and let each other know, and let Ms. Urso know, and we won't
 5   make the reporter come in the last minute, but presumably
 6   there isn't much to talk about anyhow.
 7             MR. METZGER:  Thank you.
 8             MR. TURIELLO:  Thank you, your Honor.
 9        (Proceedings adjourned.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**JA233**

141

```
 1                         I N D E X

 2    OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

 3    By Mr. Goodwin                                   59

 4    OPENING STATEMENT ON BEHALF OF THE DEFENDANT

 5    By Mr. Metzger                                   70

 6

 7    WITNESS:              DIRECT   CROSS   REDIRECT   RECROSS

 8    HEATHER K MINTON

 9    By Mr. Turiello        94

10    By Mr. Metzger                 136

11

12

13                     E X H I B I T S

14                          (NONE)

15

16

17

18

19

20

21

22

23

24

25
```

142

**C E R T I F I C A T E**

    I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

      /s/James P. Gibbons      May 2, 2023
        James P. Gibbons

        JAMES P. GIBBONS, CSR, RPR, RMR
           Official Court Reporter
        1 Courthouse Way, Suite 7205
        Boston, Massachusetts 02210
         jamesgibbonsrpr@gmail.com

**JA235**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
ERIC MOORE,                   )
                              )          Civil Action
         Plaintiff,           )          No. 22-10414-RWZ
                              )
v.                            )
                              )
INDUSTRIAL DEMOLITION LLC,    )
and MICHAEL J. ROBERTS,       )
                              )
         Defendants.          )
                              )
```


BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE


JURY TRIAL DAY TWO


April 12, 2023


John J. Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

2

```
1    APPEARANCES:

2    Duddy, Goodwin & Pollard
     Jamie Goodwin, Esq.
3    2 Liberty Square, 10th Floor
     Boston, Massachusetts 02109
4    508.523.2632
     and
5    Duddy, Goodwin & Pollard
     Michael Turiello, Esq.
6    446 Main Street, 16th Floor
     Worcester, Massachusetts 01608
7    860.999.9394
     For Plaintiff
8
     Littler Mendelson P.C.
9    Thomas M.L. Metzger, Esq.
     41 South High Street, Suite 3250
10   Columbus, Ohio 43215
     614.463.4216
11   and
     Littler Mendelson P.C.
12   Alexa Marie Esposito, Esq.
     One International Place, Suite 2700
13   Boston, Massachusetts 02110
     617.378.6000
14   For Defendants

15

16

17

18

19

20

21

22

23

24

25
```

**JA237**

3

1

2                                    INDEX

3

   WITNESS                                                    PAGE

4

5

   HEATHER MINTON

6

      Cross-Examination By Mr. Metzger (Cont.)                 4

7     Redirect Examination By Mr. Turiello                     8

8  ERIC MOORE

9     Direct Examination By Mr. Turiello                      10
      Cross-Examination By Mr. Metzger                        57

10    Cross-Examination By Mr. Turiello                      123
      Recross-Examination By Mr. Metzger                     131

11

12 REBECCA LYDON

      Direct Examination By Mr. Metzger                      134

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA238**

4

```
         1              P R O C E E D I N G S

         2          (The following proceedings were held in open court

         3     before the Honorable Rya W. Zobel, United States

         4     District Judge, United States District Court, District of

         5     Massachusetts, at the John J. Moakley United States Courthouse,

         6     One Courthouse Way, Courtroom 13, Boston, Massachusetts, on

         7     April 12, 2023.

         8     (Case called to order.)

         9          THE COURT:  Good morning.  Please be seated.  All the

09:06   10     jurors are apparently here.  Here they are.

        11          (Jury enters the courtroom.)

        12          THE COURT:  Good morning.  Please be seated.  We will

        13     proceed with the witness with whom we ended yesterday.  And

        14     understand, please, although we will not again swear you today,

09:07   15     you are still under oath.  You may proceed.

        16          MR. METZGER:  Thank you, Your Honor.  We discussed a

        17     new setup here.  Hopefully everyone can hear me fine instead of

        18     me trying to yell from the there.

        19              HEATHER MINTON, Previously Sworn

09:07   20     CROSS-EXAMINATION BY MR. METZGER (cont.):

        21     Q.   Good morning, Ms. Minton.

        22     A.   Good morning.

        23     Q.   Let's just pick up where we left off yesterday.

        24          THE COURT:  Excuse me, you're speaking in a direction

09:07   25     opposite of the jury, which is okay.  You don't have much
```

**JA239**

5

```
 1    choice about that, but please speak up.
 2           MR. METZGER:  Thank you, Your Honor.
 3    Q.   Ms. Minton, can you hear me okay?
 4    A.   Yes.
09:07 5   Q.   Let's just pick up where we left off yesterday.  You
 6    mentioned that in the fall of 2019, you and your husband had
 7    moved from Wisconsin to Massachusetts, correct?
 8    A.   That's correct.
 9    Q.   And that was for the Bristol [sic] Point Project in
09:08 10  connection with Industrial Demolition, correct?
11    A.   Brayton Point?
12    Q.   Brayton Point project, sorry.  The Brayton Point project
13    in Massachusetts.
14         And you had moved to the Brayton Point project with your
09:08 15  husband in a trailer that you had owned, correct?
16    A.   Yes, sir.
17    Q.   And you had moved that trailer onto the Brayton Point
18    site, correct?
19    A.   That's right.
09:08 20  Q.   And you lived there on the Brayton Point site for the
21    duration of your employment with Industrial Demolition?
22    A.   That's correct.
23    Q.   And you did not have to live on the site, but that was an
24    option for you, right?
09:08 25  A.   Yes, sir.
```

**JA240**

6

         1  Q.   Okay.  When you had moved to the Brayton Point site with
         2  your husband, your son was not yet with you, correct?
         3  A.   That's correct.
         4  Q.   After you had been at the Brayton Point site for some
09:08    5  time, you then had your son join you, correct?
         6  A.   Month and a half.
         7  Q.   Month and a half later?
         8  A.   Mm-hmm.
         9  Q.   For the duration of your employment with Industrial
09:09   10  Demolition, your son lived with you and your husband at the
        11  site, correct?
        12  A.   That's correct.
        13  Q.   And you also explained that at the Brayton Point site, you
        14  worked in what is known as the scale house, correct?
09:09   15  A.   That's correct.
        16  Q.   And you were responsible for the trucks that were coming
        17  in, for weighing those empty trucks, right?
        18  A.   Yes, at that time.
        19  Q.   And recording that information in terms of the weight of
09:09   20  the trucks, right?
        21  A.   That's correct.
        22  Q.   And then when the trucks were loaded up with material, you
        23  would ensure that you had the proper weight for the trucks
        24  exiting the site, right?
09:09   25  A.   Sometimes.

7

1   Q.   Part of the function was to ensure that you were getting

2   the measurement properly of what was being taken out of the

3   site, correct?

4   A.   I was measuring what was taken out of the site, that's

09:09 5   correct.

6   Q.   Very good.  Thank you.  And you're familiar with Roger

7   Oberkramer, correct?

8   A.   Yes.

9   Q.   He did not report to you at Industrial Demolition,

09:10 10   correct?

11   A.   Well, he did because he was the one who would come over

12   the speaker walkie-talkie, so he was relaying stuff to

13   everybody.

14   Q.   I understand.  He did not report to you in terms of a

09:10 15   supervisory capacity, right?

16   A.   No.

17   Q.   Okay.  And he also did not work in the scale house, did

18   he?

19   A.   No.

09:10 20   Q.   And you're familiar with the plaintiff Eric Moore,

21   correct?

22   A.   That's correct.

23   Q.   He did not report to you in a supervisory capacity in any

24   way, correct?

09:10 25   A.   That's correct.

**JA242**

8

```
     1    Q.   And you did not report to him, correct?

     2    A.   That's correct.

     3    Q.   And he was not assigned to work in the scale house either,

     4    was he?

09:10 5    A.   Not assigned to work in the scale house, no.

     6         MR. METZGER:  Very good.  Thank you, Ms. Minton.  I

     7    have no further questions.

     8         THE COURT:  Any redirect?

     9         MR. TURIELLO:  Just very briefly, Your Honor.

09:11 10        THE COURT:  I'm sorry?

    11         MR. TURIELLO:  Very briefly, yes.

    12    REDIRECT EXAMINATION BY MR. TURIELLO:

    13    Q.   Ms. Minton, you said that Mr. Oberkramer didn't work for

    14    you but --

09:11 15        THE COURT:  You just, both of you can use it.  Leave

    16    it there so both of you can use it.

    17         MR. TURIELLO:  Thank you.

    18    Q.   Ms. Minton, you said that Mr. Oberkramer would say things

    19    over the walkie-talkie.  Is that what your testimony was?

09:11 20   A.   Yes.

    21         THE COURT:  Can the jury hear the question?  Okay.

    22         MR. TURIELLO:  I'll speak up, too, Your Honor.

    23         THE COURT:  That's a good idea.

    24    Q.   Did you have a walkie-talkie on the site?

09:11 25   A.   Yes.
```

**JA243**

9

```
       1   Q.   And was it on all the time?
       2   A.   Yes.
       3   Q.   And would you be able to hear all of the communications on
       4   that that were being relayed?
09:11  5   A.   That's correct.
       6   Q.   And so is it true that even though Roger Oberkramer didn't
       7   work in that scale house that you could hear what was happening
       8   through the walkie-talkie?
       9   A.   Yes.
09:12 10        MR. TURIELLO:  Okay.  I have no further questions.
      11        THE COURT:  Any recross?
      12        MR. METZGER:  Nothing further, Your Honor.  Thank you.
      13        THE COURT:  Thank you very much.  You are excused.
      14   Who is the next witness?
09:12 15        MR. TURIELLO:  Your Honor, plaintiff's next witness
      16   will be the plaintiff, Eric Moore.
      17        THE COURT:  We're about to swear the witness, so would
      18   counsel kindly attend.
      19        ERIC MOORE, Sworn
09:12 20        THE CLERK:  Can you state your name for the record,
      21   please, sir.
      22        THE WITNESS:  Eric Moore.
      23        THE COURT:  Thank you.  Please be seated.
      24   How long will you be with him?
09:13 25        MR. TURIELLO:  I anticipate an hour with this witness.
```

**JA244**

```
 1              THE COURT:  Okay.

 2              MR. TURIELLO:  If I may just have a moment to move the

 3    mic, Your Honor.

 4    DIRECT EXAMINATION BY MR. TURIELLO:

09:13  5    Q.   Good morning, Mr. Moore.

 6    A.   Good morning.

 7    Q.   Could you please introduce yourself to the jury, state

 8    your full name to them and your date of birth.

 9    A.   My name is Eric Richard Moore.  I was born June 4, 1979.

09:13 10              THE COURT:  Can you all hear him?

11              JURY:  Yes.

12              THE COURT:  If anybody doesn't, just let me know and

13    we'll encourage the witness to be louder.

14    Q.   Mr. Moore, where did you grow up?

09:13 15    A.   I grew up just outside of Chicago, Illinois.

16    Q.   And what level of education did you receive?

17    A.   I went through high school and then took some college

18    courses, never officially got a degree, and then earned some

19    certificates along the way.

09:14 20    Q.   What type of -- sir, I know you speak softly, but if you

21    can, you can move that microphone closer to you.

22    A.   Is that better?

23    Q.   That's better.

24    A.   Okay, great.

09:14 25    Q.   Thank you.  So Mr. Moore, what did you study in your
```

**JA245**

1    college courses?

2    A.    General education initially and then never pursued that.

3    I went ahead and earned a CDL license, certificate, went to

4    school for that, and the bulk of my education or time spent was

09:14  5    training for the ministry.  I was ordained.

6    Q.    Okay.  You mentioned a CDL license.  What's a CDL license?

7    A.    Commercial Driver's License.  I could drive a

8    tractor-trailer, hazardous material, tinker truck.

9    Q.    Okay.  And did you ever work -- prior to the work that

09:14  10   we're going to talk about today with Industrial Demolition, did

11   you have any experience in the trades or as a CDL operator?

12   A.    I did, yes, sir.  I drove for about five years.  Maybe

13   seven years, I'm sorry.  Just outside of Cincinnati, Ohio.  I

14   drove a tractor-trailer, semi, pickups and deliveries.

09:15  15   Q.    Okay.  And when did you stop doing that?

16   A.    I stopped doing that around -- I actually resigned from

17   that position in October, November of 2008 to go full time in

18   the ministry as a pastor.

19   Q.    So in 2008, you made what appears to be a dramatic career

09:15  20   change.  Is that a safe bet?

21   A.    Yes, sir.  It was all eventually leading up to that

22   because it's something that I was studying and passionate about

23   since about 2001.

24   Q.    Okay.  Now, prior to -- I'll back this up.  So you trained

09:16  25   to be a pastor, you said, since 2001, and then you resigned and

**JA246**

12

```
 1    went full time in '08; is that right?
 2    A.   Yes, sir.
 3    Q.   Can you tell us about your family, sir.  Are you married?
 4    A.   Yes, sir, I am married to my wife Holly.  We'll be
09:16 5   celebrating 18 years this October.
 6    Q.   When did you and Holly get married?
 7    A.   2004.
 8    Q.   And so in 2004, you were still driving for the CDL and you
 9    had not yet switched to the pastoral role; is that right?
09:16 10  A.   Correct.
 11   Q.   So she was with you for that transition?
 12   A.   Yes, she was.
 13   Q.   Do you have any children?
 14   A.   I do.  I have five children.
09:16 15  Q.   You have five children?
 16   A.   Four girls and a boy.
 17   Q.   Okay.  What are their ages and names?
 18   A.   Hannah is the oldest, she's 17.  Then Abigail is 14.
 19   Sarah is 13.  Leah is ten.  And then there was a little span
09:16 20  before we had Titus.
 21            THE COURT:  I'm sorry.  I lost the count.
 22            THE WITNESS:  Five children, four girls and one boy.
 23   Q.   And Titus, you said, is your youngest, and he is three?
 24   A.   Yes, sir.
09:17 25  Q.   So there's quite an age gap.
```

**JA247**

13

```
        1   A.   Yeah.  We were doing some traveling.  We were overseas

        2   doing some ministry work, and we didn't feel comfortable giving

        3   birth in a foreign country at the time.

        4   Q.   So just to get some context, what is Titus's birthday?

09:17   5   A.   June 24.

        6   Q.   What year?

        7   A.   Three years ago.

        8   Q.   2020?

        9   A.   It was right before I left to go to Brayton Point.

09:17  10   Q.   Okay.  Great.  That's context.  Thank you.

       11   A.   Yes, sir.

       12   Q.   You said prior to Brayton Point you were overseas.  Can

       13   you explain that briefly for the jury.

       14   A.   Sure.  So I pastored for seven years in a little country

09:17  15   church.  And I just had the desire to go serve abroad.  And so

       16   I resigned that capacity in, I think it was '15, to go overseas

       17   to Ecuador, South America.  We were doing mission work.  We

       18   were helping, you know, the underprivileged with such things as

       19   food, clothing, education, teaching, things of that nature.

09:18  20   Q.   I'll stop you there.  You said you resigned.  You were

       21   full time in 2015.  You made the transition.  How long had you

       22   planned on being abroad in Ecuador?

       23   A.   We sold everything that we owned at that time, our house,

       24   our belongings, our vehicles.  It was a long-term trip.

09:18  25   Q.   So this was not a -- you know, I'll use it in terms of
```

**JA248**

14

1    military service.  This was not a one-year term of service or a

2    two-year deployment.  You were going indefinitely.

3    A.    Correct, we were going indefinitely.  My whole family, me,

4    my wife and four girls.  Titus wasn't born yet.

09:18  5    Q.    Okay.  Yes, Titus wasn't with us yet.  You said that in

6    order to prepare for that, not anticipating leaving, you sold

7    everything you had?

8    A.    Correct.

9          THE COURT:  Direct questions, please.

09:19  10          Members of the jury, we have rules about how questions

11    are to be put to a witness.  The side of the lawyer who calls

12    the witness to the stand conducts normally what we call the

13    direct examination.  And the point of the direct examination is

14    to get the witness to tell a story.

09:19  15          The next questioning by the witness by the other side

16    of the case is cross-examination, and that is designed to test

17    the direct examination answers.  Did he tell the truth?  Did he

18    know what he was talking about?  Stuff like that.  And I think

19    we are merging the two together, and it's easier if we get to

09:19  20    the direct examination so that the witness can tell you what

21    the witness knows rather than having counsel interpret it

22    directly.

23          MR. TURIELLO:  Thank you, Your Honor.

24          THE COURT:  That applies to both counsel.  It hasn't

09:20  25    been tested yet, because they haven't presented witnesses.

JA249

```
 1              MR. METZGER:  Thank you, Your Honor.

 2    Q.   To the judge's point, Eric, I'm going to be very direct.

 3    A.   Yes, sir.

 4    Q.   Okay.  So when did you arrive in Ecuador?

09:20 5    A.   May of 2015.

 6    Q.   And in what city --

 7    A.   May of 2016.

 8    Q.   May of 2016?

 9    A.   Yes, sir.

09:20 10    Q.   And in what city did you arrive in?

11    A.   El Quinche, Ecuador.  It was just outside of the capital,

12    Quito, about 9,500-foot elevation.

13    Q.   I can't hear you.

14              THE COURT:  How do you spell the name of the place

09:20 15    that you went to?

16              THE WITNESS:  Quito, Q-u-i-t-o, Ecuador.

17              THE COURT:  Thank you.

18    Q.   And can you describe for the jury a little bit about that

19    town, briefly?

09:20 20    A.   It was just a little market town.  Obviously a very

21    different culture, very different practices, very different

22    beliefs, very different way of life.  We were a spectacle in

23    the neighborhood.  My daughters have blond hair.  Nobody there

24    has blond hair.  It's all black hair.

09:21 25         We were the only Americans in the town that we lived in.
```

**JA250**

16

We were learning Spanish at the time and weren't fully fluent

in Spanish when we first arrived.  So we just tried to make a

real connection with the people and find a place to call home

and serve them.

09:21 5    Q.   Did you enjoy your work, sir?

6    A.   Oh, I did, very much, yes, sir.

7    Q.   Did there come a point where you decided to leave Ecuador?

8    A.   That was kind of outside of our circumstances.  We had to

9    leave.  My wife got sick.  She developed what was called Mungs

09:21 10   disease.

11   Q.   What was that?

12   A.   Mungs disease is a high altitude elevation sickness, and

13   it's where the blood cells clot and the oxygen can't flow

14   freely through your blood.  And so she had all these different

09:22 15   symptoms of just being really sick, tired.

16        After running various tests, brain scans, chest

17   examinations, it was just oxygen level, and it wouldn't be

18   resolved unless we got to a lower elevation.  We were so high,

19   9,500-foot elevation.

09:22 20   Q.   Okay.  And so with that diagnosis, what did you and your

21   family decide to do?

22   A.   So we traveled for about -- we had six more months on our

23   visa until we had to renew it.  We knew we had to find another

24   place to live if we were going to stay.  We went to a lower

09:22 25   altitude along the coast and really couldn't find anything that

**JA251**

1    we connected with and felt like home, and so we had to leave.

2    Q.    And when did you leave Ecuador?

3    A.    Two years after we arrived.

4    Q.    So 2018?

09:22 5    A.    Yes, sir.

6    Q.    Okay.  When you returned to the United States in 2018,

7    where did you go?

8    A.    Well, we had nothing, so we went to live with my

9    brother-in-law initially, my wife's brother.

09:23 10    Q.    And what's your wife's brother's name?

11    A.    His name is Charles.

12    Q.    Okay.  And where were you located?

13    A.    That was in Southeastern Indiana in a town called

14    Florence, Indiana, about 45 minutes from Cincinnati, Ohio.

09:23 15    Q.    Okay.  Can you describe the living accommodations.

16    A.    There was a three-bedroom home.  It was already him and

17    his wife, and I had four children and me and my wife.  And so

18    we put the four girls in one room, and my wife and I took the

19    other room.

09:23 20    Q.    When you returned, sir, did you seek re-employment with

21    the church that you previously pastored in?

22    A.    I put the new pastor in place through my resignation, so

23    it just wouldn't be right to kind of step back in.  And so I

24    took some time to think about a new direction, what I was going

09:24 25    to be doing, where I was going to be living.

**JA252**

18

```
        1        We had a little bit of savings saved up.  So we took some
        2   time and eventually found a place in Aurora, Indiana, and that
        3   is at the time when I was introduced to Roger Oberkramer's
        4   stepdaughter, Jessie, who lived in the lower floor of a home
09:24   5   that we rented.
        6   Q.   So I want to slow you down there.  So can you please
        7   describe for me Aurora, Indiana, who you met, and what happened
        8   next?
        9   A.   So we went to Aurora, Indiana, found a place.  Again I
09:24  10   then met Jessie Lashi, I believe her name was, and she was
       11   Roger Oberkramer's stepdaughter.
       12   Q.   How did you meet her?
       13   A.   She lived in the lower level of the home that we rented at
       14   the time.  It had an upstairs and a downstairs, and I had a
09:25  15   little bit of savings, but the savings were kind of dwindling
       16   at that time since we had been back in the country now for a
       17   few months.
       18   Q.   What were you doing for work when you met Jessie?
       19   A.   At that time I was not working.
09:25  20   Q.   Okay.  And so why don't you -- so did you have any
       21   conversations with Jessie about potential employment
       22   opportunities?
       23   A.   Yes.  That's where everything eventually led to.  She
       24   worked at the local power plant that was being demolished down
09:25  25   the street in Lawrenceberg, Indiana.  And her step-dad was the
```

**JA253**

```
     1  superintendent there, and she mentioned that it was a really
     2  good job, paid a lot of money.  I had some experience driving a
     3  truck, and I could easily do physical labor.  And so those were
     4  things that were required on the job.
09:26 5      I had a little bit of training on small equipment, you
     6  know, how to operate, and so it would have been a perfect fit,
     7  you know.  I thought, you know, maybe here is a change.  I can
     8  go check this out, you know, and it paid $30 an hour.  There
     9  was overtime of 18 hours a week.
09:26 10 Q.  Okay.
     11 A.  So, you know, then eventually when I moved on to Brayton
     12 Point, there was a per diem also of a thousand dollars a week.
     13 It was a really good job for that area.  And after I hired
     14 on --
09:26 15 Q.  Let me stop you there for a second.  Did you learn all of
     16 that from Jessie, sir?
     17 A.  No.  I knew the pay from Jessie.
     18 Q.  Okay.  How did you meet -- can you please describe for the
     19 jury your first meeting with Roger Oberkramer.
09:26 20 A.  So she put the contact in and I went ahead and visited the
     21 site.  Roger met me at the gate.  I hopped in the truck.  We
     22 drove around the site.  It was a huge site, 700-acre site.  The
     23 one here in Brayton Point was a little smaller, about 300
     24 acres.  But 700 acres, massive facility, equipment everywhere,
09:27 25 trucks, excavators, just everything for demolition purposes.
```

**JA254**

```
      1      So Roger is driving me around, explaining the job to me,

      2    what I would be doing.  He told me that it's a really good job.

      3    You know, he was hard up at some time in his life and Mike

      4    hired him on, gave him this job.  He was making a lot of money.

09:27 5    He said, you know, I'm saving a lot.  You can do the same.

      6      I told him, you know, I just got back from Ecuador.  We

      7    have nothing.  I really need a new start.  And he said, "It

      8    sounds like this would be a perfect fit for you.  You can put

      9    money away.  You can get yourself a house."  So he hired me

09:28 10   right on the spot, and so I took the job.

      11         THE COURT:  Can you please go back to question and

      12   answer.

      13         MR. TURIELLO:  Yes, Your Honor.

      14         THE COURT:  I know you're trying.

09:28 15   Q.   Sir, I'll jump in, but we do want to -- obviously I want

      16   you to answer all of the questions fully and honestly, but

      17   we're just going to answer the questions that are asked.  Okay?

      18   It helps the jury, it helps the court, helps everybody I think.

      19         THE COURT:  Let me interrupt for one moment.  One of

09:28 20   the reasons I'm insisting on having question and answer rather

      21   than have the witness just tell us what he wants to tell us is

      22   that counsel have some understanding of what they have to

      23   prove, so the questions are focused on what is relevant to this

      24   case.

09:28 25         And while it's very interesting to hear the story of
```

21

1   what happened in Ecuador and other places, it's not necessarily

2   appropriate for what this case is about.  So counsel will

3   direct the witness a little bit more so that he will focus on

4   what you need to know in order to come to a fair judgment in

09:29  5   the case.

6           MR. TURIELLO:  Thank you, Your Honor.

7           THE WITNESS:  Sorry.  Thank you.

8           THE COURT:  I understand.

9           THE WITNESS:  Just a little nervous.

09:29  10          THE COURT:  It's different when you're sitting in that

11   chair.

12          THE WITNESS:  Yes, it's the hot seat.

13   BY MR. TURIELLO:

14   Q.   Mr. Moore, you said that Roger hired you on the spot?

09:29  15   A.   Yes, sir.

16   Q.   Did you ever file an application for working at Industrial

17   Demolition?

18   A.   I did, but it wasn't at that time.  The on-boarding

19   process was, I had to work through Roger Oberkramer.  He paid

09:29  20   me directly for the first two weeks.

21   Q.   Okay.  Do you know why that happened?

22   A.   I had no idea.  I think maybe -- I mean, I can suppose why

23   I think it happened.

24   Q.   It's okay.  If you don't know directly, you don't have to

09:29  25   suppose for the jury.

**JA256**

22

```
      1         So just so I'm clear, Roger hired you for a couple of
      2   weeks and paid you himself?
      3   A.   Yes, correct.
      4   Q.   Did there come a time when you transitioned your
09:30 5   employment directly for Industrial Demolition?
      6   A.   Two weeks later.
      7   Q.   And what did you do; can you please describe what your job
      8   title was and what your responsibilities were.
      9   A.   I was a driver, slash, laborer.  So I would pick up the
09:30 10  scrap, move it around on the lot.  And I was a laborer, and so
     11   that entailed using our hands, using small equipment, whatever
     12   it was to reclaim the copper, the aluminium, the electric
     13   wires, the steel out of these massive facilities.
     14   Q.   Okay.  Who was your direct supervisor, sir?
09:30 15  A.   Roger Oberkramer.
     16   Q.   And how many -- so he's your direct supervisor.  What kind
     17   of on-boarding or training did you have at Industrial
     18   Demolition?
     19   A.   There was none.
09:30 20  Q.   None at all?
     21   A.   There was nothing.
     22   Q.   Did you know what to do if you ever got into an accident?
     23   A.   No.  There was no, like, standard operating procedure kind
     24   of thing.  I mean, I guess if somebody got hurt, they'd just
09:31 25  tell Roger.
```

**JA257**

23

1    Q.    Did you ever have to fill out paperwork or did you know if

2    there was any paperwork for reporting accidents?

3    A.    No, sir.

4    Q.    Did you ever have any training on safety?

09:31 5    A.    No.

6    Q.    Okay.  Did you ever attend safety meetings?

7    A.    Yes, we did.

8    Q.    Okay.  Can you please describe those for the jury.

9    A.    So the safety meeting was, I guess whoever was on the site

09:31 10    would sit at the table, and somebody would pick a topic.  And

11    generally that individual was Ray Scully, was his name.

12    Q.    Okay.

13    A.    I don't know if he was given that title of like a safety

14    guy or what.  I just knew he had a lot of experience in the

09:32 15    business.  And he mentioned something like, "Today's topic is

16    trips, slips and falls.  Don't trip, don't slip, don't fall.

17    Watch where you're going.  Okay.  We're done."

18    Q.    Okay.  Do you know, sir, who Becky Lydon is?

19    A.    As far as I knew she was like the human resources manager

09:32 20    for Commercial Development Corporation.

21    Q.    Do you know who Michael Roberts is?

22    A.    Yes.  He's right here in the courtroom.  He's the owner of

23    Commercial Development and all of the entities.

24    Q.    Do you know whether or not Michael Roberts owns Industrial

09:32 25    Demolition?

**JA258**

24

```
 1   A.   Yes, he does.
 2         MR. TURIELLO:  Your Honor, for the record, indicating
 3   the defendant and representative Michael Roberts.
 4   Q.   Mr. Moore, how were the laborers organized at the Tanners
 09:33 5  Creek property?  That was the first property you were at you
 6   said, right?
 7   A.   Yes, sir.
 8   Q.   So who managed them, how many levels of management were
 9   there?
09:33 10       THE COURT:  Can we have one question?
11   Q.   Who managed the laborers?
12   A.   So Roger was the superintendent.  He was the boss on the
13   job.  And then below him there was a gentleman named Carlos.
14   And Carlos was I guess considered the head burner, and so there
09:33 15  was a burn team.  These were the guys that would torch all of
16   the metal.
17   Q.   I'm going to ask you a question.  So Carlos handled the
18   burners?
19   A.   Yeah.
09:33 20  Q.   Were there any other sub-managers?
21   A.   No.
22   Q.   Okay.  What is a burner?
23   A.   A burner is a gentleman that would have a torch hooked up
24   to gas and he would cut the steel pipes, cut the gangways.  Any
09:33 25  type of steel that was on the property, it had to be cut and
```

25

```
      1    brought out of the building, and that was the burner's job.

      2        Sometimes the pieces were 80-feet long and five-feet high,

      3    and so they'd have to cut it in numerous pieces to be able to

      4    fit it in the trucks to take it off the lot.

09:34 5    Q.    Is a burner different than a laborer and driver that you

      6    were?

      7    A.    Yes.

      8    Q.    Okay.  Sir, how long were you at the Indiana project?

      9    A.    The Indiana project, I was hired in September, and I

09:34 10   believe we started wrapping things up then in the following

      11   April.

      12   Q.    And of what year is that, so September through April of

      13   what year?

      14   A.    Yeah, that would have been '18 to '19.

09:34 15   Q.    Okay.  What were your wages while you were on the Indiana

      16   project?

      17   A.    It was $30 an hour.

      18   Q.    How many hours a week did you work?

      19   A.    58.

09:35 20   Q.    And were you paid $30 an hour for the entire 58 hours?

      21   A.    No, sir.  Monday through Friday was a mandatory ten hours.

      22   Q.    Okay.

      23   A.    So we worked 50 hours, and then Saturday it was eight

      24   hours.  40 hours I was paid straight pay, $30 an hour.  And

09:35 25   then the remainder was overtime, so that would be $45 an hour
```

**JA260**

26

```
      1    or something.
      2    Q.   Okay.  Thank you.  Was there any per diem at the Indiana
      3    project?
      4    A.   There was but not for me.  For those that traveled to that
09:35 5    site, they got per diem.  But since I was a local guy, I didn't
      6    get the per diem.
      7    Q.   So were you ever offered to move from the Indiana project
      8    to Brayton Point by -- well, were you ever made that offer
      9    prior to April of 2019?
09:36 10   A.   Yes.
      11   Q.   By whom?
      12   A.   Roger Oberkramer.
      13   Q.   Did you accept that offer?
      14   A.   At that time, no.
09:36 15   Q.   Why not?
      16   A.   The work environment was so very dangerous, and Roger had
      17   absolutely no management ability.  It's borne out already the
      18   abuse that he would deal to the employees by way of belittling
      19   them, calling them names, using racial slurs, things of that
09:36 20   nature.
      21   Q.   So are those the reasons that you decided not to go?
      22   A.   Yeah, I just really didn't want to put up with Roger.
      23   Q.   Okay.  Obviously that changed at some point, correct?
      24   A.   It did.
09:36 25   Q.   When did it change?
```

**JA261**

27

|  |  | A.   Roger called me and said he really needed me in |
|---|---|---|
|  | 1 |  |
|  | 2 | Massachusetts, you know, I was a good, hard worker.  He could |
|  | 3 | count on me to get things done.  He needed to get things done. |
|  | 4 |      So he called and made an offer, told me he'd pay me the |
| 09:37 | 5 | per diem.  Told me just move the whole family down.  You know, |
|  | 6 | he still wants me to work for him.  And that offer was probably |
|  | 7 | made in May, towards the -- May I believe it was or June.  I |
|  | 8 | told him that, you know, my wife's pregnant; I can't just up |
|  | 9 | and leave. |
| 09:37 | 10 | Q.   Hold on.  I'm going to slow you down.  Remember, question |
|  | 11 | and answer.  We'll keep it straight for the jury and for the |
|  | 12 | court. |
|  | 13 | A.   Thank you.  Sorry. |
|  | 14 | Q.   So you said you stopped working in April? |
| 09:37 | 15 | A.   Yes, sir. |
|  | 16 | Q.   And you didn't go? |
|  | 17 | A.   Correct. |
|  | 18 | Q.   Okay.  Were you working in May or June when the second |
|  | 19 | offer was made? |
| 09:37 | 20 | A.   No, sir, I was not. |
|  | 21 | Q.   Okay.  How much was the per diem that was offered for you |
|  | 22 | to travel to Brayton Point? |
|  | 23 | A.   A thousand dollars a week, plus my regular pay. |
|  | 24 | Q.   Did that change your mind? |
| 09:38 | 25 | A.   Yes. |

**JA262**

28

1     Q.    Why?

2     A.    It was a lot of money.  You know, we were still in a bind

3     after having coming back from Ecuador, not having a place we

4     called home.  The whole goal of the job and the new career

09:38 5     shift was to be able to put money away so that I could, you

6     know, eventually buy a home.

7         We lived very modestly.  And so when I heard the thousand

8     dollars a week, I thought here is another opportunity where I

9     can start putting at least a grand a week away because, you

09:38 10    know, I could survive on the regular pay.

11    Q.    Okay.

12    A.    So I took the offer, even though, you know, I knew that

13    I'd have to work for Roger again.  I enjoyed the work and I

14    really --

09:38 15    Q.    I have to slow you down, slow you down.  It's okay.

16        So when did you move from Indiana to Massachusetts?

17    A.    So Roger said, "Let your wife have the baby," you know,

18    "I'll give you a week."  So I took a week with my baby, Titus,

19    after he was born.  Then I came up myself to go ahead and work

09:39 20    for a couple of weeks to get paid so that I would have the

21    finances available to pack up and move my whole family and find

22    somewhere to live in Massachusetts.

23    Q.    Did you find a place to live in Massachusetts?

24    A.    We did.  We were able to find a home, and I signed a lease

09:39 25    on that home through the direction of Roger.  Roger told me

**JA263**

1  that I could sign at least a ten-month lease, nine or ten-month

2  lease because the project would be going on for quite some

3  time.  And after that project, we'd go to the next one.

4  Q.   Okay.  Where was the home located?

09:40 5  A.   Westport, Massachusetts.

6  Q.   And what was the rent that you were paying?

7  A.   1500 a month.

8  Q.   Okay.  Were your children in school?

9  A.   They were home-schooled.

09:40 10  Q.   Okay.  So Holly, was Holly working at the time?

11  A.   No.  Since we've been married, she's never worked.  I've

12  been the sole breadwinner.

13  Q.   Okay.  Can you please describe what your duties were at

14  Brayton Point?

09:40 15  A.   They were just about the same as Tanners Creek.  I just

16  increased a little more responsibility.  The site was a lot

17  bigger.  Roger relied on me a lot more to do other things.

18  Q.   Can you please describe for the ladies and gentlemen of

19  the jury your increased responsibilities.

09:40 20  A.   So the increased responsibilities would be taking the

21  copper trucks.  I was kind of -- though I never had the title,

22  I was kind of like the head guy of the laborers because Roger

23  would always direct me, "Eric, get some guys over here.  Eric,

24  get some guys and take care of that."

09:41 25     I was never given that title, but that was the

30

```
        1    responsibility that was given to me.  I dealt with the fuel.  I
        2    dealt with a little bit with the scale house of taking the
        3    drivers to the scale house and back from the scale house.  And
        4    again, just greasing Roger's own excavator.  You know, he was
09:41   5    particular about that.  So I just -- outside of just everything
        6    else that I would do by way of driving the truck and, you know,
        7    scrapping stuff.
        8    Q.   Okay.  Sir, scrapping -- with the court's brief
        9    indulgence, I apologize.
09:41  10            THE COURT:  I'm sorry?
       11            MR. TURIELLO:  I'm just asking for one second to
       12    organize my thoughts, Your Honor.  I apologize.
       13            THE COURT:  Well, this is a good time for us to
       14    stretch.
09:41  15            MR. TURIELLO:  Okay.
       16            THE COURT:  Members of the jury, we will continue
       17    throughout the trial to do this.
       18            MR. TURIELLO:  Thank you, Your Honor.
       19    Q.   Sir, can you please describe for the jury what you were
09:43  20    doing, what the responsibilities were in November, the winter
       21    of 2019.
       22    A.   At that time I guess there was some -- OSHA was getting
       23    involved on the properties, violations of things, and so a
       24    clean room had to be established.  So we started tearing down a
09:43  25    lot of trailers, whole locker rooms.  We had to clean out
```

**JA265**

31

```
    1   multiple trailers and kind of put together with -- they were
    2   kind of like storage units basically.  Everything that might
    3   have been on the site was thrown on there.  We had to get all
    4   of that out.
09:44 5   Q.   Okay.
    6   A.   So we're talking desks, refrigerators, boxes, just any
    7   kind of junk that they would have put in there, file cabinets,
    8   things of that nature, computers.
    9   Q.   Okay.  Were you specifically assigned with the task of
09:44 10  emptying out -- were you specifically assigned to empty out
   11   those units?
   12   A.   Yes, I was.
   13   Q.   And was there anyone assigned to do that with you?
   14   A.   Yes, I believe there was one other gentleman with me at
09:44 15  that time.
   16   Q.   Okay.  Do you remember that person's name?
   17   A.   I recall his name was Jake.
   18   Q.   Okay.  So tell us what happened on December 7 of 2019.
   19        MR. METZGER:  Objection, Your Honor, leading.
09:44 20       THE COURT:  Leading?
   21        MR. METZGER:  Assumes facts not in evidence.
   22        THE COURT:  Well, I think you need to be a little bit
   23   more focused as to what happened, pertaining to what.
   24        MR. TURIELLO:  Sure.
09:44 25  Q.   Sorry.  Did there ever come a time at your work at
```

**JA266**

32

```
          1    Industrial Demolition where you suffered an injury?
          2    A.   Yes.
          3    Q.   What day was that?
          4    A.   That was that Saturday of December.
 09:45    5    Q.   Okay.  Can you please describe what the injury was.
          6    A.   So I didn't know exactly what the injury was initially
          7    because the pain kind of crept up.  But it was after we moved
          8    all of the furniture out of those rooms that we were making for
          9    a clean room for the burners to change in.  That would have
 09:45   10    been Saturday.  We worked on that for a few hours.  I didn't
         11    feel it a whole lot.  It was in my right hip.
         12    Q.   Hold on.  I'm going to slow you down.  This is important,
         13    so we're going to go very step by step.
         14         So what day of the week was it when you were injured?
 09:45   15    A.   Saturday.
         16    Q.   Saturday?
         17    A.   Mm-hmm.
         18    Q.   And did you tell anybody that you got injured on that
         19    Saturday?
 09:46   20    A.   No.
         21    Q.   Why?
         22    A.   It really wasn't an issue at the time.
         23    Q.   Okay.  Was there anyone to report an injury to other than
         24    Roger on the site?
 09:46   25    A.   No.
```

**JA267**

33

```
        1   Q.   Okay.  So on Saturday, what did you do after you got off
        2   of work?
        3   A.   Went home, just a regular Saturday evening with the
        4   family.  That's when I noticed, you know, after you get home,
09:46   5   start warming up a little bit because that was a freezing cold
        6   in December.  After taking a shower and eating, just sitting
        7   there I started feeling like inflammation, swelling in the hip
        8   area.
        9   Q.   What did you do about that at that time?
09:46  10   A.   Nothing at that time.
       11   Q.   And what about Sunday; what happened?
       12   A.   Sunday, got up and went to church, just normal routine for
       13   us.  And I really started feeling it more and told my wife, you
       14   know, "I hurt myself.  Something's going on.  It just seems
09:47  15   like it's progressively increasing in pain."  Kind of like when
       16   you work out, you know, you work out, and you might not feel
       17   sore the first day, but, like, the second or third day it
       18   really hits you.
       19   Q.   Sure.
09:47  20   A.   It was kind of like that because by Sunday evening, I was
       21   almost starting to walk with a limp, and I had to take some
       22   ibuprofen for the pain.  Woke up then Monday and went to the
       23   emergency room.
       24   Q.   Okay.  Sir, did you have any pain at all on Friday?
09:47  25   A.   Not that I recall.
```

34

```
       1   Q.   Did you call anybody on Sunday after your pain worsened
       2   from Industrial Demolition?
       3   A.   No, sir.
       4   Q.   What did you do on Monday?
09:47  5   A.   Monday I went to the emergency room.
       6   Q.   At what time?
       7   A.   First thing in the morning.  It was probably, I think our
       8   shift starts at 7:30.  I think I went about 6:00, something
       9   like that.  It was before my scheduled work time.
09:48 10   Q.   Did you alert anybody that you were going to the emergency
      11   room prior to going?
      12   A.   I called Roger and told him that I was going to the
      13   emergency room, that I was hurt.
      14   Q.   What did you tell him specifically?
09:48 15   A.   That I was hurt, I was going to the emergency room, and
      16   that I'd call him and let him know what the findings were.
      17   Q.   How did he respond?
      18   A.   I believe he said something along the lines, you know,
      19   "Just let me know."
09:48 20   Q.   Okay.  So how long were you -- first, how did you get to
      21   the doctor?
      22   A.   Well, my -- I drove myself.
      23   Q.   Why?
      24   A.   Because I have a family, my wife and five kids.  It's 6:00
09:48 25   a.m. in the morning, and I didn't drag them out of bed to take
```

**JA269**

1    me there to sit in the emergency room for hours on end.

2    Q.   Okay.  Did you believe it was safe for you to drive?

3    A.   I managed.

4    Q.   Okay.  What happened at the doctor's office?

09:49 5    A.   I kind of hobbled into the emergency room because at that

6    time it was just excruciating.  I couldn't even kind of like

7    stand up straight.  I had to remain kind of in a hunched

8    position.  They did a CT scan.  They gave me some medicine,

9    found out there was a real deep tissue tear in the muscle in my

09:49 10    hip.

11    Q.   And were you prescribed any medication for that injury?

12    A.   Yes, sir.

13    Q.   What were you prescribed, if you know?

14    A.   I believe the name was Toradol, Toradol, something along

09:49 15    those lines, maybe some ibuprofen to take home.

16    Q.   Did you receive a doctor's note before you went back to

17    work?

18    A.   Yes, I did.

19    Q.   And did you provide a doctor's note to Industrial

09:49 20    Demolition when you returned to work?

21    A.   Yes, I did.

22    Q.   At whose direction?

23    A.   Both Roger Oberkramer and Becky Lydon.

24    Q.   Had you ever spoken to Becky Lydon before that day?

09:50 25    A.   If I did, I don't recall.  It may have been something to

**JA270**

```
 1    do with a pay stub or something, getting paid.
 2    Q.   Okay.  And did you return to work -- so this was Monday,
 3    correct?
 4    A.   Correct.
 5    Q.   Did you return to work that Monday?
 6    A.   No, sir.
 7    Q.   Did you return to work that Tuesday?
 8    A.   Yes, sir.
 9    Q.   Did you want to go to work on Tuesday?
10    A.   I needed the money.  And if I may, that was one of the
11    reasons why they gave me a doctor's note.  And they said that
12    they wanted me to be off all week, and I said, "Well, I can
13    operate equipment, you know, I can drive a truck.  Is that
14    okay?  Would that be within the restrictions?"  And they said,
15    "Yes," so they gave me that note to reflect that so I could go
16    back to work because I needed the money.
17    Q.   Okay.  And was it the policy at the time of Industrial
18    Demolition to not provide paid sick leave?
19    A.   Yeah.  If you don't clock in, you don't get paid.
20    Q.   Okay.  So did you provide the doctor's note to Becky
21    Lydon?
22    A.   Yes, the hospital did.
23    Q.   Were you allowed to return to work on Tuesday?
24    A.   Yes, sir.
25    Q.   Did you receive any modified duty from Industrial
```

37

1   Demolition?

2   A.   Reluctantly, from Roger Oberkramer.

3   Q.   I was going to ask you, who did you receive your modified

4   duty assignments from?

09:51 5   A.   Roger Oberkramer.

6   Q.   And you said "reluctantly," sir.  How did you come to that

7   conclusion?

8   A.   Just because he really didn't -- you know, "Oh, you didn't

9   get hurt at work.  Oh, you don't need to, you know, sit in the

09:51 10   truck.  You can do this.  You can do that."  He kind of just

11   dealt with Roger.  So I just acquiesced.

12      But I was able to get in the truck and drive a truck, you

13   know, I was able to get in an excavator and operate the

14   excavator.

09:52 15   Q.   Was there work for you to do on-site using the trucks and

16   excavators?

17   A.   Yes, there's always that kind of work there.  The project

18   is just massive, so there's always need for more machines to do

19   work.

09:52 20   Q.   Did you -- and were you able to work all week using only

21   excavators?

22   A.   Yes, sir.

23   Q.   So did there come a time at any point that week when you

24   were directed to stop using the excavators?

09:52 25   A.   Yes, sir, on Friday.

**JA272**

38

1    Q.    What was happening on Friday when that direction was

2    given?

3    A.    So as I mentioned, Roger wasn't too happy about me just

4    sitting in a machine, as he said, all day long.

09:52 5    Q.    Please speak up, sir.

6    A.    Roger wasn't too happy about me sitting in a machine all

7    day, as he said, because normally that wasn't my regular duty.

8    I was getting scrap out of the building, making production.

9    And he'd holler over the radio at one point for us to get out

09:53 10    of our machines to a group of us and to start working with our

11    hands to get the production done; that we don't need the

12    machines to do that specific job that we were doing.

13    Q.    Sir, so could you please describe just the physical act of

14    what you were doing, what the task was.

09:53 15    A.    Okay.  So I was operating a magnet.  The magnet had a

16    huge, probably three-foot, four-foot base circumference.  It

17    can pick cars up.  And we're just moving material.  I'm picking

18    it up, putting it up to another spot.  A gentleman in a

19    front-end loader is moving it over to this direction, a

09:53 20    gentleman with a bobcat is picking it up and putting it into a

21    trailer.

22         And so we were getting the job done.  But Roger was in one

23    of his moods, and he was just kind of just getting

24    progressively agitated towards the day -- as the day went on.

09:54 25    And that's when he came over to us, and as we were demolishing

**JA273**

```
 1   all this different of type of stuff, trailers I think it was at

 2   that time, office trailers probably about as big as the jury

 3   box there, different items in those trailers, too, he was

 4   telling us, "I want you to get out of the machine.  We need

09:54   5   production.  Get out of the machine.  Work with your hands."

 6   Q.   How big were the piles of the scrap that you were supposed

 7   to be moving?

 8   A.   They varied in size.  Anything from, again, it's pipes,

 9   it's metal pieces, it's just -- it's junk, it's scrap.  It's

09:54  10   mangled metal of all various types and sizes.  Some of the

11   things he thought that we could do faster with our hands,

12   picking those up and putting them into the thing instead of

13   trying to get it with the machine.  Because sometimes the

14   machine can't always scoop up the piece of scrap because it

09:55  15   might be like a mangled piece somehow.

16   Q.   Let me pause you for a second.  How many people were you

17   working with when that order was given?

18   A.   Mike, Junior, Jake, and myself.

19   Q.   Once the order was given, how did you change what you were

09:55  20   doing?

21   A.   So I mentioned to Roger -- and I wasn't the only one.

22   Some of the other guys said, "We're using the machines.  We're

23   getting the job done."  And he was just irate.  And I told him,

24   I said, "Listen, I'm on a work restriction, you know.  I'm not

09:55  25   supposed to be out bending over and picking up these pieces of
```

**JA274**

heavy metal."  And then he kind of went off and said, you know,
"I don't give an F about your doctor's note, I don't give an F
what the office says."

Because I mentioned, you know, "Becky in the office said,
you know, that I'm to be on these restrictions for this week."
"I don't give an F what they say.  Get the job done.  We need
production.  Start working with your hands."

Q.   Do you remember what the specific restrictions were?

A.   No.  I think it said something along the lines of "No
heavy lifting, no prolonged standing."

Q.   Okay.  So after that conversation and after you told him
about your restrictions, what happened next?

A.   So I got out and I started lifting stuff and working.
It's just, you know, I didn't want to irritate him any further,
I just -- I wanted to just get the job done and hopefully get
back in the machine and do some other work.

Q.   Okay.  Did you experience any hip pain at all during that
process?

THE COURT:  Sorry, what's the question?

MR. TURIELLO:  I'm sorry, Your Honor.

Q.   Did you experience any hip pain during that process?

A.   It was still tender, yes.

Q.   Okay.

A.   So it's not always easy, especially, you know, maybe we
had to do a team lift or something to lift up an item, you

1    know.  I felt weak.  I wasn't fully recovered.

2    Q.   Okay.  But you were able to complete it?

3    A.   Yes, sir.

4    Q.   And then how long were you completing that portion of the

09:57 5    day's work?

6    A.   It was after lunch, maybe 1:00 or 2:00 until the evening,

7    and we clock out, I think 5:30 it was.

8    Q.   Okay.  And what did you do -- what happened after that?

9    A.   So we finished up the job, and at 5:30 we just normally

09:57 10    drive back to kind of the area where we change our clothes, to

11    the area basically where Heather expressed earlier that they

12    all kind of live on-site, Roger, and some other guys' trailers

13    and stuff.  I was in a gator, which is --

14    Q.   What's a gator?

09:58 15    A.   Like a modified golf cart with knob tires, just to kind of

16    handle the site because of all of the scrap everywhere.  It was

17    dark.  It was late in December.  And at these power plants

18    there's no power, so there's no lights.  We always had

19    headlamps on our helmets that we would turn on.

09:58 20         So I turned on the lights on the gator, and they were

21    really bright lights so we could see where we were going.  And

22    Junior was driving.  I was the passenger.  And we were going

23    back to park the gator.  And we come around the corner, the

24    corner to where we would park the gator inside the building,

09:59 25    which was just totally pitch black, that's why we had the

**JA276**

42

```
        1   lights on, I guess the lights got Roger's attention, and he

        2   became irate.  Over the radio, "Who's got them mother f-ing

        3   lights on?  Turn them m-f-ing lights off."

        4   Q.   What did you do at that point?

09:59   5   A.   Turned the lights off.

        6   Q.   And then what happened?

        7   A.   Junior carefully tried to pull into the facility, you

        8   know.  And again, you're going through a bay door, and it's

        9   completely dark in there, and there's scrap always laying

09:59  10   everywhere because the scrap just falls all different places.

       11   So we park it, and then I proceeded to walk up to go change and

       12   clock out.

       13   Q.   And as you were walking and changing to clock out, what

       14   happened at that point?

09:59  15   A.   Roger and I had a discussion.

       16   Q.   What was discussed?

       17   A.   Okay.  So he was very irate.  "Why did you have them f-ing

       18   lights on?"  Blah, blah, blah, this and that.  You know, I just

       19   tried to explain to him.  There's really no explaining things

10:00  20   to Roger.

       21       Then he's just getting irate, you know, "You've been

       22   jerking around all week in a machine.  You're not getting your

       23   production done."  You know, "Maybe you need to take some time

       24   off."  And the conversation just kind of started escalating.

10:00  25   Q.   What did you say to Roger, if anything, after he said,
```

**JA277**

43

1    "Maybe you should take some time off"?

2    A.    I told him that, "I can't take time off.  I have a family,

3    you know.  I need to work."  The conversation then came to,

4    "Well, you know, maybe you just need -- why don't you just go

10:00  5    and come back at the first of the year," something along those

6    lines.  I said, "There's no way I can do that."  He said, "If

7    you come back" --

8    Q.    Let me slow you down.  So the first of the year, so

9    January 1.  What day was this then?

10:01 10    A.    Friday the 13th.

11    Q.    Friday the 13th of what month?

12    A.    December.

13    Q.    Okay.  So what did you say to him when he said, "Maybe you

14    should come back after the first of the year"?

10:01 15    A.    So I reiterated again, "Roger, I don't see the problem.

16    I'm following my work restriction."  You know, he just starts

17    going off.  "You know, I don't give an F about that or what the

18    office has to say.  You come back after the first of the year

19    and you still have that smile on your face, I'll send you back

10:01 20    home again."

21        And the conversation just kept, like, escalated and

22    escalated to the point where he was almost in my face yelling

23    at me.  You know, I didn't know what the man was going to do.

24    I kind of heard some things of what he's capable of doing.  I

10:02 25    took my hardhat off, handed it to the guy next to me because I

**JA278**

44

```
          1   thought he was going to start fighting me or something.

          2        So I was just really shocked, and basically the

          3   conversation just blew up at the end where he was just like,

          4   "You know what?  I don't have a need of you here anymore.  Hit

10:02     5   the gate and don't come back."

          6   Q.   All right.  I want you to speak into the microphone and

          7   say that again because I didn't hear.

          8   A.   "Hit the gate and don't come back."

          9   Q.   Okay.  Is that how the conversation ended?

10:02    10   A.   That's how it ended, because after he said that, he turned

         11   around and stormed off.

         12   Q.   Okay.  Had you heard the term "Hit the gate and don't come

         13   back" again or previously?

         14   A.   Yes.  That's basically Roger saying, "You're fired."

10:02    15   Q.   How did you know that?

         16   A.   Because people wouldn't come back.

         17   Q.   And in what context would you hear that?

         18   A.   When he was highly irate at somebody.

         19   Q.   I guess what I'm saying is, how were you in a position to

10:03    20   hear that at a giant huge site?

         21   A.   It was -- Roger made sure everyone had a walkie-talkie so

         22   that everybody could hear what's going on at any given time.

         23   Q.   Okay.  So it was not said in person.  You didn't hear it

         24   in person.  You heard it somewhere else; is that correct?

10:03    25   A.   When he told me, I heard it in person, but at other times
```

**JA279**

45

```
         1   he would say it over the radio to whoever he was talking to.
         2   Q.   Okay.
         3   A.   He made a spectacle of it basically.
         4   Q.   Okay.  Were you given any other instructions from Roger on
10:03    5   December 13 other than, "Hit the gate and don't come back"?
         6   A.   "I don't have any need of you here anymore.  Hit the gate
         7   don't come back.  Call the office."
         8   Q.   "Call the office."  Who is the office?
         9   A.   I assumed Mike and Becky, Commercial Development
10:03   10   Corporation.
        11   Q.   Okay.  And was there anybody at the office?
        12   A.   It was 5:30 in the evening, and so I was just going to
        13   wait until Monday to call them.
        14   Q.   Okay.  That wasn't what I was asking.  What I was asking
10:04   15   you is, is the office a place on-site at Brayton Point?
        16   A.   No.  It's in St. Louis, Missouri.
        17   Q.   Okay.  So the office is not there.  It's somewhere else?
        18   A.   Correct.
        19   Q.   Why -- well, did you call the office on Friday night?
10:04   20   A.   No.
        21   Q.   Why?
        22   A.   It was after hours.
        23   Q.   Okay.  What did you do on Saturday?
        24   A.   I just -- you know, trying to take everything in, not
10:04   25   really understanding what's going on.  Thinking that, you know,
```

**JA280**

46

```
       1   I'm going to have to pack up and move.  I just lost my job.
       2   Q.   Did you call the office on Saturday?
       3   A.   No, sir.
       4   Q.   Why not?
10:04  5   A.   It's after hours.
       6   Q.   Did you call the office on Sunday?
       7   A.   No, sir.
       8   Q.   Why not?
       9   A.   After hours.
10:04 10   Q.   Did you call the office on Monday?
      11   A.   I did.
      12   Q.   Who did you speak to on Monday?
      13   A.   So I called Mike Roberts directly.
      14   Q.   And were you able to have a conversation with Mr. Roberts?
10:05 15   A.   It was very brief.  I told him what happened, that Roger
      16   fired me and I needed to talk to him about, you know, what's
      17   taking place on the job site.  I believe he said something
      18   along the lines he's got, you know, kids in the vehicle,
      19   grand-kids in the vehicle or something along those lines and
10:05 20   that he would talk to Becky and call me back.
      21   Q.   Okay.  Was that the first interaction that you had ever
      22   had with Mike Roberts?
      23   A.   No, sir.
      24   Q.   What was the -- when had you previously interacted with
10:05 25   Mike?
```

**JA281**

47

A.    I believe it was the day that the gentleman whose name was

Ted worked on the site at Brayton Point.  I think it was the

day he got fired.  It was a very highly escalated day.  Roger,

again very irate, throwing things around, brought everybody

10:05    into a room and said, "It's him or it's me."  You know, "You

guys need to get together.  You need to call the office.  Get

Mike on the phone, and you're going to choose between him or

me."  And the choice was this guy Ted.

I don't remember exactly who he worked for or which one of

10:06    the corporations under this umbrella he worked for.  But he

turned in a guy that shot up a bar that worked on our location,

and that made Roger very irate.

And so we got on the conference call with Mike, and Mike

-- there was Ray Scully, Billy Minton, there was a gentleman

10:06    named Brian, and there was a gentleman named Mike and myself,

because we were kind of looked at as maybe seniority-type

people on the project.

Mike was like, "Well, what do you guys want to do?  Who

can we put in charge?"  I'm thinking I don't know that it's my

10:06    place to speak at this time because I was the --

Q.    Did you speak at that time?

A.    I did not.  I was the youngest of the group.  I was the

newest of the employees.  Nobody spoke up.  There was a man

with three generations of demolition experience.  There was a

10:07    man sitting over here who has 35 years of experience, and then

48

there's Roger Oberkramer.

Q.    Did anybody speak up at all during --

A.    Nobody spoke up.

Q.    Okay.

10:07 A.    The next thing we know, Ted is driving off the lot.

Q.    Hold on, hold on.  Was that your only other interaction

prior to the call you made on Monday with Mike Roberts?

A.    Yes, prior.

Q.    Prior.  Okay.  Did you speak with Mr. Roberts again?

10:07 A.    On Tuesday, yes.

Q.    And what did you tell Mr. Roberts?

A.    So he called me back and said, "You know, I talked with"

-- again, something along the lines, "I talked with Roger, and

he said that you were" --

10:08 THE COURT:  Excuse me, when was that?

THE WITNESS:  That was Tuesday.

MR. TURIELLO:  It was the next day.  I'll clarify for

the record.  Thank you, Your Honor.

Q.    So Tuesday -- could you please tell the jury the date that

10:08 you spoke with Mike?

A.    Yes, it was -- so Friday the 13th I was fired.  So

Saturday, the 14th, Sunday the 15th, Monday the 16th was when I

made the first call to him.  He said he would call back.  And

then Tuesday, the 17th is when he called me back.  And when he

10:08 called me back he expressed to me that Roger said that I was

**JA283**

49

1    fired because I was talking about my wages.

2    Q.    And was that your understanding based on the interaction

3    that you had the Friday before?

4    A.    No, sir, nothing of the sort.

10:08  5    Q.    Did you ever in your conversation with Roger the Friday

6    before discuss wages?

7    A.    No, sir.

8    Q.    Did he discuss them with you?

9    A.    No, sir.  He was irate that I had a note that said I could

10:09 10    only do certain things, and he did not have control over me.

11    The office did.

12    Q.    So what did you do when you were confronted with the

13    reason that Mr. Roberts gave you on Tuesday the 17th?

14    A.    I was shocked.  I was blown away.  I said something along

10:09 15    the lines of, "What are you talking about?  I have no idea what

16    you're saying here.  That is not why I was fired.  Roger said I

17    was jerking off on the machine all day, you know, complaining

18    about my work restriction and told me 'I have no need of you

19    here anymore.  Hit the gate.  Don't come back.'"

10:09 20        Then I expressed some other things, too, along the lines

21    of --

22    Q.    Well, we're going to get into that.  First I just want to

23    ask the question, if you were fired on December 13

24    unequivocally in your mind --

10:09 25    A.    Yes, sir.

**JA284**

50

1  Q.   -- why did you call Mike Roberts on the 16th and the 17th?

2  A.   I did that because I liked my job, but I knew that I no

3  longer had this job.  And I thought of everybody else that was

4  still on the job site and the danger that they faced every day,

10:10 5  the abuse from the manager, Roger Oberkramer, every day and

6  everybody on that site had to deal with.  And I expressed that

7  to Mike.  I said, "Mike, you really need to know what's really

8  going on on the job site.  Roger is calling people nigger.

9  He's calling people spic."

10:10 10          MR. METZGER:  Objection, Your Honor.

11          THE COURT:  You're going a bit far afield.

12          MR. TURIELLO:  I will reel that in, Your Honor.

13  Q.   After you expressed that, so clarify for the jury just the

14  reason that you wanted to talk to him.

10:10 15  A.   I wanted him to know what was taking place on the job.

16  Q.   Why did you believe he needed to know?

17  A.   Because he had probably absolutely no idea from what I

18  gathered.

19  Q.   Why would he have no idea?

10:10 20  A.   Because he was never there.

21  Q.   Was there any other management at Brayton Point besides

22  Roger Oberkramer?

23  A.   No.  Just Roger Oberkramer.

24  Q.   Okay.  What was Mr. Roberts' response when you confronted

10:11 25  him with these facts?

**JA285**

51

1   A.   It was not what I expected.  He was just kind of like,

2   "Well, you know, Roger is a little rough around the edges, but

3   he gets the job done and he gets production."

4        So I was just like, "You got to be kidding me."

10:11 5   Q.   So at any point during that conversation were you made an

6   offer to return?

7   A.   I think Mike Roberts said something along the lines of,

8   "Well, Roger said you could come back after the first of the

9   year."

10:11 10   Q.   And was that your understanding -- was that your

11   understanding of what had happened on the 13th?

12   A.   No, no.  I was fired.  I was fired.  And I then expressed

13   to Mike Roberts, because he said something along the lines,

14   "Well, just go and work it out with Roger."  And I'm thinking,

10:12 15   this is the man that just fired me, and I just shared with you

16   everything that's taken place on the job site, and you want me

17   to go back to him and try to work out a job?

18   Q.   Were you made aware of any process by which you could work

19   it out with Roger?

10:12 20   A.   Process, no.  Just go back and talk to him, I guess.

21   Q.   Were you told to contact an HR supervisor?

22   A.   No, sir.

23   Q.   Were you told to fill out a form documenting your event

24   with the company?

10:12 25   A.   No, sir.

**JA286**

52

```
           1   Q.   Were you made aware of any investigation that was going to

           2   be undertaken?

           3   A.   No, sir.

           4   Q.   At the conclusion of that conversation -- well, first, how

   10:12    5   did that conversation conclude?

           6   A.   It was just kind of left at that, you know, just go work

           7   it out with Roger.

           8   Q.   What happened after -- what did you do after the

           9   conversation was over?

   10:13   10   A.   At that time I had to leave Massachusetts.

          11   Q.   And so what did you do?

          12   A.   We're talking, it's like a week before Christmas, in

          13   December.  I have five children.  I'm in a leased home.  I now

          14   have no income because I don't have a job.  So I had to get a

   10:13   15   U-Haul, had to pack the family up and move back towards home.

          16   But again, we don't have a home because we sold our home before

          17   we left to go to Ecuador.  The whole purpose of my job and what

          18   I was trying to accomplish was to be able to save the money to

          19   purchase a home.

   10:13   20   Q.   Where did you go?

          21   A.   I went to my brother-in-law's.

          22   Q.   And which brother-in-law?

          23   A.   Charles Tuthill (phonetic).

          24   Q.   Is this the same Charles with the three bedrooms back in

   10:13   25   Indiana?
```

**JA287**

53

```
     1  A.   Yes, sir.

     2  Q.   So where did you live?

     3  A.   We lived in that home when I came back.

     4  Q.   And was it the same home?

10:14 5  A.   It was the same home, yes, sir.

     6  Q.   Okay.

     7  A.   Now with one more child.

     8  Q.   Sir, I want to ask you a question that I think I forgot

     9  and I'm sorry.

10:14 10      What did you tell Holly on Friday the 13th after your

    11  conversation?

    12  A.   I didn't.

    13  Q.   You didn't do what?

    14  A.   I didn't tell her that I was fired.

10:14 15 Q.   Why not?

    16  A.   Because I didn't want her to worry.  You know, I was the

    17  sole breadwinner.  Here we are a thousand miles away from home,

    18  five children, a week before Christmas.  I think I told her

    19  Saturday or Sunday.

10:14 20 Q.   And whose decision was it to -- whose decision was it to

    21  leave the ministry and go to Ecuador?

    22          THE COURT:  Sorry, what was the end of the question?

    23          MR. TURIELLO:  I'm sorry, Your Honor.

    24  Q.   Whose decision was it for you to leave the ministry and go

10:15 25 to Ecuador?
```

54

```
        1    A.    Leave the pastorship to go to Ecuador on the mission?
        2    Q.    Yes.
        3    A.    That was mine.
        4    Q.    And whose decision was it to work at Industrial
10:15   5    Demolition?
        6    A.    That was mine.
        7    Q.    Whose decision was it to travel to Massachusetts?
        8    A.    That was mine.
        9    Q.    How did all of this make you feel?
10:15  10    A.    It was horrible.  Because, you know, I thought we were
       11    starting over again, and here we are back at ground zero trying
       12    to figure out what to do now, you know, and I just, obviously
       13    when you have five children, four girls and a boy, it's hard
       14    enough when you lose your job when you're by yourself or if you
10:16  15    have a spouse or one child or two children.  You know, we had a
       16    large family.  I couldn't buy food for my family.  I had to
       17    rely on my brother-in-law.  It just, it was a demoralizing
       18    place when you have to -- when your brother-in-law has to buy
       19    underwear for your children and then -- because my wife didn't
10:16  20    ask me.  And the only way I found out was when he gave me the
       21    money, he said, "Hey, go do this for your kids."  I said, "What
       22    are you talking about?"  "Well, my wife said that your wife
       23    talked about it."
       24          You know, you have nothing.  I had nothing.  I was just
10:16  25    totally left high and dry after I was, you know, told to come,
```

**JA289**

55

```
 1   told to get a lease, told that I'd be going to the next job
 2   site, that I'd get a raise at the next job site.  I mean, it
 3   just, everything crashed.
 4   Q.   What happened -- so just, again, what day, do you recall
 5   the day you actually left Massachusetts to go to Indiana?
 6   A.   Yeah.  It was very clear.  It was Christmas Eve because my
 7   wife wanted to be home for Christmas.
 8   Q.   What happened to your lease in Massachusetts?
 9   A.   I had to break it.
10   Q.   And do you know how long that lease had left?
11   A.   I think there might have been four months left, something
12   like that.
13   Q.   Okay.
14   A.   Three or four months.  So I had to come up with money to
15   pay for that.
16   Q.   I'm going to ask, did you have to, when you broke the
17   lease, was there a lease penalty?
18   A.   She was a very kind lady, and I explained my situation to
19   her, and so she said, you know, "We'll work something out."  It
20   was something along those lines where maybe I paid half of what
21   was left on the lease because, you know, I tried to help her
22   find a new lessee.
23   Q.   Okay.  And to your knowledge there were four months left
24   at that time; is that right?
25   A.   I believe so, yes, sir.
```

**JA290**

```
 1   Q.   So you had two months' penalty; is that correct?
 2   A.   I think so, I think that's what it was.
 3            MR. TURIELLO:  Court's brief indulgence, if I may.
 4            Thank you, Mr. Moore.
 5            THE COURT:  Are you all done?
 6            MR. TURIELLO:  On direct, yes.
 7            THE COURT:  Direct is finished?
 8            MR. TURIELLO:  Yes, Your Honor.
 9            THE COURT:  Okay.  We'll stretch.
10            MR. METZGER:  Your Honor, may I use the restroom
11   during the break here very briefly?
12            THE COURT:  I certainly am not going to prevent you
13   from going to the bathroom, but I think we normally take the
14   recess at 11:00.  How long will you be on cross, approximately?
15            MR. METZGER:  90 minutes, two hours.
16            THE COURT:  You go ahead and do what you have to do
17   and we'll wait and we'll continue with the witness then on
18   cross.
19            MR. METZGER:  I can wait until 11:00.  We're all here.
20   That's fine.
21            THE COURT:  Okay.
22            MR. METZGER:  That's fine.
23            THE COURT:  Go on to the cross-examination.  Members
24   of the jury, we have essentially two attempts at this, the
25   direct examination of the witness, cross-examination of the
```

**JA291**

57

```
      1   witness and redirect and recross; that's it.  Unless something

      2   occurs that makes it necessary to keep going.

      3          MR. METZGER:  Your Honor, if it's okay?

      4          THE COURT:  You may proceed.  It seems to me that the

10:19 5   position of that is very poor because effectively what counsel

      6   is doing is showing their back to the jury.  I think it would

      7   be better to put it in front of the jury box toward --

      8          MR. METZGER:  Absolutely, Your Honor.

      9          THE COURT:  -- and question from there.

10:20 10         MR. METZGER:  Certainly.

     11          THE COURT:  Counsel will have to be speak loudly so

     12   they can be heard by the witness, but the jury will be in a

     13   better position to see both counsel and the witness.

     14          Do you need space to park your things?  We can move

10:21 15  some of it away from there.

     16          MR. METZGER:  I'm sure I'll have documents over

     17   here --

     18          THE COURT:  By the time we finish the trial we'll know

     19   exactly where to be.

10:21 20         MR. METZGER:  May I proceed, Your Honor?

     21          THE COURT:  Yes, please do.

     22   CROSS-EXAMINATION BY MR. METZGER:

     23   Q.   Good morning, Mr. Moore.

     24   A.   Good morning.

10:21 25  Q.   Let's start at the beginning for a moment in connection
```

**JA292**

58

```
  1    with Industrial Demolition.  You had mentioned that you had

  2    started working with Industrial Demolition in Southern Indiana,

  3    correct?

  4    A.   Correct.

10:22 5    Q.   That was near the end of 2018, correct?

  6    A.   September, yes.

  7    Q.   And that was the Tanners Creek project?

  8    A.   Yes.

  9    Q.   Specifically that was in Lawrenceberg, Indiana?

10:22 10   A.   Yes.

  11   Q.   And you had already been living in the area, correct?

  12   A.   Yes.

  13   Q.   You were living in Aurora, Indiana?

  14   A.   Yes.

10:22 15   Q.   That was a short commute to the worksite, correct?

  16   A.   15 minutes.

  17   Q.   Okay.  You had mostly worked as a driver on that site,

  18   correct?

  19   A.   Driver and laborer.

10:22 20   Q.   Combination of the two?

  21   A.   Correct.

  22   Q.   And it was Roger Oberkramer's daughter-in-law, if I have

  23   it right, who recommended you talk to him about a job?

  24   A.   Yes, Jessie Lashi.

10:22 25   Q.   Did you know her before?
```

**JA293**

59

```
        1   A.    No.

        2   Q.    How did you run into her?

        3   A.    After a certain amount of time we lived in the apartment,

        4   she moved into the bottom floor of the home.

10:23   5   Q.    And she had then recommended to you to go work with her

        6   father-in-law?

        7   A.    Yes.

        8   Q.    You worked on that project for about six months, right,

        9   sir?

10:23  10   A.    September to April.

       11   Q.    And you were paid $30 an hour on that job?

       12   A.    Yes.

       13   Q.    Plus then the overtime, as you explained?

       14   A.    Yes.

10:23  15   Q.    Did you receive any, whether online or in paper, any type

       16   of a pay stub?

       17   A.    I mean, I would get a pay stub in the mail.

       18   Q.    Which --

       19   A.    I believe at one point in time they made it available

10:23  20   where we could access it online.

       21   Q.    Okay.  So you would be able to see what you made per week,

       22   correct?

       23   A.    Yes.

       24   Q.    And would you review those statements from time to time?

10:24  25   A.    I mean, they were, basically it was about the same every
```

|    | |
|----|--|
| 1 | week.  It was 58 hours that we worked.  I wouldn't necessarily |
| 2 | examine the pay stub, if that's what you're asking. |
| 3 | Q.   But you recall receiving a pay stub each week, correct? |
| 4 | A.   Sure. |
| 10:24 5 | MR. METZGER:  Your Honor, we've pre-marked Exhibit |
| 6 | Number 23.  I would like to provide a copy first to counsel. |
| 7 | Your Honor, I'm also showing counsel a copy of Exhibit |
| 8 | 23.  May I approach the witness, Your Honor? |
| 9 | THE COURT:  Are these documents in evidence by |
| 10:25 10 | agreement, or are they to be offered into evidence? |
| 11 | MR. METZGER:  Right now I'm offering them into |
| 12 | evidence. |
| 13 | THE COURT:  Is there an objection? |
| 14 | MR. TURIELLO:  Subject to the authentication by the |
| 10:25 15 | witness.  He hasn't said what we're looking at. |
| 16 | THE COURT:  This is the whole pile or this is one? |
| 17 | MR. METZGER:  This is all one, Exhibit 23.  May I |
| 18 | approach, Your Honor? |
| 19 | THE COURT:  Yes. |
| 10:25 20 | MR. METZGER:  Thank you. |
| 21 | BY MR. METZGER: |
| 22 | Q.   Mr. Moore, just first for identification, I've handed to |
| 23 | you what's been marked as Exhibit Number 23.  Starting with the |
| 24 | first page, do you recognize what that is? |
| 10:26 25 | A.   Yeah, looks like a pay stub. |

**JA295**

```
       1   Q.   And is that a pay stub to you?
       2   A.   Yes, sir, my name is on here.
       3   Q.   And does that reflect your address at the bottom
       4   left-hand?
10:26  5   A.   Yes, sir.
       6   Q.   And is this --
       7        THE COURT:  Why don't we just wait a minute.  We have
       8   a group of students who come quite regularly and are taught and
       9   entertained and are welcome to the courtroom by an employer of
10:27 10   the court, actually, who does that sort of thing for the
      11   benefit of the students.  And it's a project that has grown in
      12   years, and other courts are adopting it as well because it's
      13   useful for them to understand what's going on in the courtroom,
      14   which is quite different, as you have discovered, from what you
10:27 15   see on television going on in the courtroom.
      16        So students are welcome.  I trust that you will not
      17   talk to each other while they're in the courtroom, and we will
      18   now proceed with this case.
      19        MR. METZGER:  Thank you, Your Honor.
10:27 20        THE WITNESS:  Thank you.
      21        THE COURT:  It's too complicated to try to explain to
      22   you what this case is about, so we will simply proceed and just
      23   listen to what is happening.
      24        MR. METZGER:  Thank you, Your Honor.
10:27 25   Q.   Mr. Moore, we were just talking about the identification
```

**JA296**

1   first of Exhibit 23, starting with that first --

2         THE COURT:  I'm sorry to interrupt once more.  This is

3   the cross-examination.  The witness is the plaintiff in the

4   case, and he is suing his former employer about whether he lost

10:28 5   his job or the job was taken away.  That's the issue for the

6   jury ultimately to decide.  So we're now on the

7   cross-examination.

8         He's explained to us on direct what happened to him as

9   he saw it.  And now the defense has a right to question him

10:28 10   about what he remembers, how truthful he is, and in general

11   then to point out to you -- well, to the jurors, not to you --

12   what the jury needs to pay attention to.

13         MR. METZGER:  Thank you, Your Honor.

14   Q.   Mr. Moore, we were in the process first of just

10:28 15   identifying Exhibit Number 23.  Starting with that first page,

16   do you recognize that as a genuine copy of the pay stub you had

17   received from Industrial Demolition?

18   A.   As far as I can tell, yes.

19   Q.   And sir, for the sake of combining a document, I've also

10:29 20   then included after that pay stubs starting later in the year.

21   Do you see that, starting on the next page?

22   A.   Yeah.  The first one starts 4-11-2019, and the second one

23   goes to 7-11-2019.  Is that what you're referring to?

24   Q.   Yes, sir.  So we have a series of pay stubs here for you

10:29 25   in 2019, correct?

**JA297**

63

```
      1   A.   Yes, that's the date.
      2   Q.   And if you need more time, please let us know, but do you
      3   recognize those as genuine copies of the pay stubs that were
      4   provided to you by Industrial Demolition during the course of
10:29 5   your employment in 2019?
      6   A.   As I recall, yes, this is what they looked like.
      7        MR. METZGER:  Your Honor, based upon his
      8   identification, I would move that we admit Exhibit 23 into
      9   evidence.
10:29 10        THE COURT:  No objection?
     11        MR. TURIELLO:  Without objection, Your Honor.
     12        THE COURT:  I'm sorry?
     13        MR. TURIELLO:  Without objection.  There's no
     14   objection.
10:29 15        THE COURT:  Is there some way of showing these to the
     16   jury?
     17        THE CLERK:  I'm going to put it up right now.
     18        MR. METZGER:  Yes.  I just wanted to wait until we got
     19   through their objection.
10:30 20        THE CLERK:  I'm sorry, I was going to have them --
     21        THE COURT:  Go right ahead and tell them what to do.
     22   I think it would be useful if somebody from the --
     23        THE CLERK:  What?  I will.
     24        THE COURT:  Counsel table will move that screen --
10:31 25        THE CLERK:  I'll do it, Judge.  I have it, I have it.
```

**JA298**

64

```
        1   I've got it.

        2           Back here, Judge?

        3           THE COURT:  That would be kind of nice.

        4           MR. METZGER:  The first exhibit is always the

10:31   5   toughest.

        6           THE COURT:  You have your own?

        7           THE WITNESS:  Yes.

        8           THE COURT:  Is it not on the screen?

        9           THE WITNESS:  It's not the screen.

10:31  10           MR. METZGER:  It's not on your screen.

       11           THE CLERK:  Because it's not on.

       12           MR. METZGER:  We're going to get there.

       13           THE COURT:  All right.  I think we're all set now.

       14   The jurors can see it, the witness can see it, and counsel can

10:31  15   see it.

       16           THE CLERK:  Good.

       17           MR. METZGER:  May I proceed, Your Honor?

       18           THE COURT:  Please do.

       19           MR. METZGER:  Thank you.

10:32  20   Q.   This first page, Mr. Moore, in the upper right-hand

       21   corner, this reflects the pay period of the end of March to the

       22   beginning of April, correct?

       23   A.   Yes, sir, correct.

       24   Q.   That was right at the tail end or the end of your work in

10:32  25   Indiana, correct?
```

**JA299**

65

```
      1    A.    Correct, Tanner Creek project.

      2    Q.    For the Tanner Creek project.  And it reflects there on

      3    the left side there you were paid 29 hours at $30 an hour,

      4    correct?

10:32 5    A.    25 hours, yeah, at $30 an hour.

      6    Q.    I keep having struggles with my readers here, so I

      7    apologize.  Let me ask that again because I messed that up.

      8    Your rate, sir, was $30 an hour, correct?

      9    A.    Yes, sir.

10:32 10   Q.    And your hours worked that week were 25.5, correct?

     11    A.    25.5.

     12    Q.    Right above that, sir, it has the line of per diem,

     13    correct?

     14    A.    Correct.

10:33 15   Q.    And you were not paid a per deem?

     16    A.    Not at Tanners Creek.

     17    Q.    As you testified with your counsel on direct

     18    examination -- sorry -- you were not paid the per diem there

     19    because you were living locally, correct?

10:33 20   A.    Yes, that' s correct.

     21          THE COURT:  Take time to pick up your book.

     22          MR. METZGER:  Struggles abound here.  Thank you, Your

     23    Honor.  I' m going to leave this here, counsel.

     24          MR. TURIELLO:  That' s your space.

10:33 25   Q.    During the time that you were at the Indiana site, your
```

**JA300**

```
        1   supervisors were Roger Oberkramer, correct?

        2   A.  Yes, sir.

        3   Q.  And based upon this first page of Exhibit 23, you

        4   recognize that that was your last paycheck there for Indiana,

10:34   5   or does that refresh your recollection that it was?

        6   A.  I knew it was around April that I stopped, so if this was

        7   the last one from April, because then the next one you have

        8   here is dated July, so yeah, I'd say this was the last one if

        9   it was.  Hence, the reduced hours, too, because we were

10:34  10   wrapping things up.

       11   Q.  Yes, sir.  So going to the second page of Exhibit 23, if

       12   we look at the very top in terms of the wages paid, it's the

       13   same so far as page 1 from April, correct?

       14   A.  Yes, page 1 was April.

10:34  15   Q.  So based upon Exhibit Number 23, pages 1 and 2, would you

       16   agree that your gathered employment with Industrial Demolition

       17   was from the beginning of April 2019 to the end of June 2019?

       18   A.  Yes.

       19   Q.  And your work on the project at Indiana, that ended

10:35  20   because the work of Industrial Demolition was wrapping up,

       21   right?

       22   A.  My specific job was, yes.  There were some others that

       23   stayed on-site a little longer.  There were some that left a

       24   little earlier.

10:35  25   Q.  And as you discussed for a moment with your counsel on
```

**JA301**

67

1    direct, even before your work on the Indiana or Tanners Creek

2    project had wrapped up, you were given the offer to go to the

3    Brayton Point site, correct?

4    A.   Yes.

10:35 5    Q.   And you weren't sure that you wanted to accept the

6    position of Brayton Point, right?

7    A.   Yeah, I didn't -- initially I said no.

8    Q.   When you declined the offer of employment from Industrial

9    Demolition, you did not have another job lined up, did you?

10:36 10   A.   At that time, no.

11   Q.   You had the opportunity at that point to go directly to

12   Brayton Point, but you had declined, right?

13   A.   Yes.

14   Q.   And that was entirely within your power to decide, right?

10:36 15   A.   Correct.

16   Q.   You could stay with the company as it was offered to you,

17   or you could decline and possibly move on to a different

18   opportunity, right?

19   A.   Yes.

10:36 20   Q.   You ultimately did agree to then pick up employment with

21   Industrial Demolition again, right?

22   A.   Yes, Roger called and made the offer.

23   Q.   Did you understand that Roger Oberkramer was going to be

24   the supervisor at Brayton Point in Massachusetts as well?

10:36 25   A.   Yes.

**JA302**

68

```
        1   Q.   You agreed to continue employment or pick up employment
        2   again with Industrial Demolition because you were offered
        3   additional money, right?
        4   A.   Yes.
10:37   5   Q.   And you were offered the per diem, as we've referred to,
        6   right?
        7   A.   Yes.
        8   Q.   The per diem allowed you to cover additional living
        9   expenses while living away from your home area, correct?
10:37  10   A.   I guess that's the idea of per diem, yes.  I looked at it
       11   as savings.
       12   Q.   You were able to bank that as additional savings if your
       13   actual living expenses did not exceed that per diem, correct?
       14   A.   Yes.
10:37  15   Q.   A further benefit to you in connection with your
       16   employment at Industrial Demolition, right?
       17   A.   Yeah, it was the money.  That's why I made the choice to
       18   go to Brayton Point.
       19   Q.   And as reflected in Exhibit Number 23, while we have this
10:37  20   here, if you could please go to the third page.  And for
       21   identification, the upper right-hand corner, this is the pay
       22   stub from July 7 to July 13.  Do you see that, sir?
       23   A.   Yes, pay date 7-18 in the middle, right?
       24   Q.   That's correct.
10:38  25   A.   Okay, yes, sir.
```

```
 1   Q.   It's the same document.  Thank you.

 2            MR. TURIELLO:  Objection.  I'm not --

 3            THE COURT:  Sorry, what's the objection?

 4            MR. TURIELLO:  Can we please identify the documents by

10:38  5   the Bates stamp.  I think that's the easiest way to do that for

 6   the record and the witness.  That's my only thought.

 7            MR. METZGER:  Happy to do so. Just to note for the

 8   record --

 9            JUROR:  We cannot see the documents.  We can only see

10:38 10   the first document.

11            THE COURT:  The screen isn't working.

12            JUROR:  We can see the screen but cannot see all the

13   documents.

14            THE CLERK:  Because she hasn't turned the page yet.

10:39 15   A.   Pay date --

16            THE COURT:  Maybe because it's too small?

17            THE CLERK:  No.  They have it, yeah.

18            THE COURT:  So now you're set?

19            THE JUROR:  Yes.

10:39 20            THE COURT:  Excellent.  Thank you very much.

21   Q.   And I will, at counsel's request, in the bottom right-hand

22   corner, there is a document page, we produced all of this, this

23   is Moore 515.  Are we on the same page, sir?

24   A.   Yes, 515 on the bottom right.

10:39 25   Q.   On the upper left-hand corner you'll see that you were
```

70

```
      1   paid a per diem, correct?

      2   A.   That was on the previous paycheck.

      3   Q.   Yes.  It's reflected here, you were paid --

      4   A.   It doesn't show it on this one.

10:39 5   Q.   Do you see where it says "Current"?

      6   A.   Yes, current, thousand, yes.  I was looking at the

      7   left-hand side.

      8   Q.   That's fine.  So you were paid the thousand-dollar per

      9   diem there, correct?

10:39 10  A.   Yes, correct.

     11   Q.   Okay.  And for example, going to the next page which is

     12   actually labeled 514, but it's for the time period of July 14,

     13   to July 20, do you see that you were paid during that period

     14   per diem again?

10:40 15  A.   Yes, consistent with being paid a weekly basis of a

     16   thousand dollars.

     17   Q.   Okay.  That was a separate line item, sir, from the hours

     18   that you worked during the week, right?

     19   A.   Yeah.  It shows it as a separate line item, yes, sir.

10:40 20  Q.   Just, just to clarify then while we're on page 514, by way

     21   of example, your regular rate of pay was $30 an hour, right?

     22   A.   Correct.

     23   Q.   And then you were paid for the full 40 hours that you

     24   worked to that point, right?

10:40 25  A.   Yes, 1200.
```

**JA305**

```
       1   Q.   It also reflects right above that two lines above that you
       2   were paid an overtime rate of $45 an hour, right, or time and a
       3   half, right?
       4   A.   Yes, yes.
10:40  5   Q.   And you were paid approximately 18 hours that week, right?
       6   A.   Yes.
       7   Q.   And that continued through your employment at Brayton
       8   Point, right?
       9   A.   Yes.
10:41 10   Q.   You continued to be paid the per diem every week, right?
      11   A.   Yes.
      12   Q.   You continued to be paid your regular rate of pay of $30
      13   an hour for the first 40 hours?
      14   A.   Yes.
10:41 15   Q.   And you continued to be paid the overtime rate for
      16   anything above 40 hours?
      17   A.   Yes.
      18   Q.   At the Brayton Point site you had also worked as a driver
      19   and a laborer, correct?
10:41 20   A.   Yes.
      21   Q.   You would drive, for example, a haul truck, h-a-u-l; is
      22   that right?
      23   A.   It's like a Tonka truck, the big yellow truck, 40-ton
      24   truck.
10:41 25   Q.   Ans also as a laborer, sometimes you would work with your
```

**JA306**

72

          1    hands, right?

          2    A.   Yes.

          3    Q.   It was a combination of things during the job at Brayton

          4    Point, even early on, where you would operate equipment such as

10:41     5    a truck and also be out and working with your hands, right?

          6    A.   Yes, whatever the job called for.

          7    Q.   Now, you've alleged that you were injured one time during

          8    the course of your work at Brayton Point, right?

          9    A.   Yes.

10:42    10    Q.   On the day that you say you were injured now, you don't

         11    know what time you may have injured yourself, do you?

         12    A.   It would have been after lunch when we were working

         13    cleaning out the trailers.

         14    Q.   But you don't know what time, do you?

10:42    15    A.   I don't know the exact time, no.

         16    Q.   And you don't know what object, if any, you were moving or

         17    handling at the time that allegedly caused an injury, do you?

         18    A.   I cannot put my finger on an exact object that I moved

         19    that caused the injury.  I can speculate, but we won't do that.

10:42    20    Q.   And you don't recall tripping or falling over anything to

         21    cause an injury, do you?

         22    A.   No.  But tripping and stumbling took place in that room

         23    just because of the tight quarters and everything that was in

         24    there.

10:43    25    Q.   On the day that you're now saying that you injured

**JA307**

73

1    yourself, you worked the full day, right?

2    A.    Yes.  I then worked until the evening from whenever we did

3    the clean room until 5:30.

4    Q.    You did not require any time off this day that you say you

10:43  5    injured yourself, right?

6    A.    No, sir.

7    Q.    And to be clear, you're saying you injured yourself on

8    December 7, 2019, correct?

9    A.    If that is that Saturday, yes.

10:43 10    Q.    It's that Saturday, December 7.

11    A.    Yes, sir.

12    Q.    That's your testimony, that you believe you injured

13    yourself that day?

14    A.    Yes, sir.

10:43 15    Q.    And it's that day that you also worked a full schedule,

16    right?

17    A.    Yes, sir.

18    Q.    You did not require a break at all during that period or

19    that day, correct?

10:43 20    A.    Just the regular breaks that we took.

21    Q.    You left work that day, December 7, 2019, at your

22    regularly scheduled time, correct?

23    A.    Yes.  I mean, as far as I know, we clocked out about 5:30.

24    Q.    Well, on Saturday, sir, you actually would clock out

10:44 25    earlier.

**JA308**

74

```
         1   A.   Sorry.  Saturday was eight hours.  Thank you.

         2   Q.   So on Saturdays you would clock out around 3:30, right?

         3   A.   Yes.

         4   Q.   And for the rest of the day you spent away from the

10:44    5   worksite, right?

         6   A.   Yes, sir.

         7   Q.   And you dove yourself home, right?

         8   A.   Yes.

         9   Q.   When you were away from the worksite the rest of the day,

10:44   10   you were at home or somewhere else, right?

        11   A.   Yes.

        12   Q.   On the day that you allegedly injured yourself, you did

        13   not report an injury of any kind to anyone, did you?

        14   A.   No.

10:44   15   Q.   And on the day that you're saying you injured yourself,

        16   you did not seek any type of medical care, did you?

        17   A.   Not on Friday, no.

        18   Q.   The next day was Sunday, December 8, correct?

        19   A.   Sunday, yes.

10:45   20   Q.   That was a regular day off of work, right?

        21   A.   Yes, sir.

        22   Q.   You were with your wife and your children all day, right?

        23   A.   Mm-hmm, yes, sir.

        24   Q.   You went to church two separate times, right?

10:45   25   A.   Yes, sir, morning service and evening service.
```

**JA309**

75

Q.   And you drove to and from church both times?

A.   Yeah, I was driving and my wife didn't like to drive on roads in Massachusetts.

Q.   And on that Sunday you did not seek any medical care once again, did you?

A.   No, sir.

Q.   You don't even recall taking any type of medication that day, do you?

A.   Sunday I believe I did, yes.  I believe I took some ibuprofen maybe.

Q.   You believe --

A.   Towards the latter part of the day because it just progressively got worse.

Q.   Okay.  So you're saying you took something over the counter, such as ibuprofen or some aspirin, something like that?

A.   Yes, sir.

Q.   And you did not call on Sunday either, the Industrial Demolition office, to report anything, did you?

A.   They wouldn't be open.

Q.   But you also didn't call and leave a message for anybody, did you?

A.   No.  I figured I'd just call Roger Monday morning because he was my direct supervisor.

Q.   So on Monday morning you decided to have your hip checked

**JA310**

```
 1    out, right?

 2    A.   Yes, sir.

 3    Q.   And you drove yourself to the hospital, correct?

 4    A.   Yes.

10:46 5    Q.   That was about a 15- or 20-minute drive from where you

 6    lived, right?

 7    A.   Mm-hmm.

 8              THE COURT:   The answer?

 9    A.   Yes.

10:46 10              THE WITNESS:   Sorry, ma'am.

11              THE COURT:   The reporter has trouble with the M and

12    M's.

13    Q.   And you went to the hospital and you were evaluated,

14    right?

10:46 15    A.   Yes, sir.

16    Q.   You were there for a couple of hours, right?

17    A.   Yes, sir.

18    Q.   And do you recall receiving a note from the doctor, the

19    medical team there relating to your ability to return to work?

10:47 20    A.   Yes.

21    Q.   And in connection with you also receiving that medical

22    note, do you recall also receiving medical records relating to

23    that visit on Monday morning?

24    A.   Yeah, I believe they might have sent me home with the

10:47 25    results.
```

**JA311**

```
 1              MR. METZGER:  Your Honor, we have what's been

 2      pre-marked as Exhibit Number 5.  I believe this process will be

 3      a little more seamless.  We'll go to Exhibit 3.

 4              THE CLERK:  Exhibit 3?

10:48 5         So 3 isn't in evidence yet.

 6              MR. METZGER:  Correct.

 7              THE COURT:  It isn't?

 8              MR. METZGER:  I'll go through the process.

 9              THE CLERK:  Okay.  Then I can take it off of here.

10:48 10        MR. TURIELLO:  Yes.  No objection, Your Honor.

11              THE CLERK:  Okay, there you go.  All right.

12              MR. METZGER:  May I approach the witness?

13              THE COURT:  Yes.

14              MR. METZGER:  Thank you.  There you go, sir.

10:48 15        THE WITNESS:  Thank you, Tom.  It's not on my computer

16      screen yet.

17              MR. METZGER:  May we display Exhibit Number 3?

18              THE CLERK:  Yes.

19              THE COURT:  You may proceed.

10:49 20        MR. METZGER:  Thank you, Your Honor.

21      Q.   This, Exhibit Number 3, you understand represents a

22      portion of the medical records that were provided to you in

23      connection with your visit on December 9, 2019, correct?

24      A.   Yes, sir, that's what it looks like.

10:49 25   Q.   So just some questions about what has been documented
```

**JA312**

78

```
 1   here.  First of all, when you went to the hospital, you
 2   understood that you were to provide honest and straightforward
 3   responses to the medical team, right?
 4   A.   Yes.
10:49 5   Q.   You wanted to make sure that they were providing you with
 6   the appropriate care, right?
 7   A.   Yes, sir.
 8   Q.   Wouldn't do any good for you to give them any false
 9   information, would it?
10:49 10   A.   No, it wouldn't.
11   Q.   So on this first page, page 1 of 5 for identification for
12   everybody, Bates labeled 101 on the bottom left-hand corner.
13        THE COURT:  Are we going to show it to the jury?
14        MR. METZGER:  Yes.  I'll wait.
10:50 15        THE COURT:  What's the question?
16   Q.   This medical record, it has your name in the upper
17   left-hand corner, correct, Mr. Moore?
18   A.   Yes.
19   Q.   And then right under History of Present Illness, do you
10:50 20   see that, about halfway down, less than halfway down?
21   A.   Yes.
22   Q.   It identifies your age, and it says, just to paraphrase,
23   "No significant past history."  It says, "He presents today
24   with hip pain since Saturday night."  Right?
10:50 25   A.   Yes.
```

**JA313**

```
 1    Q.   It then goes on to say that the hip pain was to your right
 2    hip, on that second line, right?
 3    A.   Yes.
 4    Q.   In about the third to last line, picking up where it says,
10:51 5    "Patient states," do you see that section?
 6    A.   Yes.
 7    Q.   "He does manual labor for work with heavy lifting but
 8    denies significant injury or fall."  Correct?
 9    A.   Correct.
10:51 10   Q.   And that accurately reflects what you told the medical
11    staff on December 9, 2019, right?
12    A.   Yes, because, like I said, I couldn't pinpoint exactly
13    when we were lifting, what object that caused the tear.
14    Q.   Let's go to page 2, sir.  In the middle of page 2, I'll
10:51 15   wait for this to be brought up on the screen as well.  But just
16    for identification, we're going to the section called
17    "MDM/Course and Clinical Course."  Do you see that?
18    A.   Yes.
19    Q.   It starts to give some description, and you see towards
10:51 20   the end of the second line, it says, "Do not believe."  "Do not
21    believe x-ray will."  Do you see that line?
22    A.   Yes.
23    Q.   It says, "Do not believe x-ray will yield anything in this
24    patient since there was no trauma."  That's what it says,
10:52 25   right?
```

**JA314**

80

```
         1   A.   That's what it says here.
         2   Q.   And you understand that's what the medical staff had
         3   written into these medical records for you based upon your
         4   visit on December 9, correct?
  10:52  5   A.   On this page, yes.
         6   Q.   Go to page 3, please.  Also for identification first,
         7   we're in the section, sir, that refers to arrival.
         8   A.   Yes, I see that.
         9   Q.   To paraphrase briefly, "Patient states he started with
  10:52 10   right hip pain."  Do you see that?
        11   A.   Yes.
        12   Q.   This again to refers to Saturday night, right?
        13   A.   Yes.
        14   Q.   It does not say Saturday during workday or anything of the
  10:53 15   kind, does it?
        16   A.   No, because, like I said, it progressively got worse.
        17   Q.   And it says, "Progressively got worse to the point where
        18   he can't bear weight on leg."  Correct?
        19   A.   Yes.
  10:53 20   Q.   It says, "Area tender to palpitation," right?
        21   A.   Yes.
        22   Q.   The next line says, "Patient denies any injury to that leg
        23   or hip."  Right?
        24   A.   Yes, that's correct.
  10:53 25   Q.   And that's what the medical records reflect, right?
```

**JA315**

81

```
         1   A.   Yes, they do.
         2   Q.   There's nothing in this report, nothing in your medical
         3   records that says that this injury occurred at work, correct?
         4   A.   I mean, as far as I know, no.
10:53    5   Q.   That is correct?
         6   A.   Correct.
         7   Q.   Skip a page.  We're going to go to what's page 5 of 5.
         8   That's listed in the bottom right-hand corner.  Again, while
         9   the screen is catching up here, I'm going to the section on,
10:54   10   "Clinical course."  Do you see that, sir?
        11   A.   Yes, I see that.
        12   Q.   I'm going to pick up on the third line, so right there in
        13   the middle, it says, "The patient is feeling much improved."
        14   Do you see that?
10:54   15   A.   Yes.
        16   Q.   So it says, to be complete, "The patient is feeling much
        17   improved following the administration of Toradol," right?
        18   A.   Yes.
        19   Q.   "And is felt safe for discharge home," right?
10:54   20   A.   Yes.
        21   Q.   In fact, then you were sent home at that point, right?
        22   A.   Yes.
        23   Q.   You drove yourself home, right?
        24   A.   Yes.
10:54   25   Q.   You weren't on any medication that prohibited you or
```

**JA316**

82

```
           1    restricted you from driving your vehicle on your own, were you?

           2    A.   No.  Just what they gave me at the hospital.

           3            MR. METZGER:  Your Honor, we've pre-marked Exhibit

           4    Number 4.  This is Bates starting with 542.  Any objection?

   10:55    5            MR. TURIELLO:  Bates 542, what is it?

           6            MR. METZGER:  St. Anne's Hospital, the release.

           7            MR. TURIELLO:  As long we get a copy, absolutely.

           8            THE WITNESS:  Are we done with this one?

           9            MR. METZGER:  Yes, sir.

   10:55   10            THE WITNESS:  Thank you.

          11            MR. METZGER:  May I approach, Your Honor?

          12            THE COURT:  Yes.

          13            THE CLERK:  What number is this?

          14            MR. METZGER:  This is 4.  May I approach the witness?

   10:56   15            THE COURT:  Is there any objection to this?

          16            MR. TURIELLO:  No, Your Honor, there's no objection.

          17    Sorry, Madam Clerk.

          18            THE CLERK:  That's okay.  People do that all the time.

          19            THE COURT:  She's people.

   10:56   20            THE CLERK:  Okay.  I put it up.  Okay.  Thank you.

          21    Q.   Sir, you recognize this as a release that you had received

          22    from the doctor or from the hospital that morning December 9,

          23    correct?

          24    A.   Yeah, I don't believe I received this sheet.  It looks

   10:56   25    like it was a fax sheet with the second page, yes.
```

**JA317**

83

```
        1    Q.   Yes.  The second page is what you had received, correct?
        2    A.   Yes, that looks like the work number.
        3    Q.   And you understand based upon the first page that it was
        4    faxed to Industrial Demolition, right?
10:56   5    A.   Yes.
        6    Q.   And can I bring you to that second page.  It's marked 543
        7    on the bottom right-hand corner.  In this middle section, it
        8    says, "Work release form."  Do you see that?
        9    A.   Yes.
10:57  10    Q.   And it states that you were seen on December 7, 2019.  It
       11    then says in the next line, "He may return to work on
       12    12-10-2019," right?
       13    A.   Yes.
       14    Q.   You understood, based on this, you were released to return
10:57  15    to work the very next day, right?
       16    A.   Yes.
       17    Q.   And the restrictions that are listed here, there's a check
       18    or an X next to "No heavy lifting," right?
       19    A.   Yes.
10:57  20    Q.   And it does not list a particular lifting restriction,
       21    does it?
       22    A.   "No heavy lifting."
       23    Q.   It also has an X next to "No prolonged standing," right?
       24    A.   Yes.
10:57  25    Q.   And it doesn't have a limitation on how long you can
```

**JA318**

84

```
        1   stand, does it?
        2   A.   Just says "Prolonged."
        3   Q.   You weren't prohibited from lifting; you weren't
        4   prohibited from standing.  There were just directions for you
10:57   5   not to --
        6   A.   Within the restrictions, yes, sir.
        7   Q.   Okay.  And it also affirmatively states that, in the
        8   handwriting there, you can operate and drive a truck, right?
        9   A.   Yes.
10:58  10   Q.   And when this release was sent to Industrial Demolition,
       11   you understand that it was sent to Becky Lydon, right?
       12   A.   Yes.
       13   Q.   Back on that first page, as you noted, it says that it was
       14   sent to the attention of Becky, correct?
10:58  15   A.   Yes.
       16   Q.   And you recognize that to be Becky Lydon of Industrial
       17   Demolition?
       18   A.   Yeah.  I was directed to a get fax number and send it to
       19   her via the hospital doing it for me.
10:58  20   Q.   And did you speak with Becky Lydon about that release?
       21   A.   I did, yes.
       22   Q.   And she said that your restrictions would be accommodated,
       23   correct?
       24   A.   Yes.  She said whatever the doctor puts on the note,
10:59  25   that's what the restrictions need to be.
```

**JA319**

85

1    Q.   And you went back to work with the understanding that

2    Becky had said those restrictions would be on there, right?

3    A.   Yes.

4    Q.   Now, you had alluded to in your direct testimony that

10:59 5    there had been some discussion about a different type of

6    release, right, when you were at the hospital?

7    A.   No.  I don't know what you mean.  What are you talking

8    about?

9    Q.   Did you say that there was some discussion of the first

10:59 10   possible set of restrictions from the doctor was for you to be

11   out one week?

12   A.   Yes.

13   Q.   And just one week, right?

14   A.   Out for a week, correct.

10:59 15        MR. METZGER:  We have pre-marked Exhibit Number 37.

16   Any objection to these?

17        THE CLERK:  No.

18        MR. TURIELLO:  That's fine, no objection.

19        MR. METZGER:  Thank you.

11:00 20        THE CLERK:  What number?

21        MR. METZGER:  37.  Here you go, sir.

22        THE WITNESS:  Thank you, sir.

23   Q.   Showing you this Exhibit Number 37, we don't need to go

24   through the entire document.  Let's just bring up the second

11:00 25   page, please.

**JA320**

```
 1    A.   Second page, that's on the back of the first page?

 2    Q.   I'm sorry.  Let's go to, it says page 1 of 2.  It's the

 3    St. Anne's Hospital.

 4         THE COURT:  Sorry.  What are we looking at?

 5         MR. METZGER:  The second page of Exhibit Number 37,

 6    which has in the middle section, "Script RX, discharge packet

 7    signed.  St. Anne's Hospital."

 8         THE COURT:  The essentially empty page?

 9         MR. METZGER:  No, Your Honor.

10         THE CLERK:  It's on the back.

11         THE COURT:  How much more do you have with this

12    witness, approximately?

13         MR. METZGER:  Approximately one hour.

14         THE COURT:  How much?

15         MR. METZGER:  Maybe one hour or less.

16         THE COURT:  Well, as soon as he answers this question,

17    we'll take a recess.

18         MR. METZGER:  Okay.  Very good.  I'll be very brief on

19    this, Your Honor.

20    Q.   Sir, you recognize on page 2, and I believe it's displayed

21    for you as well, this was another release form that had

22    initially been discussed with you, right?

23    A.   Yes, this was the first one.

24    Q.   Okay.  And you'll see that this is the same form that we

25    just discussed, but down in the section on "Restrictions," you
```

The times in the left margin: 11:01 (line 5), 11:01 (line 10), 11:01 (line 15), 11:02 (line 20), 11:02 (line 25).

```
 1   see that again?
 2   A.   Yes.
 3   Q.   It says there that you may be released to return to work
 4   on 12-16-2019, right?
 5   A.   Yes.
 6   Q.   And it says that you can be released to return to work in
 7   one week with zero restrictions, right?
 8   A.   Correct.
 9   Q.   The medical evaluation you understand you were given as of
10   December 9, 2019, was that you could take a week off and you
11   could come back to work, perform your full duties with zero
12   restrictions, right?
13   A.   Yes, but I couldn't afford that.
14   Q.   Okay.  So the alternative that was discussed then was for
15   you to return to work the very next day?
16   A.   Yes.
17   Q.   With the restrictions for which you were accommodated,
18   right?
19   A.   Yes.
20   Q.   So the options essentially given to you were, take a week
21   off, come back, you'll be at 100 percent performing your job,
22   or you could get back to work the very next day with the
23   company accommodating you?
24   A.   Yes.
25          MR. METZGER:  Okay.  Thank you.  I can pause there.
```

**JA322**

```
         1          THE COURT:  Let us take a recess.  This will be about
         2   20 minutes because the goodies are waiting for you to get you
         3   through the next two hours.
         4          (Jury exits the courtroom.)
11:32    5          (Recess 11:03 a.m. - 11:23 a.m.)
         6          (Jury enters the courtroom.)
         7          THE COURT:  Now, I understand that we will now move
         8   this along at a slightly faster pace.
         9          MR. METZGER:  Will do, Your Honor.
11:32   10          THE COURT:  Instead of half an hour, you'll take 20
        11   minutes?
        12          MR. METZGER:  That, unfortunately, I won't be able to
        13   do, Your Honor, but I will speed up.  May I proceed?
        14          THE COURT:  Please do, carry on.
11:32   15   BY MR. METZGER:
        16   Q.   Mr. Moore, to pick up where we left off, so you were
        17   released to return to work, as we were discussing right before
        18   the break, right?
        19   A.   Yes.
11:33   20   Q.   And when you came back to work that Tuesday, you did not
        21   request any additional time off, did you?
        22   A.   No, sir.
        23   Q.   Now, you could have requested additional time off, but you
        24   had decided that you did not want to, right?
11:33   25   A.   Yes, correct.
```

**JA323**

89

```
       1    Q.   And the company did not deny you your time off because you

       2    didn't ask for more time off, right?

       3    A.   I did not ask for more time off.

       4    Q.   That week you continued to work the full schedule,

11:33  5    correct?

       6    A.   Yes.

       7    Q.   You worked Tuesday, December 10, ten hours, right?

       8    A.   Yes.

       9    Q.   You worked Wednesday, December 11, ten hours, correct?

11:33 10    A.   Yes.

      11    Q.   Thursday, December 12, you worked ten hours, correct?

      12    A.   Yes.

      13    Q.   And that Friday, December 13, where you're saying you had

      14    the argument or the discussion with Roger Oberkramer at the end

11:34 15    of the day, you had worked your full ten hours, right?

      16    A.   Yes.

      17    Q.   Now, we had previously marked Exhibit Number 23, this is

      18    already in evidence, and I want to have us go back to Exhibit

      19    23 and move to the last page of Exhibit Number 23, which for

11:34 20    identification has the document number on the bottom 508.  It's

      21    for the pay period of December 8 to December 14.  We will bring

      22    that up in a moment.

      23              THE CLERK:  That --

      24              MR. METZGER:  This is already in, Exhibit 23.

11:34 25              THE CLERK:  Okay, thank you.
```

**JA324**

90

```
 1              THE COURT:  What's the question?
 2              MR. METZGER:  Yes.
 3     Q.   Sir, you recognize this as the last pay period for which
 4     you were paid by Industrial Demolition, correct?
11:35 5     A.   Yes.
 6     Q.   And this was the week in which you were working under the
 7     limited restrictions, correct?
 8     A.   Correct.
 9     Q.   And this reflected that your rate of pay for that week was
11:35 10    $30 an hour, correct?
11     A.   Correct.
12     Q.   Which was the same rate as the prior week and all the
13     prior weeks, right?
14     A.   Yes.
11:35 15    Q.   Now, you had not that week performed overtime, right?  You
16     had worked just under 40 hours, right?
17     A.   Yes, that's what it looks like, maybe Monday through
18     Friday.  We might have got off 15 minutes or half hour early
19     one of those nights -- no Saturday.
11:35 20    Q.   Sorry.  That fits and that makes sense because your
21     testimony is you worked right at the ten hours or so Tuesday to
22     Friday, right?
23     A.   Correct.
24     Q.   Okay.  So you weren't owed any overtime that week, right?
11:36 25    A.   Owed?  No, because I didn't work.
```

**JA325**

91

```
      1    Q.   And this reflects as well that during this week that you

      2    were working under your restrictions, you were paid the per

      3    diem of a thousand dollars, just like you were every other

      4    week, right?

11:36 5    A.   Yes, sir.

      6    Q.   So during this one week that you were under restrictions,

      7    your pay was not reduced and your per diem was paid just as it

      8    always had, right?

      9    A.   Yes.  I mean, there would have been more hours if I worked

11:36 10   Saturday.

     11    Q.   Now, you had been explaining you worked on Friday all day.

     12    By the way, this equipment that you were operating this week of

     13    December, your last week that you actively worked there, what

     14    type of equipment was it?

11:36 15   A.   I operated front-end loaders with buckets bigger than this

     16    desk, excavators with a magnet on it.  The magnet is probably

     17    about as big as that light, to pick metal up.  Bobcats, skid

     18    steer, things of that nature.  Drove the haul truck, which is a

     19    big Tonka-looking truck.

11:37 20   Q.   And you were able to operate all of that equipment

     21    throughout the week?

     22    A.   Yes.

     23    Q.   You were able to climb up into the equipment and climb out

     24    of the equipment, right?

11:37 25   A.   Yes.
```

**JA326**

92

```
        1   Q.   And on the last day you actively worked with the company,
        2   you were explaining that Roger Oberkramer had directed you and
        3   several co-workers of yours to move some material by hand,
        4   right?
11:37   5   A.   Yes.
        6   Q.   Periodically, as we've discussed earlier, it was necessary
        7   for you to move certain material by hand, right?
        8   A.   When the job called for it.
        9   Q.   Now, fair to say that you and the crew had some
11:38  10   disagreement with Roger Oberkramer at that particular time as
       11   to whether you needed to move equipment by hand, right?
       12   A.   Yes.
       13   Q.   And it wasn't just you disagreeing, you said; it was you
       14   and your co-workers, right?
11:38  15   A.   Sure.
       16   Q.   And what Roger Oberkramer said to you was he wanted the
       17   equipment moved by hand because of production, right?
       18   A.   Yes.
       19   Q.   He thought it would be faster to do that particular job by
11:38  20   hand versus with the equipment, right?
       21   A.   Yes.
       22   Q.   He had a job-related reason, a business reason that he was
       23   giving to you as to why he wanted you and your co-workers to
       24   move the material by hand, right?
11:38  25   A.   Again, it was reluctantly from all of us.  It didn't make
```

**JA327**

93

```
        1   sense but we followed.
        2   Q.   But he was telling you, "I have a reason, and it's because
        3   I think it will be faster," right?
        4   A.   Yes.
11:38   5   Q.   When you had performed the work by hand, on Friday,
        6   December 13, you were not injured in any way while performing
        7   that work, were you?
        8   A.   No.  I was still on my injury, but I was not specifically
        9   injured doing that work.
11:39  10   Q.   And you did not report an injury based upon doing the work
       11   by hand that day, December 13, 2019, did you?
       12   A.   No.
       13   Q.   You've said that at the end of the day, December 13, you
       14   first had heard Roger Oberkramer yelling over the radio about
11:39  15   lights being on in this gator, right?
       16   A.   Yes, at the end of the night.
       17   Q.   And so we're clear, the gator is essentially more of an
       18   industrial golf cart, fair?
       19   A.   Yes, correct.
11:39  20   Q.   And did Ray Scully use that a significant amount on the
       21   site?
       22   A.   He would hop in because he hobbled.
       23   Q.   And Ray Scully had both of his knees replaced at some
       24   point, right?
11:40  25   A.   I don't know.
```

**JA328**

94

```
        1   Q.   You don't know that.  That's fine.  Okay.  Sometimes he
        2   would use it, right?
        3   A.   He would try to hop on anything that was passing by.
        4   Q.   Okay.  It wasn't just you using the gator, right?
11:40   5   A.   Right, no.  Anybody would use it.
        6   Q.   So Roger was yelling on the radio about whoever was in
        7   this gator with these bright lights on, right?
        8   A.   Yes.
        9   Q.   He didn't know, to your knowledge, and he wasn't saying he
11:40  10   knew that you were in there, did he?
       11   A.   No.  But I believe it came over the radio, "Who is in that
       12   machine?  Turn them lights off."
       13   Q.   Okay.  He's already agitated and yelling without knowing
       14   it's you, right?
11:40  15   A.   No.  I think when we came back on the radio, I told him,
       16   "I'll turn them off, Roger."
       17   Q.   Okay.  But he started screaming about the lights before he
       18   knew it was you, right?
       19   A.   Yes.
11:40  20   Q.   Now, this was, as you testified to, at the end of another
       21   long day on the site, right?
       22   A.   Yes, sir.
       23   Q.   And you had observed a pattern with Roger Oberkramer of
       24   him getting agitated with workers on the site, right?
11:41  25   A.   Every day.
```

**JA329**

95

```
          1    Q.   He wasn't just agitated with you every day, was he?
          2    A.   I mean, that day he was.
          3    Q.   Okay.  But other days on the worksite, you observed that
          4    he was agitated with lots of people, right?
11:41     5    A.   He'd kind of pick a target.
          6    Q.   Okay.  And prior to this week ending Friday, December 13,
          7    was he agitated with you from time to time?
          8    A.   Yeah.
          9    Q.   Yeah?
11:41    10    A.   Oh, yeah.  I mean, all the time, it was every day.
         11    Q.   All the time, every day.  So going all the way back to
         12    when you started even on Brayton Point, you're saying that he'd
         13    get agitated with you all the time?
         14    A.   Again, whatever definition we're trying to clarify about
11:41    15    agitation, he would be, yes, visibly frustrated at times with
         16    various individuals, and some of the times it was me, yes.
         17    Q.   Now, after you had driven -- actually, you weren't driving
         18    the gator, were you?
         19    A.   No, I was not.
11:42    20    Q.   What was the name of your co-worker who was?
         21    A.   We called him Junior.
         22    Q.   Junior was operating the gator, and you drove up to where
         23    everyone was congregating; is that right?
         24    A.   No.  To where we parked the gator in the evening.  It was
11:42    25    in Unit 1, I believe is what we called it, or the truck lane.
```

**JA330**

96

Q.   And when you and Junior got up to that Unit 1, where you
were parking the gator, Roger continued to yell about the
bright lights, right?

A.   When I came up to him, yes.

11:42   Q.   And that's how this started; he's screaming about the
lights on, for whatever reason, right?

A.   I believe it started earlier in the day.

Q.   All right.  But in terms of him yelling on the radio,
you're pulling up, the focus at that point was him yelling
11:43   about the lights on, right?

A.   Yes, at that point.

Q.   You then say that the argument here escalated, right?

A.   Mm-hmm, yes.

Q.   And escalated to the point where he had said to you, "Hit
11:43   the gate, don't come back," or something to that effect, right?

A.   Yes.  He said, "I have no need of you here anymore.  Hit
the gate.  Don't come back.  Call the office."

Q.   Roger Oberkramer did not say to you that you were fired,
did he?

11:43   A.   He did not use those words.

Q.   He didn't give you a piece of paper or anything to say
that you were fired, did he?

A.   No.  That wasn't a practice on the site.

Q.   And he did tell you to call the office, right?

11:43   A.   Yes.

**JA331**

97

```
          1    Q.   And that was the end of the conversation, right?
          2    A.   With him and I, yes.
          3    Q.   And by, "call the office," you understood for you to call
          4    Becky Lydon or call Mike Roberts, right?
    11:44  5    A.   Yes.
          6    Q.   And approximately what time of day was this?
          7    A.   Friday evening, probably 5:30, the end of the night.
          8    5:30, 6:00.
          9    Q.   5:30 eastern time?
    11:44 10    A.   Yes.
         11    Q.   And you understand that St. Louis, Missouri is on central
         12    time?
         13    A.   Okay.  Yes.
         14    Q.   So it would have been 4:30 or 5:00 on a Friday in St.
    11:44 15    Louis?
         16    A.   Yes.
         17    Q.   And even though Roger Oberkramer had told you to call the
         18    office that Friday, December 13, you did not call the office,
         19    did you?
    11:44 20    A.   The call the office directive was not --
         21    Q.   Sir, just answer my question.
         22    A.   Okay.  Please repeat.
         23    Q.   You were directed to call the office, correct?
         24    A.   Yes.
    11:45 25    Q.   And that Friday, December 13, you did not call the office,
```

**JA332**

98

```
        1   did you?
        2   A.   No, no.
        3   Q.   Now, the next day, Friday, December -- Saturday, December
        4   14, you were scheduled to work, right?
11:45   5   A.   Yes.
        6   Q.   That would have been a full eight hours for you to work,
        7   right?
        8   A.   Yes.
        9   Q.   You did not call the office on Saturday, December 14,
11:45  10   either, did you?
       11   A.   No.  I figured nobody was there.
       12   Q.   You just figured that.  You didn't try, did you?
       13   A.   No.  I was going to call Monday.
       14   Q.   You didn't leave a message at the office, did you?
11:45  15   A.   No, sir.
       16   Q.   Now, this week, we go back to the Monday, December 9, you
       17   had just communicated with Becky by phone, right?
       18   A.   Yes, correct.
       19   Q.   Because you were at the hospital and you spoke to her
11:45  20   about your restrictions, right?
       21   A.   Yes.
       22   Q.   Wouldn't you have had her number right in your phone?
       23   A.   I believe I did, yeah.
       24   Q.   So you could have called her by just pressing the button,
11:46  25   right?
```

**JA333**

99

```
        1    A.   Again, I thought it was after hours.

        2    Q.   Your assumption, right?

        3    A.   I mean, yes.

        4    Q.   But you did not take that step, did you?

11:46   5    A.   Again, because the directive, "Call the office" just meant

        6    you're out of here; you're fired.

        7    Q.   Sir, just answer my question.  You did not take that step,

        8    did you?

        9    A.   No, I didn't.

11:46  10    Q.   Next day, Sunday, December 15, you again did not try to

       11    reach out and call the office in any way, did you?

       12    A.   No.

       13    Q.   Monday, December 16, you called into the office, right?

       14    A.   Yes, I called Mike Roberts.

11:46  15    Q.   And you spoke to Mike Roberts briefly, right?

       16    A.   Briefly.

       17    Q.   Mike Roberts said to you that he would look into it,

       18    right?

       19    A.   If those were the words he used, yeah, he said he'd talk

11:47  20    to Becky and get back with me.

       21    Q.   Okay.  Now, I don't want to put words in your mouth about

       22    this.  Is it your understanding from the conversation with

       23    Mr. Roberts on December 16, 2019, that when you called him he

       24    said he'd look into it?

11:47  25    A.   Something along those lines, he'd call back in and get
```

**JA334**

100

```
        1    back with me.
        2    Q.   He had promised that he'd get back to you?
        3    A.   Yes.
        4    Q.   And the next day he fulfilled that promise, didn't he?
11:47   5    A.   Yes.
        6    Q.   So you speak to him briefly on Monday, December 16.  The
        7    co-owner of the business says he's going to look into it.  He
        8    keeps his word, calls you back, right?
        9    A.   Yes.
11:47  10    Q.   You had this conversation with Mr. Roberts then on
       11    December 17, 2019, right?
       12    A.   Yes.
       13    Q.   When you spoke to Mike Roberts on December 17, he did not
       14    say that you were fired, did he?
11:48  15    A.   He did not use those words, no.
       16    Q.   Mr. Roberts confirmed for you that you were welcome to
       17    stay with the company if you wanted to stay, right?
       18    A.   If I could work it out with Roger.
       19    Q.   Okay.  Mr. Roberts also said to you that if you wanted to
11:48  20    quit, you could quit.  That was your choice, right?
       21    A.   If that was part of the conversation.  I don't recall 100
       22    percent.
       23    Q.   Now, fair to say you can only quit a job that you don't
       24    have, right?
11:48  25    A.   You quit a job that you do have.
```

101

```
 1    Q.   I mean, you can only quit a job that you have, right?
 2    A.   Will you please repeat the question.
 3    Q.   Sure.  You can only quit a job that you have, right?
 4    A.   Yes.
11:49  5    Q.   It doesn't make sense to quit a job that you don't have,
 6    right?
 7    A.   Yes, but I don't remember him saying that I could quit.
 8    Maybe he did.  Again, I was under --
 9    Q.   Sorry.  You don't deny him saying, "If you want to quit,
11:49 10    you can quit"?
11    A.   Again, I don't recall the whole conversation.
12    Q.   Now, consistent with the conversation that you had with
13    Mr. Roberts on December 17, he had told you to follow up as
14    well with Roger Oberkramer, right?
11:49 15    A.   Yes, he told me to work it out with Roger.
16    Q.   And you did not do so, did you?
17    A.   No, and I explained why.
18    Q.   So even though Mike Roberts as the co-owner of the
19    business had told you to go and talk to Roger Oberkramer and
11:49 20    that you were welcome to stay, you decided not to contact Roger
21    Oberkramer again, correct?
22    A.   Correct.  Because when I spoke with Mike, there was
23    already false allegations being thrown around, and I did not
24    want to speak with Roger in regards to those.
11:50 25    Q.   You could have contacted Roger to see about your return to
```

**JA336**

102

1    the site, right?

2    A.    Sure.

3    Q.    And you decided not to do so, right?

4    A.    Correct.

11:50  5    Q.    Even though you were told you could continue with

6    Industrial Demolition, you decided that you wanted to go back

7    and talk to Roger and continue with Industrial Demolition,

8    isn't that right?

9    A.    I understood I was fired, and if I wanted to make it

11:50 10    right, I had to talk to Roger.

11    Q.    Okay.  You understand your perception, without being told

12    you were fired, your perception is that you were fired, right?

13    A.    From the previous experience on the worksite, yes.

14    Q.    And you spoke just a matter of days later with the owner

11:51 15    of the business who confirmed for you that you weren't fired

16    and that you were welcome to continue and stay with the

17    business, right?

18    A.    Correct, yes.

19    Q.    Thank you.  In fact, you said on your direct testimony

11:51 20    here that you still liked your job, right?

21    A.    I liked the work.

22    Q.    If you wanted to keep your job and get back into the job

23    that you liked, you could have gone back, right?

24    A.    Again, we're a family of seven.  We have bills to pay, of

11:51 25    course, but I got fired.

**JA337**

103

1    Q.    Again, your perception was, sir, you had the opportunity,

2    based upon what Mike Roberts confirmed for you, that you could

3    go back and continue to support your family by getting back to

4    work in the job you just said you still liked, right?

11:51  5    A.    If I could work it out with Roger.

6    Q.    Now, you do understand that Mike Roberts is of course one

7    of the two owners with his brother of the business, right?

8    A.    Yes.

9    Q.    And fair to say that Mike Roberts has more say in the

11:52 10   business of Industrial Demolition than Roger Oberkramer, right?

11   A.    I would assume, yes.

12   Q.    Now, after you stopped working at Industrial Demolition,

13   you had left Massachusetts, as you stated, and you went back to

14   Indiana, right?

11:52 15   A.    Correct.

16   Q.    And you lived in Indiana until about April or May of 2020,

17   right?

18   A.    Until April.

19   Q.    Until April 2020?

11:52 20   A.    Yes, sir.

21   Q.    And during the months from December to April, December 19

22   to April 2020, you did not seek employment at that time, did

23   you?

24   A.    No.  It's right when COVID hit.

11:53 25   Q.    Well, sir, we all lived through COVID, and there wasn't a

**JA338**

104

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | shutdown from COVID as you recall in December of '19, was            |
|        | 2  | there?                                                               |
|        | 3  | A.   No.  Again, I was just moving my family back.                   |
|        | 4  | Q.   And you did not look for work for the remainder of              |
| 11:53  | 5  | December of 2019, did you?                                           |
|        | 6  | A.   Yes, I did -- no, 2019 was when I left, yeah.                   |
|        | 7  | Q.   Yes.  So after you left and went back to Indiana, for the      |
|        | 8  | remainder of December 2019, you did not look for other work,        |
|        | 9  | did you?                                                             |
| 11:53  | 10 | A.   For the last week of December, no.                             |
|        | 11 | Q.   And January of 2020, you did not look for work, did you?       |
|        | 12 | A.   No, sir.                                                        |
|        | 13 | Q.   February of 2020, you did not look for work, did you?          |
|        | 14 | A.   No, sir.                                                        |
| 11:53  | 15 | Q.   March of 2020, you did not look for work, did you?             |
|        | 16 | A.   Again, there was a lot of things happening in the world at     |
|        | 17 | that time.  Finding a job was pretty difficult.                     |
|        | 18 | Q.   Okay.  But you didn't even seek --                             |
|        | 19 |      MR. GOODWIN:  I'm going to object to this line of              |
| 11:54  | 20 | questioning.  We're getting into --                                 |
|        | 21 |      THE COURT:  I think it was your co-counsel's witness.          |
|        | 22 |      MR. TURIELLO:  I'm sorry.  Objection withdrawn for            |
|        | 23 | now, Your Honor.                                                    |
|        | 24 |      THE COURT:  Thank you.                                         |
| 11:54  | 25 | Q.   And Industrial Demolition, after you left, stopped working    |

**JA339**

          1   there, they did not do anything to prevent you from being

          2   employed elsewhere, did they?

          3   A.   My fear was having to put I was fired on a resume for a

          4   job.

    11:54 5   Q.   Did they do anything to interfere with you looking for --

          6   A.   No.

          7   Q.   They didn't call up a prospective employer and say, "This

          8   guy is unemployable," or anything like that, did they?

          9   A.   No.

    11:54 10   Q.   Now, after you stopped working at Industrial Demolition,

         11   you had filed some various charges against Industrial

         12   Demolition, right?

         13            MR. TURIELLO:  Objection as to that line of

         14   questioning, Your Honor, consistent with our previous

    11:55 15   objections as to line of questioning, as it relates to I

         16   believe the NRLB investigation.

         17            THE COURT:  Your objection is overruled.  You may

         18   answer.

         19            MR. METZGER:  Thank you, Your Honor.

    11:55 20            THE COURT:  If I understand the question.

         21            MR. METZGER:  Yes, Your Honor.  It's what we addressed

         22   in opening.

         23            THE COURT:  How much more do you have?

         24            MR. METZGER:  I'm getting very close.

    11:55 25            THE COURT:  Okay.  Let's keep going, quickly.

**JA340**

```
        1           MR. METZGER:  Yes.
        2   Q.   You had filed a charge with what's known as the National
        3   Labor Relations Board, correct?
        4   A.   Yes.
 11:55  5   Q.   And you understood that part of what you were alleging
        6   there is that there was some adverse action in the form of a
        7   termination taken against you by Industrial Demolition, right?
        8           MR. TURIELLO:  Objection as the question calls for a
        9   legal conclusion.
 11:56 10           THE COURT:  What's the objection?
       11           MR. TURIELLO:  The question calls for a legal
       12   conclusion.
       13           MR. METZGER:  I can revise --
       14           MR. TURIELLO:  Thank you.
 11:56 15           THE COURT:  Rephrase it.
       16           MR. METZGER:  I'll rephrase it.
       17   Q.   You alleged to the National Labor Relations Board that you
       18   were fired for certain reasons by Industrial Demolition, right?
       19   A.   Yes.
 11:56 20   Q.   And what you alleged to them in that matter was that you
       21   were fired for talking about wages, right?
       22   A.   No.
       23   Q.   You did not allege that?
       24   A.   No.  That was secondary.
 11:56 25   Q.   Secondary.  So you ultimately, in terms of pursuing that
```

107

1    claim before the National Labor Relations Board, you had

2    entered into a settlement agreement with Industrial Demolition,

3    right?

4              MR. TURIELLO:  Objection.  For the record, again, Your

11:57 5    Honor, preserving our objection as to this line of questioning.

6              THE COURT:  It's kind of an argumentative question, so

7    the objection is sustained.

8    Q.   Sir, did you enter into a settlement agreement in

9    connection with your claims at the National Labor Relations

11:57 10   Board?

11   A.   As far as I understood the government did with the company

12   on my behalf.

13   Q.   Did you enter into a settlement agreement in which you

14   were paid money directly?

11:57 15             MR. TURIELLO:  Objection again, Your Honor.

16             MR. METZGER:  My question, Your Honor, was did he

17   enter into a settlement agreement in which he was paid money

18   directly.

19             MR. TURIELLO:  And there's an objection to the

11:57 20   question.

21             THE COURT:  The objection is sustained.

22             MR. TURIELLO:  Thank you.

23             MR. METZGER:  We can go to the document previously

24   marked as Exhibit Number 17.  And Alex, this has not been

11:58 25   admitted into evidence, so please don't bring this up.  I just

**JA342**

108

```
       1   want to raise this document.  May I approach the witness?
       2              THE CLERK:  Yes.
       3              MR. METZGER:  Thank you.
       4   Q.   Just for identification purposes first, sir, this Exhibit
11:58  5   Number 17, which I provided a copy to your attorney --
       6              THE COURT:  What's the question?
       7              MR. METZGER:  This is just for identification
       8   purposes.  I understand that counsel for plaintiff has an
       9   objection to the document.  I just wanted to first identify it.
11:59 10              THE COURT:  So what's the question?
      11              MR. METZGER:  My question is whether he signed this
      12   document on page 3 of Exhibit Number 17 and he recognizes that
      13   as his signature on the settlement agreement.
      14              MR. TURIELLO:  And that, Your Honor, the plaintiff
11:59 15   would object.  The objection to this line of questioning is
      16   consistent with the plaintiff's objection to all collateral
      17   source income as it is irrelevant and prejudicial.
      18              THE COURT:  First of all, what signature are you
      19   talking about?
11:59 20              MR. METZGER:  It's on page 3, Your Honor.
      21              THE COURT:  Page 3?
      22              MR. METZGER:  Yes, of this document, bottom right-hand
      23   corner, with the date next to it of October 9.
      24              THE COURT:  I have nothing on page 3 except --
11:59 25              MR. METZGER:  Sorry.  Page 4, Your Honor.
```

**JA343**

109

|       |    |                                                                       |
|-------|----|-----------------------------------------------------------------------|
|       | 1  | THE COURT:  So now we're looking at the fourth page.                  |
|       | 2  | MR. METZGER:  Yes, Your Honor.                                        |
|       | 3  | THE COURT:  And there's at least one signature here.                  |
|       | 4  | MR. METZGER:  Correct.                                                |
| 11:59 | 5  | THE COURT:  That is supposedly the plaintiff's?                       |
|       | 6  | MR. METZGER:  Correct, Your Honor.                                    |
|       | 7  | THE COURT:  And what's the objection?                                 |
|       | 8  | MR. TURIELLO:  The objection is to the line of                        |
|       | 9  | questioning relating to the identification of this document as        |
| 12:00 | 10 | all testimony relating to this document is a collateral source,       |
|       | 11 | which is prejudicial to the plaintiff and in line with our            |
|       | 12 | continuing objection on this basis.                                   |
|       | 13 | MR. METZGER:  Your Honor, we had addressed this prior                 |
|       | 14 | to even opening statements in this matter, and we specifically        |
| 12:00 | 15 | had asked whether we could mention the fact of the settlement         |
|       | 16 | agreement through October 9, 2020, and it's my understanding          |
|       | 17 | the court's ruling was yes, we can do so, and that is this very       |
|       | 18 | document.                                                             |
|       | 19 | THE COURT:  Let's go to another topic and skip over                   |
| 12:00 | 20 | this for a moment while I think about this.                           |
|       | 21 | MR. METZGER:  Okay, Your Honor.  Thank you.  I'll come                |
|       | 22 | back to that.                                                         |
|       | 23 | MR. TURIELLO:  Thank you, Your Honor.                                 |
|       | 24 | Q.   Sir, after the period of time that you were living with          |
| 12:01 | 25 | family in Indiana, did you move to Somerset, Kentucky?                |

**JA344**

110

```
      1    A.   I did, yes.

      2    Q.   And when you moved to Somerset, Kentucky, you began to

      3    look for work then, right?

      4    A.   Yes, sir.

12:01 5    Q.   And you at that point had obtained certain jobs, correct?

      6    A.   Yes.

      7    Q.   You had not obtained full-time employment just yet, right?

      8            MR. TURIELLO:  Objection again, Your Honor.

      9            THE COURT:  He may answer.  You may answer.

12:01 10   A.   Yes, I had full-time employment.

      11   Q.   And who is your current employer?

      12   A.   Currently now?

      13           MR. TURIELLO:  Objection again, Your Honor.

      14           THE COURT:  I understand, but it does sort of go to

12:01 15   the issue of damages, and I'll allow it.

      16           MR. TURIELLO:  It's not a question as to damages, Your

      17   Honor.  It's mitigation as an affirmative defense or lack of

      18   mitigation, which is not at issue.  And it's a collateral

      19   source --

12:02 20           THE COURT:  You may answer the question, but then

      21   let's go on.

      22           MR. TURIELLO:  Thank you.

      23   A.   Yes, I work full time.

      24   Q.   Yes.  And what's the name of that employer?

12:02 25   A.   Petro Towery.
```

**JA345**

111

```
         1   Q.   You started with Petro Towery in about mid 2021, correct?
         2        THE COURT:  I'm sorry?
         3   Q.   Sir, you started with your employer you have now, Petro
         4   Towery, in mid 2021, correct?
12:02    5   A.   I believe it was June or July, yes, sir.
         6   Q.   And you've been working full time in that position ever
         7   since, right?
         8        MR. TURIELLO:  Objection.  Again, Your Honor, we are
         9   beyond --
12:02   10        THE COURT:  I don't believe that this current
        11   employment has anything to do with this case.  It's
        12   acknowledged that he has employment and he's not seeking any
        13   damages for this period.
        14        MR. METZGER:  If, Your Honor, that's the stipulation,
12:03   15   then I will shut this down right away.
        16        THE COURT:  Is he claiming damages for what he's
        17   getting paid now or he's not getting paid now?
        18        MR. TURIELLO:  Your Honor, the plaintiff is claiming
        19   front pay damages, and any award would be offset at a
12:03   20   subsequent hearing.  This is not appropriate testimony for the
        21   trial phase of this.
        22        THE COURT:  Well, if a person is asking for damages
        23   for pay that he lost, then once he has another job and gets
        24   paid some amount more or less equivalent to that which he lost,
12:03   25   how can he be entitled to get the damages from the job he lost?
```

**JA346**

112

```
      1          MR. TURIELLO:  Your Honor, again, it's not a matter of
      2     entitlement at this phase.
      3          THE COURT:  The difference, yes, but not the whole
      4     thing.
12:03 5          MR. TURIELLO:  But that's not for the jury to decide.
      6     The jury will decide damages on front pay and backpay based on
      7     the evidence in this court and then we will remit --
      8          THE COURT:  But to the point where he is no longer
      9     suffering from lack of pay.
12:04 10         MR. TURIELLO:  Our contention is that he is suffering
     11     from lack of pay continually.
     12          THE COURT:  That's what this question had to do with.
     13     When did he stop not being paid?
     14          MR. TURIELLO:  Again --
12:04 15         THE COURT:  I mean, I know it's a double negative.
     16          MR. TURIELLO:  Just so we're clear on this objection,
     17     I want to preserve the record at this point, Your Honor.  For
     18     the record, we are objecting to this testimony and evidence of
     19     collateral source income for the purposes of the liability at
12:04 20    stake.  Is the court's ruling that we will get into this and
     21     you will allow collateral source income at this point?
     22          THE COURT:  I mean, I understand that he's entitled to
     23     damages for any time when he did not have work and at any time
     24     when he did have work but at a lesser pay than that which he
12:05 25    had and until such time as he no longer has any loss.  And this
```

JA347

113

```
       1   question I think is going to when he stopped having a loss.
       2              MR. TURIELLO:  Yes, Your Honor.
       3              MR. METZGER:  Correct, Your Honor.
       4              MR. TURIELLO:  That's correct.  And the plaintiff --
12:05  5              THE COURT:  So what's the objection?
       6              MR. TURIELLO:  The objection is that the jury is to
       7   decide the damages and we remit at the back end.  This is not a
       8   question for the jury.  Procedurally, this would be handled at
       9   a Rule 60 process post-verdict.
12:05 10              THE COURT:  To the extent that the jury has to decide
      11   what he lost in terms of work income, this question is trying
      12   to determine whether he had work income, when he stopped having
      13   work income and when did he start having work income again, as
      14   I understood it.
12:06 15              MR. METZGER:  That's correct, Your Honor.
      16              MR. TURIELLO:  That's correct.  However, the law
      17   forbids the consideration of collateral source income by the
      18   jury when awarding.  The courts and the parties remit after.
      19   This is inappropriate at this point, to the extent appropriate
12:06 20   by law.  This is not appropriate for this phase under the law.
      21              THE COURT:  You may have this question and that's it.
      22              MR. TURIELLO:  Thank you.
      23              MR. METZGER:  Your Honor, to stay within your
      24   guardrails, may I -- I don't want to offend the court.  May I
12:06 25   ask him for this one employer what his annual income is.
```

**JA348**

114

```
        1              THE COURT:  January when?

        2              MR. METZGER:  No.  His annual income.  May I ask --

        3              THE COURT:  I'm sorry?

        4              MR. METZGER:  I just want to ask the bottom line, what
12:06   5   his approximate annual income is at his current employer.

        6   We've already established --

        7              THE COURT:  Right now?

        8              MR. METZGER:  Yes.

        9              THE COURT:  I mean, this case finished in December or
12:06  10   January of what year?

       11              MR. METZGER:  That was 2019.

       12              THE COURT:  I don't think we go into what he has now.

       13   But we do -- well, if he has a job now that pays him

       14   approximately what he had then, that's the end of it.
12:07  15              MR. METZGER:  Right.  That's all I want to ask.

       16              THE COURT:  So you're trying to find out whether he in

       17   fact is at that point and when he got to that point?

       18              MR. METZGER:  Right.  That's all I'm trying to

       19   establish.
12:07  20              THE COURT:  You're entitled to do that, but I'm not

       21   sure that we have fully established what it was that he

       22   actually lost, what the amount was that he was getting paid by

       23   the defendant but that he then didn't get paid for a period of

       24   time by anybody.
12:07  25              MR. METZGER:  Agreed, Your Honor.
```

**JA349**

115

```
 1          THE COURT:  I don't know exactly what the question is
 2   that you intend to ask him to establish the clarity of what he
 3   lost.
 4          MR. METZGER:  Okay.  I'll just ask the question, Your
12:07 5   Honor, and if plaintiff counsel continues to object --
 6          THE COURT:  Okay.
 7   Q.  At your current employer, Petro Towery, your base
 8   compensation is $70,000 a year, correct?
 9          MR. TURIELLO:  Objection.  Preserving the objection as
12:08 10  to collateral source.
11          THE COURT:  Well, he's trying to stay within the
12   ruling I made, and so I'll allow the question.  But the real
13   point is when did he get there?  I mean, the damages need to
14   stop at some point when he in fact has made up whatever he
12:08 15  lost.
16          MR. TURIELLO:  Objection, Your Honor.  That is
17   incorrect.  At this phase in the trial that is just not for the
18   jury to determine.  We're seeking front pay damages.  The jury
19   decides --
12:08 20         THE COURT:  The jury hears the evidence to determine
21   it.
22          MR. GOODWIN:  But it's a collateral source.
23          MR. METZGER:  You honor, I agree that under the
24   Massachusetts state law that we're pursuing these claims under
12:08 25  that your ruling is correct; we agree.
```

**JA350**

116

| | 1 | THE COURT:  So you may have any questions that are |
| | 2 | correct under the law as we, I hope, jointly understand. |
| | 3 | MR. TURIELLO:  We do not.  We do not have an |
| | 4 | understanding.  Although for the record and to move this along, |
| 12:09 | 5 | I will just state again as to the line of questioning for all |
| | 6 | collateral source income as to the plaintiff's current |
| | 7 | employment, unemployment benefits, any other payments that he |
| | 8 | has received since his termination we would like to preserve |
| | 9 | again our objection as to it being an illegal collateral source |
| 12:09 | 10 | at this point.  And then I will sit and allow this to continue. |
| | 11 | But I want the record to be clear that that is what our |
| | 12 | position is. |
| | 13 | THE COURT:  Okay.  I understand what you're saying. |
| | 14 | You may proceed. |
| 12:09 | 15 | MR. TURIELLO:  Thank you. |
| | 16 | MR. METZGER:  Thank you. |
| | 17 | MR. METZGER: |
| | 18 | Q.  Very quickly to confirm, you started with your current |
| | 19 | employer called Petro Towery in mid 2021, correct? |
| 12:09 | 20 | A.  Yes, I believe it was about July. |
| | 21 | Q.  And until calendar year 2021, did you have a base salary? |
| | 22 | A.  Yes. |
| | 23 | Q.  Do you know what that base salary was? |
| | 24 | A.  60,000. |
| 12:10 | 25 | Q.  And were you also eligible for commissions on top of your |

**JA351**

117

```
        1    base salary?
        2    A.   I was.
        3    Q.   And in 2021, do you know approximately what your
        4    commissions were?
12:10   5    A.   No, sir, not offhand.
        6    Q.   Do you know whether they were above $10,000?
        7    A.   In 2021, I'm sorry, I can't recall.
        8    Q.   That's fine.  In 2022, you continued to work with this
        9    company called Petro Towery, correct?
12:10  10    A.   Yes, sir.
       11    Q.   You received a raise on your base compensation, correct?
       12    A.   I did.
       13    Q.   The raise was up to $70,000, correct?
       14    A.   Correct.
12:10  15    Q.   And you received commissions in that year, 2022?
       16    A.   Yes.
       17    Q.   Between 25 and $30,000, correct?
       18    A.   I believe that's what it amounted to.
       19    Q.   So your compensation in 2022 through Petro Towery was
12:11  20    approximately $100,000, correct?
       21    A.   It was 91.
       22         THE COURT:  Well, there's another component to that,
       23    though.  How many hours he has to work to get whatever it is
       24    that is equivalent to what he had before.  I mean, if you want
12:11  25    to argue that, then the jury has to know both aspects, how many
```

JA352

118

```
         1    hours did he put in and what did he get paid for that, and is
         2    that essentially equivalent to what he had from the defendant
         3    or not.
         4            MR. METZGER:  Understood.  Thank you.
12:11    5            THE COURT:  Are you with me, members of the jury?
         6    Okay.
         7    Q.   At Petro Towery, you have a territory that you drive
         8    around for your sales, right?
         9    A.   Yes.
12:11   10    Q.   And are you based at home and then you go out to your
        11    sales territory?
        12    A.   I can work from home or I can work at the office.
        13    Q.   And you work full time, correct?
        14    A.   Yes, sir.
12:11   15    Q.   Do you work Monday through Friday?
        16    A.   I do.
        17    Q.   Do you work any other days?
        18    A.   No, not unless there's a very pressing need.
        19    Q.   Okay.  So unlike Industrial Demolition, you don't work on
12:12   20    Saturdays, correct?
        21    A.   Correct, for the most part.
        22    Q.   And do you know approximately on an average day, Monday
        23    through Friday, how many hours you work?
        24    A.   I mean, it varies.  I mean, it's at least from, you know,
12:12   25    7:00 a.m. to 5:00, and then it goes -- you know, I'm getting
```

**JA353**

119

```
         1   calls until 7:00, 8:00 at night sometimes.
         2   Q.   Okay.  At Industrial Demolition you said on average you
         3   would work about 58 hours per week, correct?
         4   A.   About 58, yeah.
12:13    5        MR. METZGER:  Okay.  We can go to what's previously
         6   been marked as Exhibit Number 27.
         7        THE COURT:  I'm sorry.
         8        MR. METZGER:  We're going to what's been previously
         9   marked as Exhibit Number 27.  I just have one or two questions
12:13   10   on the document.
        11        THE CLERK:  27, no objection?
        12        MR. METZGER:  No objections.  May we display Exhibit
        13   27.
        14        THE CLERK:  I did.
12:14   15        MR. METZGER:  Thank you.
        16   Q.   Sir, Exhibit 27, couple of questions.  This reflects your
        17   W-2 or the actual payment from Industrial Demolition to you for
        18   all of 2019, correct?
        19   A.   Yes.
12:14   20   Q.   That reflects total payment in terms of wages of $54,855,
        21   correct?
        22   A.   Correct.
        23   Q.   Understanding, sir, to be fair, you were also paid the per
        24   diem, correct?
12:15   25   A.   2019, only half of the time.  That was the breaking point.
```

**JA354**

120

```
 1    I was paid the per diem.
 2    Q.    Only part of the time.  And the per diem is not reflected,
 3    as you understand it, in wages, right?
 4              MR. GOODWIN:  Objection.
12:15 5          MR. TURIELLO:  Objection.
 6              MR. METZGER:  That's fine.
 7              If we can go to what's been previously marked as
 8    Exhibit Number 30, 30.
 9              THE COURT:  This document?
12:15 10         THE CLERK:  No objection to 30?
11              MR. TURIELLO:  Just maintaining our objection.  Thank
12    you.
13    Q.    This is the W-2 that you received from your current
14    employer, Petro Tower, in 2021, right?
12:17 15 A.    Yes, sir.
16    Q.    And you started, as you said, midway through the year,
17    correct?
18    A.    I believe it was in July, yeah.
19    Q.    And your compensation for about half of the year at Petro
12:17 20 Towery was just over $50,000, correct?
21    A.    Yes, correct.
22    Q.    You're still employed there today, correct?
23    A.    I am.
24    Q.    And you want to continue working there, correct?
12:17 25 A.    I mean, it's a job.  Paying the bills.
```

**JA355**

121

|  |  |  |
|---|---|---|

1      MR. METZGER:  Your Honor, I'll work towards a

2  conclusion here now.

3  Q.  Sir, since your active employment at Industrial Demolition

4  ended, you've not had any physical or mental condition that has

12:18  5  prevented you from working, have you?

6  A.  No.

7  Q.  And since you stopped working at Industrial Demolition

8  back in December of 2019, the only doctor or medical

9  professional you've seen is a dentist, right?

12:18 10  A.  Yeah.

11  Q.  And your experience at Industrial Demolition has not

12  prevented you from actively working at any time since you

13  stopped working at Industrial Demolition, correct?

14  A.  No, it hasn't.

12:18 15  Q.  And your experience at Industrial Demolition has not

16  prevented you from engaging in hobbies or being with your

17  family or doing anything you'd like in your life, has it?

18  A.  Please repeat the question.

19  Q.  Sure.  Your experience at Industrial Demolition has not

12:19 20  prevented you from engaging in any hobbies or being with your

21  family since you stopped working there, has it?

22  A.  I don't make as much, so it limits some of the things we

23  can do.

24  Q.  We'll let the records reflect what you're making or not

12:19 25  making.  But in terms of your experience at Industrial

**JA356**

122

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | Demolition, your past experience, has that prevented you in any      |
|       | 2  | way from engaging in hobbies or being with your family?              |
|       | 3  | A.   Are you referring to the injury?                                |
|       | 4  | Q.   No.  In terms of any emotional reaction you have for --         |
| 12:19 | 5  | A.   Oh, no.                                                         |
|       | 6  | Q.   And your experience at Industrial Demolition has not            |
|       | 7  | prevented you in any way from performing anything you'd like to      |
|       | 8  | do in life moving forward, has it?                                   |
|       | 9  | A.   Again, I had goals of what I wanted to accomplish while I       |
| 12:19 | 10 | was working with Industrial Demolition, and I was not able to        |
|       | 11 | fulfill those due to being fired.                                    |
|       | 12 | Q.   But in terms of your experience there, has it prevented         |
|       | 13 | you from working full time elsewhere?                                |
|       | 14 | A.   Meaning the experience I gained through the equipment           |
| 12:20 | 15 | operation?                                                           |
|       | 16 | Q.   In terms of any emotional reaction you've had.                  |
|       | 17 | A.   No.                                                            |
|       | 18 | MR. METZGER:  No, okay.  Thank you, sir.  I have no                  |
|       | 19 | further questions, Your Honor.                                       |
| 12:20 | 20 | THE COURT:  That's it?                                               |
|       | 21 | MR. METZGER:  That's it.                                             |
|       | 22 | THE WITNESS:  Thank you.                                             |
|       | 23 | THE COURT:  Any redirect?                                            |
|       | 24 | MR. TURIELLO:  Briefly only on a few points, Your              |
| 12:20 | 25 | Honor.                                                              |

**JA357**

123

```
          1        THE COURT:  How much time?

          2        MR. TURIELLO:  Ten minutes maybe.

          3        THE COURT:  I think we stretch.

          4        MR. TURIELLO:  Sure.

   12:21  5        THE COURT:  Are you ready?  You may proceed and the

          6   clock has started.

          7   CROSS-EXAMINATION BY MR. TURIELLO:

          8   Q.   Mr. Moore, were there individuals at Industrial Demolition

          9   to your knowledge that followed the company around to all of

   12:21 10   their demolition sites?

         11   A.   Yes, sir.

         12   Q.   And in fact, didn't you testify that some of those folks

         13   personally lived on the site and they moved trailers all over

         14   the country, isn't that right?

   12:21 15        MR. METZGER:  Objection, Your Honor.

         16   A.   Yes, that's correct.

         17        MR. METZGER:  Objection, Your Honor, leading.

         18        THE COURT:  What's the objection?

         19        MR. METZGER:  Leading.

   12:21 20        THE COURT:  No.  You may answer.

         21   A.   Yes, they would travel with RVs, fifth-wheel trailers, and

         22   they'd bring them to the sites and set up camp basically.

         23   Q.   So first of all, how many people were you working with as

         24   a laborer or driver on the site at Brayton Point?

   12:22 25   A.   There could be maybe 20 people, give or take.  It
```

**JA358**

```
    1    fluctuated a lot.  People come and go.
    2    Q.   So you said people come and go.  There is some transient
    3    nature to this business for some of the guys; is that right?
    4    A.   I think it was officially because of the management.
12:22 5    Q.   Well, I guess what I'm asking you, sir, are you able to
    6    tell the jury whether or not there were people that were, I'll
    7    say full time, with Industrial Demolition?
    8    A.   Yes, sir.
    9    Q.   Okay.  And who was the longest tenured employee at
12:22 10   Industrial Demolition, if you know?
   11    A.   As far as I would assume, Roger Oberkramer.
   12    Q.   And how long had he been with the company, do you know?
   13    A.   Maybe three years when I started, two years.  I don't
   14    think it was incredibly long.
12:23 15   Q.   Do you know when the company was formed?
   16    A.   Industrial Demolition as far as I know was probably formed
   17    just a year or two before Tanners Creek in Lawrenceberg.
   18    Q.   Okay.  So is it fair to say that Roger had been there the
   19    whole time?
12:23 20   A.   Yes, sir.
   21    Q.   Was it your intention to continue your employment with
   22    Industrial Demolition?
   23    A.   Yes, sir.
   24         MR. METZGER:  Objection.
12:23 25        THE COURT:  Sustained.
```

**JA359**

125

```
         1          MR. METZGER:  Thank you.
         2    Q.   You testified a few minutes ago as to the goals that you
         3    had fulfilled, that you wanted to fulfill with your employment.
         4    Is that right?  We just heard that.
12:23    5    A.   Yes, sir.
         6    Q.   What were those goals?
         7    A.   Well, looking back in the country and not having a home,
         8    place to call home, selling everything, starting the new job,
         9    new career path, that was the goal.
12:23   10          When I first met Roger, he talked about, "Man, you could
        11    put away a thousand dollars a week at least."  And that was my
        12    goal to continue with the company to put away enough money to
        13    be able to just purchase a home.  I figured I'd be working
        14    there probably another ten years.
12:24   15    Q.   And had you and Holly discussed those goals?
        16    A.   We did, yes.
        17    Q.   And had you discussed what type of home you wanted to
        18    purchase?
        19    A.   Yes, sir.
12:24   20    Q.   What type of home would you like to have purchased?
        21    A.   One that would have been large enough for our family of
        22    seven.  And so, you know, we enjoyed the home we lived in in
        23    Massachusetts.  It kind of gave us an idea of what we'd look
        24    for, maybe a target range of where we needed to be.  Again,
12:24   25    we'd need six, seven bedrooms to accommodate my family.
```

**JA360**

```
        1   Q.   And do you have the same goal today of saving enough to
        2   buy a home?
        3   A.   It's still there, yes.
        4   Q.   And can you tell the jury whether or not, based on your
12:25   5   experience today, that will take longer or shorter?
        6   A.   Yeah, it's going to take a whole lot longer than I
        7   expected.  Again, I planned on being with the company, I was
        8   promised a raise at the next job site from Mike to Roger
        9   telling me this.  You know, I just -- my family was used to
12:25  10   moving around.  We home-schooled.  And so this was my new
       11   career path.  This is where I was going.
       12        Again, I identified for X amount of years in the ministry
       13   service that I was doing, and that ended, and now this is what
       14   I was doing.  And it all kind of came to a close after being
12:25  15   directed to come up and work.
       16   Q.   Counsel mentioned, asked you about hobbies, if you had to
       17   give up any hobbies because of this.  Did you have Christmas in
       18   2019?
       19   A.   No, sir.
12:26  20   Q.   And how if at all did this termination affect you
       21   emotionally in the aftermath of the termination?
       22             MR. METZGER:  Objection.
       23             THE COURT:  Sustained.
       24             MR. METZGER:  Thank you, Your Honor.
12:26  25             THE COURT:  Beyond the scope of the cross.
```

**JA361**

127

|         |    |                                                               |
|---------|----|---------------------------------------------------------------|
|         | 1  | MR. TURIELLO:  Your Honor, there was a question               |
|         | 2  | directly about whether or not he had emotional effects.       |
|         | 3  | THE COURT:  No.  The objection is sustained.                  |
|         | 4  | MR. METZGER:  Thank you, Your Honor.                          |
| 12:26   | 5  | MR. TURIELLO:  Okay.                                          |
|         | 6  | Q.   Mr. Moore, had you ever heard -- counsel asked you about |
|         | 7  | whether -- about your perception, or I think the word was your|
|         | 8  | understanding of the conversation between you and Roger on the|
|         | 9  | 13th.                                                         |
| 12:26   | 10 | What was the basis of your understanding that you had been    |
|         | 11 | terminated?                                                   |
|         | 12 | A.   That I had a work restriction and Roger did not want to  |
|         | 13 | honor that, and he got very aggravated that I was kind of     |
|         | 14 | standing up for myself, saying, "Listen, you're telling me to |
| 12:27   | 15 | do these things.  You're telling me I'm messing around on the |
|         | 16 | machines all day.  I have this note," you know, that basically |
|         | 17 | protected me, what I thought.                                 |
|         | 18 | And so when he escalated to the point of being fired, I       |
|         | 19 | just, I couldn't believe that I was --                        |
| 12:27   | 20 | Q.   I guess what I'm asking you, sir, to put it plainly, he  |
|         | 21 | never used the word, "You're fired," right?                   |
|         | 22 | A.   He did not.                                              |
|         | 23 | Q.   So how did you come to the conclusion that you had in fact|
|         | 24 | been fired?                                                   |
| 12:27   | 25 | A.   Because of the previous examples on other job sites.     |

**JA362**

```
     1   Q.   What were those examples?
     2   A.    Individuals being fired.
     3          MR. METZGER:  Objection, Your Honor.  This is beyond
     4   the scope.
12:27 5          THE COURT:  Hold on one second.  You want him to tell
     6   us what?
     7          MR. TURIELLO:  Counsel had a line of questioning
     8   specifically relating to Mr. Moore's understanding of a
     9   conversation and the conclusion that he drew that he had been
12:28 10  terminated.  I'm asking the witness to tell the jury the basis
    11   for his conclusion as to the termination.  It's plainly within
    12   the scope of cross.
    13          MR. GOODWIN:  Redirect.
    14          MR. TURIELLO:  My redirect is within the scope of
12:28 15  cross.
    16          THE COURT:  The problem is it's a complicated question
    17   that is largely not admissible and the minor part is
    18   admissible.  So maybe you can rephrase it so that we can get in
    19   the specific thing that you want to get in, which has to do
12:28 20  with his reason.
    21          MR. METZGER:  Thank you, Your Honor.
    22          MR. TURIELLO:  Okay.
    23   Q.   What does "Hit the gates" mean?
    24          MR. METZGER:  Objection, Your Honor.
12:28 25          THE COURT:  No.  He may answer that.
```

**JA363**

129

```
         1            MR. TURIELLO:  Thank you.
         2     A.   "Hit the gate," means you're fired.
         3     Q.   Had you heard, "Hit the gate" before?
         4     A.   Yes, sir.
12:29    5     Q.   How many times?
         6     A.   Three maybe, four.
         7            MR. METZGER:  Again, Your Honor, this is now clearly
         8     outside of the scope of the cross-examination.  We did not
         9     touch upon this whatsoever.  We asked about --
12:29   10            THE COURT:  Well, he's about finished, so I think
        11     we'll be done with it now.
        12            MR. METZGER:  Thank you, Your Honor.
        13            MR. TURIELLO:  I need a follow-up question on that,
        14     Your Honor.  It's not outside the scope.
12:29   15            THE COURT:  You can ask the question, and then I'll
        16     decide based on what counsel says as well as what you said.
        17            MR. TURIELLO:  Thank you.
        18     Q.   Did people return to the job site after they had been told
        19     to hit the gate?
12:29   20     A.   No.
        21            MR. METZGER:  Objection.
        22            THE COURT:  Sustained.
        23            MR. METZGER:  We would ask for an instruction --
        24            THE COURT:  I'm sorry?
12:29   25            MR. METZGER:  I'm asking for an instruction for the
```

**JA364**

130

```
       1    jury to ignore the response, given that he did respond.
       2            THE COURT:  To the extent that he said it, it's
       3    stricken.
       4            MR. METZGER:  Thank you.
12:29  5    Q.  You had testified, you spoke to -- on cross-examination,
       6    we heard about your conversation with Michael Roberts.
       7    A.  Yes, sir.
       8    Q.  And I think counsel asked you whether or not you believed
       9    Michael Roberts as CEO had the power to fire you.  That was the
12:30 10    line of questioning.  Do you remember that line of questioning?
      11    A.  Yes.
      12    Q.  Okay.  Had you ever seen a dispute involving the employer
      13    or involving a colleague where Michael Roberts and Roger
      14    Oberkramer had a different opinion?
12:30 15            MR. METZGER:  Objection, Your Honor.
      16            THE COURT:  The objection is sustained.
      17            MR. METZGER:  Thank you.
      18    Q.  What happened to Ted?
      19    A.  Ted was fired.
12:30 20    Q.  When was he fired?
      21    A.  When he stood up for himself.
      22    Q.  And were you on a conference call with Mike Roberts when
      23    Ted was fired?
      24    A.  Yes, sir.
12:30 25    Q.  And was Roger in that room?
```

**JA365**

131

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | A.   Yes, sir.                                                                |
|       | 2  | Q.   And did they disagree on what should happen to Ted?                      |
|       | 3  | A.   Yes, sir.                                                                |
|       | 4  | MR. TURIELLO:  Thank you.  I have no more questions.                          |
| 12:30 | 5  | THE COURT:  Any redirect?  You don't have to.                                 |
|       | 6  | MR. METZGER:  I just want to briefly clarify.                                 |
|       | 7  | RECROSS-EXAMINATION BY MR. METZGER:                                           |
|       | 8  | Q.   Sir, when you're referring to Ted and a disagreement, were              |
|       | 9  | you saying there was a disagreement between Roger Oberkramer               |
| 12:31 | 10 | and Mike Roberts?                                                             |
|       | 11 | A.   Roger wanted Ted fired because he allowed the police to                 |
|       | 12 | investigate somebody that shot up a bar.                                      |
|       | 13 | Q.   Sir, just my question.  Were you saying there was an                    |
|       | 14 | agreement between Roger Oberkramer and Mike Roberts?                         |
| 12:31 | 15 | A.   Roger was telling --                                                     |
|       | 16 | Q.   Sir --                                                                   |
|       | 17 | A.   I'm trying to get there.                                                 |
|       | 18 | Q.   Yes or no first.                                                         |
|       | 19 | THE COURT:  Or you can say, "I cannot answer yes or                          |
| 12:31 | 20 | no."                                                                          |
|       | 21 | A.   I cannot answer yes or no.                                               |
|       | 22 | Q.   Were you saying -- in terms of this discussion regarding               |
|       | 23 | Ted, was Mike Roberts involved in the discussion?                            |
|       | 24 | A.   He was on the call, yes.                                                 |
| 12:31 | 25 | Q.   Okay.  Was he agreeing or disagreeing with Roger?                       |

**JA366**

132

```
         1    A.   He agreed with Roger and Ted left.

         2              MR. METZGER:  Okay.  Thank you.

         3              THE COURT:  Thank you very much.  You are excused.

         4    Who is next?

12:32    5              MR. GOODWIN:  We have no further witnesses.

         6              MR. TURIELLO:  No further witnesses from the

         7    plaintiff, Your Honor.

         8              THE COURT:  So plaintiff rests?

         9              MR. GOODWIN:  Yes.

12:32   10              MR. TURIELLO:  Subject to rebuttal, yes.

        11              THE COURT:  They will start with the defense counsel,

        12    and to the extent the motion is there under advisement.

        13              MR. METZGER:  Yes, Your Honor.  You want me to do this

        14    in front of the jury.  I would like to make a motion to the

12:32   15    court.

        16              THE COURT:  Okay.  I'm assuming the motion, which will

        17    be on the record, and I will reserve on it.

        18              MR. METZGER:  Understood, Your Honor.  I just want to

        19    ask your preference here in terms of me placing that into the

12:32   20    record.

        21              THE COURT:  Well, you can put it on the record in due

        22    course.  We do not need to do that while the jury is sitting

        23    here.

        24              MR. METZGER:  Understood.  That's why I was asking.

12:32   25              THE COURT:  Does the defense have any witnesses?
```

**JA367**

133

```
             1            MR. METZGER:  We do.

             2            THE COURT:  Okay.  Well, then let's call the first

             3    witness for the defense while we are stretching, and then we

             4    will proceed with the first witness.  Did you make an opening

12:33        5    earlier?

             6            MR. METZGER:  I did, Your Honor, yes.

             7            THE COURT:  You did make it earlier?

             8            MR. METZGER:  I did.

             9            THE COURT:  So we'll go directly to your witness.

12:33       10            MR. METZGER:  We will go directly to our first

            11    witness.  It is Rebecca Lydon.  She's out in the hallway, with

            12    the separation of witnesses, so it may be a few minutes.

            13            THE COURT:  Somebody could go get her or him.

            14            We're taking a rest until he or she arrives.

12:35       15            Where could this witness be hiding?

            16            MR. TURIELLO:  It's a big courthouse, Your Honor.

            17            THE COURT:  Madam, if you are the witness, then if you

            18    could kindly step in behind that big desk and remain standing

            19    until you've taken the oath, and then we'll continue.  Thank

12:36       20    you.

            21            REBECCA LYDON, Sworn

            22            THE CLERK:  You can be seated, please.  May I ask you

            23    to speak a little louder and speak into the microphone, please.

            24    May I please ask you to state your name, spelling your last

12:37       25    name for the record, please, ma'am.
```

**JA368**

134

```
 1              THE WITNESS:  Rebecca Lydon, L-y-d-o-n.
 2              THE CLERK:  Thank you.
 3   DIRECT EXAMINATION BY MR. METZGER:
 4   Q.   Good afternoon, Ms. Lydon.  Can you hear me fine?
 5   A.   Yes, I can.
 6   Q.   Ms. Lydon, where do you live?
 7   A.   St. Louis, Missouri.
 8   Q.   And how long have you lived there?
 9   A.   All my life.
10              THE COURT:  Can you hear her?
11              THE CLERK:  Speak a little louder, please.
12   Q.   Did you go to school in St. Louis?
13   A.   Yes, I did.
14   Q.   Let's discuss your educational background briefly.  Where
15   did you go to high school?
16   A.   Melrose Senior High.
17   Q.   What city?
18   A.   St. Louis.
19   Q.   When did you graduate?
20   A.   '74.
21   Q.   Did you go to college?
22   A.   Yes, I did.
23   Q.   Where did you go to college?
24   A.   I went to Merrimack Community College in St. Louis.
25   Q.   And when did you graduate from Merrimack Community
```

135

```
        1   College?

        2   A.   '76.

        3   Q.   Did you obtain a degree from Merrimack?

        4   A.   Yes, I did.

12:38   5   Q.   And what was your degree in?

        6   A.   Accounting.

        7   Q.   And in terms of your employment, immediately after

        8   college, did you obtain employment?

        9   A.   Yes, I did.

12:38  10   Q.   And where did you work right after college?

       11   A.   Sunset Hills Dental Group.

       12   Q.   And how long were you there?

       13   A.   13 years.

       14   Q.   And generally what did you do there?

12:38  15   A.   I was in charge of the credit collection department.  I

       16   made appointments, accounting, kind of everywhere.

       17   Q.   After that employment did you obtain other employment?

       18   A.   I did.

       19   Q.   Where?

12:38  20   A.   I worked for the Teamsters Credit Union as the president

       21   and CEO.

       22   Q.   And how long were you there?

       23   A.   I was there 13 years.

       24   Q.   And you said your title was president and CEO?

12:39  25   A.   President and CEO.
```

**JA370**

136

```
        1    Q.   And if you could just describe for the jury generally then
        2    what your role was as the president and CEO of that
        3    organization?
        4    A.   As the president I ran the credit union on a day-to-day
12:39   5    basis.  I also negotiated contracts with the union employees.
        6    It was a credit union, so we did loans or opened accounts,
        7    helped with financial counseling, that type of thing.
        8    Q.   Did you enjoy that work?
        9    A.   I did.
12:39  10    Q.   And what year did you stop working there?
       11    A.   I stopped there in 1998.
       12    Q.   And where did you work after that, after 1998?
       13    A.   Commercial Development Company.
       14    Q.   And who was your current -- who is your current employer?
12:40  15    A.   Commercial Development Company.
       16    Q.   And who owns that business?
       17    A.   Mike Roberts and Tom Roberts.
       18    Q.   Brothers?
       19    A.   Brothers.
12:40  20    Q.   And is Mr. Roberts here?
       21    A.   He is.
       22    Q.   And just so we're clear, what year did you start with
       23    Commercial Development company?
       24    A.   November 1998.
12:40  25              THE COURT:  19?
```

**JA371**

137

```
        1              THE WITNESS:  ' 98.
        2              THE COURT:  How do you get to 13 years?  What happens
        3       after the 13 years from that?  Every job you have seems to be
        4       13 years long.
12:40   5              THE WITNESS:  I know.  I passed that on this one.
        6       Q.   So this job you' ve been there since 1998?
        7       A.   Correct.
        8       Q.   25 years or so?
        9       A.   Almost 25 years.
12:40  10       Q.   Almost 25 years, great.
       11            What do you do at Commercial Development Company?
       12       A.   I am the chief operating officer.
       13       Q.   And in your capacity as chief operating officer, what do
       14       you do?
12:41  15       A.   I oversee the day to day.  I also do HR duties,
       16       accounting, some IT work.  Just manage the day-to-day basis of
       17       the entities.
       18       Q.   And you say "the entities."  Are you familiar with various
       19       entities that Mr. Roberts is involved in?
12:41  20       A.   Yes, I am.
       21       Q.   Do you understand you' re who the defendant is in this
       22       case?
       23       A.   Yes, I do.
       24       Q.   And who is that defendant that you understand?
12:41  25       A.   Industrial Demolition.
```

**JA372**

138

| | | |
|---|---|---|
| | 1 | Q.   And what is Industrial Demolition? |
| | 2 | A.   It's a demolition company. |
| | 3 | Q.   Do you have responsibilities or a role with Industrial |
| | 4 | Demolition? |
| 12:41 | 5 | A.   My responsibilities are the payroll, reporting. |
| | 6 | Q.   You mentioned, for example, payroll.  Does Industrial |
| | 7 | Demolition have their own payroll? |
| | 8 | A.   Yes, they do. |
| | 9 | Q.   And by "own payroll," you mean for the specific employees |
| 12:42 | 10 | working with that particular entity? |
| | 11 | A.   That is correct. |
| | 12 | Q.   And to be clear, do you know who owns Industrial |
| | 13 | Demolition LLC? |
| | 14 | A.   Yes. |
| 12:42 | 15 | Q.   Who owns Industrial Demolition LLC? |
| | 16 | A.   Mike and Tom Roberts. |
| | 17 | Q.   For Industrial Demolition LLC, approximately how many |
| | 18 | employees does it have? |
| | 19 | A.   Today? |
| 12:43 | 20 | Q.   Let's start with today, by example. |
| | 21 | A.   Eight. |
| | 22 | Q.   Does it vary over time? |
| | 23 | A.   Yes, it does. |
| | 24 | Q.   What is -- just approximately, if you don't know exactly, |
| 12:43 | 25 | what's the highest number of employees that Industrial |

**JA373**

139

1    Demolition LLC has had?

2    A.    Approximately 38.

3    Q.    And approximately what's the fewest number of employees

4    that Industrial Demolition has had in your experience?

12:43 5    A.    Three.

6    Q.    Why the variance, why the fluctuation between a low of

7    three and a high of approximately 38?

8    A.    It all depends on the job that they're hired to do.  So

9    the bigger the job, the demolition job is, we would need more

12:44 10   crew to manage that.  As it winds down, the crew ends up being

11   either released or moved to a different site if there's

12   something going on, and there's usually two or three people

13   that stay behind to finish the cleanup process.

14   Q.    Are there -- on these projects, understanding that they

12:44 15   are different sizes, are there different employee positions or

16   different roles that they have on the site itself?

17   A.    Yes.

18   Q.    And if you could just describe from your perspective in

19   general the various categories or types of roles that are

12:44 20   filled by employees at Industrial Demolition.

21   A.    Sure.  We have a supervisor role who oversees the day to

22   day on the site itself.  We have heavy machinery operators,

23   laborers, burners.  And it depends on the project itself, but

24   we may have a scale person.

12:45 25   Q.    Very briefly, the heavy equipment operators, are they

**JA374**

140

        1  employed by Industrial Demolition in particular?
        2  A.  Yes, they are.
        3  Q.  And what is the scale position?  You said there might be
        4  for that position.  What's the responsibility there?
12:45   5  A.  The scale position is, they run the scale itself.  So once
        6  we start transporting scrap off the site, the trucks will go
        7  across the scale, and that is where the scale person comes in.
        8  She documents every truck that goes in, the weight, what type
        9  of scrap it is, that sort of thing.
12:46  10  Q.  Why is it being weighed?
       11  A.  So we know what the weight is going out before it gets to
       12  the scrap yard.
       13  Q.  Is there a scale person on each of the jobs for Industrial
       14  Demolition?
12:46  15  A.  No.  There is a -- it depends on the size of the job.
       16  Q.  So why would there be a job that does not involve a scale
       17  person?
       18  A.  Not big enough, or there's a scale that's close enough to
       19  the site where we would be utilizing our own.
12:46  20  Q.  So when you say "not big enough," just briefly can you
       21  describe, why would there be a job that is not big enough to
       22  have a scale person weighing what's going in and out?
       23  A.  Well, it's not so much that it would be big enough.  It
       24  depends on the location of the site as well.  A lot of the
12:47  25  rural areas don't have, you know, the opportunity to be able to

141

```
        1    do that.  But normally there is a scale that is close to each
        2    of our properties.  We prefer, if we can, to have a scale
        3    person on-site because then we can also have them do other
        4    things for us in between times.
12:47   5    Q.   And the individuals, the various individuals performing
        6    work for Industrial Demolition, are they on that payroll for
        7    Industrial Demolition?
        8    A.   Yes, they are.
        9    Q.   Are you familiar with the project -- well, are you
12:48  10    familiar with the project that Industrial Demolition did in
       11    Southern Indiana?
       12    A.   Yes, I am.
       13    Q.   Are you familiar with a project that was done in
       14    Lawrenceberg, Indiana?
12:48  15    A.   Yes, I am.
       16    Q.   Do you know what that project was called?
       17    A.   Tanners Creek Development.
       18    Q.   And just at a high level, what was Tanners Creek?
       19    A.   It was an old power plant.
12:48  20    Q.   What was Industrial Demolition's role or job at the
       21    Tanners Creek site?
       22    A.   Industrial Demolition went in to finish cutting, I guess
       23    what you want to call it, cutting up the scrap, getting the
       24    rest of the scrap on-site and doing the cleanup or starting to
12:48  25    do the cleanup work there.
```

**JA376**

142

|        |    |                                                                      |
|--------|----|----------------------------------------------------------------------|
|        | 1  | Q.   Do you recall approximately when Industrial Demolition had      |
|        | 2  | started work at the Tanners Creek site in Lawrenceberg,              |
|        | 3  | Indiana?                                                             |
|        | 4  | A.   August of '19 or '20.  I can't remember exactly.                |
| 12:49  | 5  | Q.   Whatever the year, it was August?                               |
|        | 6  | A.   I know it's August.                                             |
|        | 7  | Q.   Do you know how long Industrial Demolition was on-site at       |
|        | 8  | Tanners Creek?                                                       |
|        | 9  | A.   Approximately six months.                                       |
| 12:49  | 10 | Q.   So getting to the next year, approximately, what month?         |
|        | 11 | A.   March, April.                                                   |
|        | 12 | Q.   Springtime of the following year?                               |
|        | 13 | A.   Right.                                                          |
|        | 14 | Q.   And why did the project last just six months?                   |
| 12:49  | 15 | A.   They ended up finding more that had to be done once the         |
|        | 16 | other crew was offsite.                                              |
|        | 17 | Q.   Did there come a time when Industrial Demolition stopped        |
|        | 18 | working at the Tanners Creek site?                                   |
|        | 19 | A.   Yes.                                                            |
| 12:50  | 20 | Q.   Do you know how many employees Industrial Demolition had        |
|        | 21 | at the Tanners Creek site at its height?                             |
|        | 22 | A.   Roughly, I would say anywhere from 12 to 15.                    |
|        | 23 | Q.   And on the site such as Tanners Creek, what types of           |
|        | 24 | workers were employed there by Industrial Demolition?               |
| 12:50  | 25 | A.   The same, we had the operators, the laborers, the burners.     |

**JA377**

143

```
        1   Q.   When Industrial Demolition is wrapping up its work at a
        2   particular site, what's the process with respect to the workers
        3   that had been at the site with Tanners Creek?
        4   A.   I'm sorry, could you repeat that?
12:51   5   Q.   Sure.  When Industrial Demolition was wrapping up a site,
        6   what happens to the employees that had been working there?
        7   A.   It depends on what the next project is.
        8   Q.   Meaning what?
        9   A.   Depends on the size of the project, how many employees
12:51  10   we're going to need on there, what equipment we're going to be
       11   using.  If the site is big, most of them will go, if they chose
       12   to.  It's their decision.
       13   Q.   Did you say it was their decision?
       14   A.   If they're offered the position, it's up to them whether
12:51  15   they want to go or not.
       16   Q.   Is equipment moved by Industrial Demolition from one
       17   project to another?
       18   A.   Yes, it is.
       19   Q.   And are there certain workers involved in that process?
12:51  20   A.   Sometimes there are, yes.
       21   Q.   What goes into the decision to transfer employees or offer
       22   them a position at another location?
       23   A.   It's really just the size of the job, and do we have
       24   on-site what we need.
12:52  25   Q.   Are you familiar with the plaintiff in this case?
```

144

```
        1  A.   By name only, yes.
        2  Q.   Do you understand that this is Mr. Moore seated here in
        3  the blue shirt?
        4  A.   Yes.
12:52   5  Q.   Had you ever seen him in person before?
        6  A.   Not other than depo.
        7  Q.   Okay.  Other than a deposition?
        8  A.   Right.
        9  Q.   Okay.  You mean in connection with this matter, in
12:52  10  preparation --
       11  A.   Right.
       12  Q.   Okay.  All right.  Did Mr. Moore work with Industrial
       13  Demolition at Tanners Creek?
       14  A.   Yes, he did.
12:53  15  Q.   Do you know when approximately he started with the
       16  company?
       17  A.   Off the top of my head, no.
       18  Q.   Was Industrial Demolition already in progress at Tanners
       19  Creek, do you know, when Mr. Moore was hired?
12:53  20  A.   I do believe they were, yes.
       21  Q.   Do you know what Mr. Moore's responsibilities were at
       22  Tanners Creek?
       23  A.   He was hired, considered on a payroll as a laborer, which
       24  could have constituted driving a haul truck, bobcat, labor
12:53  25  work.
```

**JA379**

145

```
      1    Q.   And do you recall what his rate of pay was?

      2    A.   $30 an hour I believe.

      3    Q.   Are the Industrial Demolition workers, do they work more

      4    than 40 hours per week?

12:54 5    A.   Most of the time, yes, they do.

      6    Q.   Are they paid any additional for hours past 40 hours?

      7    A.   Yes.  They're paid for time and a half for anything over

      8    40.

      9    Q.   With respect to Mr. Moore, do you know whether he was

12:54 10   offered another position as the Tanners Creek site wrapped up?

      11   A.   He was offered a position, yes.

      12   Q.   Do you know where he worked next for Industrial

      13   Demolition?

      14   A.   He did not -- well, after that, yeah.  I don't know where

12:55 15   he went because he didn't accept the job earlier.

      16   Q.   Sorry, poor question on my part.  With respect to

      17   Industrial Demolition, did he work at another site after

      18   Tanners Creek?

      19   A.   Yes, he did.

12:55 20   Q.   Where was that?

      21   A.   Brayton Point.

      22   Q.   And where is Brayton Point?

      23   A.   In Massachusetts, Somerset.

      24   Q.   And in general, what was the Brayton Point site that

12:55 25   Industrial Demolition was working on, if you could just
```

**JA380**

146

         1   describe the site itself, to your knowledge.
         2   A.   It was an old power plant, the Dynegy power plant.
         3   Q.   And what was Industrial Demolition's job for the Brayton
         4   Point site?
  12:55  5   A.   To break down the buildings, get scrap up, get it ready
         6   for processing and clean the site up for future.
         7   Q.   Do you know approximately when Industrial Demolition
         8   started working on the Brayton Point site?
         9   A.   Approximately April of '19 I think.
  12:56 10   Q.   Do you know approximately how many workers with Industrial
        11   Demolition were employed at the Brayton Point site at its
        12   height?
        13   A.   Approximately 35 or 38 employees total.
        14   Q.   Was there more work on the Brayton Point site compared to
  12:57 15   Tanners Creek?
        16   A.   Yes, there was.
        17   Q.   How long did Industrial Demolition perform work on the
        18   site?
        19   A.   Approximately 18 months.
  12:57 20   Q.   And were there various workers who worked that entire time
        21   or others in a shorter time?
        22   A.   Yes.  Well, they were all there for the most part until,
        23   you know, the end.
        24   Q.   Do you know whether Mr. Moore, the plaintiff Mr. Moore,
  12:57 25   worked on the Brayton Point site?

**JA381**

147

```
      1   A.   I'm sorry?

      2   Q.   Do you know whether Mr. Moore worked on the Brayton Point

      3   site for Industrial Demolition?

      4   A.   Yes, he did.

12:58 5   Q.   And do you know what his responsibilities in general were

      6   on that site?

      7   A.   He was the laborer.

      8   Q.   Do you know whether there were differences in his

      9   responsibilities at Brayton Point versus the earlier job at

12:58 10  Tanners Creek?

     11   A.   There's no difference.

     12   Q.   And do you know who Roger Oberkramer is?

     13   A.   Yes, I do.

     14   Q.   Did Roger Oberkramer -- well, was there a supervisor at

12:58 15  the Tanners Creek site?

     16   A.   Yes.

     17   Q.   And who was that?

     18   A.   Roger Oberkramer.

     19   Q.   And was there a supervisor at the Brayton Point site?

12:59 20  A.   Yes.

     21   Q.   Who was that?

     22   A.   Roger Oberkramer.

     23   Q.   What were his responsibilities at the Brayton Point site?

     24   A.   To keep production moving on a day-to-day basis and

12:59 25  oversee the daily operations on the site itself.
```

**JA382**

148

```
       1   Q.   And at the Brayton Point site, with his work there, who

       2   did Mr. Oberkramer report to?

       3   A.   Mike Roberts.

       4        THE COURT:  We have to suspend now.  So I will see you

12:59  5   tomorrow.  And members of the jury, you are excused until

       6   tomorrow.  We'll start again as soon as everybody is together,

       7   if not earlier, than 9:00.

       8        (Jury exits the courtroom.)

       9        MR. METZGER:  I believe Your Honor we will.

01:00 10        THE COURT:  Will the defendant finish its evidence

      11   tomorrow?

      12        MR. METZGER:  Yes.

      13        THE COURT:  Yes?

      14        MR. METZGER:  Yes.

01:00 15        THE COURT:  Is there going to be any additional

      16   evidence by the plaintiff?

      17        MR. TURIELLO:  We don't know that.

      18        MR. GOODWIN:  We don't anticipate it at this time.

      19        THE COURT:  Do you need all morning tomorrow to

01:00 20   finish?

      21        MR. METZGER:  I don't anticipate needing until 1:00,

      22   no.

      23        THE COURT:  I'm sorry?

      24        MR. METZGER:  I don't anticipate, Your Honor, needing

01:00 25   until 1:00.
```

**JA383**

149

```
         1          THE COURT:  I'm just trying to figure out when the

         2   case is likely to go to the jury.  And when is that?

         3          MR. GOODWIN:  I suspect tomorrow towards the

         4   afternoon.

01:01    5          THE COURT:  We will finish tomorrow.  Argument and

         6   charge the day after.

         7          MR. GOODWIN:  I believe -- well, I don't think we'll

         8   have any additional witnesses to submit.  I don't know if there

         9   will be any issues around instruction or other motions, and so

01:01   10   it might be Friday morning to the jury.

        11          THE COURT:  Well, before we have argument we need to

        12   make sure that we understand what I'm going to tell them, and

        13   I'm just wondering how much more evidence there is.  Will it

        14   take up most of tomorrow morning?

01:01   15          MR. METZGER:  I think still with Ms. Lydon --

        16          THE COURT:  I'm not complaining.  I just want to know

        17   when.

        18          MR. GOODWIN:  Yes, I believe so.

        19          MR. METZGER:  Yes.

01:01   20          THE COURT:  So we'll still be having trial tomorrow

        21   morning.

        22          MR. METZGER:  Certainly.

        23          THE COURT:  Until 1:00 or sometime earlier than that,

        24   but we're pretty sure we will finish the evidence tomorrow.

01:01   25          MR. METZGER:  Yes, correct.
```

**JA384**

150

|   |   |   |
|---|---|---|
| | 1 | THE COURT:  The following day you will start arguments |
| | 2 | and charge.  We will tell the jury to be here at 9:00 or 9:30 |
| | 3 | even. |
| | 4 | I think that's the logical way to go.  We won't have |
| 01:02 | 5 | time tomorrow to do it, will we? |
| | 6 | MR. METZGER:  No. |
| | 7 | THE COURT:  No.  And is there likely to be some |
| | 8 | evidence on the next day? |
| | 9 | MR. METZGER:  I don't think so. |
| 01:02 | 10 | MR. GOODWIN:  I don't believe so. |
| | 11 | THE COURT:  So we will we anticipate finishing the |
| | 12 | evidence tomorrow, starting the following day with the review |
| | 13 | of the arguments and the charge, and then arguments and charge |
| | 14 | and give it to the jury that day. |
| 01:02 | 15 | THE CLERK:  Friday morning.  The jury can be told |
| | 16 | tomorrow they'll have to spend Friday. |
| | 17 | THE COURT:  Friday they decide the case. |
| | 18 | I think we need to be a little bit flexible, and it |
| | 19 | may be that you will go sufficiently quickly in the morning |
| 01:03 | 20 | that we can stay the afternoon to do the charge conference, and |
| | 21 | then the case would go to the jury the following day instead of |
| | 22 | the day after that. |
| | 23 | MR. GOODWIN:  Okay. |
| | 24 | (Court and clerk discussion off the record.) |
| 01:03 | 25 | THE COURT:  We may have the charge conference |

**JA385**

151

```
 1   tomorrow, rather than the following day, and then the following
 2   day we can start with arguments and charge, and the jury can
 3   arrive early in the morning and have a full day to work on the
 4   case.
 5          THE CLERK:  Friday.
 6          MR. METZGER:  Closing Friday morning.  Clean up
 7   everything tomorrow.
 8          THE COURT:  I don't need to work to get to you
 9   tomorrow, but you have another day or another night.  Okay.
10          (Adjourned, 1:04 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

01:04

**JA386**

152

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this 28th day of April, 2022.

10

11              /s/ Kelly Mortellite

12              _____

13              Kelly Mortellite, RMR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

**JA387**

3-1

```
 1                 UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2

 3   ERIC MOORE,                    )
                        Plaintiff,  )
 4                                  )
     vs.                            )  No. 22-CV-10414-RWZ
 5                                  )
     INDUSTRIAL DEMOLITION, LLC,    )
 6                      Defendant.  )

 7

 8

 9

10               BEFORE THE HONORABLE RYA W. ZOBEL
                 UNITED STATES DISTRICT COURT JUDGE
11                       JURY TRIAL DAY 3

12

13

14

15         John Joseph Moakley United States Courthouse
                         Courtroom No. 12
16                       One Courthouse Way
                     Boston, Massachusetts 02210
17

18                        April 13, 2023
                            9:05 a.m.
19

20

21

             Kathleen Mullen Silva, RPR, CRR
22                   Official Court Reporter
          John Joseph Moakley United States Courthouse
23             One Courthouse Way, Room 7209
                  Boston -- Massachusetts 02210
24             E-mail: kathysilva@verizon.net

25         Mechanical Steno - Computer-Aided Transcript
```

3-2

```
 1   APPEARANCES:

 2
             Duddy, Goodwin & Pollard
 3           Jamie Goodwin, Esq.
             2 Liberty Square, 10th Floor
 4           Boston, Massachusetts 02109
             508.523.2632
 5           and
             Duddy, Goodwin & Pollard
 6           Michael Turiello, Esq.
             446 Main Street, 16th Floor
 7           Worcester, Massachusetts 01608
             860.999.9394
 8           for Plaintiff

 9           Littler Mendelson P.C.
             Thomas M.L. Metzger, Esq.
10           41 South High Street, Suite 3250
             Columbus, Ohio 43215
11           614.463.4216
             and
12           Littler Mendelson P.C.
             Alexa Marie Esposito, Esq.
13           One International Place, Suite 2700
             Boston, Massachusetts 02110
14           617.378.6000
             for Defendant
15

16

17

18

19

20

21

22

23

24

25
```

**JA389**

1

2                                    <u>INDEX</u>

3

4   <u>WITNESS</u>                                              <u>PAGE</u>

5

    REBECCA LYDON
6
      Direct Examination By Mr. Metzger                    7
7     Cross-Examination By Mr. Goodwin                    23
      Redirect Examination By Mr. Metzger                 66
8
    MICHAEL ROBERTS
9
      Direct Examination By Mr. Metzger                   67
10    Cross-Examination By Mr. Goodwin                     75

11

12                             E X H I B I T S

13

14

15   Exhibit No.                                      Received

16      36       ....................................       8

17      34       ....................................      11

18      19       ....................................      19

19      17       ....................................      21

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2          THE CLERK:  All rise.

 3          THE COURT:  All the jurors are here and we are ready

 4     to go.  Is there anything we need to discuss before we proceed?

 5          MS. GOODWIN:  If it's acceptable to the court, we just

 6     asked Mr. Moore to sit back here so Mr. Metzger has plenty of

 7     space.

 8          THE COURT:  I'm still not clear.

 9          THE CLERK:  That's fine.

09:04 10         MR. GOODWIN:  Okay.  Thank you.

11          MR. METZGER:  Your Honor, we do have one -- the NLRB

12     settlement document, there is a question there.

13          Yesterday during my cross-examination of the

14     plaintiff, we essentially put on the shelf for a moment whether

15     the NLRB document, the settlement document would come in or

16     not.

17          My understanding now is there is an order that the

18     court has issued stating that it may come in.  Obviously, it

19     still needs to be authenticated.

09:05 20         THE COURT:  This was offered by the defendant?

21          MR. METZGER:  Correct.  I was questioning the

22     plaintiff on the settlement agreement that he had signed with

23     Industrial Demolition based upon that separate claim he had

24     with the National Labor Relations Board.

25          THE COURT:  What's the issue that we need to decide?
```

**JA391**

```
 1          MR. METZGER:  I don't think there's an issue to decide
 2   anymore because yesterday the court issued an order stating
 3   that the motion in limine was denied and now we just have this
 4   question as to how we solve that.  Because we put it on the
 5   shelf and we don't have the document in yet.
 6          THE COURT:  Do we have to decide that right this
 7   moment?  Or can we wait until we finish with the witnesses and
 8   then go forward to discuss all the legal issues not while the
 9   jury is waiting?
09:06 10       MR. METZGER:  One very straightforward way for us to
11   resolve it.  We have Ms. Lydon still on the stand from the
12   company.  If I may ask her whether that's the agreement they
13   entered into, then we can solve it.  I just want to make
14   sure --
15          THE COURT:  The questions that you're proposing to ask
16   are designed to make these exhibits admissible?
17          MR. METZGER:  Correct.
18          THE COURT:  I don't know what the problem is.
19          MR. METZGER:  I just wanted to make sure because
09:06 20  yesterday, Your Honor, we essentially said let's put that on
21   the shelf and before we put Ms. Lydon back on the stand, I want
22   to make sure we're all clear.
23          THE COURT:  All right.  Is that agreeable?
24          MR. GOODWIN:  We're just reserving our objection.
25   We'll renew our objection and the court has ruled.
```

**JA392**

```
 1            THE COURT:  I've forgotten, did we have a juror on the
 2   stand when we quit yesterday?
 3            THE CLERK:  A witness, yes.
 4            THE COURT:  Witness, I mean.
 5            THE CLERK:  Yeah.
 6            THE COURT:  So whoever the witness was yesterday,
 7   please return to the jury box.  And after the jury gets here, I
 8   will explain you're still under oath even though we're not
 9   going to swear you again today.  Okay?
09:07 10           I want counsel to note how incredibly good this jury
11   is, especially by being on time in the morning.
12            That's our experience in general.  It's just
13   remarkable.
14            How come the plaintiff is all by himself in the last
15   row?
16            MR. GOODWIN:  Just to give Mr. Metzger room to
17   examine.
18            THE CLERK:  All rise, please.
19   (Jury enters.)
09:08 20           THE COURT:  Please be seated.
21            Members of the jury, we will now continue the
22   examination of the witness who was on the stand when we left
23   yesterday.
24            And I remind you that, although we will not swear you
25   in again today, you are still under oath.  Do you understand
```

**JA393**

```
 1    that?
 2              THE WITNESS:  Yes, I do.
 3              THE COURT:  You may proceed.
 4                    REBECCA LYDON, Previously sworn.
 5                    DIRECT EXAMINATION
 6    BY MR. METZGER (Continued):
 7    Q.   Good morning, Ms. Lydon.  First of all, can you hear me
 8    okay?
 9    A.   Yes, I can.
10    Q.   If at any point you can't hear me, raise your hand and let
11    me know.
12              Where we left off was you mentioned the demolition
13    work at the Brayton Point site had ended at some point.  Was
14    there any notification that ever went out to the demolition
15    workers regarding the end of the work there?
16    A.   Yes, there was.  We sent a letter out telling them when
17    their last day on the job would be.
18    Q.   We have premarked Exhibit Number 36.
19              MR. METZGER:  May I approach?
20              THE COURT:  Yes.
21              THE CLERK:  Is there an objection to this?
22              MR. METZGER:  I'm going to authenticate it, and my
23    understanding is there's no objection.
24              THE CLERK:  Okay.
25              THE COURT:  Is this in evidence?
```

**JA394**

```
 1              MR. METZGER:  I'm going to authenticate it.  My
 2     understanding is there's no objection to the exhibit.
 3              THE COURT:  Okay.  So we can mark it.  Exhibit 36.
 4              (Exhibit No. 36 received into evidence.)
 5     Q.   Ms. Lydon, do you recognize this Exhibit 36?
 6     A.   Yes, I do.
 7     Q.   What is it?
 8     A.   It's a letter that was sent out to the remaining
 9     demolition workers on the Brayton Point site letting them know
10     when the last day would be for them on that site.
11     Q.   Is this on a particular letterhead?
12     A.   Yes, it is.
13     Q.   Which company?
14     A.   Industrial Demolition.
15     Q.   Who sent this out?
16     A.   I did.
17     Q.   Does it have a signature on the document?
18     A.   Yes, it does.
19     Q.   Whose signature?
20     A.   Mine.
21              MR. METZGER:  Your Honor, I believe the exhibit is in.
22     Before we display it to the jury, may I do so?
23              THE COURT:  Yes.
24     Q.   Ms. Lydon, who was this document sent out to on the
25     Brayton Point site?
```

**JA395**

```
     1    A.    All the remaining demolition crew.

     2    Q.    Does this letter and your notice to the demolition crew

     3    explain when the work would wrap up for them?

     4    A.    Yes.

     5    Q.    What does it say?

     6    A.    It says that as of Friday, August 14, 2020, the demolition

     7    work at Brayton Point will be complete.

     8    Q.    Is that when the demolition work there actually did end?

     9    A.    The demolition work, yes.

09:11 10    Q.    So at that point, as of August 2020, was there any

    11    additional demolition work for those workers to perform?

    12    A.    Not for Industrial Demolition, no.

    13    Q.    Did Mr. Moore, the plaintiff, ever contact you at any

    14    point to discuss an accommodation of work?

    15    A.    No.

    16    Q.    Did he call you at any point to talk about any

    17    accommodation maybe during a week?

    18    A.    I'm sorry?

    19    Q.    That's fine.  Let me --

09:12 20          MR. METZGER:  We already have admitted number 4.

    21          May I bring that up?  Thank you.

    22    Q.    This is the first page.

    23          MR. METZGER:  And then, Alex, if you may, just for

    24    completeness, if you could show the next page.

    25    Q.    Ms. Lydon, do you recognize this document?
```

```
 1   A.   Yes, I do.
 2   Q.   Okay.  What's your understanding as to what this document
 3   is?
 4   A.   This is a release for him to be able to come back to work
 5   with restrictions.
 6   Q.   On that first page --
 7            MR. METZGER:  And, Alex, sorry to be toggling back and
 8   forth.
 9   Q.   On the first page, who is this sent to?
10   A.   To me.
11   Q.   Did you receive it?
12   A.   Yes, I did.
13   Q.   Let's go to the second page.  Do you recall any
14   communication that you had with Mr. Moore regarding this work
15   release?
16   A.   Yes, I do.
17   Q.   What do you recall regarding that communication?
18   A.   Once I received this document, I told him he was able to
19   return and we would comply with the restrictions.
20   Q.   Do you know whether he returned to work at the Brayton
21   Point site for Industrial Demolition after you received this
22   work release?
23   A.   Yes, he did.
24   Q.   Do you know when he returned?
25   A.   The following day.
```

3-11

```
 1   Q.   Is it your understanding that the restrictions were

 2   honored?

 3   A.   Yes.

 4   Q.   We have also premarked Exhibit No. 34.  This document's

 5   not yet in.  Let me just share copies of that.

 6           THE COURT:  Is there an objection to this?  Are you

 7   offering it?

 8           MR. METZGER:  I am offering it.

 9           THE COURT:  Is there an objection to it?

09:15 10        MR. GOODWIN:  There's not an objection.

11           THE COURT:  So it's marked into evidence as exhibit

12   what?

13           MR. METZGER:  34.

14           THE COURT:  Thank you.

15           (Exhibit No. 34 received into evidence.)

16           (Discussion held off the record.)

17           THE COURT:  Now, the jury does not have a copy and

18   it's not on the screen.

19           MR. METZGER:  Yes.  If I may display.

09:16 20        THE COURT:  I'm sorry.

21           MR. METZGER:  May I display the document?

22           THE CLERK:  Yes, because it's in.  Yes.

23           MR. METZGER:  Thank you.

24   BY MR. METZGER:

25   Q.   Ms. Lydon, Exhibit No. 34 --
```

**JA398**

3-12

```
 1              THE COURT:  This is difficult to read sideways.
 2              MR. METZGER:  It certainly is.
 3              THE COURT:  Well, go ahead and do the best you can.
 4              MR. METZGER:  Alex will work on fixing that.
 5              THE COURT:  When the jury has it in the jury room,
 6    they can turn it any way they want.
 7              MR. METZGER:  And I believe Alex will be able to fix
 8    it here in a moment, but I'll ask some preliminary questions as
 9    she's doing so.
10    Q.   Ms. Lydon, do you recognize this document?
11    A.   Yes, I do.
12    Q.   What is this two-page document?
13    A.   This is the weekly timesheet tracker.
14    Q.   "Weekly timesheet tracker," what do you mean?
15    A.   When they turn their hours in, this is what I put their
16    hours on on a weekly basis.  So it gives me the total hours
17    that they worked for that week.
18    Q.   Okay.  And you anticipated my next question.  So who
19    maintains this document for Industrial Demolition?
20    A.   Who may change it?
21    Q.   No.  Who maintains it, who keeps it?
22    A.   I'm sorry.  I do.
23    Q.   And you keep this document in the regular course of
24    business for Industrial Demolition?
25    A.   Yes, I do.
```

**JA399**

3-13

```
 1              MR. METZGER:  Alex, are we able to fix it?

 2              PARALEGAL:  I should be able to in just a moment.

 3              MR. METZGER:  Okay.  No worries.

 4    Q.   On the first page, we have the names of others redacted,

 5    but you see Mr. Moore's name --

 6    A.   Yes.

 7    Q.   -- right in the middle?

 8              And this reflects first on Sunday -- what does that

 9    show for Mr. Moore on Sunday?

09:18 10          THE COURT:  What document are we looking at?

11              MR. METZGER:  This is still Exhibit Number 34, the

12    first page, the timesheet.

13              THE COURT:  Is it on the screen?

14              MR. METZGER:  Yes, but unfortunately it's still

15    sideways.  We're trying to fix that.

16              THE COURT:  Can we put it on the screen so we can read

17    it?

18              PARALEGAL:  I'm sorry.

19              THE COURT:  Well, if it doesn't work, we'll just do

09:19 20   the best we can.

21              MR. METZGER:  It looks like Alex fixed it there.

22              THE COURT:  Exercise your neck.

23              MR. METZGER:  Do we have it the right way now?  Oh, we

24    fixed it.

25              Thank you, Alex.  We appreciate it.
```

**JA400**

3-14

```
 1    Q.   Ms. Lydon, what does that show in terms of -- on Sunday,

 2    just to introduce the document here, for Mr. Moore in terms of

 3    hours worked?

 4    A.   There were none.

 5    Q.   And then we have Monday, December 9, what does that show?

 6    A.   No hours.

 7    Q.   For the remainder of the week, what does it show up

 8    through Friday, December 13?

 9    A.   That he worked Tuesday, Wednesday and Thursday.

09:20 10    Q.   And how about December 13, Friday?

11    A.   Yes, he did work.

12    Q.   Is there a note at the end of that row for Mr. Moore?

13    A.   Yes, there is.

14    Q.   Who wrote that note?

15    A.   I did.

16    Q.   And why did you write the note?

17    A.   It's a reminder.

18    Q.   And what does it say?

19    A.   "No-call, no-show Saturday."

09:20 20    Q.   And why did you write "no-call, no-show Saturday" on the

21    line for Mr. Moore?

22    A.   If they're scheduled to work and they don't show up and

23    there is no call-in, then it's a no-call, no-show.

24    Q.   Above those lines, about seven, eight lines above, is

25    there another note for a different employee?
```

**JA401**

3-15

```
 1    A.   Yes, there is.

 2    Q.   Who wrote that note?

 3    A.   I did.

 4    Q.   And why did you write that?

 5    A.   That's a reminder of the date -- the week that he

 6    terminated.

 7    Q.   Was that a different employee?

 8    A.   Yes, it was.

 9    Q.   Did Mr. Moore, the plaintiff, ever contact you to say that

09:21 10   he believed he was fired?

11    A.   No.

12    Q.   Did Roger Oberkramer ever contact you to say that he had

13    fired Mr. Moore?

14    A.   No, he did not.

15         MR. GOODWIN:  I'm going to object to leading.

16         THE COURT:  You object to what?

17         MR. GOODWIN:  The last two questions have been

18    leading.

19         THE COURT:  They've been answered.  So we'll just go

09:22 20   ahead.

21         MR. METZGER:  Thank you, Ms. Lydon.  I have no further

22    questions.

23         Actually, I apologize.

24         We had the discussion about those exhibits.  I just --

25    we wanted to have her authenticate them.
```

**JA402**

```
 1              THE COURT:  Is there any additional questioning of
 2     this witness?
 3              MR. METZGER:  I just recalled --
 4              THE COURT:  Not by the defendant but the plaintiff.
 5              MR. GOODWIN:  We will be crossing the witness.
 6              THE COURT:  You've had direct and you've had cross.
 7              MR. GOODWIN:  It's his witness.  It's our cross.
 8              THE COURT:  So now we're on to redirect.
 9              MR. GOODWIN:  No, we're on cross.
09:22 10         THE CLERK:  Cross.
11              THE COURT:  That's right.  This was defense witnesses.
12     Now it comes to the cross-examination by the plaintiff.
13              MR. METZGER:  I apologize.  This is my fault entirely.
14     Prior to the discussion, we had a discussion about two other
15     documents that the witness would identify.  I just wanted to
16     have her identify those because we had a question yesterday as
17     to whether they were coming in.  I simply wanted to ask her to
18     identify those documents.
19              THE COURT:  So what is happening now?
09:23 20         MR. METZGER:  I am just going to finish up my direct
21     examination, Your Honor, by two, three minutes.
22              THE COURT:  Oh, I thought you said you were finished.
23              MR. METZGER:  I did, and my mistake, I realized we had
24     these two documents sitting out there.  I apologize.
25              We had premarked, Your Honor, Exhibit No. 19.
```

**JA403**

3-17

```
 1              THE COURT:  Is there one set of numbers for exhibits,
 2    or is there a plaintiff's group and a defendant's group?
 3              MR. METZGER:  Your Honor, there is -- for the
 4    defendant, we have numbers and for the plaintiff, they are
 5    letters.  So there is a separate group.
 6              THE COURT:  So this is a defendant's document that is
 7    being marked?
 8              MR. METZGER:  That's correct.
 9              THE COURT:  Or has been marked?
10              MR. METZGER:  Correct.
11              THE COURT:  Okay.
12              THE CLERK:  Is there an objection to this?
13              MR. GOODWIN:  Yes.  This is a standing objection.
14              THE COURT:  Okay.
15    BY MR. METZGER:
16    Q.   Ms. Lydon, we previously had marked Exhibit No. 19, which
17    is a two-page -- sorry, three-page document.  Do you recognize
18    this document?
19    A.   Yes, I do.
20    Q.   And do you recognize a signature on the first page of the
21    document?
22    A.   Yes, I do.
23    Q.   Whose is that?
24    A.   It's my signature.
25              THE COURT:  I'm sorry?
```

**JA404**

3-18

```
 1            THE WITNESS:  It's my signature.
 2    Q.   And the next page of this document, do you recognize what
 3    that is?
 4    A.   It's a copy of a pay stub.
 5    Q.   And it's a pay stub from what company?
 6    A.   Industrial Demolition.
 7    Q.   Do you recognize who authorized that payment?
 8    A.   Michael Roberts.
 9    Q.   And do you recognize who the payment is to?
09:26 10   A.   Eric Moore.
11    Q.   And the third page, do you recognize that document?
12    A.   Yes, I do.
13    Q.   And what is that?
14    A.   It's a copy of a check.
15    Q.   And who is the check from?
16    A.   It is from Industrial Demolition.
17    Q.   And who is the check to?
18    A.   Eric Moore.
19            MR. METZGER:  Your Honor, I move that Exhibit No. 19
09:26 20   be admitted into evidence.
21            MR. GOODWIN:  And the plaintiff objects as it
22    considers it a collateral source per the standing objections we
23    have been talking about.
24            THE COURT:  You say it's out of date with respect to
25    the events?
```

**JA405**

```
 1              MR. GOODWIN:  No.  Our contention is that the check

 2    amount and the payment is a collateral source and should not be

 3    introduced into evidence.

 4              THE COURT:  I'll admit it and then you can explain it.

 5              MR. METZGER:  Thank you, Your Honor.

 6              THE COURT:  Exhibit 19 offered by the defendant is in

 7    evidence.

 8              MR. METZGER:  Thank you, Your Honor.

 9              (Exhibit No. 19 received into evidence.)

09:27 10              MR. METZGER:  Let's go ahead and display the document,

11    Alex, please.

12              THE COURT:  Can we speed this up a little bit, please.

13              MR. METZGER:  Yes, Your Honor.  I apologize that I

14    forgot to identify these two documents, and then I'll be done.

15    Q.   Ms. Lydon, this document, the first page, what date did

16    you sign that document?

17    A.   October 22, 2020.

18    Q.   And on the second page, when was that check prepared?

19    A.   The pay date was October 22, 2020.

09:27 20    Q.   And why was that payment made to Mr. Moore?

21    A.   It was a settlement payment.

22              MR. METZGER:  We've also premarked Exhibit No. 17.

23              Counsel, just to avoid an issue, I can remove page 1

24    of that.  We're going to take that document, the first page

25    off.
```

```
 1          THE CLERK:  So they have no objection to the first
 2  page off?
 3          MR. METZGER:  They're still reserving the same
 4  objection.  I'm just simplifying it.
 5          THE CLERK:  So Exhibit 17 without the first page.
 6          MR. METZGER:  Correct.  Thank you.
 7  BY MR. METZGER:
 8  Q.  Just first for identification, let's go to the -- I
 9  believe you have the document in front of you.  It's labeled
10  Settlement Agreement.  Do you see that at the top?
11  A.  Yes, I do.
12  Q.  Do you recognize this document?
13  A.  Yes, I do.
14  Q.  Do you know whether Industrial Demolition entered into
15  this agreement?
16  A.  Yes, we did.
17  Q.  Do you know who you entered into the agreement with?
18  A.  Eric Moore.
19  Q.  On the --
20          MR. METZGER:  Your Honor, I move to admit Exhibit No.
21  17.
22          MR. GOODWIN:  And I repeat the same objection for the
23  previous exhibit.  This is an impermissible collateral source
24  and the plaintiff's position is it should not be admitted.
25          THE COURT:  You're saying you're objecting to this?
```

**JA407**

3-21

```
 1            MR. GOODWIN:  Yes.  I'm objecting to it again, Your
 2    Honor, as a collateral source, just as I did before.
 3            THE COURT:  I think it is appropriate to admit it
 4    since we've already been talked about it for some time in this
 5    trial.  So the jury is entitled to see it at the appropriate
 6    time.  So we will mark it as Exhibit 17.
 7            THE CLERK:  So it's in?
 8            THE COURT:  It's in.
 9            MR. METZGER:  Thank you, Your Honor.
09:30 10        (Exhibit No. 17 received into evidence.)
11    Q.  Ms. Lydon, on the first page -- I'm sorry, let me bring
12    that up.  I'm getting ahead of myself.  On the first page of
13    this Exhibit No. 17 --
14            THE COURT:  Is the jury going to be able to see it?
15            MR. METZGER:  Yes.  We have it up now, Your Honor.
16            THE COURT:  Okay.  Thanks.
17    Q.  -- towards the bottom, do you see the section under "Back
18    Pay"?
19    A.  Yes.
09:31 20   Q.  And do you see a back pay amount?
21    A.  Yes, I do.
22    Q.  What is that amount?
23    A.  The total due.
24    Q.  I'm sorry.  Just first under the back pay column.
25    A.  $60,639.
```

**JA408**

```
 1   Q.   And then is there another column for front pay?
 2   A.   Yes, there is.
 3   Q.   And what is that amount?
 4   A.   $23,750.
 5   Q.   And was there also an interest payment?
 6   A.   Yes, there was.
 7   Q.   What is that amount?
 8   A.   $1,166.
 9   Q.   And the total amount then that was calculated there is
10   what?
11   A.   $85,555.
12   Q.   And did Industrial Demolition then make those payments to
13   Mr. Moore?
14   A.   Yes, we did.
15   Q.   And is that what is reflected in Exhibit No. 19 that has
16   been admitted?
17   A.   Yes, it is.
18   Q.   Thank you.
19        MR. METZGER:  Your Honor, I have no further questions.
20        THE COURT:  Any redirect, I think?
21        MR. GOODWIN:  Cross-examination, Your Honor.
22        THE COURT:  Cross.  About how long will you be?
23        MR. GOODWIN:  I'm not sure, Your Honor, to be honest.
24   I don't think it will be too long.
25        THE COURT:  Hours or days?
```

**JA409**

3-23

```
      1            MR. GOODWIN:  I would expect about an hour.

      2            THE COURT:  I think actually we should stretch before

      3    we start.

      4            (Pause.)

      5            THE COURT:  You may proceed.

      6            MR. GOODWIN:  Thank you, Your Honor.

      7                         CROSS-EXAMINATION

      8    BY MR. GOODWIN:

      9    Q.  Ms. Lydon, first of all, it's nice to see you in person as

09:33 10    opposed to virtually and thank you for coming to Boston.

     11             First, just on the last exhibit we discussed, you

     12    paid that as a fine leveled by the government right?

     13            MR. METZGER:  Objection, Your Honor.

     14            THE COURT:  What's the objection?

     15            MR. METZGER:  First, it's a legal conclusion.  He's

     16    asking whether it was a fine.  It's labeled a settlement

     17    agreement.  So we have a legal conclusion and simply he's

     18    mischaracterizing what the document is.

     19            THE COURT:  Whether it was signed by what she knows

09:33 20    about it is certainly an appropriate question.

     21            MR. METZGER:  Thank you, Your Honor.

     22    Q.  Ms. Lydon, why did Industrial Demolition enter into that

     23    settlement agreement?

     24    A.  Because we were told to by the NLRB.

     25    Q.  And the NLRB is an agency of the federal government?
```

**JA410**

3-24

```
 1  A.   Yes, it is.
 2  Q.   Okay.  Thank you.  Does Industrial Demolition have a zero
 3  tolerance policy for discrimination?
 4  A.   Yes, we do.
 5  Q.   Any type of discrimination?
 6  A.   Any type of discrimination.
 7  Q.   Great.  Thank you.
 8       So one other point that we discussed a little earlier
 9  this morning.  And this is more of a clarification than
10  anything else.  I think you said that you didn't talk to Eric
11  about his reasonable accommodation and then you got the note
12  and then you did talk to him.  I was just a little confused
13  about that.
14       THE COURT:  So what's the question?
15       MR. GOODWIN:  I'm getting there, Your Honor.  I'm just
16  trying to clarify what the order of events was.
17  Q.   So first you had no conversation with Eric Moore, correct,
18  prior to the note being received?
19  A.   Correct.
20  Q.   And then you received the note, correct?
21  A.   Correct.
22  Q.   And then you had a conversation with Eric Moore about work
23  restrictions?
24  A.   Yes.
25  Q.   Okay.  And when was that conversation, do you recall?
```

**JA411**

3-25

```
 1   A.   The day I got the letter.

 2   Q.   The day --

 3   A.   Or the fax.

 4   Q.   So whatever day it was faxed to you was the day you had

 5   that conversation?

 6   A.   Correct.

 7   Q.   Great.  Thank you.  So going on -- strike that.

 8        On the topic of accommodations, when does Industrial

 9   Demolition give accommodations to employees?

09:35 10   A.   I'm sorry, I guess I don't understand.

11   Q.   Well, do you understand what an accommodation is?

12   A.   Yes, I do.

13   Q.   All right.  What is it?

14   A.   It's making, you know -- we're making sure that we can

15   accommodate, if there is an issue --

16   Q.   So if somebody --

17   A.   -- with anyone.

18   Q.   So if somebody has a limitation, and you guys can tolerate

19   it, then you'll accommodate them; is that fair?

09:35 20   A.   That's correct.

21   Q.   And do you have a policy on accommodations?

22   A.   Policy?  No.

23   Q.   All right.  Have you ever been trained on how to provide

24   reasonable accommodations?

25   A.   No.
```

**JA412**

3-26

1    Q.   Has anybody on the staff of Industrial Demolition been

2    trained on how to provide reasonable accommodations?

3            THE COURT:  Trained in what?

4            MR. GOODWIN:  How to provide reasonable

5    accommodations.

6    A.   No.

7    Q.   All right.  And you give accommodations to individuals

8    that have disabilities, correct?

9    A.   Yes, we do.

09:36 10   Q.   And you mentioned you had a zero tolerance policy for

11   discrimination.  That includes disability discrimination?

12   A.   Yes.

13   Q.   And, again, do you have a policy about disability

14   discrimination?

15   A.   Yes.

16   Q.   Okay.  Where is that policy?

17   A.   It's in their handbook.

18   Q.   Okay.  Do you provide training on disability

19   discrimination, or --

09:37 20           THE COURT:  Training to whom?

21           MR. GOODWIN:  Strike that.  Good point, Your Honor.

22   Q.   Does Industrial Demolition provide training to its

23   employees on how to treat people with disabilities to make sure

24   they don't discriminate against them?

25   A.   Yes.

**JA413**

3-27

```
    1   Q.   And who provides that training?

    2   A.   The supervisors on-site.

    3   Q.   Okay.  And have you received such training?

    4   A.   Yes, I have.

    5   Q.   When?

    6   A.   During my years of doing what I do.

    7   Q.   Okay.  When is the last time you received such training?

    8   A.   Maybe ten years ago.

    9   Q.   Okay.  And if somebody makes an allegation of disability
09:37 10   discrimination, or any type of discrimination, does Industrial

   11   Demolition investigate those allegations?

   12   A.   Yes, we do.

   13   Q.   How would you go about investigating them?

   14   A.   I would inquire to individuals on-site to find out what

   15   the story is or background is so that we would know how to

   16   proceed forward.

   17   Q.   Would you obtain written statements?

   18   A.   If we needed to, yes.

   19   Q.   When would you need to?
09:38 20   A.   It depends on the circumstance.

   21   Q.   Okay.  In what circumstances would you want to make sure

   22   that you obtained written statements?

   23   A.   Well, it all depends on the circumstance.  So if somebody

   24   is claiming that they're disabled but yet there really isn't

   25   showing -- you know, I would have to get statements from the
```

**JA414**

3-28

1    employees first, verbal.  And if I thought that it needed to
2    proceed further, then I would have them put it in written
3    statements.
4    Q.    Okay.  When is the last time you got written statements in
5    such an investigation?
6    A.    I never have.
7    Q.    Okay.  How long have you been with Industrial Demolition?
8    A.    As long as it's been a company.
9    Q.    And how long have you been with Commercial Development
09:39 10  Company?
11   A.    Almost 25 years.
12   Q.    So in the 25 years you've been with the Roberts family
13   companies, you've never gotten a statement about a
14   discrimination case?
15   A.    We never had one.
16   Q.    What about discipline?  So if you found out if a
17   supervisor, for example, were to have engaged in disability
18   discrimination, would you discipline them?
19   A.    I'm sorry.  I didn't hear that last part.
09:39 20  Q.    Would you discipline them?  If you found out the
21   supervisor had done something wrong and discriminated against
22   another employee or a subordinate, would you discipline them?
23   A.    Yes, we would.
24   Q.    Have you ever disciplined such an employee?
25   A.    No.

**JA415**

```
 1   Q.   What type of discipline would be appropriate?

 2            MR. METZGER:  Objection, Your Honor.

 3            THE COURT:  Sustained.

 4            MR. GOODWIN:  Your Honor, she testified that they have

 5   zero tolerance for discrimination.

 6            THE COURT:  I don't understand what that has to do

 7   with this plaintiff --

 8            MR. GOODWIN:  I'll move on.

 9            THE COURT:  -- given her prior answers.

09:40 10         MR. GOODWIN:  Okay.

11   Q.   Would the same be true for workers' compensation

12   discrimination?

13   A.   Yes.

14   Q.   Zero tolerance, correct?

15   A.   Yes.

16   Q.   What about folks who made safety complaints, was that zero

17   tolerance as well?

18   A.   I'm sorry.  You kind of went down.

19   Q.   I've got to work the room better.  I apologize.

09:41 20         So let's say you found out that somebody had treated

21   an employee differently because they made a safety complaint.

22   Would that be grounds for discipline?

23            MR. METZGER:  Objection, Your Honor.  Irrelevant.

24            MR. GOODWIN:  It's the rules and regulations.

25            THE COURT:  I'll allow it.  It's within the area.
```

**JA416**

```
  1              MR. METZGER:  Thank you, Your Honor.
  2    Q.   Lastly, let's say somebody --
  3              THE COURT:  I'm sorry.  What's the question?
  4              MR. GOODWIN:  I made a mistake.
  5    Q.   So the question was if somebody were to engage in --
  6    discriminate against an individual who had made a safety
  7    complaint, would you discipline them?
  8    A.   If the person made a safety complaint.
  9    Q.   And a supervisor disciplined them, would you take action
09:42 10    against that supervisor?
 11    A.   Yes.
 12    Q.   And what action would be appropriate?
 13    A.   Well, we would, first of all, discuss it, because we're
 14    miles away from each other normally.
 15    Q.   Okay.  Then what would you do?
 16    A.   If it were to continue, then they would be given a written
 17    notice.
 18    Q.   In any circumstance, regardless of what the supervisor
 19    did?
09:42 20    A.   Yes.
 21    Q.   So you'd give a written notice, you wouldn't terminate
 22    them or suspend them or take such other action?
 23    A.   Depending on what the infraction is, yes.
 24    Q.   Okay.  Again, do you train supervisors not to retaliate
 25    against employees of Industrial Demolition?
```

**JA417**

```
 1  A.   Train?  Yes, we have talks.

 2  Q.   Talks.  Any formal trainings?

 3  A.   No.

 4  Q.   So basically it gets addressed at shop talks?

 5  A.   Shop talks?

 6  Q.   It's a common parlance in the industrial setting.  But

 7  basically you have a safety meeting, you have a meeting with

 8  the foreperson and superintendent at the start of the day.

 9  That's when that would occur?

10  A.   Yes, for the most part, yes.

11  Q.   For the most part.

12       You testified yesterday that there's a lot of

13  turnover with Industrial Demolition employees, correct?

14  A.   Yes, there is.

15  Q.   Was Roger Oberkramer an employee of Industrial Demolition

16  since its inception?

17  A.   No.

18  Q.   When did he become an employee of Industrial Demolition?

19  A.   I really don't know for sure.

20       MR. GOODWIN:  If I may approach the witness.

21       THE COURT:  I'm sorry, what's the question?

22       MR. GOODWIN:  If I may I approach the witness.

23       THE COURT:  Yes.

24  Q.   I'm showing the witness a document marked Exhibit A.

25       THE CLERK:  Is this in?
```

09:43 appears at lines 10 and 20.

```
 1            MR. GOODWIN:  I do not believe it is in.
 2            THE CLERK:  Okay.
 3    Q.   Would you take a minute to review that, Ms. Lydon.
 4            This is a W-9 with Roger Oberkramer's name on it,
 5    correct?
 6    A.   Correct.
 7    Q.   The date next to his name is 11/2/17, does that seem
 8    correct?
 9    A.   11/2 or 11/12, I can't really tell.
09:44 10            THE COURT:  Is there any reason not to show it to the
11    jury?
12            MR. GOODWIN:  I'm just laying a foundation.
13            MR. METZGER:  There's no objection.
14            THE COURT:  Okay.  It can go on the screen.
15    Q.   So did Industrial Demolition exist in November of 2017?
16    A.   Yes, I do believe they did.
17    Q.   And would this W-9 filled out by Roger Oberkramer be the
18    start of his employment with Industrial Demolition?
19    A.   He was an independent contractor then.
09:45 20    Q.   Okay.  When did he become an employee?
21    A.   Not until a little bit later than that.
22    Q.   Okay.  And you said he was an independent contractor.
23    Does Mr. Oberkramer own his own business, do you know?
24    A.   I think at one point he did.
25    Q.   So how long after the date that this W-9 is signed did
```

**JA419**

```
 1    Mr. Oberkramer become an employee of Industrial Demolition?

 2    A.    Again, I don't remember the exact date.

 3    Q.    Okay.  Was it before 2019?

 4    A.    I think so, yes.

 5    Q.    Okay.  I'll take that back from you.  Thank you.

 6          When did Mr. Oberkramer stop working for Industrial

 7    Demolition?

 8    A.    March of '22.

 9    Q.    March of '22.

10          And why did he stop working for Industrial

11    Demolition?

12    A.    He was burnt out, wanted to come home, tired of traveling.

13    Q.    He wasn't terminated?

14    A.    No.

15    Q.    Do you know what he's doing now?

16          MR. METZGER:  Objection, your Honor.

17          THE COURT:  What's the question?

18          MR. GOODWIN:  Does she know what Mr. Oberkramer is

19    doing for work presently.

20          THE COURT:  You're asking her what he knew.

21          MR. GOODWIN:  No.  What she knows about his present

22    employment.

23          THE COURT:  What's the relevance?

24          MR. GOODWIN:  She just said he was previously an

25    independent contractor with them.  I'm seeing if he's presently
```

**JA420**

```
 1   an independent contractor with them.
 2           THE COURT:  At that time?
 3           MR. GOODWIN:  So, Your Honor, the testimony was --
 4           THE COURT:  I'm sorry.  I don't understand the point
 5   of your question.
 6           MR. GOODWIN:  It's understandable.
 7           So the question was, she gave testimony that at some
 8   point in November of 2017 or thereabouts, Roger Oberkramer was
 9   working with the Roberts family companies as an independent
10   contractor.  Then he became an employee.  Then in March he was
11   no longer employed there.  And now I'm asking if she knows the
12   status of her -- of his present employment and then I was going
13   to ask if they have a relationship -- that the Roberts family
14   companies has a relationship with him.
15           THE COURT:  What's the objection?
16           MR. METZGER:  Irrelevance, Your Honor.
17           THE COURT:  I assume it has some relevance to the
18   ultimate judgment.
19           MR. METZGER:  Well, Your Honor --
20           THE COURT:  Maybe.
21           MR. METZGER:  The testimony has already been that he's
22   not employed with Industrial Demolition and what Mr. Oberkramer
23   is doing now is irrelevant to the plaintiff's claim.
24           THE COURT:  Well, if the defendant isn't going to get
25   into it, then the plaintiff won't either.
```

**JA421**

```
 1          MR. METZGER:  Right.  We're not getting into it.
 2   We've not opened the doors as to what Mr. Oberkramer is doing
 3   post employment.
 4          THE COURT:  Well, if they're not going to use his
 5   current pay or income, then there is no reason --
 6          MR. GOODWIN:  It's not their use, Your Honor.
 7   Mr. Oberkramer was their agent for years.  And while we came up
 8   in advance of trial, he was suddenly not available to the
 9   plaintiff in deposition, and we were informed of that in
10   November.  So it is very relevant.
11          THE COURT:  I don't think we'll get into that.
12          MR. METZGER:  Thank you, Your Honor.
13          THE COURT:  It was excluded for a reason at the time.
14          MR. GOODWIN:  It was not excluded, Your Honor.  It's
15   never been excluded.
16          THE COURT:  I'm sorry?
17          MR. GOODWIN:  It has never been excluded.  This is the
18   first time this topic has come up.
19          MR. METZGER:  Your Honor, Mr. Oberkramer, the
20   testimony has already been that he's not an employee.
21          THE COURT:  The objection is sustained and we will go
22   on with something else.
23          MR. METZGER:  Thank you, Your Honor.
24   BY MR. GOODWIN:
25   Q.   How much money did Roger Oberkramer make when he worked at
```

**JA422**

```
 1   Industrial Demolition?

 2          MR. METZGER:  Objection, Your Honor.  Irrelevant.

 3          THE COURT:  We're going a bit beyond the direct.

 4          MR. GOODWIN:  I'm not on direct, Your Honor.  It's

 5   cross-examination.

 6          THE COURT:  I mean cross.  Cross based not on direct

 7   but on whatever you want to get into, which is -- I just don't

 8   understand the relevance.

 9          MR. GOODWIN:  Your Honor, first of all, it's relevant

10   just because he was an employee working there, and is somewhat

11   related to this proceeding.

12          It's germane and important to the proceeding because

13   the economic relationship of Roger Oberkramer, the person we're

14   alleging terminated Mr. Moore, and how it has moved forward

15   since he's apparently been terminated and what it was before

16   and after is probative.  And it's a very straightforward

17   question.

18          THE COURT:  What's the question?

19          MR. GOODWIN:  I just asked what did Mr. Oberkramer

20   make in salary while he worked at Industrial Demolition.  We're

21   talking about it longer than it would have been answered.

22          MR. METZGER:  Your Honor, but it's entirely

23   irrelevant.

24          THE COURT:  I'll allow this question but we're not

25   going to go into it in a big way.
```

**JA423**

```
 1              MR. METZGER:  Okay.  Thank you, Your Honor.
 2              MR. GOODWIN:  Okay.
 3    BY MR. GOODWIN:
 4    Q.   Do you know what he made, Ms. Lydon?
 5    A.   I don't know what the total amount was.
 6    Q.   Okay.  Did you get along with Mr. Oberkramer?
 7    A.   Yes.
 8    Q.   Did you consider him a safe employee?
 9    A.   I had no reason not to.
10    Q.   So that's a yes?
11    A.   Yes.
12    Q.   Had anybody ever reported --
13              Outside of the circumstances of this case, had anyone
14    ever reported to you that Mr. Oberkramer said something
15    inappropriate?
16    A.   No.
17    Q.   Did you think he was an effective employee?
18    A.   Effective?
19    Q.   Effective, yes.
20    A.   Yes.
21    Q.   Because he got the job done, correct?
22    A.   Yes.
23    Q.   Had anybody ever reported to you that Mr. Oberkramer made
24    any threats?
25    A.   No.
```

**JA424**

3-38

```
 1    Q.   Has anybody ever reported to you that Mr. Oberkramer was

 2    abusive?

 3    A.   I'm sorry?

 4    Q.   Had anybody ever told you that Roger Oberkramer is an

 5    abusive supervisor?

 6    A.   No.

 7         MR. GOODWIN:  I'm going to approach the witness if

 8    it's acceptable to Her Honor.

 9         THE COURT:  I'm not sure whether we're on the record

09:52 10   at the moment.  Is what you just said for the record?

11         MR. GOODWIN:  I was just approaching, Your Honor.

12         I'm showing the witness a document marked for

13    identification as Plaintiff's Exhibit C.

14    Q.   Ms. Lydon, is your email address blydon@cdcco.com?

15    A.   Yes, it is.

16    Q.   I would direct your attention to midway through the second

17    paragraph.  Take a moment to read that.

18         MR. METZGER:  Just for clarification, are we still on

19    identification of the document?  Because we do have an

09:53 20   objection.

21         MR. GOODWIN:  I'm refreshing her recollection.

22         MR. METZGER:  We do have an objection to the document.

23         MR. GOODWIN:  I've not moved to enter the document, so

24    I'm not sure what the objection is.

25         THE COURT:  Are you offering this document into
```

**JA425**

```
 1   evidence?

 2          MR. GOODWIN:  I'm directing her attention to the

 3   midpoint of it to refresh her recollection, and I will ask her

 4   presently if it refreshes her recollection.

 5          THE COURT:  I didn't know her recollection had been

 6   exhausted.

 7          MR. GOODWIN:  Okay.  I'll do it differently.  I'll do

 8   foundation then, Your Honor.

 9   BY MR. GOODWIN:

09:53 10   Q.   Ms. Lydon, did you in the second paragraph down, did you

11   draft an email to Russ Becker dated November 25, 2019 at

12   7:50 a.m.?

13   A.   On the second paragraph?

14   Q.   Yeah, the second paragraph.  Oh, that was -- strike that.

15   I reversed it.

16          So did you receive the second email from Mr. Becker?

17   A.   I would assume that I did, yes.

18   Q.   Okay.

19          MR. GOODWIN:  I'd ask that the exhibit be moved into

09:54 20   evidence.

21          MR. METZGER:  We object, Your Honor.  This is entirely

22   irrelevant.  It does not refer to the plaintiff whatsoever.

23   The plaintiff is not a part of these emails and the plaintiff

24   is not even referenced in the emails.

25          THE COURT:  You want him to offer the entire thing?
```

**JA426**

3-40

```
 1        MR. METZGER:  No.  There's nothing in here of the
 2   two-page document --
 3        THE COURT:  I think he's entitled to have some leeway
 4   on the questions of the person who made the ultimate decision
 5   to find out what she knew and didn't know.  That's realistic
 6   and appropriate.
 7        MR. METZGER:  Okay.  Thank you.
 8        THE COURT:  And the jury will have to decide whether
 9   the basis of this witness's decision to relieve Mr. -- the
10   plaintiff from his job and ultimately whether that was
11   appropriate.
12        MR. GOODWIN:  I'll provide copies to the jury.
13   BY MR. GOODWIN:
14   Q.   So in the second paragraph, do you see the sentence that
15   says, "Roger needs to back off with his threats"?
16   A.   Yes.
17   Q.   Do you recall what threats those are in reference to?
18   A.   No, I don't.
19   Q.   Okay.  Did you think that those were any workplace safety
20   threats?
21        MR. METZGER:  Objection.
22        THE COURT:  This is a notice to him by somebody else?
23        MR. GOODWIN:  She received an email saying, "Roger" --
24        THE COURT:  The question is -- somebody sent her this
25   notice.
```

**JA427**

3-41

```
 1              MR. GOODWIN:  Yup.

 2              THE COURT:  And what's the question now?  She said she

 3    read it, I think.

 4              MR. GOODWIN:  She testified that she hadn't received

 5    complaints about abuse or threats.

 6              THE COURT:  Had not received?

 7              MR. GOODWIN:  Had not previously received any

 8    allegations of threats about Mr. Oberkramer.

 9              THE COURT:  Okay.  So you're reminding her or not.  I

09:55 10   don't know.

11              MR. GOODWIN:  Yeah, and that's the question.

12    Q.   Do you recall what this is about, Ms. Lydon?

13    A.   What it was about?

14    Q.   Mm-hmm.

15    A.   No.

16              MR. GOODWIN:  I'm approaching the witness with an

17    exhibit marked K for identification.

18              THE COURT:  What's the question?

19    Q.   Ms. Lydon, do you recall sending this email?

09:57 20   A.   Do I remember it?  No.

21    Q.   Okay.  But blydon@cdcco.com is your email, correct?

22    A.   That is correct.

23    Q.   And that is your signature line below?

24    A.   Yes, it is.

25    Q.   Okay.  And who's this email to?
```

**JA428**

```
 1    A.   Mike Roberts.

 2    Q.   And who's Mike Roberts?

 3    A.   Who is he?  He's the owner.

 4    Q.   Okay.  So he's your boss, right?

 5    A.   Yes.

 6    Q.   Okay.

 7         MR. GOODWIN:  I'd ask that this be moved into

 8    evidence.

 9         MR. METZGER:  We object, Your Honor.  The date on this

10    document is April 23, 2020, which is at least four months past

11    any active work at Industrial Demolition by the plaintiff and

12    it does not reference in any way the plaintiff.  We're post

13    employment and it's irrelevant as to the plaintiff.

14         MR. GOODWIN:  Your Honor --

15         THE COURT:  Why is that not correct?

16         MR. GOODWIN:  Because it's for impeachment.  The

17    witness testified --

18         THE COURT:  I'm sorry?

19         MR. GOODWIN:  It's for impeachment, Your Honor.  The

20    witness testified she never received complaints about Roger

21    Oberkramer.  This email is ripe with complaints about Roger

22    Oberkramer.

23         THE COURT:  But this is long after the event.

24         MR. GOODWIN:  Your Honor, it goes to the credibility

25    of the witness.  She said that she never received complaints
```

**JA429**

3-43

```
 1    about Mr. Oberkramer, had no issues with him, and then this

 2    email demonstrates that testimony is all not true.

 3              THE COURT:  Well, I don't know about that.

 4              You can ask her again about what she received and when

 5    concerning this particular issue.

 6              MR. GOODWIN:  Your Honor, I would ask that it be moved

 7    in because I would like to review this email step by step with

 8    this witness.  It's plainly a business record for impeachment.

 9              THE COURT:  But this document is dated -- having been

09:59 10    sent in April of 2020.

11              MR. GOODWIN:  Your Honor, if the witness did not tell

12    the truth at any point around this proceeding -- I mean --

13              THE COURT:  You may use it for impeachment purposes

14    but not to prove the event.

15              MR. GOODWIN:  Correct.  That is all I'm using it for.

16              THE COURT:  So go ahead and do it that way.

17              MR. GOODWIN:  Okay.

18              MR. METZGER:  Thank you, Your Honor.

19              MR. GOODWIN:  I can provide it to the jury.

09:59 20              THE COURT:  No, no.  It doesn't go to the jury yet.

21              MR. METZGER:  The document's not been admitted.

22              MR. GOODWIN:  Oh, I thought it was admitted.  I

23    apologize.

24    Q.   So please take a minute --

25              THE COURT:  Excuse me, one minute.
```

**JA430**

```
 1            Members of the jury, evidence sometimes gets very
 2    complicated, as you can see.  A document may be offered for the
 3    purpose of what is in the document and for you to use what is
 4    in the document to decide what actually happened.  This is a
 5    different kind of document.  It is designed to assist the
 6    witness in remembering something that she may not remember.  I
 7    mean, we're talking about some time ago.  And for that purpose,
 8    it is admissible for her to see.  It may not be admissible for
 9    the purposes of your reviewing it.  But you know that it's
10    here.  You know that it has something to do with this witness.
11            So let us proceed along those lines.
12    BY MR. GOODWIN:
13    Q.   All right.  Ms. Lydon, have you read this email, had a
14    moment to read this email?
15    A.   I glanced through it, yes.
16    Q.   Can you please read the first sentence.
17    A.   "I received a call at 5:00 a.m. from Roger telling me he
18    had words with Billy Minton."
19    Q.   And it goes on?
20    A.   I'm sorry?
21    Q.   Can you continue?
22            MR. METZGER:  Your Honor, if he's using it solely as
23    impeachment for him to then --
24            MR. GOODWIN:  The first sentence is what I'm --
25            THE COURT:  I'm sorry?
```

**JA431**

```
 1          MR. GOODWIN:  I said the first sentence is what I'm
 2   discussing with her.  That's it.  I'm not going to have her
 3   read the next document, but --
 4          THE COURT:  What is the precise question you want this
 5   witness to answer now?
 6          MR. GOODWIN:  What she understood by the words "he had
 7   words with Billy Minton."  What did you understand that to
 8   mean?
 9          THE COURT:  I'm sorry.  From this document?
10:01 10    MR. GOODWIN:  Yeah.
11          THE COURT:  Where in the document is the language you
12   referred to?
13          MR. GOODWIN:  That's why I had her read it, Your
14   Honor.  So it goes, if you look at it, "I received a call at
15   4:00 a.m. from Roger telling me he had words with Billy
16   Minton."  So it's midway through the first sentence.
17          THE COURT:  Well, it's a bit beyond the direct
18   examination, but -- you're doing the redirect.
19          MR. GOODWIN:  I'm doing cross, Your Honor.
10:01 20    THE COURT:  I'll allow it.  She may answer.
21   Q.   So he had words with Billy Minton.  What did that mean,
22   Ms. Lydon?
23   A.   That they probably had a conversation between the two of
24   them about something.
25   Q.   "He had words" means a conversation to you, Ms. Lydon?
```

```
 1    A.    Well, it depends on what type of words.  I didn't know

 2    what they were discussing.

 3    Q.    Okay.  I'd ask you to look at the third sentence that

 4    starts with "Roger threatened."

 5              THE COURT:  Which sentence?

 6              MR. GOODWIN:  So if you go down one, two, three lines

 7    under the word "Mike," it says, "Roger threatened Billy and

 8    Heather's lives, which I totally believe considering" --

 9              THE COURT:  Don't read the whole thing.

10    MR. GOODWIN:  Well -- okay.

11              THE COURT:  So it's the beginning of the third line of

12    the --

13              MR. GOODWIN:  Yeah.

14              THE COURT:  And what's the question?

15              MR. GOODWIN:  I'm just waiting for her to read it,

16    Your Honor, and then I will --

17              THE COURT:  This document is in evidence, right?

18              MR. METZGER:  It is not.

19              THE COURT:  It is not.

20    MR. METZGER:  It's just being used for impeachment.

21              THE COURT:  Then how can the contents of it come in?

22    You can certainly ask her about it.  But to read it requires it

23    to be in evidence.

24              MR. GOODWIN:  Your Honor, you requested me to point

25    out which line it was.  I directed it and then explained what
```

**JA433**

3-47

```
    1    the sentence was.

    2            THE COURT:  You may ask her about what she said but

    3    not to read a document that is not in evidence at this stage.

    4            MR. GOODWIN:  I understand, Your Honor.

    5            THE COURT:  It may be appropriately in evidence, but I

    6    don't know.

    7            MR. GOODWIN:  Okay, Your Honor.  I will just discuss

    8    it.

    9    Q.  So does this email say that Roger Oberkramer threatened

10:03 10    Billy and Heather Minton's lives?

   11    A.  Yes, it does.

   12    Q.  And that's directly contrary to testimony you just gave

   13    earlier this morning, isn't it?

   14    A.  Well, yes and no.

   15    Q.  How yes and no?  I mean, you said that you never had

   16    received a threat about -- strike that.

   17            You never received a report from anybody at

   18    Industrial Demolition about a threat from Mr. Oberkramer.

   19    Wasn't that your testimony?

10:03 20    A.  Yes, it was.

   21    Q.  Okay.  So how is that a yes and no?

   22    A.  Because I didn't receive it before that day.

   23    Q.  You wrote this email.  It's not received.  You wrote this

   24    email, correct?

   25    A.  Yes, I did.
```

**JA434**

3-48

```
 1    Q.   So this email reports a threat by Roger Oberkramer, you
 2    are reporting a threat to Mike Roberts by Roger Oberkramer to
 3    Heather and Bill Minton, correct?
 4    A.   Yes.
 5    Q.   And that is not consistent with your testimony earlier
 6    today, is it?
 7    A.   I'm sorry.  I didn't remember receiving any other phone
 8    calls.
 9    Q.   That's a yes or no question.  Was it consistent with your
10:04 10    testimony or not?
11    A.   Okay, yes.
12         MR. GOODWIN:  Okay.  I'd ask this be admitted into
13    evidence, Your Honor.
14         THE COURT:  No.
15         MR. METZGER:  Thank you, Your Honor.
16         MR. GOODWIN:  I'd like to approach, Your Honor, at
17    sidebar.
18         THE COURT:  Go ahead.  Approach me?
19         MR. GOODWIN:  Yes.
10:04 20         THE COURT:  For what purposes?
21         MR. GOODWIN:  I prefer not to discuss within the
22    hearing of the jury, Your Honor.
23         THE COURT:  You want to have an argument now?
24         MR. GOODWIN:  Yes, Your Honor.
25         THE COURT:  About this?
```

**JA435**

3-49

```
 1            MR. GOODWIN:  About this piece of evidence, yes, Your
 2    Honor.
 3            THE COURT:  The ruling I just made?
 4            MR. GOODWIN:  Correct, Your Honor.
 5            THE COURT:  No.
 6            MR. METZGER:  Thank you, Your Honor.
 7            THE COURT:  But the record will reflect that you
 8    offered.
 9    Q.  Did Russell Becker ever text you about any threats by
10:05 10    Roger Oberkramer against any other employees?
11            MR. METZGER:  Objection, Your Honor.  Irrelevant.
12            MR. GOODWIN:  How is that irrelevant?
13            THE COURT:  She may answer.  If you know.
14    A.  I don't know.  I don't remember.
15            MR. GOODWIN:  Then I would like to refresh her memory,
16    Your Honor.
17            THE COURT:  Well, we'll have a question and then I can
18    decide it.
19            MR. GOODWIN:  Your Honor, it's the same exhibit where
10:06 20    it tells -- I have to utilize the same exhibit that has not
21    been allowed into evidence for impeachment of the witness.
22            THE COURT:  Well, does she have it?
23            MR. GOODWIN:  She should still have a copy.
24            THE COURT:  So what's the question?
25    Q.  The question is I will direct your attention, Ms. Lydon,
```

**JA436**

3-50

```
 1    to the second sentence.  Please take a moment to read it.
 2              THE COURT:  What line are we looking at?
 3              MR. GOODWIN:  The second sentence, Your Honor.
 4    Q.  Have you had a moment to review it?
 5    A.  The same document?
 6    Q.  Yes.  Second sentence, please.
 7    A.  Okay.
 8    Q.  Does that refresh your recollection?
 9    A.  About Russ Becker?
10:07 10    Q.  Texting you.
11    A.  No.
12    Q.  I direct -- so if you look at the end of the second line
13    from the right where Russ's name is, do you see that?
14    A.  Yes, I do.
15    Q.  And then it says -- I'd like to read the one, two, three,
16    four, five, six words before it.
17              MR. METZGER:  Your Honor, asked and answered.  The
18    witness read the line that he referred her to.  Her answer was
19    it does not refresh her recollection.
10:07 20              THE COURT:  Which line of this do you want her to
21    read?  It's not in evidence, right?
22              MR. METZGER:  Correct, Your Honor.
23              MR. GOODWIN:  It is not in evidence.
24              THE COURT:  So how can we get the piece of it in?
25              MR. GOODWIN:  I'm not trying to get a piece of it in.
```

**JA437**

3-51

1    She says she didn't recall, Your Honor, and I'm using this to
2    refresh her recollection about whether or not she ever received
3    a text message.
4        THE COURT:  Well, you can ask her that.
5        MR. GOODWIN:  Your Honor, then I have to start talking
6    about this specific document that you told me a moment ago not
7    to talk about.
8        THE COURT:  Which part do you want her to read now?
9    And presumably read aloud so the jury hears it, correct?
10:08 10       MR. GOODWIN:  So I need to understand the rules here,
11    Your Honor.  So either I can read parts of this document out
12    loud so the jury can hear it, or I cannot.  If you want me to
13    read a sentence out loud, I will, but then -- but that's
14    counter to the ruling you just made a few minutes ago.  So what
15    would you like me to do?
16        THE COURT:  What is the purpose of this entire
17    exhibit?
18        MR. GOODWIN:  The purpose of this entire exhibit is to
19    demonstrate that Ms. Lydon's testimony this morning has not
10:09 20    been truthful and this email is directly contrary to it and it
21    undermines her credibility.  That's the purpose of it.  That's
22    what it's being offered for and it's a business record.
23        MR. METZGER:  Your Honor, he had already asked the
24    witness to refer to the one line.  The witness read it.
25        THE COURT:  I mean, if you want to show that this

```
 1    witness is not being truthful here, and you offered this
 2    document, which I think was admitted into evidence --
 3              Not yet.
 4              MR. METZGER:  No.
 5              THE COURT:  But if it comes into evidence, then what
 6    else do we need from her?
 7              MR. GOODWIN:  I tried to get it into evidence, Your
 8    Honor.
 9              THE COURT:  You were planning to?
10:09 10          MR. GOODWIN:  Yes.  Pursuant to Rule 804, it's
11    evidence of impeachment and it's a business --
12              THE COURT:  For what purposes are you offering it into
13    evidence?
14              MR. GOODWIN:  Impeachment, Your Honor.
15              THE COURT:  I don't think documents for impeachment
16    come into evidence.
17              MR. GOODWIN:  Yes, they do, Your Honor.
18              THE COURT:  They're used by counsel and the jury to --
19    with respect to specific pieces.
10:10 20          MR. GOODWIN:  Well, then I would go through the
21    relevant portions with her.
22              THE COURT:  Well, let me have a question.  I don't
23    know what the question is at the moment that I'm supposed to
24    rule on.
25              MR. GOODWIN:  All right.
```

**JA439**

3-53

```
    1    Q.   Did Russ Becker ever text you about Roger Oberkramer ever

    2    making threats to anybody?

    3    A.   I don't remember.

    4    Q.   Okay.  Have you ever talked anybody out of calling the

    5    cops on Roger Oberkramer?

    6              MR. METZGER:  Objection, your Honor.

    7              THE COURT:  No.  She may answer that.

    8              MR. METZGER:  Okay.

    9    Q.   Ms. Lydon, have you ever --

10:10 10              THE COURT:  Wait a minute.  She's thinking.

   11              MR. GOODWIN:  I thought she was waiting for me, Your

   12    Honor.  I wasn't --

   13              THE COURT:  Did you understand the question?

   14              THE WITNESS:  I think so, yeah.

   15    Q.   So --

   16              THE COURT:  Do you have an answer to the question?  Or

   17    is it you don't have an answer?

   18              THE WITNESS:  I don't recall.

   19    Q.   You don't.

10:11 20              In April of 2020 was Roger Oberkramer reassigned to a

   21    different site?

   22    A.   No.

   23    Q.   He wasn't?

   24    A.   No.

   25    Q.   Did you ever tell Mike Roberts that employees were tired
```

**JA440**

```
 1   of being afraid of Roger Oberkramer?
 2   A.   I don't remember that.
 3   Q.   So I refer you again to the document in front of you.
 4   This time it is the fifth sentence that starts with "if he."
 5          THE COURT:  What's the question?
 6          MR. GOODWIN:  I'm just waiting for her to --
 7   Q.   Have you been able to review the document?
 8   A.   Yes, I glanced at it.
 9   Q.   Okay.  Does that refresh your recollection about whether
10   or not you ever told Mike Roberts that you were tired of being
11   afraid, or somebody was tired of being afraid?  Excuse me.
12   A.   Yes.
13   Q.   Okay.  And how did it refresh your recollection?
14   A.   Just by seeing it in this email.
15   Q.   Okay.  And so that had in fact occurred, that you told
16   Mr. Roberts that employees at Brayton Point were tired of being
17   afraid of Mr. Oberkramer?
18   A.   I can only assume so, yes.
19   Q.   Did you ever tell Mr. Roberts that Mr. Oberkramer was
20   waiting for him to beg him to stay again?
21   A.   I don't recall that.
22   Q.   Okay.  Then I would again redirect your attention to the
23   email in front of you.  And again we're looking at what -- the
24   sixth sentence after the portion you just reviewed.  Can you
25   read that sentence?
```

10:12 (line 10)
10:13 (line 20)

**JA441**

```
 1    A.   I'm sorry.  I don't see it.
 2             MR. GOODWIN:  May I approach the witness?
 3             THE COURT:  Yes.  How much more do you have with the
 4    witness, in time?
 5             MR. GOODWIN:  I'm not sure, Your Honor.  It depends on
 6    the answers I receive.
 7             THE COURT:  And what precisely is the question right
 8    now?
 9             MR. GOODWIN:  The question is whether or not Ms. Lydon
10:14 10   had ever told Mr. Roberts that Roger Oberkramer was begging
11    him -- waiting for him to beg him to stay again, meaning
12    Mr. Oberkramer.
13    Q.   Have you had time to review that document?
14    A.   I did.
15    Q.   All right.  Does it refresh your recollection?
16    A.   By the email, yes.
17    Q.   Okay.  So at one point you had said to Mr. Roberts that
18    Roger Oberkramer was waiting for Mr. Roberts to beg him to stay
19    again, correct?
10:15 20   A.   That's what it says, yes.
21    Q.   And that -- so that would have been what occurred?  Strike
22    that.
23             You said that, correct, to him in this email?
24    A.   Yes.
25    Q.   Okay.  What did you mean by "beg him to stay again"?
```

**JA442**

```
 1          MR. METZGER:  Objection, Your Honor.  It's irrelevant.
 2     It's continuing to be irrelevant.  It's still an email that
 3     we're talking about from April of 2020.
 4          THE COURT:  I'm getting very confused as to whether
 5     we're offering -- whether you're offering evidence as to what
 6     occurred or whether you are testing this witness's credibility.
 7     I'm not following, frankly.
 8          MR. GOODWIN:  I'm testing this witness's credibility.
 9          MR. METZGER:  Your Honor, she has not previously
10:16 10    testified --
11          THE COURT:  It's not clear to me in what respect her
12     credibility is an issue.
13          Members of the jury, you will ultimately have to make
14     a determination when you decide your verdict as to what you
15     believe of what any witness told you, because if you feel that
16     a witness wasn't telling the truth, then obviously you can't
17     base your verdict on that portion of that witness's testimony
18     that you didn't believe.  So it's a difficult issue.  But at
19     the moment, and counsel is entitled to test the believability
10:16 20    of a witness, but we're getting too far afield right now and
21     it's becoming too confusing.  So I think we need to focus.
22          MR. GOODWIN:  Okay.
23          THE COURT:  And just move it along.
24          MR. GOODWIN:  All right.  I will move it along, Your
25     Honor.
```

**JA443**

```
 1              THE COURT:  Before you do that, we need to stretch.
 2              (Pause.)
 3              THE COURT:  Are we ready to proceed?
 4              MR. GOODWIN:  Yes, Your Honor.
 5              THE COURT:  All right.  You may continue.
 6              MR. GOODWIN:  One moment, please.  Thank you, Your
 7      Honor, for that indulgence.
 8      Q.   You testified earlier, Ms. Lydon, that you never received
 9      any complaints about --
10:18 10              THE COURT:  I'm sorry, could you keep your voice up,
11      especially when you speak away from the microphone.
12              MR. GOODWIN:  Certainly, Your Honor.
13      Q.   Ms. Lydon, you testified earlier you have never received
14      any complaints from any staff at any of the Roberts family
15      companies regarding Mr. Oberkramer abusing people?
16      A.   To my knowledge, yes.
17      Q.   To your knowledge.  So had you received a complaint before
18      or had you not?
19      A.   Not that I can recall.
10:18 20      Q.   Okay.  Not that you can recall.
21              So did you ever tell Mr. Roberts that Mr. Oberkramer
22      was staying around to get last dibs on certain people and
23      people that did nothing to him?
24              MR. METZGER:  Your Honor --
25              THE COURT:  She can answer that.
```

**JA444**

3-58

         1            MR. METZGER:  Well, I just don't -- I apologize, Your

         2    Honor.  I just don't understand the relevance.

         3            MR. GOODWIN:  It's a retaliation case.

         4            THE COURT:  I mean, cross-examination has rather loose

         5    limits to relevance.

         6            MR. METZGER:  I understand, Your Honor.  Thank you.

         7            THE COURT:  Cross-examination, members of the jury, is

         8    not simply to give evidence of what the facts are, according to

         9    the party that is doing it, but it is to test the evidence that

10:19   10    was offered through the witness's direct examination.  And

        11    they're entitled to do that.

        12    A.   Could you repeat that?

        13    Q.   Yes, Ms. Lydon, I certainly can.

        14            So just prior to -- just to moor us.  You testified

        15    that you did not recall ever receiving a complaint from anybody

        16    saying that Roger Oberkramer retaliated against them, correct?

        17    A.   Correct.

        18    Q.   And then I asked, did you ever report to Mr. Roberts

        19    that he was -- that Roger Oberkramer was just staying around to

10:20   20    get last dibs on certain people, people that did nothing to

        21    him?

        22    A.   I don't recall saying that.

        23    Q.   Okay.  So how often do you receive threats of violence?

        24            THE COURT:  How often do you what?

        25    Q.   How often in the course of your work life do people call

**JA445**

1  and say somebody is threatening somebody, somebody is -- I'm

2  concerned someone's violent.  Does that happen every day?

3          MR. METZGER:  Objection.

4          THE COURT:  The objection is sustained.

5          MR. GOODWIN:  Withdrawn, Your Honor.

6          So I would ask the witness to look at the exhibit to

7  refresh her recollection.  And if I may just approach her to

8  point it out, Your Honor.

9          MR. METZGER:  Your Honor, in terms of impeachment, the

10:21 10  question was objected to and sustained.  There's no question to

11  refresh her recollection.

12          THE COURT:  I don't know what the question is right

13  now.

14          MR. GOODWIN:  She answered that she did not recall the

15  particular statement about last dibs in retaliation for.

16          THE COURT:  So what's the question?

17          MR. GOODWIN:  I'm asking her to refresh her

18  recollection about that comment with the exhibit in front of

19  her.

10:21 20          THE COURT:  You may do that, refer her to whatever may

21  refresh -- but not needing a question.  You just need to point

22  out to her whether it helps her remember.

23          MR. GOODWIN:  I wasn't asking a question, Your Honor.

24  That was Mr. Metzger's point.

25          THE COURT:  And you may see whatever he's showing her,

```
 1    if you want to.

 2              MR. METZGER:  I have a copy, Your Honor.  Thank you.

 3              THE COURT:  Okay.

 4    Q.   Can you just let me know when you've read that portion,

 5    ma'am.

 6    A.   Okay.

 7    Q.   Does that refresh your recollection about whether or not

 8    you'd ever made such comments to Mr. Roberts?

 9    A.   Ever made?  Or --

10    Q.   Made such comments to Mr. Roberts.

11    A.   Yes.

12    Q.   So you did tell Mr. Roberts that?

13    A.   Yes, in this email.

14    Q.   Okay.

15              MR. GOODWIN:  If I may approach the witness and show

16    her Defense Exhibit 4.

17              MR. METZGER:  This exhibit is already in, Your Honor.

18              THE COURT:  I'm sorry?

19              MR. METZGER:  This exhibit is already in evidence,

20    Your Honor.

21              THE COURT:  He can show it to her.

22              Is this document in evidence?

23              MR. GOODWIN:  It is, Your Honor.

24              THE COURT:  Are you going to ask questions about it?

25              MR. GOODWIN:  Yes, Your Honor.
```

**JA447**

```
         1          THE COURT:  Is there any reason why the jury can't see
         2     it on the screen?
         3          MR. GOODWIN:  Because we're not set up to put it on
         4     the screen, Your Honor.
         5          MR. METZGER:  We can give them a copy of it.  We do
         6     have those documents in our system.  So we'll go ahead and load
         7     that.
         8          THE CLERK:  Thank you.  That would be great.
         9          THE COURT:  What did you show to the jury?
10:24   10          MR. GOODWIN:  Just Exhibit 4, Your Honor.
        11          THE COURT:  Well, it's difficult to wander around.
        12     Are you able to put it on the screen?
        13          MR. METZGER:  We are bringing that up, yes.  Alex will
        14     bring it up.
        15          THE CLERK:  Thank you.
        16          THE COURT:  While you're looking at that, let me
        17     welcome the students in the back of the courtroom.  I'm
        18     delighted that you're here to learn something about the law and
        19     how courts operate.
10:25   20          This is a case in which the plaintiff complained that
        21     he was improperly terminated from his employment.  We've had
        22     several days of trial already.  This witness worked for the
        23     company in a relatively high position and knew about and
        24     participated in the determination for him to depart was made.
        25     So now it's counsel for the plaintiff, who had initially called
```

**JA448**

```
 1   her, I think.
 2           MR. GOODWIN:  No, Your Honor.  It's cross-examination.
 3           THE COURT:  Defense counsel, yeah.  Now he's cross-
 4   examining her testimony in order to point out that maybe she
 5   didn't know it all or she didn't tell the truth or whatever
 6   he's going to ultimately argue.  So that's what he's trying to
 7   do using, among other things, documents that were generated at
 8   the time that these events took place at the company.
 9           STUDENTS:  Thank you.
10:26 10         THE COURT:  If counsel wish to briefly elaborate on
11   what I've said or correct what I've said, you may do so.
12           MR. METZGER:  Thank you.
13           MR. GOODWIN:  I'm cross-examining the witness for the
14   company, and here we go.
15   BY MR. GOODWIN:
16   Q.   Ms. Lydon, you have what is in evidence, I think what is
17   Exhibit 4 for the defendant, correct?
18   A.   Correct.
19   Q.   And I direct your attention to the second page.
10:26 20         THE COURT:  Do you have all these documents?
21           THE WITNESS:  Yes.
22           MR. GOODWIN:  Okay.
23   Q.   So you testified about this earlier and receiving it and
24   then engaging in a conversation with Eric Moore, correct?
25   A.   Yes.
```

**JA449**

3-63

```
 1    Q.   So as a consequence of receiving this note and that
 2    conversation with Mr. Moore, you temporarily transferred Eric
 3    to a less strenuous position, right?
 4    A.   Yes.
 5    Q.   And Mr. Oberkramer was obligated to comply with that
 6    accommodation, correct?
 7    A.   Yes.
 8    Q.   And the employees at Brayton Point, if they didn't work
 9    one day, they didn't get paid, correct?
10:27 10   A.   That is correct.
11    Q.   They didn't have vacation time, sick time, other paid time
12    off, anything like that?
13    A.   They had paid time off -- they had paid sick time but it
14    had to be recorded.
15    Q.   So how do you -- what do you mean by that?
16    A.   They would have to request it.  It would have to be
17    written on the timesheet in order for me to know to pay that.
18    Q.   So if I got sick Monday morning, for example, I couldn't
19    get sick leave for that day because I didn't record it the
10:28 20   previous week?
21    A.   You could get it, even if it wasn't recorded that week.
22    They would still be able to get paid for it as long as it was
23    on the timesheet when they turned it in.
24    Q.   Okay.  Where were those leave totals kept where you would
25    put pay stubs in and that was recorded on them?
```

3-64

```
          1    A.    They fill out a timesheet on-site every day.
          2    Q.    Let's say I have sick time, right?
          3    A.    Mm-hmm.
          4    Q.    And I get my pay stub.  And on my pay stub it says
          5    vacation, sick, whatever else, right?  It said per diem in this
          6    case, whatever they got paid.  Did the payroll for Industrial
          7    Demolition record that?
          8    A.    Yes, we did.
          9    Q.    Okay.  So it's on that statement.  All right.
10:28    10    A.    Yes.
         11    Q.    And how much sick time do employees for Industrial
         12    Demolition get?
         13    A.    Forty hours.
         14    Q.    Flat, just upfront?
         15    A.    After 90 days.
         16    Q.    Do you conduct your own investigation into workplace
         17    injuries?
         18    A.    Yes, I do.
         19    Q.    How do you do those investigations?
10:29    20    A.    When it's reported to me, then I have to talk to the
         21    injured person, get all of the details as to the time, what
         22    happened and fill out a form, because we have a first report of
         23    injury form that has to be filled out.
         24    Q.    And do you get statements from other employees?
         25    A.    If there's somebody that was by them at the time of the
```

**JA451**

```
  1   injury or the supervisor or the safety person.
  2   Q.    What else do you do when you investigate workplace
  3   injuries?
  4   A.    What else do I do?
  5   Q.    Yeah.  What steps do you take to investigate it?
  6   A.    Once I get that -- well, it depends on whether they were
  7   taken to a hospital or --
  8   Q.    So it depends on the severity?
  9   A.    I can't --
10:30 10  Q.    I'm sorry.  I'll move on.  Question withdrawn.
 11              Did you ever issue a termination letter for Eric
 12   Moore?
 13   A.    Yes.
 14   Q.    When did you do that?
 15   A.    Within a week of the final day of being on-site.
 16   Q.    Okay.  And did you provide that letter to your attorneys?
 17   A.    The termination letter?
 18   Q.    Yes.
 19   A.    The one that said that the job ended at Brayton?
10:31 20  Q.    No.  I'm saying that Eric Moore's employment ended in
 21   December of 2019, correct?  You're aware of that, aren't you,
 22   Ms. Lydon?
 23   A.    Yes, I am.
 24   Q.    Okay.  And in and around that period of time, did you send
 25   in a letter saying your employment here is terminated?
```

**JA452**

3-66

```
        1    A.    No, I did not.  He wasn't terminated.

        2    Q.    But his employment ended, correct?

        3    A.    Yes.

        4    Q.    So even if you say somebody quit the job, walked away, you

        5    don't record that anywhere?

        6    A.    I record it in the personnel file, but I don't send a

        7    termination letter out.

        8    Q.    And that personnel file, did you provide that to your

        9    attorneys?

10:32  10    A.    Yes.  I do believe they have his personnel file.

       11          MR. GOODWIN:  Just one moment, Your Honor.  I'm just

       12    reviewing to see if I have any other questions.

       13          I have no further questions at this time, Your Honor.

       14          THE COURT:  Any recross?

       15          MR. GOODWIN:  Redirect, Your Honor.

       16          MR. METZGER:  Just a few questions, Your Honor.

       17          THE CLERK:  It's actually redirect.

       18          THE COURT:  Redirect, right.

       19                         REDIRECT EXAMINATION

10:33  20    BY MR. METZGER:

       21    Q.    Ms. Lydon, you were asked on cross-examination about

       22    workers' compensation.  During Mr. Moore's employment with the

       23    company, did he file a workers' compensation claim?

       24    A.    Not that I recall.

       25    Q.    And during the temporary accommodation that Mr. Moore had
```

**JA453**

```
 1    in December of 2019, did he ever contact you to say that he was

 2    not being accommodated?

 3    A.   No.

 4              MR. METZGER:  Thank you.  I have no further questions.

 5              MR. GOODWIN:  Nothing further, Your Honor.  Thank you.

 6              THE COURT:  Thank you very much.  You are excused.

 7              Who's next?

 8              MR. METZGER:  Mr. Roberts, Your Honor.

 9              THE COURT:  Let's get a stretch in.

10:34 10         (Pause.)

11                        MICHAEL ROBERTS, sworn

12              THE CLERK:  Sir, can you just state your name for the

13    record, please.

14              THE WITNESS:  Michael Roberts.

15              THE CLERK:  Thank you.

16              THE COURT:  You may proceed.

17              MR. METZGER:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19    BY MR. METZGER:

10:34 20    Q.   Good morning, Mr. Roberts.

21    A.   Good morning.

22    Q.   Just to introduce yourself further to the jury -- I know

23    you've been here throughout the proceedings.  In what city do

24    you live?

25    A.   St. Louis, Missouri.
```

3-68

```
 1   Q.   How long have you lived there?
 2   A.   My whole life.
 3   Q.   Did you go to school there?
 4   A.   I did.
 5   Q.   Where did you go to school?
 6   A.   Grade school and high school.
 7   Q.   Did you have any education past high school?
 8   A.   I did not.
 9   Q.   Did you work during high school?
10:35 10   A.   I did.
11   Q.   What did you do during high school?
12   A.   Various jobs until senior year.  Then I started my own
13   business.
14   Q.   What business did you start?
15   A.   Landscaping and tree service.
16   Q.   And did you have any employees at that point?
17   A.   Just friends that would help.
18   Q.   What type of work specifically were you doing in those
19   early days?
10:35 20   A.   Landscaping, yard work, just anything to make some extra
21   money.
22   Q.   Did that work then move on to something else?
23   A.   It did.  After high school I didn't go to college.  So
24   after high school I continued the landscaping tree business,
25   did hauling jobs for people.  That led into tearing down
```

**JA455**

3-69

```
 1    garages and houses and demolition.
 2    Q.    Okay.  How did you start to get into tearing down garages?
 3    A.    Kind of by default.  We were working for a family that had
 4    a house and a garage in the backyard with an attached house,
 5    and they asked if we could take the house and garage down, and
 6    foolishly I said we could do it.  Never did it before but I
 7    thought we could try and we did it and it worked out fine.
 8    Q.    Did you have any idea what you were doing at the time?
 9    A.    None.
10:36 10    Q.    Just for context, approximately what year are we talking
11    about?
12    A.    '74 or '75.
13    Q.    Did you have any additional projects after that that you
14    started to work on?
15    A.    Yes.  Over a series of probably five years, still did
16    landscaping, demolition, really anything to pay the bills.
17    Then we started -- or I started buying real estate and doing
18    the demolition work on those.
19    Q.    Were there any -- in the early years, any particularly
10:37 20    memorable projects that you worked on?
21    A.    I guess the turning point was a brewery that went bankrupt
22    in Bellevue, Illinois.  That's outside of St. Louis.  That was
23    back in, I guess, '85.  It went up for sale.  They were
24    asking -- I forget the numbers -- 1.5 million, and I offered a
25    million dollars, really not knowing what I was doing, and they
```

**JA456**

3-70

1    accepted it.  So it was one of those moments kind of careful

2    what you wish for.

3              Bought the property, it came with all the contents,

4    all the equipment.  So I liquidated the equipment, tore the

5    buildings down, resold the property and it worked out great.

6    Made a bunch of money at it.  I thought this is the business to

7    be in.

8    Q.   How old were you at that point?

9    A.   I don't know, 30, something like that, 28 to 30.

10:37 10   Q.   And you said that this was a turning point of sorts.  Why

11   is that?

12   A.   The early years doing the landscaping, I was competing

13   with everybody else.  And it was just tough to make a buck.

14   You kind of just earned dollars.  You didn't make a lot of

15   money.  When I bought the brewery, I bought it with all the

16   contents and environmental problems and the seller liked that.

17   They said we want to deal with one person.  We don't want to

18   deal with somebody that takes environmental issues, a

19   liquidation real estate.  So we made it easy on them.

10:38 20           After then the Stag Brewery in Belleville, Illinois,

21   they had three other breweries we bought and did the same thing

22   and it worked out.

23   Q.   What was the name of that first brewery you were referring

24   to?

25   A.   Stag Brewery in Belleville, Illinois.

**JA457**

3-71

```
 1   Q.   What was the other brewery, what was the name of that?
 2   A.   One was in Phoenix, Arizona.  I forget the name.
 3   Q.   No, I'm sorry.  What was the first one you were
 4   referencing in St. Louis?
 5   A.   Stag Brewery is owned by G. Heileman Brewery.
 6   Q.   At that point in your life was that the largest project
 7   you had gone into?
 8   A.   It was, yes.
 9   Q.   From there, then did you continue to build your business?
10:39 10  A.   I did.  From there I started looking for the big buildings
11   with environmental problems with equipment that we could bring
12   our talent in and do complete liquidation.
13   Q.   And in terms of the equipment, types of equipment you'd be
14   using, if you could just describe that.
15   A.   It was all brewery equipment, and I had no idea what it
16   was, and, you know, at the time there was no Internet.  So when
17   we tried to sell something, we had to fax Polaroid pictures
18   that we'd made a copy of.  It was archaic but it all worked
19   out.  You kind of learn as you go.
10:39 20  Q.   Did you enjoy the work?
21   A.   I did.  It was fun.
22   Q.   You're here on behalf of the defendant, correct?
23   A.   Yes.
24   Q.   What is Industrial Demolition?
25   A.   Industrial Demolition demolishes large industrial sites
```

JA458

        1    and redevelops for resale of the land.
        2    Q.    Is it a continuation of the work you started doing as
        3    someone out of high school?
        4    A.    Yeah, I would think so, yes.
        5    Q.    For Industrial Demolition, are you familiar with a Brayton
        6    Point project?
        7    A.    I am.
        8    Q.    If you could describe for us in general, what was that
        9    site?  What was on it?
10:40  10    A.    Brayton Point was the largest coal-fired plant in the New
       11    England area.  It closed down in I think 2016.  They had a bid
       12    process.  We were high bid.  And we bought the site.
       13    Q.    And what was Industrial Demolition's role then on the site
       14    once you became involved with it?
       15    A.    To demolish all the buildings and structures.
       16    Q.    What types of structures were on that particular site?
       17    A.    Power plants are probably one of the heavier built
       18    structures in the country.  It's all massive steel, massive
       19    concrete.  It's all heavy-duty stuff.
10:41  20    Q.    And are you familiar with the plaintiff in this matter?
       21    A.    I am.
       22    Q.    Do you know whether he worked on the Brayton Point site?
       23    A.    Yes, he did.
       24    Q.    Did there come a time where you had some direct
       25    communication with the plaintiff, Mr. Moore?

**JA459**

3-73

```
 1   A.   The only time I talked to him was on December 16.
 2   Q.   Was that, in other words, the first time you spoke to him?
 3        MR. GOODWIN:  Objection, leading.
 4   A.   The first and only.
 5        THE COURT:  No.  He may have the question.  You may
 6   answer.
 7   Q.   What do you recall about your conversation the first time
 8   you spoke to Mr. Moore?
 9   A.   The first time I talked to Mr. Moore on, let's see,
10   December 16, it was a Monday, he called me and said he had
11   problems on his site Friday.
12   Q.   And what did he say?
13   A.   He had problems on the site Friday with Roger as
14   superintendent.
15   Q.   And what did he tell you about those problems?
16   A.   They had some issue and argument -- he kind of -- I wasn't
17   real clear on what it was about, and I listened to him.
18   Q.   And did you tell Mr. Moore that you would do anything
19   next?
20   A.   Yes.  I told him that I would do some investigation on it,
21   get the other side of the story and call him back.
22   Q.   Did you do so?
23   A.   I did.
24   Q.   What did you do?
25   A.   I called Roger and said:  Eric Moore called and said he's
```

**JA460**

3-74

```
 1    been fired.  And Roger immediately said he wasn't fired.  But
 2    we had an argument on Friday.  He mentioned something about the
 3    gator and the headlights, which at the time didn't mean a lot
 4    to me.  And I just said, So what's up?  What are you going to
 5    do on this?  I said, Has he been fired?  He said, No.  I said,
 6    Can he come back to work?  He said, He was supposed to come
 7    back Saturday.  He was a no-show.  I said, Can you put this
 8    aside and hire him back or have him come back to work?  He
 9    said, Yeah.
10:43 10    Q.   And did you follow -- did you do anything next?
11    A.   I talked to Becky about it, just told her what's going on.
12    Q.   And did you follow up further after you had the
13    conversation with Roger Oberkramer?
14    A.   No.
15    Q.   Did you have any further communication with Mr. Moore, the
16    plaintiff?
17    A.   I called Mr. Moore back on Tuesday, the next day, just
18    told him what I found out.
19    Q.   What did you tell him?
10:43 20    A.   That you weren't fired.  I said, Roger said you were not
21    fired.  He said just go home.  It was the end of the shift.  It
22    was a ten-hour day.  I don't know if this was in the 8th or 9th
23    hour of the day but it was a rough day for everybody.  Tempers
24    were sharp.  He said, We did get in an argument.  I told him to
25    go home and that was it.  He was supposed to show up Saturday
```

**JA461**

1    morning for work and he was a no-show.

2    Q.   Did you tell Mr. Moore anything about his ability to go

3    back to the site?

4    A.   Yeah.  When I called him back on Tuesday, I told him two

5    or three times, You were not fired.  You're welcome to come

6    back.  If you think you can work things out with Roger, you're

7    fine to come back.  We'd like to have you back.

8    Q.   Did Industrial Demolition terminate Mr. Moore's

9    employment?

10:44 10    A.   No, we did not.

11    Q.   Thank you.

12         MR. METZGER:  Your Honor, I have no further questions.

13              CROSS-EXAMINATION

14    BY MR. GOODWIN:

15    Q.   Mr. Roberts, you weren't in Somerset, Massachusetts on

16    Friday, I believe it was December 7, correct?  You weren't in

17    Somerset, Massachusetts, right?

18    A.   Is Friday -- is the 7th a Friday?

19    Q.   Yup.

10:45 20    A.   No, I was not.

21    Q.   So you really have no idea what happened on that property

22    that day, do you?

23    A.   No, I don't.

24    Q.   So you have no idea if Roger Oberkramer fired Mr. Moore,

25    do you?

3-76

```
       1    A.    I'm just going by what Roger Oberkramer told me.
       2    Q.    Okay.  Where did you go to high school?
       3    A.    Where?
       4    Q.    Yeah.
       5    A.    Bishop DeBourg.
       6    Q.    What town's that in?
       7    A.    St. Louis, Missouri.
       8    Q.    Is your email mroberts@cdcco.com?
       9    A.    Yes, it is.
10:45 10    Q.    And is Becky Lydon's blydon@cdcco.com?
      11    A.    Yes, it is.
      12    Q.    Your attorney referred to Becky Lydon as a Jack of all
      13    trades for you and Industrial Demolition; is that fair?
      14    A.    That's a fair statement.
      15    Q.    She's your right-hand person, correct?
      16    A.    Yes.
      17    Q.    And you trust her?
      18    A.    Yes.
      19    Q.    Has she ever been insubordinate with any directions you've
10:46 20    given her?
      21    A.    Has she what?
      22    Q.    Strike that.
      23          Has she ever been insubordinate to any direction
      24    you've given her?
      25    A.    No.
```

**JA463**

```
 1   Q.   Okay.  She does what you ask, right?
 2   A.   Yes.  Wait a minute.  Within reason.  I mean, we have our
 3   arguments.  She's been with us for 25 years.  But she's a good
 4   employee.
 5   Q.   But you trust her?
 6   A.   Yes.
 7   Q.   And you and your brother Tom own Commercial Development
 8   Company, right?
 9   A.   Yes.
10:46 10  Q.   And that basically, as you just testified, that company
11   acquires and redevelops dirty or polluted properties throughout
12   North America, right?
13   A.   Yes.
14   Q.   And you own a series of other lateral companies, correct?
15   A.   That's correct.
16   Q.   And one you testified is Industrial Demolition.  It
17   basically demolishes structures on your properties, right?
18   A.   Yes.
19   Q.   And another one is EnviroAnalytics, which employs
10:47 20  scientists and engineers to make sure the redevelopment is
21   feasible, correct?
22        MR. METZGER:  Objection, Your Honor.  These other
23   entities are not defendants in the matter.  It's not relevant
24   to this matter.
25        MR. GOODWIN:  It goes to the scope and sophistication
```

**JA464**

```
 1    of the defendant and will inform punitive damages should the

 2    jury elect to give them.

 3            THE COURT:  I don't think so.  The objection is

 4    sustained.

 5            MR. METZGER:  Thank you, Your Honor.

 6            MR. GOODWIN:  I'm not going to go through the list of

 7    the other companies, Your Honor, but I want to preserve my

 8    rights for --

 9            THE COURT:  If you're telling me that you have similar

10:48 10   questions with respect to other entities, I would rule them out

11    as well.

12            MR. GOODWIN:  Okay.

13            THE COURT:  And your objection is noted.

14            MR. GOODWIN:  Thank you, Your Honor.

15    Q.   How long has Commercial Development Company existed?

16    A.   The spring of --

17            THE COURT:  I'm sorry?

18            MR. GOODWIN:  I said how long has the Commercial

19    Development Company existed.

10:48 20   A.   The spring of 1991.

21    Q.   And every time you buy a new piece of property, you create

22    a new holding company for these as well, right?

23            THE COURT:  I'm sorry?

24            MR. GOODWIN:  Sure.

25    Q.   So every time that Industrial Demolition -- strike that.
```

```
 1              Every time that Commercial Development Company
 2      purchases a new company, you create an LLC by which to hold
 3      that piece of property, right, sir?
 4              MR. METZGER:  Objection, Your Honor.
 5              THE COURT:  What is the relevance of that?
 6              MR. GOODWIN:  Again, same point as the previous one,
 7      Your Honor.  It goes to scope and scale and sophistication of
 8      the entity.
 9              THE COURT:  I don't understand what it has to do with
10:49 10    the plaintiff.
11              MR. GOODWIN:  Well, what it has to do with the
12      plaintiff, Your Honor, is we will be seeking punitive damages
13      in this case.  And that Mr. Roberts is running a company that
14      has --
15              MR. METZGER:  Objection.
16              MR. GOODWIN:  You can object as much as you want,
17      Mr. --
18              THE COURT:  I don't understand how that is relevant to
19      the specific issue that the jury has to decide, whether he was
10:49 20    terminated against his will.
21              MR. GOODWIN:  But it isn't relevant to liability, Your
22      Honor.  It is relevant to damages.  You made the determination
23      to not bifurcate this case as to punitive damages.  So as a
24      consequence of that, we get to present evidence as to what
25      damages the jury should give Mr. Moore.
```

**JA466**

3-80

```
    1           THE COURT:  Based on how much money he has made?
    2           MR. GOODWIN:  I have not said anything about money.
    3   I'm talking about scope and scale.  They're talking -- it's how
    4   they run their company, Your Honor.  And Mr. Metzger is able to
    5   talk about what he did in high school and the companies that --
    6   what he has done subsequent to it.  We're allowed to go to the
    7   larger window.  They opened it with their questions.
    8           THE COURT:  We need to decide this case on the issues
    9   in this case and I think we're going afield.
10:50 10           MR. GOODWIN:  Okay.
   11           MR. METZGER:  Thank you, Your Honor.
   12           MR. GOODWIN:  Please preserve my objection for the
   13   record.
   14           THE COURT:  Your objection is noted.
   15           MR. GOODWIN:  Thank you.
   16   BY MR. GOODWIN:
   17   Q.  Becky Lydon has authority to terminate employees, correct?
   18   A.  Yes.
   19   Q.  And that includes site superintendents, correct?
10:50 20   A.  Yes.
   21   Q.  So she could have terminated Roger Oberkramer, by way of
   22   example?
   23   A.  Yes.
   24   Q.  And similarly, a site superintendent has the ability to
   25   terminate a laborer or operator or people below them, correct?
```

**JA467**

3-81

```
 1   A.   Typically the site superintendent will go through Becky

 2   and discuss with Becky first.

 3   Q.   Okay.  But your counsel represented earlier in this case

 4   that Mr. Oberkramer had the ability to terminate Mr. Moore.  So

 5   did Mr. Oberkramer have the ability to terminate Mr. Moore?

 6   A.   No.

 7   Q.   Okay.  So your counsel misrepresented that, correct?

 8            MR. METZGER:  Your Honor --

 9            THE COURT:  I don't think we will have the witness

10:51 10   making a judgment about whether counsel --

11            MR. GOODWIN:  Well, they represented it in connection

12   to a piece of evidence --

13            THE COURT:  The jury will decide that in good time.

14            MR. GOODWIN:  Okay.  That sounds good, Your Honor.

15            MR. METZGER:  Just so the record is correct -- and

16   obviously the record will reflect it -- I believe --

17            THE COURT:  I think I just --

18            MR. METZGER:  Okay.

19            MR. GOODWIN:  The record will say what the record

10:51 20   says.

21   Q.   So why did you call Roger Oberkramer and ask him what

22   happened?

23   A.   Well, being self-employed for 48 years and having four

24   kids, I know there's always two sides to every story.  I wanted

25   to hear the other side of the story.
```

**JA468**

3-82

1  Q.   Do you remember, were you present for testimony about a

2  gentleman named Ted?

3  A.   I was.

4  Q.   Do you remember that conversation at all?

5  A.   No, I don't.

6  Q.   Okay.  So have you ever been involved yourself in a

7  decision about whether or not Mr. Oberkramer terminates a

8  laborer such as Mr. Moore?

9  A.   No, I haven't.

10:52 10  Q.   Okay.  And have you ever talked to Becky Lydon about the

11  individuals that Mr. Oberkramer or she have terminated?

12  A.   You know, I don't know.  We have, in the course of a year,

13  thousands of conversations.  I can't remember them all.

14  Q.   Okay.  So you don't know?

15  A.   I don't get involved with a termination typically.

16  Q.   So then how do you know if Mr. Oberkramer has authority to

17  terminate anybody?

18  A.   How he has authority?

19  Q.   Yeah.  How do you know?  If you're not involved and you

20  don't remember.

21  A.   Because I trust Becky and Becky is the overseer.

22  Q.   Okay.  You trust Becky, correct?  That's the testimony you

23  just gave?

24  A.   I'm sorry?

25  Q.   You trust Becky?

**JA469**

3-83

```
 1   A.   Yes.
 2   Q.   She tells the truth, right?
 3   A.   Yes.
 4   Q.   Were you present for the testimony when she spoke about
 5   Roger Oberkramer just waiting to see if you'd beg him to stay
 6   again?
 7   A.   Could you repeat that, please?
 8   Q.   Sure.  Ms. Lydon testified that she told you in an email
 9   that at one point you begged Mr. Oberkramer to stay.
10:54 10  A.   Yes, I saw that email today.
11   Q.   Okay.  You never had seen it before?
12   A.   I haven't.  No, I have not.
13   Q.   You realize this was given to us by your attorneys, right?
14   A.   I do.  But I get in the course of, I don't know, a month's
15   time 5,000 emails.  And there's a lot I don't open.  There's a
16   lot I don't open from Becky just because it's too busy and it
17   goes by the wayside.  I never saw that email until today.
18   Q.   How many emails do you get in the course of a day?
19   A.   I don't know.  It's a bunch.
10:54 20  Q.   What's a bunch?
21   A.   It's going to be a guess.  300.
22   Q.   So you get 300 emails in a day and how many of them do you
23   open?
24   A.   Well, out of the 300 there's probably -- no, probably 200
25   that are junk.
```

**JA470**

3-84

```
 1   Q.   So you get 100 emails a day?

 2   A.   Right.  I go through those and categorize them.  I open

 3   them and I address the ones that don't take too much time, so I

 4   can keep them in line.  But there's times as I go through them,

 5   new ones are coming in and it keeps dropping farther and

 6   farther down the list.

 7   Q.   So you don't check -- but Becky Lydon's your right-hand

 8   person, right?

 9   A.   Yes.

10:55 10   Q.   So I have a right-hand person.  There's certain people in

11   my firm that when they email me -- Mike Turiello emails me, I

12   open it.

13        THE COURT:  Wait a minute.  Who's testifying?

14        MR. GOODWIN:  I would ask for a little leeway, Your

15   Honor.  It's cross-examination.

16        THE COURT:  I don't think you need it.  You may have a

17   question to the witness without telling him what your

18   experience is.

19   Q.   How many emails do get from Ms. Lydon in a day?

10:55 20   A.   I don't know.

21   Q.   Did Joe Biden recently visit Brayton Point?

22        MR. METZGER:  Objection, Your Honor.

23        MR. GOODWIN:  Withdrawn.

24        THE COURT:  What is the relevance of that?

25        MR. GOODWIN:  I withdrew it, Your Honor.
```

**JA471**

3-85

```
 1   Q.   How much did you purchase the Brayton Point site for?

 2          MR. METZGER:  Objection, Your Honor.

 3          THE COURT:  I'm sorry, what is it?

 4          MR. GOODWIN:  The question is how much did Mr. Roberts

 5   and his brother purchase the Brayton Point site for.

 6          MR. METZGER:  Objection, Your Honor.  Again, this has

 7   nothing to do with Industrial Demolition.

 8          THE COURT:  I don't understand how that is relevant.

 9          MR. GOODWIN:  It goes to punitive damages, Your Honor.

10:57 10        THE COURT:  No, it does not.

11          MR. GOODWIN:  It does and I'd ask you preserve my

12   objection.

13          THE COURT:  The objection is overruled.  No, the

14   objection is sustained.  And your objection to the sustaining

15   is part of the record.

16          MR. GOODWIN:  All right.  Then I would like to note

17   for the record, Your Honor, that this line of questioning will

18   not be allowed so I can preserve.

19          THE COURT:  Well, the line -- I don't know what the

10:57 20   line of questioning is.

21          MR. GOODWIN:  The line of questioning -- I'm sorry,

22   Your Honor.

23          THE COURT:  I think you were going sort of far afield

24   of what the questions are.  You can certainly ask the direct

25   questions along the lines that you suggested, but you were
```

**JA472**

1   going well beyond that.

2        MR. GOODWIN:  Your Honor, for punitive damages, the

3   jury has to determine what amount of a speeding ticket to give

4   the employer should they feel it's appropriate.  If they don't

5   know how fast the employer is going and how big they are, they

6   cannot give a proportional determination.

7        THE COURT:  But you can ask -- you already have asked.

8   He told us how many employees there are, I think, and he told

9   us about the kind of work he does and the kind of equipment he

10:58 10  uses for it.  And that's certainly information along the lines

11  that you say you need.

12        MR. GOODWIN:  But the scale and scope of operation,

13  that evidence will not be allowed, and I'm just preserving my

14  objection.

15        THE COURT:  Well, I don't know exactly what the

16  question is.

17        MR. GOODWIN:  I'm going to ask him how much he bought

18  these properties for.  I've requested to talk about how many

19  corporations he's created.  And that will not be allowed,

10:58 20  correct?

21        THE COURT:  I don't think we need that.  At the moment

22  I have no evidence that there is any problem with paying a

23  judgment if the judgment is entered for the plaintiff.

24        MR. GOODWIN:  It's not about the ability to give

25  remuneration, Your Honor.  It is about what is the appropriate

**JA473**

3-87

1    penalty should the jury conclude punitive damages is

2    appropriate and that, of course, goes to what is an appropriate

3    punishment for an entity of this scale.

4            THE COURT:  The objection is sustained.

5            MR. GOODWIN:  Thank you, Your Honor.  Please preserve

6    for the record.

7            THE COURT:  Is that it with the witness?

8            MR. GOODWIN:  One moment, please, Your Honor.

9    Q.   Mr. Roberts, you spoke a moment ago about your

10:59 10  conversation with Mr. Moore, correct?

11   A.   Yes.

12   Q.   In that conversation, what did Mr. Moore say to you?

13   A.   I don't remember the whole conversation, but he was

14   terminated.  He basically didn't like Roger, thought he was too

15   rough on him.  And I forget the rest of it.

16   Q.   Okay.  But you were present for the entire trial, correct?

17   A.   Yes.

18   Q.   And it didn't jog your memory at all?

19   A.   Not really.  When I had that conversation, I was driving

10:59 20  down the road with my two grandkids in the back seat.  It was

21   an unexpected phone call and it caught me off guard.  I was

22   concentrating on other things besides the conversation.

23   Q.   Well, that's the first conversation, isn't it, sir?  There

24   were two conversations.

25   A.   Right.

**JA474**

3-88

1    Q.   The first conversation was when your grandkids were in the

2    car, correct?

3    A.   I'm not sure.

4    Q.   So does this sound accurate?  Let me see if I have this

5    right because this is my understanding.

6            Eric Moore calls you on the Monday following the

7    Friday when he alleges Mr. Oberkramer terminated him.  You were

8    with your grandkids in the car.  You were present for

9    Mr. Moore's testimony today?

11:00 10   A.   Yes.

11    Q.   Does that sound right?

12    A.   I think so, yes.

13    Q.   So then we go to Tuesday, correct?  And between Monday and

14    Tuesday, I believe your testimony is that you spoke to

15    Ms. Lydon, right?

16    A.   Correct.

17    Q.   And you spoke to Mr. Oberkramer, correct?

18    A.   Yes.

19    Q.   Okay.  So in that conversation on Tuesday, it wasn't quick

11:00 20   and your kids weren't in the car, correct?

21    A.   Yes, correct.

22    Q.   Okay.  So what do you remember from that conversation,

23    sir?

24    A.   That Eric said he was fired.

25    Q.   And why?

**JA475**

```
 1   A.   You know, I don't -- we talked about different things.  He
 2   talked about, I think him and Roger getting in an argument at
 3   the end of the day.  He didn't like the abusiveness of Roger.
 4   Q.   And what about the abusiveness of Roger did he not like?
 5   A.   That Eric didn't like?
 6   Q.   Yes.
 7   A.   I don't know, Eric said he used racial slurs and other
 8   comments to him.
 9   Q.   And did you instruct Becky Lydon to engage in an
10   investigation after Mr. Moore reported that Oberkramer was
11   using racial slurs?
12   A.   Did I report that to her?
13   Q.   Did you have her engage in an investigation?
14        MR. METZGER:  Objection, your Honor.
15        MR. GOODWIN:  He just testified --
16        THE COURT:  He may answer yes or no or he doesn't
17   know.
18   A.   Repeat the question, please.
19   Q.   Certainly, sir.  And I apologize for talking at the same
20   time.
21        So Mr. Moore called you on Tuesday.  Your kids
22   weren't in the car, it was a quick conversation, correct so
23   far?
24   A.   Yes.
25   Q.   So then you had this conversation with Mr. Moore in which
```

JA476

3-90

1    he reports to you Oberkramer's using racial slurs, correct?

2    A.    I don't know --

3    Q.    That's a yes or no answer.

4    A.    Okay.  Yes, correct.

5    Q.    So you have a zero tolerance for discrimination at

6    Industrial Demolition, correct?

7    A.    Yes.

8    Q.    So as a zero tolerance employer, an employer that will not

9    put up with discrimination in any form, when you're informed

11:02 10    that your superintendent Roger Oberkramer is using racial

11    slurs, did you task your right-hand person, Ms. Lydon, to

12    conduct an investigation as to whether or not that was true?

13    A.    I don't know if it was that specific or just what

14    happened, that Eric thinks he was fired.  The conversation with

15    Becky wasn't that long.

16    Q.    What do you mean, wasn't that specific, the conversation

17    with Becky?

18          Do you agree that employers, when they receive

19    complaints about discrimination, slurs and the like have an

11:03 20    obligation to do something about it?

21    A.    Yes.

22    Q.    And did you do anything about it?

23    A.    Me specifically, no.

24    Q.    And you're the owner of the company, right?

25    A.    Yes.

**JA477**

```
 1   Q.   So the buck stops with you?
 2   A.   Yes, but I thought Becky was handling it.
 3   Q.   Did you tell Becky to handle it?
 4   A.   I told Becky the conversation I had with Eric.  I don't
 5   know if I said about the racial slurs.  I said talk to Roger
 6   and get to the bottom of it.
 7   Q.   You said talk to Roger, but you don't tell her, you don't
 8   recall if you told her anything about using slurs, Oberkramer
 9   using slurs?
11:04 10  A.   You know, I don't know if I did.  I don't think so.
11   Q.   How often do you receive complaints that your
12   superintendents are using racial slurs?
13   A.   That's the first one.
14   Q.   First one?
15   A.   Yes.
16        THE COURT:  How much more do you have?
17        MR. TURIELLO:  I have a little bit more, Your Honor.
18   It won't be long.
19        THE COURT:  In that case we'll take a recess now.
11:04 20       MR. GOODWIN:  Okay.
21        THE CLERK:  All rise, please.
22        THE COURT:  Twenty minutes.  We will resume at 11:25.
23        MR. GOODWIN:  Thank you.
24        MR. METZGER:  Thank you, Your Honor.
25   (A recess was taken.)
```

**JA478**

```
 1          THE COURT:  Approximately how much more time do you
 2    have with this witness?
 3          MR. GOODWIN:  I think we're just going to discuss the
 4    call a little more, Your Honor, and then we'll be done.
 5          THE COURT:  Okay.  You may proceed.
 6          MR. GOODWIN:  Thank you.
 7    BY MR. GOODWIN:
 8    Q.   Mr. Roberts, I think where we left off was whether or not
 9    you instructed Ms. Lydon to do an investigation and you said
11:29 10    you had not, you're not even sure if you told her that
11    Mr. Moore had reported slurs; is that about right?
12    A.   Yeah, that's correct.
13    Q.   So let's get back to the conversation.
14          THE COURT:  Which one?
15          MR. GOODWIN:  On December 17, Tuesday, Your Honor.
16    Q.   So on Tuesday, December 17, the conversation with
17    Mr. Moore, the telephone call.  So Mr. Moore said to you that
18    Mr. Oberkramer had used certain slurs.  Do you recall Mr. Moore
19    also saying to you that he had a work restriction?
11:30 20    A.   That he had a work restriction?
21    Q.   Yeah, that he had an injury?
22    A.   I guess.  I'm not real sure, though.
23    Q.   You think so, but not a hundred percent?
24    A.   I don't remember that part of it, actually.
25    Q.   Okay.  So you don't remember that part.
```

**JA479**

```
 1              So did he say that he had an injury or not?
 2     A.   I would assume -- I'm just assuming that he did.
 3     Q.   Okay.  So he did say it.  And then do you recall him
 4     saying that Mr. Oberkramer was dangerous?
 5     A.   I think I do, yes.
 6     Q.   And do you recall responding that Mr. Oberkramer was just
 7     rough around the edges?
 8     A.   I do.
 9     Q.   How long have you known Mr. Oberkramer?
10     A.   Four or five years.
11     Q.   And he began -- I think Ms. Lydon testified that he began
12     with Industrial Demolition because -- as a contractor, does
13     that sound right?
14     A.   As a subcontractor, yes.
15     Q.   What type of subcontractor?
16     A.   What is a subcontractor?
17     Q.   Well, sure, let's start there.  Explain to the jury what a
18     subcontractor is.
19     A.   A subcontractor is somebody that owns his own equipment,
20     his own business.  He does work for us and just charges a
21     contract price.
22     Q.   Okay.  And laborer work or other type work?
23     A.   It was a combination of both, labor work and equipment
24     time.
25     Q.   So heavy equipment operation, labor work.  Anything else?
```

3-94

```
       1    A.   No, that's it.
       2    Q.   Okay.  And then eventually you brought him in as an
       3    employee, correct?
       4    A.   Yes.
       5    Q.   And why did you bring him in as an employee?
       6    A.   We had a need for him, and he was a good operator,
       7    organized, kept jobs going.
       8    Q.   Gets the job done, right?
       9    A.   Yes.
11:32 10    Q.   And did you tell Mr. Moore that day that Mr. Oberkramer
      11    gets the job done?
      12    A.   I did, yes.
      13    Q.   Okay.  And that day being the Tuesday where you had the
      14    second phone call?
      15    A.   Correct.
      16    Q.   Okay.  And did you tell Mr. Moore to work it out with
      17    Oberkramer?
      18    A.   I did, yes.
      19    Q.   Okay.  And you testified that you really didn't know what
11:32 20    had happened the preceding Friday, correct?
      21    A.   Correct.
      22    Q.   So you basically -- you know, you don't -- this isn't
      23    something typically you get involved in, right?
      24    A.   Yes.
      25    Q.   So your position was, I don't know what's going on here,
```

**JA481**

3-95

```
 1    you guys figure it out, correct?
 2    A.   On the first phone call or second phone call?
 3    Q.   The second phone call.  The first call you didn't know --
 4    I think you testified you didn't have any knowledge?
 5    A.   At that point I heard both sides of the story.  And it
 6    was -- Roger said that Eric was not fired.  So I said, "Eric,
 7    go back to Roger and start working.  If you can work it out
 8    with him, that's great."
 9    Q.   So if you can work it out with him, that's great?
11:33 10    A.   Yes.
11    Q.   So figure it out?
12    A.   Yes.  It was a good job for him, good paying job.  I said,
13    figure it out.
14    Q.   They're grown men, right?  They've got to figure it out,
15    right?  It's not your problem.
16    A.   It's my problem, yes, but yes, they're grown men.  They
17    should be able to figure it out.
18    Q.   Did you say anything to him about Roger, about workplace
19    scuttlebutt?
11:34 20    A.   I did, yes.
21    Q.   What did you say to Mr. Moore about workplace scuttlebutt?
22    A.   That we don't like that.  That we don't like people
23    spreading rumors, just talking scuttlebutt on the job.  Just do
24    your job and do what you're supposed to do.
25    Q.   Did that include talking about what you were earning to
```

**JA482**

3-96

```
     1   co-workers?
     2   A.   When I said that to Mr. Moore, I wasn't really thinking
     3   about that.
     4   Q.   Okay.  So why did you enter into a settlement with the
     5   National Labor Relations Board for prohibited speech?
     6   A.   I did talk about that at one time about the employees
     7   talking about their wages.
     8   Q.   Yeah.
     9   A.   And I didn't know you couldn't do that.
11:34 10   Q.   Why didn't you like employees talking about their wages?
    11   A.   It just causes issues on the job site.
    12   Q.   What type of issues?
    13   A.   Everybody thinks they're better than the next guy.
    14   Q.   Wouldn't it be easier just to pay everybody the same?
    15   A.   That wasn't how -- there was different classifications of
    16   workers.
    17   Q.   Okay.  And now you're aware that that comment was illegal?
    18   A.   Through this process, yes.
    19   Q.   Okay.  Did you say, We frown upon that and we don't want
11:35 20   that happening on the job site?
    21   A.   I did, yes.
    22   Q.   After you told him that Roger had said to you this is
    23   about workplace scuttlebutt, did Mr. Moore say that wasn't what
    24   happened and it was about my medical restriction being in a
    25   machine?
```

**JA483**

3-97

```
 1    A.    Is that what Mr. Moore said, did you say?
 2    Q.    Yeah.  So you say Roger told me you're talking about your
 3    wages and other things that cause problems on the site, we
 4    frown upon that.  Eric said to you that's not what happened, it
 5    was about my medical restriction and being in the machine all
 6    day.  Does that sound right?
 7    A.    No, it doesn't.  But there was no -- Roger didn't mention
 8    anything about the medical restrictions.
 9    Q.    No, I'm saying did Eric say that to you in that call on
10    that Tuesday?  Not if Roger said it to you.
11    A.    He might have.
12    Q.    Might have or did he?
13    A.    Well, I'm sure he did if you said he did.  I'm sure you
14    have a document that proves it.
15    Q.    Okay.  Did Roger tell you that Eric wasn't supposed to
16    come back until the beginning of the year?  Is that something
17    you said in that conversation?
18    A.    He did not, no.
19    Q.    So you never said to Eric Moore, well, Roger said you
20    weren't fired but he just said don't come back until the
21    beginning of the year?
22    A.    Roger said that he was not fired.  He told him to leave.
23    It was the end of the shift and end of the day.  He said, Just
24    get out of here, go home.
25    Q.    So Roger Oberkramer never said to you, Don't come back
```

11:36 (line 10)
11:36 (line 20)

**JA484**

3-98

```
 1   until next year?
 2   A.   He did not, no.
 3   Q.   And Eric never told you that that's what Roger said?
 4   A.   I don't remember that either.
 5   Q.   Okay.  So you don't remember or you -- you have no
 6   knowledge or?
 7   A.   I don't remember the conversation that Eric said that.
 8   Q.   Okay.  When did Mr. Oberkramer stop working with
 9   Industrial Demolition?
11:37 10  A.   I think the spring of '20.
11   Q.   If I were to tell you it was October of 2022, does that
12   sound correct?
13   A.   It really doesn't, no.
14   Q.   Well --
15   A.   Do you have records showing that he worked until October
16   of '22?
17   Q.   Well, it doesn't go this way, unfortunately.
18        But in your -- but your counsel did -- if in the
19   process of what you're probably familiar with discovery now
11:38 20  your counsel held out to the plaintiff that Mr. Oberkramer
21   worked for Industrial Demolition as a superintendent from 2015
22   until his voluntary resignation on October 5, '22, does that
23   sound right?
24   A.   If that's what the document says, I'm sure it's accurate,
25   yes.
```

**JA485**

```
 1    Q.   Okay.  Do you have any economic relationship presently

 2    with Roger Oberkramer?

 3              MR. METZGER:  Objection, your Honor.

 4              MR. GOODWIN:  Your Honor --

 5              THE COURT:  I don't understand the relevance of that

 6    or the propriety of it.

 7              MR. GOODWIN:  Your Honor, we received the motion to

 8    dismiss in this case.  It was denied in the beginning of the

 9    fall of 2022 and we served our initial discovery on September

10    12 --

11              THE COURT:  No, we're not getting into that.  I don't

12    know what the relevance is even.  The objection is sustained.

13              MR. METZGER:  Thank you, Your Honor.

14              MR. GOODWIN:  I would just preserve -- I do think it

15    is germane to a missing witness, and I would just ask it be

16    preserved for the record, Your Honor.

17              THE COURT:  Yeah, you can do that during the next time

18    we stop.

19              MR. GOODWIN:  Okay.  Sounds good.  Thank you.

20              One moment, please, Your Honor.

21    Q.   When were you deposed in this trial, do you recall?

22    A.   I do not, no.

23    Q.   Does February sound right?

24    A.   If you have a record saying that, I'm sure it's correct.

25    Q.   Okay.  So Mr. Oberkramer resigned right before we were set
```

**JA486**

```
 1   to take depositions in this case, correct?
 2   A.  Yes.
 3            MR. GOODWIN:  One moment, please, Your Honor.
 4            Rest subject to recross, Your Honor.
 5            THE COURT:  Any further questions?
 6            MR. METZGER:  I have no further questions for
 7   Mr. Roberts.
 8            THE COURT:  Thank you.  You are excused.  Who's next?
 9            MR. METZGER:  We have no further witnesses, Your
11:41 10  Honor.
11            THE COURT:  I'm sorry?
12            MR. METZGER:  We have no further witnesses.
13            THE COURT:  Any rebuttal?
14            MR. GOODWIN:  No rebuttal, Your Honor.
15            THE COURT:  So that's it for all -- that's all the
16   evidence that you will get to hear in this case, and I think
17   what we should do is to suspend now until --
18            Can we start at 8:30 for the -- what did you have in
19   mind, Lisa, for the morning?
11:42 20        (Court/clerk discussion held off the record.)
21            THE COURT:  Will counsel be available at 8:30 in the
22   morning?  And then we can meet with the jurors at 9:00 and
23   explain to them what we're going to do?
24            MR. METZGER:  Yes.
25            THE COURT:  I need to review with you what the
```

```
 1    questions are that we're going to put to the jury and what I
 2    will tell them the law is with respect to those questions.
 3              Will 8:30 work for all the jurors?
 4              THE CLERK:  No, because we'll meet with the attorneys
 5    at 8:30.
 6              THE COURT:  Do the usual.  We will try to be done by
 7    9:00.  The next thing that will happen is that counsel will
 8    address you.  First the defendant and -- the defendant goes
 9    first, the plaintiff goes next.  The defendant has an
11:43 10   opportunity to do a little bit of fixing up afterwards.  And
11    then I will charge you on the law.  And after that you will
12    have the case.
13              Now, in the normal course of events in a case like
14    that, it is highly unlikely that the part I just described will
15    take more than two hours.  I assume that by around 11:00, you
16    will be in the room upstairs deciding your verdict.  And when
17    you do that, you will have with you all of the exhibits that
18    have been offered and put into the part of the case.  Ms. Urso
19    will collect them.  She will bring them up.  You will have them
11:43 20   to use in your determination as to what the outcome of the case
21    will be.  And I will certainly send you a number of questions,
22    the answer to which will constitute your verdict.  Okay?
23              So that's how we will do it.  Tomorrow we will start
24    hopefully promptly at 9:00.  Sometimes we go a little bit over
25    because we don't understand each other very well.  But then
```

```
 1   after that, we will have first arguments and charge by --

 2   arguments by counsel, and I will charge you on the law, and

 3   then the case will be in your hands.

 4        I would ask you please to keep the afternoon free

 5   tomorrow so that you can hopefully reach a verdict without

 6   impinging on the schedule that you thought you had.

 7        Thank you very much for your patience and everything

 8   else.  Leave your notebooks again.  Next time you leave after

 9   the arguments and charge, take the notebooks with you.

11:45 10  (Jury exits.)

11        THE COURT:  All right.  So we will meet at 8:30

12   tomorrow morning and I think primarily to go over the charge

13   and I will hopefully -- if I get the questions to the jury done

14   before then, we can send them to you by email and then you'll

15   have plenty of time to make sure that they're okay.

16        MR. METZGER:  Your Honor, I do just want to preserve

17   our Rule 50 motion for judgment as a matter of law.

18        THE COURT:  I will reserve on that.

19        MR. METZGER:  Thank you.  I just wanted to make clear

11:45 20  that -- I entirely understand that --

21        THE COURT:  I'm not denying it.  I'm just reserving.

22        MR. METZGER:  I understand.

23        Your Honor, just so I'm clear, you do not want me to

24   present any additional argument on that?  I just want to be

25   clear.  I'll absolutely follow --
```

**JA489**

1          THE COURT:  Is it sufficient to --

2          MR. METZGER:  If that's sufficient to you, Your Honor.

3  If that's sufficient to you, it is to me.

4          THE COURT:  All right.  I'll see you at 8:30 tomorrow

5  morning.

6          MR. GOODWIN:  Okay.  So we're reserved on all motions?

7          THE CLERK:  Yes.

8          THE COURT:  Thank you very much.

9  (Proceedings adjourned at 11:46 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA490**

1                          C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken April 13, 2023 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14   /s/ Kathleen Mullen Silva                    4/29/23

15

16   Kathleen Mullen Silva, RPR, CRR              Date
     Official Court Reporter
17

18

19

20

21

22

23

24

25

**JA491**

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3   ERIC MOORE,                      )
                      Plaintiff,      )
 4                                    )
     vs.                             )  No. 22-CV-10414-RWZ
 5                                    )
     INDUSTRIAL DEMOLITION, LLC,      )
 6                    Defendant.      )

 7

 8

 9

10                 BEFORE THE HONORABLE RYA W. ZOBEL
11              UNITED STATES DISTRICT COURT JUDGE
                       JURY TRIAL DAY 4
12

13

14

15           John Joseph Moakley United States Courthouse
                         Courtroom No. 12
16                       One Courthouse Way
                     Boston, Massachusetts 02210
17

18                       April 14, 2023
                           8:39 a.m.
19

20

21

22              Kathleen Mullen Silva, RPR, CRR
                      Official Court Reporter
23       John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 7209
24             Boston -- Massachusetts 02210
                  E-mail: kathysilva@verizon.net
25

             Mechanical Steno - Computer-Aided Transcript
```

```
1   APPEARANCES:

2
            Duddy, Goodwin & Pollard
3           Jamie Goodwin, Esq.
            2 Liberty Square, 10th Floor
4           Boston, Massachusetts 02109
            508.523.2632
5           and
            Duddy, Goodwin & Pollard
6           Michael Turiello, Esq.
            446 Main Street, 16th Floor
7           Worcester, Massachusetts 01608
            860.999.9394
8           for Plaintiff

9           Littler Mendelson P.C.
            Thomas M.L. Metzger, Esq.
10          41 South High Street, Suite 3250
            Columbus, Ohio 43215
11          614.463.4216
            and
12          Littler Mendelson P.C.
            Alexa Marie Esposito, Esq.
13          One International Place, Suite 2700
            Boston, Massachusetts 02110
14          617.378.6000
            for Defendant

15

16

17                         INDEX

18
```

```
19
   Closing Argument By Mr. Metzger              42
20 Closing Argument By Mr. Turiello             59
   Jury Charge                                  67
21
```

```
22

23

24

25
```

**JA493**

```
08:37  1                      P R O C E E D I N G S
08:37  2            THE CLERK:  All rise.
08:37  3            THE COURT:  Good morning.
08:37  4            I apologize for being late.  Unfortunately Ms. Urso is
08:37  5       also late because of the T.
08:38  6            I have done or sort of redrafted the proposed
08:38  7       questions to the jury which we're now giving to you and I, of
08:38  8       course, invite your suggestions -- further suggestions as to
08:38  9       what we should do with them.
08:38 10            MR. GOODWIN:  Your Honor, I think the plaintiff --
08:38 11            THE COURT:  Wait one second until both parties are
08:38 12       ready and then we'll get going on it.
08:39 13            (Pause.)
08:39 14            THE COURT:  Are we ready?
08:39 15            MR. GOODWIN:  I am, Your Honor.
08:39 16            MR. METZGER:  To discuss --
08:39 17            THE COURT:  Yes.  First plaintiff, what do you find
08:39 18       unacceptable?
08:39 19            MR. GOODWIN:  Two things.  Well, this isn't
08:39 20       unacceptable.  I think --
08:39 21            THE COURT:  I'm sorry?
08:39 22            MR. GOODWIN:  I think that for the ease of
08:39 23       presentation to the jury, the plaintiff is going to drop 4 and
08:39 24       5.  The 151B --
08:40 25            THE COURT:  The retaliation you say is not in the case
```

**JA494**

4-4

08:40 1    at all?

08:40 2              MR. GOODWIN:  No, I'm not saying that.  I'm saying

08:40 3    that the -- well, no, 4 would be correct.  4 would be to the

08:40 4    151B and -- strike that.

08:40 5              2 should cover the retaliation as to 151B, which is

08:40 6    the handicap discrimination statute but in terms of the

08:40 7    industrial accident statute, 152:75.

08:40 8              THE COURT:  Which question are you protesting?

08:40 9              MR. GOODWIN:  I'm not protesting any of the questions.

08:40 10             THE COURT:  What do you want me to say with respect to

08:40 11   any of the questions as they exist on my form?

08:40 12             MR. GOODWIN:  Your Honor, I would like you to drop

08:40 13   question 5 altogether, termination for utilization of sick

08:40 14   leave.  So that count is gone.

08:40 15             THE COURT:  Well, I think there was some evidence to

08:40 16   that effect, was there not?  I mean, it was one of the issues.

08:40 17             MR. GOODWIN:  If your Honor wants to keep it --

08:41 18             THE COURT:  But if the parties agree on this, I'll

08:41 19   take it out.

08:41 20             MR. METZGER:  We can take it out.  We're fine taking

08:41 21   it out.

08:41 22             THE COURT:  You do not agree?

08:41 23             MR. METZGER:  No, we do.

08:41 24             THE COURT:  You do?

08:41 25             MR. METZGER:  Yes.

**JA495**

08:41 1          THE COURT:  So both plaintiff and defendant agree that

08:41 2   question 5 should be deleted.

08:41 3          We're nothing if we're not accommodating, at times.

08:41 4          MR. GOODWIN:  What's that, Your Honor?

08:41 5          THE COURT:  So 5 goes out.

08:41 6          MR. GOODWIN:  Yes.  5 is out.  And I would say 2 would

08:41 7   be because of his handicap or protected activity because this

08:41 8   doesn't really cover the retaliation contemplated under 151B.

08:41 9   It's about protected activity.  And that may include his

08:41 10  handicap.

08:41 11         THE COURT:  So you want the case to be limited not to

08:41 12  termination for handicap, but termination in general?

08:41 13         MR. GOODWIN:  No.  I want -- it is termination in

08:42 14  retaliation for protected activity.  Protected activity --

08:42 15         THE COURT:  So 3 stays in?

08:42 16         MR. GOODWIN:  Your Honor, please just let me state the

08:42 17  whole way, because it's a little bit more nuanced than that.

08:42 18         "Did the defendant terminate the plaintiff because of

08:42 19  his handicap" is fine.  But it's also -- it's a discrimination

08:42 20  case as well.  So discrimination isn't just termination.

08:42 21         Would it be more helpful if I propose --

08:42 22         THE COURT:  With respect to question 1 as I have it,

08:42 23  do you object to that?

08:42 24         MR. GOODWIN:  No.

08:42 25         THE COURT:  Does the defendant?

**JA496**

08:42  1            MR. METZGER:  I do, Your Honor, because we need a

08:42  2  first question --

08:42  3            THE COURT:  Why don't you stay seated.  It will be a

08:42  4  lot easier.

08:42  5            MR. METZGER:  Okay.  I do, Your Honor, because we need

08:42  6  an initial question to ask whether the plaintiff has a

08:42  7  handicap.  This says, "Did defendant fail to reasonably

08:42  8  accommodate plaintiff's handicap," which assumes he has one.

08:43  9  One of our key questions is whether he has a handicap, and I

08:43 10  think that we need a very important initial question, did the

08:43 11  plaintiff prove or does the plaintiff have a handicap.

08:43 12            THE COURT:  Well, I'll explain to them that the

08:43 13  plaintiff has a burden of proving by a preponderance of the

08:43 14  evidence.

08:43 15            MR. METZGER:  I understand, Your Honor.  But the very

08:43 16  first question states --

08:43 17            THE COURT:  To put it into the questions themselves

08:43 18  makes it all that much more complicated.

08:43 19            MR. METZGER:  I'm only asking for one threshold

08:43 20  question, Your Honor, which is --

08:43 21            THE COURT:  Well, then we'd need to do it in every

08:43 22  question.

08:43 23            MR. METZGER:  No.  I'm just saying on the handicap

08:43 24  question, Your Honor, this is stating -- the first question is

08:43 25  did defendant fail to reasonably accommodate plaintiff's

**JA497**

08:43 1    handicap.  That's stating that he has one.  We have a threshold

08:43 2    question, which we've presented all the way through here, that

08:43 3    we believe the plaintiff has not established that he has a

08:43 4    handicap.  So the very first question that I want to ask the

08:44 5    jury or have them answer is does the plaintiff have a handicap,

08:44 6    or did the plaintiff prove he had a handicap, something along

08:44 7    those lines.

08:44 8         THE COURT:  I think it would be helpful if counsel

08:44 9    would get together and give me -- edit this in a way that you

08:44 10   can agree to it.

08:44 11        MR. METZGER:  Okay.

08:44 12        THE COURT:  And we'll just use the form that you want.

08:44 13        MR. GOODWIN:  I suspect as to that point we're not

08:44 14   going to be able to --

08:44 15        THE COURT:  You don't think you're going to be able to

08:44 16   do that?

08:44 17        MR. METZGER:  We can try.

08:44 18        MR. GOODWIN:  At present, Your Honor, I would just

08:44 19   delete question 5 and the plaintiff's position is that

08:44 20   questions 1, 2, 3 and 4 are fine as they are and we're

08:44 21   comfortable and we would propose using the court's questions 1

08:44 22   to 4.

08:44 23        And then we get to the second part of this, which is

08:44 24   6, which includes for back pay, for front pay, for emotional

08:44 25   distress, but punitive damages is not included.

**JA498**

4-8

| | | |
|---|---|---|
| 08:45 | 1 | THE COURT:  No.  Because I think punitive damages go |
| 08:45 | 2 | out.  I don't see that the evidence supports punitive damages |
| 08:45 | 3 | in this case from what I heard from all the witnesses. |
| 08:45 | 4 | MR. GOODWIN:  So you're deciding that without any |
| 08:45 | 5 | argument, Your Honor? |
| 08:45 | 6 | THE COURT:  It goes to the jury with what the case |
| 08:45 | 7 | will be and we haven't had the discussion about that yet.  But |
| 08:45 | 8 | I don't think the case will go forward on punitive damages. |
| 08:45 | 9 | MR. GOODWIN:  But Your Honor, you refused to bifurcate |
| 08:45 | 10 | as to punitive damages.  You didn't allow us to be heard about |
| 08:45 | 11 | it.  You're instructing the jury in about an hour about the |
| 08:45 | 12 | case and you're, all of a sudden, telling us that you're not |
| 08:45 | 13 | going to include punitive damages? |
| 08:45 | 14 | THE COURT:  But now we've heard all the evidence, and |
| 08:45 | 15 | I don't think the evidence is there. |
| 08:45 | 16 | MR. GOODWIN:  But Your Honor, you presented the fact |
| 08:45 | 17 | evidence without -- you afforded us no process around this. |
| 08:45 | 18 | You didn't let us be heard on it and it's a plain violation of |
| 08:45 | 19 | my plaintiff's rights. |
| 08:46 | 20 | THE COURT:  The jury is still coming at 9:00.  If we |
| 08:46 | 21 | don't finish this discussion by 9:00 I'm just going to put it |
| 08:46 | 22 | off until after all of the evidence is concluded and the |
| 08:46 | 23 | parties -- no, I guess we have concluded that.  Right? |
| 08:46 | 24 | MR. GOODWIN:  Yes, we have to, Your Honor.  This is |
| 08:46 | 25 | the time we have to.  We strongly object to the exclusion of |

**JA499**

08:46  1    punitive damages in this case.

08:46  2           THE COURT:  Yeah, but I don't want to keep the jury

08:46  3    waiting.

08:46  4           MR. METZGER:  On the punitive damages -- I'll be very

08:46  5    short -- we believe there's not been a showing to rise to that

08:46  6    level.  And certainly we would agree that an instruction --

08:46  7           THE COURT:  I'm sorry?

08:46  8           MR. METZGER:  We agree with Your Honor on the punitive

08:46  9    damage piece.

       10           If I can just, on the very critical threshold, though,

08:46 11    going back to the questions --

08:46 12           THE COURT:  So are the parties agreed with respect to

08:46 13    question 1?

08:46 14           MR. METZGER:  No, Your Honor, because --

08:46 15           THE COURT:  You don't want that at all?

08:46 16           MR. METZGER:  I do, but I believe, Your Honor, that

08:46 17    question number 1 before that needs to be does the plaintiff

08:46 18    have a handicap?

08:46 19           THE COURT:  Does what?

08:46 20           MR. METZGER:  Does the plaintiff have a handicap?

08:47 21           THE COURT:  So what do you want me to do about it?

08:47 22           MR. METZGER:  Insert one question before:  Does the

08:47 23    plaintiff have a handicap, yes or no?

08:47 24           THE COURT:  Does the plaintiff --

08:47 25           MR. METZGER:  Have a handicap, yes or no.  That's it.

**JA500**

4-10

08:47 1              THE COURT:  Have any income?

08:47 2              MR. METZGER:  No, have a handicap.  Just question

08:47 3   number 1.

08:47 4              (Court/law clerk discussion held off the record.)

08:47 5              THE COURT:  I think that's not inappropriate.

08:47 6              MR. GOODWIN:  I think it's very inappropriate.

08:47 7              THE COURT:  Wait a minute.

08:47 8              MR. METZGER:  It's the standard.

08:47 9              THE COURT:  Interestingly, my law clerks worked on

08:48 10  this.  We then got together.  And my question to them was did

08:48 11  he have a handicap that interfered with his ability?  And I

08:48 12  need to talk to my law clerks about that and see why they don't

08:48 13  think we should do that and I may agree or disagree with them.

08:48 14  But I need their help.  So that one I understand is an issue

08:48 15  for the defendant but not the plaintiff, correct?

08:48 16             MR. GOODWIN:  Correct.

08:48 17             THE COURT:  Okay.

08:48 18             And then I had a second question, did he disclose his

08:48 19  handicap to the defendant.

08:48 20             MR. GOODWIN:  No.  Wait.  The second question is, Did

08:48 21  the defendant terminate plaintiff.

08:48 22             THE COURT:  I want to know what you think about the

08:48 23  question.

08:48 24             MR. GOODWIN:  I apologize, Your Honor.  The question

08:48 25  is did the plaintiff disclose --

**JA501**

4-11

08:48 1        THE COURT:  So you would want that question in?

08:48 2        MR. GOODWIN:  No.

08:48 3        THE COURT:  You want it out?

08:48 4        MR. GOODWIN:  The four questions you have presented to

08:48 5 the jury as they stand are acceptable to the plaintiff and we

08:48 6 will object to any alteration.

08:48 7        THE COURT:  What's the defendant's view on whether he

08:49 8 disclosed it to the -- whether the jury should determine

08:49 9 whether he disclosed it?

08:49 10       I mean, it's a funny case because things happened

08:49 11 without any sort of introductory conduct.  I mean, the conduct

08:49 12 was there but it wasn't spread out among the parties.  That

08:49 13 makes it difficult.  I mean, the plaintiff knew what was wrong

08:49 14 with him or what he thought was wrong with him, but the

08:49 15 defendant didn't know the whole story.

08:49 16       MR. GOODWIN:  Your Honor, that's your opinion.  But

08:49 17 follow me, please, for the minute.

08:49 18       There's no dispute in this case that the note went to

08:49 19 Ms. Lydon.  We don't need that other question.  It's just going

08:49 20 to confuse the jury.

08:49 21       THE COURT:  I understand that, but it's a kind of a

08:49 22 hole that we have to work around.  This is the way the case

08:49 23 went in.

08:49 24       MR. GOODWIN:  And the jury will reach the facts on --

08:49 25       THE COURT:  Tell me when you're finished?

**JA502**

4-12

08:49 1          MR. GOODWIN:  What's that?

08:49 2          THE COURT:  Anything else right now?

08:49 3          MR. GOODWIN:  Other than the strong objection to the

08:49 4    exclusion of punitive damages without the process of argument

08:49 5    or really any consideration of the applicable Massachusetts

08:50 6    law, no, Your Honor, there is nothing else.

08:50 7          THE COURT:  Okay.  Defendant?

08:50 8          MR. METZGER:  Just briefly, the only issue that is

08:50 9    open for us is the question regarding whether the plaintiff

08:50 10   proved or had a handicap.

08:50 11         THE COURT:  This is question 1 that you're talking

08:50 12   about?

08:50 13         MR. METZGER:  It is what I would like to add in as

08:50 14   question 1.

08:50 15         THE COURT:  So what you want out is whether defendant

08:50 16   failed to reasonably accommodate his handicap?

08:50 17         MR. METZGER:  We don't need that out.  I'm just trying

08:50 18   to insert the first threshold question:  Did the plaintiff have

08:50 19   a handicap.

08:50 20         THE COURT:  I'm sorry, the first question you want is

08:50 21   what?

08:50 22         MR. METZGER:  Did the plaintiff have a handicap?

08:50 23         THE COURT:  Well, that's the question that I asked

08:50 24   myself why it wasn't here.

08:50 25         MR. METZGER:  I agree.

**JA503**

4-13

08:50 1          THE COURT:  So I think -- I mean, the way I had it was

08:50 2    did plaintiff have a handicap that interfered with his ability

08:50 3    to do all of his work?

08:51 4          MR. METZGER:  Perfect.

08:51 5          THE COURT:  Any objection?

08:51 6          MR. GOODWIN:  Very strongly, Your Honor, yes.  It

08:51 7    should be dealt with in an instruction.  That question should

08:51 8    not be included.

08:51 9          THE COURT:  So you don't object?

08:51 10          MR. GOODWIN:  I do object, Your Honor.

08:51 11          THE COURT:  So add that.

08:51 12          Then I had a second question related to this, I think,

08:51 13    Did he disclose this handicap to defendant?

08:51 14          MR. METZGER:  And I agree with adding that.

08:51 15          THE COURT:  That that should be a question?

08:51 16          MR. METZGER:  I agree.

08:51 17          THE COURT:  What's the plaintiff's view?

08:51 18          MR. GOODWIN:  I do not agree.

08:51 19          THE COURT:  I mean, having a handicap that makes it

08:51 20    difficult to work for somebody and not telling them about it

08:51 21    doesn't get the plaintiff very far, does it?

08:51 22          MR. GOODWIN:  What are you -- Your Honor, it's plain

08:51 23    that the defendant even stated it reasonably accommodated the

08:51 24    plaintiff.  I understand Mr. Metzger's --

08:51 25          THE COURT:  You can't reasonably accommodate if you

**JA504**

4-14

08:51 1    don't know it.

08:51 2         MR. GOODWIN:  But Your Honor, they sent the note.

08:51 3    Ms. Lydon received it.  What are we talking about here?

08:52 4         THE COURT:  I don't understand why you object so

08:52 5    vehemently to the question.  The jury can say yes, of course he

08:52 6    did talk about it.

08:52 7         MR. GOODWIN:  And I understand that, but I don't

08:52 8    understand what your particular comment is about whether or not

08:52 9    it was provided.  It was the possible fax and restricted note

08:52 10   that the defendant's witness testified about.  It is an

08:52 11   indisputable fact.  If the question is going in, fine.  But to

08:52 12   your other comments about it, it's plain that they were aware.

08:52 13        THE COURT:  Well, I don't think that's right.

08:52 14        MR. GOODWIN:  Okay.  But is that for the court or for

08:52 15   the jury, Your Honor?

08:52 16        THE COURT:  I mean, frankly, I was sort of surprised

08:52 17   that as the evidence went to the jury, that that particular

08:52 18   issue wasn't really addressed by the witnesses.

08:52 19        MR. GOODWIN:  It's in record evidence, Your Honor.

08:52 20        THE COURT:  But if that's the case, then there's no

08:52 21   reason why the jury can't determine that that's what happened.

08:52 22        MR. GOODWIN:  Understood, Your Honor.  Just please

08:53 23   note my objection.

08:53 24        THE COURT:  Okay.

08:53 25        Then question -- is the document that counsel have the

**JA505**

4 -15

08:53  1   same that I have here, that I have adopted already?

08:53  2            LAW CLERK:  Yes.

08:53  3            THE COURT:  I would suggest taking out question 5.

08:53  4            MR. GOODWIN:  That's acceptable, Your Honor.

08:53  5            THE COURT:  Because I think it's sort of subsidiary to

08:53  6   other questions.

08:53  7            MR. GOODWIN:  We agree.  No objection.

08:53  8            THE COURT:  Agreed?

08:53  9            MR. METZGER:  Agreed.

08:53 10            MR. GOODWIN:  Agreed.

08:53 11            THE COURT:  And then the amount of damages, you had a

08:53 12   problem with that?

08:53 13            MR. GOODWIN:  No.  The exclusion of punitive damages I

08:53 14   had a problem with.

08:53 15            MR. METZGER:  And we --

08:53 16            THE COURT:  And you agreed with the three elements of

08:53 17   damages?

08:53 18            MR. GOODWIN:  No, Your Honor.  The not including

08:53 19   punitive damages is plainly --

08:53 20            THE COURT:  What do you want me to do?

08:53 21            MR. GOODWIN:  I want you to add a line --

08:53 22            THE COURT:  I'm sorry.  Do you want me to take out the

08:53 23   details, simply the amount of plaintiff's damages is blank

08:54 24   dollars?

08:54 25            MR. GOODWIN:  I'm fine with that, Your Honor.  What I

**JA506**

08:54 1  would ask is that you reinclude the punitive damages.

08:54 2       THE COURT:  Well, I certainly would explain to the

08:54 3  jury what that means.

08:54 4       MR. METZGER:  Your Honor, the way that it is written

08:54 5  up, we agree with leaving it exactly that way.  We also agree

08:54 6  that, based upon the evidence the plaintiff put on in their

08:54 7  case, they are not entitled to an instruction on punitive

08:54 8  damages.  That is clearly within the court's discretion whether

08:54 9  the jury would hear an instruction on punitive damages.  My

08:54 10  understanding is your ruling is that the evidence did not rise

08:54 11  to that level and it's absolutely appropriate to exclude an

08:54 12  instruction on punitive damages when they have not met that

08:54 13  threshold.  So we agree with exactly how the court has written

08:54 14  up the second page of this proposal, and leaving it as is.

08:54 15       THE COURT:  I do think that having this question that

08:54 16  asks for details as to three separate elements of damages would

08:55 17  be very difficult for the jury because that's not how the

08:55 18  evidence went in.

08:55 19       MR. METZGER:  Well, on the back pay and the front pay

08:55 20  and also on emotional distress, we did break those out in terms

08:55 21  of my questioning of the plaintiff.  So we would agree that as

08:55 22  written up, setting out those three categories would be very

08:55 23  helpful.

08:55 24       MR. GOODWIN:  We have no objection to setting out the

08:55 25  three categories.

**JA507**

4 -17

08:55 1          THE COURT:  What would you want me to do with respect
08:55 2    to this question?
08:55 3          MR. METZGER:  In terms of that second page, leaving it
08:55 4    alone as is, and I believe that plaintiff's counsel has said
08:55 5    that they're also now okay leaving that as is.
08:55 6          MR. GOODWIN:  Except with the inclusion of punitive
08:55 7    damages.
08:55 8          MR. METZGER:  I understand they reserve their
08:55 9    objection on punitive damages but as is, we would agree to
08:55 10   leaving it as is.
08:55 11         THE COURT:  So what we have is a question asking for
08:55 12   total damages, and then ask the jury.  I think we could improve
08:55 13   the question.  And then ask it to translate it into three
08:56 14   pieces.
08:56 15         MR. METZGER:  That's fine.
08:56 16         THE COURT:  That's what I would explain to the jury.
08:56 17   And that's okay for you?
08:56 18         MR. GOODWIN:  I mean, except it's plain that punitive
08:56 19   damages should be included, yes, it's acceptable.
08:56 20         MR. METZGER:  And acceptable to us, as well.
08:56 21         THE COURT:  Okay.  All right.
08:56 22         Now, on the charge itself.  We are now late.
08:56 23         I will try to explain to the jury its role.  I will
08:56 24   tell them what evidence is.  I will tell them what is not
08:56 25   evidence in the case, like opening statements and closing

**JA508**

4-18

08:56  1    argument, for instance.

08:56  2          And then I will try to explain to them the issues in

08:56  3    the case, as I understand them, that the plaintiff says the

08:56  4    defendant discriminated against him, et cetera, et cetera, that

08:56  5    the defendant denies each of the plaintiff's allegations, that

08:56  6    he was qualified, that he needed reasonable accommodation, that

08:57  7    the plaintiff requested such accommodation, that the defendant

08:57  8    knew that the plaintiff was a handicapped person but able to

08:57  9    perform essential functions, that the defendant took an adverse

08:57 10    or adverse employment actions against the plaintiff.

      11          MR. GOODWIN:  Your Honor --

08:57 12          THE COURT:  Those are what I understand to be the

08:57 13    defendant's position in response to the plaintiff's case.

08:57 14          Then I would explain to them what burden of proof

08:57 15    means, and that in this kind of a case, the plaintiff has the

08:57 16    burden of proving all of the elements of each of its claims of

08:57 17    defendant's alleged wrongdoing and then also the amount of

08:57 18    damages.  That's up to the plaintiff to do.

08:57 19          And then I will explain to them in some greater detail

08:57 20    what I understand to be the claims and the elements of the

08:58 21    claims.  So plaintiff alleges that the defendant failed to

08:58 22    accommodate, and to prevail on such a claim, the plaintiff has

08:58 23    to prove the following elements.  And then I would tell them

08:58 24    that --

08:58 25          MR. GOODWIN:  Your Honor, we need to know what you're

**JA509**

08:58 1    actually going to say.  We can't just get an overview like

08:58 2    that.

08:58 3         THE COURT:  I'm sorry?

08:58 4         MR. GOODWIN:  We need the actual language of the

08:58 5    instruction.  An overview isn't going to be sufficient because

08:58 6    how do we know what our objections are?

08:58 7         THE COURT:  I don't understand your problem.  I'm just

08:58 8    trying to explain to you what I'm trying to explain to the jury

08:58 9    they need to understand.

08:58 10        MR. GOODWIN:  Yes, Your Honor, but you're going to say

08:58 11   and then we're going to talk about discrimination and move

08:58 12   through the elements without saying what it is and then we're

08:58 13   going to talk about what a burden of proof is without

08:58 14   explaining what you're going to say about burden of proof.  The

08:58 15   charge to the jury should be laid out to us.

08:58 16        THE COURT:  What do you mean, laid -- that's what I'm

08:58 17   trying to do.

08:58 18        MR. GOODWIN:  But you're glossing over what you're

08:58 19   saying in whole cloth.  You're not going through each element

08:58 20   saying specifically to us what you're going to say.  If you

08:58 21   want us to make your objections after your instructions, that's

08:59 22   fine, but I've never engaged in the process in this way.

08:59 23        THE COURT:  What does the defendant -- does the

08:59 24   defendant have a problem?

08:59 25        MR. METZGER:  No problem, Your Honor.

**JA510**

4-20

08:59 1          THE COURT:  I don't want to give you word by word what

08:59 2   I'm going to tell the jury because we're already late.

08:59 3          MR. GOODWIN:  Okay, Your Honor.  We'll just preserve

08:59 4   our objection and please proceed.

08:59 5          THE COURT:  I'm telling you the elements of what I'm

08:59 6   telling them.  Is that not enough?

08:59 7          MR. GOODWIN:  Your Honor, I've noted my concerns for

08:59 8   the record.  Please proceed.

08:59 9          THE COURT:  I will explain to them the claims and the

08:59 10  elements of what the plaintiff has to prove -- I mean, you

09:00 11  know, there's a fair amount of stuff here.  I will tell them

09:00 12  that, number one, plaintiff alleges that defendant failed to

09:00 13  accommodate his alleged physical handicap, and to prevail on

09:00 14  that claim I would tell the jury that the plaintiff has to

09:00 15  prove each of the following elements, namely, that he was

09:00 16  handicapped within the meaning of the law, that he needed a

09:00 17  reasonable accommodation due to his handicap, that the

09:00 18  plaintiff requested an accommodation, and that the defendant

09:00 19  knew he was handicapped, yet refused to provide an

09:00 20  accommodation.  Those are the elements of that claim.

09:00 21          And I will tell them that the plaintiff alleges that

09:00 22  the defendant discriminated against him by terminating his

09:00 23  employment because of his alleged physical handicap.

09:00 24          I think we gave you copies of the questions to the

09:00 25  jury this morning.  Did we?

**JA511**

```
09:01  1            MR. GOODWIN:  No.

09:01  2            THE COURT:  Did we have enough copies?

09:01  3            MR. METZGER:  Yes.  You're referring to --

09:01  4            MR. GOODWIN:  You're referring to these questions?

09:01  5            THE COURT:  These are the questions I propose to give

09:01  6    to the jury to answer and then explain them in the charge as I

09:01  7    just outlined with respect to question 1.  Is that okay?

09:01  8            MR. METZGER:  Your Honor, we're referring to the

09:01  9    revised --

09:01 10            THE COURT:  Yeah.  And then with respect to -- I will

09:01 11    tell them that the plaintiff alleges that the defendant failed

09:01 12    to accommodate him or his physical handicap.  And to prevail on

09:01 13    this claim, he has to prove each of the following elements:

09:01 14    One, that the plaintiff was handicapped within the meaning of

09:01 15    the law, that he needed a reasonable accommodation due to this

09:01 16    alleged handicap.  Three, that plaintiff requested an

09:01 17    accommodation for the alleged handicap, and the defendant knew

09:01 18    he was handicapped, yet refused to provide an accommodation.

09:02 19    And the jury has to answer these subquestions, which are not

09:02 20    part of the questions that I'm asking them to answer.

09:02 21            I guess we didn't have enough copies of the proposed

09:02 22    questions, did we?

09:02 23            (Court/law clerk discussion held off the record.)

09:04 24            THE COURT:  Let me skip sort of to the end.  I have

09:04 25    questions -- proposed questions to the jury on special verdict.
```

**JA512**

4-22

| | | |
|---|---|---|
| 09:04 | 1 | You have those, correct?  Each of you has a copy? |
| 09:04 | 2 | MR. GOODWIN:  Correct, Your Honor. |
| 09:04 | 3 | THE COURT:  Now, with respect to the plaintiff, do you |
| 09:04 | 4 | object to any of those questions? |
| 09:04 | 5 | MR. GOODWIN:  No, Your Honor.  We've already discussed |
| 09:04 | 6 | that.  Question 5 was stricken. |
| 09:04 | 7 | THE COURT:  The defendant I think already said, you do |
| 09:04 | 8 | not object? |
| 09:04 | 9 | MR. METZGER:  Just briefly, we definitely want the |
| 09:04 | 10 | threshold or initial question in, being:  Does the plaintiff |
| 09:04 | 11 | have a handicap? |
| 09:04 | 12 | THE COURT:  Which question do you object to? |
| 09:04 | 13 | LAW CLERK:  They're not objecting to any question. |
| 09:04 | 14 | They want to add a question about whether he had a handicap. |
| 09:04 | 15 | THE COURT:  Well, I had already made that decision |
| 09:05 | 16 | myself. |
| 09:05 | 17 | MR. METZGER:  Yes.  I just wanted to clarify. |
| 09:05 | 18 | THE COURT:  Adding the question, Did plaintiff have a |
| 09:05 | 19 | handicap that interfered with his ability to do all of his |
| 09:05 | 20 | work?  Maybe "all of his work" is too strong.  It should be |
| 09:05 | 21 | "all or part of his work." |
| 09:05 | 22 | MR. GOODWIN:  I'm sorry, Your Honor. |
| 09:05 | 23 | THE COURT:  Then the second part of this question, Did |
| 09:05 | 24 | he disclose this handicap to defendant? |
| 09:05 | 25 | MR. METZGER:  Yes.  We agree with Your Honor. |

**JA513**

4-23

09:05 1          THE COURT:  Is there an objection to having that as --

09:05 2          MR. GOODWIN:  The appropriate question would be, Did

09:05 3     the defendant know --

4          THE COURT:  As --

09:05 5          MR. GOODWIN:  The appropriate question --

09:05 6          THE COURT:  I think it's really question 1 and the

09:05 7     order of these questions.  1 becomes 2 and so on.

09:05 8          MR. GOODWIN:  Mr. Moore would propose that it be

09:05 9     first, was he a qualified handicapped person?

09:05 10         THE COURT:  Are you objecting to that as a question 1?

09:05 11         MR. GOODWIN:  Your Honor, I'm confused about what

09:05 12    we're even talking about right now.  We keep jumping back and

09:06 13    forth between the jury form and instructions.

09:06 14         THE COURT:  Is the answer yes or no?  Are you

09:06 15    objecting to having that question?

09:06 16         MR. GOODWIN:  What are you asking me if I'm objecting

09:06 17    to?  I'm unclear on the question is what I'm saying.  Where are

09:06 18    we?  Are you discussing what the elements are about disability

09:06 19    or failure to accommodate?

09:06 20         THE COURT:  I mean, to me there's a sort of funny part

09:06 21    of this case in that there is really no discussion about

09:06 22    whether the plaintiff had a handicap.  All it has to do with is

09:06 23    whether the defendant used it in some way.

09:06 24         MR. METZGER:  Your Honor, I did, during the

09:06 25    cross-examination of the plaintiff, specifically get into

**JA514**

4-24

09:06  1   whether he had a handicap, particularly with the exhibits that
09:06  2   we used for his medical records.
09:06  3          THE COURT:  So we can start with whether the defendant
09:06  4   failed to reasonably accommodate the handicap?
09:06  5          MR. METZGER:  I think the first question you had
09:06  6   exactly right.  Did the plaintiff have a handicap?  And then
09:06  7   the second question you had -- the additional question you had
09:06  8   right as well.
09:06  9          THE COURT:  I'm sorry.  Are you saying you want that
09:07 10   additional question or you don't?
09:07 11          MR. METZGER:  We do, yes.
09:07 12          THE COURT:  What about the plaintiff?
09:07 13          MR. GOODWIN:  The second element of the claim should
09:07 14   be that the defendant knew that Mr. Moore was a qualified
09:07 15   handicapped person.
09:07 16          THE COURT:  So you don't want this?  I mean, the
09:07 17   question that I thought to add was, Did plaintiff have a
09:07 18   handicap that interfered with his ability to do all of this
09:07 19   work?  And second, did he disclose this handicap to defendant?
09:07 20          MR. METZGER:  Your Honor, we agree to leave it --
09:07 21   defendant agrees to write that in exactly --
09:07 22          MR. GOODWIN:  And we object, because that's not the
09:07 23   elements --
09:07 24          THE COURT:  You do or do not object?
09:07 25          MR. GOODWIN:  What's that?

**JA515**

4-25

09:07 1          THE COURT:  Do you want this included or do you object
09:07 2    to including it as a question to the jury?
09:07 3          MR. GOODWIN:  I don't think it's a proper statement of
09:07 4    the elements of the claim, and we object to the language as
09:07 5    written and we'd ask the court to rule on it and then keep
09:07 6    moving.
09:07 7          THE COURT:  We're assuming the questions, as I had
09:08 8    done them, and I think you have a copy of that --
09:08 9          MR. GOODWIN:  We do not have a copy of your elements.
09:08 10   We only have a copy of these questions.  I've not reviewed
09:08 11   these.  It's highly inappropriate for you to be reading it into
09:08 12   us and then changing the point we're talking about.
09:08 13         THE COURT:  Do me a favor, don't give a lecture each
09:08 14   time.  I'm trying to do this and get the jury going.  The
09:08 15   question we now have that we start with is did defendant fail
09:08 16   to reasonably accommodate plaintiff's handicap.  And there is
09:08 17   nothing in the questions that suggests that he, in fact, had a
09:08 18   handicap.  And the question I'm asking is whether that is a
09:08 19   question for the jury to decide?
09:08 20         MR. GOODWIN:  Yes.  Whether or not he's a qualified
09:08 21   handicapped person is a question for the jury.
09:08 22         THE COURT:  You want it in?
09:08 23         MR. GOODWIN:  Honestly, Your Honor, I'm lost.  But I
09:08 24   would state for the record that if he's a qualified handicapped
09:08 25   person is the first element of this, yes.

**JA516**

4-26

09:08 1          THE COURT:  What's the defendant's view?

09:08 2          MR. METZGER:  I think we're all at the same point now

09:08 3   of asking that initial question of whether he's a qualified

09:09 4   person --

09:09 5          THE COURT:  I mean, I have a second piece of this, did

09:09 6   he disclose the handicap to the defendant?  I mean, it wasn't

09:09 7   very clear to me from the evidence we did hear how the

09:09 8   defendant knew that there may be a handicap.  I just -- there

09:09 9   may have been evidence that just bypassed me, but I didn't

09:09 10  remember when I started working --

09:09 11         MR. GOODWIN:  That second element should be did the

09:09 12  defendant know that Mr. Moore was a qualified handicapped

09:09 13  person.

09:09 14         THE COURT:  I'm sorry?

09:09 15         MR. GOODWIN:  The second element, and I don't think

09:09 16  Mr. Metzger is going to disagree with this, was did the

09:09 17  defendant know that Mr. Moore was a qualified handicapped

09:09 18  person.

09:09 19         THE COURT:  Yeah, but the question is do we put it in

09:09 20  and how?

09:09 21         MR. METZGER:  Yes, I believe we put it in.

09:09 22         (Court/law clerk discussion held off the record.)

09:10 23         THE COURT:  So what we will do is add a question as to

09:10 24  whether plaintiff had a handicap that interfered with his

09:10 25  ability to do all of his work.

**JA517**

09:10  1          MR. METZGER:  Thank you.

09:10  2          THE COURT:  Or however you want me to redraft that.

09:10  3  And that would be question 1, correct?

09:10  4          MR. METZGER:  Thank you.

09:10  5          MR. GOODWIN:  Are we talking about the verdict slip

09:10  6  again or are we talking about instructions?

09:10  7          THE COURT:  These are questions to the jury.  The

09:10  8  questions that the jury needs to answer.

09:10  9          MR. GOODWIN:  Okay.  And you're adding an initial

09:10 10  element --

09:10 11          THE COURT:  I'm adding number 1 and fixing the numbers

09:10 12  for the others in accordance.  What is now 1 will become 2.

09:10 13          MR. GOODWIN:  Your Honor, I've noted my previous

09:10 14  objection to that.  Please proceed.

09:10 15          THE COURT:  And I think -- do they have this copy?  Do

09:10 16  the lawyers have this?  Then I think question 5, which says,

09:10 17  "Did defendant retaliate by terminating" --

09:11 18          LAW CLERK:  They agreed to take that out.

09:11 19          THE COURT:  Yeah, I would take that out, so that goes

09:11 20  out.

09:11 21          MR. GOODWIN:  Agreed.  We've discussed that.

09:11 22          THE COURT:  And that was the only change I would make,

09:11 23  except that the next line, "If you answered yes to any of

09:11 24  Questions 1 through 5" will become questions "1 through 4."

09:11 25          LAW CLERK:  Well, we're adding a question.

**JA518**

4-28

```
09:11  1              THE COURT:  So it's still 5.  Okay?
09:11  2         Then question 6 is the sort of the trifurcated damages
09:11  3    question.
09:11  4              MR. METZGER:  Right.  And Your Honor --
09:11  5              THE COURT:  And is there disagreement about that?
09:11  6              MR. METZGER:  No problem with that.
09:11  7              THE COURT:  I knew you wouldn't object.
09:11  8              MR. GOODWIN:  There is, and we've covered it already
09:11  9    about the punitive damages.
09:11 10              THE COURT:  So what do you want me to do with --
09:11 11              LAW CLERK:  They want punitive damages.  That's their
09:11 12    only objection.
09:11 13              THE COURT:  No.  With respect to punitive damages, I
09:11 14    don't think the evidence supports that.
09:11 15              MR. GOODWIN:  We understand that.  I would say that we
09:11 16    pretty much covered the questions to the jury.  I believe what
09:11 17    we need to discuss is the instructions that you're going to
09:12 18    give to the jury, and that's what I -- when I was talking about
09:12 19    the qualified handicap person earlier, that's what I was
09:12 20    noting.
09:12 21              But at this point I would just ask that I be given an
09:12 22    opportunity to ask for a few very specific instructions and
09:12 23    then have you rule on them and I'm sure my brother counsel has
09:12 24    some he'd like as well.  And then -- because -- and then we'll
09:12 25    object if we object when we put it to the jury.  Because
```

**JA519**

4-29

09:12 1    otherwise, I feel like this is going to be very circular.

09:12 2        THE COURT:  So with respect to the charge itself, I

09:12 3    will explain to the jury what its role is.  I will explain to

09:12 4    them what the evidence consists of, namely the exhibits.  There

09:12 5    may have been some stipulations that I don't remember.  And in

09:12 6    particular, the testimony of all the witnesses, and that that

09:12 7    is -- the major job that they have to do is review all of the

09:13 8    evidence, all of the testimony of the witnesses, and then

09:13 9    decide what they believe of what any witness said and what they

09:13 10   don't believe, and ultimately put it all together into their

09:13 11   answer to the ultimate question as to what happened in this

09:13 12   case and was it correct.

09:13 13        I will tell them what is not evidence in the case,

09:13 14   including any opening statements and introductions when we

09:13 15   started this.  Any closing summary or closing argument is

09:13 16   counsel's version of this.  It's helpful for them to have it

09:13 17   recalled to them but they have to decide what they remember of

09:13 18   the evidence and how they find the evidence from the witnesses.

09:13 19        I will tell them that questions in the form of a

09:13 20   statement that a witness didn't adopt or the court's

09:13 21   statements, for that matter, are not evidence and they should

09:13 22   not consider -- I want them to follow my ruling -- my

09:13 23   suggestion as to what the case is about, but I am not -- they

09:14 24   should not take anything I said as to my view as to what the

09:14 25   evidence calls for, what the evidence is.

**JA520**

09:14  1          And I will then explain to them what the issues in the
09:14  2    case are, which are essentially the claims that the plaintiff
09:14  3    has made, and there are -- that is, that the plaintiff says
09:14  4    that his employer, the defendant, discriminated against him by
09:14  5    failing to accommodate his handicap and taking an adverse
09:14  6    action against him, namely terminating his employment because
09:14  7    of the handicap.  That I think is the plaintiff's --
09:14  8    essentially the plaintiff's position.
09:14  9          The defendant, I will tell them, denies each of these
09:14 10    allegations, that he was a qualified handicapped person, that
09:14 11    he needed reasonable accommodation, that the plaintiff
09:14 12    requested such accommodation, that defendant knew that he was a
09:15 13    handicapped person but able to perform essential functions of
09:15 14    the job, and that the defendant took an adverse employment
09:15 15    action in this case.
09:15 16          I will tell them that in a case like this, the
09:15 17    plaintiff has the burden of proving each element of the alleged
09:15 18    wrongdoing by a preponderance of the evidence, that is, that
09:15 19    the plaintiff has to show that the defendant more likely than
09:15 20    not did what the plaintiff alleged.  And that to prove that,
09:15 21    they have to -- well, that's it.
09:15 22          And then I will need to, I think, explain to them some
09:15 23    of the questions that we specifically put to them, but that's
09:15 24    also fairly simple and fairly direct.
09:16 25          I will tell them that the plaintiff asserts three

09:16 1   retaliation claims, as best as I can tell.  He alleges that the
09:16 2   defendant retaliated against him by terminating his employment
09:16 3   because he engaged in certain protected activities, and in
09:16 4   order to prevail on these related claims, that he has to prove
09:16 5   each of the following elements:  One, that he engaged in a
09:16 6   protected activity, that is, an activity protected by law, that
09:16 7   he -- that the defendant knew he had engaged in protected
09:16 8   activity, that the defendant nonetheless terminated plaintiff's
09:16 9   employment in retaliation for plaintiff engaging in a protected
09:16 10  activity.  And if the jury doesn't find that he was engaged in
09:16 11  a protected activity, the defendant could not have terminated
09:16 12  plaintiff's employment.
09:16 13          So those are -- that's what the jury -- the process
09:17 14  the jury has to go through.
09:17 15          I will tell them if they find that the plaintiff has
09:17 16  proven that the wrong was done to him, he is entitled to
09:17 17  damages to right that wrong.
09:17 18          One of the things I'm not clear about is how we agreed
09:17 19  to deal with the $85,000 that he's already gotten.
09:17 20          MR. GOODWIN:  It's to the jury, Your Honor, would be
09:17 21  the plaintiff's position.
09:17 22          THE COURT:  The jury knows it.
09:17 23          MR. GOODWIN:  That's what I'm saying.  So they'll just
09:17 24  --
09:17 25          THE COURT:  But do I need to instruct them as to what

**JA522**

09:17  1    that means to their determination of damages?  I mean, it seems

09:17  2    to me he's not entitled to collect it twice, but the question

09:17  3    is do we tell the jury now to deduct it from any determination

09:17  4    that -- any judgment that he's entitled to money or should they

09:17  5    simply decide how much he's entitled to based on what happened

09:17  6    within the company or by the company.  And that we then -- I'll

09:17  7    tell them that we will simply deduct it from the ultimate

09:18  8    determination of damages by this jury.

09:18  9         MR. GOODWIN:  I think that -- subject to my earlier

09:18 10    objections, I think that that --

09:18 11         THE COURT:  So both parties are agreed that that's the

09:18 12    way to go?

09:18 13         MR. METZGER:  Since --

09:18 14         THE COURT:  How do you want me to deal with this?

09:18 15         MR. METZGER:  Yes, Your Honor.  Since the court's

09:18 16    earlier ruling was to allow for the jury to hear about the

09:18 17    $85,000 --

09:18 18         THE COURT:  Well, they know about it.

09:18 19         MR. METZGER:  Yes.  Then it should be -- to the extent

09:18 20    they are awarding any damages, it should be deducted because

09:18 21    they have seen it.

09:18 22         THE COURT:  But who deducts it?  I mean, that's the

09:18 23    question.  I can tell the jury once you decide what the damages

09:18 24    are --

09:18 25         MR. GOODWIN:  I think we agree, Your Honor.  I

**JA523**

09:18 1    think -- we're comfortable with the statement for back pay

09:18 2    damages, subject to my earlier objections --

09:18 3            THE COURT:  What do I tell the jury?

09:18 4            MR. GOODWIN:  I'm getting there, Your Honor.

09:18 5            Subject to my earlier objections, which I reserve, I

09:18 6    would say that you should instruct the jury to decrease the

09:18 7    amount of any earnings in record by the plaintiff from whatever

09:19 8    back pay award --

09:19 9            THE COURT:  So tell them that they should -- once they

09:19 10    decide what the total damages are, reduce it by $85,000?

09:19 11            MR. METZGER:  The parties are in agreement.

09:19 12            THE COURT:  That's agreed?

09:19 13            MR. GOODWIN:  Yes.

09:19 14            THE COURT:  I will -- beyond that, I will tell them

09:19 15    back pay amounts to the amount of plaintiff's lost earnings

09:19 16    from the date of the separation of employment and so long as

09:19 17    they determine that he suffered the loss.  And then front pay

09:19 18    is the amount of damages resulting from future earnings.  I

09:19 19    must say, I don't recall much evidence on that issue, but I

09:19 20    think we'll send it to the jury in any event.

09:19 21            And then I will also tell them that the plaintiff is

09:19 22    entitled to emotional distress damages and will explain to them

09:19 23    what that means and that they need to be wise in what they do

09:19 24    with respect to that.

09:19 25            I will tell them to elect a foreperson from among the

**JA524**

09:20 1    jurors who will be deliberating on the verdict.

09:20 2         And I wonder whether we should not use all ten jurors

09:20 3    we have.  We have ten, don't we?

09:20 4         MR. GOODWIN:  I think we use all ten.

09:20 5         THE COURT:  Ten?

09:20 6         LAW CLERK:  Yeah.

09:20 7         THE COURT:  Does everybody agree all ten of them can

09:20 8    deliberate?

09:20 9         MR. GOODWIN:  Yes, Your Honor.

09:20 10        MR. METZGER:  Yes.

09:20 11        THE COURT:  Okay.  That's good.  I will tell them that

09:20 12   their verdict will be the answer to each of the questions that

09:20 13   we'll give to them on paper, and that if they have any

09:20 14   questions about anything that I said, they should just write it

09:20 15   out -- the foreperson should write it out.  They need to elect

09:20 16   their foreperson as their first action as jurors and that the

09:20 17   marshal, somebody will be outside the jury room protecting

09:20 18   them.  And that person should -- the foreperson should write

09:20 19   out any questions and it will come to us and I will answer

09:21 20   either in writing or assembling everybody in the courtroom and

09:21 21   explain it.

09:21 22        And I think that we should send lunch to them

09:21 23   somewhere around 12:30 or so.  They need to have enough time to

09:21 24   do some work and hopefully -- sometimes they -- they

09:21 25   necessarily will have to -- they will wait long enough to have

09:21 1    free lunch for sure.  So the question is when do we give them

09:21 2    lunch.  So somewhere between 12:00 and 1:00 is probably

09:21 3    reasonable.

09:21 4          MR. GOODWIN:  Your Honor, if I may.  So is it fair to

09:21 5    say that our other -- both of our -- the instructions we both

09:21 6    submitted to you, you've reviewed and you're not including

09:21 7    going forward?

09:21 8          THE COURT:  You do not agree on what?

09:21 9          MR. GOODWIN:  So Attorney Metzger and I -- the parties

09:21 10   both submitted their own jury instructions.  We're assuming the

09:21 11   court has reviewed them and what you're -- I don't want to get

09:22 12   bogged down is what I'm trying to do here.  I'm trying to say

09:22 13   we both submitted instructions.  We'll object to the extent

09:22 14   that they're not included in whatever instructions we did to

09:22 15   preserve it for any appellate issues.

09:22 16        But I do have one additional instruction I'd like to

09:22 17   suggest, if possible, that hasn't been proposed yet.

09:22 18        THE COURT:  What's that?

09:22 19        MR. GOODWIN:  I would like a missing witness

09:22 20   instruction about Roger Oberkramer.

09:22 21        THE COURT:  About what?

09:22 22        MR. GOODWIN:  A missing witness instruction for

09:22 23   failure to call Roger Oberkramer.

09:22 24        MR. METZGER:  He was never deposed.  He was never

09:22 25   served with a subpoena.

**JA526**

```
09:22  1            MR. GOODWIN:  Incorrect.
09:22  2            MR. METZGER:  He was never served with a valid
09:22  3       subpoena.
09:22  4            THE COURT:  I didn't know this was in the case.
09:22  5            MR. GOODWIN:  We just closed evidence yesterday, Your
09:22  6       Honor.  You can't do a missing witness instruction until the
09:22  7       evidence closes.
09:22  8            MR. METZGER:  Your Honor, that would be highly
09:22  9       prejudicial to suggest there was any wrongdoing or there was
09:22 10       some question as to a former employee not being here.  This is
09:23 11       inappropriate.  This has never been raised.  And there's no
09:23 12       evidence that he's been employed during this trial.  There's no
09:23 13       evidence he's been employed this year or that there was
09:23 14       anything done to prevent the plaintiff from getting his
09:23 15       deposition.  This case has been out there for a year.  That
09:23 16       would be entirely inappropriate, particularly at this stage, to
09:23 17       give an instruction.
09:23 18            THE COURT:  I will think about it but I'm inclined not
09:23 19       to go ahead with that.  And the plaintiff's objection is noted.
09:23 20            MR. METZGER:  Thank you, Your Honor.
09:23 21            THE COURT:  I have one more question of counsel.  How
09:23 22       long will your argument be?
09:23 23            MR. METZGER:  Your Honor, I assume --
09:23 24            THE COURT:  Approximately.
09:23 25            MR. METZGER:  20 minutes.
```

4-37

```
09:23  1              THE COURT:  20 minutes?

09:23  2              MR. METZGER:  20.

09:23  3              THE COURT:  How about the plaintiff?

09:23  4              MR. TURIELLO:  Same, Your Honor.

09:23  5              THE COURT:  Okay.  I'm likely to go longer than that,

09:24  6   I think.

09:24  7              LAW CLERK:  Can I give them the updated jury

09:24  8   questions?

09:24  9              THE COURT:  Yes.

09:24 10              MR. METZGER:  Just a quick question in terms of the

09:24 11   court's procedure.  Will the defendant go first and then

09:24 12   plaintiff?  I know --

09:24 13              THE COURT:  You tell me what you want and if counsel

09:24 14   agree, that's what we'll do.

09:24 15              MR. GOODWIN:  The court process in this district court

09:24 16   is defendant goes first, then plaintiff.

09:24 17              THE COURT:  So defendant begins, plaintiff goes second

09:24 18   and defendant has the final word?

09:24 19              MR. GOODWIN:  No, Your Honor.  It's the opposite.

      20              THE COURT:  Plaintiff goes first.

09:24 21              MR. GOODWIN:  We go last.  Plaintiff goes last;

09:24 22   defendant goes first.

09:24 23              THE COURT:  Defendant goes first, plaintiff goes last,

09:24 24   period.

09:24 25              MR. GOODWIN:  Period.
```

**JA528**

09:24  1          MR. METZGER:  Sometimes there's a --

09:24  2          THE COURT:  If the plaintiff says something really

09:24  3  outlandish, raise the issue and maybe we'll consider it.

09:24  4          MR. GOODWIN:  We would never do that.

09:24  5          THE COURT:  I think it's unlikely.  I think he won't

09:24  6  do that now that it would invite a second address to the jury.

09:25  7          MR. METZGER:  I just reserve the opportunity for a few

09:25  8  minutes to respond to anything else.

09:25  9          THE COURT:  All right.  How long will your argument

09:25 10  be, approximately?

09:25 11          MR. METZGER:  I was estimating 20 minutes.

09:25 12          THE COURT:  And the plaintiff similar?

09:25 13          MR. GOODWIN:  That would be the outside limit.

09:25 14          THE COURT:  I think we should give to the jury the

09:25 15  proposed questions that they need to answer before you argue so

09:25 16  that they have that available.  We have it ready, right?

09:25 17          LAW CLERK:  Maya has it.  She just gave it to them.

09:25 18          THE COURT:  Is there any objection to that?

09:25 19          MR. GOODWIN:  I'm sorry, I didn't look at it.

09:25 20          THE COURT:  So that you can also be led by whatever --

09:25 21          MR. GOODWIN:  I mean, other than my standing objection

09:25 22  of punitive damages.

09:25 23          THE COURT:  No objection to giving it to the jury?

09:25 24          MR. GOODWIN:  Yeah.  I preserve my objection to

09:25 25  punitive damages.

**JA529**

```
09:25  1              THE COURT:  Okay.

09:25  2              MR. METZGER:  We agree, Your Honor.  No further

09:25  3    questions, no objection.

09:25  4              THE COURT:  You agree also that the jury can have it?

09:25  5              MR. METZGER:  Yes, Your Honor.

09:25  6              THE COURT:  And the parties agree with the questions

09:26  7    as I phrased them?  They're largely your questions except

09:26  8    sometimes I try to make them more consistent.

09:26  9              MR. METZGER:  Yes.  Thank you, Your Honor.

09:26 10              THE COURT:  Let's take about a two-minute recess.

09:26 11              MR. GOODWIN:  Your Honor, I think both parties have --

      12    do you have any more motions?

09:26 13              I would like to move for a directed verdict on all --

09:26 14              THE COURT:  I'm sorry?

09:26 15              MR. GOODWIN:  I'm moving for a directed verdict on all

09:26 16    affirmative defenses raised by the defendant for failure to

09:26 17    call Roger Oberkramer.

09:26 18              MR. METZGER:  For failure -- I didn't hear.

09:26 19              MR. GOODWIN:  I'm moving for a directed verdict on the

09:26 20    affirmative defenses put forward by the defendant because they

09:26 21    have not produced any witness who was actually present.

09:26 22              THE COURT:  Directed verdict on the entire case?

09:26 23              MR. GOODWIN:  No.  On the affirmative defenses raised

09:26 24    by defendant in their complaint, to the extent that they still

09:26 25    last, I'm raising -- I'm moving for a directed verdict because
```

4-40

09:26 1    they did not call anybody who was present on the day in

09:26 2    question when Mr. Moore was allegedly terminated.

09:26 3              MR. METZGER:  Well, Your Honor, we certainly object to

09:27 4    that.

09:27 5              THE COURT:  You object to the whole works?

09:27 6              MR. METZGER:  We object to all of that, yes.

09:27 7              THE COURT:  Okay.  I'll think about it.

09:27 8              MR. GOODWIN:  Thank you, Your Honor.

09:27 9              THE COURT:  Okay.  And we need that piece of furniture

09:27 10   there.

09:27 11             MR. GOODWIN:  We put the microphone here, Your Honor.

09:27 12             THE COURT:  Well, I don't care, but for purposes of

09:27 13   where you stand, this is about the right place.

09:27 14             MR. GOODWIN:  Yes.  We worked with the court reporter.

09:27 15             THE COURT:  If it interferes in any way, you can work

09:27 16   it out with the court reporter.  We'll take about a five-minute

09:27 17   recess and then we will begin.

09:27 18             MR. GOODWIN:  Thank you, Your Honor.

09:27 19             MR. METZGER:  Thank you.

09:27 20             THE COURT:  Thank you.  We are in recess.

11:12 21             THE CLERK:  All rise, please.

11:12 22   (A recess was taken.)

11:12 23   (Court and Jury enter.)

11:12 24             THE COURT:  Good morning.

11:12 25             JURORS:  Good morning.

**JA531**

4-41

11:12 1          THE COURT:  Please be seated.

11:12 2          Members of the jury, we're now coming to the next to

11:12 3    last stage of this trial.  The last stage is your deliberation

11:12 4    and ultimate determination of the verdict.

11:12 5          I apologize for the length of time that it took us.

11:12 6    We started at 8:30 but there were many issues that the parties

11:12 7    needed to discuss, and it's important, because they all had to

11:12 8    do with what they will tell you and that has much to say to you

11:12 9    about how you ultimately approach your job in rendering a

11:12 10   verdict.

11:12 11         So we will begin with counsel for the defendant

11:12 12   addressing you about the evidence as they view it.  Counsel for

11:12 13   the plaintiff will follow.  And then I will give you the

11:12 14   instructions on the law.  And then after that, you will retire

11:12 15   to the jury room and the evidence will go with you.  Everything

11:12 16   that was introduced in evidence will be upstairs in the jury

11:12 17   room for you to use in reaching your verdict, and we also will

11:12 18   order lunch for you by 12:30 or so, so that you shouldn't do

11:12 19   this on an empty stomach.

11:12 20         I think the parties will take relatively little time

11:12 21   to address you, but it's important that they explain to you

11:12 22   what their claim is, or what their defense is, so that you can

11:12 23   come to -- you can have that understanding in reaching your

11:12 24   verdict, which is ultimately based on the evidence in the case,

11:12 25   that is, the exhibits that were offered and any testimony as

**JA532**

4-42

11:12 1    well.  Okay?

11:12 2             So you may proceed.

11:12 3             MR. METZGER:  Thank you, Your Honor.

11:12 4             MR. GOODWIN:  Your Honor, for the record, I think we

11:12 5    have nine jurors.  Did we lose --

11:12 6             THE COURT:  I'm sorry?

11:12 7             MR. GOODWIN:  There's nine jurors here, not ten.

11:12 8             THE CLERK:  There is?

11:12 9             MR. GOODWIN:  Sorry.  Oh, never mind.  They slid down.

11:12 10   My apologies.

11:12 11            MR. METZGER:  Thank you, Your Honor.

11:12 12            Good morning.  Thank you very much for all of your

11:12 13   time this week.  Again, I'm Tom Metzger.

11:12 14            THE COURT:  Could you speak up a little, please, or

11:12 15   move the whole thing back a little.

11:12 16            MR. METZGER:  Yes.  Is that better, Your Honor?

11:12 17            THE COURT:  Yes.

11:12 18            MR. METZGER:  Thank you.

      19                CLOSING ARGUMENT BY MR. METZGER

11:12 20            MR. METZGER:  Again, I'm Tom Metzger, attorney for the

11:12 21   defendant, Industrial Demolition.

11:12 22            So what are the real issues in this case?

11:12 23   Particularly in terms of the claims that the plaintiff has

11:12 24   brought?  In other words, what did the plaintiff actually need

11:12 25   to prove on those particular claims?

**JA533**

4-43

11:12 1          There are a few key items for us to discuss and I want
11:12 2     to focus on those.  So let's go through those together here.
11:12 3     The first one is, did the plaintiff actually prove that
11:12 4     Industrial Demolition terminated his employment?  That becomes
11:12 5     a key threshold question in all of this because the adverse
11:12 6     action, as it's referred to, that he's complaining about is
11:12 7     termination of his employment.  So what were the facts?  What
11:12 8     is the evidence that came out in this case?  And he has to
11:12 9     demonstrate, by the way, through all of these elements by a
11:12 10    preponderance of the evidence, by the greater weight of the
11:12 11    evidence, that in fact he was terminated.
11:12 12         The threshold question is, first, was the plaintiff
11:12 13    told that he was fired?  The evidence is that he was not.  He
11:12 14    was not told by Roger Oberkramer that in fact he was fired.  He
11:12 15    was not told by Becky Lydon that he was fired.  Mike Roberts
11:12 16    did not tell him that he was fired.
11:12 17         Next, the plaintiff had contacted Mike Roberts on that
11:12 18    Monday, December 16, and Mike had committed to follow up on the
11:12 19    situation to see what both sides of the story were.  Mike kept
11:12 20    his word and Mike called the plaintiff back the very next day.
11:12 21    Mike then confirmed with the plaintiff the very next day that
11:12 22    he was not fired and that he understood through Roger that
11:12 23    Roger did not understand the plaintiff to be fired.
11:12 24    Critically, what Mike confirmed, in case there was any
11:12 25    confusion, in case plaintiff was under the impression that he

**JA534**

4-44

11:12 1   was fired without being told that he was fired by anybody, Mike

11:12 2   confirmed for him, through the testimony that we saw of the

11:12 3   plaintiff and Mike Roberts, that the plaintiff is welcome to

11:12 4   continue his work with the company.  This was in fact confirmed

11:12 5   in the testimony of Mike Roberts and of the plaintiff, based

11:12 6   upon the discussion of that call on December 17.

11:12 7         Then, related to that, although the plaintiff was told

11:12 8   if you want to stay with the company, you can certainly stay,

11:12 9   the plaintiff did nothing to return.

11:12 10        He in no way attempted to go back to the site.  He did

11:12 11  not reach out to Roger.  He did not contact Becky Lydon again

11:12 12  and he did not contact Mike Roberts again.  There was a direct

11:12 13  discussion by the co-owner of the business to the plaintiff

11:12 14  explaining you're absolutely free to continue.  You can go back

11:12 15  to the site.  But he did nothing.

11:12 16        In addition, still on this key threshold question as

11:12 17  to whether the plaintiff has proven by the greater weight of

11:12 18  the evidence that the defendant terminated his employment, the

11:12 19  exhibits that were admitted into evidence also backed up the

11:12 20  fact that the plaintiff was not actually fired.  The company

11:12 21  records going back to 2019, before we have a lawsuit, before

11:12 22  there's any claim, demonstrate that the company characterized

11:12 23  what was going on as a no-call, no-show.  You will have in your

11:12 24  deliberations Exhibit No. 34.  Exhibit No. 34 is that timesheet

11:12 25  tracker, the initial one that was sideways and we ultimately

**JA535**

11:12 1    were able to fix that.  And what you see in that timesheet

11:12 2    tracker first, in a record that Becky Lydon had explained she

11:12 3    kept in the regular course of business and she would make

11:12 4    notations as to what was going on, she noted for the day after

11:12 5    this argument with Roger Oberkramer that the plaintiff was a

11:12 6    no-call, no-show.  He was not listed as terminated.  There was

11:12 7    no note for her to list there.  And, by the way, on that same

11:12 8    sheet several lines up you'll see on that Exhibit 34 from the

11:12 9    same week there was another employee.  The name was redacted

11:12 10   because his name -- her name is not relevant, but another

11:12 11   person was terminated and she noted exactly that on that same

11:12 12   sheet.

11:12 13        We have her testimony that what she wrote down at that

11:12 14   time relating to the plaintiff was no-call, no-show, unlike the

11:12 15   other employee, who was written down as a termination.  And by

11:12 16   the way, you heard the testimony that Ms. Lydon is based in St.

11:12 17   Louis and what she was hearing from the site is what would be

11:12 18   recorded there.  So she heard that someone was terminated.  She

11:12 19   had written that note.  She heard that it was a no-call,

11:12 20   no-show for the plaintiff and she wrote that note in the

11:12 21   records that she kept at that time.

11:12 22        The plaintiff also, still on this key question, the

11:12 23   threshold question as to whether the plaintiff has proven to

11:12 24   you that the greater weight of the evidence that he in fact was

11:12 25   terminated, the plaintiff called one witness in this case, and

11:12 1    Heather Minton had nothing to say about his termination.

11:12 2    There's no other evidence that the plaintiff presented.

11:12 3          So in summary on this key first issue, there are no

11:12 4    documents saying that the plaintiff was terminated.  There's no

11:12 5    witness saying that he was terminated.  And both the

11:12 6    explanation from Mr. Roberts and, frankly, the plaintiff as to

11:12 7    the clarifying conversation on December 17 was that the

11:12 8    plaintiff was welcome to stay.  There is not, looking at the

11:12 9    plaintiff's burden, the greater weight of the evidence that in

11:12 10   fact he was terminated.

11:12 11         Now, if in your deliberations you determine that the

11:12 12   plaintiff had not proven that, we can, consistent with the

11:12 13   instructions and the questions that you will be answering

11:12 14   during those deliberations, we can essentially end our

11:12 15   discussions there because the plaintiff is complaining that he

11:12 16   was terminated for wrongful reasons.  So the related second

11:12 17   question, another key threshold question for you to decide --

11:12 18   and looking at the questions that you had been presented to you

11:12 19   from the court, from the judge, is "Did plaintiff prove he had

11:12 20   a handicap?"  So let's focus on that key question as well.

11:12 21   Again, what are the facts?  What's the evidence that was

11:12 22   presented to you in the course of this case?  Let's focus on

11:12 23   several items.

11:12 24         First, on Monday, December 9, 2019, when the plaintiff

11:12 25   had gone to the hospital to be evaluated, he drove himself to

**JA537**

4-47

11:12  1    the hospital, had his right hip checked.  The medical records,

11:12  2    again, Exhibit 3, you'll have with you, those show, page 2, the

11:12  3    medical staff listed no trauma.  Page 3, quote, "patient denies

11:12  4    any injury to that leg or hip."  Page 5, plaintiff is, quote,

11:12  5    "feeling much improved following the administration of some

11:12  6    basic medications and he was safe for discharge until several

11:12  7    hours later that very morning."  Plaintiff drove himself home

11:12  8    that morning.

11:12  9          Also related to this question of does the plaintiff

11:12 10    have a handicap, and I'll talk about what that threshold, what

11:12 11    that bar is, what he needs to clear to get there here in a

11:12 12    moment.  But the facts are, getting to the second point, he

11:12 13    returned to work the very next day under minor restrictions.

11:12 14    You'll see in Exhibit No. 4, that was the first release we

11:12 15    looked at, the one with the handwriting on it that was sent to

11:12 16    Becky.  It was faxed to her that morning.

11:12 17          The testimony, the facts are all consistent, that he

11:12 18    returned to work that very next day on a demolition site.  He

11:12 19    was operating heavy machinery, climbing up into it, operating

11:12 20    it, and the only restrictions listed on that form, Exhibit No.

11:12 21    4, was no heavy lifting and no prolonged standing.  There was

11:12 22    not a particular lifting limit such as something that was

11:12 23    highly restrictive, such as a five-pound limit or a ten-pound

11:12 24    limit.  They just said no heavy lifting.  There also was no

11:12 25    prohibition on standing or continuing to do his job out on that

**JA538**

4-48

11:12 1   site.  They just said no prolonged standing.

11:12 2          And it's undisputed that with those restrictions, that

11:12 3   very Tuesday, the very next day after he was evaluated at the

11:12 4   hospital, he worked a ten-hour day on this demolition site and

11:12 5   the same for Wednesday, Thursday and Friday.  He was able to

11:12 6   perform that work.

11:12 7          We also have the second release that we looked at that

11:12 8   was the first one that he was given, and this is absolutely

11:12 9   critical, and this is Exhibit 37, which you'll also have in

11:12 10  your deliberations.  Exhibit 37 was that very first release he

11:12 11  was given, which said that he could take a week off and come

11:12 12  back with no restrictions whatsoever.  So the medical staff

11:12 13  there evaluated his condition.  The medical staff had

11:12 14  determined that he could return to full duty on a very tough

11:12 15  job on a demolition site doing everything that he did within

11:12 16  one week, no restrictions.  Those are the facts.  That is

11:12 17  Exhibit Number 37.

11:12 18         There is clearly then no facts that the plaintiff has

11:12 19  proven that he had any permanent restriction or long-term

11:12 20  restriction or that the restrictions were going to even last

11:12 21  two weeks.  And we don't need to rely upon any disputed

11:12 22  testimony or arguments there.  That is from the medical staff

11:12 23  and those are medical records that the plaintiff was given by

11:12 24  the team there at the hospital.  He's in a very demanding,

11:12 25  physically demanding job.  The medical staff determined that he

**JA539**

11:12 1    could perform that job once again full duty within one week.

11:12 2         Third, after the plaintiff stopped actively working at

11:12 3    Industrial Demolition, we have the undisputed testimony that he

11:12 4    did not see any other doctor from December of 2019 up until we

11:12 5    spoke to him here this week, except he went to a dentist.  The

11:12 6    important point of that for our claims here is he did not

11:12 7    afterwards then need some other care.  He didn't need physical

11:12 8    therapy.  There's no evidence that he then pursued any other

11:12 9    care for that very temporary restriction that was then

11:12 10   accommodated for him.

11:12 11        So what the plaintiff also confirmed is that he was

11:12 12   fully capable, after he stopped working at Industrial

11:12 13   Demolition, of working all jobs and working full-time.  There's

11:12 14   no testimony, no evidence that there was some other long-term

11:12 15   restriction that he had.

11:12 16        So I promised you that I'd talk briefly about the

11:12 17   standard.  What's the bar?  Obviously not everything, every

11:12 18   potential complaint or issue counts as a disability.  And the

11:12 19   judge is going to give you further instructions on that.  But

11:12 20   let me just summarize some of those important points because

11:12 21   there is a standard and, fortunately, this is one of those

11:12 22   situations where common sense lines up with the law in that a

11:12 23   very temporary condition or a very temporary impairment is not

11:12 24   going to rise to the level of a disability.

11:12 25        Someone has to prove, in order to say they have a

4-50

11:12 1    disability, in other words, for the plaintiff in this case to

11:12 2    establish by the greater weight of the evidence he has an

11:12 3    actual disability, he has to prove that he's substantially

11:12 4    limited in a major life activity.  What does that mean,

11:12 5    substantially limited?  Fortunately we do have direction on

11:12 6    that.

11:12 7           One key factor is the duration of the limitation.  It

11:12 8    must be either permanent or very long term, not short term.

11:12 9    Permanent or very long term.  Also, in addition to duration,

11:12 10   there's a question of severity.  And it must prevent or

11:12 11   significantly restrict someone from performing a wide range of

11:12 12   jobs.  That's not what we have here at all.  We have an

11:12 13   exceedingly short duration, confirmed by the medical staff, and

11:12 14   we do not have a restriction that in any way prohibited him

11:12 15   from performing a wide range of jobs.  In fact, he was cleared

11:12 16   by the medical staff to perform a very physically demanding job

11:12 17   within one week, and he was able to do that, with limited

11:12 18   accommodations, the very next day.

11:12 19          The bottom line is on the second critical piece -- the

11:12 20   first one was whether he was terminated.  The second one we're

11:12 21   wrapping up here is on the disability, whether he proved that.

11:12 22   The facts do not begin to rise to the level of him proving that

11:12 23   he clears that bar for a disability.  There's no actual

11:12 24   disability he was able to prove.  There's no long term or

11:12 25   permanent condition and the severity does not begin to meet the

4-51

11:12 1  level required under the law.

11:12 2        Therefore, when you are answering these questions that

11:12 3  the court has presented to you, did the plaintiff prove that he

11:12 4  had a handicap?  He did not prove that he had a handicap based

11:12 5  upon the greater weight of the evidence.  In fact, what we have

11:12 6  in front of us in terms of the evidence that they presented is

11:12 7  that he does not have a handicap and he was also not in any way

11:12 8  terminated for that handicap.

11:12 9        Now, we are almost done in terms of the key issues in

11:12 10  the case.  So let me get to the third one.  Did the plaintiff

11:12 11  actually prove that Industrial Demolition intentionally

11:12 12  discriminated against him or retaliated against him?  For

11:12 13  example, did the plaintiff prove by the preponderance of the

11:12 14  evidence that he was terminated because of a disability?  In

11:12 15  other words, and the phrase sometimes becomes a bit of a tongue

11:12 16  twister but is it the determinative cause of the termination.

11:12 17  Again, if you find he wasn't terminated, if you find he wasn't

11:12 18  disabled, we don't even need to get to this question.  But the

11:12 19  plaintiff would also have to demonstrate to you that if he was

11:12 20  terminated and he had a handicap, that the cause of it was

11:12 21  intentional discrimination by the company because of that

11:12 22  protected category or because of protected conduct.

11:12 23        Did the plaintiff meet his burden?  He did not do so.

11:12 24  Again, what are the facts?  What is the evidence that was

11:12 25  presented here?  We know that the restrictions that the

**JA542**

11:12 1    plaintiff sent in on that Monday, December 9, to Becky Lydon,

11:12 2    the testimony is she received them.  She said he can return to

11:12 3    work the very next day, which in fact he did.

11:12 4        The work restrictions were honored that week.  He

11:12 5    operated in the machinery and he continued to perform his work

11:12 6    ten hours per day.  The plaintiff also never reported to the

11:12 7    company that the restrictions were not being honored, and

11:12 8    there's the one moment on that Friday where the plaintiff had

11:12 9    testified that he was told by his supervisor to work with his

11:12 10   hands.  He was told, not individually, to work with his hands.

11:12 11   His testimony was he was told, along with his fellow

11:12 12   co-workers, three others, he explained, to do a particular task

11:12 13   because the supervisor believed the more productive way of

11:12 14   performing that particular task was to have them work with

11:12 15   their hands.

11:12 16       The plaintiff explained that the supervisor had that

11:12 17   business reason to do it and he wasn't picking on the plaintiff

11:12 18   for it.  He had the entire crew do the exact same thing.  The

11:12 19   plaintiff explained that he was not injured in any way

11:12 20   performing that limited work with his hands.  And he returned

11:12 21   back to the machine he was working on.  And remember, the

11:12 22   restrictions, the limited restrictions, did not say he was

11:12 23   prohibited from working with his hands, did not say no lifting,

11:12 24   did not say no standing.  It just said no heavy lifting, no

11:12 25   prolonged standing.  And there was no complaint that there was

11:12 1   any failure to accommodate those restrictions or any

11:12 2   intentional discrimination against him.

11:12 3          In addition, you recall in terms of the timesheets --

11:12 4   not the timesheets, the pay stubs that are also in evidence, we

11:12 5   looked at that last week, and that last week shows that he was

11:12 6   paid the exact same rate of pay.  He was paid his per diem, and

11:12 7   there was no change in terms of his compensation for the hours

11:12 8   that he actually worked.  Again, there is no evidence, that the

11:12 9   plaintiff presented, certainly not the greater weight of the

11:12 10  evidence or the preponderance of the evidence that he was

11:12 11  intentionally discriminated against for this alleged disability

11:12 12  or because of any other protected category.

11:12 13         There are, in terms of some remaining claims on this

11:12 14  sheet that you do have, I think in essence there was very

11:12 15  little, if any, focus by the plaintiff on these remaining

11:12 16  claims or any evidence relating to it.  But I just want to

11:12 17  touch upon them to explain why these are, in fact, here,

11:12 18  particularly the last question relating to whether the

11:12 19  plaintiff was terminated for reporting that he had suffered a

11:12 20  potential industrial accident.

11:12 21         The plaintiff did not pursue a claim for workers'

11:12 22  compensation while he was employed.  There's no evidence that

11:12 23  he said he had a workplace injury or reported a workplace

11:12 24  injury.  There's no witness, as we talked about, during his

11:12 25  testimony to this alleged injury.  The plaintiff confirmed he's

4 -54

11:12 1    well.  He could not pinpoint when or how it occurred and,

11:12 2    remember, his testimony as well was that on this day that he's

11:12 3    now saying he was injured, he worked that entire day.  He went

11:12 4    home at his regular hour.  He did not report anything to

11:12 5    anybody about an alleged workplace injury.  He drove himself

11:12 6    home.  He went to -- he was with his family the entire next day

11:12 7    after that.  No report of any injury.  And he did not seek any

11:12 8    medical care that weekend.  He just got up to that Monday, and

11:12 9    we've already covered that.  But in terms of that final claim,

11:12 10   I just wanted to raise that briefly because there was very

11:12 11   little, if any, discussion on that.  Again, we can always go

11:12 12   back to the base of did he demonstrate by the preponderance of

11:12 13   the evidence, did he demonstrate by the greater weight of the

11:12 14   evidence that he, in fact, was terminated for that reason?

11:12 15          Now, just briefly, in the absence of proof that he was

11:12 16   fired, in the absence of him being able to prove that he had a

11:12 17   disability or that there was any intentional discrimination or

11:12 18   retaliation, we did have by the plaintiff some effort to talk

11:12 19   about things that are outside of those key lanes of what the

11:12 20   facts and the evidence are.  There were some issues, for

11:12 21   example, of trying to discuss emails or communications four

11:12 22   months after the plaintiff was gone, four months after he had

11:12 23   stopped working.  Remember, he had stopped working there in

11:12 24   December of 2019.  The emails and discussion as to what was

11:12 25   going on in the workplace in April of 2020 have no relevance or

**JA545**

11:12 1    any significance to his claims.

11:12 2         And the other matters that they're trying to raise

11:12 3    should not distract us from those three items I just went

11:12 4    through.  In terms of the termination, there is not a

11:12 5    preponderance of the evidence that he established for that.

11:12 6    The disability question, he did not prove what he needed to

11:12 7    prove there.  And also then in terms of intentional

11:12 8    discrimination, he did not prove what he needed to.  And based

11:12 9    upon that, the verdict should be in favor of the defendant.

11:12 10        Now, I would like to end there, and those are the

11:12 11   substantive issues.  The plaintiff, however, is asking for

11:12 12   damages in this case.  And I just want to take a very brief

11:12 13   time to explain why the plaintiff is not entitled to any

11:12 14   damages.  Now, to be clear, if you do not find that he was

11:12 15   terminated or that he had a disability or that he was

11:12 16   terminated for the disability or some other protected category,

11:12 17   you don't ever need to get to the discussion of damages.  He's

11:12 18   not entitled to any money.  He has to prove his claims and then

11:12 19   there's a question as to whether he's entitled to any money if

11:12 20   he had established that.  So I need to discuss this just

11:12 21   briefly with you, even though we believe there's absolutely no

11:12 22   basis for him to be paid any money whatsoever.

11:12 23        You'll recall that we talked about with Becky Lydon

11:12 24   Exhibit No. 36.  That was the notice regarding the demolition

11:12 25   work being done on that site in Brayton Point as of August 14,

**JA546**

11:12 1  2020.  All of the Industrial Demolition workers on that site

11:12 2  were done and laid off by that point.  And that's not only the

11:12 3  testimony of Becky Lydon, but you have that document in hand.

11:12 4       Now, the plaintiff of course was on that demolition

11:12 5  crew up through December of 2019.  But the work on that site

11:12 6  ended for this demolition crew as of August 14, 2020.  If the

11:12 7  plaintiff is asking for wages, back wages, whatever he may be

11:12 8  asking for in terms of additional money from the company, by

11:12 9  all means there's the backstop of August 14, 2020 because his

11:12 10  fellow co-workers as of 2019 had worked through August 2020 and

11:12 11  then that was it.  And the plaintiff certainly would have been

11:12 12  in the same category as everybody else.

11:12 13       Also, we had discussed Exhibit No. 17 and Exhibit 19.

11:12 14  Those are the documents relating to the settlement agreement

11:12 15  that the plaintiff entered into directly with Industrial

11:12 16  Demolition on the $85,000 that was paid to him, and that the

11:12 17  plaintiff had accepted.  We showed you not only the settlement

11:12 18  agreement signed by the plaintiff, but also we showed you the

11:12 19  check that the company sent to him and he received that money.

11:12 20  It specifically says in that document that he was paid back pay

11:12 21  and he was paid front pay.

11:12 22       We don't need to go precisely through the

11:12 23  calculations, but the bottom line is what he was paid as of

11:12 24  October 2020 when he signed that settlement agreement were his

11:12 25  wages for about ten months.  The straightforward calculation

4 –57

11:12 1   was he was paid $30 an hour.  He worked 40 hours per week on

11:12 2   that straight time.  Generally then was paid 18 hours' worth of

11:12 3   overtime at $45 an hour, which brings us to about $2,000, just

11:12 4   rounding it off, per week.  If we do the calculation of that,

11:12 5   what it brings us to is ten months of those wages.

11:12 6         So in fact, remembering the exhibit that his

11:12 7   co-workers who had worked through the winter on that site,

11:12 8   worked through the summer on that site and their wages ended in

11:12 9   August of 2020, he wasn't there working.  But instead he was

11:12 10  paid actually more than what his co-workers were paid who did

11:12 11  the work.  He was paid his wages by the company directly

11:12 12  through October of 2020.

11:12 13        And you heard Mr. Roberts' testimony on that.  He paid

11:12 14  the money because he understood that he was not supposed to say

11:12 15  anything about workers not talking about wages.  He said he

11:12 16  learned his lesson.  He owned up to it.  So he paid the back

11:12 17  pay and paid that money and understanding that that should have

11:12 18  been the end of it.  Now, you'll see in that document, the

11:12 19  settlement agreement, there's a non-admission clause and we

11:12 20  don't need to get into the weeds of that.  The bottom line is

11:12 21  it is undisputed the plaintiff was paid his wages for another

11:12 22  ten months based upon his allegations in that matter, and he

11:12 23  received that money.  And he cashed that check.

11:12 24        Also, to wrap up on this question of damages, you

11:12 25  heard the plaintiff's testimony that he has a full-time job,

**JA548**

11:12  1   it's a well-paying job.  He's at the Petro Towery Company, and

11:12  2   we showed you records from that company and the plaintiff

11:12  3   testified that he has a base salary of $70,000.  He's also

11:12  4   receiving commissions of $25,000 to $30,000.  He's received a

11:12  5   promotion.  He likes his job and he's going to continue in that

11:12  6   job.

11:12  7           The plaintiff should not be paid double.  The

11:12  8   plaintiff should not be paid anything more.  But certainly in

11:12  9   your considerations, if you ever get to the point of damages,

11:12 10   which, again, we believe you don't even need to get there,

11:12 11   based upon the evidence, based upon the facts that we've talked

11:12 12   about, he certainly is not entitled to any damages whatsoever.

11:12 13           Final point, and then I'll be done:  The plaintiff is

11:12 14   also going to ask you not just for additional wages, which he's

11:12 15   not entitled to, but he's now going to ask you to award an

11:12 16   amount for emotional distress, but the plaintiff's testimony,

11:12 17   when we spoke to him just the other day, was that there's

11:12 18   nothing about his experience at Industrial Demolition that has

11:12 19   prevented him from doing anything in his life.  He's been fully

11:12 20   capable physically and mentally of working full-time.  There is

11:12 21   nothing about his experience that has prevented him from

11:12 22   pursuing his hobbies if he wants to, being with his family and

11:12 23   spending time in his community.

11:12 24           So we respectfully submit that the verdict should be

11:12 25   in favor of the defendant for all the reasons I've given and

**JA549**

11:12 1    that plaintiff is not entitled to any damages.  I thank you for

11:12 2    your time.

11:12 3              THE COURT:  Let us stretch.

11:12 4              Okay.  Ready.  You may proceed.

11:12 5              MR. TURIELLO:  Thank you, Your Honor.

11:12 6                  CLOSING ARGUMENT BY MR. TURIELLO

11:12 7              MR. TURIELLO:  Ladies and gentlemen, Eric Moore was

11:12 8    fired.  Eric Moore was fired.  And to believe that he was not

11:12 9    fired would force you to believe that the sole breadwinner for

11:12 10   a family of seven with five children, one of whom was an

11:12 11   infant, who was coming to rebuild his life after selling

11:12 12   everything before going to Ecuador, walked away from a $156,000

11:12 13   a year job, and that he did that twelve days before Christmas

11:12 14   with four months left on a lease and nowhere else to go.

11:12 15   That's a preposterous conclusion.  Preposterous.

11:12 16            When you make your determinations about what happened

11:12 17   in this case, you get to consider all of the evidence, all of

11:12 18   the testimony, all of the documents, and you get to draw

11:12 19   reasonable conclusions based on that evidence.  You get to

11:12 20   conclude who was telling you the truth and who wasn't telling

11:12 21   you the truth.  You get to evaluate the credibility of

11:12 22   everybody that spoke to you.

11:12 23            So let's go to the company records, specifically

11:12 24   defense number 34, about whether or not Eric Moore was fired.

11:12 25   Those records were maintained by Becky Lydon, who relied on

4-60

11:12 1    hearsay from other people from a job site 1200 miles away that

11:12 2    she neither supervised or had any contact with.  You don't know

11:12 3    when those entries were made and you don't know what

11:12 4    information was given to her because the only testimony you

11:12 5    heard from people that were present on December 13 was from

11:12 6    Eric Moore.  You heard from no one else.  Now, there was

11:12 7    someone else there, but he's not here.

11:12 8         Ms. Lydon would have you believe that those records

11:12 9    are indisputable proof that he walked off the job and Ms. Lydon

11:12 10   was impeached over and over again by Mr. Goodwin when she took

11:12 11   the stand.  She was asked direct questions about what she knew,

11:12 12   from whom, when, what she did with the information, and she

11:12 13   lied to you.  You cannot trust her testimony.  You should give

11:12 14   it no weight.

11:12 15        Let's go to the questions that you have to consider.

11:12 16   I'm going to go directly to question 1:  Did the plaintiff

11:12 17   prove he had a handicap?  A handicap will be defined to you in

11:12 18   the instructions.  A handicap does not have to be permanent.

11:12 19   It can be temporary.  And Eric Moore plainly had a temporary

11:12 20   handicap.  How do we know?  Because he received a temporary

11:12 21   accommodation for four days, not five.  There is no dispute by

11:12 22   anybody that testified that he was receiving an accommodation

11:12 23   for four days and he could not receive one if he wasn't

11:12 24   handicapped.  Period.  Question 1 has proven the facts are not

11:12 25   disputed.

11:12 1          Question 2:  Did the defendant fail to accommodate the

11:12 2    plaintiff's handicap?  We have established that Eric Moore was

11:12 3    a qualified handicapped person because he suffered an

11:12 4    industrial injury or he had a temporary disability that

11:12 5    substantially limits his major life activities.  Those

11:12 6    limitations were his inability to do manual labor, as he was

11:12 7    required to do, and working generally.  The doctor gave him a

11:12 8    note that said you need to take a full week off.  You can't go

11:12 9    to work under normal duty.  That is a handicap.  We have to

11:12 10   demonstrate additionally that he was able to work with a

11:12 11   reasonable accommodation.  We know that's the case because they

11:12 12   gave him modified duty.  That was given to him by Becky Lydon.

11:12 13         Now, if it was given to him by Becky Lydon, well, how

11:12 14   did they fail to accommodate him?  It was given to him for a

11:12 15   week and they don't get off the hook just because he made it 80

11:12 16   percent of the way.  The employer, through its agent, the site

11:12 17   superintendent, Roger Oberkramer, refused to honor his

11:12 18   accommodation on Saturday, December 7 -- I'm sorry, on Friday,

11:12 19   December 13, when he forced him to get out of the truck, to

11:12 20   move scrap with his hands, threatened to then keep him out of

11:12 21   work until the first of the year and firing him when he said,

11:12 22   "I have no use for you.  Hit the gate, call the office."

11:12 23         As to the question 3:  Did the defendant terminate the

11:12 24   plaintiff because of his handicap?  Again, he was a qualified

11:12 25   handicapped person under Massachusetts law by virtue of a work-

JA552

4-62

11:12 1    related injury who could work with a temporary and reasonable

11:12 2    accommodation, which he demonstrated he could for the first

11:12 3    three days that he returned to work, and that the defendant

11:12 4    discriminated against him when they, again, fired him, saying,

11:12 5    "I have no use for you. Hit the gate and call the office."

11:12 6    There is no testimony that controverts what that conversation

11:12 7    was, what that meant, none that you can rely upon, except

11:12 8    Eric's.

11:12 9         Question 4 is a question about retaliation. Did the

11:12 10   defendant retaliate by terminating the plaintiff for requesting

11:12 11   or using a reasonable accommodation? Again, the plaintiff has

11:12 12   proved his case. Retaliation is about protected activity and

11:12 13   what happens to a person if they engage in protected activity.

11:12 14   In this case Eric engaged in protected activity in three

11:12 15   different ways. Way number one, he took sick leave on Monday.

11:12 16   Under Massachusetts law, the use of sick leave is protected

11:12 17   activity. Question number 2, he requested an accommodation.

11:12 18   We know he requested an accommodation because the doctors sent

11:12 19   Becky Lydon a note, she received the note and they granted him

11:12 20   light duty. He also was protected because he was working under

11:12 21   that accommodation. He accepted it and he worked for the next

11:12 22   three days. He engaged in protected activity. That's number

11:12 23   one.

11:12 24        Number two, that the employer knew that he engaged in

11:12 25   protected activity. We don't have to go through that. They

**JA553**

4-63

11:12 1    obviously knew.  He took the day off.  They got the facts.

2    They gave him light duty and he was jerking off in machines all

11:12 3    day.  So they know that he was using his protected activity or

11:12 4    engaging in that protected activity.

11:12 5         And number 3, the defendant took adverse employment

11:12 6    action.  They took three adverse employment actions on December

11:12 7    13.  They forced him to work outside the truck lifting things

11:12 8    in violation of his light duty.  They threatened to keep him

11:12 9    out of work until the first of the year and finally, and most

11:12 10   importantly, they terminated him, telling him, "I have no use

11:12 11   for you.  Hit the gate, call the office."

11:12 12        The plaintiff's burden has been plainly met in the

11:12 13   case.  You have to use your common sense, your judgment.  You

11:12 14   have to draw reasonable conclusions to all of the evidence

11:12 15   that's been presented, all of it.  You get to assign weight to

11:12 16   all of it as well.  When you go back and you review all the

11:12 17   documents and all the testimony, ask yourself what does this

11:12 18   mean.

11:12 19        So to damages, we're absolutely asking you to find and

11:12 20   to award Eric Moore damages, specifically three:  Back pay,

11:12 21   front pay and emotional distress.  Back pay under the law would

11:12 22   be from the date of his termination, December 13, 2019, through

11:12 23   today's date, April 14, 2023.  That span of time is 40 months

11:12 24   and two days; three years, four months, two days.

11:12 25        You have Defendant's Exhibit 23, the large body of

11:12 1   documents with all of the pay stubs.  Direct your attention to

11:12 2   the pay stub and advice issued on October 10 of 2019.  On that

11:12 3   pay stub, Eric Moore had a full 58 hours, not a quarter -- not

11:12 4   15 minutes more or less.  It was the perfect 58 hours, and his

11:12 5   gross pay for one week of work is $3,010 a week.  $3,010 a week

11:12 6   amounts to $156,520 per year.  1-5-6-5-2-0 per year.  Three

11:12 7   years of that amounts to $469,560 -- 4-6-9-5-6-0.  The

11:12 8   additional four months, each month, if you take 156,520, divide

11:12 9   it by twelve, it is $13,043.33.  Multiply it by four, that is

11:12 10  $52,173.33.  The additional two days of work at his standard

11:12 11  rate of $30 an hour with his standard schedule of ten hours a

11:12 12  day does not allow him for any overtime.  That is $300 a day.

11:12 13  That is $600.  We are asking you award him back pay through

11:12 14  today for a total amount of $522,333.33, subject to any other

11:12 15  instructions that were given by Her Honor.

11:12 16          We are asking you to award him front pay.  Front pay

11:12 17  is the money that he would have earned had he continued his

11:12 18  employment.

11:12 19          If you look at Defendant's Exhibit 23, it's very

11:12 20  instructive as to front pay, very, very instructive.  You have

11:12 21  to look through the numbers and you have to look through the

11:12 22  documents and what you're going to find is this:  Eric Moore

11:12 23  moved his family in August of 2019.  You'll see on August 15,

11:12 24  2019 on that stub he didn't work.  He testified that after he

11:12 25  moved here to work for a little while, he drove back to

11:12  1   Indiana, picked up his family, drove all the way back, got a

11:12  2   hotel, and they eventually moved in.  So from the day his

11:12  3   family got on-site what did Eric Moore do?  What was his work

11:12  4   ethic?  Was he showing up?

11:12  5        If you look from the August 22 check -- I'm sorry --

11:12  6   yes, the August 22 check all the way down to the December 12

11:12  7   check, that encapsulates all of the time he worked at

11:12  8   Industrial Demolition before his injury.  Because, remember, he

11:12  9   was injured on the 7th.  Right?  So all the way up until his

11:12 10   injury, how much time did Eric miss?  None.  On balance, he

11:12 11   worked six hours more than he would have -- than the 58 hours a

11:12 12   week.  There were some weeks when it was 15 minutes less.

11:12 13   There were some weeks when it was five hours less.  There was

11:12 14   one week when it was 20 hours more.  But the fact of the matter

11:12 15   is Eric Moore did not miss work.  He showed up every day to a

11:12 16   difficult job where he lifted heavy things, a physical job 58

11:12 17   hours a week.  The man didn't take time off.  And he testified

11:12 18   why he didn't take time off, because he had a goal with this

11:12 19   job.  He was rebuilding his life with this job.  The money

11:12 20   meant something to him.  It meant he could buy a house for his

11:12 21   kids, his five babies.  He committed to that and he worked

11:12 22   every day.

11:12 23        If you determine that based on that he would have

11:12 24   continued to work, then you should believe his testimony.  He

11:12 25   testified he was going to work maybe for another ten years at

4 -66

11:12 1   that company.  He had a goal.  So we're asking that you award

11:12 2   him front pay all the way through December 13 of 2029.  Again,

11:12 3   those calculations, it's six years and eight months to the day

11:12 4   from today.  We are asking that you award him on the six years

11:12 5   at $156,520 -- $156,520 times six is $939,120.  The eight

11:12 6   months, the monthly number calculated by eight is an additional

11:12 7   $104,346.64.  The total front pay we're asking for is

11:12 8   $1,043,466.64.  No more, no less.

11:12 9       We're also seeking damages for emotional distress.

11:12 10  Work is about more than money and it's about more than what you

11:12 11  do at your job.  Some of us are very lucky to have jobs that we

11:12 12  love and most of us are just lucky to have a job.  Work is

11:12 13  about why you're working and work affords you dignity.

11:12 14      And Eric's dignity was stripped.  He testified that he

11:12 15  couldn't tell his wife immediately after being terminated.  He

11:12 16  testified how he felt.  He testified that he alone was

11:12 17  responsible for everything that was happening to his family in

11:12 18  his heart.  That's how he felt.  He was responsible for selling

11:12 19  everything and moving to Ecuador.  He was responsible, when he

11:12 20  came back, for finding new work.  He was responsible for

11:12 21  selecting this job and moving his family across the country.

11:12 22      He bore the weight of that responsibility, and now he

11:12 23  was responsible for telling his children that they didn't get

11:12 24  to have Christmas this year, the last Christmas before COVID

11:12 25  19.  Put this all in that context.  He was responsible for

11:12  1    telling them what happened.  And then he had to move a family

11:12  2    of seven all the way back to live with his brother-in-law where

11:12  3    someone else bought his kids underwear.  And then he had to

11:12  4    enter a job market during a pandemic.  I don't know what that's

11:12  5    worth.  But I know that you will.  And Eric trusts that you'll

11:12  6    make the right decision there.

11:12  7          It has been an honor to represent Eric Moore before

11:12  8    the ten of you.  And on behalf of him, thank you.  The case is

11:12  9    with you.

11:12 10          THE COURT:  You ready?  Is the jury ready?

11:12 11          JURORS:  Yes.

11:12 12                    JURY CHARGE

11:12 13          THE COURT:  Members of the jury, I now need to explain

11:12 14    to you, although you probably have already gathered from

11:12 15    counsel's summations to you, what your job is, indeed I need to

11:12 16    explain it to you again in some detail as to what your role is

11:12 17    from here on in.  Number one, please listen to what I have to

11:12 18    tell you because one of the major things that I will address is

11:12 19    what the law says is required to prove certain kinds of

11:12 20    wrongdoing that the plaintiff has asserted.

11:12 21          Your role is to review the evidence, and the evidence

11:12 22    means all of the testimony of all of the witnesses that was put

11:12 23    before you and not stricken by the court because it was

11:12 24    improper in some way.  It includes the exhibits that are in

11:12 25    evidence.  And there are agreements and various other

4-68

11:12 1    documents.  As I told you yesterday, they will be in the jury
11:12 2    room with you when you begin your deliberations.
11:12 3          And when you begin your deliberations, and it's
11:12 4    ultimately your decision, it should be based on all of the
11:12 5    evidence that you accept as appropriate evidence in the case.
11:12 6    I mean, you have a major -- you have a number of major judgment
11:12 7    calls to make as you review the evidence that was presented by
11:12 8    both parties in the case and ultimately use that part of what
11:12 9    you accept of the evidence, which is testimony as well as the
11:12 10   exhibits in the case.  Well, it's the jurors who are
11:12 11   deliberating, which I hope will be all of you, agree that
11:12 12   certain exhibits are useful for you to decide the case, then,
11:12 13   by all means, use them.  And so long as you have agreement as
11:12 14   to the use of those, whatever the sum and substance of those
11:12 15   documents or whatever they are before you, again, rely on them
11:12 16   in reaching your verdict.
11:12 17         So you should review all of the evidence, the
11:12 18   testimony of all of the witnesses who have appeared before you,
11:12 19   as well as the exhibits, as I just mentioned.  And then you
11:12 20   should decide, based on all of the evidence that you have
11:12 21   accepted.  You have lots of power to decide that certain
11:12 22   evidence, whether it be documents or testimony, you don't
11:12 23   believe and, therefore, you don't want to consider it and you
11:12 24   are entitled to do that.
11:12 25         You have to decide in the process of getting to a

**JA559**

4-69

11:12 1   verdict whether the plaintiff -- the plaintiff has the burden

11:12 2   of proof here.  The plaintiff has to persuade you that he has

11:12 3   proven each of the elements of each of the claims that he has

11:12 4   made against you.  And both counsel have alluded to those and

11:12 5   I'm sure that you're aware of them now, but I'll come back to

11:12 6   that in a moment.

11:12 7          You should accept the law as I explain it to you, but

11:12 8   the facts in this case are entirely for you to determine from

11:12 9   the evidence that you've heard in the case.  Now, the evidence

11:12 10  consists of the exhibits, which I said -- as I said, will be

11:12 11  with you in the jury room.

11:12 12          I don't remember whether there were any stipulations

11:12 13  in this case.

11:12 14          MR. GOODWIN:  No.

11:12 15          THE COURT:  There were none.  A stipulation is an

11:12 16  agreement that certain facts are not in dispute.  You don't

11:12 17  have to worry about that because there weren't any such in this

11:12 18  case.

11:12 19          But another very important, perhaps the most important

11:12 20  part of the evidence, is the testimony of all of the witnesses.

11:12 21  Now, you have a number of jobs with respect to that testimony

11:12 22  and the use of it in reaching your verdict.  The main issue

11:12 23  will be the credibility of each of the witnesses that appeared

11:12 24  before you.  You make that judgment.  Do I believe what the

11:12 25  witness said?  Do I believe it in whole or do I discard it in

**JA560**

4-70

| | | |
|---|---|---|
| 11:12 | 1 | whole?  Or do I believe a piece of it?  And that will need to |
| 11:12 | 2 | be part of the discussion that you have as jurors in reaching |
| 11:12 | 3 | your verdict in this case. |
| 11:12 | 4 | You may consider, in reviewing the testimony of any |
| 11:12 | 5 | witness, the interest that that witness may have in the outcome |
| 11:12 | 6 | of the case.  You have a judgment about in general the |
| 11:12 | 7 | believability of any witness.  I mean, we normally make this |
| 11:12 | 8 | judgment sort of automatically.  If you made such a judgment |
| 11:12 | 9 | with respect to any witness, by all means discuss it with your |
| 11:12 | 10 | fellow jurors and decide -- use that as part of the evidence |
| 11:12 | 11 | available to you to reach the ultimate determination in this |
| 11:12 | 12 | case. |
| 11:12 | 13 | You may also draw inferences from what the witness has |
| 11:12 | 14 | told you.  We do that all the time.  You look out the window |
| 11:12 | 15 | and see that people are wandering around with umbrellas and we |
| 11:12 | 16 | infer from that, although we don't feel it, the fact that it's |
| 11:12 | 17 | raining.  So you may in this case also make judgments based on |
| 11:12 | 18 | inferences from all the evidence in the case.  It doesn't have |
| 11:12 | 19 | to be, you know, direct evidence where somebody says I did such |
| 11:12 | 20 | and so.  It can be evidence similar to what I just described, |
| 11:12 | 21 | where the witness says I looked out the window and people were |
| 11:12 | 22 | walking around with umbrellas and from that you may infer that |
| 11:12 | 23 | maybe it was raining.  So with respect to the evidence before |
| 11:12 | 24 | you, do a similar process in reviewing that evidence in |
| 11:12 | 25 | deciding whether to accept it or reject it and include such |

**JA561**

11:12 1    evidence as you determine to be properly used in this case.

11:12 2    That is your judgment and your task.

11:12 3         You may consider, in determining the believability of

11:12 4    any witness, the interest that the witness has in the outcome

11:12 5    of the case and it is your judgment of the believability of any

11:12 6    witness that will ultimately have to carry.  You may also draw

11:12 7    inferences from the evidence, as I suggested with the umbrellas

11:12 8    and the rain.

11:12 9         The weight of any witness's testimony is not based on

11:12 10   the number of witnesses who agree -- who talked about a

11:12 11   particular subject in a particular way.  It is, again, your

11:12 12   judgment of the believability of each of the witnesses who has

11:12 13   come before you and has given testimony.

11:12 14        Now, there is a bunch of stuff that happened in the

11:12 15   course of the trial, including talking of various kinds that is

11:12 16   not evidence.  The opening statements by counsel were an

11:12 17   introduction to the case, and what counsel said then was not

11:12 18   evidence.  It was designed to assist you in following the

11:12 19   evidence, which necessarily comes in piecemeal and sometimes

11:12 20   can't be connected until you've heard more.  So counsel's job

11:12 21   is to give you some idea of the whole so that you can pay

11:12 22   attention and use the testimony of even the first witness.

11:12 23        Are you with me?  Okay.

11:12 24        The closing arguments that you just heard from both

11:12 25   counsel are their view of the evidence.  They are entitled to

**JA562**

11:12 1   argue this to you.  It's an important part of the case.  But in

11:12 2   the end, it is your judgment of what the evidence said and what

11:12 3   the evidence means, not counsel's.  What they told you is

11:12 4   probably helpful in recalling various of the parts of the trial

11:12 5   and because we necessarily go on over a period of time, it's

11:12 6   helpful to have it recalled to you, but your recollection is

11:12 7   what ultimately has to carry the day.

11:12 8          If there were any questions to the witness in the form

11:12 9   of a statement that the witness did not adopt -- You did do

11:12 10  that.  No -- that is not evidence in the case.  If the witness

11:12 11  adopts a statement, then of course you may use it.  Nothing I

11:12 12  have said in the course of this trial from the beginning until

11:12 13  now and including now is evidence.  I want you to follow the

11:12 14  law as I outline it to you, but nothing I say is evidence and

11:12 15  I'm in no way trying to suggest to you what evidence you should

11:12 16  review and what evidence -- what conclusions you draw from the

11:12 17  evidence with respect to the plaintiff's job to persuade you as

11:12 18  to the validity of his assertions.

11:12 19         Now, the issues in this case and the claims that the

11:12 20  plaintiff has made are that he says that the defendant, the

11:12 21  Industrial Demolition Company, who is also his employer,

11:12 22  discriminated against him by failing to accommodate his

11:12 23  handicap and taking an adverse action against him, adverse job

11:12 24  action against him, namely terminating his employment because

11:12 25  of the handicap.  And he says that was improper and he is

```
11:12  1    entitled to be compensated for the wrong that was done to him
11:12  2    by that action.
11:12  3          Now, the defendant denies each of these allegations.
11:12  4    Number one, that he was a qualified handicapped person due to
11:12  5    physical impairment; two, that he needed reasonable
11:12  6    accommodation because of the handicap; three, that the
11:12  7    plaintiff requested such an accommodation; and, four, that the
11:12  8    defendant knew the plaintiff was a handicapped person but able
11:12  9    to perform essential functions of the job.  The defendant also
11:12 10    denies that it took improper adverse employment steps against
11:12 11    the defendant.  Now, that's what the plaintiff has charged the
11:12 12    defendant with having done, and the defendant denies that it
11:12 13    did do that.
11:12 14          Now, it is the burden of proof, so-called, in a civil
11:12 15    case is on the plaintiff.  That is, the plaintiff has to
11:12 16    persuade you -- he has, first of all, the burden of providing
11:12 17    evidence that will allow him to prove that all elements of each
11:12 18    of his claims of wrongdoing are correct by a preponderance of
11:12 19    the evidence, that they have been proven by a preponderance of
11:12 20    the evidence.  And preponderance of the evidence simply means
11:12 21    that a fact that the plaintiff has to prove is more likely true
11:12 22    than not based on all of the evidence in the case.  The
11:12 23    plaintiff has the burden.  But in reaching your verdict, you
11:12 24    can look at all of the evidence, that of the plaintiff and that
11:12 25    of the defendant, in order to decide whether a particular
```

**JA564**

4 -74

11:12 1   necessary fact to reach a verdict for the plaintiff has been

11:12 2   proven by all the evidence in the case.  I mean, obviously the

11:12 3   main burden is on the plaintiff.  Sometimes evidence creeps in

11:12 4   that may help the other side or the defendant' s evidence may

11:12 5   help the plaintiff.

11:12 6        So very, very simply, the plaintiff has the burden of

11:12 7   proving each element of each of his claims of wrongdoing by a

11:12 8   preponderance of the evidence, namely evidence that persuades

11:12 9   you that the defendant, more likely than not, did what the

11:12 10  plaintiff has alleged.  That' s what burden of proof means and

11:12 11  the burden of proof by the evidence.

11:12 12       Now, the proof by the preponderance of the evidence

11:12 13  means that the evidence in the case needs to come to the

11:12 14  conclusion that more likely than not the allegation is true.

11:12 15  So that' s the plaintiff' s job, is to persuade you that the

11:12 16  evidence in this case leads to the conclusion -- leads you to

11:12 17  the conclusion that more likely than not, the allegation is

11:12 18  true.  It nonetheless requires you to go through all of it and

11:12 19  look at it individually and then collectively to come to a

11:12 20  judgment.

11:12 21       So more specifically, the plaintiff alleges that the

11:12 22  defendant failed to accommodate his handicap, discriminated

11:12 23  against him by terminating his employment because of his

11:12 24  handicap and retaliated against him by terminating his

11:12 25  employment because he requested and utilized a reasonable

**JA565**

4-75

11:12 1   accommodation and suffered and reported an industrial injury.

11:12 2   So that's the plaintiff's position, is that that's what he did,

11:12 3   and they improperly terminated him as a result.

11:12 4        So the plaintiff says the job -- and he told them what

11:12 5   his issues were, required them to accommodate his alleged

11:12 6   physical handicap and to prevail on this, the plaintiff has to

11:12 7   prove each of the following elements:  One, that he was

11:12 8   handicapped within the meaning of the law; two, that he needed

11:12 9   a reasonable accommodation due to this alleged handicap; three,

11:12 10  that he requested an accommodation from his employer and that

11:12 11  the employer, the defendant, knew he was handicapped but still

11:12 12  refused to provide an accommodation.  That's the essence of the

11:12 13  plaintiff's case and those are the elements of that case that

11:12 14  you need to review and, if you find that the plaintiff has

11:12 15  proven each of these elements, then you may find that he has --

11:12 16       I think I should go back -- also we have questions to

11:12 17  you on the verdict form and I'll review that in a moment.

11:12 18       Now, in this case, handicap means an actual physical

11:12 19  impairment which substantially -- I mean, these are all sort of

11:12 20  formalistic legal things but I think I need to tell them to you

11:12 21  because that's what you have to rely on.

11:12 22       It means actual physical impairment which

11:12 23  substantially limits one or more major life activities.  Now, a

11:12 24  major life activity includes, but isn't limited to, caring for

11:12 25  oneself, performing manual tasks, walking, seeing, hearing,

11:12  1    speaking, breathing, learning and working.  These are all part
11:12  2    of what a person does and part of major life activities of
11:12  3    everybody.
11:12  4         An actual physical impairment substantially limits an
11:12  5    individual's ability to work if it prevents or significantly
11:12  6    restricts the individual from performing a class of jobs or
11:12  7    broad range of jobs in various classes.
11:12  8         The determination of whether an individual is
11:12  9    substantially limited in a major life activity depends on, one,
11:12 10    the nature and severity of the impairment; two, the duration or
11:12 11    expected duration of the impairment; and three, the permanent
11:12 12    or long-term impact or the expected permanent or long-term
11:12 13    impact of or resulting from the impairment.
11:12 14         Now, for plaintiff's claim the defendant
11:12 15    discriminated -- as the plaintiff has styled this complaint,
11:12 16    that the -- he claims that the defendant discriminated against
11:12 17    him by terminating his employment because of his handicap.  So
11:12 18    the plaintiff has to prove he was actually terminated by
11:12 19    defendants.  He must also prove that the defendant acted with a
11:12 20    discriminatory motive or a state of mind in terminating him.
11:12 21    It is not unlawful for an employer to terminate a person's
11:12 22    employment for legitimate, non-discriminatory or
11:12 23    non-retaliatory reasons.  If you find, however, that plaintiff
11:12 24    was terminated by defendant and that defendant acted with a
11:12 25    discriminatory motive, then the plaintiff must prove that his

11:12 1   handicap was the determinative cause of defendant's decision to

11:12 2   terminate him.

11:12 3          He doesn't need to show that the handicap was the only

11:12 4   cause of termination, just that it was the determinative

11:12 5   factor.

11:12 6          The discriminatory motive was determinative if it was

11:12 7   a material and important reason that the defendant terminated

11:12 8   plaintiff's employment.

11:12 9          Now, the plaintiff also asserts retaliation claims,

11:12 10  but I think those have mostly gone away.  So I don't think you

11:12 11  need to go into them anymore.

11:12 12         MR. GOODWIN:  That's not true, Your Honor.  Objection.

11:12 13  We maintain the retaliation claims.

11:12 14         THE COURT:  You want them in?

11:12 15         MR. GOODWIN:  Yes, please.

11:12 16         THE COURT:  The plaintiff alleges that the defendant

11:12 17  retaliated against him by terminating his employment because he

11:12 18  engaged in certain protected activities.  Now, in order for

11:12 19  plaintiff to prevail on these claims, he must prove each of the

11:12 20  following elements:  One, that he engaged in protected activity

11:12 21  under the law; two, that the defendant knew he engaged in the

11:12 22  protected activity; and three, that the defendant terminated

11:12 23  plaintiff's employment in retaliation for plaintiff engaging in

11:12 24  the protected activity; and four, if not for plaintiff engaging

11:12 25  in the protected activity, the defendant would not have

4-78

11:12 1    terminated plaintiff's employment.

11:12 2        Here the plaintiff alleges that he engaged in the

11:12 3    following protected activity, namely, requesting and utilizing

11:12 4    a reasonable accommodation for the alleged handicap and

11:12 5    suffering and reporting an industrial injury.  For plaintiff's

11:12 6    retaliation claim, he must prove that he was actually

11:12 7    terminated by the defendant.  I'm not sure there's a whole lot

11:12 8    of dispute about that.

11:12 9        Defendant's retaliation against defendant for engaging

11:12 10    in protected activity must be a determinative factor in the

11:12 11    decision to terminate his employment.  Plaintiff must show that

11:12 12    the defendant acted with a retaliatory motive or state of mind.

11:12 13    For plaintiff to prevail on the retaliation claim, you must

11:12 14    find a causal connection between the protected activity and the

11:12 15    termination.  The mere fact that one event followed another is

11:12 16    not enough by itself to make out a causal link.  There has to

11:12 17    be -- there has to be the connection between the protected

11:12 18    activity and the termination before the termination takes

11:12 19    place.

11:12 20        Now, if you determine that the defendant did, in fact,

11:12 21    carry out the activities that we have just discussed, then you

11:12 22    need to go to the -- did we hand out the jury questions?  Yeah.

11:12 23    -- then you need to go to the questions to the jury on special

11:12 24    verdict, and the answers to those will, in fact, be your

11:12 25    verdict.  Normally, we may ask a jury to say does the plaintiff

**JA569**

11:12 1   win or does the defendant win but in a case like this, it is
11:12 2   very often easier for the jury and for the participants in the
11:12 3   trial to sort of cut the pieces -- cut the complaint into
11:12 4   pieces, separate pieces, each of which has to be proven in this
11:12 5   case by the plaintiff, and it will help you rather than to try
11:12 6   to understand the law, which is sometimes complicated as to
11:12 7   whether there's a contract and whether there's a breach of
11:12 8   contract and so on.
11:12 9        So the questions to you are, number 1, did the
11:12 10  plaintiff prove that he had a handicap?  That is an essential
11:12 11  part of the allegation with respect to the termination.
11:12 12        Did the defendant fail -- and then the answer is yes
11:12 13  or no.  And you should answer each of those regardless of what
11:12 14  the answer to the prior question was.
11:12 15        Did the defendant fail to reasonably accommodate
11:12 16  plaintiff's handicap?  If the plaintiff made known to the
11:12 17  defendant that he had a particular handicap, then the defendant
11:12 18  may have an obligation to accommodate that handicap by
11:12 19  providing a job description or a job that the plaintiff can do
11:12 20  without harming himself further.
11:12 21        Then the third question is, did the defendant
11:12 22  terminate plaintiff because of the handicap?  That is, of
11:12 23  course, the essence of this entire claim about termination.
11:12 24        Did the defendant retaliate by terminating the
11:12 25  plaintiff for requesting or using a reasonable accommodation?

**JA570**

4-80

11:12 1   That is, did the plaintiff, in fact, ask for an accommodation?

11:12 2   Did the defendant simply ignore it?  And was that inappropriate

11:12 3   under the circumstances?  And finally, number 5, did the

11:12 4   defendant retaliate by terminating plaintiff for reporting that

11:12 5   he had suffered a potential industrial accident?

11:12 6           Questions 4 and 5 are related, but they are different

11:12 7   from each other.  One asks whether the plaintiff, whether he

11:12 8   was terminated for requesting a reasonable accommodation, and

11:12 9   the other for reporting that he had suffered a potential

11:12 10  industrial -- that he might suffer if he didn't report his

11:12 11  situation.

11:12 12          And then if you -- these are the questions that may

11:12 13  cover the entire case that the plaintiff has made.  I have cut

11:12 14  it back into these questions.  So if the answer to any of these

11:12 15  questions, 1 through 5, is yes, then you need to go to the

11:12 16  ultimate question, which asks you what the damages are that the

11:12 17  plaintiff has suffered as a result of the defendant's conduct.

11:12 18  And it asks you there for -- to determine how much back pay he

11:12 19  is entitled to receive based on what happened to him by -- as

11:12 20  done by the defendant, how much he may be entitled to for front

11:12 21  pay.  Front pay means an amount of money that he would have

11:12 22  earned for a period of time in the future.  And you will need

11:12 23  to determine both the period of time and the amount and for how

11:12 24  long in the future he would receive this amount of money.  And

11:12 25  that really depends, in large part, on your judgment of his

**JA571**

4-81

11:12 1    position in the company, of his job -- of the job that he had,

11:12 2    of the skills that he had and all of that, and how -- if he was

11:12 3    improperly terminated, then he may be entitled, if you so

11:12 4    decide, to recover money that he would have earned in the

11:12 5    future and for a period of time in the future you determine had

11:12 6    he not been fired.

11:12 7            I think the third question on my form is out.  I think

11:12 8    we agreed on that.

11:12 9            MR. GOODWIN:  No, Your Honor.

11:12 10           THE COURT:  It's still in?

11:12 11           MR. GOODWIN:  It's still in.  Thank you.

11:12 12           THE COURT:  Okay.

11:12 13           Then the plaintiff says he's also entitled to -- that

11:12 14   he suffered emotional distress as a result of the events at his

11:12 15   employer at the time and that he's entitled to recover for

11:12 16   that.

11:12 17           This is, again, similar to the one I just explained.

11:12 18   You'll need to determine, number one, whether he did indeed

11:12 19   suffer emotional distress such that he should be paid

11:12 20   compensation for that and how much compensation and for how

11:12 21   long a period of time into the future.  But this is both for

11:12 22   the past, any emotional distress he may have suffered from the

11:12 23   time of the incident until today, and to the extent that you

11:12 24   think that he has -- that he's entitled to the future, then you

11:12 25   need to determine also for how long and, in any event, for how

**JA572**

11:12 1  much.  So these are the questions that I've just reviewed with

11:12 2  you that are -- the answer to which constitute your verdict.

11:12 3  Okay?

11:12 4          MR. GOODWIN:  Your Honor, if I just may preserve --

11:12 5          THE COURT:  I'm not done.

11:12 6          MR. GOODWIN:  Sorry.  My apologies.

11:12 7          THE COURT:  Now, if you determine that the plaintiff

11:12 8  -- that the defendant did what -- if you answered yes to any of

11:12 9  the questions 1 through 5, then you need to determine what the

11:12 10  consequences are of that, and we've already alluded to that.

11:12 11  The consequences of any determination by you that the defendant

11:12 12  did in fact wrongfully terminate the plaintiff or in any other

11:12 13  way, as alleged, harm the plaintiff, the plaintiff is entitled

11:12 14  to recover damages for the harm that he suffered, and the

11:12 15  primary damage is any amount of back pay that was lost to him

11:12 16  as a result of his termination.  And then that would go on to

11:12 17  front pay, if you determine that he continues to suffer the

11:12 18  lack of pay as a result of the defendant's actions.  And you

11:12 19  need then to determine the amount of such pay that he's not

11:12 20  getting and the period of time for which he's not getting it.

11:12 21  And you need to make that judgment based on what you know about

11:12 22  the plaintiff's work, the defendant's relationship to the

11:12 23  plaintiff and work, and make a judgment about how long he would

11:12 24  be -- he should be paid, for how long a period of time he

11:12 25  should be paid, as well as how much he should be paid.

11:12 1          And when you consider that and are done with

11:12 2     considering that issue, and you have come up with a number,

11:12 3     please deduct from that number $85,000.  And the reason for

11:12 4     that is because there was an earlier proceeding in which the

11:12 5     parties agreed, not including this defendant, that the

11:12 6     plaintiff should get $85,000 from the defendant.  I think

11:12 7     that's right.  But the defendant really wasn't very much

11:12 8     engaged in that.  It was a different entity that was involved

11:12 9     in that.  However the parties agree that he has already

11:12 10    received $85,000 arising out of the wrongdoing that he's

11:12 11    complaining about with respect to the defendant.  So when you

11:12 12    come up with a number, deduct the $85,000 from it because he's

11:12 13    already gotten it.

11:12 14         Now, the fact that he has previously received money

11:12 15    doesn't mean either that he's not entitled to more, nor that

11:12 16    he's entitled to any more.  It is a separate issue.  It has

11:12 17    nothing to do with the validity of the claim for a judgment of

11:12 18    money now.  It's there and it obviously affects the amount, but

11:12 19    it has nothing to do with whether he's entitled to anything or

11:12 20    not.

11:12 21         I have told you he's entitled to any back pay he

11:12 22    didn't get and any front pay he may not get.  And front pay

11:12 23    really means future earnings and benefits that may be

11:12 24    attributable to defendant's conduct.  That's a hard one and

11:12 25    you'll need to decide whether it is relevant in this case.  And

4-84

11:12 1   how much he should get for it.

11:12 2          Neither front pay nor back pay should be determined by

11:12 3   speculation or guess.  It must be causally related to

11:12 4   defendant's wrongdoing and plaintiff should not be made more --

11:12 5   should not get more than the whole amount of damages that he

11:12 6   suffered.  And that's your determination to decide what that

11:12 7   amount is.

11:12 8          I think that is it on damages.

11:12 9          So please review all of the evidence that you have

11:12 10  heard, review and consider and use all of the exhibits that

11:12 11  will be with you in the courtroom, and then decide, based on

11:12 12  all of that, what your answer is to the questions that I have

11:12 13  put to you that you are looking at now, all five of them.  And

11:12 14  as you go about that, you should be courteous to each other.

11:12 15  You should not come into fist fights with each other.  And I

11:12 16  would ask, please, when you get to the jury room to decide who

11:12 17  among you will be your foreperson, who will have no greater

11:12 18  vote than anybody else, but who has the job of making sure that

11:12 19  you do not come to blows as you decide what the answer to the

11:12 20  various questions is.  The foreperson also has the job of -- if

11:12 21  there is some -- if there's some misunderstanding about what I

11:12 22  told you just now and you need further instructions, your

11:12 23  foreperson should write out what the question is and I will

11:12 24  either answer in writing or we'll reassemble and I will try to

11:12 25  explain what I failed to explain the first time.

**JA575**

11:12  1          So if you have any questions, just let the -- there

11:12  2   will be someone outside of the courtroom to protect your

11:12  3   privacy.  Let that person know you have a question and we'll

11:12  4   get it and in short order we will try to respond to it.

11:12  5          I have asked the cafeteria to send lunch to you about

11:12  6   12:30, but in the meantime when you go upstairs, you will have

11:12  7   your mid-morning relief as well.  And I hope that you will be

11:12  8   able to reach a verdict in relatively short order, but after

11:12  9   all the meals.

11:12 10          Let me stop for a moment and talk to counsel and then

11:12 11   I probably will come back to you with some additional --

11:12 12   additions or otherwise.

11:12 13          MR. GOODWIN:  Your Honor, I'm just preserving my --

11:12 14          THE COURT:  I'll see you at sidebar.

      15   **SIDEBAR CONFERENCE AS FOLLOWS:**

11:12 16          THE COURT:  Does the plaintiff have some --

11:12 17          MR. GOODWIN:  I'm just preserving my -- post

11:12 18   instructions, preserving my objections to punitive damages,

11:12 19   missing witness, temporary disability, GLC 152:75B(1), and

11:12 20   except for punitive damages, that's all.

11:12 21          THE COURT:  Do you have an interest in any of those?

11:12 22          MR. METZGER:  I believe we already addressed those,

11:12 23   Your Honor.

11:12 24          MR. GOODWIN:  It's just for the record.

11:12 25          THE COURT:  Do you have any suggestions?

**JA576**

```
11:12  1              MR. METZGER:  Let me just confirm, Your Honor.
11:12  2              THE COURT:  I think my law clerk pointed out that I
11:12  3     neglected to --
11:12  4              LAW CLERK:  The elements of this claim.  They're
11:12  5     similar to the first one but a little different.  The
11:12  6     discrimination claim.
11:12  7              THE COURT:  They've been very hard at work.
11:12  8              MR. GOODWIN:  We appreciate it.
11:12  9              THE COURT:  Well, emotional distress is out.
11:12 10              LAW CLERK:  No.
11:12 11              MR. GOODWIN:  No.
11:12 12              LAW CLERK:  No, but you already did damages.  May I?
11:12 13     Do you want to just take mine?  You can just -- just this
11:12 14     section, Judge.
11:12 15              THE COURT:  Well, yes, that is -- I talked about --
11:12 16              LAW CLERK:  The failure to accommodate.
11:12 17              THE COURT:  -- the one discrimination claim but not
11:12 18     the other.
11:12 19              Are you objecting to --
11:12 20              MR. TURIELLO:  No.  We --
11:12 21              MR. GOODWIN:  We would like it done.
11:12 22              MR. TURIELLO:  We would like you to do it, yes.
11:12 23              THE COURT:  No objection?
11:12 24              LAW CLERK:  Just reading the elements of the claim.
11:12 25              MR. METZGER:  This here?
```

11:12 1          LAW CLERK:  Yes.

11:12 2          THE COURT:  That part I didn't do.

11:12 3          MR. METZGER:  That sounds fair.

11:12 4          THE COURT:  There are so many papers, I couldn't --

11:12 5          MR. GOODWIN:  That's all I had.

11:12 6          LAW CLERK:  That's all, though, Judge.  Just this.

11:12 7          MR. GOODWIN:  Thank you, Your Honor.

11:12 8          THE COURT:  Thank you.

11:12 9     **END OF SIDEBAR CONFERENCE.**

11:12 10         THE COURT:  Both my law clerks were very alert and

11:12 11    counsel were even more alert, although they're not as entirely

11:12 12    alert as the law clerks, reminded me that I neglected to give

11:12 13    you one piece of the law in the case, really one piece of the

11:12 14    claim.

11:12 15         Plaintiff made two claims.  There was one and we did

11:12 16    talk about that, that the defendant failed to accommodate for

11:12 17    his physical handicap.  The other part of that, the other

11:12 18    element, not really an element, the separate claim is that the

11:12 19    plaintiff says that the defendant discriminated against him.

11:12 20    Not just that he failed to accommodate the physical handicap,

11:12 21    but they discriminated against him by terminating his

11:12 22    employment because of the physical handicap.  So it's not just

11:12 23    failing to accommodate the handicap but then that amounted

11:12 24    ultimately to discrimination.  So that's the second part of the

11:12 25    questions that you have, which I have again lost.

**JA578**

4-88

11:12 1        I think part of the problem is it's not part of the

11:12 2   questions.

11:12 3        MR. GOODWIN:  It's question 3, Your Honor, because we

11:12 4   added an additional question this morning.

11:12 5        THE COURT:  Question 3 asked did the defendant

11:12 6   terminate the plaintiff because of the handicap.

11:12 7        MR. GOODWIN:  Oh.

11:12 8        THE COURT:  That is what the plaintiff says amounts

11:12 9   to --

11:12 10        MR. GOODWIN:  Oh, no.  It's question 3, Your Honor.

11:12 11   It is question 3.

11:12 12        THE COURT:  I'm sorry?

11:12 13        MR. GOODWIN:  It is question 3, which says --

11:12 14        THE COURT:  Did defendant terminate plaintiff because

11:13 15   of his handicap?

11:13 16        MR. GOODWIN:  Yes.

11:13 17        THE COURT:  That's the question?

11:13 18        MR. METZGER:  Correct.

11:13 19        MR. GOODWIN:  Yes.

11:13 20        THE COURT:  Okay.  I think it's fairly straightforward

11:13 21   and it can be deemed to be a violation, as well as dealing with

11:13 22   a handicap improperly.

23        (Court/law clerk discussion held off the record.)

11:13 24        THE COURT:  So members of the jury, I charge you now

11:13 25   to consider the evidence, consider the testimony and find --

**JA579**

4-89

| | | |
|---|---|---|
| 11:13 | 1 | reach a verdict as to and answer all the questions that I've |
| 11:13 | 2 | put to you; and before you start the work on that, please elect |
| 11:14 | 3 | a foreperson from among you, and if you have any problems or |
| 11:14 | 4 | any questions, please let the person who is securing you know |
| 11:14 | 5 | that you have such and we will try to answer any questions that |
| 11:14 | 6 | you have.  I would guess that if you do not have the |
| 11:14 | 7 | mid-morning -- |
| 11:14 | 8 | CLERK:  Snack.  They probably do by now. |
| 11:14 | 9 | THE COURT:  Yeah, they're probably giving them to you |
| 11:14 | 10 | now.  While they're there, if they're laying it out, please |
| 11:14 | 11 | talk about something else.  When the food providers leave, go |
| 11:14 | 12 | back to the case.  And if any of you have a question, please |
| 11:14 | 13 | let the person know and we will reassemble here, and if I can |
| 11:14 | 14 | answer the question in writing, I will do that. |
| 11:14 | 15 | Otherwise, we'll come back into the courtroom.  Thank |
| 11:14 | 16 | you very much. |
| 11:14 | 17 | THE CLERK:  All rise, please. |
| 11:15 | 18 | THE COURT:  Court is in recess until we hear from the |
| 11:15 | 19 | jury. |
| | 20 | (Jury deliberating.) |
| 01:05 | 21 | (Plaintiff's counsel, clerk and court reporter present.) |
| 01:05 | 22 | THE CLERK:  The question from the jury is:  Can you |
| 01:05 | 23 | provide the definition of handicap? |
| | 24 | I'm just going to read this in.  This is the answer |
| 01:05 | 25 | the judge gave. |

**JA580**

01:05  1          In this case, handicapped under the law means an

01:05  2    actual physical impairment which substantially limits one or

01:05  3    more major life activities.  Major life activities include, but

01:05  4    are not limited to, caring for oneself, performing manual

01:06  5    tasks, walking, seeing, hearing, speaking, breathing, learning

01:06  6    and working.  An actual physical impairment substantially

01:06  7    limits an individual's ability to work if it prevents or

01:06  8    significantly restricts the individual from performing a class

01:06  9    of jobs or broad range of jobs in various classes.

01:06 10          And then you can put on the record --

01:06 11          MR. GOODWIN:  And the plaintiff is comfortable with

01:06 12    that definition.  The plaintiff would also renew to the court

01:06 13    that it reinstruct the jury about -- with all of its

01:06 14    instructions and would note its previous objections as to

01:06 15    instructions, including definition -- let me get my notes -- my

01:07 16    previous objections as to instructions regarding the missing

01:07 17    witness instruction, 152:75B(1), temporary handicap, punitive

01:07 18    damages, missing witness instruction, which I think I said, and

01:07 19    that's it.  And anything else I mentioned before.

      20          Thank you.

01:08 21    (Defense counsel entered the courtroom.)

01:08 22          MR. METZGER:  What's the question?

01:08 23          THE CLERK:  I put it right here.

01:08 24          (Discussion held off the record.)

01:09 25          MR. METZGER:  The judge, during her reading to the

**JA581**

4-91

01:09  1    jury, had also included the discussion specifically about

01:09  2    duration and severity.  It was a specific point on the either

01:09  3    permanent nature or the long-term nature, and that's a critical

01:09  4    piece of her instruction.  It's already in her instruction, and

01:09  5    we believe that absolutely needs to be included.

01:09  6         THE CLERK:  Okay.  I'm just going to give her a little

       7    heads up.

01:29  8    (A recess was taken.)

01:29  9         THE CLERK:  Your objection is noted.  She said your

01:29 10    objection is noted, to put it on the record.  Okay?  So it's

01:29 11    noted.

01:29 12         MR. METZGER:  Can I see what was sent back?

01:29 13         THE CLERK:  Uh-huh.  Let me just make a copy so I can

01:29 14    bring it up to them.

01:30 15         (Discussion held off the record.)

01:30 16         MR. METZGER:  I'm going to read something in now.  Can

01:30 17    I proceed now, Lisa?  I didn't know if you have me to wait for

01:30 18    anybody.

01:30 19         THE CLERK:  Oh, no.  You can just -- Nope.

01:30 20         MR. METZGER:  Thank you, Kathy.

01:30 21         So this is Tom Metzger, attorney for the defendant,

01:30 22    Industrial Demolition, and we had received a call during the

01:30 23    lunch break understanding that the jury had a question.  We

01:30 24    stood up from where we were immediately right across the

01:30 25    street.  We came through security.  There was a slight delay

4-92

01:30 1    getting up the elevator due to the number of individuals in the

01:30 2    courthouse, but we came over immediately.

01:30 3          I understand that the question presented from the jury

01:30 4    of Can you provide the definition of handicap was then read to

01:31 5    plaintiff's counsel without us being present and that a

01:31 6    response to that was prepared.

01:31 7          After we got here, a matter of minutes after we

01:31 8    received the phone call, we've not had an opportunity to

01:31 9    present any objections directly to the judge.  And what I

01:31 10   raised immediately, upon seeing the proposed definition to the

01:31 11   jury in response to their question of Can you provide the

01:31 12   definition of handicap, was that a piece that the judge had

01:31 13   read to the jury is not being provided to them in response.

01:31 14   Specifically I had asked, consistent with the definition of

01:31 15   what "substantially limits" means, that the following language

01:32 16   be included in what is provided to the jury.  It has not been

01:32 17   provided to the jury and I've not had an opportunity to address

01:32 18   our objection with the judge.

01:32 19         What we requested on behalf of the defendant to be

01:32 20   submitted is the following:  An impairment substantially limits

01:32 21   an individual's ability to work only if it prevents or

01:32 22   significantly restricts the individual from performing a class

01:32 23   of jobs or a broad range of jobs in various classes.  And the

01:32 24   determination of whether an individual is substantially limited

01:32 25   in a major life activity depends on the nature and severity of

**JA583**

4-93

01:32  1    the impairment, the duration or expected duration of the

01:32  2    impairment, the permanent or long-term impact or the expected

01:32  3    permanent or long-term impact of or resulting from the

01:32  4    impairment.  To be substantially limiting, the impairment's

01:32  5    impact must be permanent or long term.

01:32  6          And just for the record, there are cases consistent

01:33  7    with that instruction that we had requested, including first

01:33  8    the *Marenco v. Broad Institution, Inc.*, 2022 Westlaw 2236354;

01:33  9    also *O'Brien v. MIT*, 82 Mass. App. 905; and also, just by way

01:33 10    of example, *Salomon* -- S-a-l-o-m-o-n -- *v. Massachusetts*

01:33 11    *Housing Fin. Agency*, 2023 Westlaw 2588334.

01:33 12          So we immediately noted an objection to the

01:33 13    instruction.  We did not have an opportunity to be heard by the

01:34 14    court.  Instead we were presented with the proposed language by

01:34 15    Lisa Urso with the court.  I noted my objection to Lisa Urso.

01:34 16    And I was just told that our objection is noted, but I've had

01:34 17    no opportunity to present our argument regarding a full, fair

01:34 18    and accurate definition for the jury to consider in response to

01:34 19    their question.  Thank you.

01:34 20          MR. GOODWIN:  And if I may make a brief remark.

01:34 21          The plaintiff had no involvement in drafting the

01:34 22    relevant answer to the question.  That was entirely done by the

01:34 23    court.  We were provided it as we walked into the room, because

01:34 24    we were in the hallway, to see if we had comment.  I responded

01:34 25    on the record.

**JA584**

01:34  1    I would note that the defendant has waived its right

01:35  2    to address any of the instructions because it did not address

01:35  3    it, preserve it upon the initial instruction of the jury.  I

01:35  4    would say that their definition of handicap is not accurate and

01:35  5    that temporary handicaps are, in fact, handicaps under 151B and

01:35  6    that we did not object to the presentation of this to the jury

01:35  7    and, again, we made requests to the court to instruct the jury

01:35  8    on all instructions again alongside this answer, and, again,

01:35  9    noted our objections to the instruction on punitive damages,

01:35 10    not including our definition of temporary handicap, a missing

01:35 11    witness instruction, and GLC 152, Section 75B(1).

01:36 12    And I think that's it.  Thank you.

01:36 13    MR. METZGER:  And I do -- I apologize -- I'll just

01:36 14    direct this directly to counsel.  If I understand correctly,

01:36 15    when the court came back with the question and the proposed

01:36 16    response is when you just said what you said on the record in

01:36 17    response to all of this?

01:36 18    MR. GOODWIN:  Yeah.  I didn't say anything in response

01:36 19    to the point about waiver, but I did renew my objections and

01:36 20    the court responded to the effect of defense counsel, fairly or

01:36 21    unfairly, should have been more responsive.

01:36 22    MR. METZGER:  So I want to note a further objection.

01:36 23    I was unaware that there were then substantive discussions on

01:36 24    the record without us present.  We were directly across the

01:36 25    street.  We received the call, immediately stood up and got

01:36  1    through security and came up the elevator.

01:36  2            MR. GOODWIN:  There were no substantive discussions.

01:36  3            MR. METZGER:  It's my understanding, based upon what

01:37  4    was just discussed, that there were discussions about

01:37  5    objections and further discussion without counsel for the

01:37  6    defendant present.  And I just want to note our further

01:37  7    objection to that, particularly given the absolutely critical

01:37  8    and central question that the jury raised regarding, Can you

01:37  9    provide the definition of handicap.  We were literally minutes

01:37 10    away, right across the street, and came here immediately, and

01:37 11    there was no indication that there would be then any discussion

01:37 12    with the court without both sides present.  It's my

01:37 13    understanding that there was, and we want to note a further

01:37 14    objection to that taking place.

01:37 15            So to review very quickly, we not only have an

01:37 16    objection to the answer to the jury's question which was

01:37 17    submitted, we also have an objection to the manner in which

01:37 18    that process was handled, particularly the discussion on the

01:37 19    record or off the record without us being present.

01:38 20            MR. GOODWIN:  It was -- in terms of the discussion, to

01:38 21    clarify, I was handed the piece of paper and asked to make any

01:38 22    comments I had on the record and I made a comment.  The judge

01:38 23    was not present.

01:38 24            Thank you.

01:38 25            MR. METZGER:  Based upon that, we certainly continue

4-96

01:38 1    our objection that that occurred.

01:38 2         Thank you.

01:50 3    (A recess was taken.)

01:50 4    (Court entered.)

01:50 5         THE COURT:  Please be seated.

01:50 6         Lisa, do we have the question that the jury sent?

01:50 7         THE CLERK:  Well, I sent it up to them but this is a

01:50 8    copy of it and I want to give a copy for counsel.

01:50 9         THE COURT:  I understand the defendant is objecting to

01:50 10   the suggested answer.

01:50 11        MR. METZGER:  Yes, Your Honor.  We are objecting to

01:50 12   the suggested --

01:50 13        THE COURT:  Can you speak up, please.

01:50 14        MR. METZGER:  Yes, Your Honor.

01:50 15        We are objecting to the suggested answer.  We're also

01:50 16   objecting to the process that took place right before I

01:50 17   understood the suggested --

01:50 18        THE COURT:  Which part of the answer are you objecting

01:50 19   to?

01:50 20        MR. METZGER:  May I approach, Your Honor?  I have a

01:50 21   copy of exactly what I'd like to propose.

01:50 22        For the record, and everyone's benefit, I've flagged

01:51 23   with a red flag the section I'm going to be speaking of.

01:51 24        THE CLERK:  Do you need a copy of that?

01:51 25        LAW CLERK:  No, we have it.

**JA587**

01:51 1       MR. METZGER:  I want to give you a copy of exactly

01:51 2  what I'll be referring to.

01:51 3       So first of all, Your Honor, it's my understanding

01:51 4  that there was discussion with counsel for plaintiff without us

01:51 5  being present once the question came out from the jury.  We

01:51 6  were, as I've stated on the record, but just to review quickly,

01:51 7  immediately across the street.  When the call came to us, we

01:51 8  stood up, immediately went to security here.  There was some

01:52 9  delay in getting up the elevator because of the number of

01:52 10  visitors in the courthouse today and all of the activity that

01:52 11  is taking place, particularly because of some of the high

01:52 12  profile cases.  But we came to the court immediately.

01:52 13       We understand not only was the question from the jury

01:52 14  presented to plaintiff's counsel --

01:52 15       THE COURT:  Can I know what the answer would be if

01:52 16  you'd drafted it?

01:52 17       MR. METZGER:  Yes, Your Honor.  The critical part that

01:52 18  we believe is central to the case and is part of the clear

01:52 19  definition starts with that second paragraph that I have

01:52 20  flagged with the red flag where it says, "An impairment" --

01:52 21       THE COURT:  I'm looking at the sentence, "Proposed

01:52 22  jury instruction number 11."  Is that what you have?

01:52 23       MR. METZGER:  That's exactly right, Your Honor.

01:52 24       THE COURT:  So which part of that is the answer to the

01:52 25  jury's question?

01:52  1          MR. METZGER:  The part that is sent to the jury is

01:52  2  incomplete.  The part that we want included begins with "An

01:52  3  impairment substantially limits an individual's ability to work

01:52  4  only if it prevents or significantly restricts the individual

01:53  5  from performing a class of jobs or a broad range of jobs in

01:53  6  various classes."  And then it defines in the next part, and

01:53  7  that's the critical piece.  "The determination of whether an

01:53  8  individual is substantially limited" --

01:53  9          THE COURT:  What if we had just sent the first

01:53 10  sentence?

01:53 11          MR. METZGER:  But it doesn't define what is a central

01:53 12  question in this case covered by both defense counsel and the

01:53 13  plaintiff in closing, in opening and throughout this case,

01:53 14  which is the next part:  What does "substantially limited"

01:53 15  mean?  And for the jury to understand what it means, consistent

01:53 16  with the case law we've cited --

01:53 17          THE COURT:  I'm sorry.  I'm having great trouble

01:53 18  following.  The jury wants to know can you provide the

01:53 19  definition of handicap.  Then we have the definition in the

01:53 20  proposal, which I think came from your request for

01:53 21  instructions.

01:53 22          MR. METZGER:  But it's missing the last part beginning

01:53 23  with, "The determination" --

01:53 24          THE COURT:  Which part do you want out?

01:53 25          MR. METZGER:  I want in one more piece stating -- we

**JA589**

01:53 1    just want to add to what's there so it is complete.

01:54 2         THE COURT:  And this is in part of instruction number

01:54 3    11?

01:54 4         MR. METZGER:  Yes.  It states, "The determination of

01:54 5    whether an individual is substantially limited in a major life

01:54 6    activity depends on, one, the nature and severity of the

01:54 7    impairment; two, the duration or expected duration of the

01:54 8    impairment; and three, the permanent or long-term impact or the

01:54 9    expected permanent or long-term impact of or resulting from the

01:54 10   impairment.  To be substantially limiting, the impairment's

01:54 11   impact must be permanent or long term."  That's a critical

01:54 12   piece of the definition that is missing from what was sent to

01:54 13   the jury and which it appears was sent to the jury without our

01:54 14   ability to comment on it and now over our objection.

01:54 15        So we believe to cure that, getting to the jury that

01:54 16   critical piece, which is part of the definition, is essential.

01:55 17        THE COURT:  I mean, what we left out was the last two

01:55 18   sentences, which deal with the result of physical impairment.

01:55 19   And it's not clear to me that that's what this case is about at

01:55 20   the moment -- I mean, what the question is about.

01:55 21        MR. METZGER:  Your Honor, the definition deals with

01:55 22   both severity and duration.  Both counsel during closing

01:55 23   addressed duration.  I addressed it specifically.  Plaintiff's

01:55 24   counsel has a different argument on it, but it's critical given

01:55 25   that this is part of the case law that the jury be given that

4-100

| | | |
|---|---|---|
| 01:55 | 1 | piece.  It is a central argument and central finding of fact |
| 01:55 | 2 | for the jury.  And right now they've been given an incomplete |
| 01:55 | 3 | definition which makes it an inaccurate definition. |
| 01:56 | 4 | THE COURT:  Assume for the moment that we sent them |
| 01:56 | 5 | only the first sentence. |
| 01:56 | 6 | MR. METZGER:  I'd be fine with that. |
| 01:56 | 7 | THE COURT:  I'm sorry? |
| 01:56 | 8 | MR. METZGER:  I would be fine with that.  That would |
| 01:56 | 9 | be okay. |
| 01:56 | 10 | THE COURT:  How do you feel about that for the |
| 01:56 | 11 | plaintiff? |
| 01:56 | 12 | MR. GOODWIN:  And when you say "the first sentence," |
| 01:56 | 13 | you're saying the first sentence of their instruction number |
| 01:56 | 14 | 11, "In order to establish" -- |
| 01:56 | 15 | THE COURT:  It seems to me that's what they're asking. |
| 01:56 | 16 | MR. METZGER:  No, the first sentence beginning with -- |
| 01:56 | 17 | THE COURT:  Wait a minute.  I was talking to defense |
| 01:56 | 18 | counsel. |
| 01:56 | 19 | MR. METZGER:  Oh, I'm sorry. |
| 01:56 | 20 | MR. GOODWIN:  Plaintiff's counsel. |
| 01:56 | 21 | THE COURT:  Plaintiff's counsel.  I'm sorry. |
| 01:56 | 22 | MR. GOODWIN:  So I'm comfortable with what was sent to |
| 01:56 | 23 | the jury. |
| 01:56 | 24 | THE COURT:  You're comfortable with what? |
| 01:56 | 25 | MR. GOODWIN:  I was comfortable with what was sent to |

**JA591**

01:56 1   the jury.  I would object -- I'm a little unclear what sentence

01:56 2   we're talking about.  Tom, would you --

01:56 3          MR. METZGER:  May I clarify that, Your Honor?  The one

01:56 4   sentence I would agree to send, and I believe I understand,

01:56 5   Your Honor, instead of both sentences, it would be as follows,

6   and I'll read it exactly.

7          MR. GOODWIN:  Thank you.

01:56 8          MR. METZGER:  The determination of whether an

01:56 9   individual is substantially limited --

01:56 10         THE COURT:  You're going into too much stuff.  The

01:57 11  jury wants to know the definition of handicap.

01:57 12         MR. METZGER:  Right, Your Honor.  But you touched upon

01:57 13  this very issue.  I touched upon it -- not touched upon it.  It

01:57 14  was a central part of what we raised in closing.  It's a

01:57 15  central part of what plaintiff raised in closing.  There's a

01:57 16  definition under handicap not only of the severity but the

01:57 17  duration.  Those are two critical separate pieces, severity

01:57 18  affecting a major job and then the next part is the duration of

01:57 19  it.  That's an absolutely critical fact at issue in this case.

01:57 20         THE COURT:  Which is the critical fact?

01:57 21         MR. METZGER:  The duration of an alleged handicap.

01:57 22  And it's just one sentence that clears that up.  It's critical

01:57 23  that the jury be able to see that in response to their central

01:57 24  question.

01:57 25         THE COURT:  You mean the definition of what major life

**JA592**

01:57 1    activities includes?

01:58 2            MR. METZGER:  No.  The determination of whether an

01:58 3    individual is substantially limited in a major life activity --

01:58 4            THE COURT:  I don't know what you're reading.

01:58 5            MR. METZGER:  I marked it --

01:58 6            THE COURT:  I have a piece of a proposed --

      7            THE CLERK:  They're right here.

01:58 8            THE COURT:  Oh, from the instructions.

01:58 9            THE CLERK:  Yeah, from the actual instructions?

01:58 10   Right.

01:58 11           MR. METZGER:  Correct.  Number 11 right by the red

01:58 12   mark.

      13           THE CLERK:  Yeah, right here with the red mark.  He

01:58 14   did this.  This is what he's referring to.

01:58 15           THE COURT:  It seems to me you're overanswering the

01:58 16   question.

01:58 17           MR. GOODWIN:  Plaintiff agrees.

01:58 18           MR. METZGER:  Your Honor, all they've been given is

01:58 19   part one of the definition.

01:58 20           THE COURT:  They want the definition.

01:58 21           MR. METZGER:  Right.  All I'm asking is one sentence.

01:58 22   And, Lisa, if I may I approach.

      23           THE CLERK:  Yup.

01:58 24           MR. METZGER:  I just circled the one sentence.

01:58 25           THE COURT:  If you need to get into all of that, why

**JA593**

01:59  1    don't we just simply stop with the first sentence?

01:59  2            MR. METZGER:  Because it's incomplete.

01:59  3            THE CLERK:  He wants to put in the next sentence.

01:59  4            THE COURT:  I don't understand.

01:59  5            THE CLERK:  Starting from there, "The determination."

01:59  6    Starting from there he wants.

01:59  7            THE COURT:  So what you're proposing now is to go

01:59  8    ahead with the additional two sentences and then continue with

01:59  9    the determination sentence as well?

01:59 10            MR. METZGER:  All we're looking to do, Your Honor, is

01:59 11    to add the one sentence beginning with, "The determination of

01:59 12    whether."

01:59 13            THE COURT:  Well, it's not one long sentence.

01:59 14    "Handicap under the law means a physical impairment which

01:59 15    substantially limits one or more major life activities" period.

01:59 16            And then this goes ahead and says what major life

01:59 17    activities includes.

02:00 18            MR. METZGER:  Agreed.  We're fine with that.

02:00 19            THE COURT:  I mean, why do we need that?  We could

02:00 20    send it to the jury with just the first sentence.

02:00 21            MR. METZGER:  No.  Your Honor, all I'm saying is we're

02:00 22    just looking to add to this existing instruction to make it

02:00 23    complete and accurate under the law because there is a duration

02:00 24    element to the definition of a disability.

02:00 25            To use an extreme example, if someone has a physical

```
02:00  1   impairment for one hour under the law, it is not a disability.
02:00  2   If someone has a permanent or very long-term physical
02:00  3   impairment, it may qualify as a disability.  There is an
02:00  4   essential duration element to the definition, and what has been
02:00  5   sent to the jury is missing that duration element.  And it's
02:00  6   also something that counsel for both parties has raised.
02:01  7            THE COURT:  I'm inclined to send only the first
02:01  8   sentence.
02:01  9            MR. GOODWIN:  Your Honor, at this point the
02:01 10   plaintiff's position would be that the language --
02:01 11            THE COURT:  I mean, it's the elaboration that's
02:01 12   causing the problem.
02:01 13            MR. GOODWIN:  Your Honor, the plaintiff, if I could be
02:01 14   heard, would say that --
02:01 15            THE COURT:  But that goes beyond.  It then defines
02:01 16   what is included.
02:01 17            But the jury says, "Can you provide the definition of
02:01 18   handicap?"  And handicap under the law means a physical
02:01 19   impairment which substantially limits one or more major life
02:01 20   activities.  Why is that not enough?
02:01 21            MR. METZGER:  Because of the --
02:01 22            THE COURT:  I mean, it defines it, and that's all
02:01 23   they're asking.  I understand why you want to argue some more.
02:01 24   But it's argument.  It's no longer definition.
02:01 25            MR. METZGER:  Your Honor, just on the severity aspect
```

**JA595**

4-105

02:01  1    of it, the jury's been given that part of it.  There is a very

02:02  2    significant missing part of the definition which is merely one

02:02  3    additional sentence I'm asking for.  And it's something that

02:02  4    we've all touched upon, and I believe it was touched upon in

02:02  5    part of what Your Honor had already provided to the jury, and

02:02  6    we just want there to be absolute clarification and a complete

02:02  7    definition.

02:02  8           MR. GOODWIN:  But if we start getting into that, then

02:02  9    I'm going to start asking for additional language as well, Your

02:02 10    Honor.

02:02 11           THE COURT:  I think what I will do is send to the jury

02:02 12    the proposed response that you have seen and Ms. Urso will take

02:02 13    it to them, ask them to read it, and ask them whether that

02:02 14    satisfies the question that they put to us.  If it doesn't

02:02 15    satisfy, then they can ask us what else they need to know in

02:02 16    order to be able to answer the question that is posed to them

02:02 17    in the jury verdict.

02:02 18           MR. GOODWIN:  Thank you, Your Honor.

02:02 19           THE COURT:  And we'll let you know.

02:02 20           MR. METZGER:  Okay.  Thank you, Your Honor.  We'll

02:02 21    just maintain our objection.

02:03 22           THE COURT:  Lisa, you need the papers?

02:03 23           THE CLERK:  No, I have them.

      24           THE COURT:  Both of them?

02:03 25           THE CLERK:  Yup.

**JA596**

4-106

02:03 1          MR. GOODWIN:  For the record, I would just like to

02:03 2     preserve previous --

02:03 3          THE COURT:  So we'll recess and wait a bit to see what

      4     happens.

      5          MR. METZGER:  Okay.  Thank you, Your Honor.

      6          MR. GOODWIN:  I do have one thing I'd like to read

02:03 7     into the record, Your Honor, if possible.

02:03 8          THE COURT:  To the extent the defendant has an

02:03 9     objection to the record, we'll note it.

02:03 10         But we'll take a recess and see what goes on and we'll

02:03 11    tell you what goes on.

02:03 12         LAW CLERK:  Judge, plaintiff's counsel wanted to note

02:03 13    something for the record.

02:03 14         MR. GOODWIN:  I'm just noting for the record I

02:03 15    preserve my previous objections and what's been previously

02:03 16    stated about reinstructing the jury and the objections we made

02:03 17    to the instructions --

02:03 18         THE COURT:  I'm sorry.  Are you now making an argument

02:03 19    against the defendant?

02:03 20         MR. GOODWIN:  No, no.  I'm just preserving, Your

02:03 21    Honor.  I'm just preserving.  If I don't need to, I don't need

02:03 22    to.

02:03 23         THE COURT:  Okay.  Thank you.

02:03 24         THE CLERK:  The answer is sufficient.  It answered

02:04 25    their question.  They're all good.

**JA597**

4-107

```
02:04  1              THE COURT:  They're okay?
       2              THE CLERK:  Yes.
02:04  3              THE COURT:  So the abbreviated answer went to the
02:04  4     jury.  The jury is happy with it.  We'll wait for their next
02:04  5     question.
02:04  6              MR. GOODWIN:  Thank you, Your Honor.
02:04  7              MR. METZGER:  Thank you.
02:04  8     (A recess was taken.)
02:20  9     (Court and jury enter.)
02:22 10              THE CLERK:  Everyone can be seated except for the
02:22 11     foreperson.
02:22 12              Mr. Foreman, has the jury agreed upon a unanimous
02:22 13     verdict?
      14              FOREMAN:  Yes.
02:22 15              THE CLERK:  Okay.  Sir, you can -- no, you can keep it
02:22 16     folded, sir.  Thank you, sir.  You may be seated.
02:22 17              THE COURT:  You may be seated.
02:22 18              I am only looking at it before counsel gets to see it
02:22 19     to make sure that you properly filled out the spaces.  We have
02:22 20     to do that.
02:22 21              (Pause.)
02:22 22              Okay.
02:22 23              THE CLERK:  So this is Eric Moore v. Industrial
02:23 24     Demolition, LLC.  This is questions to the jury on special
02:23 25     verdict.
```

**JA598**

4-108

02:23 1          Did plaintiff prove he had a handicap?  Yes.

02:23 2          Did defendant fail to reasonably accommodate

02:23 3  plaintiff's handicap?  Yes.

02:23 4          Did defendant terminate plaintiff because of his

02:23 5  handicap?  No.

02:23 6          Did defendant retaliate by terminating plaintiff for

02:23 7  requesting or using a reasonable accommodation?  Yes.

02:23 8          Did defendant retaliate by terminating plaintiff for

02:23 9  reporting that he had suffered a potential industrial accident?

02:23 10 No.

02:23 11         The amount of plaintiff's damages is -- let me see --

02:23 12 $10,035.  And that comes out to be -- because it was for back

02:23 13 pay 95,590 minus the -- -- wait a minute.  Hold on.  Oh, we had

02:23 14 to do minus the --

02:23 15         THE COURT:  The 10,000.

02:23 16         THE CLERK:  The 10,000.  So it comes out for damages

02:23 17 for the plaintiff $10,035 with zero for front pay and zero for

02:24 18 emotional distress.  So say you, Mr. Foreperson, so say you

02:24 19 all, members of the jury?

02:24 20         JURORS:  Yes.

02:24 21         THE COURT:  I'm not suggesting that Ms. Urso didn't

02:24 22 read it correctly but I didn't quite get it all.

02:24 23         THE CLERK:  Right here.  Okay.

02:24 24         THE COURT:  Well.  I thank you, members of the jury.

02:24 25         This was not an easy case.  It appeared easy in the

**JA599**

4-109

02:24 1    beginning but it became complicated because it dealt with

02:24 2    issues that are complicated and you certainly have done a

02:24 3    fantastic job of cutting through and getting to the heart of it

02:24 4    and giving us a sensible judgment.

02:24 5         And I thank you for that, and I thank you for having

02:24 6    been prompt every day.  We tried very hard to start as promptly

02:24 7    as you arrived but sometimes it's very complicated because

02:24 8    lawyers and the witnesses get stuck on the T too.

02:25 9         I would very much appreciate your waiting for me in

02:25 10   the jury room so I might thank you individually before you

02:25 11   depart.

02:25 12           THE CLERK:  All rise, please.

02:25 13           THE COURT:  We'll be in recess.

02:25 14           If anybody wants to look at the verdict, it is there.

02:25 15           THE CLERK:  Let me make a copy of this.

02:25 16           THE COURT:  Court is in recess.  Thank you all.

02:25 17           MR. METZGER:  I'll just briefly note.  We will renew

02:25 18   our Rule 50(b) motion for judgment as a matter of law.  We also

02:25 19   preserve judgment notwithstanding the verdict.  We'll preserve

02:25 20   those.

02:27 21   (Proceedings adjourned at 2:27 p.m.)

22

23

24

25

**JA600**

```
 1                      C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8            I certify that the foregoing is a correct transcript

 9    from the record of proceedings taken April 14, 2023 in the

10    above-entitled matter to the best of my skill and ability.

11

12

13

14

15    /s/ Kathleen Mullen Silva              4/24/23

16

17    Kathleen Mullen Silva, RPR, CRR              Date
      Official Court Reporter
18

19

20

21

22

23

24

25
```

**JA601**

Case 1:22-cv-10414-RWZ   Document 63   Filed 04/14/23   Page 1 of 1

AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

DISTRICT OF _____

*ERIC MOORE*

v.

*Industrial Demo*

### EXHIBIT AND WITNESS LIST

Case Number: *22-10414-RWZ*

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY | DEFENDANT'S ATTORNEY |
|---|---|---|
| *Zobel* | | |

| TRIAL DATE (S) | COURT REPORTER | COURTROOM DEPUTY |
|---|---|---|
| *4/11 -* | | |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| B | | 4/11 | ✓ | ✓ | *Email from Becky etc...* |
| | 23 | 4/12 | ✓ | ✓ | *Pay Stub* |
| | 3 | 4/12 | ✓ | ✓ | *Emergency Dept. Doc Signed* |
| | 4 | 4/12 | ✓ | ✓ | *St Anne's Hospital* |
| | 37 | 4/12 | ✓ | ✓ | *e2 RX discharge package Signed* |
| | 17 | 4/12 | ✓ | ✓ | *Jamie Goodwin (Letter) (IRS) Settlement* |
| | 17 | 4/12 | ✓ | ✓ | *W 2 2014 Tax* obj |
| | 31 | 4/12 | ✓ | ✓ | *W 2 current employment 2021* obj |
| | 30 | 4/13 | ✓ | ✓ | |
| | 34 | 4/13 | ✓ | | |
| | 19 | 4/13 | ✓ | ✓ | *3pg Copy of Pay Stub* |
| A | | 4/13 | ✓ | ✓ | *W-9 Request Tax payer* . |
| C | | 4/13 | ✓ | ✓ | *Letter Re Trials* |
| A | | 4/13 | ✓ | ✗ | *Letter Today & Good Morning (NO)* |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

Page 1 of _____ Pages

**JA602**

## Saint Anne's Hospital

**795 MIDDLE STREET**
**FALL RIVER, MA 02721**

**Emergency Department Document**
**Signed**

Patient: Moore,Eric
DOB: ███████
Age/Sex: 40? M
Loc: ED.AH Room:
Attending Dr: David Ignatius MD

Medical Record#: ███████
Acct: ███████
Admit/Reg Date: 12/09/19
Report Number: HIM1209-0330

*<Dockery,Dominique - Last Filed: 12/09/19 06:36>*

### History of Present Illness
**Chief Complaint:** Extremity Problem,Nontraumatic
**Nursing note reviewed:** Yes
**Source:** patient
**Exam/History Limitations:** no limitations
**History of Present Illness:**
Pt is a 40 y/o male with no significant past history who presents today with hip pain since Saturday night. He reports the pain is on the outside of his right hip, currently 7/10 in severity. The pain has been getting worse and is exacerbated by straightening or lifting his leg as well as swiveling. He is now having trouble bearing weight on his right leg and had to crawl to the bathroom this morning. Pt states he does manual labor for work with heavy lifting but denies significant injury or fall. Reports mild back pain on left side on Saturday but no other joint problems. Denies fever or other symptoms.
**Allergies/Adverse Reactions:**

No Known Drug Allergies Allergy (Verified 12/09/19 06:23)

### Review of Systems
**Constitutional:** Denies: chills, fever
**Eyes:** Denies: eye pain
**ENMT:** Denies: throat pain
**Cardiovascular:** Denies: chest pain
**Respiratory:** Denies: shortness of breath
**Gastrointestinal:** Denies: abdominal pain, diarrhea, nausea, vomiting
**Genitourinary:** Denies: dysuria
**Musculoskeletal: Reports: back pain, joint pain.** Denies: neck pain
**Integumentary:** Denies: rash
**Neurological:** Denies: headache, numbness, tingling

### Past Medical/Surgical History
**Narrative PMH:**
none reported

### Family/Social History

**- Family History**
HIM 1209-0330

1-000001

DEFENSE
TRIAL EXHIBIT
3
U. S. District Court / 1:22-cv-10414-RWZ

**JA603**

Saint Anne's Hospital
Patient name: Moore Eric
Account #: ▇▇▇▇▇▇▇

Report Number: HIM1209-0330
Medical Record #: ▇▇▇▇▇▇▇

## Arrival

**- Arrival**
**ED Triage Note:** Pt states he started with right hip pain on Saturday night that has gotten progressively worse, to the point where he can not bear weight on that leg. Area tender to palpation. Pt denies any injury to that leg/hip.

## Family/Social History

**- Social History**
**Smoked/Used Tobacco in the Last 30 Days?:** No
**1. How Often Do You Have a Drink Containing Alcohol:** a, Never

## Results/Orders

**- Results and Orders**
**Result diagrams:**



## Attending

**- Scribe**
**MD Scribe Attestation:** Yes
**Attestation Statement:** Portions of this medical record, where indicated, have been recorded by a Scribe. I was present during the time the encounter was recorded. I have reviewed this information and attest to its accuracy. Also, I have indicated additional information as needed.

*<Ross,Thomas - Last Filed: 12/09/19 09:21>*

## History of Present Illness
**PCP:**
[f_Reg Prim Care Provider]

## Physical Exam
**Triage Vital Signs:**

| Temperature | 98.1 F | 12/09/19 05:52 |
|---|---|---|
| Temperature Source | Oral | 12/09/19 05:52 |
| Pulse Rate | 80 | 12/09/19 05:52 |
| Respiratory Rate | 18 | 12/09/19 05:52 |
| Blood Pressure | 137/86 | 12/09/19 05:52 |

HIM 1209-0330

3 of 5

1-000002

**JA604**

Saint Anne's Hospital
Patient name: Moore,Eric
Account #:

Report Number: HIM1209-0330
Medical Record #:

12/09/19 06:19
CT hip RT wo con Stat

**MDM/COURSE**

**Vital Signs**

| Temperature | 98.1 F | 12/09/19 05:52 |
|---|---|---|
| Pulse Rate | 80 | 12/09/19 05:52 |
| Respiratory Rate | 18 | 12/09/19 05:52 |
| Blood Pressure | 137/86 | 12/09/19 05:52 |
| 02 Sat by Pulse Oximetry | 100 | 12/09/19 05:52 |

| Temperature | 98.1 F | 12/09/19 05:52 |
|---|---|---|
| Pulse Rate | 70 | 12/09/19 07:10 |
| Respiratory Rate | 18 | 12/09/19 07:10 |
| Blood Pressure | 135/85 | 12/09/19 07:10 |
| 02 Sat by Pulse Oximetry | 99 | 12/09/19 07:10 |

**Clinical Course:**

12/09/19 09:21
Assumed care of this patient. Patient's initial laboratory work-up is largely unrevealing, although inflammatory markers are still pending at this time. However, the patient CT imaging of his hip reveals a partial tear of his gluteus medius where it inserts on the greater trochanter. The patient is feeling much improved following the administration of Toradol, and is felt safe for discharge home. He will be referred to outpatient physiatry/sports medicine and provided with a prescription for oral Motrin, as well as a work note..

Dictated By: David Ignatius, MD
Signed By: Ignatius,David MD 12/09/19 0642
          Ross,Thomas MD 12/09/19 0921

DD/DT: 12/09/19 0609
TD/TT: 12/09/19 0609                Transcriptionist: IGNDA

cc: Pop-None,Md *

HIM 1209-0330                                          5 of 5

1-000003

**JA605**

Run Date: 12/15/19                    St. Anne's Hospital
Run Time: 0107                          795 Middle Street
                                      Fall River, MA 02721
Phone: 508-674-5600          Medical Director: Robert Bagdasaryan, M.D.

| PATIENT | SEX | AGE | DATE OF BIRTH | LOCATION | DATE PRINTED |
|---|---|---|---|---|---|
| Moore,Eric | M | 40 | ▓▓▓▓ | ED.AH | 12/15/19 |
| | | | | | @ 0107 |

| MED REC # / ACCT # | ADMIT DATE | DISCH DATE | SUBMITTING DOCTOR |
|---|---|---|---|
| ▓▓▓▓▓▓▓▓ | 12/09/19 | | Thomas Ross, MD |

### Chemistry

| Date | 12/09/2019 | | |
|---|---|---|---|
| Time | 0630 | Reference | Units |
| NA | 139(*b) | (137-146) | mmol/L |
| K | 3.9(*b) | (3.5-5.3) | mmol/L |
| CL | 105(*b) | (98-107) | mmol/L |
| CO2 | 20(*b) L | (23-32) | mmol/L |
| Gap | 14(*b) | (5-15) | mmol/L |
| BUN | 19(*L) | (5-25) | mg/dl |
| Creat | 0.9(*b) | (0.6-1.4) | mg/dL |
| Creat Calc FHA | 105.6(A) | | ml/min |

(A)   "This value is calculated by Cockcroft Gault Equation using
ideal body weight. This result is dependent on an accurate
patient height and weight which is obtained from patients
medical record." Cockcroft, D.W. and M.H. Gault.
Prediction of creatinine clearance from serum creatinine.
Nephron. 1976, 16(1):31-41.
See also (*b)

| EGFR AA | > 60(*b) | (>=60 mL/mi |  |
|---|---|---|---|
| EGFR NAA | > 60(*b) | (>=60 mL/mi |  |
| BUN/Creat Ratio | 21:1(*b) H | (10.0-20.0) |  |
| Glu | 102(*b) H | (<100 -Fast | mg/dL |
| Lactic | 1.7(*b) | (0.5-2.2) | mmol/L |
| CA | 9.4(*b) | (8.6-10.3) | mg/dl |
| TOTAL BILI | 0.9(*b) | (<1.2) | mg/dl |
| AST | 18(*b) | (15-41) | U/L |
| Alt | 24(*b) | (14-63) | U/L |
| CRP | 0.30(*b) | (<0.50) | mg/dl |
| TP | 7.0(*b) | (6.4-8.3) | g/dL |
| Alb | 4.4(*b) | (4.0-5.0) | g/dl |
| A/G Ratio | 1.6(*b) | (1.0-2.6) |  |
| Alk Phos | 51(*b) | (40-129) | U/L |

NOTES:   (*b) St. Anne's Hospital Lab
         St. Anne's Hospital Laboratory  795 Middle St. Fall River, MA. 02721
         Bagdasaryan, Robert M.D., Medical Director

▓▓▓▓▓▓▓ - Moore,Eric ▓▓▓▓▓▓▓     DEP(/) 40/M Thomas Ross, MD

1-000004

**JA606**

**Saint Anne's Hospital**

Steward Health Care
795 MIDDLE STREET
FALL RIVER, MA 02721
508-674-5600

Patient Name: Moore,Eric
Address: 7 Harbor Meadows
City/State/Zip: WESTPORT,MA 02790
Phone: (812)598-9905
DOB/Age/Sex: ███████

Medical Record#: ███████
Account#: ███████
Attending Dr: David Ignatius MD
Insurance: Self Pay

Admit/Reg Date: 12/09/19
Location: ED,AH/

Ordering Dr: David Ignatius, MD
PCP: Pcp-None,Md
Date of Service: 12/09/19

Order (s): CT hip RT wo con
CPT Code: 73700
Reason for Exam: severe r hip pain 2 days,limited movement,

Report Number: IMG1209-0287

**\*\*ADDENDUM\*\***

Addendum: 12/9/2019 9:59 AM
The report from teleradiology services has become available.
This raises the question of myositis which is quite possible.
There is still likely element of possible inflammatory change adjacent to the area of density within the
distal portion of the gluteus medius on the right.
Impression: Consider also myositis ossificans.

Addendum Dictated By: Bruce Bertrand, MD
Addendum Signed By: Bruce Bertrand MD   12/09/19 1000

DD/DT: 12/09/19/0952
TD/TT: 12/09/19/0952

CT hip RT wo con

Clinical: severe r hip pain 2 days,limited movement;

Comparison: None

Technique: A helical scan was obtained through the bony pelvis. No intravenous contrast was
administered. Coronal, axial and sagittal reconstructions are reviewed. CT examination was performed
utilizing dose reduction techniques with auto exposure control and/or iterative reconstruction.

1-000005

**JA607**

**Saint Anne's Hospital**

Steward Health Care
795 MIDDLE STREET
FALL RIVER, MA 02721
508-674-5600

Patient Name: Moore,Eric
Address: 7 Harbor Meadows
City/State/Zip: WESTPORT,MA 02790
Phone: (812)599-9905
DOB/Age/Sex: ▓▓▓▓▓ /40/M

Admit/Reg Date: 12/09/19
Location: ED.AH/

Medical Record#: ▓▓▓▓▓▓
Account#: ▓
Attending Dr: David Ignatius MD
Insurance: Self Pay

Ordering Dr: David Ignatius, MD
PCP: Pcp-None,Md
Date of Service: 12/09/19

Order (s): CT hip RT wo con
CPT Code: 73700
Reason for Exam: severe r hip pain 2 days,limited movement,

Report Number: IMG1209-0287

**\*\*ADDENDUM\*\***

Addendum: 12/9/2019 9:59 AM
The report from teleradiology services has become available.
This raises the question of myositis which is quite possible.
There is still likely element of possible inflammatory change adjacent to the area of density within the distal portion of the gluteus medius on the right.
Impression: Consider also myositis ossificans.

Addendum Dictated By: Bruce Bertrand, MD
Addendum Signed By: Bruce Bertrand MD   12/09/19 1000

DD/DT: 12/09/19/0952
TD/TT: 12/09/19/0952

CT hip RT wo con

Clinical: severe r hip pain 2 days,limited movement,

Comparison: None

Technique: A helical scan was obtained through the bony pelvis. No intravenous contrast was administered. Coronal, axial and sagittal reconstructions are reviewed. CT examination was performed utilizing dose reduction techniques with auto exposure control and/or iterative reconstruction.

1-000006

**JA608**

Dec/9/2019 11:58:10 AM          St Anne's Hospital 508-235-5582                    1/2



# Saint Anne's Hospital
A STEWARD FAMILY HOSPITAL

## Facsimile Sheet

**From: Saint Anne's Hospital**

**Emergency Department**

**Phone: (508) 675-5682**

**Fax Number: (508)675-5691**

ATT: _Banky_          From _Brandi_

Location: _____          Date: _12/9_

Fax Number: _914 835 1616_          Time: _____

RE: _____          Total No. of Pages: _2_

Comment: _____

Notice of Confidentiality: This transmission is intended only for the addressee(s) listed above, and may contain information that is confidential and/or legally privileged. If you are not the addressee, any use, disclosure, copying or communication of this transmission is prohibited. IF THIS CONTAINS MEDICAL INFORMATION, the recipient of this patients' information is prohibited from is prohibited from disclosing this information (including copies) to any party not authorized by the patient. If this message was received in error, please telephone us at (508)235-5070, and we will arrange for the return of the original documents to us at no cost to you.

**This form contains Protected Health Information. Provider must maintain the confidentiality of such information in accordance with law, including HIPAA, HITECH and Massachusetts privacy laws.**

DEFENSE
TRIAL EXHIBIT
4
U. S. District Court / 1.22-cv-10414-RWZ

Confidential                    Industrial Demo_Moore 000542

## JA609

Dec/9/2019 11:58:10 AM      St. Anne's Hospital 508-235-5582      2/2



Saint Anne's Hospital
795 Middle Street
Fall River, MA 02721
(508) 674-5600

**Discharge Instructions
(Patient Copy)**

Date:    12/09/2019
Time:    11:18 a.m.

| | | | | |
|---|---|---|---|---|
| Treating Provider: | Thomas Ross, MD | Phone: | (508)674-5600   Fax: | (508)675-5635 |
| Supervised Provider: | | | | |
| Patient Name: | Eric Moore | Phone: | (812)599-9905 | |
| Patient Address: | 7 Harbor Meadows WESTPORT , MA 02790 | | | |

| Patient Discharge Instructions: |
|---|

### Work Release Form

This notice verifies that your employee, ___Eric Moore_____

was seen in this facility on _____12/09/19_____.

   He/she may return to work on _____12/10/19_____ with the following restrictions:
None:
   No heavy lifting:X
   No prolonged standing:X
   Desk Work Only:_____
   Other: *Can operate machinery & drive a truck*

Restrictions: Until cleared by patient's primary care doctor and/or sports medicine/physiatry

NOTE: If symptoms continue and the employee is unable to perform the full duties of their job by this date, please advise the employee to return to this facility or make an appointment with the referral physician for further evaluation.

_____Thomas Ross_____
      Attending MD

I understand that the emergency care I received is not intended to be complete and definitive medical care and treatment. EKG's, X-rays, and lab studies will be reviewed by appropriate specialists and   I will be notified of significant discrepancies.

Page 1 of 1

Confidential

Industrial Demo_Moore 000543

## JA610

| | |
|---|---|
| From: | Jamie Goodwin |
| To: | Goldman, Emily G. |
| Cc: | Papaleo, Andyeliz |
| Subject: | RE: Industrial Demolition |
| Date: | Friday, October 9, 2020 12:04:00 PM |
| Attachments: | RTS001.pdf |

Mr. Moore accepts the terms. He very much appreciates all of your work.

Thanks,

Jamie

**From:** Goldman, Emily G. <Emily.Goldman@nlrb.gov>
**Sent:** Thursday, October 8, 2020 1:27 PM
**To:** Jamie Goodwin <jgoodwin@kjclawfirm.com>
**Cc:** Papaleo, Andyeliz <Andyeliz.Papaleo@nlrb.gov>
**Subject:** Industrial Demolition

Jamie,

Attached are the Settlement Agreement and Notice in the above-referenced matter. Please review them with your client, sign and date the Agreement, and initial and date the Notice, and return them to us via email as soon as possible. Thanks for your patience.

Emily Goldman

Field Attorney

Region 1

National Labor Relations Board

Thomas P. O'Neill Federal Building

10 Causeway Street, 6th Floor

Boston, MA 02222-1072

Phone: (857) 317-7808

Fax: 617 565-6725

E-mail: Emily.goldman@nlrb.gov

**The NLRB has switched to mandatory electronic filing of all case documents. See GC Memo 20-01. For instructions on e-filing documents, please see Frequently Asked Questions and E-File Live Demo.**

DEFENSE
TRIAL EXHIBIT
17
U. S. District Court / 1:22-cv-10414-RWZ

**JA611**

UNITED STATES GOVERNMENT
NATIONAL LABOR RELATIONS BOARD
**SETTLEMENT AGREEMENT**

IN THE MATTER OF
**INDUSTRIAL DEMOLITION LLC**                                    Case 01-CA-257960

Subject to the approval of the Regional Director for the National Labor Relations Board, the Charged Party and the Charging Party **HEREBY AGREE TO SETTLE THE ABOVE MATTER AS FOLLOWS:**

**POSTING AND MAILING OF NOTICE** — After the Regional Director has approved this Agreement, the Regional Office will send copies of the approved Notice to the Charged Party in English, Spanish, and in additional languages if the Regional Director decides that it is appropriate to do so. A responsible official of the Charged Party will then sign and date those Notices and immediately post them in prominent places around its corporate headquarters located at 1515 Des Peres Road, Suite 300, St. Louis, MO, including in the breakroom/kitchen; in the Gate House at its Brayton Point project in Somerset, MA; in the trailer at the Fox Lake project in Sherburn, Minnesota, and in all other places where the Charged Party normally posts notices to employees. The Charged Party will keep all Notices posted for 60 consecutive days after the initial posting. The Charged Party will also copy and mail, at its own expense, a copy of the attached Notice to all current employees and former employees who were employed at any time since December 13, 2019. If the Employer's place of business is currently closed and a substantial number of employees are not reporting to the facility due to the Coronavirus pandemic or is operating with less than a substantial complement of employees, the 60 consecutive day period for posting will begin when the
Employer's place of business reopens and a substantial complement of employees have returned to work. For purposes of this notice posting, a substantial complement of employees is at least 50% of the total number of employees employed by the Employer prior to closing its business due to the Coronavirus pandemic. If the Employer's place of business is currently closed due to the Coronavirus pandemic, the Employer will mail the Notice to its employees when the Employer's place of business reopens. Those Notices will be signed by a responsible official of the Charged Party and show the date of mailing. The Charged Party will provide the Regional Director written confirmation of the date of mailing and a list of names and addresses of employees to whom the Notices were mailed.

**COMPLIANCE WITH NOTICE** — The Charged Party will comply with all the terms and provisions of said Notice.

**BACKPAY** — Within 14 days from approval of this agreement, the Charged Party will make whole the employee named below by payment of the amount opposite their name. The Charged Party will make appropriate withholdings for the named employee. No withholdings should be made from the interest portion of the backpay.

| Employee | Backpay Amount | Excess Tax Liability | Front Pay | Compound Interest |
|---|---|---|---|---|
| Eric Moore | $60,639 | $0 | $23,750 | $1,166 |
| Total due: $85,555 | | | | |

**SCOPE OF THE AGREEMENT** — This Agreement settles only the allegations in the above-captioned case(s), and does not settle any other case(s) or matters. It does not prevent persons from filing charges, the General Counsel from prosecuting complaints, or the Board and the courts from finding violations with respect to matters that happened before this Agreement was approved regardless of whether General Counsel knew of those matters or could have easily found them out. The General Counsel reserves the right to use the evidence obtained in the investigation and prosecution of the above-captioned case(s) for any relevant purpose in the litigation of this or any other case(s), and a judge, the Board and the courts may make findings of fact and/or conclusions of law with respect to that evidence. By approving this Agreement the Regional Director

3-000026

**JA612**

withdraws any Complaint(s) and Notice(s) of Hearing previously issued in the above case(s), and the Charged Party withdraws any answer(s) filed in response.



3-000027

**JA613**

**PARTIES TO THE AGREEMENT** — If the Charging Party fails or refuses to become a party to this Agreement and the Regional Director determines that it will promote the policies of the National Labor Relations Act, the Regional Director may approve the settlement agreement and decline to issue or reissue a Complaint in this matter. If that occurs, this Agreement shall be between the Charged Party and the undersigned Regional Director. In that case, a Charging Party may request review of the decision to approve the Agreement. If the General Counsel does not sustain the Regional Director's approval, this Agreement shall be null and void.

**AUTHORIZATION TO PROVIDE COMPLIANCE INFORMATION AND NOTICES DIRECTLY TO CHARGED PARTY** — Counsel for the Charged Party authorizes the Regional Office to forward the cover letter describing the general expectations and instructions to achieve compliance, a conformed settlement, original notices and a certification of posting directly to the Charged Party. If such authorization is granted, Counsel will be simultaneously served with a courtesy copy of these documents.

Yes _____        No _____
      Initials           Initials

**PERFORMANCE** — Performance by the Charged Party with the terms and provisions of this Agreement shall commence immediately after the Agreement is approved by the Regional Director, or if the Charging Party does not enter into this Agreement, performance shall commence immediately upon receipt by the Charged Party of notice that no review has been requested or that the General Counsel has sustained the Regional Director. The Charged Party agrees that in case of non-compliance with any of the terms of this Settlement Agreement by the Charged Party, and after 14 days' notice from the Regional Director of the National Labor Relations Board of such non-compliance without remedy by the Charged Party, the Regional Director will reissue the complaint previously issued on June 30, 2020 in the instant case(s).

**NOTIFICATION OF COMPLIANCE** — Each party to this Agreement will notify the Regional Director in writing what steps the Charged Party has taken to comply with the Agreement. This notification shall be given within 5 days, and again after 60 days, from the date of the approval of this Agreement. If the Charging Party does not enter into this Agreement, initial notice shall be given within 5 days after notification from the Regional Director that the Charging Party did not request review or that the General Counsel sustained the Regional Director's approval of this agreement. No further action shall be taken in the above captioned case(s) provided that the Charged Party complies with the terms and conditions of this Settlement Agreement and Notice.

**NON-ADMISSION** — By entering into this Settlement Agreement, the Charged Party does not admit that it has violated the National Labor Relations Act.

| Charged Party<br>INDUSTRIAL DEMOLITION LLC | Charging Party<br>ERIC MOORE |
|---|---|
| By:    Name and Title       Date | By:    Name and Title       Date<br><br>*Eric Moore*     10/9/2020 |
| Print Name and Title below | Print Name and Title below |



3-000028

**JA614**

| Recommended By: | Date | Approved By: | Date |
|---|---|---|---|
| Emily Goldman and Andyeliz Papaleo, Field Attorneys | | PAUL J. MURPHY Regional Director, Region 1 | |



3-000029

**JA615**

**(To be printed and posted on official Board notice form)**

**THE NATIONAL LABOR RELATIONS ACT GIVES YOU THE RIGHT TO:**

- Form, join, or assist a union;
- Choose a representative to bargain with us on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

**WE WILL NOT** interfere with, restrain, or coerce you in the exercise of the above rights.

**YOU HAVE THE RIGHT** to discuss your wages, hours, and working conditions with your fellow employees and others, and **WE WILL NOT** do anything to interfere with that right.

**WE WILL NOT** forbid you from discussing your wages, hours, and working conditions with your fellow employees and others.

**WE WILL NOT** discipline or discharge you, or send you home from work and tell you not to return, or tell you that we did any of those things because you discussed your wages, hours, and working conditions with your fellow employees and others.

**WE WILL NOT** in any like or related manner interfere with your rights under Section 7 of the Act.

**WE WILL** pay Eric Moore the wages and other benefits he lost because of his discharge before the conclusion of the Brayton Point project. We have been informed that Moore does not wish to return to his former position.

**WE WILL** remove from our files all references to Moore's discharge and notify him in writing that we have done so and that his discharge will not be used against him in any way.

**INDUSTRIAL DEMOLITION LLC**
_____
(Employer)

Dated: _____ By: _____

                                                   (Representative)        (Title)

_The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine_



**JA616**

*whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Hearing impaired callers who wish to speak to an Agency representative should contact the Federal Relay Service (link is external) by visiting its website at https://www.federalrelay.us/tty (link is external), calling one of its toll free numbers and asking its Communications Assistant to call our toll free number at 1-844-762-NLRB.*

Thomas P. O'Neill Fed Bldg                    **Telephone:** (617)565-6700
10 Causeway St, Room 601                       **Hours of Operation:** 8:30 a.m. to 5 p.m.
Boston, MA 02222-1001

---

### THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE

This notice must remain posted for 60 consecutive days from the date of posting and must not be altered, defaced or covered by any other material. Any questions concerning this notice or compliance with its provisions may be directed to the Centralized Compliance Unit at complianceunit@nlrb.gov.



3-000031

**JA617**

**CERTIFICATION OF COMPLIANCE**
**(PART TWO)**

RE:     **INDUSTRIAL DEMOLITION LLC**
        **Case 01-CA-257960**

**Backpay**

On (date) *Oct. 22, 2020* , the Employer made payment to the employee named in the Settlement Agreement and/or Notice to Employees in the amounts set forth therein. Proof of payment is attached.

**Expungement of Records**

On (date) *October 14, 2020* the Employer expunged from its records any reference to the discharge and notified the employee in writing that this has been done and that his discharge will not be used against him in any way. A copy of the letter of expungement is attached.

I have completed this Certification of Compliance and state under penalty of perjury that it is true and correct.

                        **CHARGED PARTY/RESPONDENT**

                        By: *Rebecca Lydon*

                        Title: *C.O.O.*

                        Date: *10.22.2020*

This form should be e-filed to the Agency's Compliance Unit at complianceunit@nlrb.gov along with supporting documents.

DEFENSE
TRIAL EXHIBIT
19
U. S. District Court / 1:22-cv-10414-RWZ

Confidential                                    Industrial Demo_Moore 000526

**JA618**



| #92 - ERIC MOORE | | Check # 2213 | | Pay Date: 10/22/2020 |
|---|---|---|---|---|
| Massachusett | | | | Pay Period: 10/11/2020-10/17/2020 |

**Earnings**

| | | Current | YTD |
|---|---|---|---|
| Settlement | | 84,389.00 | 84,389.00 |
| Gross Pay | | 84,389.00 | 84,389.00 |

**Deductions**

| | | Current | YTD |
|---|---|---|---|
| MA PFML | | 5.47 | 5.47 |

**Taxes Withheld**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 84,389.00 | 84,389.00 | 11,154.58 | 11,154.58 |
| OASDI | 84,389.00 | 84,389.00 | 5,232.12 | 5,232.12 |
| MEDI | 84,389.00 | 84,389.00 | 1,223.64 | 1,223.64 |
| SIT:MA | 84,389.00 | 84,389.00 | 4,119.45 | 4,119.45 |
| Total | | | 21,729.79 | 21,729.79 |

| Net Pay | | 62,653.74 | 62,653.74 |
|---|---|---|---|
| | Check | 62,653.74 | 62,653.74 |

**Company Paid Benefits**

| | | Current | YTD |
|---|---|---|---|
| FUTA | | 42.00 | 42.00 |
| OASDI | | 5,232.12 | 5,232.12 |
| MEDI | | 1,223.64 | 1,223.64 |
| SUTA_SC:MA | | 8.40 | 8.40 |
| SUTA:MA | | 1,105.50 | 1,105.50 |
| Total | | 7,611.66 | 7,611.66 |

**Accruals**

| | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs. | 0.00 | 0.00 | 0.00 |

**Tax Allowance Settings**

| Federal: | Married/4 |
|---|---|
| Massachusetts: | Allowances: 0 |
| | Employee Family Exemption: FALSE |
| | Employee Medical Exemption: FALSE |
| | Employer Family Exemption: FALSE |
| | Employer Medical Exemption: FALSE |
| | Full Time Student: FALSE |
| | Head of Household: FALSE |
| | Personal Blindness: FALSE |
| | Spouse Blindness: FALSE |

[1] For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853       1 of 1

▼ REMOVE DOCUMENT ALONG THIS PERFORATION ▼

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

ENTERPRISE BANK AND TRUST
80-616
810

Check Date: 10/22/2020
Check #: 2213

Void After 90 Days

Pay To The Order Of: **ERIC MOORE**

Amount: Sixty Two Thousand Six Hundred Fifty Three Dollars and 74/100 Cents       $ 62,653.74

Massachusett 92 10/22/2020 2213

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

Authorized Signature

DOCUMENT CONTAINS A PANTOGRAPH & MICROPRINTING. BACK HAS THERMOCHROMIC INK & WATERMARK. HOLD AT AN ANGLE TO VIEW. VOID IF NOT PRESENT.

Redacted

Confidential

Industrial Demo_Moore 000527

**JA619**



| | (INDEMO) | | | CHECK DATE: 10/14/2020 | CHECK NO.: 012615 | | ERIMO |
|---|---|---|---|---|---|---|---|
| Invoice No. | Inv. Date | Inv. Amount | Disc. Amt | Description | | Vchr | Net Amount |
| 10/14/20 | 10/14/2020 | 1,166.00 | 0.00 | Settlement for Interest on Back Pay | | 03904 | 1,166.00 |
| | | | | 1,166.00 | GL Acct 6640-0000 | | |
| | TOTAL | 1,166.00 | 0.00 | | | | 1,166.00 |

**INDUSTRIAL DEMOLITION LLC**
**1515 DES PERES RD**
**SUITE 300**
**ST LOUIS, MO 63131**

(INDEMO)     ERIMO

Enterprise Bank & Trust
150 N. Meramec Ave.
St. Louis, MO 63105

081006162
80-616/810

| DATE | CHECK NO. | AMOUNT |
|---|---|---|
| 10/14/2020 | 012615 | $1,166.00* |

One Thousand One Hundred Sixty-six and no/100 DOLLARS ***

PAY
TO THE
ORDER OF      Eric Moore

Void After 90 Days

Redacted

**JA620**



| #92 - ERIC MOORE | | | | Voucher # (8232) | | | Pay Date: 04/11/2019 |
|---|---|---|---|---|---|---|---|
| Indiana | | | | | | Pay Period: 03/31/2019-04/06/2019 | |

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | | | | 2,621.25 |
| Per Diem | | | | 620.00 |
| Regular | 30.00 | 25.50 | 765.00 | 10,942.50 |
| **Gross Pay** | | | **765.00** | **14,183.75** |
| Hours Paid | | 25.50 | | |

**Deductions**

| | | | Current | YTD |
|---|---|---|---|---|
| MISC | | | | 620.00 |

**Taxes Withheld**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 765.00 | 13,563.75 | 21.50 | 886.77 |
| OASDI | 765.00 | 13,563.75 | 47.43 | 840.95 |
| MEDI | 765.00 | 13,563.75 | 11.09 | 196.67 |
| SIT:IN | 765.00 | 13,563.75 | 22.22 | 410.78 |
| CNTY:De | 765.00 | 13,563.75 | 8.26 | 144.00 |
| **Total** | | | **110.50** | **2,479.17** |

**Net Pay**

| | | | 654.50 | 11,084.58 |
|---|---|---|---|---|
| Checking | | | 654.50 | 11,084.58 |

**Company Paid Benefits** [1]

| | | | Current | YTD |
|---|---|---|---|---|
| FUTA | | | | 42.00 |
| OASDI | | | 47.43 | 840.95 |
| MEDI | | | 11.09 | 196.67 |
| SUTA:IN | | | | 259.35 |
| **Total** | | | **58.52** | **1,338.97** |

**Accruals**

| | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs: | 0.00 | 0.00 | 0.00 |

**Tax Allowance Settings**

| Federal: | Married/4 |
|---|---|
| Indiana: | Allowances: 4 |
| | Dependent Exemptions: 0 |

[1] For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853     1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 04/11/2019 |
|---|---|
| Voucher #: | (8232) |

| Deposited To The Account(s) Of | | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|---|
| ERIC MOORE | | 1 | Checking | | 042100175 | 654.50 |

Indiana  92  04/11/2019  (8232)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana  92  04/11/2019  (8232)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

> DEFENSE
> TRIAL EXHIBIT
> 23
> U. S. District Court / 1:22-cv-10414-RWZ



| 882 - ERIC MOORE | | | Voucher # (107714) | | Pay Date: 07/11/2019 |
| Indiana | | | | | Pay Period: 06/26/2019-07/06/2019 |

**Earnings**

| | Current | YTD |
|---|---|---|
| Overtime | | 2,621.25 |
| Per Diem | 2,000.00 | 2,620.00 |
| Regular | | 10,942.50 |
| **Gross Pay** | **2,000.00** | **16,183.75** |

**Earnings**

| | Current | YTD |
|---|---|---|
| MISC | | 629.00 |

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | | 13,563.75 | | 886.77 |
| OASDI | | 13,563.75 | | 840.95 |
| MEDI | | 13,563.75 | | 196.67 |
| ST-IN | | 13,563.75 | | 410.78 |
| CNTY-IN | | 13,563.75 | | 144.00 |
| **Total** | | | **0.00** | **2,479.17** |

| **Net Pay** | | **2,000.00** | **13,084.58** |
| Checking | | 0.00 | 11,084.58 |
| Checking | | 2,000.00 | 2,000.00 |

**Earnings**

| | Current | YTD |
|---|---|---|
| FUTA | | 42.00 |
| OASDI | | 840.95 |
| MEDI | | 196.67 |
| SUTA-IN | | 259.35 |
| **Total** | | **0.00** | **1,338.97** |

**Earnings**

| | Accrued | Taken | Bal. |
|---|---|---|---|
| Vacation | Hrs: 0.00 | 0.00 | 0.00 |

**Tax Allowance Settings**

| Federal: | Married/4 |
| Indiana: | Allowances: 4 |
| | Dependent Exemptions: 0 |

1. For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853      1 of 1

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 07/11/2019 |
| Voucher #: | (107714) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,000.00 |

Indiana 882 07/11/2019 (107714)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana 882 07/11/2019 (107714)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential      Industrial Demo_Moore 000516



**682 - ERIC MOORE**
**Indiana**

Voucher # (8876)

Pay Date: 07/18/2019
Pay Period: 07/07/2019-07/13/2019

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 17.75 | 798.75 | 3,420.00 |
| Per Diem | | | 1,000.00 | 3,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 12,142.50 |
| **Gross Pay** | | | **2,998.75** | **19,182.50** |

**Company Paid Benefits Continued**

| | | Current | YTD |
|---|---|---|---|
| SUTA:IN | | | 259.35 |
| **Total** | | **152.92** | **1,491.89** |

**Earnings**

| | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs: | 0.00 | 0.00 | 0.00 |

**Earnings**

| | Current | YTD |
|---|---|---|
| MISC | | 620.00 |

**Tax Allowance Settings**

Federal:  Married/4
Indiana:  Allowances: 4
              Dependent Exemptions: 0

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,998.75 | 15,562.50 | 166.39 | 1,053.16 |
| OASDI | 1,998.75 | 15,562.50 | 123.93 | 964.88 |
| MEDI | 1,998.75 | 15,562.50 | 28.98 | 225.66 |
| SIT:IN | 1,998.75 | 15,562.50 | 62.08 | 472.86 |
| CNTY:IN | 1,998.75 | 15,562.50 | 23.06 | 187.06 |
| **Total** | | | **404.48** | **2,883.62** |
| **Net Pay** | | | **2,594.38** | **15,678.88** |
| Checking | | | 0.00 | 11,054.58 |
| Checking | | | 2,594.38 | 4,634.30 |

**Earnings**

| | Current | YTD |
|---|---|---|
| FUTA | | 42.00 |
| OASDI | 123.93 | 964.88 |
| MEDI | 28.98 | 225.66 |
| -- More -- | | |

1. For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853                    1 of 1

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 07/18/2019 |
|---|---|
| Voucher #: | (8876) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,594.38 |

Indiana  #2  07/18/2019  (8876)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana  #2  07/18/2019  (8876)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential                                                                 Industrial Demo_Moore 000515

# JA623



| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 17.00 | 765.00 | 4,185.00 |
| Per Diem | | | 1,000.00 | 4,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 13,342.50 |

**882 - ERIC MOORE** · Voucher # (9009) · **Pay Date: 07/25/2019**
Indiana · **Pay Period: 07/14/2019-07/20/2019**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 07/25/2019 |
|---|---|
| Voucher #: | (9009) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,568.70 |

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential

Industrial Demo_Moore 000514

**JA624**



| Earnings | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 10.75 | 483.75 | 4,668.75 |
| Per Diem | | | 1,000.00 | 5,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 14,542.50 |
| **Gross Pay** | | | **2,683.75** | **24,831.25** |

| Company Paid Benefits Continued | Current | YTD |
|---|---|---|
| SUTA:IN | | 259.35 |
| **Total** | **128.30** | **1,771.01** |

| Earnings | Accrued | Taken | Bal |
|---|---|---|---|
| Vacation | Hrs: 0.00 | 0.00 | 0.00 |

**Tax Allowance Settings**
Federal:   Married/4
Indiana:   Allowances: 4
           Dependent Exemptions: 0

| Earnings | | Current | YTD |
|---|---|---|---|
| MISC | | | 620.00 |

| Earnings | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,683.75 | 19,211.25 | 178.58 | 1,346.69 |
| OASDI | 1,683.75 | 19,211.25 | 104.39 | 1,191.10 |
| MEDI | 1,683.75 | 19,211.25 | 24.41 | 278.56 |
| SIT:IN | 1,683.75 | 19,211.25 | 51.90 | 585.74 |
| CNTY:DE | 1,683.75 | 19,211.25 | 19.29 | 209.00 |
| **Total** | | | **329.57** | **3,808.49** |

| | | Current | YTD |
|---|---|---|---|
| **Net Pay** | | **2,355.18** | **20,602.78** |
| Checking | | 0.00 | 41,054.58 |
| Checking | | 2,355.18 | 9,516.14 |

| Earnings | | Current | YTD |
|---|---|---|---|
| FUTA | | | 42.00 |
| OASDI | | 104.39 | 1,191.10 |
| MEDI | | 24.41 | 478.56 |
| -- More -- | | | |

¹ For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853     1 of 1

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 08/01/2019 |
|---|---|
| Voucher #: | (9064) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,355.18 |

Indiana  #2  08/01/2019  (9064)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana  #2  08/01/2019  (9064)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential

Industrial Demo_Moore 000513

# JA625



| #82 - ERIC MOORE | | | Voucher # (107907) | | Pay Date: 08/08/2019 |
|---|---|---|---|---|---|
| Indiana | | | | | Pay Period: 07/28/2019-08/03/2019 |

**Earnings**

| | Current | YTD |
|---|---|---|
| Overtime | | 4,668.75 |
| Per Diem | 1,000.00 | 6,620.00 |
| Regular | | 14,542.50 |
| **Gross Pay** | **1,000.00** | **25,831.25** |

**Earnings**

| | Current | YTD |
|---|---|---|
| MISC | | 620.00 |

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | | 15,211.25 | | 1,346.00 |
| OASDI | | 15,211.25 | | 1,191.10 |
| MEDI | | 15,211.25 | | 278.56 |
| ST-IN | | 15,211.25 | | 585.74 |
| CNTY-IN | | 15,211.25 | | 209.00 |
| **Total** | | | **0.00** | **3,600.49** |

**Net Pay** | **1,000.00** | **21,602.75**

| Checking | 0.00 | 11,084.58 |
| Checking | 1,000.00 | 10,518.19 |

**Earnings**

| | Current | YTD |
|---|---|---|
| FUTA | | 42.00 |
| OASDI | | 1,191.10 |
| MEDI | | 278.56 |
| SUTA-IN | | 259.35 |
| **Total** | | **0.00** | **1,771.01** |

**Earnings**

| | Accrued | Taken | Bal. |
|---|---|---|---|
| Vacation | Hrs: 0.00 | 0.00 | 0.00 |

**Tax Allowance Settings**

Federal: Married/4
Indiana: Allowances: 4
Dependent Exemptions: 0

1. For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853      1 of 1

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Pay Date: 08/08/2019
Voucher #: (107907)

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 1,000.00 |

Indiana #2 08/08/2019 (107907)
**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana #2 08/08/2019 (107907)
**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential

Industrial Demo_Moore 000512

# JA626



| #82 - ERIC MOORE | | | Voucher # (8113) | | | Pay Date: 08/15/2019 |
| Indiana | | | | | | Pay Period: 08/04/2019-08/10/2019 |

| Earnings | | | | | Company Paid Benefits  Continued | | |
|---|---|---|---|---|---|---|---|
| | Rate | Hours | Current | YTD | | Current | YTD |
| Overtime | 45.00 | 8.00 | 360.00 | 5,028.75 | SUTA:IN | | 259.35 |
| Per Diem | | | 1,000.00 | 7,620.00 | Total | 119.34 | 1,890.35 |
| Regular | 30.00 | 40.00 | 1,200.00 | 15,742.50 | | | |

| Gross Pay | | | 2,560.00 | 28,391.25 |
|---|---|---|---|---|

| Earnings | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs: | 0.00 | 0.00 | 0.00 |

| Earnings | | Current | YTD |
|---|---|---|---|
| MISC | | | 620.00 |

Tax Allowance Settings

| Federal: | Married/4 |
| Indiana: | Allowances: 4 |
| | Dependent Exemptions: 0 |

| Earnings | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,560.00 | 20,771.25 | 113.74 | 1,457.83 |
| OASDI | 1,560.00 | 20,771.25 | 96.72 | 1,287.82 |
| MEDI | 1,560.00 | 20,771.25 | 22.62 | 301.18 |
| SIT:IN | 1,560.00 | 20,771.25 | 47.90 | 633.64 |
| CNTY:IN | 1,560.00 | 20,771.25 | 17.90 | 226.80 |

| Total | | | 298.78 | 3,907.27 |
|---|---|---|---|---|

| Net Pay | | | 2,261.22 | 23,863.98 |
|---|---|---|---|---|
| Checking | | | 0.00 | 11,084.58 |
| Checking | | | 2,261.22 | 12,779.40 |

| Earnings | | Current | YTD |
|---|---|---|---|
| FUTA | | | 42.00 |
| OASDI | | 96.72 | 1,287.82 |
| MEDI | | 22.62 | 301.18 |

-- More --

1. For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853    1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 08/15/2019 |
|---|---|
| Voucher #: | (8113) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,261.22 |

Indiana  #2  08/15/2019  (8113)
**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana  #2  08/15/2019  (8113)
**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Industrial Demo_Moore 000509

**JA627**



**-882 - ERIC MOORE** | Voucher # (9161) | Pay Date: 08/22/2019
Indiana | | Pay Period: 08/11/2019-08/17/2019

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 17.75 | 798.75 | 5,927.50 |
| Per Diem | | | 1,000.00 | 8,629.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 16,942.50 |
| **Gross Pay** | | | **2,998.75** | **31,399.00** |

**Company Paid Benefits  Continued**

| | Current | YTD |
|---|---|---|
| SUTA:IN | | 259.35 |
| **Total** | **152.91** | **1,043.26** |

**Earnings**

| | Accrued | Taken | Bal. |
|---|---|---|---|
| Vacation | Hrs: 0.00 | 0.00 | 0.00 |

**Earnings**

| | Current | YTD |
|---|---|---|
| MISC | | 620.00 |

**Tax Allowance Settings**

Federal:     Married/4
Indiana:     Allowances: 4
             Dependent Exemptions: 0

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,998.75 | 22,770.00 | 166.18 | 1,624.37 |
| OASDI | 1,998.75 | 22,770.00 | 123.92 | 1,411.74 |
| MEDI | 1,998.75 | 22,770.00 | 28.98 | 330.17 |
| SIT:IN | 1,998.75 | 22,770.00 | 62.08 | 695.72 |
| CNTY:IN | 1,998.75 | 22,770.00 | 23.08 | 249.86 |
| **Total** | | | **404.44** | **4,311.71** |

| **Net Pay** | | | **2,594.31** | **26,466.29** |

| Checking | | | 0.00 | 11,094.58 |
| Checking | | | 2,594.31 | 15,371.71 |

**Earnings**

| | Current | YTD |
|---|---|---|
| FLTA | | 42.00 |
| OASDI | | 123.92 | 1,411.74 |
| MEDI | | 28.98 | 330.17 |
| -- More -- | | |

*1  For information purposes only. No effect on your net pay.*

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853          1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 08/22/2019 |
|---|---|
| Voucher #: | (9161) |

| Deposited To The Account(s) Of | | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|---|
| ERIC MOORE | | 1 | Checking | | 042100175 | 2,594.31 |

Indiana  -82  08/22/2019  (9161)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana  -82  08/22/2019  (9161)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential                                    Industrial Demo_Moore 000510

# JA628



| 882 - ERIC MOORE | | | | Voucher # (108016) | | | | Pay Date: 08/29/2019 |
| Indiana | | | | | | | | Pay Period: 08/18/2019-08/24/2019 |

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 17.50 | 787.50 | 6,615.00 |
| Per Diem | | | 1,000.00 | 9,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 18,142.50 |
| **Gross Pay** | | | **2,987.50** | **34,377.50** |

**Company Paid Benefits   Continued**

| | | | Current | YTD |
|---|---|---|---|---|
| SUTA:IN | | | | 259.35 |
| **Total** | | | **152.04** | **1,195.30** |

**Earnings**

| | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| | Hrs: | | | |
| Vacation | | 0.00 | 0.00 | 0.00 |

**Earnings**

| | Current | YTD |
|---|---|---|
| MISC | | 620.00 |

**Tax Allowance Settings**

Federal:   Married/4
Indiana:   Allowances: 4
           Dependent Exemptions: 0

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,987.50 | 24,757.50 | 165.04 | 1,789.36 |
| OASDI | 1,987.50 | 24,757.50 | 123.23 | 1,534.97 |
| MEDI | 1,987.50 | 24,757.50 | 28.81 | 358.98 |
| SIT:IN | 1,987.50 | 24,757.50 | 61.71 | 757.43 |
| CNTY:De | 1,987.50 | 24,757.50 | 22.93 | 272.79 |
| **Total** | | | **401.72** | **4,713.43** |

| **Net Pay** | | | **2,585.78** | **29,664.07** |

| Checking | | | 0.00 | 11,954.58 |
| Checking | | | 2,585.78 | 17,959.49 |

**Earnings**

| | Current | YTD |
|---|---|---|
| FUTA | | 42.00 |
| OASDI | 123.23 | 1,534.97 |
| MEDI | 28.81 | 358.98 |
| -- More -- | | |

1 For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853           1 of 1

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 08/29/2019 |
| Voucher #: | (108016) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 041001175 | 2,585.78 |

Indiana #2  08/29/2019  (108016)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana #2  08/29/2019  (108016)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential                                                   Industrial Demo_Moore 000511

# JA629



| Earnings | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 17.75 | 798.75 | 7,413.75 |
| Per Diem | | | 1,000.00 | 10,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 19,342.50 |
| **Gross Pay** | | | **2,998.75** | **37,376.25** |

| Earnings | | Current | YTD |
|---|---|---|---|
| MISC | | | 620.00 |

| Earnings | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,998.75 | 26,756.25 | 166.19 | 1,955.65 |
| OASDI | 1,998.75 | 26,756.25 | 123.92 | 1,658.89 |
| MEDI | 1,998.75 | 26,756.25 | 28.98 | 387.97 |
| SIT:IN | 1,998.75 | 26,756.25 | 62.98 | 819.51 |
| CNTY:IN | 1,998.75 | 26,756.25 | 23.06 | 295.85 |
| **Total** | | | **404.44** | **5,117.87** |

| **Net Pay** | | **2,594.31** | **31,638.38** |
|---|---|---|---|
| Checking | | 0.00 | 11,054.58 |
| Checking | | 2,594.31 | 20,553.80 |

| Earnings | | Current | YTD |
|---|---|---|---|
| FLTA | | | 42.00 |
| OASDI | | 123.92 | 1,658.89 |
| MEDI | | 28.98 | 387.97 |
| -- More -- | | | |

| Company Paid Benefits Continued | | Current | YTD |
|---|---|---|---|
| SUTA:IN | | | 259.35 |
| **Total** | | **152.91** | **1,948.21** |

| Earnings | Accrued | Taken | Bal. |
|---|---|---|---|
| Vacation Hrs: | 0.00 | 0.00 | 0.00 |

Tax Allowance Settings
Federal:    Married/4
Indiana:    Allowances: 4
            Dependent Exemptions: 0

¹ For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853     1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| | Pay Date: | 09/05/2019 |
|---|---|---|
| | Voucher #: | (108073) |

| Deposited To The Account(s) Of | | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|---|
| ERIC MOORE | | 1 | Checking | | 042100175 | 2,594.31 |

Indiana  42  09/05/2019  (108073)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana  42  09/05/2019  (108073)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

# JA630



**#82 - ERIC MOORE**  Voucher # {108101}  **Pay Date:** 09/12/2019
Indiana  **Pay Period:** 09/01/2019-09/07/2019

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 18.25 | 821.25 | 8,225.00 |
| Per Diem | | | 1,000.00 | 11,020.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 20,542.50 |
| **Gross Pay** | | | **3,021.25** | **40,397.50** |

**Earnings**

| | Current | YTD |
|---|---|---|
| MISC | | 620.00 |

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 2,021.25 | 28,772.50 | 169.94 | 2,124.77 |
| OASDI | 2,021.25 | 28,772.50 | 125.32 | 1,784.21 |
| MEDI | 2,021.25 | 28,772.50 | 29.30 | 417.27 |
| SIT:IN | 2,021.25 | 28,772.50 | 62.80 | 882.31 |
| CNTY:IN | 2,021.25 | 28,772.50 | 22.12 | 319.15 |
| **Total** | | | **409.98** | **5,527.71** |

| **Net Pay** | | | **2,611.41** | **34,749.79** |
|---|---|---|---|---|
| Checking | | | 0.00 | 11,094.58 |
| Checking | | | 2,611.41 | 23,185.21 |

**Earnings**

| | Current | YTD |
|---|---|---|
| FICA | | 42.00 |
| OASDI | 125.32 | 1,784.21 |
| MEDI | 29.30 | 417.27 |
| -- More -- | | |

**Company Paid Benefits  Continued**

| | Current | YTD |
|---|---|---|
| SUTA:IN | | 259.35 |
| **Total** | **154.82** | **1,902.83** |

**Earnings**

| | Accrued Taken | Bal. |
|---|---|---|
| | Hrs: 0.00 | 0.00 | 0.00 |
| Vacation | | | |

**Tax Allowance Settings**

Federal:  Married/4
Indiana:  Allowances: 4
         Dependent Exemptions: 0

¹ For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853      1 of 1

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| | **Pay Date:** | 09/12/2019 |
|---|---|---|
| | **Voucher #:** | {108101} |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,611.41 |

Indiana #2 09/12/2019 {108101}
**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana #2 09/12/2019 {108101}
**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Industrial Demo_Moore 000495

# JA631



| 882 - ERIC MOORE | | | | | Voucher # (8318) | | | Pay Date: 09/19/2019 |
| Indiana | | | | | | | | Pay Period: 09/08/2019-09/14/2019 |

### Earnings

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 18.50 | 832.50 | 9,067.50 |
| Per Diem | | | 1,000.00 | 12,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 21,742.50 |
| **Gross Pay** | | | **3,032.50** | **43,438.00** |

### Company Paid Benefits   Continued

| | | | Current | YTD |
|---|---|---|---|---|
| SUTA:IN | | | | 259.35 |
| **Total** | | | **155.49** | **1,658.31** |

### Earnings

| | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs: | 0.00 | 0.00 | 0.00 |

### Earnings

| | Current | YTD |
|---|---|---|
| MISC | | 620.00 |

### Tax Allowance Settings

Federal:     Married/4
Indiana:     Allowances: 4
             Dependent Exemptions: 0

### Earnings

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 2,032.50 | 30,810.00 | 170.44 | 2,245.18 |
| OASDI | 2,032.50 | 30,810.00 | 126.01 | 1,910.22 |
| MEDI | 2,032.50 | 30,810.00 | 29.48 | 446.75 |
| SIT:IN | 2,032.50 | 30,810.00 | 63.17 | 945.48 |
| CNTY:IN | 2,032.50 | 30,810.00 | 23.47 | 342.65 |
| **Total** | | | **412.57** | **5,840.28** |

| **Net Pay** | | | **2,619.93** | **36,869.72** |
| Checking | | | 0.00 | 41,084.58 |
| Checking | | | 2,619.93 | 25,785.14 |

### Earnings

| | Current | YTD |
|---|---|---|
| FICA | | 42.00 |
| OASDI | | 126.01 | 1,910.22 |
| MEDI | | 29.48 | 446.75 |
| -- More -- | | |

¹ For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853     1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 09/19/2019 |
| Voucher #: | (9018) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,619.93 |

Indiana  #2  09/19/2019  (9018)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana  #2  09/19/2019  (9018)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential     Industrial Demo_Moore 000496

# JA632





**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 10/03/2019 |
|-----------|-----------|
| Voucher #: | (108292) |

| Deposited To The Account(s) Of | | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|---|
| ERIC MOORE | | 1 | Checking | | 042100175 | 3,276.13 |

Indiana #2 10/03/2019 (108292)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana #2 10/03/2019 (108292)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential                                           Industrial Demo_Moore 000498

# JA634



**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| | | Pay Date: | 10/10/2019 |
| | | Voucher #: | (9457) |

| Deposited To The Account(s) Of | | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|---|
| ERIC MOORE | | 1 | Checking | | 042100175 | 2,597.38 |

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential                    Industrial Demo_Moore 000499

# JA635



| #82 - ERIC MOORE | | | Voucher # (108387) | | Pay Date: 10/17/2019 |
| Indiana | | | | | Pay Period: 10/06/2019-10/12/2019 |

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 12.50 | 562.50 | 13,961.25 |
| Per Diem | | | 1,000.00 | 16,629.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 26,542.50 |
| **Gross Pay** | | | **2,762.50** | **56,223.75** |
| Income Hold | | 52.50 | | |

**Company Paid Benefits   Continued**

| | | | Current | YTD |
|---|---|---|---|---|
| OASDI | | | 109.23 | 2,455.43 |
| MEDI | | | 25.55 | 574.25 |
| SUTA:IN | | | | 259.35 |
| **Total** | | | **334.82** | **9,331.01** |

**Earnings**

| | | Current | YTD |
|---|---|---|---|
| MA PTML | | 5.47 | 10.94 |
| MISC | | | 620.00 |
| **Total** | | **5.47** | **630.94** |

**Earnings**

| | | | Accrued | Taken | Bal. |
|---|---|---|---|---|---|
| Vacation | | Hrs.: | 0.00 | 0.00 | 0.00 |

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,762.50 | 35,603.75 | 138.04 | 3,152.01 |
| OASDI | 1,762.50 | 35,603.75 | 109.23 | 2,455.43 |
| MEDI | 1,762.50 | 35,603.75 | 25.55 | 574.25 |
| SIT:IN | 1,762.50 | 35,603.75 | 54.44 | 1,219.58 |
| CNTY:De | 1,762.50 | 35,603.75 | 20.23 | 444.49 |
| **Total** | | | **347.53** | **7,845.76** |

| **Net Pay** | | | **2,409.50** | **47,747.05** |
| Checking | | | 0.00 | 11,084.58 |
| Checking | | | 2,409.50 | 36,662.47 |

**Earnings**

| | Married/4 |
|---|---|
| Federal: | |
| Indiana: | Allowances: 4 |
| | Dependent Exemptions: 0 |

**Company Paid Benefits**

| | | Current | YTD |
|---|---|---|---|
| FUTA | | | 42.00 |
| -- More -- | | | |

1. For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853          1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 10/17/2019 |
| Voucher #: | (108387) |

| Deposited To The Account(s) Of | | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|---|
| ERIC MOORE | | 1 | Checking | | 042100175 | 2,409.50 |

Indiana #2 10/17/2019 (108387)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana #2 10/17/2019 (108387)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential                    Industrial Demo_Moore 000500

# JA636



| #82 - ERIC MOORE | | | | Voucher # (8505) | | Pay Date: 10/24/2019 |
| Indiana | | | | | | Pay Period: 10/13/2019-10/19/2019 |

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 17.75 | 798.75 | 13,960.00 |
| Per Diem | | | 1,000.00 | 17,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 27,742.50 |
| **Gross Pay** | | | **2,998.75** | **59,322.50** |

**Earnings**

| | | | Current | YTD |
|---|---|---|---|---|
| MA PFML | | | 5.47 | 16.41 |
| MISC | | | | 620.00 |
| **Total** | | | **5.47** | **636.41** |

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,998.75 | 41,602.50 | 166.99 | 3,318.49 |
| OASDI | 1,998.75 | 41,602.50 | 123.93 | 2,579.36 |
| MEDI | 1,998.75 | 41,602.50 | 28.99 | 603.24 |
| SIT:IN | 1,998.75 | 41,602.50 | 62.98 | 1,281.66 |
| CNTY:De | 1,998.75 | 41,602.50 | 23.06 | 467.55 |
| **Total** | | | **404.45** | **8,258.21** |

| **Net Pay** | | | **2,588.83** | **50,335.85** |
| Checking | | | 0.00 | 11,084.58 |
| Checking | | | 2,588.83 | 39,251.54 |

**Company Paid Benefits**

| | | | Current | YTD |
|---|---|---|---|---|
| FUTA | | | | 42.00 |
| -- More -- | | | | |

**Company Paid Benefits   Continued**

| | | | Current | YTD |
|---|---|---|---|---|
| OASDI | | | 123.93 | 2,579.36 |
| MEDI | | | 28.99 | 603.24 |
| SUTA:IN | | | | 259.35 |
| **Total** | | | **152.92** | **3,483.95** |

**Earnings**

| | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs: | 0.00 | 0.00 | 0.00 |

**Earnings**

Federal:    Married/4
Indiana:    A low er cnt 4
            Dependent Exemptions: 0

⌐ For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853                    1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 10/24/2019 |
|---|---|
| Voucher #: | (9505) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,588.83 |

Indiana #2  10/24/2019  (9505)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana #2  10/24/2019  (9505)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential                    Industrial Demo_Moore 000501

# JA637



| | | #882 - ERIC MOORE | | Voucher # (8884) | | Pay Date: 10/31/2019 |
| | | Indiana | | | | Pay Period: 10/26/2019-10/26/2019 |

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 17.75 | 798.75 | 14,658.75 |
| Per Diem | | | 1,000.00 | 18,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 28,942.50 |
| **Gross Pay** | | | **2,998.75** | **62,221.25** |
| Income Wad | | 54.75 | | |

**Earnings**

| | | | Current | YTD |
|---|---|---|---|---|
| MA PTML | | | 5.47 | 21.89 |
| MISC | | | | 620.00 |
| **Total** | | | **5.47** | **641.89** |

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,998.75 | 43,601.25 | 166.99 | 3,486.79 |
| OASDI | 1,998.75 | 43,601.25 | 123.92 | 2,703.29 |
| MEDI | 1,998.75 | 43,601.25 | 28.98 | 632.22 |
| SIT:IN | 1,998.75 | 43,601.25 | 62.98 | 1,343.74 |
| CNTY:De | 1,998.75 | 43,601.25 | 23.06 | 480.61 |
| **Total** | | | **404.43** | **8,654.54** |

| **Net Pay** | | | **2,588.85** | **52,924.71** |
| Checking | | | 0.00 | 11,084.36 |
| Checking | | | 2,588.85 | 41,840.35 |

**Company Paid Benefits**

| | | | Current | YTD |
|---|---|---|---|---|
| FUTA | | | | 42.00 |
| -- More -- | | | | |

**Company Paid Benefits   Continued**

| | | | Current | YTD |
|---|---|---|---|---|
| OASDI | | | 123.92 | 2,703.29 |
| MEDI | | | 28.98 | 632.22 |
| SUTA:IN | | | | 259.35 |
| **Total** | | | **152.90** | **3,594.85** |

**Earnings**

| | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs: | 0.00 | 0.00 | 0.00 |

**Earnings**

| Federal: | Married/4 |
|---|---|
| Indiana: | Allowances: 4 |
| | Dependent Exemptions: 0 |

1. For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853                1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 10/31/2019 |
|---|---|
| Voucher #: | (9554) |

| Deposited To The Account(s) Of | | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|---|
| ERIC MOORE | | 1 | Checking | | 042100175 | 2,588.85 |

Indiana  #2  10/31/2019  (9554)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana  #2  10/31/2019  (9554)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

# JA638



| #82 - ERIC MOORE | | | | Voucher # (108626) | | Pay Date: 11/07/2019 |
| Indiana | | | | | | Pay Period: 10/27/2019-11/02/2019 |

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 19.00 | 855.00 | 15,513.75 |
| Per Diem | | 1,000.00 | 1,000.00 | 19,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 30,142.50 |
| **Gross Pay** | | | **3,055.00** | **65,276.25** |

**Company Paid Benefits    Continued**

| | | | Current | YTD |
|---|---|---|---|---|
| OASDI | | | 127.41 | 2,930.69 |
| MEDI | | | 29.80 | 662.02 |
| SUTA:IN | | | | 259.35 |
| **Total** | | | **157.21** | **3,794.06** |

**Earnings**

| | | Current | YTD |
|---|---|---|---|
| MA PFML | | 5.47 | 27.35 |
| MISC | | | 620.00 |
| **Total** | | **5.47** | **647.35** |

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 2,055.00 | 45,656.25 | 173.14 | 3,657.93 |
| OASDI | 2,055.00 | 45,656.25 | 127.41 | 2,830.69 |
| MEDI | 2,055.00 | 45,656.25 | 29.80 | 662.02 |
| SIT:IN | 2,055.00 | 45,656.25 | 63.89 | 1,407.63 |
| CNTY:De | 2,055.00 | 45,656.25 | 23.74 | 514.35 |
| **Total** | | | **417.98** | **9,072.62** |

| **Net Pay** | | | **2,631.55** | **52,556.22** |
| Checking | | | 0.00 | 11,084.58 |
| Checking | | | 2,631.55 | 56,431.70 |

**Earnings**

| | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs: | 0.00 | 0.00 | 0.00 |

**Earnings**

Federal:    Married/4
Indiana:    A Lower ret:4
            Dependent Exemption: 0

**Company Paid Benefits**

| | Current | YTD |
|---|---|---|
| FUTA | | 42.00 |
| -- More -- | | |

* For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853          1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 11/07/2019 |
| Voucher #: | (108625) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,631.55 |

Indiana  #2  11/07/2019   (108626)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana  #2  11/02/2019   (108626)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential     Industrial Demo_Moore 000503

# JA639

082 - ERIC MOORE — Voucher # (9627)
Indiana
Pay Date: 11/14/2019
Pay Period: 11/03/2019-11/09/2019

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 17.75 | 798.75 | 16,312.50 |
| Per Diem | | | 1,000.00 | 20,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 31,342.50 |
| **Gross Pay** | | | **2,998.75** | **68,275.00** |

**Company Paid Benefits Continued**

| | Current | YTD |
|---|---|---|
| OASDI | 123.92 | 2,954.61 |
| MEDI | 28.98 | 691.08 |
| SUTA:IN | | 259.26 |
| **Total** | **152.90** | **3,940.96** |

**Earnings**

| | Current | YTD |
|---|---|---|
| MA PFML | 5.47 | 32.82 |
| MISC | | 620.00 |
| **Total** | **5.47** | **652.82** |

**Earnings**

| | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs: | 0.00 | 0.00 | 0.00 |

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,998.75 | 47,655.00 | 166.99 | 3,834.30 |
| OASDI | 1,998.75 | 47,655.00 | 123.92 | 2,954.61 |
| MEDI | 1,998.75 | 47,655.00 | 28.98 | 691.08 |
| SIT:IN | 1,998.75 | 47,655.00 | 62.98 | 1,469.71 |
| CNTY:IN | 1,998.75 | 47,655.00 | 23.96 | 537.41 |
| **Total** | | | **404.43** | **9,479.05** |

**Earnings**

Federal: Married/4
Indiana: Allowances: 4
Dependent Exemptions: 0

| **Net Pay** | | | **2,588.85** | **58,195.15** |
| Checking | | | 0.00 | 11,084.59 |
| Checking | | | 2,588.85 | 47,000.00 |

**Company Paid Benefits**

| | Current | YTD |
|---|---|---|
| FUTA | | 42.00 |
| -- More -- | | |

1 For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853        1 of 1

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Pay Date: 11/14/2019
Voucher #: (9627)

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,588.85 |

Indiana 42 11/14/2019 (9627)
**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana 42 11/14/2019 (9627)
**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential                Industrial Demo_Moore 000504

# JA640



**#82 - ERIC MOORE**     **Voucher # {108688}**     **Pay Date: 11/21/2019**
Indiana     **Pay Period: 11/10/2019-11/16/2019**

### Earnings

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 17.75 | 798.75 | 17,111.25 |
| Per Diem | | | 1,000.00 | 21,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 32,542.50 |
| **Gross Pay** | | | **2,998.75** | **71,273.75** |
| Hours Paid | | 57.75 | | |

### Earnings

| | | | Current | YTD |
|---|---|---|---|---|
| MA PFML | | | 5.47 | 38.29 |
| MISC | | | | 620.00 |
| **Total** | | | **5.47** | **658.29** |

### Earnings

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,998.75 | 48,653.75 | 166.19 | 3,960.71 |
| OASDI | 1,998.75 | 48,653.75 | 123.92 | 3,078.53 |
| MEDI | 1,998.75 | 48,653.75 | 28.98 | 719.98 |
| ST:IN | 1,998.75 | 48,653.75 | 62.08 | 1,531.79 |
| CNTY:De | 1,998.75 | 48,653.75 | 23.06 | 560.47 |
| **Total** | | | **404.43** | **9,851.48** |

| **Net Pay** | | | **2,588.85** | **60,733.98** |
|---|---|---|---|---|
| Checking | | | 0.00 | 11,084.58 |
| Checking | | | 2,588.85 | 49,649.40 |

### Company Paid Benefits

| | | Current | YTD |
|---|---|---|---|
| FLTA | | | 42.00 |
| -- More -- | | | |

### Company Paid Benefits   Continued

| | | Current | YTD |
|---|---|---|---|
| OASDI | | 123.92 | 3,078.53 |
| MEDI | | 28.98 | 719.98 |
| SUTA:IN | | | 259.35 |
| **Total** | | **152.90** | **4,099.86** |

### Earnings

| | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs: | 0.00 | 0.00 | 0.00 |

### Earnings

| Federal: | Married/4 |
|---|---|
| Indiana: | Allowances: 4 |
| | Dependent Exemptions: 0 |

1. For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853     1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| **Pay Date:** | **11/21/2019** |
|---|---|
| **Voucher #:** | **{108688}** |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,588.85 |

Indiana #2  11/21/2019  {108688}

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

### NON-NEGOTIABLE - THIS IS NOT A CHECK

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana #2  11/21/2019  {108688}

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

### PERSONAL & CONFIDENTIAL

Confidential     Industrial Demo_Moore 000505

# JA641



| #82 - ERIC MOORE | | | | | Voucher # (108721) | | Pay Date: 11/27/2019 |
| Indiana | | | | | | Pay Period: 11/17/2019-11/23/2019 |

**Earnings**

| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 18.25 | 821.25 | 17,922.50 |
| Per Diem | | | 1,000.00 | 22,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 33,742.50 |
| **Gross Pay** | | | **3,021.25** | **74,285.00** |

**Earnings**

| | Current | YTD |
|---|---|---|
| MA PFML | 5.47 | 48.76 |
| MISC | | 620.00 |
| **Total** | **5.47** | **668.76** |

**Earnings**

| | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 2,021.25 | 51,675.00 | 169.09 | 4,159.80 |
| OASDI | 2,021.25 | 51,675.00 | 125.32 | 3,203.85 |
| MEDI | 2,021.25 | 51,675.00 | 29.31 | 749.23 |
| SIT:IN | 2,021.25 | 51,675.00 | 62.90 | 1,594.99 |
| CNTY:De | 2,021.25 | 51,675.00 | 23.33 | 583.60 |
| **Total** | | | **409.95** | **10,291.53** |

| **Net Pay** | | | **2,605.93** | **63,339.91** |
| Checking | | | 0.00 | 11,084.58 |
| Checking | | | 2,605.93 | 52,255.33 |

**Company Paid Benefits**

| | Current | YTD |
|---|---|---|
| FUTA | | 42.00 |
| ++ More ++ | | |

**Company Paid Benefits  Continued**

| | Current | YTD |
|---|---|---|
| OASDI | 125.32 | 3,203.85 |
| MEDI | 29.31 | 749.23 |
| SUTA:IN | | 259.35 |
| **Total** | | **154.63** | **4,254.49** |

**Earnings**

| | Accrued | Taken | Bal. |
|---|---|---|---|
| Vacation  Hrs: | 0.00 | 0.00 | 0.00 |

**Earnings**

| | |
|---|---|
| Federal: | Married/4 |
| Indiana: | A Ixxx xxx 4 |
| | Dependent Exemptions: 0 |

+ For information purposes only. No effect on your net pay.

Industrial Demolit on LLC 1515 Des Peres Rd, Ste 300, Saint Lou s, MO 63131-1853    1 of 1

---

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 11/27/2019 |
| Voucher #: | (108721) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,605.93 |

Indiana #2 11/27/2019 (108721)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana #2 11/27/2019 (108721)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

    Industrial Demo_Moore 000506

# JA642



| #82 - ERIC MOORE | | | Voucher # (108772) | | Pay Date: 12/12/2019 |
|---|---|---|---|---|---|
| Indiana | | | | | Pay Period: 12/01/2019-12/07/2019 |

**Earnings** | | | | | **Company Paid Benefits   Continued**

| Earnings | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | 45.00 | 17.50 | 787.50 | 18,720.00 |
| Per Diem | | | 1,000.00 | 23,620.00 |
| Regular | 30.00 | 40.00 | 1,200.00 | 34,942.50 |
| **Gross Pay** | | | **2,987.50** | **77,282.50** |

| | Current | YTD |
|---|---|---|
| OASDI | 123.25 | 3,327.09 |
| MEDI | 28.82 | 778.11 |
| SUTA:IN | | 259.35 |
| **Total** | **152.05** | **4,408.54** |

| Earnings | Current | YTD |
|---|---|---|
| MA PFML | 5.47 | 49.23 |
| MISC | | 620.00 |
| **Total** | **5.47** | **669.23** |

| Earnings | | Accrued | Taken | Bal. |
|---|---|---|---|---|
| Vacation | Hrs: | 0.00 | 0.00 | 0.00 |

**Earnings**
Federal: Married/4
Indiana: Allowances: 4
Dependent Exemptions: 0

| Earnings | Taxable | Taxable YTD | Current | YTD |
|---|---|---|---|---|
| FIT | 1,987.50 | 53,662.53 | 165.04 | 4,134.34 |
| OASDI | 1,987.50 | 53,662.53 | 123.25 | 3,327.08 |
| MEDI | 1,987.50 | 53,662.53 | 28.82 | 778.11 |
| SIT:IN | 1,987.50 | 53,662.53 | 61.71 | 1,656.30 |
| CNTY:De | 1,987.50 | 53,662.53 | 22.91 | 666.73 |
| **Total** | | | **401.73** | **10,699.06** |

| Net Pay | | | 2,880.30 | 68,020.31 |
|---|---|---|---|---|
| Checking | | | 0.00 | 11,084.98 |
| Checking | | | 2,580.30 | 56,935.04 |

| Company Paid Benefits | Current | YTD |
|---|---|---|
| FUTA | | 42.00 |
| -- More -- | | |

1. For information purposes only. No effect on your net pay.

Industrial Demolition LLC 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853    1 of 1

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 12/12/2019 |
|---|---|
| Voucher #: | (108772) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,580.30 |

Indiana #2 12/12/2019 (108772)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

Indiana #2 12/12/2019 (108772)

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

# JA643



| | Rate | Hours | Current | YTD |
|---|---|---|---|---|
| Overtime | | | | 18,720.00 |
| Per Diem | | | 1,000.00 | 24,620.00 |
| Regular | 30.00 | 39.78 | 1,193.40 | 36,135.99 |
| **Gross Pay** | | | **2,193.40** | **79,475.99** |

**Industrial Demolition LLC** 1515 Des Peres Rd, Ste 300, Saint Louis, MO 63131-1853

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

| Pay Date: | 12/19/2019 |
|---|---|
| Voucher #: | (9788) |

| Deposited To The Account(s) Of | Deposit # | Account Type | Account # | Transit ABA | Deposit |
|---|---|---|---|---|---|
| ERIC MOORE | 1 | Checking | | 042100175 | 2,477.43 |

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**NON-NEGOTIABLE - THIS IS NOT A CHECK**

**Industrial Demolition LLC**
1515 Des Peres Rd
Ste 300
Saint Louis, MO 63131-1853

**ERIC MOORE**
10338 US HWY 50
Aurora, IN 47001

**PERSONAL & CONFIDENTIAL**

Confidential                    Industrial Demo_Moore 000508

# JA644

| | | a Employee's social security number | | |
|---|---|---|---|---|
| Vo d ☐ | | ████████ | | |

| b Employer identification number (EIN) ████████ | 1 Wages, tips, other compensation 54855.90 | 2 Federal income tax withheld 4394.59 |
|---|---|---|
| c Employer's name, address and ZIP code | 3 Social security wages 54855.90 | 4 Social security tax withheld 3401.07 |
| Industrial Demolition LLC 1515 Des Peres Rd Ste 300 Saint Louis MO 63131-1853 | 5 Medicare wages and tips 54855.90 | 6 Medicare tax w thheld 795.41 |
| | 7 Social security tips | 8 Allocated tips |

| d Control number WA-41246336 | 9 | 10 Dependent care benefits |
|---|---|---|

| e Employee's first name and in tial    Last name    Suff. | 11 Nonqualified plans | 12a |
|---|---|---|
| ERIC    MOORE | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 10338 US HWY 50 Aurora, IN 47001 | 14 Other MA PFML    54.70 | 12c |
| | | 12d |
| f Employee's address and ZIP code | | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| IN | ████████ | 54855.90 | 1692.36 | 54855.90 | 620.13 | Dearborn Cou |

Form **W-2**  Wage and Tax Statement    2019    Department of the Treasury-Internal Revenue Service

Copy D -- For Employer.

DEFENSE
TRIAL EXHIBIT
27
U. S. District Court / 1:22-cv-10414-RWZ

6-000138

**JA645**

DEFENSE
TRIAL EXHIBIT

30

U. S. District Court / 1:22-cv-10414-RWZ

| a Employee's social security number ████ | | OMB No. 1545-0008 | This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it. | |
|---|---|---|---|---|
| b Employer identification number (EIN) ████ | | | 1 Wages, tips, other compensation  50,706.54 | 2 Federal income tax withheld  1,383.57 |
| c Employer's name, address, and ZIP code  ████  Petro Towery Inc  P.O. Box 1836  Richmond, KY 40476 | | | 3 Social security wages  50,706.54 | 4 Social security tax withheld  3,143.80 |
| | | | 5 Medicare wages and tips  50,706.54 | 6 Medicare tax withheld  735.20 |
| | | | 7 Social security tips | 8 Allocated tips |
| d Control number | | | 9 | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code  BRIGMO  ERIC R.          MOORE  1071 LAKEVIEW DR  SOMERSET, KY 42503 | | Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
| | | | 13 Statutory employee ☐  Retirement plan ☑  Third-party sick pay ☐ | 12b |
| | | | 14 Other | 12c |
| | | | | 12d |

| 15 State  KY | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc.  50706.54 | 19 Local income tax  304.22 | 20 Locality name  SOMERSET |
|---|---|---|---|---|---|---|
| | | | | | | |

Form **W-2** **Wage and Tax Statement**

Copy C—For EMPLOYEE'S RECORDS (See *Notice to Employee* on the back of Copy B.) or Copy 2 to be Filed With Employee's State, City or Local Income Tax Return

**2021**

Department of the Treasury—Internal Revenue Service

Safe, accurate, FASTI Use  *e~file*

6-000143

**JA646**

**EXHIBIT**
Eric Moore
2
January 31, 2023

# Brayton Point Timesheet Tracker



| DATE | Type | SUNDAY 12/8/2019 | MONDAY 12/9/2019 | TUES 12/10/2019 | WED 12/11/2019 | THURS 12/12/2019 | FRI 12/13/2019 | SAT 12/14/2019 | TTL HRS | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| **BRAYTON POINT GUYS** | | | | | | | | | | |
| [REDACTED] | H | | 8 | 8 | 8 | 8.25 | 8 | | 40.25 | holiday / VAC |
| **INDEMO GUYS** | | | | | | | | | | |
| [REDACTED] | H | | 10 | 10 | 10 | 10 | 10 | | 50.00 | |
| [REDACTED] | H | | 10 | | 10 | 10 | 10 | 8 | 48.00 | |
| [REDACTED] | PD H | 5.25 | 10 | 10 | 10 | 10 | 10 | | 55.25 | |
| [REDACTED] | PD H | 5.5 | 10 | 10 | 10 | 10 | 10 | 8 | 63.50 | |
| [REDACTED] | PD H | 5.5 | 10 | 10 | 10 | 10 | 10 | 8 | 63.50 | |
| [REDACTED] | PD H | 5.5 | 10 | 10 | 10 | 10 | 10 | 8 | 63.50 | |
| [REDACTED] | PD H | 5.5 | 10 | 10 | 10 | 10 | 10 | 8 | 63.50 | |
| [REDACTED] | PD H | | 10 | 10 | | | | | 20.00 | terminated |
| [REDACTED] | PD H | 5.5 | 10 | 10 | 10 | 10 | 10 | 8 | 63.50 | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | |
| [REDACTED] | PD H | 8 | 9.5 | 10.5 | 10.5 | 10 | 9.75 | 9 | 67.25 | |
| [REDACTED] | PD H | 7.75 | 9.5 | 9.5 | 9.5 | 9.5 | 9 | 9 | 63.75 | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | |
| [REDACTED] | PD H | 5 | 10 | 10 | 10 | 10 | 10 | 8.25 | 63.25 | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | |
| [REDACTED] | PD H | | 8.75 | 9.75 | 9.5 | 9.5 | 9.5 | | 47.50 | |
| [REDACTED] | PD H | 1 | 10.25 | 11 | 9.75 | 10.5 | 11 | | 53.50 | |
| **MOORE, ERIC** | PD H | | | 10 | 9.75 | 10 | 10 | | 39.75 | no call no show Saturday |
| [REDACTED] | PD S | 9 | 11.5 | 11 | 11.5 | 11 | 11.25 | 10.25 | 75.50 | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | |
| [REDACTED] | H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | |
| [REDACTED] | PD H | 5.5 | 10 | 10 | 10 | 10 | 10 | 8 | 63.50 | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | | 20.00 | |
| [REDACTED] | PD H | 5.5 | 10 | 10 | 10 | 10 | 10 | 8 | 55.00 | |
| [REDACTED] | PD H | 5 | 10 | 10 | 10 | 10 | 9.5 | 9 | 63.25 | |
| [REDACTED] | H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | |
| [REDACTED] | PD H | 5.25 | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | |
| [REDACTED] | PD H | | 11.5 | 11.5 | 10 | 10 | 9.5 | 9 | 63.25 | |
| [REDACTED] | PD H | 5.25 | 9.5 | 11.5 | 10 | 10 | 9.5 | 9 | 67.50 | |
| [REDACTED] | H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | |
| [REDACTED] | PD H | 8 | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | |
| [REDACTED] | PD H | 8 | | | | | | 8 | 16 | owed 8 from prior wk |
| **START TAKING MASS DEDUCTIONS OUT** | | | | | | | | | | |

we 12-14-19

DEFENSE
TRIAL EXHIBIT
34
U. S. District Court / 1:22-cv-10414-RWZ

**EXHIBIT 04**

**Brayton Point Timesheet Tracker**

| DATE | | SUNDAY 12/1/2019 | MONDAY 12/2/2019 | TUES 12/3/2019 | WED 12/4/2019 | THURS 12/5/2019 | FRI 12/6/2019 | SAT 12/7/2019 | TTL HRS | holiday | VAC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **BRAYTON POINT GUYS** | | | | | | | | | | | |
| [REDACTED] | H | | 9 | 9 | 9 | 8 | 8.5 | | 43.50 | | |
| **INDEMO GUYS** | | | | | | | | | | | |
| [REDACTED] | H | | 10 | 10 | 10 | 10 | 10 | 8 | 48.00 | | |
| [REDACTED] | H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 11 | 10 | 8 | 59.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | 7.75 | 10.25 | 11 | 10.5 | 9.5 | 10.25 | 6 | 67.25 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 6 | 56.00 | | |
| [REDACTED] | PD H | | 8 | 10 | 10 | 10 | 10 | 8 | 56.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 9.5 | 9.75 | 7.5 | 9.25 | 9.75 | 5 | 50.75 | | |
| [REDACTED] | PD H | | 10.5 | 9.5 | 8 | 11 | 10 | 9 | 57.50 | | |
| MOORE, ERIC | PD H | | 12 | 10 | 9.5 | 10 | 10 | 8 | 57.50 | | |
| [REDACTED] | PD S | 9.25 | 12 | 10 | 11.5 | 10.75 | 11 | 10 | 74.50 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | H | | 10 | | 10 | 10 | 10 | 8 | 48.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 8 | 10 | 10 | 10 | 10 | 8 | 56.00 | | |
| [REDACTED] | PD H | | 10 | 9.5 | 10 | 9.5 | 8 | 8 | 55.50 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | 8.5 | 9.5 | | 9.5 | 9.5 | 9.5 | 8 | 54.50 | | |
| [REDACTED] | PD H | | 10 | 10 | 10 | 10 | 10 | 8 | 58.00 | | |
| [REDACTED] | PD H | | 10 | 10 | 9.75 | 10 | 10 | 8 | 57.75 | | |
| [REDACTED] | H | | | | | | | | | | |
| **START TAKING MASS DEDUCTIONS OUT** | | | | | | | | | | | |

we 12-7-19

**JA648**



Shared By Kalor Industrial Den
8/13/20 9:49 AM

INDUSTRIAL DEMOLITION LLC
1515 DES PERES RD  STE 300
ST. LOUIS, MO  63131
314-835-2880 D
314-835-1616 F
blydon@cdcco.com

To all demolition personnel,

We would like to thank you for all your safe, hard work and dedication during the demolition phase of our Brayton Point site.

As of Friday, August 14th, 2020 at 5:30 p.m., demolition work at Brayton will be complete. Unfortunately, we do not have sufficient additional demolition work in the pipeline to offer continued employment and your services are no longer needed at this time.  We will keep your information on file for future reference as we are encouraged that additional work opportunities may be available soon.

Thank you all again!

Respectfully,

Rebecca Lydon
Chief Operating Officer

3-000019

DEFENSE
TRIAL EXHIBIT
36
U. S. District Court / 1:22-cv-10414-RWZ

**JA649**

*Northeast* Steward Health       E-Chart Facesheet       Page: 1
      Date: 12/09/19 09:55
      User: Costa,Ryan

**Facility**  St. Anne's Hospital
REGISTRATION/DEMOGRAPHIC INFORAMTION
      Account# Label                 Medical Record# Label

SA7002869084                          AH20022418

| | | | |
|---|---|---|---|
| Adm Phys | | | |
| Att Phys | | | |
| Patient Name | Moore,Eric | Status DEP | Admit Date |
| Account# | | Room-Bed | Admit Time |
| Unit# | AH20022418 | Location ED.AH | Service Date 12/09/19 |
| Age | 40 | Service | Service Time 05:41 |
| Sex | M | AdmitPriority ER | |
| Birthdate | | Admission Source SEL | |
| Preferred Lang | ENG | Patient Phone (812)599-9905 | |
| Primary Lang | ENG | | |
| Race | WH | Patient Address 7 Harbor Meadows | |
| Marital Status | Married | | |
| Religion Name | Baptist | WESTPORT, MA 02790 | |
| Affiliation | | PCP Name Pcp-None,Md | |
| Admit Clerk | MD338 | PCP Phone | |
| Discharge Date | 12/09/19 | Reservation Date | |
| Discharge Time | 09:55 | Reservation Time | |
| Status Type | DEP ER | SS# XXX-XX-1683 | |
| Visit Reason | right hip pain | | |
| Visit Comment | | | |
| Arrival Mode | FV | Have you ever served in the Military? NO | |
| Employer | Industrial Demolition | Other Name | |

NOTIFY INFORMATION
Notify Person Moore,Holly       Notify City WESTPORT
Notify Address 7 Harbor Meadows       Notify State/Zip MA 02790       Notify Work Phone
      Notify Home Phone (812)599-7729

GUARANTOR INFORMATION
      Guar Name Moore,Eric                 NOK INFORMATION
      Guar Address 7 Harbor Meadows           Nok Name Moore,Holly
                                Nok Address 7 Harbor Meadows
      WESTPORT, MA 02790
      Guar Emp Name Industrial Demolition        WESTPORT, MA 02790
      Guar Home Phone (812)599-9905        Nok Work Phone
      Guar Rel Name Self / Same As Patient       Nok Relationship Self / Same As Patient
                                 Nok Home Phone (812)599-7729

PRIMARY INSURANCE       SECONDARY INSURANCE       TERTIARY INSURANCE

| | |
|---|---|
| Name | Self Pay |
| Group | SP |
| Phone# | |
| Policy# | |
| Address | |

Subs Yes

DEFENSE
TRIAL EXHIBIT
37
U. S. District Court / 1:22-cv-10414-RWZ

**Saint Anne's Hospital**

**795 MIDDLE STREET
FALL RIVER, MA 02721**

**ScriptRx Discharge Packet
Signed**

Patient: Moore, Eric
DOB: ███████
Age/Sex: 40 / M
Loc: ED.AH  Room:
Attending Dr. David Ignatius MD

Medical Record #: ███████
Acct: ███████
Admit/Reg Date: 12/09/19
Report Number: HIM 1209-1145

Your Discharge Instructions:
WORK RELEASE FORM

Your Prescriptions:
Ibuprofen (Motrin) 600 Milligram # 30 Tablets 1 TABLET EVERY 6 HOURS
(0 Refills). Printed

Your Referrals:
Physician: Adams, Marc
Follow-up When: In 3 to 5 days
Follow-up Diagnosis: Refer to Discharge Instruction List
Specialty: Physical Medicine & Rehabilitation
Address: 851 Middle street Ste 3300 Fall River MA 02721 MA 02721
Phone: (508)689-3214
Follow-up Notes: For follow up of your injury. Please call to set up
an appointment. Ice the area for the next couple of days, before switching
to heat. Tylenol in addition to the motrin for pain.

Work Release Form

This notice verifies that your employee, ___Eric Moore_____

was seen in this facility on ____12/09/19_____.

He/she may return to work on _____12/16/19_____ with the following
restrictions:
None: X
No heavy lifting: _____
No prolonged standing: _____
Desk Work Only: _____
Other:

Restrictions:

NOTE: If symptoms continue and the employee is unable to perform the
full duties of their job by this date, please advise the employee to
return to this facility or make an appointment with the referral physician
for further evaluation.

_____Thomas Ross_____
Attending MD

HIM 1209-1145

Saint Anne's Hospital
Patient name: Moore, Eric
Account #: SA7002869084

Report Number: HIM1209-1145
Medical Record#: ████████

Dictated By: Thomas Ross, MD
Signed By: Ross, Thomas MD 12/09/19 0950

DD/DT: 12/09/19 0924
TD/TT: 12/09/19 0924                    Transcriptionist: SVCSCRIPTR

cc: *

HIM 1209-1145                                              2 of 2

**JA652**

**Saint Anne's Hospital**

**795 MIDDLE STREET
FALL RIVER, MA 02721**

**ScriptRx Discharge Packet
Signed**

Patient: Moore, Eric
DOB ▮▮▮▮▮▮▮▮
Age/Sex: 40 / M
Loc: ED.AH. Room:
Attending Dr: David Ignatius MD

Medical Record# ▮▮▮▮▮▮▮▮
Acct SA7002869084
Admit/Reg Date: 12/09/19
Report Number: HIM1209-1080

Your Discharge Instructions:
WORK RELEASE FORM

Your Prescriptions:
Ibuprofen (Motrin) 600 Milligram # 30 Tablets 1 TABLET EVERY 6 HOURS
(0 Refills). Printed

Your Referrals:
Physician: Adams, Marc
Follow-up When: In 3 to 5 days
Follow-up Diagnosis: Refer to Discharge Instruction List
Specialty: Physical Medicine & Rehabilitation
Address: 851 Middle street Ste 3300 Fall River MA 02721 MA 02721
Phone: (508)689-3214
Follow-up Notes: For follow up of your injury. Please call to set up
an appointment. Ice the area for the next couple of days, before switching
to heat. Tylenol in addition to the motrin for pain.

Work Release Form

This notice verifies that your employee, ___Eric Moore_____

was seen in this facility on ____12/09/19_____.

He/she may return to work on _____12/16/19_____with the following
restrictions:
None: X
No heavy lifting: _____
No prolonged standing: _____
Desk Work Only: _____
Other:

Restrictions:

NOTE: If symptoms continue and the employee is unable to perform the
full duties of their job by this date, please advise the employee to
return to this facility or make an appointment with the referral physician
for further evaluation.

_____Thomas Ross_____ _____
Attending MD

HIM 1209-1080                                    1 of 2

**JA653**

Saint Anne's Hospital
Patient name: Moore, Eric
Account #: ▮▮▮▮▮▮▮

Report Number: HIM1209-1080
Medical Record#: ▮▮▮▮▮▮▮

Dictated By: Thomas Ross, MD
Signed By: Ross, Thomas MD 12/09/19 0940

DD/DT: 12/09/19 0924
TD/TT: 12/09/19 0924

Transcriptionist: SVCSCRIPTR

cc: *

HIM 1209-1080

2 of 2

**JA654**

```
*Northeast* Steward Health                                        Page: 1
                                   ED Visit Summary               Date: 12/10/19 02:32

Moore,Eric
Fac: St. Anne's Hospital              Loc:Emergency              Bed:-
40 M█████████                   Med Rec Num: ███████████        Visit:SA7002869084
    Attending:█████████                                         Reg Date:12/09/19
        Reason:right hip pain
─────────────────────────ED Interventions/Assessments/Treatments─────────────────
```

**ED Interventions/Assessments/Treatments**

```
Call-In Assessment                               Start: 12/09/19 05:43
Freq:                                            Status: Discharge
Protocol:
  Edit Status 12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
    Active=>Discharge
```

```
Columbia Suicide Risk Rating Scale               Start: 12/09/19 05:52
Freq: .ADM/PRN                                   Status: Discharge
Protocol: N.CSS
  Created     12/09/19 05:52  System  (Rec: 12/09/19 05:52  System  SAH2169W)
  Edit Status 12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
    Active=>Inactive
  Edit Status 12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
    Inactive=>Active
  Document    12/09/19 05:59  DS  (Rec: 12/09/19 05:59  DS  SAH2169W)
Columbia Suicide Severity
  Triage Assessment
     Suicide Scale Completed in ED Triage       Yes
     Assessment
  Edit Status 12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
    Active=>Discharge
```

```
Critical Value Reporting & Notifications         Start: 12/09/19 05:52
Freq:                                            Status: Discharge
Protocol:
  Created     12/09/19 05:52  System  (Rec: 12/09/19 05:52  System  SAH2169W)
  Edit Status 12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
    Active=>Inactive
  Edit Status 12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
    Inactive=>Active
  Edit Status 12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
    Active=>Discharge
```

```
ED Discharge Assessment                          Start: 12/09/19 05:43
Freq:                                            Status: Discharge
Protocol:
  Document    12/09/19 09:34  RC  (Rec: 12/09/19 09:35  RC  SAH2169W)
Vital Signs
  Pulse
    Pulse Ox Machine
     Pulse Rate (60-90 beats/min)              66
  Respirations
     Respiratory Rate (12-24 breaths/min)      18
  Oxygen
     O2 Sat by Pulse Oximetry (95-100 %)       99
     Oxygen Delivery Method                    Room Air
  Blood Pressure
    Left Arm
     Blood Pressure (90/60-140/90 mmHg)        129/83
     Blood Pressure Mean (mm Hg)               98
```

Continued on Page 2

**JA655**

```
                                                                          Page: 2
Moore,Eric
Fac: St. Anne's Hospital           Loc:Emergency              Bed:-
40 M                         Med Rec Num:                     Visit:SA7002869084
ED Interventions/Assessments/Treatments - Continued
     Blood Pressure Source                  Automatic Cuff
IV Medication Intake
     IV Medication Intake
     Sodium Chloride 0.9% 1,000 ml @ 999 mls/hr IV .Q1H1M ONE Rx#:AH00661144
     Transferred w/Fluids Running           No
     Date Infusion Completed                12/09/19
     Infusion Stop Time                     09:34
ED Discharge Assessment
     Discharge Information
     Interpreter Required                   No
        Query Text:Please utilize the My Steward
        Interpreter/Disability Request Portal
        or use Phone/Video
     Discharged with Whom                   Self
     Mode of Discharge                      Ambulatory
     Discharge Instructions Reviewed; Able To   Yes
        Teach Back
     Instructions Provided By               RN
     Teaching Recipient                     Patient
     Learning Response                      Verbalizes Understanding
     Discharge Comment
     Discharge Comment                      Pty discharged with all
                                            scripts and instructions. Pt
                                            verbalized understanding of
                                            instructions and reasons to
                                            return to ED.

     Belongings
     Valuables Sheet Attached               No
     Essential Belonging(s) Sent with Patient  None
Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
     Active=>Discharge
ED Lower Extremity Injury Assessment              Start:  12/09/19 05:52
Freq:                                             Status: Inactive
Protocol:
Created      12/09/19 05:52  System  (Rec: 12/09/19 05:52  System SAH2169W)
Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
     Active=>Inactive
ED Nontraumatic Extremity Injury Assmnt           Start:  12/09/19 05:52
Freq:                                             Status: Discharge
Protocol:
Created      12/09/19 05:52  System  (Rec: 12/09/19 05:52  System SAH2169W)
Document     12/09/19 06:00  DS  (Rec: 12/09/19 06:06  DS  SAH2160W)
Extremity Problem Nontraumatic
     Complaint Information
     Right Lower Extremity
     Symptoms/Complaint                     Extremity Pain
     Onset                                  Pain started saturday, much
                                            worse when pt woke up this
                                            morning
     Consistency                            Constant
     Radiation                              None
     Context                                Unknown
     Improves With                          Rest
                          Continued on Page 3
```

```
                                                                    Page: 3
Moore,Eric
Fac: St. Anne's Hospital         Loc:Emergency         Bed:-
40 M                  Med Rec Num:                     Visit:SA7002869084
ED Interventions/Assessments/Treatments - Continued
        Worsens With                    Range of Motion,Weight Bearing
                                        ,Walking,Exertion,Palpation
        Associated Symptoms             Denies Other Symptoms
     Sensation
        Right Hip
        Sensation Description           Pain
     Movement
        Right Leg
        Movement Description Nursing/Therapies  +4 - Full ROM, Less Than
                                        Normal Strength.
  Nontraumatic Ext Inj Comment
     Comments
        Nontraumatic Extremity Injury Comment (    Pt states he started with
        CC)                             right hip pain on Saturday
                                        night that has gotten
                                        progressively worse, to the
                                        point where he can not bear
                                        weight on that leg. Area
                                        tender to palpation. Pt denies
                                        any injury to that leg/hip.
   Edit Status 12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
   Active=>Discharge
ED Triage Assessment                        Start:  12/09/19 05:43
Freq:                                       Status: Discharge
Protocol: E.TRIAGE
Document    12/09/19 05:52  DS  (Rec: 12/09/19 05:58  DS  SAE2169W)
Arrival :
     Arrival
        Mode of Arrival                 Walk-in
Specific Travel Risk
     Specific Travel Risk
        In the last 30 days have you traveled   No
        outside the United States?
Triage Note
     Note
        ED Triage Note                  Pt states he started with
                                        right hip pain on Saturday
                                        night that has gotten
                                        progressively worse, to the
                                        point where he can not bear
                                        weight on that leg. Area
                                        tender to palpation. Pt denies
                                        any injury to that leg/hip.
ED Vital Signs with Sepsis
     Sepsis Indicators
     Protocol: E.SEPSIS
        Clinical Criteria Present       None
        Query Text:**Please indicate all
        Suspected or Documented Infection
        Criteria that apply to your patient.
        Temperature
        Temperature (97.6 F-99.6 F)     98.1 F
        Source                          Oral
                     Continued on Page 4
```

JA657

Page: 4

**Moore,Eric**
Fac: St. Anne's Hospital                    Loc:Emergency                    Bed:-
40 M ▓▓▓▓▓▓▓▓     Med Rec Num: ▓▓▓▓▓▓▓▓          Visit:SA7002869084

| ED Interventions/Assessments/Treatments - Continued | |
|---|---|
| Pulse | |
| Pulse Ox Machine | |
| Pulse Rate (60-90 beats/min) | 80 |
| Respirations | |
| Respiratory Rate (12-24 breaths/min) | 18 |
| Oxygen Delivery | |
| Pulse Oximetry (95-100 %) | 100 |
| Oxygen Delivery Method | Room Air |
| Blood Pressure | |
| Left Arm | |
| Blood Pressure (90/60-140/90 mmHg) | 137/86 |
| Mean (mm Hg) | 103 |
| Source | Automatic Cuff |
| Position | Supine |
| Sepsis Screen | |
| Sepsis Screen | No Definite Risk |
| Action Taken (Select All That Apply) | No Action Required |
| Query Text:In the ED if the patient screens positive for sepsis, the RN will notify the ED LIP and initiate the Sepsis ED RN MEC Approved Order Set Following notification, the LIP will assess the patient for any additional treatment needs using the Sepsis Protocol and Sepsis order sets. | |
| Pain | |
| Pain | |
| ED Triage Pain Present | Reports Pain |
| Triage | |
| Height/Weight/BMI | |
| Height | 1.73 m |
| Weight | 90.718 kg |
| Weight Measurement Method | Estimated by Patient |
| Body Mass Index (BMI) | 30.4 |
| Glasgow Coma Scale | |
| Eye Opening | Spontaneous |
| Motor Response | Obeys commands |
| Verbal Reponse | Oriented |
| Glasgow Coma Scale Total | 15 |
| ESI | |
| Protocol: F.ESI | |
| ESI Level | 3 |
| E-cigarette/Vaping History | |
| E-cigarette/Vaping History | |
| Have You Used E-cigarettes or Vaping Products in the Past 90 Days? | No |
| Columbia Suicide Severity | |
| Suicide Rating Scale | |
| Protocol: N.CSS | |
| 1. Wish to be Dead (Past Month) | No |
| Query Text:Ask: "Have you wished you were dead or wished you could go to sleep and not wake up?" | |

Continued on Page 5

**JA658**



Moore,Eric                                                                                    Page: 5
Fac: St. Anne's Hospital              Loc:Emergency                    Bed:-
40 M                       Med Rec Num:                                Visit:SA7002869084
ED Interventions/Assessments/Treatments - Continued

        2. Suicidal Thoughts (Past Month)           No - Proceed to Question 6
        Query Text:Ask: "Have you actually had
        any thoughts of killing yourself?"
        General non-specific thoughts of wanting
        to end one's life/commit suicide. "I'
        ve thought about killing myself" without
        general thoughts of ways to kill
        oneself/associated methods, intent, or
        plan.

        6. Suicidal Behavior Question (Past           No
        Month)
        Query Text:Ask: "Have you ever done
        anything, started to do anything, or
        prepared to do anything to end your life
        ?"

        Examples: Collected pills, obtained a
        gun, gave away valuables, wrote a will
        or suicide note, took out pills but didn
        't swallow any, held a gun but changed
        your mind or it was grabbed from your
        hand, went to the roof but didn't jump;
        or actually took pills, tried to shoot
        yourself, cut yourself, or hang yourself
        , etc.
        Suicide Risk
            Suicide Risk                             Low
Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
    Active=>Discharge
ED Vital Signs/Progress Note                         Start:  12/09/19 05:52
Freq:                                                Status: Discharge
Protocol:
Created       12/09/19 05:52  System  (Rec: 12/09/19 05:52  System SAH2169W)
Edit Status   12/39/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
    Active=>Inactive
Edit Status   12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
    Inactive=>Active
Document      12/09/19 06:35  DS  (Rec: 12/09/19 06:38  DS  SAH2169W)
ED Vital Signs/Progress Note
    Pulse
        Pulse Ox Machine
        Pulse Rate (60-90 beats/min)                 71
    Respirations
        Respiratory Rate (12-24 breaths/min)         18
    Oxygen
        Pulse Oximetry (95-100 %)                    97
        Oxygen Delivery Method                       Room Air
    Blood Pressure
        Left Arm
        Blood Pressure (90/60-140/90 mmHg)           121/80
        Blood Pressure Mean (mm Hg)                  93
        Source                                       Automatic Cuff
        Position                                     Supine
Document      12/09/19 07:10  RC  (Rec: 12/09/19 07:10  RC  SAH2169W)
                    Continued on Page 6

**JA659**

```
                                                                      Page: 6
Moore,Eric
Fac: St. Anne's Hospital            Loc:Emergency           Bed:-
40 M                      Med Rec Num:                      Visit:8A7002869084
ED Interventions/Assessments/Treatments - Continued
ED Vital Signs/Progress Note
   Pulse
      Pulse Ox Machine
         Pulse Rate (60-90 beats/min)          70
      Respirations
         Respiratory Rate (12-24 breaths/min)  18
      Oxygen
         Pulse Oximetry (95-100 %)             99
         Oxygen Delivery Method               Room Air
      Blood Pressure
         Left Arm
            Blood Pressure (90/60-140/90 mmHg)  135/85
            Blood Pressure Mean (mm Hg)         101
            Source                              Automatic Cuff
      Progress Note
         Progress Note                         Care assumed at this time.
   Document    12/09/19 07:10  DB  (Rec: 12/09/19 07:10  DB  SAH2159W)
ED Vital Signs/Progress Note
      Progress Note
         Progress Note                         Exit of care to Ryan, RN.
   Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
         Active=>Discharge
EMS Assessment                                  Start: 12/09/19 05:43
Freq:                                           Status: Discharge
Protocol:
   Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
         Active=>Discharge
Fall Risk Assessment Tool-John Hopkins          Start: 12/09/19 05:52
Freq:                                           Status: Discharge
Protocol:
   Created     12/09/19 05:52  System  (Rec: 12/09/19 05:52  System  SAH2169W)
   Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
         Active=>Inactive
   Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
         Inactive=>Active
   Document    12/09/19 05:59  DS  (Rec: 12/09/19 05:59  DS  SAH2169W)
Johns Hopkins Fall Risk Assessment
      Compl Assmnt if No Fall Risk Doc Above
      Patient Age
         Protocol: N.JHFAGE
         Patient Age                           59 or Less (0)
      Fall History
         Protocol: N.JHFHX
         Fall History                          No Fall-Last 6 Months (0)
      Elimination, Bowel, Urine
         Protocol: N.JHFALLE
         Elimination, Bowel and Urine          No Incont/Urgency/Freq(0)
      Medications
         Protocol: N.JHFMED
         Medications                           None (0)
            Query Text:Includes PCA/ Opiates, Anti-
            convulsants, Anti-hypertensives,
            Diuretics, Hypnotics, Laxatives,
                       Continued on Page 7
```

JA660

| Moore,Eric | | | Page: 7 |
|---|---|---|---|
| Fac: St. Anne's Hospital | | Loc:Emergency | Bed:- |
| 40 M | Med Rec Num: | | Visit:SA7002869084 |

ED Interventions/Assessments/Treatments - Continued

```
      Sedatives, and Psychotropics.
    Patient Care Equipment
    Protocol: N.JHFALLP
      Patient Care Equipment               None (0)
        Query Text:Any equipment that tethers
        the patient (IV Infusion, Chest Tube,
        Indwelling Catheter, SCDs, etc.)
    Mobility
    Protocol: N.JHFMCB
      Requires Assistance or Supervision    No (0)
        Query Text:Requires assistance or
        supervision for mobility, transfer or
        ambulation.
      Unsteady Gait                         No (0)
      Visual or Auditory Impairment Affecting   No (0)
        Mobility
    Cognition
    Protocol: N.JHFCOG
      Altered Awareness of Immediate Physical   No (0)
        Environment
      Impulsive                             No (0)
      Lack of Understanding of Physical/    No (0)
        Cognitive Limitations
        Query Text:Lack of understanding of one'
        s physical and cognitive limitations.
    Fall Risk Score
      Fall Risk Score Total        .        0
        Query Text:Copyright (C) 2007 by The
        Johns Hopkins Health System Corporation.
        All Rights Reserved.
    Risk Assessment
      Fall Risk Category                    LOW
        Query Text:Low Risk = 0-5 points *OR*
        Completely paralyzed or Immobile
        Moderate Risk = 6-13 points
        High Risk = Greater than 13 points *OR*
        Automatic high fall risk based on fall
        risk factor category criteria
    Fall Risk Interventions
      Environmental                         Bed in Lowest Position,Brake
                                            Locks on Wheels,Adequate
                                            Lighting in Room
      Communication                         Return Demonstr-Call Bell,
                                            Prevention Ed- Patient
      Elimination                           Clear Path to Bathroom,Toilet
                                            every 2-3 hours
      Patient Care Equipment/Mobility       Grip Sock/Supportive Shoe
      Other                                 Pain Management
    Edit Status 12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
      Active=>Discharge
```

| Height/Weight Assessment | Start: 12/09/19 05:52 |
|---|---|
| Text: | Status: Discharge |
| Freq: | |

Continued on Page 9

**JA661**

```
┌─────────────────────────────────────────────────────────────────────────────┐
│ Moore,Eric                                                         Page: 8     │
│ Fac: St. Anne's Hospital           Loc:Emergency           Bed:~              │
│ 40 M ▬▬▬▬▬▬        Med Rec Num:▬▬▬▬          Visit:SA7002869084               │
├─────────────────────────────────────────────────────────────────────────────┤
│ ED Interventions/Assessments/Treatments - Continued                           │
└─────────────────────────────────────────────────────────────────────────────┘
```

Protocol:
Created       12/09/19 05:52  System  (Rec: 12/09/19 05:52  System SAH2169W)
Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
     Active=>Inactive
Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
     Inactive=>Active
Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
     Active=>Discharge

```
┌─────────────────────────────────────────────────────────────────────────────┐
│ IV/Invasive Line Status                         Start:  12/09/19 05:52        │
│ Text:                                           Status: Discharge             │
│ Freq:                                                                          │
└─────────────────────────────────────────────────────────────────────────────┘
```
Protocol:
Created       12/09/19 05:52  System  (Rec: 12/09/19 05:52  System SAH2169W)
Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
     Active=>Inactive
Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
     Inactive=>Active
Document      12/09/19 06:42  DS  (Rec: 12/09/19 06:42  DS  SAH2160W)
     IV/Invasive Line Assessment
        IV Location
           Left Antecubital
           Field Start?                        No
           Date of Insertion                   12/09/19
           Insertion Attempts                  1
           Reason for IV Insertion             Provide Access for IV
                                               Medication(s)
           IV Catheter Type                    Saline Lock
           Site Observation                    Asymptomatic,Intact,Patant
           Dressing Applied                    Transparent Film Dressing
           Line Care                           Saline Flush,Check Blood
                                               Return
Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
     Active=>Discharge

```
┌─────────────────────────────────────────────────────────────────────────────┐
│ Intake and Output                               Start:  12/09/19 05:52        │
│ Text:                                           Status: Discharge             │
│ Freq:                                                                          │
└─────────────────────────────────────────────────────────────────────────────┘
```
Protocol:
Created       12/09/19 05:52  System  (Rec: 12/09/19 05:52  System SAH2169W)
Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
     Active=>Inactive
Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
     Inactive=>Active
Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
     Active=>Discharge

```
┌─────────────────────────────────────────────────────────────────────────────┐
│ Nursing Swallow Screen                          Start:  12/09/19 05:52        │
│ Freq:                                           Status: Discharge             │
└─────────────────────────────────────────────────────────────────────────────┘
```
Protocol:
Created       12/09/19 05:52  System  (Rec: 12/09/19 05:52  System SAH2169W)
Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
     Active=>Inactive
Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
     Inactive=>Active
Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)

Continued on Page 9

```
                                                                        Page: 9
Moore,Eric
Fac: St. Anne's Hospital          Loc:Emergency
40 M                        Med Rec Num:                    Bed:-
                                                       Visit:SA7002869084
  ED Interventions/Assessments/Treatments - Continued
     Active=>Discharge
Pain Assessment                                   Start:  12/09/19 05:52
Text:                                             Status: Discharge
Freq:
Protocol:  N.PAIN
  Created      12/09/19 05:52  System  (Rec: 12/09/19 05:52  System SAH2169W)
  Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
      Active=>Inactive
  Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
      Inactive=>Active
  Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
      Active=>Discharge
Patient Safety/Precautions                        Start:  12/09/19 05:52
Text:                                             Status: Discharge
Freq:
Protocol:
  Created      12/09/19 05:52  System  (Rec: 12/09/19 05:52  System SAH2169W)
  Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
      Active=>Inactive
  Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
      Inactive=>Active
  Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
      Active=>Discharge
Patient/Social History Assessment                 Start:  12/09/19 05:43
Freq:                                             Status: Discharge
Protocol:
  Document   12/09/19 05:52  DS  (Rec: 12/09/19 05:58  DS  SAH2169W)
  Social History
     Tobacco History
        Smoking Status                     Former smoker
        Query Text:Heavy tobacco smoker >10
        cigarettes per day
        Light tobacco smoker <10 cigarettes per
        day
        Have You Smoked/Used Tobacco in the Last  No
        30 Days?
        Tobacco Type                       cigarettes
     AUDIT-C For ETOH History
        1. How Often Do You Have a Drink          a. Never
        Containing Alcohol
        Audit-C Score                      0
        Query Text:**The Audit-C is Scored on a
        Scale of 0-12.
        **In Men, a Score of 4 or More is
        Considered Positive.
        **In Women, a Score of 3 or More is
        Considered Positive.
        Audit-C Result                     Negative
        Query Text:**If Positive Audit-C, Add
        High Risk for Withdrawal Problem to Care
        Plan, Complete the CIWA Assessment and
        Notify the MD.
        **When the points are all from question
                          Continued on Page 10
```

```
                                                                            Page: 10
Moore,Eric
Fac: St. Anne's Hospital              Loc:Emergency        Bed:-
40 M ████████████          Med Rec Num ████████           Visit:SA7002869084
    ED Interventions/Assessments/Treatments - Continued
            #1 'How Often Do You Have a Drink
              Containing Alcohol', it can be assumed
              that the patient is drinking below
              recommended limits and it is suggested
              that the provider review the patient's
              alcohol intake over the past few months
              to confirm accuracy.
        Drug Use Hx
            Do You Currently Use or Have Hx of Using     No
            Recreational Drugs
        Non-Opioid Directive
            Has the Pt Indicated Their Wishes            No
            Regarding Non-Opioid Directive?
            Query Text:**Document Yes ONLY if
            patient Volunteers this information.
        Domestic Abuse History
            Do you feel safe in your current living      Yes
            situation?
            Are you being Verbally or Physically         No
            Hurt or Threatened?
    Sexual Orientation/Gender ID
        Sexual Orientation/Gender ID
            Current Sex                                  Male
            Gender Identity                              Male
            How would you like us to refer to you?       He/Him/His/Himself
        Edit Status 12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
            Active=>Discharge
Sepsis Screening                                      Start:  12/09/19 05:52
Freq:  Q4H                                            Status: Discharge
Protocol;
    Created      12/09/19 05:52  System  (Rec: 12/09/19 05:52  System SAH2169W)
    Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  SAH2169W)
        Active=>Inactive
    Edit Status  12/09/19 05:52  DS  (Rec: 12/09/19 05:52  DS  9AH2169W)
        Inactive=>Active
    Edit Status  12/09/19 09:56  BKG DAEMON  (Rec: 12/09/19 09:56  BKG DAEMON  SHCS-BG39)
        Active=>Discharge



                              ED Calls


Current Call Details
File Date/Time: 12/09/19 10:05        Edit Number: 1

Subject/Summary of Call:
Auto-generated call for the following results:
 - CT hip RT wo con
12/09/19 10:03 EST:  The following ITS procedure has triggered this followup call.  Please
see EMR for result details:
 - CT hip RT wo con

12/09/19 10:05 EST:  Edited results have been received.  Please see EMR for result details:
                          Continued on Page 11
```

```
                                                                    Page: 11
Moore,Eric
Fac: St. Anne's Hospital                  Loc:Emergency
40 M                                                          Bed:-
                                  Med Rec Num:              Visit:SA7002869084
ED Calls - Continued
 - CT hip RT wo con


Historical Call Details
File Date/Time: 12/09/19 10:03      Edit Number: 2

Subject/Summary of Call:
Auto-generated call for the following results:
 - CT hip RT wo con
12/09/19 10:03 EST:  The following ITS procedure has triggered this followup call.  Please
see ENR for result details:
 - CT hip RT wo con
```

**User Key**

| Monogram | Mnemonic | Name | Credentials | Provider Type |
|---|---|---|---|---|
| | BKG DAEMON | Daemon,Background | | |
| DB | SAHDNB14 | Borges,David | | Registered Nurse |
| DS | DJS16 | Souza,Darrian | RN | Registered Nurse |
| RC | RC041 | Costa,Ryan | RN | Registered Nurse |

"Northeast" Formend Health         Patient Order Summary         Page: 1

Date: 12/15/19 03:50

User: Costa, Ryan

SAT002869084  Moore, Eric         Medical Record Number:

40/M      Attending:      Location: Emergency       Account Number: SAT002869084

Reason: right hip pain.         Registration: 12/09/19

| Category | Order | Status | Start | Ord Provider | Entered By |
|---|---|---|---|---|---|
| Medications | 191209-061612588 | Cancelled | 12/09/19 06:15 | Ignatius,David MD | Ignatius,David |

Sodium Chloride 0.9%        Stop Reason: DUE        Order Source: Provider

Medication       Done
Sodium Chloride 0.9%    Vol Per Bag: 250 ML    Per     Total Volume

Q8 Drug        Q8 Volume        250 ML

| Route | Frequency | Sched | PRN Reason | Days | Hours | Tot Vol | Stop | Clinical Indication |
|---|---|---|---|---|---|---|---|---|
| IV | .Q8H | ONE | | | | | | |

Rate: 999 ML5/HR
Stop Date/Time: 12/09/19 06:30

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 12/09/19 06:16 | OH - Ignatius,David | SAN2111N | Order is Entered and Signed | Y |
| 2 | 12/09/19 06:16 | OH - Ignatius,David | SAN2111N | Order cancelled | Y |
| 3 | 12/09/19 06:16 | OH - Ignatius,David | SAN2111N | Status changed: | Y |
| | | | | New: Cancelled | |
| | | | | Old: Verified | |
| 4 | 12/09/19 06:16 | OH - Souza,Darian | SAN2160N | Order acknowledged | NA |

Hematology   191209-061612596   Completed   12/09/19 06:30   Ignatius,David MD   Stat    Order Source: Provider

Department   DS      Stop Reason: Completed by Lis
Specimen    Send someone from the department to collect

Complete Blood Count Auto Diff

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 12/09/19 06:16 | OH - Ignatius,David | SAN2111N | Order is Entered and Signed | Y |
| 2 | 12/09/19 06:16 | OH - Souza,Background | SMON-BK39 | Status changed: | NA |
| | | | | New: Transmitted | |
| | | | | Old: Verified | |
| 3 | 12/09/19 06:16 | OH - Souza,Darian | SAN2160N | Order acknowledged | NA |
| 4 | 12/09/19 06:23 | LAB - Badson,background | BHCH-CBMS | Status changed: | NA |
| | | | | New: In Process | |

**JA666**

Steward™ Steward Health

| | | | | | Page: 2 |
| --- | --- | --- | --- | --- | --- |
| | | | | | Date: 12/15/19 03:50 |
| | | | | | User: Costa, Ryth |

**SN7002865084 Moore,Eric**    Medical Record Number: SN7002865064
40/M    Account Number:
   Registration: 12/09/19

Attending:
Reason: right hip pain    Location: Emergency

**Patient Order Summary**

| Category | Order | Start | Status | Ord Provider | Entered By | Acknowledged |
| --- | --- | --- | --- | --- | --- | --- |
| 5 | 12/09/19 06:39 | LAB - Daemon,Background | SMC9-CM05 | Old: Transmitted / Start Time edited: / New: 06:30 / Old: 06:15 | | Y |
| 5 | 12/09/19 06:39 | LAB - Dawson,Background | SMC9-CM05 | Query Department edited: / New: D9 / Old: | | Y |
| 6 | 12/09/19 07:08 | LAB - Daemon,Background | SMC9-CM05 | Status changed: / New: Completed / Old: In Process | | NA |
| 7 | 12/09/19 07:10 | CM - Costa,Ryan | SAN2169W | Order acknowledged | | NA |
| 8 | 12/09/19 08:11 | LAB - Bernardes,Martin | SMC9-CM05 | Status changed / New: In Process | | NA |
| 9 | 12/09/19 03:49 | LAB - Daemon,Background | SMC9-CM05 | Status changed / New: Completed / Old: In Process | | NA |

Chemistry:   131209-06161604   Completed   12/09/19 06:30   Ignatius,David MD   Ignatius,David
Comprehensive Metabolic Panel    Stat    Order Source:Provider

Department:   D9    Stop Reason Completed by him
Specimen:   Send remains from the department to collect

| | Date & Time | User | Device | Event | Acknowledged |
| --- | --- | --- | --- | --- | --- |
| 1 | 12/09/19 06:16 | CM - Ignatius,David | SAN2111W | Order is Entered and Signed | Y |
| 2 | 12/09/19 06:16 | OK - Daemon,Background | SMC9-B639 | Status changed / New: Transmitted | NA |
| 3 | 12/09/19 06:16 | CM - Sousa,Patricia | SAN2164GV | Old: Verified / Order acknowledged | NO |
| 4 | 12/09/19 06:23 | LAB - Daemon,Background | SMC9-CM05 | Status changed / New: In Process | NA |
| 5 | 12/09/19 06:39 | LAB Daemon,Background | SMC9-CM05 | Old: Transmitted / Start Time edited: / New: 06:30 / Old: 06:15 | Y |
| 5 | 12/09/19 06:39 | LAB - Daemon,Background | SMC9-CM05 | Query Department edited: | Y |

*Northeast* Steward Health  Patient Order Summary

Page: 3
Date: 12/15/19 09:50
User: Costa, Ryan

SA700286S084  Moore, Eric     Location: Emergency
40/M     Attending:     Medical Record Number:
Reason: right hip pain     Account Number: SA700286S084
Registration: 12/09/19

| Category | Order | Status | Start | Ord Provider | Entered By |
|---|---|---|---|---|---|
| | | | | New: DS | |
| 6 | 12/09/19 07:34 | LAB - Daemon,Background | | Old: | NA |
| | | | | Status changed: | |
| | | | | New: Completed | |
| | | | | Old: In Process | |
| 7 | 12/09/19 07:36 | CM - Costa,Ryan | | Order acknowledged | NA |
| 8 | 12/09/19 09:10 | LAB - Almeida,Lori | | Status changed: | NA |
| | | | | New: In PROCESS | |
| | | | | Old: Completed | |
| 9 | 12/09/19 09:23 | LAB - Daemon,Background | | Status changed: | NA |
| | | | | New: Completed | |
| | | | | Old: In Process | |

Blood Culture  191209-061615/621   Completed   12/09/19 06:30   Ignatius,David MD   Ignatius,David
  Blood Culture   Stat   Order Source:Provider

Department  DS
MIC Source  Blood
Quantity  2
Specimen  Send someone from the department to collect   Stop Reason: Completed by Lis

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 12/09/19 06:16 | CM - Ignatius,David | SAU211LW | Order is Entered and Signed | Y |
| 2 | 12/09/19 06:16 | CM - Daemon,Background | SEC9-B639 | Status changed: | NA |
| | | | | New: Transmitted | |
| | | | | Old: Verified | |
| 3 | 12/09/19 06:16 | CM - Sonta,Darian | SAB2164GM | Order acknowledged | NA |
| 4 | 12/09/19 06:23 | LAB - Daemon,Background | SEC9 CM05 | Status changed: | NA |
| | | | | New: In Process | |
| | | | | Old: Transmitted | |
| 5 | 12/09/19 07:23 | LAB - Daemon,Background | SEC9-CM05 | Start Time edited: | N |
| | | | | New: 06:30 | |
| | | | | Old: 06:15 | |
| 5 | 12/09/19 07:23 | LAB - Daemon,Background | SEC9-CM05 | Query Department edited: | N |
| | | | | New: DS | |
| | | | | Old: | |
| 6 | 12/16/19 14:49 | LAB - Daemon,Background | SEC9-CM05 | Status changed: | NA |

*Northeast* Steward Health — Patient Order Summary

Page: 4
Date: 12/15/19 09:30
User: Costa, Ryan
Medical Record Number:
Account Number: SA7002869084
Registration: 12/09/19

SA7002869084  Moore, Eric    Location: Emergency
40/M    Attending:    Reason: right hip pain

| Category | Order | Status | Start | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|---|---|
| | | | | | | Ord Provider: Ignatius,David MD    Entered By | |
| | | | | | | New: Completed    Old: In Process | |

Nursing Orders 191209-061613623    Verified  12/09/19 06:15    Order Source: Provider
Saline Lock Insert/Manage

| | Date & Time | User | Device | Event | | Acknowledged |
|---|---|---|---|---|---|---|
| 1 | 12/09/19 06:16 | OM - Ignatius, David | SN0211IM | Order is Entered and Signed | | Y |
| 2 | 12/09/19 06:16 | OM - Souza, Darrian | SN0216GW | Order acknowledged | | NA |

Start    Order Source: Provider

Chemistry    191209-061613612    Completed  12/09/19 06:30    Ignatius,David MD
Lactic Acid

Stop Reason: Completed by Lis

Department    DS
Specimen    Send someone from the department to collect

Lactic Acid Collected    Yes

| | Date & Time | User | Device | Event | | Acknowledged |
|---|---|---|---|---|---|---|
| 1 | 12/09/19 06:16 | OM - Ignatius, David | SAN0211IM | Order is Entered and Signed | | Y |
| 2 | 12/09/19 06:16 | OM - Dawson, Background | SNC5-BA39 | Status changed: New: Transmitted | | NA |
| 3 | 12/09/19 06:16 | OM - Souza, Darrian | SAN0216GW | Old: Verified | | NA |
| 4 | 12/09/19 06:23 | LAB - Dawson, Background | SNC09-CM05 | Order acknowledged    Status changed: New: In Process | | NA |
| 5 | 12/09/19 06:39 | LAB - Dawson, Background | SNC5-CM05 | Old: Transmitted    Start Time edited: New: 06:30    Old: 06:15 | | Y |
| 6 | 12/09/19 06:39 | LAB - Dawson, Background | SNC5-CM05 | Query Department edited: New: DS    Old: | | Y |
| 7 | 12/09/19 07:04 | LAB - Dawson, Background | SNC5-CM05 | Status changed: New: Completed    Old: In Process | | NA |

*Northeast Steward Health    Patient Order Summary    Page: 5
Date: 12/15/19 03:50
User: Costa, Ryan

SA7002859084 Moore, Eric    Location: Emergency    Medical Record Number:
40/X    Account Number: SA7002859084
Reason: Right hip pain    Registration: 12/09/19

| Category | Order | Status | Start | Ord Provider | | Entered By |
|---|---|---|---|---|---|---|
| 7 | 12/09/19 07:06 | GM - Souza, Darrian | | Ignatius, David MD | | NA |
| | | | | Stat | Order Source: Provider | |

Hematology    192269-08114211X    Completed    12/09/19 06:30    Ignatius, David MD    Ignatius, David

Erythrocyte Sedimentation Rate

Stop Reason: Completed by Lis

Department    DS

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 12/09/19 06:11 | LAB - Bermudez, Martin | SNES-CM05 | Signature is Necessary | Y |
| 1 | 12/09/19 06:11 | LAB - Bermudez, Martin | SNES-CM05 | Order is Entered | Y |
| 2 | 12/09/19 09:10 | LAB - Damson, Background | SNES-CM00 | Query Department edited: | Y |
| | | | | New: ns | |
| | | | | Old: | |
| 3 | 12/09/19 09:49 | LAB - Damson, Background | SNES-CM05 | Status changed: | NA |
| | | | | New: Completed | |
| | | | | Old: In Process | |
| | | | | Order acknowledged | |

6    12/09/19 06:51    GM - Costa, Ryan    SN0205X    Ignatius, David MD    Ignatius, David    NA
Chemistry    191209-091301385    Completed    12/09/15 06:30    Stat    Order Source: Provider
C-Reactive Protein

Stop Reason: Completed by Lis

Department    DS

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 12/09/19 09:10 | LAB - Almeida, Lori | SNES-CM05 | Signature is Necessary | Y |
| 1 | 12/09/19 09:10 | LAB - Almeida, Lori | SNES-CM05 | Order is Entered | Y |
| 2 | 12/09/19 09:23 | LAB - Damson, Background | SNES-CM05 | Query Department edited: | Y |
| | | | | New: ns | |
| | | | | Old: | |
| 3 | 12/09/19 09:23 | LAB - Damson, Background | SNES-CM05 | Status changed: | NA |
| | | | | New: Completed | |
| | | | | Old: In Process | |
| | | | | Order acknowledged | |

4    12/09/19 09:29    GM - Costa, Ryan    SN0106M    Ignatius, David MD    Ignatius, David    NA
Chemistry    191209-081636216    Cancelled    12/09/19 06:16    Stat    Order Source: Provider
Crp High Sensitivity

Stop Reason: INCORRECT TEST ORDED

*Northeast* Steward Health

Patient Order Summary

Page: 6
Date: 12/15/19 03:50
User: Costa, Ryan

SA7002869984  Moore, Kylo

BA7002869984

Attending:
Reason: right hip pain

Location: Emergency

Medical Record Number:
Account Number: SA7002869984
Registration: 12/09/19

40/H

| Category | Order | Status | Start | Ord Provider | | Entered By |
|---|---|---|---|---|---|---|

Specimen    Send nursing from the department to collect

| | Date & Time | User | | Device | Event | | Acknowledged |
|---|---|---|---|---|---|---|---|
| 1 | 12/06/19 06:16 | OM - Ignatius, David | | SAN211IW | Order is Entered and Signed | | Y |
| 2 | 12/09/19 06:16 | OM - Deamon, Background | | SNC3-0659 | Status changed: New: Transmitted | | NA |
| 3 | 12/09/19 06:16 | OM - Souza, Darrian | | SNN216CW | Old: Verified Order acknowledged | | NA |
| 4 | 12/09/19 06:23 | LAB - Deamon, Background | | SNC5-CM05 | Status changed: New: In Process | | NA |
| 5 | 12/09/19 05:07 | LAB - Alansde, Lori | | SNC3-CM05 | Old: Transmitted Status changed: New: Cancelled | | NA |

Hematology  191209-061636224  Cancelled  12/09/19 06:16  Ignatius,David MD  Stat  Ignatius,David
Erythrocyte Sedimentation Rate                    Stop Reason: Cancelled by Lin    Order Source:Provider

Specimen    Send someone from the department to collect

| | Date & Time | User | | Device | Event | | Acknowledged |
|---|---|---|---|---|---|---|---|
| 1 | 12/06/19 06:16 | OM - Ignatius, David | | SAN211IW | Order is Entered and Signed | | Y |
| 2 | 12/09/19 06:16 | OM - Deamon, Background | | SNC3-BG39 | Status changed: New: Transmitted | | NA |
| 3 | 12/09/19 06:16 | OM - Souza, Darrian | | SNN216CW | Old: Verified Order acknowledged | | NA |
| 4 | 12/09/19 06:23 | LAB - Deamon, Background | | SNC5-CM05 | Status changed: New: In Process | | NA |
| 5 | 12/09/19 08:12 | LAB - Bermudez, Martin | | SNC5-CM05 | Old: Transmitted Status changed: New: Cancelled | | NA |

Medication  19.209-061901505  Completed  12/09/19 06:18  Ignatius,David MD  Ignatius,David
Sodium Chloride 0.9%                    Stop Reason: Reached Stop Date    Order Source:Provider

Medication    Dose    Rte

JA671

*Northeast Steward Health

**SA7002869084  Moore, Hilo**
40/M
Attending:
Reason: right hip pain

Patient Order Summary
Location: Emergency

Page: 7
Date: 12/15/19 03:50
User: Costa, Ryan
Medical Record Number:
Account Number: SA7002859088
Registration: 12/09/19

| Category | Order | Status | Start | Ord Provider | | Entered By |
|---|---|---|---|---|---|---|

QH Drug
Sodium Chloride 0.9%     Vol Per Bag: 1,000 ML

Total Volume
1000 ML

| Route | Frequency | Q8 Volume | | Days Hours Tot Vol | Bags | Clinical Indication |
|---|---|---|---|---|---|---|
| IV | .Q12H | | | | | |

Rate: 999 ML8/HR
Stop Date/Time: 12/09/19 07:18
Discontinued 12/09/19 07:18

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 12/09/19 06:19 | CM - Ignatius,David | SAN211JW | Order is Entered and Signed | Y |
| 2 | 12/09/19 06:19 | CM - Dawson,Background | SNCS-SMC39 | Status changed:<br>New: Transmitted<br>Old: Verified | NA |
| 3 | 12/09/19 06:19 | EPA - Dawson,background | SNCS-CMC5 | Status changed:<br>New: Pho Verified<br>Old: Transmitted | NA |
| 4 | 12/09/19 06:20 | CM - Romero,Ana Felicia | SAN212JW | Order Acknowledged | NA |
| 5 | 12/09/19 07:18 | PHA - Dawson,Background | SNCS-CMC5 | Status changed<br>New: Completed<br>Old: Pho Verified | Y |
| 6 | 12/09/19 07:22 | CM - Costa,Ryan | SAN2109W | Order Acknowledged | NA |

Medications    2932209-061912232    Completed    12/09/19 06:19    Ignatius,David MD    Ignatius,David
(Toradol Inj)                                                        Order Source:Provider

Medication                     Stop Reason: Reached Stop Date
Ketorolac Inj [Toradol Inj]    Dose
                               30 mg    PRN

QH Drug
                               Q8 Volume    Total Volume

| Route | Frequency | Sched | PRN Reason | Days Hours Tot Vol | Doses | Clinical Indication |
|---|---|---|---|---|---|---|
| IV | ONCE | ONCE | | | | |

**JA672**

*Northeast* Steward Health

Patient Order Summary

Page: 8
Date: 12/15/19 09:50
User: Cozza,Ryan

SA1002869084  Moore,Eric

Attending:
Reason: Right hip pain

Location: Emergency

Medical Record Number: SA1002869084
Account Number:
Registration: 12/09/19

40/M

| Category | Order | Status | Start | Device | Ord Provider | Event | Entered By | Acknowledged |
|---|---|---|---|---|---|---|---|---|

Stop Date/Time: 12/09/19 06:20
Discontinued 12/09/19 06:20

|  | Date & Time | User | Device |  | Event |  | Acknowledged |
|---|---|---|---|---|---|---|---|
| 1 | 12/09/19 06:19 | OM - Ignatius,David | SDN2111W | | Order is Entered and Signed | | Y |
| 2 | 12/09/19 06:19 | OM - Daemon,Background | SMC8-9639 | | Status changed: | | NA |
| | | | | | New: Transmitted | | |
| | | | | | Old: Verified | | |
| 3 | 12/09/19 06:19 | PHA - Damson,Background | SMC8-CM05 | | Order Type edited: | | Y |
| | | | | | New: MED | | |
| | | | | | Old: | | |
| 4 | 12/09/19 06:19 | PHA - Damson,Background | SMC8-CM05 | | Status changed: | | NA |
| | | | | | New: Pha Verified | | |
| | | | | | Old: Transmitted | | |
| 5 | 12/09/19 06:20 | PHA - Damson,Background | SMC8-CM05 | | Status changed: | | Y |
| | | | | | New: Completed | | |
| | | | | | Old: Pha Verified | | |
| 6 | 12/09/19 06:20 | OM - Moreira,Ana Felicia | SDN2111W | | Order acknowledged | | NA |

CT Scan  191209-060025701  Cancelled  12/09/19 06:19  Ignatius,David MD  Ignatius,David
Ct Hip Rt wo/W Con.  Stat  Order Source: Provider

Stop Reason: Changed to 12/09 0619 CT / HIPTWO

Comment:
Mode Of Transportation: Stretcher
Reason For Exam: severe r hip pain 2 days,limited movement.

no known injury

The Next Question Is Required For  Any order from Residents, Fellows, NPs, or PAs, **For PAs and Unit
Secretaries: Please enter the name of the Attending or Consulting MD with
whom the Resident, Fellow, NP, or PA discussed this order.

Order Site: St. Anne's Hospital

|  | Date & Time | User | Device |  | Event |  | Acknowledged |
|---|---|---|---|---|---|---|---|
| 1 | 12/09/19 06:20 | OM - Ignatius,David | SDN2111W | | Order is Entered and Signed | | Y |
| 2 | 12/09/19 06:20 | OM - Daemon,Background | SMC8-9639 | | Status changed: | | NA |
| | | | | | New: Transmitted | | |
| | | | | | Old: Verified | | |

"Northeast" Steward Health       Patient Order Summary

Page: 9
Date: 12/15/19 09:50
User: Costa, Ryan

SAT002865084  Moore, Eric                Location: Emergency               Medical Record Number: SAT002865084
40/M        Attending:                                Account Number:
         Reason: right hip pain                       Registration: 12/09/19

| Category | Order | Status | Start | Ord Provider | | Entered By | |
|---|---|---|---|---|---|---|---|
| 3 | 12/09/19 06:20 | ITS - Dawson, Background | | SNC9-CM05 | Status changed: | | NA |
| | | | | | New: Logged | | |
| | | | | | Old: Transmitted | | |
| 4 | 12/09/19 06:20 | OM - Romero, Ana Felicia | | SUD9310W | Order acknowledged | | NA |
| 5 | 12/09/19 06:41 | ITS - Paskowski, Amanda K | | SNC9-CM05 | Status changed: | | Y |
| | | | | | New: Cancelled | | |
| | | | | | Old: Logged | | |
| 6 | 12/09/19 06:44 | OM - Borges, David | | SAN2159W | Order acknowledged | | NA |

CT Scan   191209-0641344119   Resulted   12/09/19 06:19   Ignatius, David MD        Ignatius, David
        Ct Hip Rt Wo Con                              Stat              Order Source: Provider

Comment            no known injury
Mode Of Transportation     Stretcher
Reason For Exam          severe r hip pain 2 days, limited movement,

The Next Question Is Required For   Any order from Residents, Fellows, NPs, or PAs. **For RNs and Unit
                             Secretaries: Please enter the name of the Attending or Consulting MD with
                             whom the Resident, Fellow, NP, or PA discussed this order.
                             St. Anne's Hospital

Order Site

| | Date & Time | User | Device | Event | Acknowledged |
|---|---|---|---|---|---|
| 1 | 12/09/19 06:41 | OM - Paskowski, Amanda K | SNC9-CM05 | Order created from the edit of: CT hip RT | Y |
| | | | | Wo/w Con Stat | |
| 2 | 12/09/19 06:41 | ITS - Paskowski, Amanda K | SNC9-CM05 | Signature is Necessary | Y |
| 3 | 12/09/19 06:44 | OM - Borges, David | SAN2159W | Order acknowledged | NA |
| 4 | 12/09/19 07:02 | ITS - Paskowski, Amanda K | SNC9-CM05 | Status changed: | NA |
| | | | | New: Taken | |
| | | | | Old: Logged | |
| 5 | 12/09/19 08:54 | ITS - Dawson, Background | SNC9-CM05 | Status changed: | NA |
| | | | | New: Resulted | |
| | | | | Old: Taken | |

**JA674**

```
DATE: 12/10/19 @ 0141          Northeast Steward Health - SHC                    PAGE 1
USER: FEABKGJOB                Medication Administration Summary
```

| | | | | |
|---|---|---|---|---|
| Patient | Moore Eric | | Responsible Doctor David Ignatius, MD | |
| Account Number | SA7002869084 | Location   ED.AH | Unit Number | |
| Age/Sex | 40/M | Room | Registered Date 12/09/19 | |
| Status | DEP ER | Bed | Discharged Date | |

```
Height    5 ft        8 in  172.72 cm          Body Surface Area   2.04 m2
Weight  200 lb        oz   90.718 kg

Drug Allergies  No Known Drug Allergies (No Known Drug Allergies)

ADRS  Not Recorded

Creatinine Test Results
                                    LABORATORY
Date    Time Test              Result                    Flag Normal Range
12/09/19 0630 Creat            0.9                            0.6-1.4 mg/dL
```

```
SODIUM CHLORIDE 0.9% 1,000 ML BAG  (1,000 ML)

    Admin Route IV
    Site      IV
    Volume    1.000        Rate 999 MLS/HR            Duration 1 HR 1 MIN
    Frequency  .Q1H1M (ONE)
    Start Date 12/09/19-0618        Stop Date 12/09/19 0718     DC Date 12/09/19-0718
    Ordering Doctor    David Ignatius, MD
    Last Bag   0
    Total Dispensed   0          Total Costs $           Total Charges $
    Rx Number    AH00661144

    Discontinue Comments Reached Stop Date
```

| Admin Date  Time  User | Given Bag | Reason Code | Items | Charge |
|---|---|---|---|---|
| 12/09/19   0634 DJS16 | Y | | 1 | 0.00 |
| (12/09/19) (0618) Rate: 999 MLS/HR | | | | |
| Admin Totals | | | 1 | 0 |

```
Titrations:
    Date-Time      Action         Rate              Dose Rate          User
12/09/19-0618  Started        999 MLS/HR                              DJS16

    History
```

```
DATE: 12/10/19 @ 0141              Northeast Steward Health - SHC                    PAGE 2
USER: PHARMKGJOB                 Medication Administration Summary
```

| | | | |
|---|---|---|---|
| Patient ▓▓▓▓▓ | | Responsible Doctor David Ignatius, MD | |
| Account Number SA7002869084 | Location ED.AH | Unit Number ▓▓▓▓▓▓ | |
| Age/Sex 40/M | Room | Registered Date 12/09/19 | |
| Status DEP ER | Bed | Discharged Date | |

| Moore,Eric | SA7002869084 | (Continued) |
|---|---|---|

KETOROLAC 30 MG/ML INJ  (30 MG)
     (TORADOL INJ)

     Dose           30 MG  (1 ML)
     Admin Route IV
     Frequency     ONCE (ONE)
     Start Date 12/09/19-0619          Stop Date 12/09/19 0620          DC Date 12/09/19-0620
     Ordering Doctor     David Ignatius, MD
     Total Dispensed       1          Total Costs $0.00               Total Charges $16.50
     Rx Number    AH00661145
     Label Comments: PUT ANY UNUSED MEDICATION IN THE BLACK
                     CONTAINER.

     Discontinue Comments Reached Stop Date

| Admin Date | Time | User | Given | Bag | Reason Code | Items | Charge |
|---|---|---|---|---|---|---|---|
| 12/09/19 | 0634 | DJS16 | Y | | | 1 | 0.00 |
| (12/09/19) (0619) Dose: 30 MG | | | | | | | |

     Admin Totals                                                          1              0

     History

```
This is the end of the MAR Summary for Patient SA7002869084 - Moore,Eric.
```

JA676

DATE: 12/10/19 @ 0141
USER: PHARMACY

Northeast Steward Health - BIC
Medication Discharge Summary Report

PAGE 1

Name
Unit Num
Account Num
Allergies

Admit Date
Discharge Date
Status

Age 63
Sex M

12/10/19

No Known Drug Allergies

MORPHINE SULFATE 0.9% 1,000 ML BAG 1,000 ML
(MORPHN SULFATE 0.9% 1,000 ML BAG)
PF9 9 MG/HR IV CONTIN-ORD
RX #: A8105G5144

| | 12/05/19 | 08S8 CONTIN at RESU DATE: PF9 MG/HR |
| | 12/05/19 | Reason Medication: |
| | | RUCTION: (DS4470SR5Y (ROUTE: MOUS) |
| | | Admin Courier |
| | | Increase/Decrease: Started Infusion Rate: 999 |

YUMATEC IMS (NATURELLE) 32 MG/ML (IMS)
26 MG IV ONCE-ORD
Comments: PF9 NOT UNITED MEDICATION IN THE NIGHT
COMPLAINE.
RX #: A8106G5165

| | 12/07/19 | MG/P SULT at RESU DATE: 26 MG |
| | 12/05/19 | Reason Medication: RUCTION |

SODIUM CHLORIDE 0.9% 1,000 ML BAG 1,000 ML
(SODIUM CHLORIDE 0.9% 1,000 ML BAG)
PF9 ML/HR IV CONTIN-ORD
RX #: A8106G5144

| | 12/07/19 | RC 0718 |
| | 12/08/19 | RUC 7702 |

*** Continued on Page 2 ***

This document is part of the legal medical record.

**JA677**

Case: 23-1697    Document: 00118074653    Page: 682    Date Filed: 11/15/2023    Entry ID: 6604069

DATE: 12/10/15 @ 21:
USER: PROVIDER

12/10/15

Name Redacted



Northeast Medical Health - ECC
Medication Discharge Summary Report

Unit Num 2678092938                          Account Num 1970026068

PAGE 2

ACTIVITY (CPM)
ACE - Acknowledged Sides
DC - Discontinue
INVERSION - Infection in Progress

Administered By

Pharmacy

Allergy History

**JA678**

```
Run Date: 12/15/19                          St. Anne's Hospital
Run Time: 0107                               795 Middle Street
                                            Fall River, MA 02721
Phone: 508-674-5600              Medical Director: Robert Bagdasaryan, M.D.
```

| PATIENT | SEX | AGE | DATE OF BIRTH | LOCATION | DATE PRINTED |
|---|---|---|---|---|---|
| Moore,Eric | M | 40 | | ED.AH | 12/15/19 |
| | | | | | # 0107 |

| MED REC # / ACCT # | ADMIT DATE | DISCH DATE | SUBMITTING DOCTOR |
|---|---|---|---|
| / SA7002869084 | 12/09/19 | | Thomas Ross, MD |

### Hematology

| Date | 12/09/2019 | | |
|---|---|---|---|
| Time | 0630 | Reference | Units |
| WBC | 9.0(*a) | (4.5-11.0) | X10 3/ |
| RBC | 4.90(*a) | (4.00-5.60) | X10 6/ |
| HGB | 15.1(*a) | (13.0-17.0) | g/dl |
| HCT | 42.3(*a) | (37.5-50.0) | % |
| MCV | 86.3(*a) | (80.0-100.0) | fl |
| MCH | 30.8(*a) | (27.0-34.0) | pg |
| MCHC | 35.7(*a) | (31.0-36.0) | g/dl |
| RDW | 12.9(*a) | (11.5-15.0) | % |
| Plt | 183(*a) | (150-400) | X10 3/ |
| Im Gran% (Auto) | 0.4(*a) | | % |
| Neut % (Auto) | 65.9(*a) | | % |
| Lymp % (Auto) | 23.3(*a) | | % |
| Mono % (Auto) | 8.5(*a) | | % |
| Eos % (Auto) | 1.6(*a) | | % |
| Baso % (Auto) | 0.3(*a) | | % |
| Im Gran# (Auto) | 0.04(*a) | (0.00-0.09) | X10 3/ |
| Neut # (Auto) | 6.0(*a) | (1.5-7.8) | X10 3/ |
| Lymph # (Auto) | 2.1(*a) | (1.0-4.8) | X10 3/ |
| Mono # (Auto) | 0.8(*a) | (0.0-0.8) | X10 3/ |
| Eos # (Auto) | 0.1(*a) | (0.0-0.5) | X10 3/ |
| Baso# (Auto) | 0.0(*a) | (0.0-0.2) | X10 3/ |
| ESR | 7(*a) | (0-15) | mm/hr |
| NRBC% | 0.0(*a) | (0.0-0.0) | /100 W |

```
NOTES:  (*a) St. Anne's Hospital Lab
        St. Anne's Hospital Laboratory  795 Middle St.  Fall River, MA. 02721
        Bagdasaryan, Robert M.D., Medical Director
```

SA7002869084 - Moore,Eric ( ) DEF(/) 40/M Thomas Ross, MD

```
Run Date: 12/15/19                        St. Anne's Hospital
Run Time: 0107                              795 Middle Street
                                          Fall River, MA 02721
Phone: 508-674-5600            Medical Director: Robert Bagdasaryan, M.D.
```

| PATIENT | SEX | AGE | DATE OF BIRTH | LOCATION | DATE PRINTED |
|---|---|---|---|---|---|
| Moore,Eric | M | 40 | | ED.AH | 12/15/19 |
| MED REC # / ACCT # | | | | | @ 0107 |
| / SA7002869084 | | ADMIT DATE | DISCH DATE | SUBMITTING DOCTOR | |
| | | 12/09/19 | | Thomas Ross, MD | |

| Chemistry |
|---|

| Date | 12/09/2019 | | | |
|---|---|---|---|---|
| Time | 0630 | | Reference | Units |
| NA | 139(*b) | | (137-146) | mmol/L |
| K | 3.9(*b) | | (3.5-5.3) | mmol/L |
| CL | 105(*b) | | (98-107) | mmol/L |
| CO2 | 20(*b) L | | (23-32) | mmol/L |
| Gap | 14(*b) | | (5-15) | mmol/L |
| BUN | 19(*b) | | (5-25) | mg/dl |
| Creat | 0.9(*b) | | (0.6-1.4) | mg/dL |
| Creat Calc PHA | 105.6(A) | | | ml/min |

(A)   "This value is calculated by Cockcroft Gault Equation using
       ideal body weight.  This result is dependent on an accurate
       patient height and weight which is obtained from patients
       medical record."  Cockcroft, D.W. and M.H. Gault
       Prediction of creatinine clearance from serum creatinine.
       Nephron. 1976. 16(1):31-41.
       See also (*b)

| EGFR AA | > 60(*b) | | (>=60 mL/mi | |
|---|---|---|---|---|
| EGFR NAA | > 60(*b) | | (>=60 mL/mi | |
| BUN/Creat Ratio | 21.1(*b) H | | (10.0-20.0) | |
| Glu | 102(*b) H | | (<100 -Fast mg/dL | |
| Lactic | 1.7(*b) | | (0.5-2.2) | mmol/L |
| CA | 9.4(*b) | | (8.6-10.3) | mg/dl |
| TOTAL BILI | 0.9(*b) | | (<1.2) | mg/dl |
| AST | 18(*b) | | (15-41) | U/L |
| Alt | 24(*b) | | (14-63) | U/L |
| CRP | 0.30(*b) | | (<0.50) | mg/dl |
| TP | 7.0(*b) | | (6.4-8.3) | g/dL |
| Alb | 4.4(*b) | | (4.0-5.0) | g/dl |
| A/G Ratio | 1.6(*b) | | (1.0-2.6) | |
| Alk Phos | 61(*b) | | (40-129) | U/L |

```
NOTES:  (*b)  St. Anne's Hospital Lab
              St. Anne's Hospital Laboratory  795 Middle St.  Fall River, MA. 02721
              Bagdasaryan, Robert M.D.. Medical Director
```

```
SA7002869084 - Moore,Eric (          )  DEP(✓) 40/M Thomas Ross, MD
```

```
Run Date: 12/15/19                St. Anne's Hospital
Run Time: 0107                     795 Middle Street
                                   Fall River, MA 02721
Phone: 508-674-5600         Medical Director: Robert Bagdasaryan, M.D.
```

| PATIENT | SEX | AGE | DATE OF BIRTH | LOCATION | DATE PRINTED |
|---------|-----|-----|---------------|----------|--------------|
| Moore,Eric | M | 40 | ▇▇▇▇ | ED.AH | 12/15/19 |
| | | | | | @ 0107 |

| MED REC # ▇▇ | ACCT # SA7002869084 | ADMIT DATE 12/09/19 | DISCH DATE | SUBMITTING DOCTOR Thomas Ross, MD |
|---|---|---|---|---|

---

**Microbiology**

---

Specimen: 19:BC0061401S                Collection Date - Time: 12/09/19 0630
Source: Blood

> Blood Culture (*c)                   Final 12/14/19
                                       NO GROWTH AFTER 5 DAYS

Specimen: 19:BC0061402S                Collection Date - Time: 12/09/19 0630
Source: Blood

> Blood Culture (*c)                   Final 12/14/19
                                       NO GROWTH AFTER 5 DAYS

NOTES:   (*c) Good Samaritan Medical Center
              Good Samaritan Medical Center 235 North Pearl Street Brockton, MA 02301
              Garrey Faller, MD - Medical Director

SA7002869084 - Moore,Eric (AH20022418)  DEP(/) 40/M Thomas Ross, MD
```

**JA681**

**Saint Anne's Hospital**

Steward Health Care
795 MIDDLE STREET
FALL RIVER, MA 02721
508-674-5600

Patient Name: Moore,Eric
Address: 7 Harbor Meadows
City/State/Zip: WESTPORT,MA 02790
Phone: (812)599-9905
DOB/Age/Sex: ████████40/M

Medical Record#: ██████████
Account#: SA7002869084
Attending Dr: David Ignatius MD
Insurance: Self Pay

Admit/Reg Date: 12/09/19
Location: ED.AH/

Ordering Dr: David Ignatius, MD
PCP: Pcp-None,Md
Date of Service: 12/09/19

Order (s): CT hip RT wo con
CPT Code: 73700
Reason for Exam: severe r hip pain 2 days,limited movement,

Report Number: IMG1209-0267

**\*\*ADDENDUM\*\***

Addendum: 12/9/2019 9:59 AM
The report from teleradiology services has become available.
This raises the question of myositis which is quite possible.
There is still likely element of possible inflammatory change adjacent to the area of density within the
distal portion of the gluteus medius on the right.
Impression: Consider also myositis ossificans.

Addendum Dictated By: Bruce Bertrand, MD
Addendum Signed By: Bruce Bertrand MD  12/09/19 1000

DD/DT: 12/09/19/0952
TD/TT: 12/09/19/0952

CT hip RT wo con

Clinical:  severe r hip pain 2 days,limited movement,

Comparison:  None

Technique:  A helical scan was obtained through the bony pelvis. No intravenous contrast was
administered. Coronal, axial and sagittal reconstructions are reviewed. CT examination was performed
utilizing dose reduction techniques with auto exposure control and/or iterative reconstruction.

**JA682**

Saint Anne's Hospital
Patient name: Moore, Eric
Account #: SA7002869084

Report Number: IMG1209-0287
Medical Record #: ██████

Findings: Bony elements are unremarkable. There is no evidence of fracture or subluxation. No sclerotic or lucent areas are identified.
Joint spaces are well-maintained.
There is an area of increased density within the gluteus medius muscle before its insertion into the trochanteric region. There is also slight induration of the fat adjacent to this area beneath the fascial layer. Findings may be consistent with a tear of the muscle in the region. The remainder of the muscles in the area otherwise unremarkable.

Impression: Slight increase in density in the body of the gluteus medius. Question of a muscle tear with small amount of hemorrhage in the area.

Dictated By: Bruce Bertrand, MD  12/09/19 0841
Signed By: Bertrand,Bruce MD  12/09/19 0851

TD/TT: 12/09/19 0841          Tech: SA:HAEP01

cc: IGNDA; PCPNO*

David Ignatius, MD; Pcp-None,Md

**JA683**

JA684





Page: 8

Nurse Rule
Faci: St. Anne's Hospital                                                   Medi~
40 M                                                            Med Rec Num:  V1a1113A702165914

Loc: Emergency                Pain Management
Order:
12/09/19 06:00
ED Nontraumatic Extremity Injury Agent
Freq:
Protocol:
Document:     DS (Rec: 12/09/19 06:06 DS SA321690)           Start: 12/09/19 05:52
Extremity Problem Nontraumatic                               Status: Discharge
  Complaint Initiation
  Right Lower Extremity
  Symptom/Complaint
Onset:                          Extremity Pain
                                Pain started saturday, much
                                worse when pt wakes up this
                                morning
Consistency                     Constant
Radiation                       Contrast
Context                         Unknown
Improves With                   Rest
Worsens With                    Range of Motion, Weight Bearing
                                , Walking, Exertion, Palpation
Associated Symptoms             Denies Other symptoms
Sensation
Right Hip
Sensation Description           Pain
Movement
Right Leg
Movement Description Massing/Strength
                                +4 - Full ROM, Less Than
Comment                         Normal Strength,
Nontraumatic Extremity Injury Comment (
Comment
Nontraumatic Extremity Injury Comment           Pt states he started with
(A)                                             right hip pain on saturday
                                                night that has gotten
                                                progressively worse, to the
                                                point where he can not bear
                                                weight on the leg. Area
                                                tender to palpation. Pt denies
                                                any injury to that leg/hip.

12/09/19 06:38
ED Vital Sign/Progress Note
Freq:
Protocol:
Document:     DS (Rec: 12/09/19 06:38 DS SA321690)           Start: 12/09/19 05:52
ED Vital Sign/Progress Note                                  Status: Discharge
  Pulse
  Pulse On Machine
  Pulse Rate (60-99 beats/min)     71
  Respiration
  Respiratory Rate (12-24 breaths/min)   18
  Oxygen
  Pulse Oximetry (95-100 %)        97
  Oxygen Delivery Method           None Air
  Blood Pressure
  Left Arm
  Blood Pressure (90/60-140/90 mmHg)  122/80

Continue on Page 19
Legal Medical Record

---

Page: 19

Nurse Rule
Faci: St. Anne's Hospital                                              Medi~
40 M                                                         Med Rec Num:  V1a1113A702165914

                              Blood Pressure Worn (mm Hg)            Automatic Cuff
  Source
  Position                                                           Supine
12/09/19 06:42
IV/Invasive Line Status
Freq:
Protocol:
Document:     DS (Rec: 12/09/13 06:42 DS SA321690)           Start: 12/09/19 05:52
IV/Invasive Line Assessment                                  Status: Discharge
  IV Location
  Left Antecubital
  Fluid Start?
  Fluid Start?                                               No
  Date of Insertion                                          12/09/13
  Insertion Attempts                                         1
  Reason for IV Insertion                                    Provide Access for IV
                                                             Medication(s)
  IV Catheter Type                                           saline lock
  Site Observation                                           Asymptomatic Intact, Patent
  Dressing Applied                                           Transparent Film Dressing
  Line Care                                                  Saline Flush-Check, Blood
                                                             Return

12/09/19 07:10
ED Vital Sign/Progress Note
Freq:
Protocol:
Document:     RC (Rec: 12/09/13 07:10 RC SA321690)           Start: 12/09/13 07:52
ED Vital Sign/Progress Note                                  Status: Discharge
  Pulse
  Pulse On Machine
  Pulse Rate (60-99 beats/min)     70
  Respiration
  Respiratory Rate (12-24 breaths/min)   18
  Oxygen
  Pulse Oximetry (95-100 %)        95
  Oxygen Delivery Method           None Air

12/09/19 07:10
ED Vital Sign/Progress Note
Freq:
Protocol:
Document:     DR (Rec: 12/09/13 07:10 DR SA321394)           Cate assumed at this time.
ED Vital Sign/Progress Note                                  Start: 12/09/13 05:52
  Blood Pressure                                             Status: Discharge
  Left Arm
  Blood Pressure (90/60-140/90 mmHg)    125/85
  Blood Pressure Worn (mm Hg)     101
  Source                           Automatic Cuff
  Progress Note
  Progress Note                    Exit of Care to Ryan, RN.

12/09/19 07:54
ED Discharge Assessment
Freq:
Protocol:

Continued on Page 11
Legal Medical Record

Page: 11

Moron Eric
Fac: St. Anne's Hospital    Med: W141153070265916B
40 H    Hst Enc Number    Loc:Emergency

| Document | RC (Enc) 12/09/13 09:35  RC 52MC-8698 | | |
|---|---|---|---|
| **Vital Signs** | | | |
| Pulse | | | |
| Pulse Ox Machine | | | |
| Pulse Rate (60-90 beats/min) | 66 | | |
| Respiration | | | |
| Respiratory Rate (12-24 breaths/min) | 18 | | |
| Oxygen | | | |
| O2 Sat by Pulse Oximetry (95-100 %) | 98 | | |
| Oxygen Delivery Method | Room Air | | |
| **Blood Pressure** | | | |
| Left Arm | | | |
| Blood Pressure (90/60-140/90 mmHg) | 129/93 | | |
| Blood Pressure Mean (bp mg) | 90 | | |
| Blood Pressure Source | Automatic Cuff | | |
| **IV Medication** | | | |
| IV Medication Intake | | | |
| Sodium Chloride 0.9% 1,000 ml @ 999 ml/hr | IV -QUEEN ORD Ref:AQ0046601:14 | | |
| Predefined w/Fluids Running | No | | |
| Rate Infusion Completed | 12/09/15 | | |
| Infusion Stop Time | 09:36 | | |
| **ED Discharge Assessment** | | | |
| Discharge Information | | | |
| Interpreter Required | No | | |
| Query Facility was utilize the My Stewart or use Phone/video | | | |
| Discharged with Whom | Self | | |
| Mode of Discharge | Ambulatory | | |
| Discharge Instructions Reviewed: Able To | Yes | | |
| Teach Back | | | |
| Instructions Provided By | RN | | |
| Teaching Recipient | Patient | | |
| Learning Response | Verbalized Understanding | | |
| Discharge Comment | | | |
| Discharge Consent | Pty discharged with all scripts and instructions. Pt verbalized understanding of instructions and reasons to return to ED. | | |
| **Belongings** | | | |
| Valuables Sent Attached | No | | |
| Essential Belonging(s) sent with Patient | None | | |
| 12/09/15 09:45 | | | Start: 12/09/13 09:45 |
| Status: Discharge | | | |
| **Fall Agreement** | | | |
| Freq: | | | |
| Protocol: | | | |
| Edit Status  RMG DAEMON (Enc) 12/09/13 09:15  RMG DAEMON  52E1-3039) | | | Start: 12/09/13 05:45 |
| Active=>Discharge | | | Status: Discharge |
| **Rsk Assessment** | | | |
| Freq: | | | |
| Protocol: | | | |
| Edit Status  RMG DAEMON (Enc) 12/09/13 09:16  RMG DAEMON  52E1-3039) | | | Start: 12/09/13 05:45 |
| Active=>Discharge | | | Status: Discharge |

Continued on Page 12
Legal Medical Record

---

Page: 12

Moron Eric
Fac: St. Anne's Hospital    Med: W141153070265916B
40 H    2nd Enc Number    Loc:Emergency

| **ED Triage Assessment** | | | |
|---|---|---|---|
| Freq: | | | |
| Protocol: S.FRANCE | | | |
| Edit Status  RMG DAEMON (Enc) 12/09/13 09:56  RMG DAEMON  52E1-3039) | | | Start: 12/09/13 03:52 |
| Active=>Discharge | | | Status: Discharge |
| **Falls/Special History Assessment** | | | |
| Freq: | | | |
| Protocol: | | | |
| Edit Status  RMG DAEMON (Enc) 12/09/13 09:56  RMG DAEMON  52E3-3039) | | | Start: 12/09/13 03:52 |
| Active=>Discharge | | | Status: Discharge |
| **ED Discharge Assessment** | | | |
| Freq: | | | |
| Protocol: | | | |
| Edit Status  RMG DAEMON (Enc) 12/09/13 09:56  RMG DAEMON  52E1-3039) | | | Start: 12/09/13 03:52 |
| Active=>Discharge | | | Status: Discharge |
| **Columbia Suicide Risk Rating Scale** | | | |
| Freq:  AIM/PRN | | | |
| Protocol: N.CSS | | | |
| Edit Status  RMG DAEMON (Enc) 12/11/13 09:55  RMG DAEMON  52E1-3039) | | | Start: 12/09/13 03:52 |
| Active=>Discharge | | | Status: Discharge |
| **Fall Risk Assessment: Tool-John Hopkins** | | | |
| Freq: | | | |
| Protocol: | | | |
| Edit Status  RMG DAEMON (Enc) 12/09/13 09:56  RMG DAEMON  52E3-3039) | | | Start: 12/09/13 05:52 |
| Active=>Discharge | | | Status: Discharge |
| **Height/Weight Assessment** | | | |
| Freq: | | | |
| Protocol: | | | |
| Edit Status  RMG DAEMON (Enc) 12/09/13 09:56  RMG DAEMON  52E1-3039) | | | Start: 12/11/13 03:52 |
| Active=>Discharge | | | Status: Discharge |
| **Patient Safety/Precautions** | | | |
| Freq: | | | |
| Protocol: | | | |
| Edit Status  RMG DAEMON (Enc) 12/09/13 09:56  RMG DAEMON  52E3-9039) | | | Start: 12/09/13 03:52 |
| Active=>Discharge | | | Status: Discharge |
| **ED Vital Signs/Progress Note** | | | |
| Freq: | | | |
| Protocol: | | | |
| Edit Status  RMG DAEMON (Enc) 12/09/13 09:56  RMG DAEMON  52E3-3039) | | | Start: 12/09/13 03:52 |
| Active=>Discharge | | | Status: Discharge |
| **IV/Invasive Line Status** | | | |
| Freq: | | | |
| Protocol: | | | |
| Edit Status  RMG DAEMON (Enc) 12/09/13 09:56  RMG DAEMON  52E3-3039) | | | Start: 12/09/13 03:52 |
| Active=>Discharge | | | Status: Discharge |

continued on Page 13
Legal Medical Record



Saint Anne's Hospital
795 Middle Street
Fall River, MA 02721
(508) 674-5600

# Discharge Summary
# (Chart Copy)

Date:    12/09/2019
Time:    9:24 a.m.

Treating Provider:   Thomas Ross, MD       Phone: (508)674-5600     Fax:    (508)675-5835

Provider Signature:   <Electronically signed by Thomas Ross,MD.>

Supervised Provider:

| Patient Name: | Eric Moore | MR#: | | Account: | SA7002869084 |
|---|---|---|---|---|---|
| Patient Address: | 7 Harbor Meadows WESTPORT , MA 02790 | Phone: | (812)599-9905 | | |

**Your Discharge Instructions:**

**Your Prescriptions:**

Ibuprofen (Motrin) 600 Milligram # 30 Tablets
1 TABLET EVERY 6 HOURS (0 Refills).Printed.

You should follow up with the following physician in 3 to 5 days:

Physician Name: Marc Adams, DO, physiatry      Specialty:   Physical Medicine &

Address:     851 Middle street Ste 3300       Phone:    (508)689-3214
           Fall River MA 02721 , MA 02721

Follow-up Notes:   On 12/09/2019 this patient was treated at Saint Anne's Hospital
         for Refer to Discharge Instruction List.
         Additional Notes: For follow up of your injury. Please call to set up an appointment. Ice the area for the next
         couple of days, before switching to heat. Tylenol in addition to the motrin for pain. .

I understand that the emergency care I received is not intended to be complete and definitive medical care and treatment. I
acknowledge that I have been instructed to contact the above physician(s) as indicated for continued and complete medical
diagnosis, care, and treatment. EKG's, X-rays, and lab studies will be reviewed by appropriate specialists and I will be notified of
significant discrepancies. I also understand that my signature authorizes this Medical Center to release all or any part of my
medical record (including, if applicable, information pertaining to AIDS and/or HIV testing, mental health records, and drug and/or
alcohol treatment) to the follow-up physician indicated above.

I have read and understand the above, received a copy of applicable inst ruction sheets, and will arrange for follow-up care.    12/9/12
                                                                             6140

_Eric Moore_

Signature      Patient/Parent/Guardian    Date/Time           Signature      Instructed By      Date/Time

                                                                       Page 1 of 1

Moore,Eric    M
UN#:
DOB:        AGE:49
SVC: 12/09/19     REG:
PT: SA7002869084
PCP: Pcp-None,Md

Saint Anne's Hospital
795 Middle Street
Fall River, MA 02721
(508) 674-5600

**Discharge Instructions
(Patient Copy)**

Date:     12/09/2019
Time:     11:18 a.m.

| Treating Provider: | Thomas Ross, MD | Phone: (508)674-5600 | Fax: | (508)675-5635 |

Supervised Provider:

Patient Name:          Eric Moore                                    Phone:    (812)599-9905

Patient Address:       7 Harbor Meadows
                       WESTPORT , MA 02790

---

Patient Discharge Instructions:

### Work Release Form

This notice verifies that your employee, ____Eric Moore_____

was seen in this facility on ____12/09/19_____ .

He/she may return to work on ____12/10/19_____ with the following restrictions:
None:
   No heavy lifting:X
   No prolonged standing:X
   Desk Work Only:_____
   Other: Can operate machinery & drive a truck

Restrictions: Until cleared by patient's primary care doctor and/or sports medicine/physiatry

NOTE: If symptoms continue and the employee is unable to perform the full duties of their job by this date, please advise the employee to return to this facility or make an appointment with the referral physician for further evaluation.

____Thomas Ross____
        Attending MD

I understand that the emergency care I received is not intended to be complete and definitive medical care and treatment. EKG's, X-rays, and lab studies will be reviewed by appropriate specialists and  I will be notified of significant discrepancies.

Page 1 of 1

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

Give Form to the
requester. Do not
send to the IRS.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

ROGER OBERKRAMER

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

☑ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

#12 HERITAGE COURT

**6** City, state, and ZIP code

FENTON, MO  63061

Requester's name and address (optional)

**7** List account number(s) here (optional)

*Print or type
See Specific Instructions on page 2.*

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

**Redacted**

or

Employer identification number

_ _ - _ _ _ _ _ _ _

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

Sign Here

Signature of U.S. person ▶ *Roger Oberkramer*     Date ▶ *11/2/17*

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X                                                Form **W-9** (Rev. 12-2014)

**Message**

| | |
|---|---|
| **From**: | Mike Roberts [/O=CDCCO/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MIKE] |
| **Sent**: | 11/25/2019 10:58:27 AM |
| **To**: | Becky Lydon [blydon@cdcco.com] |
| **Subject**: | RE: Trucks |

You handle

**From:** Becky Lydon <blydon@cdcco.com>
**Sent:** Monday, November 25, 2019 9:36 AM
**To:** Mike Roberts <mroberts@cdcco.com>
**Subject:** FW: Trucks

Not sure if you talked to Roger today and not sure what mood he is in but the below is unacceptable.  He needs to understand the severity of what this is.

You want to talk him or me.

**From:** Russ Becker <rbecker@enviroanalyticsgroup.com>
**Sent:** Monday, November 25, 2019 7:42 AM
**To:** Becky Lydon <blydon@cdcco.com>
**Subject:** FW: Trucks

Becky,
This is an unacceptable response from Roger.  Heather is the Industrial Demolition safety coordinator and needs to be allowed to do her job.  We are preparing for an OSHA inspection.

Not sure what Roger is thinking but he does not have this authority.

We will talk today.

**From:** Heather Minton <heather@allarounddemolition.com>
**Sent:** Monday, November 25, 2019 8:38 AM
**To:** Russ Becker <rbecker@enviroanalyticsgroup.com>
**Subject:** Trucks

Russ, I'm not sure how I am supposed to do safety and run 50 trucks threw the scale? This morning I did not attend a meeting for national grid Roger came up to the scale and said I'm either going to work for industrial or work at safety? What exactly does that mean?

Heather Minton
All Around Demolition
Ph: 812-632-1695
heather@allarounddemolition.com
www.allarounddemolition.com

Confidential                                                              Industrial Demo_Moore 003100

Message

| | |
|---|---|
| **From**: | Becky Lydon [blydon@cdcco.com] |
| **Sent**: | 11/25/2019 8:55:51 AM |
| **To**: | Russ Becker [rbecker@enviroanalyticsgroup.com] |
| **Subject**: | RE: Trucks |

That would be a John McNulty question.

Obviously safety is more important than Heather doing the scale for them although I know we do have scrap going out.

**From:** Russ Becker <rbecker@enviroanalyticsgroup.com>
**Sent:** Monday, November 25, 2019 7:50 AM
**To:** Becky Lydon <blydon@cdcco.com>
**Subject:** RE: Trucks

Note that about half of the trucks are salt trucks for Patriot....So – is Patriot helping?

Roger needs to back off with his threats

**From:** Becky Lydon <blydon@cdcco.com>
**Sent:** Monday, November 25, 2019 8:48 AM
**To:** Russ Becker <rbecker@enviroanalyticsgroup.com>
**Subject:** RE: Trucks

I talked to him on Saturday and we are going to have to find someone to help her at the scale.

**From:** Russ Becker <rbecker@enviroanalyticsgroup.com>
**Sent:** Monday, November 25, 2019 7:42 AM
**To:** Becky Lydon <blydon@cdcco.com>
**Subject:** FW: Trucks

Becky,
This is an unacceptable response from Roger. Heather is the Industrial Demolition safety coordinator and needs to be allowed to do her job. We are preparing for an OSHA inspection.

Not sure what Roger is thinking but he does not have this authority.

We will talk today.

**From:** Heather Minton <heather@allarounddemolition.com>
**Sent:** Monday, November 25, 2019 8:38 AM
**To:** Russ Becker <rbecker@enviroanalyticsgroup.com>
**Subject:** Trucks

Russ, I'm not sure how I am supposed to do safety and run 50 trucks threw the scale? This morning I did not attend a meeting for national grid Roger came up to the scale and said I'm either going to work for industrial or work at safety? What exactly does that mean?

Confidential                                                                 Industrial Demo_Moore 002507

# JA695

Heather Minton
All Around Demolition
Ph: 812-632-1695
heather@allarounddemolition.com
www.allarounddemolition.com

Confidential                                                   Industrial Demo_Moore 002508

**JA696**

**Message**

| | |
|---|---|
| **From**: | Becky Lydon [blydon@cdcco.com] |
| **Sent**: | 4/23/2020 7:54:48 AM |
| **To**: | Mike Roberts [mroberts@cdcco.com] |
| **CC**: | Becky Lydon [blydon@cdcco.com] |
| **Subject**: | Today and Good Morning! |

Mike,

I received a call at 5:00 a.m. from Roger telling me he had words with Billy Minton and could I keep him at the top of the hill until he was gone. As I am talking to Roger, Billy is trying to get hold of me and I received a text from Russ. Roger threatened Billy and Heather's lives –which I totally believe considering he had done it to others before. I talked Billy out of calling the cops for now so we could see if Roger was off site within the hour. Roger told me he was waiting on a truck to get his RV, although according to Billy, it wasn't even moved out of the building yet. If he is not off site and continues to disrupt everything up there, it is out of my hands what they (all the employees up there) do- they are done with him, tired of him and tired of being afraid of him. He is stalling hoping you will call him and beg him to stay again otherwise he would have been out by now. He tried staying on site with a different approach with me yesterday stating that Carver was in a real mess that they only had one card holder and he asked Roger to stick around and help so he didn't get caught when they came to check on cards again. I told him no, have Hunter call me and I will see what I can do but that he needed to concentrate on vacating the site and Carver will have to come to the realization that you (meaning Roger) would no longer be on site. He made his own mess, not me, not you, just him.

It isn't fair to everyone else onsite to put up with this either. He needs to be offsite right away whether his RV is still there or not. Not like he was driving it home anyway. We can let the truck in to get it and make sure it gets out. He is just staying around now get last dibs in to certain people. People that did nothing to him except come to work every day. I think the timebomb is about to explode.

I was not even awake yet when I got these calls. I still don't feel good and then I have to put up with this bright and early because of Roger. I am going in but I am not sure how long I am staying.

*Rebecca Lydon*
*Chief Operating Officer*
*Commercial Development Co Inc*
*Environmental Liability Transfer Co Inc*
*EnviroAnalytics Group, LLC*
*1515 Des Peres Rd Ste 300*
*St. Louis, Mo 63131*
*(314) 835-2880 Direct*
*(314) 835-1616 Fax*
*blydon@cdcco.com*

This e-mail (including attachments, if any) may contain confidential and/or privileged material for sole use of the intended recipient and may also include attorney-client privileged communications and/or information protected by the attorney "work product" doctrine or other legal rules. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies. Moreover, This communication shall in no way be construed or interpreted to be an offer or acceptance of an offer relative to a real estate transaction; any binding agreement relative to a real estate transaction must be set forth in a final, comprehensive, written agreement signed by the parties intended to be bound.

JA697

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 22-10414-RWZ

ERIC MOORE

v.

INDUSTRIAL DEMOLITION, LLC

<u>QUESTIONS TO THE JURY ON SPECIAL VERDICT</u>

Please answer Questions 1 through 5.

1.  Did Plaintiff prove he had a handicap?

      Yes __X__             No _____

2.  Did Defendant fail to reasonably accommodate Plaintiff's handicap?

      Yes __X__             No _____

3.  Did Defendant terminate Plaintiff because of his handicap?

      Yes _____          No __X__

4.  Did Defendant retaliate by terminating Plaintiff for requesting or using a reasonable accommodation?

      Yes __X__             No _____

5.  Did Defendant retaliate by terminating Plaintiff for reporting that he had suffered a potential industrial accident?

      Yes _____          No __X__

If you answered <u>Yes</u> to any of Questions 1 through 5, please continue to Question 6.   If you answered <u>No</u> to each of Questions 1 through 5, please return your verdict to the court without answering Question 6.

**JA698**

**JA699**

6. The amount of Plaintiff's damages is $ _10,035.00_ .

    a. $ _10,035.00_      for back pay $95,590 - 85,555 = 10,035$

    b. $ _0_      for front pay

    c. $ _0_      for emotional distress.

_4-14-23_
DATE

_Paul Hackett_
FOREPERSON

**JA700**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ERIC MOORE,<br><br>            Plaintiff,<br><br>      v.<br><br>INDUSTRIAL DEMOLITION LLC,<br><br>           Defendant. | Civil Action No. 1:22-cv-10414-RWZ |

**DECLARATION OF ALEXANDRA M. BUCKINGHAM**

I, Alexandra M. Buckingham, do hereby depose and state as follows:

1.    I make the statements contained in this declaration based on my personal knowledge and am competent to testify as to all facts stated herein.

2.    I am a paralegal at the law firm Littler Mendelson, P.C., One International Place, Suite 2700, Boston, MA 02110. I support Attorneys Thomas M. Metzger and Alexa Esposito Allen who represent Defendant Industrial Demolition LLC in this matter.

3.    I attended the trial proceedings of this matter from April 11, 2023 through April 14, 2023.

4.    During the proceedings on the morning of April 14, 2023, the Court advised counsel that the jury would be given lunch between 12:00 p.m. and 1:00 p.m. (See Day 4 Transcript, p. 4-34-35).

5.    The Court also explained later in the morning that lunch would be sent to the jury at approximately 12:30 p.m. (See Day 4 Transcript, p. 4-85).

6.    On April 14, 2023, the jury received the case at approximately 11:15 a.m. After which time, the Court was in recess. (See Day 4 Transcript, p. 4-89).

**JA701**

7.    Later that morning, at 11:37 a.m., I sent an email to the courtroom clerk to provide the additional cell phone numbers for myself and Attorney Allen to ensure the Court could reach the trial team if needed.  A true and accurate copy of the email is attached hereto as **Exhibit A**.

8.    During the lunch break, Attorney Metzger, Attorney Allen, Michael Roberts and myself were meeting on the ground floor of the Envoy hotel which is located directly across the street from the courthouse at 70 Sleeper Street, Boston, MA 02210.

9.    I received a call on my cell phone at 1:00 p.m. from the courtroom clerk advising that the jury had a question. A screenshot showing the incoming call lasting 19 seconds is attached hereto as **Exhibit B**.

10.    I responded that we would return to the courtroom.

11.    Immediately, Attorney Metzger, Attorney Allen, Michael Roberts and I stood up from where we were, walked across the street to the courthouse and went through security.

12.    There were several people waiting for elevators and accordingly there was a slight delay in getting on an elevator to return to the 5$^{th}$ floor courtroom.

13.    The trial team was back in the courtroom by 1:08 p.m. This is confirmed in the official transcript from Trial Day 4, at page 4-90.

14.    I requested an official copy of the transcripts from days one through four of the trial proceedings which took place from April 11, 2023 to April 14, 2023.

15.    Attached here to as **Exhibit C** are true and accurate copies of excerpts from the transcript of the trial proceedings from Trial Day 2 which took place on April 12, 2023.

16.    Attached here to as **Exhibit D** are true and accurate copies of excerpts from the transcript of the trial proceedings from Trial Day 3 which took place on April 13, 2023.

**JA702**

17.    Attached here to as **Exhibit E** are true and accurate copies of excerpts from the transcript of the trial proceedings from Trial Day 4 which took place on April 14, 2023.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 15, 2023.

*/s/ Alexandra M. Buckingham*
Alexandra M. Buckingham

**JA703**

**CERTIFICATE OF SERVICE**

    I, Alexa M. Esposito, hereby certify that on this 12th day of May 2023, the foregoing document was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

                                      /s/ Alexa M. Esposito
                                      Alexa M. Esposito

# EXHIBIT A

**Buckingham, Alexandra**

| | |
|---|---|
| **From:** | Buckingham, Alexandra |
| **Sent:** | Friday, April 14, 2023 11:37 AM |
| **To:** | Lisa Urso |
| **Cc:** | Allen, Alexa Esposito; Metzger, Thomas |
| **Subject:** | Industrial Demo / Moore - Additional Contacts |

Hi Lisa,

I am writing to provide some additional cell phone numbers in case you need to reach us:

Alex Buckingham 816-766-3571 or 760-420-2626

Alexa Esposito Allen 617-595-5818

Thank you.

Sincerely,
Alex

1

**JA706**

# EXHIBIT B



**JA708**

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
ERIC MOORE,                         )
                                    )          Civil Action
          Plaintiff,                )          No. 22-10414-RWZ
                                    )
v.                                  )
                                    )
INDUSTRIAL DEMOLITION LLC,          )
and MICHAEL J. ROBERTS,             )
                                    )
          Defendants.               )
                                    )
```

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE

JURY TRIAL DAY TWO

April 12, 2023

John J. Moakley United States Courthouse
Courtroom No. 12
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1   APPEARANCES:

 2   Duddy, Goodwin & Pollard
     Jamie Goodwin, Esq.
 3   2 Liberty Square, 10th Floor
     Boston, Massachusetts 02109
 4   508.523.2632
     and
 5   Duddy, Goodwin & Pollard
     Michael Turiello, Esq.
 6   446 Main Street, 16th Floor
     Worcester, Massachusetts 01608
 7   860.999.9394
     For Plaintiff
 8
     Littler Mendelson P.C.
 9   Thomas M.L. Metzger, Esq.
     41 South High Street, Suite 3250
10   Columbus, Ohio 43215
     614.463.4216
11   and
     Littler Mendelson P.C.
12   Alexa Marie Esposito, Esq.
     One International Place, Suite 2700
13   Boston, Massachusetts 02110
     617.378.6000
14   For Defendants

15

16

17

18

19

20

21

22

23

24

25
```

```
         1   A.   Second page, that's on the back of the first page?
         2   Q.   I'm sorry.  Let's go to, it says page 1 of 2.  It's the
         3   St. Anne's Hospital.
         4        THE COURT:  Sorry.  What are we looking at?
11:01    5        MR. METZGER:  The second page of Exhibit Number 37,
         6   which has in the middle section, "Script RX, discharge packet
         7   signed.  St. Anne's Hospital."
         8        THE COURT:  The essentially empty page?
         9        MR. METZGER:  No, Your Honor.
11:01   10        THE CLERK:  It's on the back.
        11        THE COURT:  How much more do you have with this
        12   witness, approximately?
        13        MR. METZGER:  Approximately one hour.
        14        THE COURT:  How much?
11:01   15        MR. METZGER:  Maybe one hour or less.
        16        THE COURT:  Well, as soon as he answers this question,
        17   we'll take a recess.
        18        MR. METZGER:  Okay.  Very good.  I'll be very brief on
        19   this, Your Honor.
11:02   20   Q.   Sir, you recognize on page 2, and I believe it's displayed
        21   for you as well, this was another release form that had
        22   initially been discussed with you, right?
        23   A.   Yes, this was the first one.
        24   Q.   Okay.  And you'll see that this is the same form that we
11:02   25   just discussed, but down in the section on "Restrictions," you
```

```
        1    see that again?
        2    A.   Yes.
        3    Q.   It says there that you may be released to return to work
        4    on 12-16-2019, right?
11:02   5    A.   Yes.
        6    Q.   And it says that you can be released to return to work in
        7    one week with zero restrictions, right?
        8    A.   Correct.
        9    Q.   The medical evaluation you understand you were given as of
11:02  10    December 9, 2019, was that you could take a week off and you
       11    could come back to work, perform your full duties with zero
       12    restrictions, right?
       13    A.   Yes, but I couldn't afford that.
       14    Q.   Okay.  So the alternative that was discussed then was for
11:02  15    you to return to work the very next day?
       16    A.   Yes.
       17    Q.   With the restrictions for which you were accommodated,
       18    right?
       19    A.   Yes.
11:03  20    Q.   So the options essentially given to you were, take a week
       21    off, come back, you'll be at 100 percent performing your job,
       22    or you could get back to work the very next day with the
       23    company accommodating you?
       24    A.   Yes.
11:03  25             MR. METZGER:  Okay.  Thank you.  I can pause there.
```

96

1    Q.    And when you and Junior got up to that Unit 1, where you

2    were parking the gator, Roger continued to yell about the

3    bright lights, right?

4    A.    When I came up to him, yes.

11:42 5    Q.    And that's how this started; he's screaming about the

6    lights on, for whatever reason, right?

7    A.    I believe it started earlier in the day.

8    Q.    All right.  But in terms of him yelling on the radio,

9    you're pulling up, the focus at that point was him yelling

11:43 10    about the lights on, right?

11    A.    Yes, at that point.

12    Q.    You then say that the argument here escalated, right?

13    A.    Mm-hmm, yes.

14    Q.    And escalated to the point where he had said to you, "Hit

11:43 15    the gate, don't come back," or something to that effect, right?

16    A.    Yes.  He said, "I have no need of you here anymore.  Hit

17    the gate.  Don't come back.  Call the office."

18    Q.    Roger Oberkramer did not say to you that you were fired,

19    did he?

11:43 20    A.    He did not use those words.

21    Q.    He didn't give you a piece of paper or anything to say

22    that you were fired, did he?

23    A.    No.  That wasn't a practice on the site.

24    Q.    And he did tell you to call the office, right?

11:43 25    A.    Yes.

**JA714**

```
 1   back with me.
 2   Q.   He had promised that he'd get back to you?
 3   A.   Yes.
 4   Q.   And the next day he fulfilled that promise, didn't he?
11:47 5   A.   Yes.
 6   Q.   So you speak to him briefly on Monday, December 16.   The
 7   co-owner of the business says he's going to look into it.   He
 8   keeps his word, calls you back, right?
 9   A.   Yes.
11:47 10   Q.   You had this conversation with Mr. Roberts then on
11   December 17, 2019, right?
12   A.   Yes.
13   Q.   When you spoke to Mike Roberts on December 17, he did not
14   say that you were fired, did he?
11:48 15   A.   He did not use those words, no.
16   Q.   Mr. Roberts confirmed for you that you were welcome to
17   stay with the company if you wanted to stay, right?
18   A.   If I could work it out with Roger.
19   Q.   Okay.  Mr. Roberts also said to you that if you wanted to
11:48 20   quit, you could quit.  That was your choice, right?
21   A.   If that was part of the conversation.  I don't recall 100
22   percent.
23   Q.   Now, fair to say you can only quit a job that you don't
24   have, right?
11:48 25   A.   You quit a job that you do have.
```

**JA715**

```
 1    Q.   I mean, you can only quit a job that you have, right?

 2    A.   Will you please repeat the question.

 3    Q.   Sure.  You can only quit a job that you have, right?

 4    A.   Yes.

11:49 5    Q.   It doesn't make sense to quit a job that you don't have,

 6    right?

 7    A.   Yes, but I don't remember him saying that I could quit.

 8    Maybe he did.  Again, I was under --

 9    Q.   Sorry.  You don't deny him saying, "If you want to quit,

11:49 10   you can quit"?

11    A.   Again, I don't recall the whole conversation.

12    Q.   Now, consistent with the conversation that you had with

13    Mr. Roberts on December 17, he had told you to follow up as

14    well with Roger Oberkramer, right?

11:49 15   A.   Yes, he told me to work it out with Roger.

16    Q.   And you did not do so, did you?

17    A.   No, and I explained why.

18    Q.   So even though Mike Roberts as the co-owner of the

19    business had told you to go and talk to Roger Oberkramer and

11:49 20   that you were welcome to stay, you decided not to contact Roger

21    Oberkramer again, correct?

22    A.   Correct.  Because when I spoke with Mike, there was

23    already false allegations being thrown around, and I did not

24    want to speak with Roger in regards to those.

11:50 25   Q.   You could have contacted Roger to see about your return to
```

**JA716**

```
       1   the site, right?
       2   A.   Sure.
       3   Q.   And you decided not to do so, right?
       4   A.   Correct.
11:50  5   Q.   Even though you were told you could continue with
       6   Industrial Demolition, you decided that you wanted to go back
       7   and talk to Roger and continue with Industrial Demolition,
       8   isn't that right?
       9   A.   I understood I was fired, and if I wanted to make it
11:50 10   right, I had to talk to Roger.
      11   Q.   Okay.  You understand your perception, without being told
      12   you were fired, your perception is that you were fired, right?
      13   A.   From the previous experience on the worksite, yes.
      14   Q.   And you spoke just a matter of days later with the owner
11:51 15   of the business who confirmed for you that you weren't fired
      16   and that you were welcome to continue and stay with the
      17   business, right?
      18   A.   Correct, yes.
      19   Q.   Thank you.  In fact, you said on your direct testimony
11:51 20   here that you still liked your job, right?
      21   A.   I liked the work.
      22   Q.   If you wanted to keep your job and get back into the job
      23   that you liked, you could have gone back, right?
      24   A.   Again, we're a family of seven.  We have bills to pay, of
11:51 25   course, but I got fired.
```

**JA717**

| | |
|---|---|
| 1 | Q.   Again, your perception was, sir, you had the opportunity, |
| 2 | based upon what Mike Roberts confirmed for you, that you could |
| 3 | go back and continue to support your family by getting back to |
| 4 | work in the job you just said you still liked, right? |
| 11:51  5 | A.   If I could work it out with Roger. |
| 6 | Q.   Now, you do understand that Mike Roberts is of course one |
| 7 | of the two owners with his brother of the business, right? |
| 8 | A.   Yes. |
| 9 | Q.   And fair to say that Mike Roberts has more say in the |
| 11:52  10 | business of Industrial Demolition than Roger Oberkramer, right? |
| 11 | A.   I would assume, yes. |
| 12 | Q.   Now, after you stopped working at Industrial Demolition, |
| 13 | you had left Massachusetts, as you stated, and you went back to |
| 14 | Indiana, right? |
| 11:52  15 | A.   Correct. |
| 16 | Q.   And you lived in Indiana until about April or May of 2020, |
| 17 | right? |
| 18 | A.   Until April. |
| 19 | Q.   Until April 2020? |
| 11:52  20 | A.   Yes, sir. |
| 21 | Q.   And during the months from December to April, December 19 |
| 22 | to April 2020, you did not seek employment at that time, did |
| 23 | you? |
| 24 | A.   No.  It's right when COVID hit. |
| 11:53  25 | Q.   Well, sir, we all lived through COVID, and there wasn't a |

**JA718**

```
         1   shutdown from COVID as you recall in December of '19, was

         2   there?

         3   A.   No.  Again, I was just moving my family back.

         4   Q.   And you did not look for work for the remainder of

11:53    5   December of 2019, did you?

         6   A.   Yes, I did -- no, 2019 was when I left, yeah.

         7   Q.   Yes.  So after you left and went back to Indiana, for the

         8   remainder of December 2019, you did not look for other work,

         9   did you?

11:53   10   A.   For the last week of December, no.

        11   Q.   And January of 2020, you did not look for work, did you?

        12   A.   No, sir.

        13   Q.   February of 2020, you did not look for work, did you?

        14   A.   No, sir.

11:53   15   Q.   March of 2020, you did not look for work, did you?

        16   A.   Again, there was a lot of things happening in the world at

        17   that time.  Finding a job was pretty difficult.

        18   Q.   Okay.  But you didn't even seek --

        19        MR. GOODWIN:  I'm going to object to this line of

11:54   20   questioning.  We're getting into --

        21        THE COURT:  I think it was your co-counsel's witness.

        22        MR. TURIELLO:  I'm sorry.  Objection withdrawn for

        23   now, Your Honor.

        24        THE COURT:  Thank you.

11:54   25   Q.   And Industrial Demolition, after you left, stopped working
```

**JA719**

```
        1              MR. METZGER:  Your Honor, I'll work towards a

        2     conclusion here now.

        3     Q.   Sir, since your active employment at Industrial Demolition

        4     ended, you've not had any physical or mental condition that has

12:18   5     prevented you from working, have you?

        6     A.   No.

        7     Q.   And since you stopped working at Industrial Demolition

        8     back in December of 2019, the only doctor or medical

        9     professional you've seen is a dentist, right?

12:18  10     A.   Yeah.

       11     Q.   And your experience at Industrial Demolition has not

       12     prevented you from actively working at any time since you

       13     stopped working at Industrial Demolition, correct?

       14     A.   No, it hasn't.

12:18  15     Q.   And your experience at Industrial Demolition has not

       16     prevented you from engaging in hobbies or being with your

       17     family or doing anything you'd like in your life, has it?

       18     A.   Please repeat the question.

       19     Q.   Sure.  Your experience at Industrial Demolition has not

12:19  20     prevented you from engaging in any hobbies or being with your

       21     family since you stopped working there, has it?

       22     A.   I don't make as much, so it limits some of the things we

       23     can do.

       24     Q.   We'll let the records reflect what you're making or not

12:19  25     making.  But in terms of your experience at Industrial
```

**JA720**

# EXHIBIT D

3-1

```
 1                        UNITED STATES DISTRICT COURT
                             DISTRICT OF MASSACHUSETTS
 2

 3    ERIC MOORE,                        )
                            Plaintiff,   )
 4                                       )
      vs.                                )  No. 22-CV-10414-RWZ
 5                                       )
      INDUSTRIAL DEMOLITION, LLC,        )
 6                          Defendant.   )

 7

 8

 9

10                        BEFORE THE HONORABLE RYA W. ZOBEL
11                        UNITED STATES DISTRICT COURT JUDGE
                                  JURY TRIAL DAY 3
12

13

14

15              John Joseph Moakley United States Courthouse
                              Courtroom No. 12
16                            One Courthouse Way
                           Boston, Massachusetts 02210
17

18                             April 13, 2023
                                 9:05 a.m.
19

20

21

                      Kathleen Mullen Silva, RPR, CRR
22                         Official Court Reporter
                John Joseph Moakley United States Courthouse
23                    One Courthouse Way, Room 7209
                         Boston -- Massachusetts 02210
24                    E-mail: kathysilva@verizon.net

25              Mechanical Steno - Computer-Aided Transcript
```

**JA722**

```
 1   APPEARANCES:

 2
             Duddy, Goodwin & Pollard
 3           Jamie Goodwin, Esq.
             2 Liberty Square, 10th Floor
 4           Boston, Massachusetts 02109
             508.523.2632
 5           and
             Duddy, Goodwin & Pollard
 6           Michael Turiello, Esq.
             446 Main Street, 16th Floor
 7           Worcester, Massachusetts 01608
             860.999.9394
 8           for Plaintiff

 9           Littler Mendelson P.C.
             Thomas M.L. Metzger, Esq.
10           41 South High Street, Suite 3250
             Columbus, Ohio 43215
11           614.463.4216
             and
12           Littler Mendelson P.C.
             Alexa Marie Esposito, Esq.
13           One International Place, Suite 2700
             Boston, Massachusetts 02110
14           617.378.6000
             for Defendant

15

16

17

18

19

20

21

22

23

24

25
```

**JA723**

3-8

```
 1           MR. METZGER:  I'm going to authenticate it.  My
 2   understanding is there's no objection to the exhibit.
 3           THE COURT:  Okay.  So we can mark it.  Exhibit 36.
 4           (Exhibit No. 36 received into evidence.)
 5   Q.  Ms. Lydon, do you recognize this Exhibit 36?
 6   A.  Yes, I do.
 7   Q.  What is it?
 8   A.  It's a letter that was sent out to the remaining
 9   demolition workers on the Brayton Point site letting them know
09:10 10 when the last day would be for them on that site.
11   Q.  Is this on a particular letterhead?
12   A.  Yes, it is.
13   Q.  Which company?
14   A.  Industrial Demolition.
15   Q.  Who sent this out?
16   A.  I did.
17   Q.  Does it have a signature on the document?
18   A.  Yes, it does.
19   Q.  Whose signature?
09:11 20 A.  Mine.
21           MR. METZGER:  Your Honor, I believe the exhibit is in.
22   Before we display it to the jury, may I do so?
23           THE COURT:  Yes.
24   Q.  Ms. Lydon, who was this document sent out to on the
25   Brayton Point site?
```

**JA724**

```
 1    A.    All the remaining demolition crew.
 2    Q.    Does this letter and your notice to the demolition crew
 3    explain when the work would wrap up for them?
 4    A.    Yes.
 5    Q.    What does it say?
 6    A.    It says that as of Friday, August 14, 2020, the demolition
 7    work at Brayton Point will be complete.
 8    Q.    Is that when the demolition work there actually did end?
 9    A.    The demolition work, yes.
09:11 10    Q.    So at that point, as of August 2020, was there any
11    additional demolition work for those workers to perform?
12    A.    Not for Industrial Demolition, no.
13    Q.    Did Mr. Moore, the plaintiff, ever contact you at any
14    point to discuss an accommodation of work?
15    A.    No.
16    Q.    Did he call you at any point to talk about any
17    accommodation maybe during a week?
18    A.    I'm sorry?
19    Q.    That's fine.  Let me --
09:12 20          MR. METZGER:  We already have admitted number 4.
21          May I bring that up?  Thank you.
22    Q.    This is the first page.
23          MR. METZGER:  And then, Alex, if you may, just for
24    completeness, if you could show the next page.
25    Q.    Ms. Lydon, do you recognize this document?
```

JA725

```
 1            MR. GOODWIN:  Yes.  I'm objecting to it again, Your
 2    Honor, as a collateral source, just as I did before.
 3            THE COURT:  I think it is appropriate to admit it
 4    since we've already been talked about it for some time in this
 5    trial.  So the jury is entitled to see it at the appropriate
 6    time.  So we will mark it as Exhibit 17.
 7            THE CLERK:  So it's in?
 8            THE COURT:  It's in.
 9            MR. METZGER:  Thank you, Your Honor.
09:30 10        (Exhibit No. 17 received into evidence.)
11    Q.   Ms. Lydon, on the first page -- I'm sorry, let me bring
12    that up.  I'm getting ahead of myself.  On the first page of
13    this Exhibit No. 17 --
14            THE COURT:  Is the jury going to be able to see it?
15            MR. METZGER:  Yes.  We have it up now, Your Honor.
16            THE COURT:  Okay.  Thanks.
17    Q.   -- towards the bottom, do you see the section under "Back
18    Pay"?
19    A.   Yes.
09:31 20   Q.   And do you see a back pay amount?
21    A.   Yes, I do.
22    Q.   What is that amount?
23    A.   The total due.
24    Q.   I'm sorry.  Just first under the back pay column.
25    A.   $60,639.
```

**JA726**

```
 1   Q.   And then is there another column for front pay?

 2   A.   Yes, there is.

 3   Q.   And what is that amount?

 4   A.   $23,750.

 5   Q.   And was there also an interest payment?

 6   A.   Yes, there was.

 7   Q.   What is that amount?

 8   A.   $1,166.

 9   Q.   And the total amount then that was calculated there is

10   what?

11   A.   $85,555.

12   Q.   And did Industrial Demolition then make those payments to

13   Mr. Moore?

14   A.   Yes, we did.

15   Q.   And is that what is reflected in Exhibit No. 19 that has

16   been admitted?

17   A.   Yes, it is.

18   Q.   Thank you.

19        MR. METZGER:  Your Honor, I have no further questions.

20        THE COURT:  Any redirect, I think?

21        MR. GOODWIN:  Cross-examination, Your Honor.

22        THE COURT:  Cross.  About how long will you be?

23        MR. GOODWIN:  I'm not sure, Your Honor, to be honest.

24   I don't think it will be too long.

25        THE COURT:  Hours or days?
```

**JA727**

# EXHIBIT E

4-1

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3   ERIC MOORE,                        )
                        Plaintiff,      )
 4                                      )
     vs.                                )  No. 22-CV-10414-RWZ
 5                                      )
     INDUSTRIAL DEMOLITION, LLC,        )
 6                        Defendant.    )

 7

 8

 9

10
                     BEFORE THE HONORABLE RYA W. ZOBEL
11                 UNITED STATES DISTRICT COURT JUDGE
                           JURY TRIAL DAY 4
12

13

14

15         John Joseph Moakley United States Courthouse
                         Courtroom No. 12
16                       One Courthouse Way
                     Boston, Massachusetts 02210
17

18                       April 14, 2023
                           8:39 a.m.
19

20

21

22           Kathleen Mullen Silva, RPR, CRR
                     Official Court Reporter
23         John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 7209
24               Boston -- Massachusetts 02210
                 E-mail: kathysilva@verizon.net
25
             Mechanical Steno - Computer-Aided Transcript
```

**JA729**

```
 1   APPEARANCES:

 2

 3           Duddy, Goodwin & Pollard
             Jamie Goodwin, Esq.
 4           2 Liberty Square, 10th Floor
             Boston, Massachusetts 02109
 5           508.523.2632
             and
 6           Duddy, Goodwin & Pollard
             Michael Turiello, Esq.
 7           446 Main Street, 16th Floor
             Worcester, Massachusetts 01608
 8           860.999.9394
             for Plaintiff

 9           Littler Mendelson P.C.
             Thomas M.L. Metzger, Esq.
10           41 South High Street, Suite 3250
             Columbus, Ohio 43215
11           614.463.4216
             and
12           Littler Mendelson P.C.
             Alexa Marie Esposito, Esq.
13           One International Place, Suite 2700
             Boston, Massachusetts 02110
14           617.378.6000
             for Defendant

15

16

17                           INDEX

18

19
     Closing Argument By Mr. Metzger              42
20   Closing Argument By Mr. Turiello             59
     Jury Charge                                  67
21

22

23

24

25
```

**JA730**

```
09:20  1    jurors who will be deliberating on the verdict.

09:20  2           And I wonder whether we should not use all ten jurors

09:20  3    we have.  We have ten, don't we?

09:20  4           MR. GOODWIN:  I think we use all ten.

09:20  5           THE COURT:  Ten?

09:20  6           LAW CLERK:  Yeah.

09:20  7           THE COURT:  Does everybody agree all ten of them can

09:20  8    deliberate?

09:20  9           MR. GOODWIN:  Yes, Your Honor.

09:20 10           MR. METZGER:  Yes.

09:20 11           THE COURT:  Okay.  That's good.  I will tell them that

09:20 12    their verdict will be the answer to each of the questions that

09:20 13    we'll give to them on paper, and that if they have any

09:20 14    questions about anything that I said, they should just write it

09:20 15    out -- the foreperson should write it out.  They need to elect

09:20 16    their foreperson as their first action as jurors and that the

09:20 17    marshal, somebody will be outside the jury room protecting

09:20 18    them.  And that person should -- the foreperson should write

09:20 19    out any questions and it will come to us and I will answer

09:21 20    either in writing or assembling everybody in the courtroom and

09:21 21    explain it.

09:21 22           And I think that we should send lunch to them

09:21 23    somewhere around 12:30 or so.  They need to have enough time to

09:21 24    do some work and hopefully -- sometimes they -- they

09:21 25    necessarily will have to -- they will wait long enough to have
```

09:21 1    free lunch for sure.  So the question is when do we give them

09:21 2    lunch.  So somewhere between 12:00 and 1:00 is probably

09:21 3    reasonable.

09:21 4         MR. GOODWIN:  Your Honor, if I may.  So is it fair to

09:21 5    say that our other -- both of our -- the instructions we both

09:21 6    submitted to you, you've reviewed and you're not including

09:21 7    going forward?

09:21 8         THE COURT:  You do not agree on what?

09:21 9         MR. GOODWIN:  So Attorney Metzger and I -- the parties

09:21 10   both submitted their own jury instructions.  We're assuming the

09:21 11   court has reviewed them and what you're -- I don't want to get

09:22 12   bogged down is what I'm trying to do here.  I'm trying to say

09:22 13   we both submitted instructions.  We'll object to the extent

09:22 14   that they're not included in whatever instructions we did to

09:22 15   preserve it for any appellate issues.

09:22 16        But I do have one additional instruction I'd like to

09:22 17   suggest, if possible, that hasn't been proposed yet.

09:22 18        THE COURT:  What's that?

09:22 19        MR. GOODWIN:  I would like a missing witness

09:22 20   instruction about Roger Oberkramer.

09:22 21        THE COURT:  About what?

09:22 22        MR. GOODWIN:  A missing witness instruction for

09:22 23   failure to call Roger Oberkramer.

09:22 24        MR. METZGER:  He was never deposed.  He was never

09:22 25   served with a subpoena.

```
11:12  1          So if you have any questions, just let the -- there
11:12  2   will be someone outside of the courtroom to protect your
11:12  3   privacy.  Let that person know you have a question and we'll
11:12  4   get it and in short order we will try to respond to it.
11:12  5          I have asked the cafeteria to send lunch to you about
11:12  6   12:30, but in the meantime when you go upstairs, you will have
11:12  7   your mid-morning relief as well.  And I hope that you will be
11:12  8   able to reach a verdict in relatively short order, but after
11:12  9   all the meals.
11:12 10          Let me stop for a moment and talk to counsel and then
11:12 11   I probably will come back to you with some additional --
11:12 12   additions or otherwise.
11:12 13          MR. GOODWIN:  Your Honor, I'm just preserving my --
11:12 14          THE COURT:  I'll see you at sidebar.
      15   SIDEBAR CONFERENCE AS FOLLOWS:
11:12 16          THE COURT:  Does the plaintiff have some --
11:12 17          MR. GOODWIN:  I'm just preserving my -- post
11:12 18   instructions, preserving my objections to punitive damages,
11:12 19   missing witness, temporary disability, GLC 152:75B(1), and
11:12 20   except for punitive damages, that's all.
11:12 21          THE COURT:  Do you have an interest in any of those?
11:12 22          MR. METZGER:  I believe we already addressed those,
11:12 23   Your Honor.
11:12 24          MR. GOODWIN:  It's just for the record.
11:12 25          THE COURT:  Do you have any suggestions?
```

**JA733**

4-89

| | | |
|---|---|---|
| 11:13 | 1 | reach a verdict as to and answer all the questions that I've |
| 11:13 | 2 | put to you; and before you start the work on that, please elect |
| 11:14 | 3 | a foreperson from among you, and if you have any problems or |
| 11:14 | 4 | any questions, please let the person who is securing you know |
| 11:14 | 5 | that you have such and we will try to answer any questions that |
| 11:14 | 6 | you have.  I would guess that if you do not have the |
| 11:14 | 7 | mid-morning -- |
| 11:14 | 8 | CLERK:  Snack.  They probably do by now. |
| 11:14 | 9 | THE COURT:  Yeah, they're probably giving them to you |
| 11:14 | 10 | now.  While they're there, if they're laying it out, please |
| 11:14 | 11 | talk about something else.  When the food providers leave, go |
| 11:14 | 12 | back to the case.  And if any of you have a question, please |
| 11:14 | 13 | let the person know and we will reassemble here, and if I can |
| 11:14 | 14 | answer the question in writing, I will do that. |
| 11:14 | 15 | Otherwise, we'll come back into the courtroom.  Thank |
| 11:14 | 16 | you very much. |
| 11:14 | 17 | THE CLERK:  All rise, please. |
| 11:15 | 18 | THE COURT:  Court is in recess until we hear from the |
| 11:15 | 19 | jury. |
| | 20 | (Jury deliberating.) |
| 01:05 | 21 | (Plaintiff's counsel, clerk and court reporter present.) |
| 01:05 | 22 | THE CLERK:  The question from the jury is:  Can you |
| 01:05 | 23 | provide the definition of handicap? |
| | 24 | I'm just going to read this in.  This is the answer |
| 01:05 | 25 | the judge gave. |

**JA734**

```
01:05  1          In this case, handicapped under the law means an
01:05  2   actual physical impairment which substantially limits one or
01:05  3   more major life activities.  Major life activities include, but
01:05  4   are not limited to, caring for oneself, performing manual
01:06  5   tasks, walking, seeing, hearing, speaking, breathing, learning
01:06  6   and working.  An actual physical impairment substantially
01:06  7   limits an individual's ability to work if it prevents or
01:06  8   significantly restricts the individual from performing a class
01:06  9   of jobs or broad range of jobs in various classes.
01:06 10          And then you can put on the record --
01:06 11          MR. GOODWIN:  And the plaintiff is comfortable with
01:06 12   that definition.  The plaintiff would also renew to the court
01:06 13   that it reinstruct the jury about -- with all of its
01:06 14   instructions and would note its previous objections as to
01:06 15   instructions, including definition -- let me get my notes -- my
01:07 16   previous objections as to instructions regarding the missing
01:07 17   witness instruction, 152:75B(1), temporary handicap, punitive
01:07 18   damages, missing witness instruction, which I think I said, and
01:07 19   that's it.  And anything else I mentioned before.
      20          Thank you.
01:08 21   (Defense counsel entered the courtroom.)
01:08 22          MR. METZGER:  What's the question?
01:08 23          THE CLERK:  I put it right here.
01:08 24          (Discussion held off the record.)
01:09 25          MR. METZGER:  The judge, during her reading to the
```

**JA735**

01:09  1    jury, had also included the discussion specifically about

01:09  2    duration and severity.  It was a specific point on the either

01:09  3    permanent nature or the long-term nature, and that's a critical

01:09  4    piece of her instruction.  It's already in her instruction, and

01:09  5    we believe that absolutely needs to be included.

01:09  6          THE CLERK:  Okay.  I'm just going to give her a little

      7    heads up.

01:29  8    (A recess was taken.)

01:29  9          THE CLERK:  Your objection is noted.  She said your

01:29 10    objection is noted, to put it on the record.  Okay?  So it's

01:29 11    noted.

01:29 12          MR. METZGER:  Can I see what was sent back?

01:29 13          THE CLERK:  Uh-huh.  Let me just make a copy so I can

01:29 14    bring it up to them.

01:30 15          (Discussion held off the record.)

01:30 16          MR. METZGER:  I'm going to read something in now.  Can

01:30 17    I proceed now, Lisa?  I didn't know if you have me to wait for

01:30 18    anybody.

01:30 19          THE CLERK:  Oh, no.  You can just -- Nope.

01:30 20          MR. METZGER:  Thank you, Kathy.

01:30 21          So this is Tom Metzger, attorney for the defendant,

01:30 22    Industrial Demolition, and we had received a call during the

01:30 23    lunch break understanding that the jury had a question.  We

01:30 24    stood up from where we were immediately right across the

01:30 25    street.  We came through security.  There was a slight delay

01:30  1    getting up the elevator due to the number of individuals in the

01:30  2    courthouse, but we came over immediately.

01:30  3            I understand that the question presented from the jury

01:30  4    of Can you provide the definition of handicap was then read to

01:31  5    plaintiff's counsel without us being present and that a

01:31  6    response to that was prepared.

01:31  7            After we got here, a matter of minutes after we

01:31  8    received the phone call, we've not had an opportunity to

01:31  9    present any objections directly to the judge.  And what I

01:31 10    raised immediately, upon seeing the proposed definition to the

01:31 11    jury in response to their question of Can you provide the

01:31 12    definition of handicap, was that a piece that the judge had

01:31 13    read to the jury is not being provided to them in response.

01:31 14    Specifically I had asked, consistent with the definition of

01:31 15    what "substantially limits" means, that the following language

01:32 16    be included in what is provided to the jury.  It has not been

01:32 17    provided to the jury and I've not had an opportunity to address

01:32 18    our objection with the judge.

01:32 19            What we requested on behalf of the defendant to be

01:32 20    submitted is the following:  An impairment substantially limits

01:32 21    an individual's ability to work only if it prevents or

01:32 22    significantly restricts the individual from performing a class

01:32 23    of jobs or a broad range of jobs in various classes.  And the

01:32 24    determination of whether an individual is substantially limited

01:32 25    in a major life activity depends on the nature and severity of

**JA737**

| | | |
|--|--|--|
| 01:32 | 1 | the impairment, the duration or expected duration of the |
| 01:32 | 2 | impairment, the permanent or long-term impact or the expected |
| 01:32 | 3 | permanent or long-term impact of or resulting from the |
| 01:32 | 4 | impairment.  To be substantially limiting, the impairment's |
| 01:32 | 5 | impact must be permanent or long term. |
| 01:32 | 6 | And just for the record, there are cases consistent |
| 01:33 | 7 | with that instruction that we had requested, including first |
| 01:33 | 8 | the *Marenco v. Broad Institution, Inc.*, 2022 Westlaw 2236354; |
| 01:33 | 9 | also *O'Brien v. MIT*, 82 Mass. App. 905; and also, just by way |
| 01:33 | 10 | of example, *Salomon* -- S-a-l-o-m-o-n -- *v. Massachusetts* |
| 01:33 | 11 | *Housing Fin. Agency*, 2023 Westlaw 2588334. |
| 01:33 | 12 | So we immediately noted an objection to the |
| 01:33 | 13 | instruction.  We did not have an opportunity to be heard by the |
| 01:34 | 14 | court.  Instead we were presented with the proposed language by |
| 01:34 | 15 | Lisa Urso with the court.  I noted my objection to Lisa Urso. |
| 01:34 | 16 | And I was just told that our objection is noted, but I've had |
| 01:34 | 17 | no opportunity to present our argument regarding a full, fair |
| 01:34 | 18 | and accurate definition for the jury to consider in response to |
| 01:34 | 19 | their question.  Thank you. |
| 01:34 | 20 | MR. GOODWIN:  And if I may make a brief remark. |
| 01:34 | 21 | The plaintiff had no involvement in drafting the |
| 01:34 | 22 | relevant answer to the question.  That was entirely done by the |
| 01:34 | 23 | court.  We were provided it as we walked into the room, because |
| 01:34 | 24 | we were in the hallway, to see if we had comment.  I responded |
| 01:34 | 25 | on the record. |

**JA738**

01:34  1          I would note that the defendant has waived its right

01:35  2     to address any of the instructions because it did not address

01:35  3     it, preserve it upon the initial instruction of the jury.  I

01:35  4     would say that their definition of handicap is not accurate and

01:35  5     that temporary handicaps are, in fact, handicaps under 151B and

01:35  6     that we did not object to the presentation of this to the jury

01:35  7     and, again, we made requests to the court to instruct the jury

01:35  8     on all instructions again alongside this answer, and, again,

01:35  9     noted our objections to the instruction on punitive damages,

01:35 10     not including our definition of temporary handicap, a missing

01:35 11     witness instruction, and GLC 152, Section 75B(1).

01:36 12          And I think that's it.  Thank you.

01:36 13          MR. METZGER:  And I do -- I apologize -- I'll just

01:36 14     direct this directly to counsel.  If I understand correctly,

01:36 15     when the court came back with the question and the proposed

01:36 16     response is when you just said what you said on the record in

01:36 17     response to all of this?

01:36 18          MR. GOODWIN:  Yeah.  I didn't say anything in response

01:36 19     to the point about waiver, but I did renew my objections and

01:36 20     the court responded to the effect of defense counsel, fairly or

01:36 21     unfairly, should have been more responsive.

01:36 22          MR. METZGER:  So I want to note a further objection.

01:36 23     I was unaware that there were then substantive discussions on

01:36 24     the record without us present.  We were directly across the

01:36 25     street.  We received the call, immediately stood up and got

| | | |
|---|---|---|
| 01:36 | 1 | through security and came up the elevator. |
| 01:36 | 2 | MR. GOODWIN:  There were no substantive discussions. |
| 01:36 | 3 | MR. METZGER:  It's my understanding, based upon what |
| 01:37 | 4 | was just discussed, that there were discussions about |
| 01:37 | 5 | objections and further discussion without counsel for the |
| 01:37 | 6 | defendant present.  And I just want to note our further |
| 01:37 | 7 | objection to that, particularly given the absolutely critical |
| 01:37 | 8 | and central question that the jury raised regarding, Can you |
| 01:37 | 9 | provide the definition of handicap.  We were literally minutes |
| 01:37 | 10 | away, right across the street, and came here immediately, and |
| 01:37 | 11 | there was no indication that there would be then any discussion |
| 01:37 | 12 | with the court without both sides present.  It's my |
| 01:37 | 13 | understanding that there was, and we want to note a further |
| 01:37 | 14 | objection to that taking place. |
| 01:37 | 15 | So to review very quickly, we not only have an |
| 01:37 | 16 | objection to the answer to the jury's question which was |
| 01:37 | 17 | submitted, we also have an objection to the manner in which |
| 01:37 | 18 | that process was handled, particularly the discussion on the |
| 01:37 | 19 | record or off the record without us being present. |
| 01:38 | 20 | MR. GOODWIN:  It was -- in terms of the discussion, to |
| 01:38 | 21 | clarify, I was handed the piece of paper and asked to make any |
| 01:38 | 22 | comments I had on the record and I made a comment.  The judge |
| 01:38 | 23 | was not present. |
| 01:38 | 24 | Thank you. |
| 01:38 | 25 | MR. METZGER:  Based upon that, we certainly continue |

```
01:38  1   our objection that that occurred.

01:38  2          Thank you.

01:50  3   (A recess was taken.)

01:50  4   (Court entered.)

01:50  5          THE COURT:  Please be seated.

01:50  6          Lisa, do we have the question that the jury sent?

01:50  7          THE CLERK:  Well, I sent it up to them but this is a

01:50  8   copy of it and I want to give a copy for counsel.

01:50  9          THE COURT:  I understand the defendant is objecting to

01:50 10   the suggested answer.

01:50 11          MR. METZGER:  Yes, Your Honor.  We are objecting to

01:50 12   the suggested --

01:50 13          THE COURT:  Can you speak up, please.

01:50 14          MR. METZGER:  Yes, Your Honor.

01:50 15          We are objecting to the suggested answer.  We're also

01:50 16   objecting to the process that took place right before I

01:50 17   understood the suggested --

01:50 18          THE COURT:  Which part of the answer are you objecting

01:50 19   to?

01:50 20          MR. METZGER:  May I approach, Your Honor?  I have a

01:50 21   copy of exactly what I'd like to propose.

01:50 22          For the record, and everyone's benefit, I've flagged

01:51 23   with a red flag the section I'm going to be speaking of.

01:51 24          THE CLERK:  Do you need a copy of that?

01:51 25          LAW CLERK:  No, we have it.
```

**JA741**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ERIC MOORE,** | |
| Plaintiff, | |
| v. | Civil Action No. 1:22-cv-10414-RWZ |
| **INDUSTRIAL DEMOLITION LLC,** | |
| Defendant. | |

## DEFENDANT'S NOTICE OF APPEAL

Notice is hereby given that Defendant, Industrial Demolition LLC, hereby appeals to the United States Court of Appeals for the First Circuit from the (1) July 25, 2023 Order denying Industrial Demolition LLC's Motion for Judgment as a Matter of Law or, in the Alternative for a New Trial or, in the Alternative for a Remittitur [Docket No. 92], and from the (2) the Final Judgment and Order entered in this action on April 18, 2023 [Docket No. 65].

**JA742**

By Its Attorneys,

INDUSTRIAL DEMOLITION LLC


*/s/ Alexa M. Esposito*
Alexa M. Esposito, Bar No. 698378
aesposito@littler.com
Thomas M. L. Metzger, Ohio Bar No. 0059694
tmetzger@littler.com

LITTLER MENDELSON, P.C.
One International Place
Suite 2700
Boston, MA  02110
Telephone:   617.378.6000
Facsimile:   617.737.0052

Dated: August 21, 2023

**CERTIFICATE OF SERVICE**

I, Alexa M. Esposito, hereby certify that on this 21st day of August 2023, the foregoing document was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.


*/s/ Alexa M. Esposito*
Alexa M. Esposito

- 2 -

**JA743**

UNITED STATES OF AMERICA
DISTRICT COURT OF MASSACHUSETTS

_____

Eric Moore,

       Plaintiff

       v.                                                    CA No. 1:22-cv-10414-RWZ

Industrial Demolition, LLC

       Defendant

_____

## PLAINTIFF'S NOTICE OF APPEAL

Notice is hereby given that the Plaintiff, Eric Moore, hereby appeals to the United States

Court of Appeals for the First Circuit the Trial Court's denial of [#74] Motion for a New Trial on

Punitive Damages and [#75] Motion to Amend Judgement (thereby modifying  [#65] Judgment

for the Plaintiff.)

                               By his Attorney,
                               Eric Moore

                               /s/Jamie Goodwin
                               Jamie Goodwin
                               Duddy Goodwin & Pollard
                               446 Main Street, 16$^{th}$ Floor
Date: 08/22/2023                  Worcester, MA 01608

## CERTIFICATE OF SERVICE

I, Jamie Goodwin, hereby certify that on this 22$^{nd}$ day of August of 2023, this document was filed
electronically through the ECF system and thereby served on counsel of record.

                               /s/Jamie Goodwin

**JA744**

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas M. L. Metzger, hereby certify that, on this 15th day of November, 2023, I electronically filed the foregoing *Joint Appendix* with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following counsel of record for Plaintiff-Appellee/Cross-Appellant are registered as ECF Filers and that they will be served by the CM/ECF system, and any non-registered participants will be served via electronic mail:

Jamie Goodwin, Esq.
Michael Turiello, Esq.
DUDDY GOODWIN & POLLARD
446 Main Street
Worcester, MA 01608
jg@dgpfirm.com
mt@dgpfirm.com

Samuel A. Kennedy-Smith, Esq.
DUDDY GOODWIN & POLLARD
39 Russ Street
Hartford, CT 06106
sks@dgpfirm.com


*/s/ Thomas M. L. Metzger*
An Attorney for Defendant-Appellant/
Cross-Appellee